# Exhibit 13

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID ALAN COLE & )
KIMBERLY COLE )
- vs - ) No. 1:23-CV-00327-JDL
)
SIG SAUER, INC. )

Videotaped Video Teleconference Deposition of WILLIAM VIGILANTE, Ph.D, held on June 20, 2025, at 10:07 a.m., before Dolores M. Horne, Professional Reporter and Notary Public, in and for the Commonwealth of Pennsylvania.

ESQUIRE DEPOSITION SOLUTIONS
1835 Market Street, Suite 555
Philadelphia, Pennsylvania 19103
215-988-9191

Page 2

APPEARANCES:

SALTZ MONGELUZZI & BENDESKY
BY: SAMUEL A. HAAZ, ESQUIRE
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
shaaz@smbb.com
Attorneys for the Plaintiffs

LITTLETON JOYCE UGHETTA & KELLY
BY: KRISTEN E. DENNISON, ESQUIRE
BRETT LELAND, ESQUIRE
2460 North Courtenay Parkway
Suite 204
Merritt Island, Florida 32953
kristen.dennison@littletonjoyce.com
Attorneys for the Defendant

ALSO PRESENT:
ERIC FINKELMAN, ESQUIRE
DEREK WATKINS

Page 3

I N D E X


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| WILLIAM VIGILANTE, Ph.D. | | |
| | By: Ms. Dennison | 6 |
| | By: Mr. Haaz | 123 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Photograph | 126 |


Page 4

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer
Page Line Page Line Page Line

Request for Production of Documents
Page Line Page Line Page Line

Stipulations
Page Line Page Line Page Line

Question Marked
Page Line Page Line Page Line

Page 5

THE VIDEO TECHNICIAN: We are now on the record. The time is 10:07 a.m. Eastern time on June 20, 2025. This begins the video conference deposition of Dr. William Vigilante taken in the matter of David Alan Cole and Kimberly Cole versus Sig Sauer, Inc. The case number is 1:23-CV-00327-JDL and is filed in the United States District Court for the District of Maine. My name is George Ellis. I'm your remote videographer. Our court reporter is Dolores Horne, and we are representing Esquire Deposition Solutions.

Counsel, if you don't mind, please state your name and who you represent after which the court reporter will swear in the witness.

MS. DENNISON: Good morning. Kristen Dennison from Littleton Joyce Ughetta & Kelly. I represent the defendant, Sig Sauer, Inc. Also on the line is Brett Leland, who also represents Sig Sauer, Inc. For the record, we have Eric Finkelman from Sig Sauer, Inc. and Derek Watkins, Sig Sauer's retained expert, also listening in.

Page 6

MR. HAAZ: This is Sam Haaz from Saltz Mongeluzzi Bendesky representing the plaintiffs.

WILLIAM VIGILANTE, Ph.D., after having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

* * *

BY MS. DENNISON:

Q. Okay. Good morning, Dr. Vigilante. This is your continued deposition. We are under some time limitations here this morning. Frankly, I don't even think I'm going to need the full time that we've set aside. So I'll be as quick as possible as I can with you here this morning. Thank you for appearing.

Dr. Vigilante, can we agree that the introduction of a bladed or tabbed trigger can introduce a finger placement hazard depending on the design of the blade?

MR. HAAZ: Object to form.

THE WITNESS: Yeah, I'm going to need a little bit more information.

Page 7

BY MS. DENNISON:

Q. Okay. You did some work in this matter where you demonstrated that if you placed your finger in certain areas of the trigger, the trigger could not be pressed rearward if it did not engage a tab or a blade within the trigger; is that correct?

A. I'm sorry. Which testing are you referring to?

Q. In this case you did testing with a Glock where you placed your finger on the side of a blade avoiding the -- the tab or the blade in the middle of the trigger to show that the trigger could not be pulled rearward if the blade was not engaged, correct?

MR. HAAZ: Object to form.

THE WITNESS: Yeah, I don't recall doing that offhand. I did some testing with the Glock involving a nylon rope, a key and a -- other device. I don't recall doing a finger test with the Glock.

BY MS. DENNISON:

Q. Okay. Let's ask this then. Have you personally done any tests with a Glock or another

Page 8

pistol that has a tabbed trigger to demonstrate that if you do not engage the tab you cannot pull the trigger rearward?

A. In the Cole matter?

Q. Well, in any matter.

A. Yes, I have in any matter.

Q. Okay. What testing have you done to demonstrate that if you do not contact the blade on a trigger you will not be able to pull the trigger rearward?

A. Yeah, offhand I -- I don't recall. So I'd have to go back in my file and look at testing I did for other cases and see if I included that.

Q. So, let me ask you this. Are you relying in this case on testing that you have done in other cases involving a P320 pistol?

A. So, I was planning on relying on testing I did for Cole matter in this matter.

Q. Okay. So, when we go to trial because part of the deposition is to understand what you're going to rely on at trial, are you going to rely on any work that you have done, any testing that you have done in other matters involving the

P320 or are you limiting your reliance on testing to work done specifically for the Cole matter?
MR. HAAZ: Object to form.
THE WITNESS: Yes. I think that's a -- not a fair question. Of course I can't forget testing I had done with other Sigs for other cases when I go to trial. But any demonstrative that I was planning on providing or any specific testing I was planning on talking about was going to be the ones I did for the Cole matter and produced for the Cole matter.
BY MS. DENNISON:
Q. Okay. In the Cole matter you produced videos of -- strike that.
In the Cole matter, in your file in the Cole matter you have videos of work done by James Tertin where he demonstrated finger placement on a Glock trigger to demonstrate the areas on a Glock trigger that you can contact without depressing the blade in the middle of the trigger that will prevent the trigger from moving rearward; is that correct?
A. I don't recall. If you want to point me to a particular folder in my file, I'm happy to



look.
Q. Okay. Let's step back a second. It's been a little bit since I took your initial deposition. Have you done any work to prepare for your deposition here today?
A. Sure.
Q. What did you do to prepare for today's deposition?
A. So, I looked at my report. Well, let's back up a little bit. In the immediate past I reviewed my reports. I reviewed -- reviewed some of the files that were produced by Sig Sauer involving unintentional discharges, their failure mode and effect analysis. I spoke to Sam Haaz. I also -- I looked at some of the testing I did for Cole just to refresh myself. So that was in -- within the last day or two.
Q. Okay.
A. A little bit further back, I think that I also had the opportunity to look at the tabbed trigger that Sig Sauer produced for the Canadian contract, if I'm not mistaken. And I had the opportunity to look at some of the testing done by -- so-called testing done by your experts. I



had the opportunity to do some additional testing with that Canadian tabbed trigger. Also, I had an opportunity to do some testing with an Agency Arms tabbed trigger for the Sig P320. And I produced all of those videos to -- to you guys here within the last week or two, I believe.
I also drafted a supplemental report regarding failure to warn. That was produced within the last week or so. So, I think that's kind of, I want to say in -- well, I guess it was all done in preparation knowing that I was going to be deposed again for whatever reason. And, so, that would be included in that preparation. But they didn't -- it wasn't for the immediate preparation for the deposition.
Q. Okay. So, in last day or two you've met with Mr. Haaz, correct?
A. I didn't meet with him. We had teleconference. So I didn't -- didn't have a meeting in person.
Q. Okay. And -- and by met, I was not defining that to be in person. So, you had a telephone conversation with Mr. Haaz in the last couple of days; is that correct?



A. Yesterday and this morning.
Q. How long did you meet with Mr. Haaz yesterday?
A. I'm going to say maybe ten, 15 minutes. Our teleconference got interrupted by some storms that were coming through the area. So we picked -- picked the conversation up this morning.
Q. And how long did you meet with Mr. Haaz this morning?
A. So, again, we didn't meet, but we did have a teleconference. And it was approximately another maybe ten, 15 minutes.
Q. And then -- then in the last day or two you reviewed some materials that were produced by Sig; is that what you indicated?
A. Yes.
Q. And that included the FMECA document?
A. Yes.
Q. And what other documents from Sig did you review the last day or two?
A. Some of the unintended discharge inspection reports done by Al LaRochelle. And I apologize to Al if I'm mispronouncing his last

name. So, I looked at those documents as well -- as well as I -- I refreshed myself on the 2025 manual that Sig Sauer updated and the -- the warning that Sig Sauer posted on their website in 2023 regarding light bearing holsters.
Q. Did you review any of the file materials that you previously produced prior to your first deposition?
A. So, I did re-review my report. And I think that I had the manual -- I'm fairly certain that I had the manual and the website warning in my file for the first deposition. I did review, I think it was the Watkins' report. So I had that, I believe, in my file for the first deposition. I had the Al LaRochelle unintended discharges for the first deposition. I had the failure effects mode analysis for the first deposition. I don't think -- so I don't think -- I don't think there was anything new that I reviewed in the last day or so that I didn't have for my first deposition.
Q. Did you review any of the testing materials or testing videos that you performed in connection with this matter in the last day or


two?
A. I did.
Q. You did?
A. Yes.
Q. Which ones?
A. So, I don't know if you have my folder there. It might it be easier to follow along that way. But there's a folder titled David Cole and then there is some subfolders called VF jacket inspection 3-9 12-2025. So I reviewed those photographs and -- from that inspection. And then there was the VF jacket inspection, 6-11-2025 and there's three subfolders in there. I re-reviewed those videos and folders. And there's a folder tiled VF jacket photos, 4-13-2025. I re-reviewed those. And there's the VF Sig trigger unbox and install, 6-11-2025. I re-reviewed those videos. And then the VF Sig trigger unboxed inspection, 6-13. I re-reviewed those videos. And then if you go back up one level in the folder structure, there's another subfolder titled VF videos and photos. And there is a subfolder titled 1-23-2025, and I re-reviewed those photos and videos. And then one -- I'm sorry?


Q. This was all in the last day or two what you're going over, right?
A. Yes.
Q. We'll -- we'll go back --
A. And then -- and then there's another folder -- folder titled 1-22-2025, and I re-reviewed those photos.
Q. Okay. If I could just stop you for one second because I do -- I do agree with you that it might be a little bit easier if we do this when I have the file materials on the screen. So, understanding you have not completed all the stuff that you re-reviewed from your folders, we'll get back to that in -- in just a moment when I can put that up on the screen.
So, let me just go back a second. You are familiar with videos that James Tertin has done that demonstrate locations on a Glock pistol where you can contact the trigger and it will not pull rearward because you do not engage the blade of the trigger, correct?
A. So, I didn't re-review James Tertin's videos for my deposition preparation today. I don't recall all the videos I had from him. But


the ones that stand out are kind of the ones that he sent initially where he -- he kind of milled out the side of the slide and showed that the Sig P320 striker was fully tensioned and the trigger was just releasing the striker. I can't remember, and I think he did that with a Glock, too, but I can't remember him doing any testing showing whether or not the trigger on a Glock can or cannot be depressed in different areas.
Q. Part of your opinion is that there are areas on a Glock trigger that can be contacted but will not result in the trigger being pulled rearward, correct?
A. Sure.
Q. And would you agree that if a person contacts those portions of the trigger to pull the trigger rearward and does not contact and depress the blade or the tab in the front of the trigger the gun will not discharge?
A. Yeah, I agree that if you purposely attempt to engage the Glock trigger without engaging the tab it will not discharge.
Q. And regardless of purpose, will you agree that if somebody contacts the portion of the

trigger that has a blade and does not depress the blade, whether that's intentional or accidental, the gun will not discharge?
A. So, the way the Glock is designed is that the tabbed trigger has to be -- the tabbed trigger safety has to be engaged for the trigger to be actuated.
Q. And would you agree --
MR. HAAZ: Kristen, can you hear me?
MS. DENNISON: Yes.
MR. HAAZ: Okay. Can we go off the record briefly before you ask the question --
MS. DENNISON: We sure can.
MR. HAAZ: I'll pause your time --
MS. DENNISON: Yes. Off the record.
THE VIDEO TECHNICIAN: Off the record. The time is 10:24.
(Discussion off the record.)
THE VIDEO TECHNICIAN: We're back on the record. The time is 10:28.
MS. DENNISON: Did you need to



place something on the record, Sam?
MR. HAAZ: Yeah, yeah, I do. Thank you. We didn't have notice that Derek Watkins or any of the other attorneys for Sig were going to be on this Zoom. You know, with respect to Derek Watkins, I didn't have notice that he was on the prior deposition of Bill Vigilante. And because we're doing these depositions remotely, I did not see him at the top of my screen and Sig Sauer never announced that he was even on that deposition.
While we will allow the deposition to go forward with Derek Watkins on this deposition, we object to it and we do not waive objections for any deposition going forward and demand that Sig Sauer at the very least provide notice of its intention to have any of its experts present during any deposition so we can raise that with the court if need be.
MS. DENNISON: Okay. We -- we will take that under consideration. I don't believe that we are required to provide advanced notice of who is going to be on the depositions. And as I indicated, there is no restriction on



having experts attend the deposition, but we will take that under advisement and can deal with that moving forward.
MR. HAAZ: All right. We'll start the time back up.
MS. DENNISON: Okay. So, ready to go?
MR. HAAZ: Yes.
BY MS. DENNISON:
Q. All right. So, Dr. Vigilante, when you demonstrate the functionality of a trigger safety where you can place an object or a finger on a trigger to engage the blade and pull the trigger and where you can contact the trigger, which will not engage the blade and pull the trigger, you were demonstrating areas of the trigger that can be contacted and not pull the trigger, correct?
A. So, Kristen, I missed the first part of that question.
Q. No problem. And it probably wasn't that clear so, I'll -- I'll rephrase it.
When you were demonstrating the portions of the trigger that have a blade or a tab on it, and you were demonstrating the areas on the



trigger that can be contacted and not engage the blade and not pull the trigger, you were necessarily demonstrating areas of the trigger that a person can contact that would not result in the trigger being pulled and the gun discharge, correct?
MR. HAAZ: Object to form. You can answer.
THE WITNESS: So, for example, at the last two trials I had the opportunity to demonstrate to the jury that the Sig P320 trigger can be engaged with pressure from the sides, along the sides, top, bottom, middle, along the tip and along the top. And then I had the opportunity to demonstrate that on a similar type of firearm that included a tabbed trigger, that the only way the trigger -- trigger could be actuated is by first engaging the tab. And typically that would require a flush and center trigger pull -- sorry -- flush across the face of the trigger.
Q. Is the design of the blade or tab on a trigger critical to the effectiveness of preventing foreign objects from actuating the trigger?

Page 21

MR. HAAZ: Object to the form.
THE WITNESS: It depends.
BY MS. DENNISON:
Q. What does it depend on?
A. So, if the entire front of the tab -- or entire front of the trigger is the tab or houses the tab, that's going to increase the potential for a foreign object to be able to access the tab and engage it. If the tab is narrower, it's going to reduce that risk.
Q. Is there any sort of pass/fail criteria for properly designing a blade or tabbed trigger to prevent foreign objects from actuating the trigger?
MR. HAAZ: Objection to form.
THE WITNESS: Yeah, I don't think I've seen a pass/fail criteria or formula. I think it takes reasonable efforts in design. So, for example, if you want to equate it to another common guard, we consider a guardrail. And certainly higher guardrails provide greater protection compared to lower guardrails. And if you're a reasonable person and you're trying to protect people from falls, you probably wouldn't

Page 22

want to put a 1 foot guardrail up. You'd probably want to put it up 4 feet. Can you take it up to 10 feet, sure, but you start losing the -- the benefits compared to the -- to the cost, if it were.
So, the same thing with the tab. If you're trying to reduce risk to a reasonable level with the use of the tab, the risk of unintended discharge particularly with foreign objects, particularly with a holster, you don't want to make the tab as big as you possibly can. That would be akin to making the guardrails as low as you possibly can. And certainly you don't want to make it as small as you possibly can. That would be akin to making it as tall as you can. And, so, there has to be a reasonable medium that provides a reasonable level of risk reduction but still providing reasonable utility. And I think Glock has done a great job of -- of doing that. And Glock's been the standard in the industry since mid 1980s for striker fired guns. So, I -- I think there's a reasonable balance at play. And that's certainly something that needs to be considered during design of the -- of the -- of

Page 23

the product.
BY MS. DENNISON:
Q. What -- so, are you saying that Glock's design of the -- of its bladed trigger is a reasonable level of risk reduction for prevention of or reduction of risk of foreign objects actuating a trigger?
A. This --
THE WITNESS: I'm sorry, Sam.
MR. HAAZ: No. It's okay. Object to form. You can answer.
THE WITNESS: Yeah, I think the Glock design choice and design decisions with respect to the size of its trigger, tabbed trigger safety and trigger guard are reasonable in reducing the risk of unintended discharge, particularly when holstered, by a foreign object.
BY MS. DENNISON:
Q. And when you say you think Glock has done a reasonable job of that, are you talking about Glock's standard trigger or Glock's performance trigger?
A. Their standard trigger.
Q. Have you evaluated Glock's performance

Page 24

trigger to determine if that trigger provides a reasonable level of risk reduction for accidental trigger actuation from foreign objects?
A. Yeah, I haven't done any testing with Glock's performance trigger. Offhand I can't recall its specifics.
Q. What other manufacturers of bladed triggers or other manufacturers of firearms that incorporate a bladed or tabbed trigger reasonably reduce the risk of inadvertent actuation of the trigger from foreign objects?
A. So, the other striker fire -- firearm I tested for this case was the Springfield Hellcat. That, again, uses a -- it's a striker design that uses a tabbed trigger safety. And I felt that that was a reasonable design.
Q. All right. So, we've got the Glock standard trigger and we have the Springfield Hellcat trigger. What other weighted triggers or tabbed triggers have you evaluated that you would consider to be a reasonable level of risk reduction for inadvertent contact by foreign objects?
MR. HAAZ: Object to form.

Page 25

THE WITNESS: So, the Glock tabbed trigger and the Springfield tabbed trigger are the only two that are OEM that I tested for my work in this case. I did look at the Agency Arms tabbed trigger safety for the Sig P320. Now that's not an OEM. That's an aftermarket part. And -- and I felt that it did a reasonable job as well.
BY MS. DENNISON:
Q. What standards are there for a manufacturer to test to determine what a reasonable level of risk reduction is for inadvertent contact from foreign objects?
MR. HAAZ: Object to form.
THE WITNESS: Yeah, I'm not aware of there being a standard for it. Certainly there's a standard of care that manufacturers are held to that requires them to assess the hazards associated with the uses and foreseeable -- reasonably foreseeable missuses of their product, assessing those risks and then putting steps in place to mitigate those risks. And so an -- as an example would be Sig -- in the M17 and M18 project that they did for the US Army where they went

Page 26

through a risk assessment of their product, identified risks, including unintended discharge due to contact with a foreign object and then -- then looked at ways to mitigate that risk through changes in design or the provision of safety features. And, so, in that instance, in that example, Sig identified a critical risk and was able to reduce it by providing an external safety on the -- on the handgun.
BY MS. DENNISON:
Q. So, on that FMECA, I asked you this before, and I don't know if you have done any work since, are you aware that Sig Sauer's corporate designee -- let me strike that.
Are you aware that Matt Taylor from Sig Sauer testified that the FMECA for the military was drafted in February of 2017?
A. I'm sorry. Who did you say testified?
Q. Matt Taylor from Sig Sauer testified that the FMECA was prepared for the military in February of 2017.
A. Which -- I've got two copies of his deposition testimony. Which -- which date was it?
Q. It was the one for Catatao versus Sig

Page 27

Sauer, which would have been in January of this year.
A. So, I don't believe I have Matt Taylor's deposition in Catatao. I have it in the Cole matter and I have it in the Joshua Glasscock matter.
Q. So, if Sig Sauer submitted a pistol to the military for consideration with a manual safety on it in 2016 but prepared the FMECA in February 2017, just by the dates we can agree that the FMECA was prepared after Sig had decided to or after Sig had designed the P320 for submission to the military with a manual safety, correct?
A. Yeah, I'm -- I'm not sure what you're asking me. I -- I will agree that if Sig submitted a P320 variant to the military in 2016 and then the military accepted that and the agreement was reached to produce it for them and then two years later Sig created an FMEAC for that same handgun, that that FMEAC would have been created after the gun was manufactured, shipped to the military.
Q. So, going back to the standards. You're familiar with the National Institute of Justice

Page 28

standards for pistols for law enforcement use, correct?
A. I'm aware of them. I -- I don't know that I'm an expert in the entire -- entire standard.
Q. Have you seen any standards or criteria within those NIJ standards for reducing the risk of inadvertent actuation of a trigger by contact with a foreign object?
A. Not that I'm aware of.
Q. And you've reviewed the Sporting Arms and Ammunition Manufacturers Institute standards for firearms as well, correct?
A. Not for this case but in the past I have.
Q. Are you aware of any standards set forth in the Sporting Arms and Ammunition Manufacturers Institute for reduction of the risk of inadvertent contact by foreign objects?
A. Yeah, I'm not -- I'm not aware of that. Either of those two minimum standards, I don't think have that particular problem being addressed.
Q. Have you reviewed NATO's standards for

Page 29

design of and manufacture of firearms?
A. I don't think I've reviewed a NATO standard with respect to firearms for my work in any of the Sig P320 cases that I'm involved in.
Q. Have you ever reviewed the TOP standards for design and manufacture of firearms from the military?
A. I don't believe that I have seen a TOP standard for the manufacture of firearms for the military.
Q. Have you ever reviewed any international standards for design and manufacture of firearms?
A. I don't believe I've reviewed any international standards specifically for the design of firearms for my work in these cases. I have reviewed other international standards with respect to risk assessment and product safety in my work in this case.
Q. Okay. Let's go to the -- the Glock pistol with the standard trigger. Have you ever seen an FMEA or other written document of a hazard analysis that Glock performed on any of its pistols?

Page 30

A. So, I have not seen an FMEA for Glock. The only documentation I've seen from Glock regarding relevant issues is their marketing that I've cited in my report that indicate the purpose of the tabbed trigger and their overall trigger safety system.
Q. Okay. And what about Springfield; did you see any FMEA or other written hazard analysis from Springfield?
A. Yeah, I'm -- I'm sorry, I'm not privy to any FMEA or hazard analysis conducted by Springfield Armory for the design of their Hellcat.
Q. And other than the Sig Sauer FMECA that you mentioned that you reviewed that was done for the military, have you seen any firearm manufacturers -- let me strike that.
Have you seen an FMEA or written hazard analysis from any firearms manufacturer besides the one that you saw from Sig Sauer for the military pistol?
A. So, I don't think I've been privy to any other manufacturers FMEACs for their firearms, other than -- other than the Sig Sauer FMEA that

Page 31

had been produced in this case.
Q. Do you have any knowledge, one way or the other, about whether any other manufacturer, any other firearm manufacturer has conducted a formal FMEA or other formal hazard analysis in the design of their firearms?
A. Yeah, I'm not privy to any other fire -- firearms manufacturers' product design and development processes and whether or not they include a failure mode and effect analysis. I do know that failure mode and effect analysis are a -- a well known and widely -- widely used implement for hazard analysis for the design of products. And, so, it wouldn't surprise me that other manufacturers have done similar exercises. In fact, I think it would be reasonably prudent step for those manufacturers to have done a similar exercise in designing their particular product.
Q. And as we sit here today, you have no information that would tell you that they did, in fact, undertake those exercises, correct?
A. Yeah, I'm sorry, I'm not involved in litigation where I would have direct access to

Page 32

another firearms manufacturer's internal documents, internal policies and internal procedures with respect to design and development of their products.
Q. And you've never worked for a firearms manufacturer, correct?
A. I have not.
Q. Have you ever toured a firearm manufacturer's facilities?
A. I have not. I have not.
Q. Do you have any information that Glock performed any tests on its standard trigger to determine the appropriate size of the blade on the trigger to reduce the risk of contact by foreign objects?
MR. HAAZ: Object to form.
THE WITNESS: Yeah, I'm sorry, I have not seen any of Glock's internal testing documents for their firearms.
BY MS. DENNISON:
Q. Do you have any information, one way or the other, that when Glock originally designed its trigger with the blade on it, that it evaluated whether that blade would reduce the risk of

Page 33

inadvertent contact by foreign objects?
A. So, again, I'm not privy to Glock's internal documents back from the early 1980s when they were designing and developing their first firearms. The only thing I'm privy to is their marketing information and their manuals and the statements they make in those documents with regard to the purpose of the tabbed trigger and the overall trigger -- trigger safety system.
Q. Do you have any information that any manufacturer has evaluated the size of the blade on their trigger to determine whether it would reduce the risk of inadvertent contact by a foreign object?
A. Yeah, again, I'm not privy to the internal decision making processes and testings of other firearm manufacturers. Obviously at some point in their design process they had to choose a design. And how they went specifically about choosing the design that they ended up with, I -- I don't have documents related to that or testimony related to that.
Q. What -- I'm sorry. Excuse me. What tests should a manufacturer do to evaluate the

Page 34

design of a tabbed trigger to reasonably reduce the risk of inadvertent contact by a foreign object?
MR. HAAZ: Object to the form.
THE WITNESS: Yeah, so, I think that's up to the manufacturer to decide. It's -- it's their firearm. It's their trigger and it's their design. And certainly as Sig pointed out in their FMEA and Glock has pointed out in their marketing material and in -- in their owner's manuals, it's a known risk. And how they go about addressing that known risk is up to them and -- and they should take steps to do that.
BY MS. DENNISON:
Q. Have you evaluated whether there is a test that could be implemented by a manufacturer to determinate what the appropriate reduction in risk or the appropriate size of a blade on a trigger should be to reduce the risk of inadvertent contact by foreign objects?
MR. HAAZ: Object to form.
THE WITNESS: So, I missed the first part of that question.
BY MS. DENNISON:

Page 35

Q. Have you evaluated or looked into whether a manufacturer could come up with a test to -- to determine whether a tab on a trigger would reduce the risk of inadvertent contact by a foreign object?
A. So, I haven't evaluated methods. Certainly I've created my own methods for demonstration in this case and other Sig Sauer cases to demonstrate the ease at which a foreign object inserted into a holster, with a firearm securely holstered in that -- securely -- secured in that holster and how the relative risk is associated with different designs. And, certainly, it's possible to come up with it, but I haven't evaluated a particular standard related to it.
Q. Okay. What is a reasonable level of risk reduction for inadvertent contact with a foreign object?
MR. HAAZ: Object to form.
THE WITNESS: Well, I thought Sig did a reasonable level in their FMEAC for the military. So, what they did, to refresh your memory, is they have the opportunity to reduce the

Page 36

probability of occurrence. And, so, with the hazard associated with unintentional discharges due to a foreign object or even a finger inadvertently on the trigger, you -- you can't eliminate it. And, so, you can't reduce the severity. I mean, if a firearm goes off and someone is struck, you know, they can be killed or severely injured. So what you can do is -- is reduce the probability of occurrence. And the way to do that is what Sig did for the military, as noted in the FMEAC is -- is they included an additional safety feature, that being the manual safety. And, so, they were able to reduce the probability of occurrence from occasional to improbable. So I think that's a -- that's a reasonable step.
BY MS. DENNISON:
Q. And you understand that there are certain entities that will not purchase a firearm that has a manual safety, correct?
A. So, I've seen testimony from one or two law enforcement agencies that have been involved in a Sig unintentional discharge event that had a policy that when they were looking for the

Page 37

replacement of their prior service pistol, they did not want a manual thumb safety.
Q. And, so, if you are going to look at the design of a tabbed trigger for purposes of determining if you can avoid or reduce the risk of accidental contact by a foreign object, how do you go about determining what that reasonable level of risk reduction is, as you've indicated a manufacturer should do?
MR. HAAZ: Object to form.
THE WITNESS: Yeah, so, again, they -- they can certainly develop their own internal testing methodology to assess how different levels or different sizes of tab trigger widths and trigger guards affect the ability or likelihood or ease of actuating the trigger by a foreign object. So, there's different tests that they can do. Typically FMEAC's are done before -- beforehand. So, sometimes it's just a matter of brainstorming that if we have an issue and that we're assessing it and -- at one level and if we add a safety feature that reduces access, reduces risk of unintentional access, certainly we can infer that we are reducing that overall level.

Page 38

So, there's multiple ways to skin the cat, as it were. But it's up to the manufacturer to identify the risk, to assess that risk, to put in place mitigation strategies to reduce that risk to a reasonable level, considering where they were when they began, considering their resources and considering the -- the problem.
BY MS. DENNISON:
Q. The smaller you make a blade on a trigger, the more area on -- sorry. Let me strike that.
The smaller you make the blade on a trigger, the higher probability there is of somebody not being able to pull the trigger if they do not contact the blade; would you agree with that?
MR. HAAZ: Object to form.
THE WITNESS: So, are we talking width? Are we talking height? Are we talking width and height? What -- what are you referring to?
BY MS. DENNISON:
Q. So, let's talk about that. Are you suggesting that the reasonable level of

Page 39

risk reduction -- well, let me strike that.
You said the Glock does a reasonable level of risk reduction through contact with foreign objects, right?
A. Yes.
Q. And we can agree that you haven't seen anything from Glock that indicates that that bladed trigger was put on the gun to reduce the risk of contact from a foreign object, right?
A. That's not true.
Q. Where does Glock say that the blade reduces the risk of contact by a foreign object?
A. So, it doesn't say specifically that, but you can infer it from what they do say. And that is to prevent lateral forces and lateral movement from engaging the trigger.
Q. My question wasn't whether you can infer. My question was do they say the bladed trigger is there to prevent inadvertent actuation by a foreign object, those words?
A. Well, that wasn't your question. And, so, if you have the court reporter go back and re-read the question, we can see why it was -- but I will agree I haven't seen a statement from Glock

Page 40

saying specifically foreign objects --
Q. Are you aware --
A. -- that talk about -- they talk flush trigger pulls and prevention of lateral movement.
Q. Are you aware of any manufacturer who has published a statement that they have incorporated a bladed trigger on their pistol to reduce the risk of inadvertent contact by a foreign object?
A. So, that's not a question that I sought to answer, so I haven't done the research. I will say that I don't know that it's necessary for the firearm manufacturer to market that or to make that public. And, so, for example, I'm not aware of Sig marketing the fact that the manual thumb safety was put on there to reduce the risk of unintentional discharges due to a foreign object accidently pulling the trigger.
Q. Okay. I'm just asking you if you have seen it. And I think the answer is no, you, haven't seen that, correct?
A. I'm sorry. You -- you kind of asked -- asked a half question.

Page 41

Q. Am I correct that you have not seen that language by any manufacturer that a tabbed trigger prevents the risk or reduces the risk of inadvertent contact by a foreign object, you have not seen that published by a manufacturer, correct?
A. So, as I answered a few moments ago, that's not a question I looked to ascertain an answer to, so I don't know.
Q. Well, you haven't seen it, right? I mean, it's not -- you don't know that you haven't seen it, right? Your answer -- I'm asking you have you seen it, and you're saying I don't know. You either seen it or you haven't seen it?
A. Yes, so this is the third time I'm answering the question. I have not been asked that question before. That's not something that I sought to find an answer to. I have not looked for it, so I don't know whether a manufacturer does or does not do that. What I can tell you is that I haven't -- I haven't seen it, but I haven't looked for it. But I also tell you I don't know that it's necessary for a manufacturer to state that. And the example I gave is the fact that Sig

Page 42

Sauer in their M18 and M17, which they're selling the same or similar version to the public, added a manual safety to it as part of their risk reduction to prevent unintentional discharges associated with a foreign object accidentally pulling the trigger and yet they have no marketing information or information in their manual related to that. So, again, I don't know that it's necessary for a manufacturer to publish that information.
Q. So, after -- sorry. Strike that.
Recently you had an opportunity to inspect and test a P320 with a prototype tabbed trigger and an aftermarket tabbed trigger; is that correct?
A. So, I had the opportunity to test a -- the tabbed trigger that Sig Sauer made for a Canadian entity. I don't recall if that was a law enforcement entity or the Canadian military. And I don't know if it was a prototype or if it was an actual sample they sent up or part of actual samples they sent up to Canada. So there's a difference. And -- and I don't know that I've been provided with any specific testimony as to

Page 43

whether it was a prototype or a sample they sent.
Q. Okay. So --
MR. HAAZ: Can we take just a short break and go off the record and we'll pause the time?
MS. DENNISON: Sure. How long do you need?
MR. HAAZ: It's not a question of need. It's a question -- you know, the court gave guidelines as to how much time you have per topic. And based on your last question it seems like you're delving into hour two and the second topic, and I just wanted to get a sense of timing.
MS. DENNISON: Okay. We can go ahead and go off the record.
THE VIDEO TECHNICIAN: Going off the record. The time is 11:03.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: Back on the record. The time is 11:14.
MR. HAAZ: All right. We went off the record to do a time check. We understand that because this is a wrap-up deposition, the

Page 44

court imposed some restrictions on -- on time. Ms. Dennison has been going for, according to the court reporter, 52 minutes. I had about 50 minutes. Ms. Dennison is reserving ten minutes for the first topic, which is issues not covered during the first deposition. She also has an hour to -- to question Dr. Vigilante regarding new testing. And from what I understand, she's going to begin that hour now.
BY MS. DENNISON:
Q. All right. Dr. Vigilante, I received some file materials for supplemental inspections and testing that you did on June 11th and June 13th of this year. To the best of your recollection, are those the dates on which you conducted -- conducted supplemental inspections and testing of materials shipped to you by Derek Watkins, as well as an Agency Arms aftermarket tabbed trigger?
A. So, the items shipped from your expert was unpacked on the 11th and then again on the 13th. The Agency Arms was done on the 11th as well.
Q. Did you purchase that Agency Arms

Page 45

trigger?
A. Yes, I did.
Q. When did you purchase that? Are you looking for that record on your computer?
A. I am. Offhand I don't recall. I can look further off the record.
Q. Okay. Do you recall approximately when you purchased it?
A. So, sometime between June 11th and my prior deposition.
Q. Okay.
A. And I don't recall when my prior deposition was. I know it was a few months ago.
Q. How did you determine that there was an aftermarket tabbed trigger available by Agency Arms for a P320 pistol?
A. I don't recall offhand if I found it in my own research or if a friend may have alerted me to it.
Q. Okay. So, the items shipped to you by Derek Watkins were the Blackhawk CQC Serpa holster for a Glock that had been modified by being sanded down, correct, one of them?
A. Give me a moment.

Page 46

Q. And are you trying to look in your file for something now?
A. Yeah, I'm looking at my inspection photos.
Q. Okay.
A. So, I had a modified Glock Serpa holster for the Glock, G17, at least that's how it was labeled. I don't know how Watkins modified it, whether he cut it or whether he sanded it, so I -- I can't comment on that. I do want to comment before I forget that he actually cracked the back of the holster vet, covers the -- the trigger guard.
Q. Did you receive Derek Watkins' deposition transcript from this matter for review? Again, are you looking at your file material to see?
A. I am looking at my file material. I do not see his test -- his deposition in this matter.
Q. Have you asked to be provided with a copy of his deposition testimony in this matter?
A. I don't recall if I asked or not.
Q. Okay. So you said that you wanted to

Page 47

note that the back of the holster was cracked. How do you know that that was a crack in the back of the holster?
A. So, to be clear, I did no testing with that holster. All I did was take it out of the plastic bag and photograph it. If you go into my folder titled VF Sig trigger unboxed inspection, 6-13-2025.
Q. Okay.
A. There is a -- I do take that back. I did testing but I photographed it first. There is a series of photographs after I took it out of the plastic bag. And if you go to photograph 104403.
Q. 104403, yes, I'm there.
A. The crack is visible on the backside of the area that covers the trigger guard.
Q. Let me show you --
A. Well, if you go to 104701.
Q. 104701, okay.
A. You can see the crack in the back of the holster part that covers the trigger guard.
Q. All right. So just --
A. I'm not done. If you go to 104757 and

Page 48

104803, 104809, and then 104917, 105129, 105135, 105202, 105251, 105255, 105446. Sorry.
Q. So, I was going to mark them for the record. I'm not going to mark all of those now that you've gone through all of them. But on the last one, 105446, let me show that on the screen. We'll mark this as Exhibit 1. Do you see photo 105446 on the screen?
A. I do.
Q. Okay. And right -- can you see my mouse?
A. I can.
Q. Is this right here that I am showing on the screen, is this what you were referencing as the crack?
A. Yes.
Q. And did you do any analysis of the material to determine that that was a crack in the material?
A. I didn't do any analysis of the material. I did an analysis of where he kind of butchered that holster. And that was an area that he took material from. How he took the material from it, I don't know. And I compared it to a

Page 49

stock Blackhawk holster. And, so, that's in a different photograph that I have -- that I have taken. And I also documented that that crack went all the way through. And then I took measurements of the crack as you're -- as you're scrolling through the photos.

Q. I was just trying to go to the comparison photo that you referenced. I don't remember what the number was. I'm just scrolling through to find that comparison photo of the two holsters. Right here. So, I'm on photo 104757. Can you see that on your screen?

A. Yes.

Q. Is this one of the comparison photos you are referencing?

A. It is one of the comparison photos. But the one on the right is the Sig P320 holster. I thought I had a holster, a comparison of the Glock holster as well. I do -- it is 104521, but I did not take photographs, unfortunately, of the backside comparing them side by side. But can I do that. But I can't -- well, I can take a photograph of the exemplar. I don't have the Watkins version any more -- actually, I do. I

Page 50

haven't shipped it back yet. I haven't been provided with information on where to send it. Theoretically I can but I have both.

Q. Okay. And for the record, we can follow up afterwards. It just needs to be sent back to Derek Watkins. And if you need his address, we will make sure that Mr. Haaz gets that to you. So, you don't have a comparison photo of the back of the two holsters, correct?

A. I don't. But in this photograph you're showing, 4521, 104521 --

Q. Yes.

A. -- the one on the left is the stock. The one on the right is the Watkins change. And you can see the backside of the trigger guard, which is lying face down or lying down on the bench, you can see how it's cut lower, and that's where material was removed, one of the areas where material was removed, as well as the left side of the -- the top of the left side of the holster as, again, depicted in that photograph.

Q. Okay. All right. And you did testing of the Glock in that modified holster, correct?

A. I did.

Page 51

Q. And that testing that you did involved inserting the Glock into the modified holster and then using a zipper on an exemplar jacket to see if you could get the zipper to actuate the trigger to discharge the -- the Glock in that modified holster, correct?

A. I did it with two zippers, a big zipper and a little zipper on the exemplar jacket.

Q. And you were able to discharge the Glock with the zipper on the jacket in the modified holster, correct?

A. Eventually with a lot of effort and a lot of force and with flexion of the side of the Glock holster that was aided by the crack in the back of the holster.

Q. And, so, the Glock pistol did discharge by the zipper in that modified holster, right?

A. So, I was able to get it to discharge with a lot of effort and a lot of force and with the extra flexion that crack provided and while getting the -- being able to get the zipper down in and across the face of the trigger.

Q. Okay. And were you able to get that Glock pistol to discharge with both of the zippers

Page 52

in the modified holster?

A. I was not with the little -- with the little zipper.

Q. Okay. And you were with the larger zipper?

A. I was after a lot of effort and flexion of the holster aided by the crack in the back of the holster and being able to get the zipper out in front of the trigger and across the face of the trigger.

Q. Then you also received the -- I'm going to call it the prototype tabbed trigger and represent to you that had you read Derek Watkins' deposition testimony you would have seen that he identified it as a prototype tabbed trigger from Sig. So I'm just going to reference it as the prototype tabbed -- tabbed trigger.

And, frankly, I guess, in your file materials you have it labeled as Sig prototype tabbed trigger, so I think we're on the same page for that, correct?

A. Well, that's the way it was presented to me. I -- I don't know and I don't know how Mr. Watkins would know what Sig designed and developed

for Canada. So if he is saying that, that's -- that's certainly one thing he's saying, but I don't know how he knows that.
Q. I'm just referencing that if we call it Sig prototype tabbed trigger we're on the same page because that's how it's labeled in your file, correct?
A. It is labeled on my file. But, again, that's the way it was presented to me in the -- on -- on the unboxing. So, if you go to the unboxing list it's labeled --
Q. Doctor, I want to make sure we're on the page --
A. Kristen, let me finish --
Q. Hold on.
A. It's labeled -- it's labeled in my folder based upon what -- what it was labeled on in the shipping container that was shipped to me. Being on the same page as to whether it was a prototype or sample, I'm not on the same page with that and I don't know how Mr. Watkins knows that several years later.
Q. So --
A. For purposes of today's deposition, if



you want to refer to it as a prototype, I'm -- I'm okay with that.
Q. Okay. And that's all I was trying to clarify.
MS. DENNISON: So, let's go off the records for a moment and just stay on -- I just need to go off the record for a moment.
THE VIDEO TECHNICIAN: Off the record. The time is 11:31.
MS. DENNISON: So, because I'm limited on time, I want to stop the time for the deposition right now, as far as the time is counting against me. I just want to see if we can come to some sort of agreement here.
There are times when I may -- and this is for you, too, Dr. Vigilante --
MR. HAAZ: Is this for me or is this for Dr. Vigilante?
MS. DENNISON: It's for both of you. I'll talk to you since he went off and then we can talk to him if we need to. For purposes of the time, obviously there are times when I realize that Dr. Vigilante may have misunderstood my question or something along those lines, you know,



all I was trying to do there was to stop and explain that I was not trying to reach an agreement that it was, in fact, a prototype tabbed trigger. I just wanted to clarify that if I call it prototype tabbed trigger we both know what we're talking about without some sort of inclination.
There are times with this deposition where I can clarify that without having to listen to a very long answer from Dr. Vigilante that is not going to matter. So, there are a couple of times here where I have tried to stop where we're going with it because it's going way off track, and I can just get it back on track because I am limited to an hour. I would ask that I would be allowed some leeway with that throughout here that I -- that I get the ability to at least -- if we need him to finish, if I get to just interrupt and say why I'm interrupting and try to restate a question, we can then make a determination, Sam, as to whether you think that we need to allow Dr. Vigilante to completely finish whatever answer he's doing or whether it's okay for me to clarify my question so that we're



not wasting time. I'm trying to get this done faster, not longer.
MR. HAAZ: I am fine with you conducting the deposition how you see fit within the time constraints. You know, I don't think you'll need more than an hour. If you do and you need one more minute or two minutes, I think we'll cross that bridge. But I don't have any issue with you, you know, trying to get the answers that you need as you see fit within the time that you have. So I would proceed however you see fit.
(Whereupon a break was taken.)
MS. DENNISON: So, before we go back on, Dr. Vigilante, we can agree or not agree, the only time that I'm going to interrupt one of your answers is if I think that there is a misunderstanding as to the question and your answering. And all I'm going to do is ask for an opportunity to just say can I restate the question. I understand that you want to get your answers in. I'm not going to try to prevent you from getting your answers in. On that last one, all I wanted to do was to let you know that I was not trying to suggest that I wanted your admission

Page 57

that it was a prototype tabbed trigger. I wanted to agree that if I call it prototype tabbed trigger that we know which trigger we're talking about. I'm just trying to identify them by triggers. I am limited on time, so I don't want to spend a lot of time with having to go through an explanation that we don't necessarily need because if I correct it with you, we can be on the same page. So with that, you can let me interrupt you or not if I have to interrupt you with an answer and we'll take it from there. I just wanted to let you know that on that last one in particular and there was one other, I may just ask you to stop for a minute, like if I wanted to mark an exhibit as to what you were talking about with the photographs, I might say, hey, can I just stop you for one second. I just want to mark this photo so that instead of having you go through every single photo first and then have me have to go back through it and show the photos and get the same testimony again, that could make the deposition more efficient. With that we'll proceed as best as we can. Before we go back on the video record, if I -- and we're still on the

Page 58

stenographic record. Dr. Vigilante, if I call it a prototype tabbed trigger, can we agree that that is what we're calling it simply for purposes of this deposition and you are not agreeing that it is, in fact, a prototype tabbed trigger because you don't have that information?

THE WITNESS: I thought we already agreed to that.

MS. DENNISON: Okay. Let's go back on. Are you ready to go back on the video record, Dr. Vigilante?

THE WITNESS: I am.

THE VIDEO TECHNICIAN: Back on the record. The time is 11:37.

MR. HAAZ: Kristen, I have -- I have you as 16 minutes past, just to give you a sense of where we are.

MS. DENNISON: Okay. Thank you, appreciate it.

BY MS. DENNISON:

Q. Okay. Dr. Vigilante, so, we talked about the testing that you did with the modified Glock holster and now I'm asking about the testing that you did with what was sent to you and

Page 59

identified to you as a Sig prototype tabbed trigger, understanding you don't have any information about that tabbed trigger other than how it was identified to you in the packaging.

So, when you received that, what was labeled as a prototype tabbed trigger you photographed it, you put it in the -- in a Sig P320 pistol and you did some testing on it; is that correct?

A. I did do testing and measurements of the tabbed trigger provided by Sig Sauer.

Q. Did you make any determination as to whether that prototype tabbed trigger would reasonably reduce the risk of a -- an inadvertent discharge by contact with a foreign object?

A. Compared to the stock trigger?

Q. No, just in general. You -- you talked earlier that a manufacturer in making a tabbed or bladed trigger would have to reasonably evaluate the design of that to determine whether it would reduce the risk of inadvertent contact by a foreign object. Do you recall that?

A. I don't know that you stated that exactly the way I would.

Page 60

Q. If it -- is it the general concept of what you testified to earlier?

A. So, I testified as to manufacturers' responsibility to assess the hazards associated with the uses and reasonably foreseeable misuses of its product, to assess those hazards and then to put in risk mitigation strategies to reduce the risks associated with those hazards. And you do that through design changes, provision of safeguards and/or warnings. And, so, certainly with regard to unintended activation of a trigger of a holstered firearm by a foreign object, one way to do that is to provide an external safety. Sig in their FMEA had done just that. And I've show repeatedly with Glock's and -- and Springfield's that these -- the tabbed trigger does that as well for the P320.

Q. So, earlier we talked about the Glock, and you indicated that Glock did a good job of designing the blade on its standard trigger to reasonably reduce the risk of inadvertent discharge from contact with a foreign object. Do you recall that discussion?

A. I do believe that Glock took reasonable

Page 61

steps in providing a reasonable reduction of that risk.
Q. And you agree or you testified that Springfield did that with its Hellcat trigger as well, correct?
A. Yes, yes, with respect to inadvertent operation or activation of the trigger while holstered by a foreign object, I think that Springfield and Glock did a good job with their tabbed triggers.
Q. Do you have an opinion as to whether what was sent to you and marked as the Sig prototype tabbed trigger reasonably reduces the risk of accidental discharge by contact with a foreign object?
A. Compared to a stock trigger, absolutely.
Q. I just -- I'm not asking you compared to a stock trigger. I'm talking about, let's say, compared to the Glock trigger, the Glock standard trigger?
A. So, I think that the -- this is probably an easier comparison. I thought the Agency Arms did a better job of reducing that risk. I think

Page 62

the Glock as well did a better job. But I think certainly the prototype, quote, unquote, trigger that was sent down from Sig Sauer certainly does a better job than the stock trigger. Could it have been better, sure. That's kind of where I would rank it as.
Q. Why did Agency Arms do a better job of reducing the risk of accidental contact by a foreign object than the trigger that was marked prototype tabbed trigger?
A. So, the tab on the Agency Arms trigger is -- is a little bit narrower and that made it a little bit harder to access it to engage it. And that's depicted in my testing and the videos.
Q. Do you have an opinion --
A. That's -- you know, that's how I assessed it. So, again, the width of the -- of the tab, the wider it gets relative to the same trigger size, the greater or the likelier that it can be accessed. So there's got to be a reasonable level. If you have a tab pad or a tab that extends the entire width of the pad, you're basically deleting the benefits of having a tab. So there has to be reasonable -- reasonable

Page 63

balance between tab size, trigger, trigger guard to be afforded the benefits of the tab in reducing unintended discharge by a foreign object, particularly with a holster.
Q. Have you done any calculations to determine what that reasonable balance should be as far as the proportion of the blade and the trigger to the size of trigger itself?
MR. HAAZ: Object to form.
THE WITNESS: So, I've taken measurements of the tabs and compared to their -- the triggers and looked at the relative size. And then I did the testing of them, and it -- it correlated with size or width, greater the width, the relatively easier to access.
BY MS. DENNISON:
Q. Have you come up with a number of what that proportion is that you would recommend or reasonably what you consider to be reasonably reducing that risk?
MR. HAAZ: Object to form.
THE WITNESS: I haven't come up with a number. I think that when I compared the Agency Arms to the Glock to the Sig trigger that

Page 64

was sent down with the tab, I think the Sig trigger with the tab is -- is getting to the outside edges of -- of what's reasonable.
BY MS. DENNISON:
Q. It's getting to the outside edges of -- of what? I'm apologize.
A. Of what's reasonable.
Q. What's reasonable. Is there a blade that could be too narrow or would be too disproportionate to the width of the trigger to be a reasonable balance?
MR. HAAZ: Object to form.
THE WITNESS: So, you know, anything is possible. We can have a trigger guard that is 2 inches wide and a trigger face that is 1 inch and one-half wide and a tab that -- that's one-half inch wide -- excuse me -- one-half millimeter wide. And -- and that's probably not a good design. Like I said, I think that a Glock has got a reasonable design. I think the Springfield had a reasonable design.
BY MS. DENNISON:
Q. When manufacturers test to -- during the design, they test to pass/fail criteria,

Page 65

correct?
A. So, again, that depends upon the manufacturer's testing protocol. It -- it may be pass/fail. It may be percentages. It just depends.
Q. We talked about the SAAMI standards, right?
A. We did mention the SAAMI standards.
Q. The standards set forth for testing pistols in the SAAMI standards, those are tested to a pass/fail criteria; is that right?
A. Offhand I don't know. I didn't come prepared to testify about SAAMI standards. I will say that, again, it's -- it's dependent upon their testing protocol. So, for example, Sig Sauer in their FMECA did not have a pass/fail. It had a scale that they determined what was and what was not reasonable. So, again, it's -- it's dependent upon their testing protocol.
Q. Well, an FMECA is not a test, we can agree to that, right?
A. No. The -- the information you get to input into the FMEAC, may come from a test. So it just depends. And, again, that test may be

Page 66

pass/fail or it may be a scale.
Q. What test --
A. And that scale can be anything from, you know, zero to one, zero to ten, zero to 100, zero to 1000. It -- it does just depend on the protocol.
Q. What manufacturers have you seen test their products during a design phase to a scaled test, performance test? I'm talking about a performance test.
MR. HAAZ: Object to form.
BY MS. DENNISON:
Q. Let me -- let me ask that again.
When a manufacturer conducts a performance test on a product, are you aware of any performance tests that are on a scale as opposed to a pass/fail criteria?
A. Yes.
Q. Can you give me anything?
A. So, for example, I'm involved in a case involving a backup alarm. And I'm not going to get into the manufacturer because I don't know how much this is confidential. But they test their backup alarms, and they rate it depending upon how

Page 67

loud the alarm gets. They rate from the type A down to a type D and then a type F, which is other. And, so, that's just another example of an evaluation of a product on a performance criteria that's -- that's not pass/fail. It's -- it's going to be dependent upon where it falls in that particular scale.
Q. And within those scales, are there acceptable and unacceptable ranges?
A. For each level. So, type A has to be a certain level above or excuse me it's got to be above a certain level. Type B it's got to be a certain -- above a certain level, below a certain level. Type C, above a certain level, below a certain level, et cetera.
Q. And if it's above a certain level, then it would either be acceptable or unacceptable and if it was below it, it would either be acceptable or unacceptable, correct?
A. For a particular type. And, so, they're categorizing the product based upon where it falls on that performance test.
Q. What tests are there for firearms manufacturers that use a scale as opposed to

Page 68

pass/fail criteria?
A. So, Sig Sauer used a scale in their FMEAC to test the reasonableness of their design that they shipped to the military. So that's just an example of where some of the criteria may have been pass/fail but some of them were on scale.
Q. All right. So, outside of a hazard analysis or FMEA, what firearms manufacturer conducts a performance test to a scale as opposed to pass/fail criteria?
A. So, this was asked earlier in the deposition. I'm not privy to the internal testing protocols of different firearm manufacturers other than the material I've been provided with Sig Sauer or provided by Sig Sauer in these cases.
Q. So, other than what you have seen from Sig Sauer in testing, would it be fair to say that you don't know how manufacturers test firearms?
MR. HAAZ: Object to form.
THE WITNESS: That's not true, too. So, we talked about minimum safe -- safety standards that firearms are -- are tested to. We talked about the FMEA -- FME -- FMECA that Sig Sauer did, and we've talked about what other

product manufacturers have done. And some of the standards I cited and provided in my first deposition detailed different types of -- of tools that are used for hazard analysis. And -- and they're -- again, testing is based upon how the testing protocol was written. And whether it's acceptable or not may be a pass/fail but it may be a scale. So it just depends.

BY MS. DENNISON:

Q. All right. We'll come back to that because that's more in the first part with the first report, and I want to continue talking about your supplemental testing for this hour.

All right, so, when you dropped the Sig prototype tabbed trigger into the P320 and placed it into the Blackhawk Serpa CQC exemplar holster for the P320, you used a zipper on the jacket to determine or test if you could discharge that weapon with that prototype tabbed trigger; is that correct?

A. So, I did test the tabbed Sig trigger in a Blackhawk exemplar holster with a large, small zipper on the exemplar Cole jacket.

Q. And you were able to discharge the P320



with that prototype tabbed trigger?

A. So, with the large trigger with a lot of effort and a lot of time in getting the trigger out in front of the -- the zipper out in front of the trigger and getting it across the tab, I was able to discharge it. With the little zipper I was not able to get it to discharge. In fact, I bent the zipper -- the little zipper trying to get it to discharge.

Q. You bent the little zipper trying to get it to discharge on which test?

A. Well, I did it on the P320. I did it on another one, too, because it broke. I think it was the -- I'll have to go back and look. I think it was the Agency Arms, the zipper actually broke trying to get it to actuate the Sig P320 with the Agency Arms tabbed trigger.

Q. And which tests caused the bent zipper?

A. So, the -- I bent it on the Sig prototype, quote, unquote, tabbed trigger with the little zipper.

Q. And then you broke the zipper on the Agency Arms trigger?



A. Correct, using a different small zipper on the jacket, I broke the zipper trying to actuate the trigger on the Sig P320 with the Agency Arms tabbed trigger.

Q. All right. And then did you test the Glock in the modified holster with any objects other than the big and little zipper on the jacket?

A. No.

Q. Did you test the Sig P320 with a prototype tabbed trigger in the holster with any objects other than the big and little zipper on the subject jacket?

A. No. And just to be clear, it -- as requested and demanded, everything I did with the Sig provided trigger and holsters was videotaped.

Q. And, so, did you test the Sig P320 with the Agency Arms tabbed trigger with any object other than the big and little zipper on the jacket?

A. So, I don't -- I don't believe so, certainly not within the time frame that I was doing the testing with the Sig provided tabbed



trigger, quote, unquote, prototype trigger in the cut up Glock holster.

Q. Have you done any testing with the Agency Arms trigger that you did not videotape?

A. So, I didn't videotape everything I did with it, but I didn't use any other implements in any testing as I just testified -- as I just stated in my testing of the Agency Arms tabbed trigger.

Q. What did you do with the Agency Arms tabbed trigger that you did not videotape?

A. I don't know. But I didn't have the video running the entire time like I did with the Sig stuff.

Q. What do you mean you didn't know what you did with the Agency Arms trigger that you did not videotape?

A. So, for example, I recall measuring it, and I'm not seeing photographs of that and I didn't video it. And I don't know that I did any other iterations with the zippers that were not videotaped.

Q. Are --

A. And I think I did -- I did photograph

Page 73

the measurements, just to clarify.
Q. Are there reasons why you would run testing with the Agency Arms trigger and not videotape it?
MR. HAAZ: Object to form.
THE WITNESS: Yeah, there's no reason to videotape all of my testing. That's absurd. What I'm videotaping is what I want to be able to show to the jury as a demonstrative of what my testing had looked like and I found.
BY MS. DENNISON:
Q. Why would it be absurd to videotape all of your testing that you've done in this matter?
A. A, it's not necessary. B, it takes more time. C, it takes more memory and resources and it's -- again, my testing is my testing and my testimony is based upon my testing, and the videos are just demonstratives for the jury. So there's no reason for me to videotape one, two, ten, 20 or whatever different runs to show the jury all the same thing.
Q. And if you video just what you want to demonstrate to the jury, then you have control over what the jury sees; is that correct?

Page 74

MR. HAAZ: Object to form.
THE WITNESS: I -- I don't have control over what the jury sees. I think there's a judge involved and attorneys involved. I'm just creating demonstrative videos for exhibits to be presented to the jury.
BY MS. DENNISON:
Q. Well, if you videotape testing that doesn't have the results that you want -- sorry. Strike that.
If you don't videotape testing that does not come out with the results that you want, then you don't have documentation that could be shown to the jury, that's correct, right?
A. So, if I found testing -- if I found something in my testing that had problems with my opinions, then I would document it and then that would be part of my testimony.
Q. How would you document it?
A. Well, it could be anything. It could be a photograph. It could be video or it could be written down. It can be memorialized in the report.
Q. Did you take any notes during any of the

Page 75

testing or inspections that you conducted on June 11th and June 13th?
A. I did not. I just took photographs and video to memorialize what I did.
Q. When you were doing the testing, was anybody else present?
A. On which date?
Q. Was anybody present when you did any sort of any of your inspections on June 11th?
A. I don't believe so.
Q. Was anybody participating remotely when you did your inspections on June 11th?
A. No.
Q. When you did your testing on June 13th, was anybody else present?
A. There was.
Q. Who else was present for the testing?
A. Sam Haaz.
Q. Was he in person or virtual?
A. In person.
Q. And was that done in your office?
A. In my workshop.
Q. And your workshop, is that -- where is that located? Is that in your home?

Page 76

A. It's, yeah, part of my home office.
Q. How long was -- let me ask you this. What time did Mr. Haaz arrive at your workshop on June 13th?
A. Maybe five minutes before the video starts.
Q. How long was he at your office that day?
A. He left like two minutes after I stopped the video.
Q. Did Mr. Haaz participate in any of the testing?
A. He did not.
Q. How did you videotape the testing?
A. So I -- well, I set up my laptop that has a camera, put it on my work bench and ensured that everything that I was doing with the unboxing and boxing was visible on the camera.
Q. Who -- strike that. So that was the -- you did the inspection from -- I'm sorry. You videoed the inspection and testing from start to finish on June 13th; is that correct?
A. Yes and no.
Q. What do you mean yes and no?

A. So, on June 11th I unboxed and both were completely videotaped as requested, but on June 11th I unboxed the package that was sent to me. I documented in the camera that was running the items that were in there. And then I installed the Sig tabbed trigger, quote, unquote, prototype trigger into the fire control unit of an exemplar P320 X Full. And then I installed that control unit into the packaging, I relocked the travel box and then put it back in the cardboard box and re-taped the cardboard box. So that was done on June 11th. And if you recall my deposition was initially scheduled for last Friday. And, so, the plan was to bring the box into Sam's office for the deposition and do the testing that I did on the morning -- that I did on the 13th on the morning before the deposition because the deposition was scheduled for the afternoon. And, so, that's why there's two different days of -- of having the box open. But I ensured that any time from the time the box was unsealed, untaped, unlocked to the time it was locked, resealed -- locked, put in the box and resealed was on videotaped.



Q. So, I'm going to share my screen and we'll just look at the screen shots of the video. Can you see on my screen a copy of a video that shows a sealed box?
A. I don't see it.
Q. I didn't hit share yet. Now can you see it?
A. I can.
Q. Okay. And is this the condition of the box as you received it?
A. Is that the start of the video?
Q. Yes.
A. If it's the start of the video, that's how I received it.
Q. And then this video is four minutes and 14 seconds long. Do you see that?
A. I do.
Q. And then there is a second video that is ten minutes long. And if I just hit play very quickly, you can see here that you have a locked box?
A. Yes.
Q. Was that what was contained in the box that you received and unboxed in the four -- approximately four-minute video?



A. That's correct. So, I intended to run the video through an entirety. But when I opened the brown cardboard box and took out the storm case, it was locked and nobody had provided me with a code for the lock, so I couldn't open the storm case. And, so, I stopped the video. I called Sam's office and requested a -- the combination for the locks. When they provided me with the -- I'm not sure if they contacted your office or not, but eventually I got the combination for the locks. Then I started the video back up and continued the inspection --
Q. Okay. And, so, there was --
A. -- on the 11th.
Q. Yes. So, then that was this ten-minute video. And then there is a third video from June 11th that is about -- that is seven minutes and 20 seconds. Do you see that?
A. Yes.
Q. And why were there the -- the two videos, the ten-minute video and the seven minute and 20 second video on June 11th?
A. So, when I got the box packed up, I realized that I didn't put the -- the baggy that the Sig prototype trigger was in back in the box. So I had un -- undo everything and I wanted to capture that on video.



Q. And then in the seven minute and 20 second video, at the end, you put this box, the lock box back into the larger box; is that correct?
A. Correct. And then I taped up the larger box.
Q. With duct tape, right?
A. Yes.
Q. What did you do with the duct taped box after you finished this last seven minute and 20 second video on June 11th?
A. On June 11th it just sat in my workshop.
Q. Okay. Did you reopen that box at any time between the end of this video on June 11th and when it was opened again on June 13th?
A. So, once the box was sealed with duct tape, I did not open it until the video started recording on June 6 -- June 13th.
Q. Okay. And, so, on the screen now there

Page 81

is the start of the June 13th video of the inspection. It is 47 minutes and 12 seconds long. Do you see that?
A. I do.
Q. For this video Mr. Haaz was present, correct?
A. He was.
Q. And this video that is 47 minutes and 12 seconds long was captured by your laptop camera?
A. Yes.
Q. Now, there's additional videos that were done on the 13th of the testing that you did, correct?
A. There was.
Q. And, so, for example, under Watkins Glock holster, if I scroll down to the bottom, there are two videos. The first one I have up is one minute and two seconds long. How were these separate videos of the testing recorded?
A. My cell phone.
Q. And how did you set up the cell phone to capture this video?
A. I put it on video, hit the button.
Q. Did you hold the camera yourself or did

Page 82

you have it on some sort of tripod?
A. Oh, I'm sorry. I had a tripod set up.
Q. Okay. And was that the same for all of the -- the testing videos, separate testing videos that were taken on June 13th?
A. I believe that is the case.
Q. So, if the entire video took 47 minutes and 12 seconds and Mr. Haaz came about five minutes before the video started and left a couple of minutes after the video started, would it be fair to say that Sam -- Mr. Haaz was at your office for approximately one hour?
A. That would be my guess.
Q. Have you issued any invoices for your work in this -- sorry -- in this matter since your last deposition?
A. I believe I have.
Q. Are you checking?
A. Oh, I'm -- I'm sorry.
Q. You just said you believe you have. I can't tell -- sorry. I can't tell if you're looking at your computer for something or if you're waiting for the next question sometimes, so my apologies.

Page 83

A. I don't remember when -- what date my deposition, was my earlier deposition. Do you have that offhand?
Q. I believe it was in March. I can tell you in one second, March 19th.
A. So, I invoiced for the deposition on the 20th. And then on 4-17 I issued -- issued another invoice. However, that had a little bit of time for the Cole matter and it had time for other matters.
MS. DENNISON: Okay. Sam, I believe I asked for -- well, I know I asked for any updated invoices prior to the deposition. Do you have that invoice that you could send to me?
MR. HAAZ: I don't believe so. I can ask my paralegal and see if we didn't get it right now.
MS. DENNISON: All right. Let's take five minutes right now and then I can do a time check as well.
THE VIDEO TECHNICIAN: Off the record. The time is 12:12.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: We are

Page 84

back on the record. The time is 12:20.
BY MS. DENNISON:
Q. Dr. Vigilante, do you still have the box in your office?
A. In my workshop, yeah.
Q. In your workshop. Okay. Are you in the workshop now?
A. No.
Q. The box, is that still in the condition that it was in when you finished the video on June 13th and taped it back up?
A. It is.
Q. Have you opened the box since then for any reason?
A. I have not.
Q. Again, we'll provide you with instructions on -- on where that would just need to go back to where it came from, but we'll do that after the deposition.
Based on your -- on your testing that you did with the prototype tabbed trigger and the Glock trigger, can we agree that a tabbed trigger does not prevent all accidental discharges from foreign objects with holstered firearms?

Page 85

MR. HAAZ: Object to form.
THE WITNESS: Yeah, it's -- it's not intended to eliminate the risk. It's intended to reduce the risk.
BY MS. DENNISON:
Q. And can we also agree that holster fit determines whether a foreign object can enter the trigger guard of a holstered pistol?
MR. HAAZ: Object to form.
THE WITNESS: So, depending upon the design to the holster, there are more or less gaps and smaller or larger gaps around the trigger guard area that can allow foreign objects to enter the trigger guard area.
BY MS. DENNISON:
Q. Can we agree that the Serpa, Blackhawk Serpa CQC holster designed for the Glock does a better job of preventing access from foreign objects than the Blackhawk Serpa CQC holster designed for the Sig Sauer P320?
MR. HAAZ: Object to form.
THE WITNESS: So, I believe my inspection showed that the gaps are smaller around the Glock stock Blackhawk CQC --

Page 86

BY MS. DENNISON:
Q. And -- I'm sorry.
A. -- holster than compared to the Blackhawk model intended for the Sig P320.
Q. You also received the holster that Derek Watkins made for a Sig Sauer P320 that eliminated or at least reduced those gaps present on the Blackhawk CQC holster designed for the P320; is that right?
A. So, included in the package was a holster that had written on it X series. And that holster had what looked like a similar type of lock mechanism as the Blackhawk but I didn't do any inspection to determine if it was the same or provided the same level of retention. But the holster that I was provided that was labeled as X series did have smaller gaps around the trigger guard area of the holstered Sig P320.
Q. Did --
A. Sorry. I -- I didn't try it with the other ones. I just tried it with the X --
Q. Did you do any testing to determine whether you could get a foreign object such as the zipper on -- on the exemplar jacket into the

Page 87

trigger area of the P320 when used with the holster made by Mr. Watkins?
MR. HAAZ: Object to form.
THE WITNESS: So, I was not allowed to do testing on it. I think there was a note specifically stating that I couldn't hold it with a vice or clamp because it was made of, quote, unquote prototype SLA material.
BY MS. DENNISON:
Q. Did you attempt to put the -- put an exemplar P320 pistol into that holster and see if you could get a foreign object into it without putting it into a vice or a clamp?
A. I -- I did not.
Q. Based on your testing in this matter, can we agree that a zipper on Mr. Cole's jacket is the most likely cause of his discharge?
MR. HAAZ: Object to form.
THE WITNESS: No.
BY MS. DENNISON:
Q. Why not?
A. I haven't seen any evidence that it got in there. I think the testimony is that the jacket was off at the time. But if there was

Page 88

anything on his jacket that could get in there -- get in there, I think it's safe to say that the zipper would be the most likely object. But that's, you know, constraining it to objects that are on the jacket, not just foreign objects in general.
MS. DENNISON: Okay. Sam, I'm going to move to a couple of minutes on the overall report. I've got about ten minutes left on that. Okay?
MR. HAAZ: Okay. So, you're stopping asking questions -- I see you have 57 minutes. So that concludes the section on the new testing and you're going back to the ten minutes of reserved time for the questions you didn't get to ask during the first seven-hour deposition?
MS. DENNISON: Yes.
MR. HAAZ: Okay.
BY MS. DENNISON:
Q. So, Dr. Vigilante, in looking at what could have caused David Cole's trigger to be actuated and caused his discharge on the date of the incident, do you see any candidates for that discharge besides a zipper on his jacket?

Page 89

A. So, if it was actuated by a foreign object, it was more likely due to the foreign object being inserted into the gaps between the holster and the trigger guard and exerting pressure on the side of the trigger at the face of the trigger. But as to what that is, I -- I don't know. I don't have an opinion on it. I would -- I would also note that I don't have an opinion that a foreign object actuated the trigger. This, again, is Sig's theory. But if there was a foreign object, it didn't get in there earlier in the day when Mr. Cole holstered that firearm earlier that morning. So it had to have gotten in there at about the time of the incident.
Q. And you said you don't have an opinion that a foreign object actuated the trigger. You are not providing an opinion as to what caused David Cole's pistol to discharge; is that correct?
MR. HAAZ: Object to form.
THE WITNESS: I'm not. I'm relying -- I'm responding to Sig's theory of the foreign object contacted and engaged that trigger.
BY MS. DENNISON:
Q. Did you read Mr. Kent's deposition

Page 90

transcript in this matter?
A. So, I do not have Mr. Kent's deposition in the Cole matter.
Q. Are you aware that Mr. Kent testified that he believes the P320 pistol discharged because the trigger was actuated to the rear?
A. I have not been informed of what Mr. Kent may or may not have testified to.
Q. Do you plan to defer to Mr. Kent's opinion on the cause of Mr. Cole's incident at trial?
A. So, I'm not relying upon Mr. Kent's opinion. My opinions are with the understanding that it's Sig Sauer's contention that a foreign object contacted that trigger and engaged it resulting in the unintentional discharge.
Q. Is there any reason why you have not tried to do any work to determine what caused David Cole's pistol to discharge?
A. I'm not sure what you mean.
Q. Sure. You have not determined or made any effort to determine what was the actual cause of David Cole's discharge, right?
A. I do have a causation opinion, but it's

Page 91

predicated on Sig Sauer's contention that a foreign object accessed and actuated the trigger. I didn't do work to determine whether or not Sig Sauer's underlying theory is valid or not or if there was alternatives to Sig Sauer's underlying theory. My -- my report and my analysis is based on Sig Sauer's contention that the trigger was actuated -- accessed and actuated by a foreign object.
Q. And my question to you is why haven't you done that work?
A. I haven't been asked.
Q. And, so, when we go to trial in this matter, you will not offer any opinions that David Cole's pistol was discharged by anything other than a foreign object; is that correct?
A. So, my testimony will be similar as it was in the Abrams and the Lang trial. So, under direct I will state that my analysis is predicated on Sig Sauer's contention. What I opine at cross examination will depend upon the questions you ask me.
Q. But certainly you understand that if you were going to render any opinion as to causation

Page 92

of David Cole's incident other than a foreign object, we have a right to understand that before trial, right?
A. So, I've provided extensive reports in this matter to outline my opinions and the analysis, coming to those opinions and the support for those opinions. I don't know what you guys are going to ask me in cross examination. I think in at least one of those two trials you guys opened the door for questions regarding other possibilities, and I responded appropriately. So if you do the same thing in the Cole trial, I'll respond in the same way.
Q. Can you say within a reasonable degree of professional certainty what caused David Cole's pistol to discharge?
A. The defective firearm.
Q. What defect in the firearm caused David Cole's pistol to discharge?
A. So, assuming Sig Sauer's contention that a foreign object accessed and actuated the trigger, it was the failure to provide an external safety, such as a tabbed trigger safety.
Q. And in that event, that means that a

Page 93

foreign object pulled the trigger rearward, under that assumption, correct?
A. That's Sig Sauer's contention.
Q. And you don't have a contention one way or the other as to what caused the trigger to be actuated, correct?
A. Yeah, I haven't been asked to determine whether Sig Sauer's underlying contention is or is not correct.
Q. And you have done no work to determine whether that underlying contention is correct, right?
A. I have not purposely set out to do that in this case.
Q. You will certainly not be rendering any opinions at trial that David Cole's P320 discharged without trigger actuation, correct?
A. I don't plan on offering that testimony. But, again, it's going to be dependent upon what you guys ask me on cross.
Q. Would you be able to say at trial based on the work that you've done within a reasonable degree of professional certainty that David Cole's pistol discharged without a trigger pull?

Page 94

A. It depends on the question. But my response would be it's my understanding and my analysis was predicated on Sig Sauer's contention that there was a foreign object that accessed and actuated that trigger. I have no -- I have not seen any evidence to suggest that is correct. I have not seen any evidence to suggest it's -- it's not correct. There are other possibilities for how the gun discharged. Certainly actuation of the trigger is one of them and according to Sig's testimony wear on the sear striker connection is another.
Q. Are you able to state within a reasonable degree of professional certainty that David Cole's pistol discharged without a trigger pull?
A. Again, I have not been asked to assess that question. I don't plan on providing any opinions on direct. If you ask me in cross examination, I will say I don't have an opinion on it. It's my understanding it's Sig's contention, but it's also my understanding that there are other possibilities for how foreign objects -- excuse me -- how Sig P320s can discharge without

Page 95

an intentional trigger pull.
Q. Okay. And those other possibilities for how a P320 can discharge without a trigger pull -- I'm sorry.
What are the other possibilities that you will tell a jury within a reasonable degree of professional certainty that could cause a P320 to discharge unintentionally?
A. What I would say to the jury is that Sig Sauer has determined that there are three methods for a gun to have an unintentional discharge. One, an object contacting the trigger and actuating it. Two, a drop fire and, three, sear striker connection wear.
Q. What do you mean sear striker connection wear?
A. That's what -- that's my understanding of the testimony.
Q. What testimony?
A. So, hold on a minute. I cite it in my report. So, it looks like Sean Toner testified on May 23, 2024.
Q. And what did he testify about sear striker connection wear?

Page 96

A. He said that after multiple drops it's possible that the engagement surface between the sear and striker can wear or change resulting in the gun being able to fire without a trigger pull.
Q. In this case, is there any evidence that David Cole dropped his pistol to cause it to discharge?
A. Not that I'm aware of.
Q. In this case is there any evidence of wear between the sear and striker connection in David Cole's pistol?
A. I don't know. That's not something I investigated.
Q. David Cole's pistol was CT scanned, correct?
A. Offhand I don't know.
Q. Did you physically inspect David Cole's pistol?
A. I did.
Q. Did you look at the sear and the striker?
A. I'm sure I've looked at it, but I didn't do anything to evaluate the connection or the

Page 97

dimensions of the sear and the striker or their overlap.
Q. On June 16, 2025 you issued a supplemental report in this matter, correct?
A. One moment. That's correct.
MR. HAAZ: Kristen, just so -- just so the record is clear, you're now moving on to approximately the 20 minutes that you're going to ask Dr. Vigilante about his supplemental report?
MS. DENNISON: Yes, that's correct.
MR. HAAZ: So, the other two topics for today's deposition are now closed and we're going to move on to the third topic, which is Dr. Vigilante's supplemental report.
MS. DENNISON: No. I do have -- I do have one other question. Let me just ask the other question.
MR. HAAZ: Sure.
BY MS. DENNISON:
Q. Before we move on to the supplemental report, Dr. Vigilante, do you know what the Pugh Matrix is?

Page 98

A. One more time.
Q. Do you what a Pugh Matrix is?
A. Yes.
Q. What is a Pugh Matrix?
A. So, it's a decision matrix that Watkins applied in his report.
Q. Before seeing it in Derek Watkin's report, did you -- had you seen or come across a Pugh Matrix before?
A. Not that I can recall.
Q. Have you ever performed a Pugh Matrix?
A. I have not.
Q. Now I'm going to move on to the supplemental report. Okay. Your supplemental report in this matter, Dr. Vigilante, indicates on the first line, I am in receipt of the May 5, 2025 supplemental report from Derek Watkins and Erik Warren; is that correct?
A. Yes.
Q. Okay. And your supplemental report is about 12 pages long, correct?
A. It is, it's 12 pages long.
Q. In any of those 12 pages do you address anything contained within Derek Watkins and Erik

Page 99

Warren's May 5, 2025 supplemental report?
A. I do.
Q. Okay. And where in your 12-page supplemental report do you address anything from the May 5, 2025 supplemental report of Derek Watkins and Erik Warren?
A. So, it's -- it's all geared towards the contention that -- Watkins and Warren's contention that it's a holster problem and not a defective design problem. And, so, obviously my testimony, my opinions are that it's a defective design due to lack of an external safety, such as a tabbed trigger safety. Warren and Watkins want to turn this around and blame holsters. And, so, my report is addressing that issue overall.
Q. Your report, the subject of your report on the re line is holster warnings, correct?
A. Yes.
Q. And the opinion that you provide in the 12-page report is that Sig Sauer's failure to provide an effective warning system regarding holster selection to minimize the gaps around the trigger guard area was improper and unreasonably dangerous, rendered the subject Sig P320 defective

Page 100

and unreasonably dangerous and created an unreasonably dangerous condition that was a cause of the subject unintentional discharge and David Cole's injury; is that correct?
A. So, that is one of the opinions in that report.
Q. The supplemental report does not reference or discuss your June 11th inspection of the material provided by Derek Watkins or the June 13th testing that you conducted, correct?
A. Not that I'm aware of.
Q. Can we agree that Blackhawk designed and/or manufactured the Serpa CQC holster that David Cole was using at the time of his incident?
A. I would assume that.
Q. And would you expect Blackhawk as the designer and/or manufacturer of the holster would use a P320 pistol to aid in its design of the holster intended to be used with that pistol?
MR. HAAZ: Object to the form.
THE WITNESS: So, typically holster manufacturers -- manufacturers will obtain a sample of the gun they're designing a holster

Page 101

for and then use -- utilize that in the design of their holster. Whether Blackhawk did that or not, I don't know but that's typically the process.
BY MS. DENNISON:
Q. Certainly it would be difficult to design a holster to fit a specific pistol if you do not have that specific pistol, correct?
A. So, it depends. Often times a gun -- holsters are manufactured to fit a particular gun or a particular handgun and then another one comes along that fits in there just as well, and then the manufacturer will start or the seller will start marketing it for use for both guns. So it -- it just depends.
Q. And a manufacturer would not know that another gun would fit its holster without fitting the gun in the holster, right?
A. So, again, that depends, too. They can obtain another firearm and do the fit themselves or they can get information from a customer, maybe a seller or a distributor that said, hey, oh, by the way, this holster also works with a, you know, X gun -- not X carrier -- you know, maybe I should say Y gun or just this other generic gun. So I

Page 102

guess there's different ways for the holster manufacturer to learn that their holster may fit multiple different handguns.
Q. Do you believe it would be reasonable for a holster manufacturer to market a holster to fit a gun based on information conveyed to it by a third party?
MR. HAAZ: Object to form.
THE WITNESS: I don't have an opinion on that. I wasn't asked to assess that and I haven't done anything to assess it.
BY MS. DENNISON:
Q. Have you ever worked for a holster manufacturer?
A. I have not.
Q. Have you ever seen documents from a holster manufacturer about how they design and/or manufacture or test holsters?
A. I don't know that I've seen any specific manufacturer's. Certainly I've seen You Tube videos and links on how to make -- how to make Kydex holsters for -- for fire -- for handguns, and I've had friends who manufactured their own holsters for handguns.

Page 103

Q. Have you ever manufactured a holster?
A. No. Never had the need to.
Q. Would you expect Blackhawk to evaluate the trigger coverage of a pistol that it was designing a holster to be used with?
MR. HAAZ: Object to the form.
THE WITNESS: So, I haven't been asked to answer that question, and I don't have an opinion on it. But I would hope that a holster manufacturer would design it so that it covers the trigger when it's securely holstered. That's typically a -- a requirement for a -- or recommendation for a proper holster. At least in the classes that I've taught through the NRA is that you want to pick a holster that completely covers the trigger.
BY MS. DENNISON:
Q. Are holsters designed to any performance standards?
A. I'm not -- I'm not aware of holsters being required to meet a particular performance standard.
Q. Are you aware of any performance standards available for the design or manufacture

Page 104

of holsters?
MR. HAAZ: Object to form.
THE WITNESS: Not that I'm aware of. It's something I haven't seen before, but it's also something I haven't specifically looked for.
BY MS. DENNISON:
Q. What warnings does Blackhawk provide to users of the Serpa CQC holster for the P320?
A. I don't recall any offhand. But I can safely testify at this moment I don't know.
Q. Did Indian River County sheriffs office receive instructions and warnings for use of the Blackhawk holster?
A. So, it's my understanding that the deputies were provided training on the P320s and the issued holsters.
MR. HAAZ: Kristin, I think you said Indian River County.
MS. DENNISON: Oh, my gosh. I did. You know what, I'm working on too many cases. Let's strike that last question.
MR. HAAZ: Okay. I just wanted to --

Page 105

MS. DENNISON: Let's strike that last question and re-ask it.
MR. HAAZ: Yes.
BY MS. DENNISON:
Q. Did Somerset County receive instructions and warnings for use of the Blackhawk holster?
A. Did the county, I'm -- I'm assuming they were provided with whatever information is shipped with the holster. I'm not aware of them being provided any training. I know that Michael Rizzo went to training at Sig Sauer with his P320, but I don't know that he testified whether he was using a Blackhawk or a different model holster during that training.
Q. And the Blackhawk CQC holster was used for -- at Somerset County was used for plain clothes use, correct?
A. That's my understanding.
Q. And duty use they used a Safariland holster; is that your understanding?
A. Well, I think it's all duty use. But I think when they were in uniform and had a duty belt on, they were using a Safariland.
Q. Did David Cole read any instructions for

Page 106

use of the Blackhawk holster?
A. Not that I'm aware of. I don't think he was provided with any information -- any instructions for the Blackhawk holster other than the training he was provided by the county, by the sheriff's office.
Q. You talk a little bit more about hazard analysis within your supplemental report; is that correct?
A. I do.
Q. Have you ever seen hazard analysis, a written hazard analysis of any sort by a firearms manufacturer regarding holsters to be used with their firearms?
A. I don't believe so. The only ones -- the only information I have directly from a manufacturer is what Sig produced. And they do have as part of their FMECA a line regarding pistol accidentally, unintentionally discharges during holster and unholstering.
Q. Anything else?
A. That's the only thing I can recall.
Q. And the Somerset County sheriff's department worked with a company other than Sig

Page 107

Sauer for purchase and selection of the holsters to be used with the P320; is that your understanding?
A. No.
Q. No, that's not your understanding?
A. That's correct.
Q. What information do you have that Somerset County worked with Sig Sauer to select the holsters that they would be using?
A. I'm sorry. I thought your question was the Sig P320.
Q. So, let me ask the question again just in case. Is it your understanding that Somerset County worked with a company other than Sig Sauer for the selection of the holsters to be used with the P320?
A. So, I believe Rizzo testified that he had talked to or spoke with the distributor about holsters when they were ordering the Sig P320s.
Q. What effective warning system should Sig Sauer have provided regarding holster selection? End of question. It sounded like it wasn't the end of the question. Let me ask it again.
What effective warning system should Sig

Page 108

Sauer have provided regarding holster selection?
A. For this matter, an effective warning system would have been information provided directly through Don -- Don Boulerice to the county, as well as written information in the -- in the manual for the Sig P320 and in the marketing information provided with the Sig P320.
Q. What written information should Sig Sauer have provided in its manual about holster selection?
A. So, I haven't come up with a specific language for a warning in the manual. But I would point back to Sig's 2025 manual as a -- as a good start.
Q. So I'll take us to Sig's 2025 manual. And you reviewed that in the last couple of days in preparation for your deposition today; is that correct?
A. I did. But I had also reviewed it prior to my first deposition.
Q. So, I will share my screen with you. Okay. So, do you see on the screen Operator's Manual, P320, part number 8501909-1, rev 15?
A. That's the name of the file.

Page 109

Q. I'm going to take you to the holster warning, which is section -- contained within section 3.1. Accessories and holsters is 3.1.1 in the manual. Do you see that on the screen?
A. I do.
Q. I'll try to make it a little bit larger so you can see it a little bit better. The information contained here that I've highlighted on the screen under holsters, do you believe that that is an appropriate warning on holster selection?
A. No. I think it's a good start, but it's not complete.
Q. And what is not complete about this one?
A. Well, they be specifically and explicit -- explicitly informing purchasers and users that due to the failure to include a tabbed trigger safety in conjunction with the short reset trigger, that the gun is at increased risk of unintentional discharge, and, therefore, holster selection is critical.
Q. And the information that you have to indicate that Sig Sauer is at an increased risk of trigger actuation because it has a short reset

Page 110

trigger and no tabbed trigger -- just strike that.
You have not done any additional work -- strike that again.
Have you done any additional work since your March 18th deposition in this matter to look at incident rates of accidental discharges with pistols that have tabbed triggers?
MR. HAAZ: Object to form.
THE WITNESS: Since my first deposition I have not.
BY MS. DENNISON:
Q. Okay. Were you provided with the deposition of Chris Jacob taken in this matter?
A. I have not.
Q. Have you been provided the deposition of David Counselor taken in this matter?
A. I have not.
Q. Are you familiar with a concept of over warning?
A. Sure.
Q. Sorry. Did you answer?
A. I did.
Q. I didn't hear your answer.
A. I said sure.

Page 111

Q. Okay. And what is over warning?
A. Over warning is when you have a defective design that you try to patchwork with warnings to fix the issue rather than dealing with the underlying problem.
Q. Where did you obtain that definition of over warning from?
A. So, I've been studying warnings since 1994. I had been involved in basic research, warnings and risk perception since that time frame. I've been involved in the design and application of warning systems for consumer and commercial products since at least the late 1990s. I am the Human Factors and Egronomics Society's representative on the ANSI Z535, which is the warning and safety communication standard. So I'd say I've got a pretty good background in warnings and risk perception and a pretty good understanding of the issues associated with warnings.
Q. That's not my question, though. My question is the definition you just gave me for over warning, did you get that from -- let me ask it in a more explicit way.

Page 112

Did you get that definition of over warning you just gave me from any peer reviewed literature or publication?
A. I got it through my education and training in the field. I'm sure that it's addressed in publications, but I didn't come prepared to provide a specific reference.
Q. Okay. As we sit here today, you are unable to tell me any peer reviewed publication or study in the field that defines over warning in the manner in which you just described it?
A. Yeah, I didn't come prepared for a specific reference on the topic.
Q. I would ask that if you find that peer reviewed literature or study that backs up your definition of over warning that you just gave me prior to trial and you plan to give that at trial, that that be produced to us in advance.
All right. Can we agree that actual incident rates are more reliable for studying hazard in a product than subjective projections of what the expected incident rates may be?
A. Yeah, I don't think one is better than the other. I think it's -- availability is

Page 113

certainly one aspect and certainly available metrics should be used in -- in consideration of the overall risk assessment.
Q. Do you have any peer reviewed literature that you rely upon that indicates to you what an acceptable or tolerable risk is in a product?
A. I didn't bring one specifically. But certainly the National Safety Council addresses it. Offhand that would be one of the examples I would provide.
Q. How does the National Safety Council -- let me strike that.
What is the National Safety Council's identification of what an acceptable risk is for a product?
A. So, when we talk about acceptable risk, it's -- it's a -- it's a balancing of the hazard, the likelihood and the frequency of exposure and the ability to address it within reason with respect to effect on utility and/or cost. And, so, technically you want risks to be zero. But in the real world it's not likely to get down to zero without completely destroying the utility of the product or the feature. And, so, the goal is to

Page 114

reduce it as much as possible within reason.
Q. And is there a peer reviewed study or publication that provides a number or a range of what that reasonable risk reduction is when it comes to actual numbers?
A. No, there's not one size fits all. It's up to the designer and manufacturer to determine whether or not it's reasonable. And certainly that includes a proper product safety management program. That includes your hazard analysis and your risk assessment and your assessment of mitigation -- mitigation options that are available and what those -- what those mitigation strategies have on the overall risk. And then we get back into the utility aspect of it. If we put up a guard that prevents anyone from falling off a balcony, the way to do that completely is -- is to a -- to barrier it off so you can't get anything through. But then that kills the utility if part of the utility is wanting to be able to see what the height provides or the view that the height provides. And, so, there are different ways to -- to keep the utility but improve the risk reduction method. So, again, it's going to be dependent

Page 115

upon the options available, their costs and their affect on the utility of the product or the feature.
MS. DENNISON: Sam, let's go off the record for two minutes. I just want to see what else I need to ask so that I can streamline this.
THE VIDEO TECHNICIAN: We are going off --
THE WITNESS: Give me like ten minutes.
MS. DENNISON: Okay. That's fine.
THE VIDEO TECHNICIAN: Going off the record. The time is 1:05.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: We are back on the video record. The time is 1:16.
THE WITNESS: So, Kristen, the other reference for the tolerable risk and risk reduction that I would point to is the ISO Guide 51. I couldn't remember it at the time you asked me the question but that would be another specific reference.

Page 116

BY MS. DENNISON:
Q. ISO guide 51?
A. Correct, safety aspects, guidelines for their -- inclusion and standards.
Q. Is that something that is in your file materials that have been provided to us?
A. It's not but I can.
Q. I would ask for that, for you to give that to Mr. Haaz and for him to send it to us.
Okay. In the -- in any of the breaks that we've had --
MS. DENNISON: We are back on the record, right? We're not? I started to ask questions --
THE VIDEO TECHNICIAN: Yes, we are.
MS. DENNISON: Oh, we are. Okay. Thanks. Sorry. Thank you.
THE WITNESS: Was my statement on the record?
BY MS. DENNISON:
Q. Yes, it was. Okay. Dr. Vigilante, in any of the breaks that we've taken today, have you had any conversations with anybody about the

substance of your testimony that you have been providing here today?
A. No regarding substance. I did talk to Mr. Haaz a few moments ago to alert me that he's going to need another two minutes. So he wanted to talk about my schedule.
Q. Okay. All right. And I just wanted to show you the invoice that was provided to me. So let me just share my screen. This was provided to me on one of the breaks. So, can you see the invoice dated March 20, 2025, you can see a portion of it on the screen; is that correct?
A. I can see a portion of it.
Q. And this is for work dated March 12, March 14, March 17, March 18, March 19; is that correct?
A. Correct.
Q. Was this work here all for the Cole matter?
A. The only one I don't know is -- yeah, I think so because 3-17 was depo prep and I believe the depo was 3-19. So, I'm -- I'm assuming that it is all.
Q. Okay. And the total for that was



$5720.81?
A. It was.
Q. You have not yet issued an invoice for the work that you did in this month, at least with the testing and the supplemental report; is that correct?
A. I have not.
Q. Did you do any work in the Cole matter in April?
A. So, I did the jacket inspection and first supplemental report in April.
Q. Did you do any work in May?
A. I don't know.
Q. Then you did some work in June?
A. I did.
Q. You said a first supplemental report. Is your June 15, 2025 report a second supplemental report?
A. Yes.
Q. What is the date of the first supplemental report?
A. April 17, 2025.
MS. DENNISON: Sam, was that produced to us?



MR. HAAZ: I'll have to look and see.
MS. DENNISON: Let's go off the record and can you check on that, please.
MR. HAAZ: Sure.
THE VIDEO TECHNICIAN: Just a moment. Off the record, the time is 1:21.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: Back on the record. The time is 1:25.
MR. HAAZ: Kristen, I just had a conversation with Dr. Vigilante regarding what he meant by a report in April, and I now have in front of me a one-page draft of a report. It was never finalized or sent. And I'll represent that the one-page draft report was merely relating to an inspection of the subject jacket as compared to an exemplar jacket that we eventually sent to you guys I think in April. And the conclusion is that the exemplar jacket was just the same in every meaningful way, zippers in the same place, same size, et cetera. So, it's literally a one-page draft report, never finalized. So that's -- that's all that was.



BY MS. DENNISON:
Q. So, Dr. Vigilante, I understand that you prepared a draft report in April that was never finalized; is that accurate?
A. That's -- yes.
Q. Okay. And that draft report, that was one page long?
A. It is a little over one page.
Q. Okay. And that draft report, is that a comparison of the subject jacket and an exemplar jacket?
A. It is -- well, yeah, it just documents my comparison of two -- two jackets.
Q. Okay. And why did you prepare that draft report?
A. I was asked.
Q. And what was or did you -- do you have any opinions or conclusions about your comparison between the subject jacket and an exemplar jacket?
A. Yeah, they're substantially similar.
Q. Okay. And was there anything else in that draft report besides the comparison of those two jackets and a conclusion that they were

substantially similar?
A. No.
Q. And when you identified for me the work that you did in April, what were you looking at to determine what work you did in April?
A. So, the invoice, April 17th.
Q. Okay. And, so, did you issue an invoice in April?
A. I did.
MS. DENNISON: Okay. Sam, can I get a copy of that invoice, please?
MR. HAAZ: Absolutely. Give me one second.
MS. DENNISON: And then while you're doing that --
MR. HAAZ: Just so you understand, our paralegal, Camile, usually has all the invoices. So I was going by, you know, what -- what she produced to me, which is asked for everything for March onward. So let me get that and I'll send it to you now.
MS. DENNISON: Thank you, Sam. I appreciate it.
THE WITNESS: To clarify. I


mentioned this earlier in the deposition, too, that invoice is one hour for Cole and then five hours for other cases.
BY MS. DENNISON:
Q. That's the April invoice?
A. Correct.
Q. And then you do not have an invoice issued for Cole in May; is that correct?
A. I do not.
Q. Is that because you haven't generated one yet or because you did not do any work for Cole in May or some other reason?
A. So, I haven't generated another invoice. I don't recall if I did any work in May on Cole or not.
Q. All right. Dr. Vigilante, I think the only question I may have left -- left for you is on the invoice.
MS. DENNISON: Let's just go off the record until we get that invoice and then we'll finish.
THE VIDEO TECHNICIAN: One moment, please. Going off the record. The time is 1:30.


(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: Going back on the record. The time is 1:33.
BY MS. DENNISON:
Q. All right. Dr. Vigilante, while we were off the record I was able to obtain a copy of the April invoice that we just mentioned. Can you see it on the screen, portions of it?
A. Yes.
Q. So, this is dated April 17, 2025 and there is an entry for April 7th for a product inspection, which is five hours and is blacked out. Is that for the case other than Cole?
A. Yes.
Q. And then 4-14-2025 jacket inspection report, D. Cole, one hour. And that's what you were referencing earlier?
A. So, that's for the jacket, exemplar jacket inspection, that draft report and they were both in the Cole matter.
MS. DENNISON: Okay. I will stop the share. And, Dr. Vigilante, those are all the questions I have for you.
BY MR. HAAZ:


Q. I have some brief redirect. Dr. Vigilante, do you remember there being testimony about your causation opinion in this case?
A. Yes.
Q. And what is your causation opinion in this case with respect to the P320?
A. So, specifically it's Sig Sauer's failure to integrate an external safety into the design of the Sig P320 was improper and unreasonably dangerous, rendering the -- the firearm defective and unreasonably dangerous and was most likely the cause of the subject unintentional discharge of Deputy David Cole's injury.
Q. If there is a properly designed tabbed trigger on David Cole's P320 and his P320 was in the same holster that he was using, could that have prevented the subject incident?
A. Yes.
Q. And did your testing support that conclusion?
A. Absolutely.
Q. The Agency Arms tabbed trigger was a tabbed trigger that you installed on the same

exact make and model of P320 that David Cole was using, right?

A. Yes.

Q. And when you tested that Agency Arms tabbed trigger in that exemplar P320, did you use the same holster David Cole was using?

A. The same model exemplar, not the exact same one but the same model.

Q. And when you attempted to effectuate that Agency Arms tabbed trigger in the exemplar P320 in the same exemplar holster, were you able to actuate it with the zipper pulls on the exemplar jacket?

A. I was not.

MR. HAAZ: Those are all the questions I have.

MS. DENNISON: Okay. Dr. Vigilante, we are finished.

THE VIDEO TECHNICIAN: Let me just read us off the record. This now concludes the video conference deposition of Dr. William Vigilante. At this time we do ask all counsel to stay connected briefly to provide the court reporter with you transcript and video orders.



MS. DENNISON: Yes, I would like an e-trans, TXT and the video.

THE VIDEO TECHNICIAN: Synched video or standard?

MS. DENNISON: Standard.

THE VIDEO TECHNICIAN: Mr. Haaz?

MR. HAAZ: Can I have a TXT and a mini PDF, please.

THE VIDEO TECHNICIAN: And no video, right?

MR. HAAZ: No, sir.

THE VIDEO TECHNICIAN: Thank you. We are now going off the record on June 20, 2025 at 1:37 p.m. Eastern time.

(Witness excused.)

(Deposition concluded at 1:37 p.m.)

(Document marked Exhibit 1 for identification.)



C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

-------------------------

Dolores M. Horne

Dated: June 24, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)