# Exhibit 15

Robert Rauschenberger, Ph.D.
28 W. 44th Street, Ste. 700
New York, NY 10005

Kristen E. Dennison, Esq.
Littleton Joyce Ughetta & Kelly LLP
2460 N Courtenay Pkwy, Suite 204
Merritt Island, FL 32953

February 21, 2025

RE: Cole v. SIG SAUER
Project No. 25020041

Dear Ms. Dennison:

Pursuant to your request, I am providing the following report, summarizing the work conducted by J.S. Held in the matter of Cole v. SIG SAUER. I have been asked to prepare a rebuttal to the report of Plaintiffs' expert, Dr. William J. Vigilante, Jr. The present report describes my findings to date. I have reviewed case-specific materials (listed in the appendix to this report), as well as scientific literature related to human performance, warnings, and safety communication. The opinions contained in this report are based on my education, training, and experience, as well as on my review of the aforementioned materials. The opinions proffered in the report have been rendered with a reasonable degree of scientific certainty. I reserve the right to supplement the report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery. Should I be asked to testify in this case, I plan to use excerpts and charts from the materials I have cited in this report. A copy of my resume is attached as an appendix to the report.

**Qualifications**

I received a master's degree and a Ph.D. in cognitive psychology from The Johns Hopkins University. I am currently VP Director of Human Factors at J.S. Held, where I oversee a network of state-of-the-art user research centers that employ predominantly Ph.D.-level scientists performing research related to product usability, labeling comprehension, and product safety in use. Over the past 28 years, I have conducted research on the way humans process information, perceptually organize information, attend to various aspects of the visual world, and interact with technology. I have also assisted consumer products and healthcare companies in researching consumer attitudes toward their products, creating and evaluating instructions and warnings, and preparing regulatory submissions for clearance or approval by the FDA. My research has been funded by the National Science Foundation, for which I also serve as grant reviewer. I have authored peer-reviewed articles on visual perception, visual attention, human-machine interaction, driver behavior, and warnings effectiveness, published in scientific journals and conference proceedings, and have, in turn, provided my own peer review as grant selection committee member, editorial board member, and as reviewer for two dozen scientific journals. I served as the program chair for the healthcare technical group of the Human Factors and

Ergonomics Society. I am a Fellow of the Psychonomic Society, which requires a nomination by a senior member and the fulfillment of certain criteria that are indicative of productive post-graduate research activity. Current or past professional memberships include the Visions Sciences Society (VSS), the Association for Research in Vision and Ophthalmology (ARVO), and the Association for Computing Machinery's (ACM) Special Interest Group on Human-Computer Interaction (SIGCHI). I also held an adjunct professorship at the School of Interactive Arts and Technology at Simon Fraser University, Vancouver, BC. I am regularly invited to present my research to scientists at research laboratories in both industry and academia, in the U.S. as well as abroad. Prior to joining J.S. Held, I was a principal at Exponent, where I created and directed the Centers for Scientific User Research (CSUR); and prior to Exponent, I managed the research in human factors and user experience for the North American continent at Siemens Corporate Research, for the entire breadth of the Siemens portfolio, which, at the time, included medical, industrial, and consumer products. I have developed product warnings, used scientific methods to evaluate the safety of products, and used large-scale databases maintained by the Food and Drug Administration (FDA) and the Consumer Product Safety Commission (CPSC) to evaluate the safety of products. J.S. Held presently bills my time at a rate of $650 an hour.

**Cognitive and Perceptual Psychology and the Science of Consumer Decision-Making**

Usability engineering was born out of cognitive and perceptual psychology,[1] as it closely relates to how humans perceive the "affordances" of designs,[2] process information, and commit errors based either on flawed perceptions or a flawed execution of their movements.[3] In his chapters on consumer decision-making and designing labels for presenting risk information, Dr. James Bettman bases his exposition on thirty years of basic research in information processing, for which he, in turn, identifies three major subsystems that allow memories and internal processes to interact with the environment: the perceptual systems, the motor system, and the cognitive systems.[4] All three subsystems have been the purview of perceptual and cognitive psychology for over a century.[5] Not surprisingly, the decision-making processes that relate to risk taking/avoidance and the processing of warnings and other disclosures are also derived from the same underlying perceptual, cognitive, and motor structures and processes studied by perceptual and cognitive psychologists.[6] Given these foundational science origins, a sizeable literature has

---

[1] E.g., Gillan, D. J., & Bias, R. G. (2001). Usability science. I: Foundations. *International Journal of Human-Computer Interaction*, *13*, 351-372.

[2] E.g., Norman, D. A. (2015). Affordances: Commentary on the special issue of AIEDAM. *Artificial Intelligence for Engineering Design, Analysis and Manufacturing, 3*, 235-238.

[3] E.g., Norman, D. A. (1981). Categorization of action slips. *Psychological Review, 88*, 1-15; Norman, D. A. (1983). Design rules based on analyses of human error. *Communications of the ACM, 26*, 254-258; Leape, L. L. (1994). Error in medicine. *Journal of the American Medical Association, 272*, 1851-1857; Reason, J. (1990). *Human error*. Cambridge University Press.

[4] Bettman, J. R., Johnson, E. J., & Payne, J. W. (1986). Consumer decision making. In T. S. Robertson & H. H. Kassarjian (Eds.), *Handbook of Consumer Behavior* (pp. 50-84). Englewood Cliffs, NJ: Prentice-Hall; Bettman, J. R., Payne, J. W., & Staelin, R. (1991). Cognitive considerations in designing effective labels for presenting risk information. *Journal of Public Policy & Marketing, 5*, 1-28.

[5] James, W. (1890). *The principles of psychology*. New York: Holt.

[6] See, e.g., Bettman, J. R., Payne, J. W., & Staelin, R. (1991). Cognitive considerations in designing effective labels for presenting risk information. *Journal of Public Policy & Marketing, 5*, 1-28.

accumulated over the past four decades-plus on those factors that influence the effectiveness of warnings and other disclosures. For example, the effects of familiarity and benign experience, as well as the cost of compliance, have been subjected to empirical investigation.[7] The effect of repeated exposure to the same or different hazards has undergone scientific scrutiny.[8] The impact of numerosity, embeddedness, formatting, and other aspects of presentation have been studied by scientific researchers.[9]

**Understanding of Allegations**

On May 4, 2022, Detective David Allen Cole was executing a search warrant at a home in Sangerville, ME.[10] As he exited the subject property, a round discharged from his service pistol, a SIG SAUER P320,[11] striking Detective Cole in the right upper thigh and subsequently penetrating his right calf.[12] Detective Cole's gun was still holstered at the time it discharged.[13] Plaintiffs allege that the P320 is unreasonably dangerous;[14] that SIG SAUER failed to discover the P320's alleged propensity to discharge unintentionally;[15] and that SIG SAUER failed to warn consumers of this alleged propensity.[16]

---

[7] E.g., Dingus, T. A., Hathaway, J. A., & Hunn, B. P. (1991). A most critical warning variable: Two demonstrations of the powerful effects of cost on warning compliance. In *Proceedings of the Human Factors Society 35th Annual Meeting* (pp. 1034-1038); Goldhaber, G. M., & deTurck, M. A. (1988). Effectiveness of warning signs: "Familiarity effects." *Forensic Reports*, *1*, 281-301; Karnes, E. W., Leonard, S. D., & Rachwal, G. (1986). Effects of benign experiences on the perception of risk. In *Proceedings of the Human Factors Society 30th Annual Meeting* (pp. 121-125); Lehto, M. R., & Foley, J. P. (1991). Risk-taking, warning labels, training, and regulation: Are they associated with the use of helmets by all-terrain vehicle riders? *Journal of Safety Research*, *22*, 191-200; Otsubo, S. M. (1988). A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs. In *Proceedings of the Human Factors Society 32nd Annual Meeting* (pp. 536-540); Zeitlin (1994). Failure to follow safety instructions: Faulty communication or risky decisions? *Human Factors*, *36*, 172-181.

[8] E.g., Halpern-Felsher, B. L., Millstein, S. G., Ellen, J. M., Adler, N. E., Tschann, J. M., & Biehl, M. (2001). The role of behavioral experience in judging risks. *Health Psychology*, *20*, 120-126; Lima, M. L. (2004). On the influence of risk perception on mental health: Living near an incinerator. *Journal of Environmental Psychology*, *24*, 71-84.

[9] E.g., Chen, J. Y., Gilson, R. D., & Mouloua, M. (1997). Perceived risk dilution with multiple warnings. In *Proceedings of the Human Factors and Ergonomics Society 41st Annual Meeting* (pp. 831-835); Huntley-Fenner, G., Harley, E., Trachtman, D., & Young, D. (2007). ANSI Z535.6 and conspicuity: A test of the new state of the art format for instructions. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting* (pp. 1029-1033); Otsubo, S. M. (1988). A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs. In *Proceedings of the Human Factors Society 32nd Annual Meeting* (pp. 536-540); Shaver, E. F., Young, S. L., Frantz, J. P., Rhoades, T. P., Hall, S. M., & Shah, R. J. (2006). Comparison of ANSI and ISO standard formats on people's response to product warnings. In *Proceedings of the Human Factors and Ergonomics Society 50th Annual Meeting* (pp. 2197-2201); Strawbridge, J. A. (1986). The influence of position, highlighting, and imbedding on warning effectiveness. In *Proceedings of the Human Factors Society 30th Annual Meeting* (pp. 716-720).

[10] Complaint ¶ 142

[11] Deposition of David Cole, 08/30/2024 ("D. Cole depo"), p. 56

[12] Complaint ¶ 148

[13] D. Cole depo, p. 117

[14] Complaint ¶ 152

[15] Complaint ¶ 159

[16] Complaint ¶¶ 158, 159

**Dr. William J. Vigilante, Jr.'s Report**

Plaintiffs' expert, Dr. Vigilante, in his report dated January 23, 2025, opines that SIG SAUER had a responsibility to mitigate any safety risks associated with the P320; that there was sufficient information for SIG SAUER to identify the alleged propensity of the P320 to discharge unintentionally; that this alleged propensity was foreseeable; and that Detective Cole's department would not have purchase the P320 if SIG SAUER had provided warnings that the P320 can allegedly discharge by contact with a foreign object when fully holstered in a holster specifically designed for the pistol.[17] In the introduction to his report, Dr. Vigilante states that the purpose of his investigation was to determine if the P320 had an elevated risk of unintentional discharge; whether such a risk would have been foreseeable to SIG SAUER; whether SIG SAUER should have included a manual safety on the P320; and whether SIG SAUER's not having included a manual safety was the cause of Detective Cole's incident.[18]

Dr. Vigilante's report, which is extremely sparse on published peer-reviewed science, citing textbook chapters on human factors, a host of industry standards, and an opinion piece authored by an attorney,[19] in its first part, discusses general practices within human factors for determining and addressing hazards potentially associated with products. Nothing in the section titled, "Was the elevated risk of unintended discharge of the P320 foreseeable to Sig Sauer?" – which spans 30 pages of Dr. Vigilante's report – actually evaluates whether there is an elevated risk of unintended discharge for the P320 and whether such an elevated risk would have been foreseeable to SIG SAUER. Before even conducting an analysis of any sort, Dr. Vigilante concludes that "Given the types of uses and users in conjunction with the design of the firearm, there was sufficient information for Sig Sauer to identify the increased risk of unintentional discharge associated with the design choices it made for the Sig P320 handgun."[20] There is no discussion of any information available to SIG SAUER, nor of those aspects of the design of the P320 that allegedly render it less safe than other pistols. Dr. Vigilante then goes on to discuss the "Trigger design" of the P320.

*Trigger design*

In the section on trigger design, Dr. Vigilante discusses the trigger weight and travel distance of the trigger on the P320 but does not tie either empirically to any increased risk of unintentional discharge. His argument is that because "[t]he Sig P320 trigger is significantly more sensitive than competitor striker-fired guns because of the substantially reduced movement required to fire the gun, … as a result it is more prone and susceptible to unintentional discharge than other striker-fired guns."[21] This conclusion, however, relies solely on face validity, intuition, and speculation. Dr. Vigilante is simply inviting the reader, almost with a conspiratory elbow-nudge, to follow his conjecture that because the P320 ought to be easier to trigger, owing to its shorter trigger pull and lighter trigger weight, it therefore automatically also ought to be more prone to

[17] Expert report of Dr. William J. Vigilante, Jr., January 23, 2025 ("Vigilante Report")
[18] Vigilante Report, p. 2
[19] See Vigilante Report, p. 67
[20] Vigilante Report, p. 22
[21] Vigilante Report, p. 23

unintended discharges. By that logic, one could, similarly, point out that penguins are birds; that they possess wings; and that they therefore ought to be able to fly. In reality, this logic is not borne out, however. Dr. Vigilante's reasoning thereby becomes circular: He assumes, without basis, that the P320 is more prone to unintentional discharges, highlights their trigger design as the reason why, and then refers to the presumed higher propensity for unintentional discharges as the proof for this conclusion. Dr. Vigilante, moreover, expects SIG SAUER to have at the same conclusion, using his same logic: "Given its short displacement, [and its] SA [single-action] trigger, it was reasonably foreseeable to Sig Sauer that without an external safety (e.g., tabbed-trigger safety or manual thumb safety) the Sig P320 was at an increased risk of an unintended discharge compared to other striker-fired handguns."[22] Dr. Vigilante's arguments for the foreseeability, on part of SIG SAUER, of an allegedly elevated propensity for unintentional discharges exhaust themselves in the expectation that SIG SAUER should have followed his same logic.

*Scientific and other empirical data on unintentional discharges*

Consequently, it is expected and appropriate that Dr. Vigilante should eventually, after another 18 pages of his report, ask himself whether "there [is] evidence supporting the Sig P320 being more prone to unintended discharge than other striker-fired guns with trigger safeties."[23] He reaches the conclusion that, "[t]he objective data, public filings, and video I have reviewed and personally observed supports this hypothesis."[24] He does so based upon a discussion of an opinion piece by a "consumer advocate," who describes a "lack of available data regarding unintended discharges."[25] Not only is it problematic to draw scientific conclusions based upon a "lack of available data," which is decidedly not the same thing as a lack of empirical evidence to support a conclusion (it means simply that nothing is known about the question, one way or the other), but it is untrue that there is a lack of data. There is presently a growing peer-reviewed literature on unintended discharges, none of which has evidently made it into Dr. Vigilante's analysis, or at least not into his report.

Presently, there are several published articles in the scientific literature on unintentional discharges of firearms. As this burgeoning scientific literature shows, a large variety of firearms of all makes, models, and designs are susceptible to unintentional discharges, irrespective of the trigger pull distance or weight, the presence or absence of a manual safety, or other design elements of the gun in question. Assessing the state of science outside of these systematic empirical investigations of the topic, O'Neill and colleagues conclude that "there has been a reliance on theoretical generalizations and anecdotal evidence" and that "[i]nformation gleaned from an empirical analysis, one that can be verified through direct observation, can lead to a more complete and clear understanding of the issue."[26] Various such empirical analyses all demonstrate that unintended discharges are observed "across a wide variety of firearms,

[22] Vigilante Report, p. 30
[23] Vigilante Report, p. 48
[24] Vigilante Report, p. 50
[25] Vigilante Report, p. 49
[26] O'Neill et al. (2018a)

regardless of design, trigger mechanism, or trigger poundage."[27] These conclusions were based on a sample of 171 official reports of unintended discharges from 1992-2016. Using a different sample of 137 official reports from 1974-2015, another analysis found that unintended discharges were distributed across 23 models from 11 manufacturers. This study, as well, concludes that unintended discharges "can and do occur across a wide variety of manufacturers, models, and firearm types," and cautions not to extrapolate from the specific distribution of events across trigger types owing to the lack of counterbalancing in the study design.[28] Yet another study used the aforementioned samples of unintended discharges to investigate the causes of the intended discharge in each case.[29] It found that over half of unintended discharges occurred within the context of routine tasks, such as clearing and function checks, which, in turn, constituted over half of routine tasks associated with an unintended discharge. Another one quarter of unintended discharges were attributable to muscle coactivation, which resulted from a loss of balance, use of the other hand, and a loss of grip, which, collectively, accounted for nearly 70% of the unintended discharges in that category. The remaining quarter divided into unfamiliar firearm tasks (with unfamiliar firearms and hand transfers accounting for 70% of those tasks, in turn), contact with objects, startle stimuli, and medical conditions. A final study (to date) utilizing the 171 aforementioned official reports included a fairly high percentage of double-action only handguns (~27%) among the weapons involved in unintended discharges, which, the authors concluded, "substantiate[s] the claim that UDs [unintended discharges] occur across firearm types, trigger actions, and trigger weights."[30] A related study had found unintended discharges across a trigger weight range of four to 13 pounds.[31] In other words, unintended discharges are not the consequence of either a specific action type (such as single-action striker-fired) or trigger pull weight, or any other specific design element, as alleged by Plaintiff or argued by Dr. Vigilante.[32]

Further empirical data on the potential causes of unintended discharges come from publicly available police investigation reports. The New York Police Department, for example, publishes an annual report of firearms discharges, which includes a section on unintentional discharges. Five such reports were retrieved from the public domain, for 2010-2014. After 2014, no further reports were found in the public domain. These reports, spanning five years, provide analyses of the root causes of the unintentional discharges recorded by the New York Police Department, subsequent to a departmental investigation. In 2010, half of the unintentional discharges that did not occur during an adversarial conflict or animal attack occurred while the officer was unloading the gun; the other half occurred while the officer was handling the gun (from inspecting or cleaning the firearm, to attempting to render the firearm safe, to testing the firearm's operability).[33] Five of the 15 firearms involved were not the officers' regular guns, leading the Report to conclude that the associated unintentional discharges stemmed from a lack

---

[27] O'Neill et al. (2018a)
[28] O'Neill et al. (2017), p. 289
[29] O'Neill (2018)
[30] O'Neill et al. (2018b)
[31] O'Neill et al. (2017)
[32] See, e.g., Complaint ¶ 26; Vigilante Report, pp. 2, 24, 27, 30, 42, 48, 64
[33] See NYPD Annual Firearms Discharge Report 2010

of familiarity with the firearm in question.[34] Six of the remaining nine firearms were manufactured by Glock (which is by no means an indictment of Glock, but merely a statement of fact).[35] In all but one of the cases for which a finding was determined as the result of an investigation, the officer involved received some form of discipline or retraining,[36] intimating user error, rather than a defect on part of the gun. Similar results obtain for the 2011, 2012, 2013, and 2014 Reports: The bulk of the officers involved were determined to have violated Department guidelines and were subject to discipline and/or retraining.[37] In 2012, of the service weapons involved, 31% were Glocks, 46% Smith & Wessons, and 23% SIG SAUERs;[38] in 2013, 62% were Glocks and 38% SIG SAUERs;[39] and in 2014, 50% were Glocks, 28% Smith & Wessons, 11% SIG SAUERs, and 5% each a Colt and a Davis.[40] These results reinforce the findings from the published scientific literature, that the range of makes and models of guns that experience unintended discharges is quite wide; and it also implicates user error as a frequent culprit, even with individuals one would expect to be proficient in the proper use of firearms.

*Foreseeability and actual empirical risk of unintentional discharges with the P320*

Such scientific and/or empirical investigations move the analysis of unintended discharges away from the realm of speculation (as exemplified in Dr. Vigilante's report) and into the realm of science. What these investigations show is that the P320, or even SIG SAUER guns, more generally, do not stand out as especially or uniquely prone to unintended discharges. There is a related question, of whether the risk of unintended discharges for the P320 is unreasonably high in the first place, irrespective of whether it is putatively higher in P320s than in other pistols. This question relates to the foreseeability of the alleged hazard. Because human reasoning about foreseeability is prone to what is called a hindsight bias,[41] it is necessary to examine whether, statistically, such hindsight bias overamplifies any perception of risk in the wake of a specific incident. Airplane accidents, for example, loom very large in the public's mind, while they are actually quite rare.[42] If a loved one or acquaintance were to perish in an airplane accident, no one would argue that they reasonably foresaw that that person would die in an airplane accident when he or she boarded the aircraft. Similarly, it is not inconceivable that lightning will strike; however, how likely (and therefore foreseeable) is it that lightning will strike me, specifically, in a given particular circumstance? Such considerations underlie the determination of whether it is necessary or even appropriate to attempt to mitigate a potential hazard – which has been formalized into a process that begins with a determination of the likelihood of an adverse

---

34 *Ibid.* [NYPD Annual Firearms Discharge Report 2010]
35 *Ibid.* [NYPD Annual Firearms Discharge Report 2010]
36 *Ibid.* [NYPD Annual Firearms Discharge Report 2010]
37 See NYPD Annual Firearms Discharge Reports 2011, 2012, 2013, and 2014
38 NYPD Annual Firearms Discharge Reports 2012
39 NYPD Annual Firearms Discharge Reports 2013
40 NYPD Annual Firearms Discharge Reports 2014
41 Hindsight bias describes the difficulty or inability for people to ignore knowledge about a known outcome in judging the past foreseeability of that outcome – or, as Hawkins and Hastie (1990) put it, "the tendency for people with outcome knowledge to believe falsely that they would have predicted the reported outcome of an event" (p. 311).
42 See, e.g., Li et al. (2015)

outcome based upon empirical evidence.[43] Relatedly, Dr. Vigilante – whether intentionally, to achieve a polemic end, or unintentionally, which would be surprising for a human factors expert – confuses risk and hazard. He identifies the design of the trigger, the absence of a manual safety (on some models), and other design elements of the P320 as potential hazards, which can theoretically – but need not in practice – lead to certain outcomes. He then uses these theoretical hazards to argue that there is a real risk of unintentional discharges associated with the P320, one that was foreseeable. Risk, however, is a function of the likelihood of an adverse outcome and the severity of that adverse outcome. Identifying a theoretical hazard alone does not translate into an unreasonable risk, much less into a relatively greater risk than in comparable products, or necessarily into any risk at all. Moreover, in order to render a relative risk judgment, as Dr. Vigilante does ("the P320 … is *more* susceptible to unintended discharge"[44]), one also needs to quantify the risk profile of the comparator product(s) or activity. Dr. Vigilante has not calculated what the risk of unintentional discharge is for pistols comparable to the P320; consequently, he cannot demonstrate that the risk of unintentional discharge is greater for the P320 than for these other pistols. Indeed, as the scientific literature shows, and as discussed in detail above, unintentional discharges occur for all makes, models, and designs of guns.

Returning to the question of what the risk of unintentional discharges is for the P320, independent of any comparators, records from SIG SAUER indicate that there are to date 350 records of accidental discharges.[45] It should be noted that O'Neill and colleagues operationally define an unintended discharge as "an activation of the trigger mechanism that results in an unplanned discharge that is outside of the firearm's prescribed use."[46] Such an operationalization avoids an attribution of blame and encompasses "events that result from the complacent handling of a firearm (often referred to as accidental or negligent discharges), those associated with involuntary muscle contractions, and discharges that result from compromised structural integrity of the firearm."[47] As the prior discussion of the New York Police Department's unintentional firearm discharge records highlighted, unintended discharges occur in a variety of contexts and use cases (as well as with a large variety of makes, models, and designs). In any case, as for any product in the market, the raw incident reports for the P320 need to be contextualized to understand what they mean for the risks potentially associated with the P320. Enumerating individual cases, as Dr. Vigilante does[48] (and as the Complaint does[49]), is misleading because it does not properly contextualize these incidents within the overall number of P320s in the market (nor do any of these case reports constitute scientific evidence, given that potential confounding factors have not been controlled and cannot be ruled out). Similarly, if one were to recite all of the major commercial aviation incidents en masse, it would give rise to a very skewed perception of risk. There are an estimated nearly 12,000 injuries in the U.S. alone every year related to first aid equipment,[50] from which one might conclude – as I

---

[43] See, e.g., McCarthy et al. (1982); McCarthy et al. (1994); McCarthy et al. (1995); Ayres & Wood (1995)
[44] E.g., Vigilante Report, p. 48 (emphasis added)
[45] Deposition of Chris Meyer , 02/21/2025 (rough), pp. 24, 45-46, 51
[46] O'Neill et al. (2017)
[47] O'Neill et al. (2018a)
[48] See Vigilante Report, pp. 32-33
[49] See Complaint ¶¶ 55-66, 73-136
[50] See McCarthy et al. (1982)

suppose Dr. Vigilante might, based upon his report in the subject matter – that first aid equipment does more harm than good and should carry warnings, be redesigned, or by taken off the market. Beds might equally be ejected from households for being too dangerous or made to bear warnings, given that there are an estimated more than 170,000 bed-related injuries annually in the U.S. alone.[51] Without the proper context, such raw injury statistics are relatively meaningless. To judge how hazardous beds are, it is important to place the injury statistics within the context of some denominator, whether it be the number of beds in the U.S. (over 300,000,000 according to the U.C. Census Bureau,[52] if one assumes one bed per bedroom), or the number of hours slept in a bed every year (~7 hours[53] x 365 days x 300,000,000 or over 766 billion hours).[54]

In estimating the risk associated with the P320, therefore, one needs to consider the number of units in the market. To date, more than 3.6 million P320s are in the marketplace, the P320 being SIG SAUER's top-selling pistol to date.[55] Given the 350 reports of unintended discharges for the P320, only 0.01% of those pistols are involved in some form of unintended discharge. If one assumes that even only one quarter of the 3.65 million P320s have been in the market for a year or more, that equates to nearly 333 million days on which an unintended discharge could be observed with a P320, resulting in an estimated incidence rate of 0.0001% in a single year – making it as likely that someone would get struck by lightning[56] as it would be to experience an unintended discharge. Moreover, all adverse incidents for any product need to accumulate over time, given that products gradually enter the market over time (as more and more units get sold with time), and given that adverse incidents manifest with some statistical probability, not with statistical certainty. When the probability is extremely small, as is the case of unintended discharges, a considerable amount of time can elapse before even a single event manifests. In a similar vein, one could live many, many lifetimes and not be struck by lightning once. Accordingly, a considerable amount of time needs to elapse before any meaningful number of adverse incidents accumulates for any given product. Until such a time, any claims of foreseeability are based purely upon hindsight, inflated perceptions of risk through enumerations of individual incidents, and circular reasoning. Dr. Vigilante, in his report, writes that "[r]isk estimation is based on the severity of the consequences, exposure, and the probably of an adverse event occurring;"[57] however, he provides no such analysis anywhere in his report. He writes, further, that "[e]xposure is related to the number of users as well as the number of use times

---

[51] *Ibid.* [McCarthy et al. (1982)]

[52] https://data.census.gov/table/ACSDT1Y2022.B25041 (accessed: 2/17/2025); https://www.cnbc.com/2016/04/28/theres-6-billion-being-wasted-in-americas-spare-bedrooms.html (accessed: 2/17/2025)

[53] https://www.nhlbi.nih.gov/resources/your-guide-healthy-sleep (accessed: 2/17/2025)

[54] Ironically, or somewhat bafflingly, Dr. Vigilante perverts the notion of an incidence rate-based risk assessment by arguing that because there are over two million P320s in the market, and because the possibility of an unintentional discharge exists, the associated risk of serious injury or is high. This logic flies in the face of all science and all practice of human factors. By Dr. Vigilante's argument, because fatal aviation accidents can occur, given the millions of hours Americans travel by air each year, there should be a veritable epidemic of commercial aviation fatalities.

[55] Defendant Sig Sauer, Inc.'s Objections and Responses to Plaintiff's Second Set of Interrogatories

[56] See https://www.cdc.gov/lightning/data-research/index.html (accessed: 2/17/2025)

[57] Vigilante Report, p. 53

where an unintentional discharge of a handgun can occur;"[58] yet, he provides no such analysis. If he had, he would have arrived at the same conclusion as the above analysis following these principles of risk estimation.

*Failure Mode, Effects, and Criticality Analysis (FMECA)*

In one of the last sections of his report, Dr. Vigilante turns his attention to the FMECA (Failure Mode, Effects, and Criticality Analysis) performed by SIG SAUER in connection with the development of the P320. Although they constitute an important part of the product development lifecycle, FMECAs are ultimately entirely theoretical exercises. As such, they can be both overinclusive and underinclusive at the same time. Whatever hazards are identified are the outgrowth of human imagination, and they are thus also limited by our ability to imagine hazards. Therefore, I might expect unintended discharges, as a theoretical scenario, to appear, simply as a matter of course, in the FMECA for any gun, whether handgun or rifle, whether hammer- or striker-fired, whether single, dual, or dual-single action, whether outfitted with a manual safety or not, or whether being sold with a tabbed trigger or not. FMECAs can be fanciful in their originality and creativity in divining potential modes of injury; or they can be uninspired in ordaining the ways in which a user may misuse a product and injure him- or herself. The foregoing description is not a critique of FMECAs per se – they are a useful tool, in the absence of empirical data, for predicting some possible adverse outcomes during the design phase of product development,[59] allowing a manufacturer to begin to attempt to address these hypothetical outcomes before the product is released.

Dr. Vigilante highlights the fact that, related to the "unintentional discharge of a Sig P320, the consequences can be catastrophic with loss of life and/or permanent injury."[60] What he neglects to mention, however, is that the reason the potential effect of all of unintentional discharge failure modes in SIG SAUER's FMECA is "Kill person unintentionally" is that FMECAs assume the worst possible outcome for each failure mode for the purposes of calculating the corresponding risk. If one were to perform an FMECA of a music conductor's baton, based upon the fact that the Baroque composer and conductor, Jean-Baptiste Lully, struck himself in the foot with a conducting staff during a performance, subsequently developed gangrene, and ended up dying from the injury, one would include "Death" as a potential effect. The obvious absurdity of this proposition illustrates the logic of FMECAs, which is not flawed per se; but one needs to understand the entries in an FMECA in the proper context.

By the same token, the fact that striking oneself fatally with a conductor's baton would be included as a failure mode merely reflects the circumstance that such a scenario is not inconceivable; in other words, it constitutes a non-impossible outcome. Dr. Vigilante dedicates a not insubstantial amount of his report to the demonstration of his ability to introduce a foreign object between the trigger of a P320 and its holster.[61] Such a demonstration is just that: a demonstration. Merely because something can be accomplished under controlled lab conditions

[58] *Ibid.* [Vigilante Report, p. 53]
[59] See MIL-STD-1629A, p. iii ("from concept through development")
[60] Vigilante Report, p. 53
[61] See Vigilante Report, pp. 41-44

with a great deal of patience and dexterity does not mean that it is probable to occur in real life. What is missing entirely from Dr. Vigilante's demonstration is any sort of estimate of how likely his success in triggering a holstered P320 is in real life. In order to derive such an estimate, one would need to allow happenstance to dictate the probability of success. Given that not all unintentional discharges are caused by foreign objects, as demonstrated by the peer-reviewed scientific literature and by the published reports of the New York Police Department, as discussed in detail above, and given the extremely low probability of an unintentional discharge occurring, as also discussed above, it follows that unintentional discharges by contact of a foreign object with a holstered gun are exceedingly rare.

*Design Safety Hierarchy*

In the penultimate section of his report, Dr. Vigilante discusses the Design Safety Hierarchy and its application to the P320. The Design Safety Hierarchy constitutes the proposition that, in order to address a hazard, one should first attempt to design it out (if possible); that, if it is not possible to design out the hazard, one should attempt to guard against it (if possible); and that, if it is, lastly, not possible to guard against the hazard, one should provide warnings about the hazard.[62] Regarding the P320, Dr. Vigilante's argument is that because there is a risk of unintended discharge, the P320 should have been equipped with a tabbed trigger and/or a manual safety on every model to "design out" the hazard.[63] He proposes that these design modifications would have "reduce[d] the risk" of unintentional discharges.[64] One issue with Dr. Vigilante's argument is that it is not based on any science whatsoever; it is based purely on Dr. Vigilante's contentions. Another issue with his argument is that Dr. Vigilante has not demonstrated (or even examined whether) there is either a greater propensity of the P320 to discharge unintentionally or even a noteworthy risk in the first place. As discussed in great detail above, the empirical risk of an unintentional discharge is negligible, considering the extremely low incidence rate of unintentional discharge with the P320. There is consequently no coherent case to be made for the incorporation of either a manual safety or a tabbed trigger.

By contrast, as Matt Taylor, Director of R&D at SIG SAUER,[65] David Johnson, former head of engineering at SIG SAUER,[66] and Sean Toner, 30(b)(6) witness for SIG SAUER,[67] testify, SIG SAUER considered offering the P320 with a tabbed trigger; but because the only purpose of a tabbed trigger is to mitigate inadvertent discharges from dropped weapons, and because the P320 was eventually tested to be safe by drop test standards, there was no need for a tabbed trigger on the P320.[68] Moreover, there is evidence to suggest that consumers did not consider a tabbed trigger to be a desirable design element of the P320. Matt Taylor testifies that, not only is he unaware of any tests that would suggest that tabbed triggers help prevent unintended discharges[69]

---

[62] See, e.g., Laughery & Wogalter (2010); Krauss et al. (2008)
[63] See Vigilante Report, p. 58
[64] Vigilante Report, p. 58
[65] Deposition of Matt Taylor ("M. Taylor depo"), 06/27/2024, p. 24
[66] Deposition of David Johnson, 04/26/2024 ("Johnson depo"), pp. 13-14
[67] Deposition of Sean Toner, 05/23/2024 ("Toner depo"), p. 8; Exhibit 1 to Deposition of Sean Toner, 05/23/2024
[68] M. Taylor depo, 06/27/2024, pp. 127-128, 147-148; Johnson depo, pp. 187-188, 190; Toner depo, pp. 129, 132
[69] M. Taylor depo, 09/10/2024, p. 57-62

and that their effectiveness in doing so would not be obvious "in a lot of cases,"[70] but that there was a lack of interest from the market to purchase a variant of the P320 with a tabbed trigger.[71] He testifies that when the P320 was unveiled, one prototype featured a tabbed trigger and the other did not.[72] The tabbed trigger was mentioned in SIG SAUER's marketing literature.[73] Nevertheless, the production of a P320 with a tabbed trigger "did not happen because SIG [SAUER] never had interest from anyone purchasing to do so."[74] A similar lack of interest appears to have guided Detective Cole's first handgun purchase, that of a Ruger 380.[75] Detectiveon Cole testifies that the Ruger 380 does not have a manual safety and that he does not recall it having a tabbed trigger either.[76]

Similarly, with regard to a manual safety, there is evidence to suggest that consumers who purchased the P320 with a manual safety may have considered the presence of the manual safety an undesirable aspect of the gun, the other purported issues discussed by Dr. Vigilante notwithstanding – such as the allegedly short trigger pull, the allegedly light trigger weight, and the absence of a tabbed trigger. There are, for example, videos on the Internet demonstrating how to remove an undesired manual safety on the P320.[77] These videos have been viewed several tens of thousands of times, in some cases. A video entitled, "SIG P320 M17 Safety Removal," for example, has been viewed 52,000 times in the past four years.[78] Another video, entitled, "How to remove, install, delete or add the manual safety lever on your SIG Sauer P320" has received 25,000 views in only 10 months.[79] Detective Cole himself testifies to having purchased and owned guns without manual safety.[80] Moreover, Detective Cole testifies that he would typically carry his pistol with its manual safety off and a round in the chamber if the gun was holstered.[81] Even if Detective Cole's P320 had possessed a manual safety, it is unlikely, therefore, that Detective Cole would have engaged it when his P320 was holstered, begging the question of how it would have benefitted him, even if there were scientific evidence (which there is not, as discussed above) to show that manual safeties are effective at preventing unintentional discharges. Instead, the peer-reviewed, published scientific research and the publicly available reports of the New York Police Department both show that unintentional discharges occur with a wide variety of makes, models, and designs of guns, as elaborated previously in this report.

*Failure to warn*

---

[70] M. Taylor depo, 09/10/2024, p. 59
[71] M. Taylor depo, 09/10/2024, pp. 139-140
[72] M. Taylor depo, 09/10/2024, pp. 138-139
[73] M. Taylor depo, 09/10/2024, p. 139
[74] M. Taylor depo, 09/10/2024, pp. 139-140
[75] D. Cole depo, p. 43
[76] D. Cole depo, p. 44
[77] E.g., https://www.youtube.com/watch?v=NBukQh-mYwM (accessed: 2/17/2025); https://www.youtube.com/watch?v=Hzh-Bcyyg5I (accessed: 2/17/2025)
[78] See https://www.youtube.com/watch?v=NBukQh-mYwM (accessed: 2/17/2025).
[79] See https://www.youtube.com/watch?v=Hzh-Bcyyg5I (accessed: 2/17/2025).
[80] D. Cole depo, pp. 44, 52, 54
[81] D. Cole depo, pp. 48-49

In the last section of his report, Dr. Vigilante turns his attention to the failure to warn allegation. Without basis, he contends that "Sig Sauer had a responsibility to warn known users and prospective users that the P320 can and will discharge by contact from a foreign object even when the Sig P320 is fully holstered in a holster specifically designed for the gun."[82] He contends, further, that "Sig Sauer had a responsibility to warn, but failed to warn the SCSO and David Cole, in product literature and in the user manual, that the gun can discharge in holsters specially made for it."[83] Dr. Vigilante does not discuss, or even cite, any of the applicable peer-reviewed scientific literature on warnings design and warnings effectiveness – such as the literature on the scientific process for determining whether to warn; the literature on familiarity and benign experience, as they relate to warnings effectiveness; the literature on risk habituation; or the literature on general warning noticing, reading, and compliance rates.

The field of human factors has formalized the determination of whether it is appropriate to provide a warning or not into a process that begins with an evaluation of the likelihood of an adverse outcome based upon empirical evidence.[84] When the risk is exceedingly small, as in the case of unintentional discharges from the P320, as discussed in detail above, a warning may be not only unwarranted but in fact contraindicated. Scientific studies have demonstrated repeatedly that "overwarning" can have deleterious effects on warnings compliance. Because such government agencies as the FDA and the CPSC (whose mandate is to keep American consumers safe) have a vested interest in warnings, as one form of risk mitigation, they both advocate against overwarning or warning about speculative hazards. Speculative hazards are "theoretical hazards not well-grounded in scientific evidence."[85] The FDA, in its regulations, cautions that labeling that includes warnings against such speculative hazards "can cause meaningful risk information to 'lose its significance'" and that "[o]verwarning … can … have a negative effect on patient safety and public health."[86] The agency's stated concern is that "labeling that does not accurately portray a product's risks … potentially discourag[es] safe and effective use of approved products or encourag[es] inappropriate use…"[87] Similarly, the CPSC admonishes authors of product instructions and warnings to "[a]void 'overwarning'" because "safety messages for highly unlikely and trivial hazards … weaken the effectiveness of the more significant messages."[88] Based on published accounts, U.S. Congress was also concerned with warnings about insubstantial hazards when enacting the Federal Hazardous Substances Labeling Act.[89]

An abundance of scientific literature has been published on the potentially deleterious effects of inappropriate warnings. A dedicated meta-review of the extant literature on product warnings discusses several emerging themes that arise from this literature, among them: desensitization to

---

[82] Vigilante Report, p. 64
[83] *Ibid.* [Vigilante Report, p. 64]
[84] See, e.g., McCarthy et al. (1982); McCarthy et al. (1994); McCarthy et al. (1995); Ayres & Wood (1995)
[85] Federal Register, Vol. 71, No. 15, p. 3935
[86] *Ibid.* [Federal Register, Vol. 71, No. 15, p. 3935]
[87] *Ibid.* [Federal Register, Vol. 71, No. 15, p. 3935]
[88] Singer et al. (2003), p. 47
[89] See, e.g., Frantz et al. (1999)

warnings,[90] reduced recall of certain warning messages, reduced believability or credibility of warnings, reduced ability to differentiate the relative magnitude of risks, and misplaced reliance on the completeness of a warning label.[91] Empirical studies on overwarning have found that perceived risk dilution,[92] as well as reduced noticing, reading, and compliance with warnings,[93] can occur as a result. Consequently, authors have proposed basing consumer product warnings on objective criteria, such as the prevalence and severity of injury, and reserving warnings for significant risks.[94]

Even if one were to assume, purely for the sake of argument, and in contradiction to the published science on warnings and governmental dicta on overwarning, that SIG SAUER had provided a warning about unintentional discharges by foreign objects for the P320, the peer-reviewed literature on warnings effectiveness and the conditions under which warnings are noticed, read, and translated into behavior suggests that it unlikely that Detective Cole would have noticed, read, or heeded such hypothetical warnings. By the time of the subject incident, Detective Cole had been handling firearms for nearly two decades.[95] He purchased his first handgun a decade-and-a-half ago.[96] Since that time, he has purchased and/or owned at least five handguns, not counting the P320.[97] Detective Cole testifies that he carried his H&K on duty for seven years and his Glock for perhaps five years.[98] He testifies, further, that he unholstered his loaded gun at least twice a day.[99] All of these experiences combine to give Detective Cole decades of familiarity and benign experience with handguns by the time he was issued his P320.

The scientific literature has shown that the effectiveness of a warning is reduced by a person's familiarity with a product or activity.[100] The more experienced a person is in using a particular product, the less likely he will be to seek out, read, or heed warnings concerning that product.[101] A scientific study using two types of saws, for example, concluded that participants more familiar with, and/or having had prior experience with, a particular type of product failed to read, comply with, and recall the warning associated with that product.[102] In a related study, of participants experienced with chain saws, only about half as many complied with the associated warning, in comparison to participants who were inexperienced with them.[103]

---

[90] See, also, Stewart & Martin (1994), who include reactance, "boomerang" effects, and increased product attractiveness as additional unintended potential negative consequences of warnings.
[91] Frantz et al. (1999)
[92] Chen et al. (1997)
[93] Strawbridge (1986)
[94] E.g., McCarthy et al. (1982); McCarthy et al. (1994); McCarthy et al. (1995); Ayres & Wood (1995)
[95] See D. Cole depo, pp. 30-32
[96] D. Cole depo, p. 43
[97] D. Cole depo, pp. 53, 56
[98] D. Cole depo, p. 79
[99] *Ibid.* [D. Cole depo, p. 79]
[100] Zeitlin (1994); Otsubo (1988)
[101] Zeitlin (1994)
[102] Otsubo (1988)
[103] Zeitlin (1994)

The perceived irrelevance of a warning can be further exacerbated by benign encounters in which a user has previously engaged in the warned-about behavior without experiencing negative outcomes.[104] In a study of 'NO DIVING' warning signs at a public pool, for instance, it was observed that swimmers with a history of diving into the shallow end of the pool, or who participated in a swimming team, were more likely to ignore the posted warnings signs.[105] In another study, participants who reported engaging more frequently in such potentially risky behaviors as sky-diving, asbestos removal, or failing to wear a seatbelt on long trips rated these activities as significantly less risky than participants who engaged in these behaviors less frequently.[106] As these results suggest, in addition to benign encounters, a constant exposure to a particular hazard can cause individuals to become habituated to the associated risk,[107] so that they will engage in potentially risky behavior with diminished hesitation.

In the present case, Detective Cole's disposition toward any warnings about the P320 would have further been affected by the fact that he does not remember hearing complaints from anyone in his department about the P320,[108] as well as by the fact that he had not heard of any unintentional discharges with a P320 before his own incident.[109] Accordingly, he exhibited no interest in any materials related to the P320 where a hypothetical warning might have been included, such as "in product literature and in the user manual."[110] Detective Cole testifies, for example, that he had not reviewed any information on the P320 prior to it being issued, and that he did not research the P320 after it was issued.[111] Specifically, he testifies that he never visited the SIG SAUER website prior to his incident, nor did he read any reviews for the P320.[112] He testifies, further, that he does not recall receiving an owner's manual,[113] and that he has no recollection of ever reading the owner's manual,[114] nor did he ever ask to see an owner's manual for the P320.[115] One is left wondering, therefore, how any hypothetical warnings would have influenced Detective Cole's decision-making and behavior if he never reviewed any of the documents in which such a warning might have been provided.

More generally, it would be unusual for a consumer to consult an owner's manual pre purchase, because owner's manuals provide information that is relevant once a user sets out to interact with a product he or she has already purchased, such as how to use the product, how to perform maintenance, what to do for troubleshooting. An owner's manual may also contain warnings about use-related hazards; but these warnings are created on the presumption that a consumer has already purchased the product, because they do not become relevant until a user begins to interact with the product. The only potential exception are contraindications on pharmaceuticals,

---

[104] Karnes et al. (1986); Leonard & Hill (1989); Ayres et al. (1994)
[105] Goldhaber & deTurck (1988)
[106] Leonard & Hill (1989)
[107] Halpern-Felsher et al. (2001); Lima (2004)
[108] D. Cole depo, p. 82
[109] D. Cole depo, p. 83
[110] Cf. Vigilante Report, p. 66
[111] D. Cole depo, p. 82
[112] D. Cole depo, p. 83
[113] D. Cole depo, p. 97
[114] D. Cole depo, p. 98
[115] *Ibid.* [D. Cole depo, p. 98]

which detail which user populations should avoid using the product, rendering any subsequent warnings moot. They neither attempt, nor are they intended to, deter everyone from using the product, and they are generally encountered only post purchase, given that they are included on package inserts. Published scientific research shows that the level of reading of an owner's manual is low even post-purchase, however, and especially low for safety-related information. For example, one study examining how drivers use owner's manuals found that, whereas 17% of drivers read the manual for the specific purpose of finding maintenance-related information, less than 1% read for safety-related information.[116] Such inattention to owner's manuals and selective reading is not limited to automotive manuals, but has been described in other product domains as well, such as computing machines and software.[117]

Similarly, advertisements containing safety-relevant information, such as pharmaceutical ads, receive scant attention by purchasers. In a survey of over 300 consumers, for instance, only slightly more than half reported having read pharmaceutical advertisements carefully and completely,[118] even though these advertisements are known to contain warnings about side effects[119] that can present potentially dire health consequences to consumers. Even for on-product warnings about potentially life-threatening outcomes, consumers who know they are personally affected and should consequently exercise great care do not overwhelmingly read such warnings. For example, among buyers with food allergies, between a quarter and one third have been found not to read food labels, although these labels contain important information.[120] Similarly, even parents of children with known nut allergies, which can cause anaphylaxis, did not uniformly indicate avoiding products labeled as not suitable for nut allergy sufferers.[121] Based on findings with these various potential locations for providing warnings – in advertisements, in owner's manuals, on package inserts, and on-product – it is unlikely that either Detective Cole (who testifies anyway to not having read the owner's manual or any information on the P320 or having visited SIG SAUER's website, as discussed above) or the decision-makers in the Somerset County Sheriff's Department would have sought out, read, or modified their behavior in response to any hypothetical warnings, as suggested by Dr. Vigilante.

**Summary of Opinions**

- In spite of offering opinions that the SIG SAUER P320 is more prone to unintentional discharges than comparable pistols, Dr. Vigilante failed to conduct an analysis of the actual risk of unintentional discharge for the P320, or that of other pistols.
- Dr. Vigilante's opinions are based on pure assertions, almost entirely without reference to any peer-reviewed scientific publications, and they exhibit circular reasoning because postulated design issues with the P320 are used to assert an elevated risk of unintentional discharges, and the supposedly high rate of unintentional discharges are used to validate these assertions.

---

[116] Leonard (2001)
[117] See, e.g., Rettig (1991)
[118] Wilkes et al. (2000)
[119] 21 CFR 202.1(e)(5)(iii)
[120] Vierk et al. (2007)
[121] Noimark et al. (2009)

- An examination of the peer-reviewed scientific literature, as well as published reports on unintentional discharges by the New York Police Department, shows that unintentional discharges occur for a wide range of makes, models, and designs of firearms and are not uniquely or even predominantly tied to the design features of the P320 criticized by Dr. Vigilante.
- A calculation of the actual estimated incidence rate of unintentional discharges for the P320 reveals the risk to be exceedingly low, multiples smaller than that of being struck by lightning.
- Because the actual empirical risk of unintentional discharges for the P320 is exceedingly low and because adverse events accumulate gradually over time, it is scientifically incoherent to argue that the alleged elevated risk of unintentional discharges for the P320 was foreseeable to SIG SAUER.
- Based on the scientific literature on warnings effectiveness and those factors that determine whether warnings are noticed, read, and heeded, it is unlikely that Detective Cole (who testifies to not having consulted the owner's manual, materials related to the P320, or the SIG SAUER website) or the Somerset County Sherrif's Department would have noticed, read, or changed their decision to purchase or use the P320 in response to hypothetical warnings Dr. Vigilante argues SIG SAUER should have provided.

Sincerely,

Robert Rauschenberger, Ph.D.

**List of Materials**

- Complaint
- Deposition of David A. Cole, 08/30/2024 (+ exhibits, not including Exhibit 10)
- Deposition of Kimberly Cole, 08/30/2024
- Deposition of Wilfred Dodge, 10/28/2024
- Deposition of David Johnson 04/26/2024 (+ exhibits)
- Deposition of Jeremy Leal, 10/28/2024
- Deposition of Chris Meyer, 02/21/2025 (rough)
- Deposition of Robert Sheets, 06/26/2024
- Deposition of Matt Taylor, 06/27/2024 (+ exhibits)
- Deposition of Matt Taylor, 01/10/2025 (Catatao)
- Deposition of Sean Toner, 05/23/2024 (+ exhibits)
- William Vigilante's Expert Report
- William Vigilante's Retention Agreement with Plaintiff
- William Vigilante's CV & 4-year Testimony List
- Randy Kent's Expert Report
- Randy Kent's CV & Fee Schedule
- Plaintiff's Responses to Defendant Sig Sauer, Inc.'s First Set of Requests For Production
- Plaintiff's Response to Sig Sauer Inc.'s Fist Set of Requests for Admissions
- Plaintiff's Response to Sig Sauer Inc.'s First Set of Interrogatories
- Plaintiff's Response to Sig Sauer Inc.'s First Set of Requests for Production
- Plaintiff's Response to Sig Sauer Inc.'s Deficiency Discovery Letter
- Plaintiff's First Set of Requests for Production Directed to Sig Sauer, Inc.
- Plaintiff's First Set of Interrogatories Directed to Sig Sauer, Inc.
- Plaintiff's First Set of Requests for Admissions Directed to Sig Sauer, Inc.
- Plaintiff's Second Set of Interrogatories Directed at Sig Sauer, Inc.
- Plaintiff's Second Set of Requests for Production Directed at Sig Sauer, Inc.
- Plaintiff's Supporting Document Productions
- Plaintiff's Supplemental Productions
- SIG's Response to Complaint
- Sig Sauer Inc.'s Response to Plaintiff's First Set of Requests For Admissions
- Sig Sauer Inc.'s Response to Plaintiff's First Set of Requests For Production
- Sig Sauer Inc.'s Second Set of Requests For Production Directed to Plaintiff
- Sig Sauer Inc.'s Second Set of Interrogatories Directed to Plaintiff
- Sig Sauer Inc.'s Response to Plaintiff's Second Set of Interrogatories
- Sig Sauer Inc.'s Response to Plaintiff's Second Set of Requests For Production
- Sig's Production in Response to First RFP
- Sig's Supplemental Production in Response to Second RFP
- Sig Observation Report (Sgt Wirth RE Initial Examination at FBI Lab)
- Sig P320 Discharge Report
- Montville PD Subpoena response

- Piscataquis County Sheriff's Office
- Somerset County Sheriff's Office
- SIG P320 XSeries Operators Manual
- David Cole's bills
- David Cole's EMMC discharge docs, 05/06/2022
- David Cole's M-1 Diagnostic Medical Report, Maine Workers' Compensation Board, 05/24/2022
- David Cole's Report of Occupational Injury
- David Cole text message
- David Cole claim summary
- David Cole Police Academy Transcript, May 17, 2007
- K Baker MD document
- Mayo Hospital David Cole Emergency Documentation
- Maine Municipal Association Risk Management Services notification of Lien in amount of $43,598.25
- David Cole Emergency Department Documentation
- David Cole Outside Patient Records
- David Cole ShareCare Patient Records
- David Cole Northern Light Progress Notes
- Northern Lights Eastern Maine Medical Center
- Northern Lights Mayo Hospital


- 21 CFR 202
- Ayres, T. J., Gross, M. M., Wood, C. T., Horst, D., Beyer, R. R., & Robinson, J. N. (1994). What is a warning and when will it work? In K. R. Laughery, Sr., M. S. Wogalter & S. L. Young (Eds.), *Human Factors Perspectives on Warnings* (pp. 1-5). Santa Monica, CA: Human Factors and Ergonomics Society.
- Ayres, T. J., & Wood, C. T. (1995). The warning label development process. In *Proceedings of the Silicon Valley Ergonomics Conference & Exposition* (pp. 187-190).
- Chen, J. Y., Gilson, R. D., & Mouloua, M. (1997). Perceived risk dilution with multiple warnings. In *Proceedings of the Human Factors and Ergonomics Society 41st Annual Meeting* (pp. 831-835).
- Federal Register, Vol. 71, No. 15
- Frantz, J. P, Rhoades, T. P., Young, S. L., & Schiller, J. A. (1999). Potential problems with overusing warnings. In *Proceedings of the Human Factors and Ergonomics Society 43rd Annual Meeting* (pp. 916-920).
- Goldhaber, G. M., & deTurck, M. A. (1988). Effectiveness of warning signs: "Familiarity effects." *Forensic Reports*, *1*, 281-301.
- Halpern-Felsher, B. L., Millstein, S. G., Ellen, J. M., Adler, N. E., Tschann, J. M., & Biehl, M. (2001). The role of behavioral experience in judging risks. *Health Psychology*, *20*, 120-126.
- Hawkins, S. A., & Hastie, R. (1990). Hindsight: Biased judgments of past events after the outcomes are known. *Psychological Bulletin*, *107*, 311-327.

- Huntley-Fenner, G., Harley, E., Trachtman, D., & Young, D. (2007). ANSI Z535.6 and conspicuity: A test of the new state of the art format for instructions. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting* (pp. 1029-1033).
- Karnes, E. W., Leonard, S. D., & Rachwal, G. (1986). Effects of benign experiences on the perception of risk. In *Proceedings of the Human Factors Society 30th Annual Meeting* (pp. 121-125).
- Krauss, D., Arndt, S. R., Lakhiani, S. D., & Khan, F. (2008). Additional considerations when applying the "safety engineering hierarchy" in industrial work settings. In *Proceedings of the 13th Annual International Conference on Industrial Engineering Theory, Applications and Practice* (pp. 633-638).
- Laughery, K. R, & Wogalter, M. S. (2010). The safety hierarchy and its role in safety decisions. In W. Karwowski & G. Salvendy (Eds.), *Advances in human factors, ergonomics and safety in manufacturing and service industries* (pp. 1010-1016). Boca Raton, FL: CRC Press.
- Leonard, S. D. (2001). Relation of Owner's Manuals to Safety. In *Proceedings of the First International Driving Symposium on Human Factors in Driver Assessment, Training and Vehicle Design* (pp. 125-130).
- Leonard, S. D., & Hill, G. W. (1989). Risk perception is affected by experience. In *Proceedings of the Human Factors Society 33rd Annual Meeting* (pp. 1029-1033).
- Li, C.-W., Phun, V. K., Suzuki, M., & Yai, T. (2015). The effects of aviation accidents on public perception toward an airline. *Journal of the Eastern Asia Society for Transportation Studies*, *11*, 2347-2362.
- Lima, M. L. (2004). On the influence of risk perception on mental health: living near an incinerator. *Journal of Environmental Psychology*, *24*, 71-84.
- McCarthy, R. L., Ayres, T. J., & Wood, C. T. (1995). Risk and effectiveness criteria for using on-product warnings. *Ergonomics*, *38*, 2164-2175.
- McCarthy, R. L., Ayres, T. J., Wood, C. T., & Robinson, J. N. (1994). *Risk-based warning design*. Paper presented to the ABA National Institute, *Product Warnings, Instructions and User Information*, Washington, DC, January 20-21, 1994.
- McCarthy, R. L., Robinson, J. N., Finnegan, J. P., & Taylor, R. K. (1982). Warnings on consumer products: Objective criteria for their use. In *Proceedings of the Human Factors Society 26th Annual Meeting* (pp. 98-102).
- MIL-STD-1629A
- NYPD Annual Firearms Discharge Report 2010
- NYPD Annual Firearms Discharge Report 2011
- NYPD Annual Firearms Discharge Report 2012
- NYPD Annual Firearms Discharge Report 2013
- NYPD Annual Firearms Discharge Report 2014
- Noimark, L., Gardner, J., & Warner, J. O. (2009). Parents' attitudes when purchasing products for children with nut allergy: A UK perspective. *Pediatric Allergy and Immunology*, *20*, 500-504.
- O'Neill, J. (2018). Functional behavior assessment of the unintentional discharge of firearms in law enforcement. *Journal of Organizational Behavior Management*, *38*, 275-287.

- O'Neill, J., Hartman, M. E., O'Neill, D. A., & Lewinski, W. J. (2018a). The ABCs of unintended discharges. *The Police Chief*, *85*, 14-15.
- O'Neill, J., Hartman, M. E., O'Neill, D. A., & Lewinski, W. J. (2018b). Further analysis of the unintentional discharge of firearms in law enforcement. *Applied Ergonomics*, *68*, 267-272.
- O'Neill, J., O'Neill, D. A., & Lewinski, W. J. (2017). Toward a taxonomy of the unintentional discharge of firearms in law enforcement. *Applied Ergonomics*, *59*, 283-292.
- Otsubo, S. M. (1988). A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs. In *Proceedings of the Human Factors Society 32nd Annual Meeting* (pp. 536-540).
- Rettig, M. (1991). Nobody reads documentation. *Communications of the ACM*, *34*, 19-24.
- Shaver, E. F., Young, S. L., Frantz, J. P., Rhoades, T. P., Hall, S. M., & Shah, R. J. (2006). Comparison of ANSI and ISO standard formats on people's response to product warnings. In *Proceedings of the Human Factors and Ergonomics Society 50th Annual Meeting* (pp. 2197-2201).
- Singer, J. P., Balliro, G. M., & Lerner, N. D. (2003). *Manufacturer's Guide to Developing Consumer Product Instructions*. Washington, DC: U.S. Consumer Product Safety Commission.
- Strawbridge, J. A. (1986). The influence of position, highlighting, and imbedding on warning effectiveness. In *Proceedings of the Human Factors Society 30th Annual Meeting* (pp. 716-720).
- Vierk, K. A., Koehler, K. M., Fein, S. B., & Street, D. A. (2007). Prevalence of self-reported food allergy in American adults and use of food labels. *Journal of Allergy and Clinical Immunology*, *119*, 1504-1510.
- Wilkes, M. S., Bell, R. A., & Kravitz, R. L. (2000). Direct-to-consumer prescription drug advertising: trends, impact, and implications. *Health Affairs (Millwood) 19*, 110-128.
- Zeitlin (1994). Failure to follow safety instructions: Faulty communication or risky decisions? *Human Factors*, *36*, 172-181.

# Robert Rauschenberger, PhD

Vice President Director, Human Factors

JS HELD



## Key Expertise

- User Experience
- Usability
- Human Factors
- Product Design
- Medical Devices
- Product Liability
- Failure to Warn
- Class Actions
- Prop 65

## Education

Post Doctoral Scholar, Psychology, University of Arizona, 2001 - 2003

PhD, Experimental Psychology, The Johns Hopkins University, 2001

BA, Liberal Arts, emphasis in Psychology and Anthropology, Sarah Lawrence College, 1996

## Project Geographical Experience

U.S., Germany

## Languages

English, German

## Contact

48 Wall Street, 17th Floor,
New York, NY 10005 |
+1 929-696-0197 (O) |
+1 213-304-6598 (M) |
robert.rauschenberger@jsheld.com

## Summary of Experience

Dr. Rauschenberger is currently the Vice President, Director of Human Factors at J.S. Held. He has over 25 years of experience conducting research on topics of visual attention and distraction, the organization of perceptual information, product design, user experience, risk communication effectiveness, and consumer decision-making. He leverages this experience in legal cases across industries, including product liability/failure to warn cases, class actions (both at the certification and at the merits stages), Proposition 65, and web design cases, for which he has testified in deposition and at trial, in both federal and state court. Dr. Rauschenberger has also designed and tested products across various industries and will continue to do so in J.S. Held's state-of-the-art scientific user research labs (URL), which are populated with highly degreed experts in their respective fields. J.S. Held's URL provides product safety and user experience (UX) research along the entire product lifecycle based on 50 years of human factors and failure analysis.

Over the past decade-plus, Dr. Rauschenberger has cultivated specific expertise in the evaluation of mixed reality (MR) products. His professional background also disposes him toward the evaluation of healthcare products and services. Given his work in both the reactive (failure analysis, litigation support) and proactive (user experience research) realms, Dr. Rauschenberger's user research is informed by insights gleaned from alleged product failures on the reactive side of his practice, and his expert witness testimony is given with the authority of someone who is actively engaged in the evaluation and development of products and services.

## Speaking Engagements

Dr. Rauschenberger has been invited to give talks at, among other institutions, Harvard, Yale, Notre Dame, University of British Columbia, St. Andrews, Royal Holloway, and Microsoft Research Lab. He teaches a class annually at Arizona State University and at Drexel University.

## Expert/Testifying Experience

Dr. Rauschenberger has testified in deposition and at trial in a variety of cases over the past decade-plus, including medical device product liability, consumer product failure to warn, Proposition 65, and class action lawsuits, both at the class certification and at the merits phase.

## Professional Affiliations/Memberships/Licenses/Training

Psychonomic Society, Fellow

Vision Sciences Society, Member

NSERC, Canada, Committee Member

National Science Foundation, Reviewer

Research Foundation Flanders (FWO), Belgium, Reviewer

Attention, Perception & Psychophysics, Consulting Editor and Reviewer

Human Performance in Healthcare, HFES, Program Chair

Conference for Object Perception and Memory (OPAM), Organizer

European Conference on Visual Perception, Scientific Committee Member

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

## Role at J.S. Held

Dr. Rauschenberger is Vice President Director of Human Factors and oversees J.S. Held's state-of-the-art scientific user research labs (URL) in Phoenix, AZ and New York, NY. J.S. Held's URL provides product safety and user experience (UX) research along the entire product lifecycle based on 50 years of human factors and failure analysis. Dr. Rauschenberger performs user research for industry-leading clients and serves as a scientific expert in product liability, Proposition 65, and class action litigation.

## Work Experience

J.S. Held, LLC
Vice President Director Human Factors
2024 - Present

Exponent, Inc.
Principal, Human Factors
Head of Centers of Scientific User Research (CSUR)
2009 - 2023

Siemens Corporate Research, Inc.
Principal Scientist, User Experience
2005 - 2009

Harvard University
Associate, Psychology
2004 - 2005

MIT
Visiting Scholar, Brain and Cognitive Sciences
2004 - 2005

University of Arizona
Research Social Scientist, Psychology
2003 - 2004

## Select Project Experience

Designed healthcare and consumer products now deployed in the marketplace.

Conducted national and international user studies, focus groups, workflow analyses, and contextual inquiries across a large range of product domains, from healthcare to consumer to industrial to automotive to online.

Assisted companies with development and evaluation of safety communication (product warnings, user manuals, marketing disclosures) for consumer, healthcare, and online products.

Assisted companies with 510(k) submissions to the FDA for clearance for marketing of medical devices by conducting human factors studies.

Testified as human factors expert in product liability, class action, and Proposition 65 cases.

## Speaking Engagements

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

Rauschenberger, R., Fleming, D., Sobel, K., & Hyman, E. *A science-based approach for health and safety evaluations of virtual reality products*. Workshop given at the 2020 ICPHSO Annual Meeting and Training Symposium, Orlando, FL, February 2020.

Rauschenberger, R., & Hildebrand, E. *A product liability perspective on medical device development*. Paper presented at the Human Factors and Ergonomics Society Healthcare Symposium, Baltimore, MD, April 2015.

Heckman, G., Rauschenberger, R., Kim, R., Young, D., & Lange, R. *A comparative evaluation of rearview camera display locations: Collision avoidance outcomes and use patterns*. Paper presented at the SAE Government/Industry meeting, Washington, DC, January 2012.

Rauschenberger, R. *Human factors in product design and liability: The role of attention*. Paper presented at The West Coast Product Safety & Liability Conference: Presentations for Manufacturers by Leading Experts & Attorneys, Los Angeles, CA, March 2010.

Rauschenberger, R., & Yantis S. *Attentional capture through levels of representation*. Poster presented at the Annual Meeting of the Association for Research in Vision and Ophthalmology, Fort Lauderdale, FL, May 1998.

Rauschenberger, R., & Yantis, S. *Search asymmetries revisited: A new theory of visual attention*. Poster presented at the Annual Meeting of the Psychonomic Society, Los Angeles, CA, November 1999.

Rauschenberger, R., & Yantis, S. *What can search asymmetries really tell us?* Paper presented at the Annual EPA Vision and Attention Meeting, Baltimore, MD, March 2000.

Rauschenberger, R., & Yantis, S. *Completing the picture: Representations of amodally completed objects in visual search*. Poster presented at the Annual Meeting of the Association for Research in Vision and Ophthalmology, Fort Lauderdale, FL, May 2000.

Rauschenberger, R., & Yantis, S. *What counts as a new object in the new-object hypothesis of attentional capture?* Poster presented at the Meeting of the Vision Sciences Society, Sarasota, FL, May 2001.

Rauschenberger, R., Peterson, M.A., Mosca, F., & Bruno, N. *A modified search task investigates an alternative to the two-stage model of amodal completion*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2002.

Schulz, M.F., Rauschenberger, R., Peterson, M.A. *Amodal completion in passively viewed displays: A priming study*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2002.

Liu, T., Rauschenberger, R., Slotnick, S.D., & Yantis, S. *Neural signatures of amodal completion*. Poster presented at the Annual Meeting of the Cognitive Neuroscience Society, New York, NY, March 2003.

Peterson, M.A., & Rauschenberger, R. *Context effects on border assignment in the target stimulus in visual search*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2003.

Rauschenberger, R., Liu, T., Slotnick, S.D., & Yantis, S. *Cortical representation of pictorial occlusions in early visual areas and LOC*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2003.

Skow-Grant, E., Rauschenberger, R., & Peterson, M.A. *Attention, not inhibition of return, tracks objects*. Paper presented at the 11th Annual Workshop on Object Perception, Attention, and Memory, Vancouver, Canada, November 2003.

Rauschenberger, R., & Peterson, M.A. *When unambiguous stimuli become ambiguous: Spatiotemporal context effects with nominally unambiguous stimuli*. Paper presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2004.

Rauschenberger, R., & Chu, H. *The effects of familiarity on encoding efficiency in visual search*. Poster presented at the Annual Meeting of the Vision Sciences Society, Sarasota, FL, May 2005.

Carlson, T.A., Rauschenberger, R., & Verstraten, F.A.J. *Cortical adaptation of unconscious perceptual representations*. Paper presented at the Annual Meeting of the European Conference on Visual Perception, A Coruña, Spain, August 2005.

Rauschenberger, R., & Lin, J.W. *Workflow analysis for patients' visits in VAMC audiology departments*. Paper presented at the Annual Meeting of the Association of VA Audiologists, Denver, CO, April 2007.

Chakraborty, I., Zheng, X.S., Lin, J., & Rauschenberger, R. *Computational eye movement model based on adaptive saliency map*. Paper presented at the Annual Fall Vision Meeting, Berkeley, CA, September 2007.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

## Invited Presentations

Rauschenberger, R. *Taking a "Q" from human factors: Visual search in HMI design*. Keynote address for the HFES Regional Conference, California State University Long Beach, Long Beach, CA, February 2011.

Rauschenberger, R. *Taking a "Q" from human factors: Visual search in HMI design*. Cognitive Science and Engineering Department, Arizona State University College of Technology & Innovation, January 2011.

*Cognitive engineering for airport security screening*. Simon Fraser University, Vancouver, BC, 2009.

*When what you design is not what you get*. Microsoft Research Lab, Redmond, WA, 2009.

*An idiosyncratic perspective on visual search and perception*. University of British Columbia, Vancouver, Canada, 2008.

*An idiosyncratic perspective on visual search and perception*. Notre Dame University, South Bend, IN, 2008.

*When what you design is not what you get*. Universität Bielefeld, Bielefeld, Germany, 2006.

*When what you design is not what you get*. Deutsche Luft- und Raumfahrtgesellschaft, Braunschweig, Germany, 2006.

*When what you design is not what you get*. School of Interactive Arts and Technology, Simon Fraser University, Vancouver, Canada, 2006.

*Dynamic interactions in visual search displays: When less is more*. Yale University, New Haven, CT, 2005.

*Dynamic representations of the visual world*. University of Arizona, Tucson, AZ, 2004.

*Dynamic representations of the visual world*. Royal Holloway University, London, UK, 2004.

*Dynamic representations of the visual world*. University of Delaware, Newark, DE, 2004.

*Dynamic representations of the visual world*. University of St. Andrews, St. Andrews, Scotland, 2004.

*Dynamic interactions in visual search displays*. Michigan State University, East Lansing, MI, 2004.

*When more is less: Visual search difficulty and exposure time*. Siemens Corporate Research, Princeton, NJ, 2004.

*An idiosyncratic perspective on visual search and perception*. Vision Sciences Laboratory, Harvard University, Cambridge, MA, 2004.

*Attentional capture by auto- and allo-cues*. Visual Attention Lab., Harvard Medical School, Cambridge, MA, 2004.

*Dynamic representations of the visual world*. University of North Carolina, Chapel Hill, NC, 2003.

*Masking unveils visual representations in the brain*. University of Arizona, Tucson, AZ, 2001.

*Masking unveils visual representations in the brain*. Sarah Lawrence College, Bronxville, NY, 2000.

## Selected Publications

Lewis, R.C., Rauschenberger, R., Kalmes, R. (2021). Hand-to-mouth and other hand-to-face touching behavior in a quasi-naturalistic study under controlled conditions. *Journal of Toxicology and Environmental Health, Part A: Current Issues*, *84*, 49-55.

Rauschenberger, R., Barakat, B. (2020). Health and safety of VR use by children in an educational use case. *Proceedings of the 2020 IEEE Conference on Virtual Reality and 3D User Interfaces*, Atlanta, GA. (Nominated for Best Paper IEEE VR 2020.)

Lester, B.D., Larson, R., Dosch, I., Fowler, G., & Rauschenberger, R. (2020). Perception of terrain slope in real and virtual environments. *Proceedings of the 11th International Conference on Applied Human Factors and Ergonomics*, San Diego, CA.

Lester, B.D., Hashish, R., Kim, R., Moorman, H., Hildebrand, E., Schwark, J., Rauschenberger, R., & Young, D. (2016). Mobile device usage influences gaze patterns to obstacles during locomotion. *Proceedings of the Industrial & Systems Engineering Research Conference*, Anaheim, CA.

Barakat, B., Crump, C., Cades, D., Rauschenberger, R., Schwark J, Hildebrand E, Young D. (2015) Eye tracking evaluation of driver visual behavior with a forward collision warning and mitigation system. *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Los Angeles, CA.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

Rauschenberger, R., Sala, J.B., & Wood, C.T. (2015) Product warnings and the involuntary capture of attention. *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Los Angeles, CA.

Schwark, J., Fowler, G., Larson, R., & Rauschenberger, R. (2015) An investigation of operator performance in All-Terrain Vehicle (ATV) handling and control. *Procedia Manufacturing*, *20*, 1567-1574.

Crump, C., Cades, D., Rauschenberger, R., Hildebrand, E. et al. (2015). Driver reactions in a vehicle with collision warning and mitigation technology. SAE Technical Paper 2015-01-1411. doi:10.4271/2015-01-1411.

Crump, C., Cades, D., Rauschenberger, R., Hildebrand, E.A., & Young, D.E. (2014). Dynamic on-road method for evaluation of Advanced Driver Assistance System (ADAS). *Proceedings of the 3rd Annual World Conference of the Society for Industrial and Systems Engineering*, San Antonio, TX (pp. 77-81). ISBN: 97819384960-2-8.

Rauschenberger, R., Wood, C.T., & Sala, J.B. (2013). Human factors and the design of medical devices. In J.B. Reiss (Ed.), *Bringing your medical device to market* (pp. 215-226). Washington, DC: Food and Drug Law Institute.

Kuzel, M.J., Cohen, H., Cohen, J., & Rauschenberger, R. (2013). Evaluation of mobile eye tracking for forensic analysis of pedestrian falls. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*, San Diego, CA.

Heckman, G.M., Kim, R.S., Lin, S., Rauschenberger, R., Young, D.E., & Lange R. (2012). Drivers' visual behavior during backing tasks: Factors affecting the use of rearview camera displays. *Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting*, Boston, MA.

Kim, R., Rauschenberger, R., Heckman, G., Young, D., & Lange, R. (2012). Efficacy and usage patterns for three types of rearview camera displays during backing up. *Proceedings of the Society of Automobile Engineers World Congress*, Detroit, MI.

Zheng, X.S., Kiekebosch, J., & Rauschenberger, R. (2011). Attention-aware human-machine interface to support video surveillance task. *Proceedings of the Human Factors and Ergonomics Society 55th Annual Meeting*, Las Vegas, NV.

Sala, J.B., Nichols, E.A., Muhammad, R., Lakhiani, S.D., Rauschenberger, R., & Wood, C.T. (2010). Government, warnings, and safety information: A comparison of inter-agency regulations and guidance. In W. Karwowski & G. Salvendi (Eds.), *Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries* (pp. 1047-1056). Boca Raton, FL: CRC Press.

Rauschenberger, R. (2010). Reentrant processing in attentional guidance — Time to abandon old dichotomies. Invited editorial. *Acta Psychologica*, *135*, 109-111.

Rauschenberger, R., Lin, J.J.W, Zheng, X.S., & Lafleur, C. (2009). Subset search for icons of different spatial frequencies. *Proceedings, of the Human Factors and Ergonomics Society 53rd Annual Meeting*, San Antonio, TX.

Zheng, X.S., Chakraborty, I., Lin, J.J.W., Rauschenberger, R. (2009). Correlating low-level image statistics with users' rapid aesthetic and affective judgments of web pages. *Long Paper presented at the 2009 CHI conference*, Boston, MA. (Nominated for Best Paper CHI 2009.)

Carlson, T.A., Rauschenberger, R., & Verstraten, F.A.J. (2007). No representation without awareness in the Lateral Occipital complex. *Psychological Science*, *18*, 298-302.

Zheng, X.S., Sapundshiev, I., & Rauschenberger, R. (2007). WikiTable: A new tool for collaborative authoring and data management. *HCI*, *15*, 501-508.

Zheng, X.S., Chakraborty, I., Lin, J.J.W., & Rauschenberger, R. (2008). Developing metrics to predict users' perceptions of interface design. *Proceedings of the Human Factors and Ergonomics Society 52nd Annual Meeting*, New York, NY.

Rauschenberger, R., & Yantis, S. (2006). Perceptual encoding efficiency in visual search. *Journal of Experimental Psychology: General*, *135*, 116-131.

Rauschenberger, R., Liu, T., Slotnick, S.D., & Yantis, S. (2006). Temporally unfolding neural representation of pictorial occlusion. *Psychological Science*, *17*, 358-364.

Rauschenberger, R., & Chu, H. (2006). The effects of familiarity on encoding efficiency in visual search. *Perception & Psychophysics*, *68*, 770-775.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

Rauschenberger, R., Mosca, F., Peterson, M.A., & Bruno, N. (2004). Amodal completion in visual search: Preemption or context effects? *Psychological Science*, *15*, 351-355.

Rauschenberger, R. (2003). When something old becomes something new: Spatiotemporal object continuity and attentional capture. *Journal of Experimental Psychology: Human Perception and Performance*, *29*, 600-615.

Rauschenberger, R. (2003). Attentional capture by auto- and allo-cues. *Psychonomic Bulletin & Review*, *10*, 814-842.

Rauschenberger, R., & Yantis, S. (2001). Masking unveils pre-amodal completion representation in visual search. *Nature*, *410*, 369-372.

Rauschenberger, R., & Yantis, S. (2001). Attentional capture by globally-defined objects. *Perception & Psychophysics*, *63*, 1250-1261.

Enns, J.T., Austen, E.L., DiLollo, V., Rauschenberger, R., & Yantis, S. (2001). New objects dominate luminance transients in setting attentional priority. *Journal of Experimental Psychology: Human Perception and Performance*, *27*, 1287-1302.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**Previous Four Years of Deposition and Trial Testimony for Robert Rauschenberger, Ph.D.**
Last updated: February 20, 2025

| Depo Date | Trial Date | Case Name | Case Client | Court | Case # |
|---|---|---|---|---|---|
| 4/24/2024 | -- | Prieto v. JJJ Trucking | The Law Firm for Truck Safety | Circuit Miami-Dade, FL | 2022-002251-CA-01 |
| 10/21/2024 | | Center for Inquiry, Inc. v. Boiron, Inc. | SECIL Law PLLC | Superior Court of DC | 2022 CA 1610 B |
| 12/12/2025, 1/13/2025 | | Caraballo v. Home Depot U.S.A., Inc. | Parsky & Galloway, LLC | District Court of CT | 3:21-cv-252 (VAB) |
| 1/10/2025 | | Candelaria v. Conopco, Inc. | Lowenstein Sandler LLP | Eastern District of NY | 1:21-cv-06760 |