# Exhibit 23

The Washington Post

# ARMED AND UNREADY

By Jeff Leen; Sari Horwitz
November 18, 1998

Fourth of five articles

A decade ago, the District's Metropolitan Police Department placed one of the most advanced pistols in the world into the hands of hundreds of ill-prepared, undertrained police recruits.

The results have been unfortunate, according to police reports and internal department records examined by The Washington Post.

In the 10 years since D.C. police adopted the Glock 9mm to combat the growing firepower of drug dealers, there have been more than 120 accidental discharges of the handgun. Police officers have killed at least one citizen they didn't intend to kill and have wounded at least nine citizens they didn't intend to wound. Nineteen officers have shot themselves or other officers accidentally. At least eight victims or surviving relatives have sued the District alleging injuries from accidental discharges.

In an extraordinary sequence over the last six months, the District has settled three lawsuits for more than $1.4 million. The District admitted no wrongdoing in the suits, but the cases highlight the chronic neglect of Glock training by the D.C. police.

Last month, the District paid $250,000 to settle a case brought by the family of an unarmed teenager shot and killed at a traffic roadblock in 1996. The family's attorney argued that the officer's gun had discharged accidentally.

In August, the District paid $375,000 to settle another case in which a D.C. officer accidentally shot and killed an unarmed driver at a traffic stop in 1994.

In June, the District paid almost $800,000 to settle a case from 1994, when a D.C. officer accidentally shot his roommate. The officer had not been to the firing range to train with his weapon in more than two years -- 20 months out of compliance with regulations.

"That's just poor on the department's part to allow that to happen, and poor on the individual's part," Chief Charles H. Ramsey, who took over the D.C. police in April, said in an interview. "No wonder they settled."

Ramsey's recent efforts to bolster lax training already have yielded significant improvements, police officials say. But as the recent legal settlements show, the bill for past shortcomings is still coming due.

The string of accidental shootings by D.C. officers came amid 10 years of warnings from firearms experts about the Glock's light trigger and propensity to fire an unintentional shot when handled incorrectly. Such a sensitive gun was designed for highly trained users.

Yet the department stinted on training for recruits and failed to keep veteran officers to a twice-yearly retraining schedule that experts consider the bare minimum for firearms competence. A Washington Post investigation found that 75 percent of all D.C. officers involved in shootings during 1996 failed to comply with the retraining regulation. One officer waited so long to come to the range that firearms instructors found a spider nest growing inside his Glock.

Several factors contributed to this neglect, including the reluctance of hard-pressed commanders to spare officers from street duty, lapses on the part of officers themselves, problems with lead contamination that shut down the shooting range in the early 1990s and poor management, according to interviews with officials and independent studies of the department.

D.C. police officials repeatedly studied the phenomenon of accidental discharges, invariably concluding that there was no fundamental problem with the Glock itself -- as long as users were properly trained. Officials chose not to modify the Glock trigger, as New York City police did in 1990, to require a more forceful tug to fire the gun. In 1994, D.C. police recorded more accidental discharges than the Chicago or Los Angeles forces, two far bigger departments, according to discharge records from the departments. Last year, the accident rate for D.C. police was 50 percent greater than that of New York police.

Former D.C. police chief Larry D. Soulsby told The Post recently that he had planned to have the department switch from the Glock to another pistol before his retirement last November. Safety, Soulsby said, was "absolutely" a major factor in his thinking. In the past, the police union had pressed for a change of service weapon, Soulsby and former union officials said.

Glock Inc., the Austrian company's U.S. subsidiary, did not respond to repeated phone calls or a letter sent to its headquarters in Smyrna, Ga. A lawyer who has represented the company defended the gun as a safe weapon, citing the pistol's enormous popularity with U.S. police agencies.

"Glock has a market share probably in excess of 50 percent of the law enforcement market out there in the United States," New York lawyer John Renzulli said. Glock Perfection'

The Glock semiautomatic is, by all accounts, a 21st-century gun. Made of steel and polymer plastic, the Glock 17 model carried by D.C. police is lightweight but powerful, able to deliver 18 bullets in nine seconds. It is sturdy, requires little maintenance and is very easy to shoot.

Unlike many semiautomatics, the Glock has no external manual safety. The pistol carried by D.C. police uses a five- to six-pound trigger pull -- half the pull of most other semiautomatics for their first shot. The features allow a shooter to fire quickly in dire circumstances when getting off the first shot is critical. Glock's pride in its design and precision is reflected in the company's motto: "Glock Perfection."

The Glock's unique features made the gun attractive to D.C. police officials when slayings in the District soared in the late 1980s. The D.C. department liked the lack of an external manual safety, calling that "a paramount consideration" in selecting the Glock, according to the department's Firearms Training Manual. Officers accustomed to firing revolvers that lacked an external safety -- which included the entire D.C. force -- could more easily switch to the Glock than to a pistol that required them to learn how to disengage the safety before shooting, the department reasoned.

Department officials knew that diligent training would be crucial to ensure a safe transition from revolvers to semiautomatics. In February 1988, the departmental committee studying the handgun issue noted that the revolver was safer "for the inexperienced shooter" and that "the accidental discharge potential is greater for the semiautomatic." But the committee predicted that "proper training and clearly defined departmental policy" for the semiautomatic "should negate this factor."

In December 1988, the department made a surprise announcement that it was switching to the Glock. Police officials were so taken with the gun's merits that they got the District to approve an emergency procurement without competing bids. "Failure to procure these weapons on an emergency basis could result in needless injury to police officers and the public," a city procurement official noted of the department's request.

The District paid just over $1 million for 4,300 Glocks.

The decision was immediately controversial. Dissenting voices were beginning to be heard about "Glock Perfection." Perhaps the most significant criticism came from the FBI. The FBI Academy's firearms training unit tested various semiautomatic handguns and in a 1988 report gave the Glock low marks for safety. The report cited the weapon's "high potential for unintentional shots."

Unintentional shots would turn out to be a disquieting byproduct of Glock's unique design, according to many experts and to lawsuits filed against Glock in the last decade. Even though the Glock does not have an external manual safety, it incorporates three internal safeties intended to prevent the gun from discharging if dropped or jostled. A unique feature of the Glock is that a shooter disengages all three safeties at once by pulling the trigger.

"You can't blame the Glock for accidental discharges," said former police chief Isaac Fulwood Jr., who took over the force a few months after the District switched to Glocks. "The gun doesn't accidentally shoot. The officer has got to pull the trigger."

But officers found it difficult in tense street situations to keep their fingers off the triggers of their Glocks.

"When they feel in danger or they feel that somebody is in danger and they're really going to use that weapon, they'll put their finger on the trigger," Detective Ron Robertson, former head of the D.C. police union, said in a deposition in July. "It's kind of hard to keep the finger out of there."

D.C. police are trained to carry their Glocks in the "street-load mode" -- with a round in the chamber ready to fire when the trigger is pulled. A Glock has an innovative "trigger safety" -- a sort of trigger-within-a-trigger that makes it virtually impossible for the Glock to go off unless the trigger is pulled. But officers in stressful situations might begin the process of squeezing the trigger safety in order to be primed to fire, several firearms experts said.

Then-Deputy Chief Rodwell Catoe wrote in an internal memo in 1990, "An unholstered Glock in the street load' mode with the trigger safety mechanism pressed is a profoundly dangerous weapon, even in the most ideal conditions." It Bit Me'

Almost immediately after D.C. police adopted the Glock, unintentional discharges increased sharply.

The first accident occurred in February 1989 -- less than a month before the guns reached officers on the street. Officer Adam K. Schutz was helping to test and clean the first shipment of guns when he shot himself in the fingers.

"It bit me," said Schutz, who was left with permanent damage to a finger on his left hand. "I was moving my hand to lower the slide and it jumped forward. I had assumed the gun was unloaded."

Nine months later, the 2-year-old daughter of a D.C. police officer died after accidentally shooting herself in the head with her father's pistol in their Northwest Washington house.

By October 1989, the department had experienced 13 unintentional discharges, double the rate of 1988, the last year with revolvers, according to an internal police memo. Then-Assistant Chief Max Krupo noted in the memo to the chief that such problems were to be expected in departments switching to semiautomatics. Krupo suggested that increasing the five-pound trigger pressure to eight pounds "would be satisfactory." But after studying the issue, Krupo decided that a five-pound pull was just as safe as an eight-pound one.

In February 1990, the Use of Service Weapon Review Board -- responsible for monitoring department shooting trends -- issued a report by Catoe, the deputy chief, in response to "the increasing number of unintentional discharges." The report examined nine incidents, blaming "human error" in each case. The report found no deficiencies in either the Glock or the department's training procedures.

But the report reached a troubling conclusion: "The department is obviously experiencing far too many accidental Glock discharges . . . {which} must be eliminated promptly so that serious injury or death can be avoided."

By the early 1990s, the Glock's alleged problems with unintentional shots were the talk of the gun world. Lawsuits against Glock for accidental discharges piled up. The Firearms Litigation Clearinghouse in Washington, an advocacy center against gun violence, currently is monitoring about 60 pending lawsuits

against Glock across the country -- 90 percent of all the cases the center is tracking, the center's executive director said.

Despite such publicity, many firearms experts retain deep admiration for the gun.

"Some of the same factors that give it tremendous high-speed hit potential while you're fighting for your life also make it more prone to accidental discharges," Massad Ayoob, a New Hampshire police captain who also runs a firearms instruction institute, said. "You don't want your 16-year-old kid out of driver's ed driving a Corvette Stingray. The Glock is like a Corvette Stingray."

Alexandria Police Chief Charles E. Samarra, who as a D.C. assistant chief headed the committee that chose the Glock in 1988, called it "the perfect weapon," but said training is essential.

"Training has a lot to do with accidental discharges," Samarra said in an interview. "Our only concern was training."

Three months after D.C. police started carrying Glocks, the department began a crash program to hire 1,500 officers in 18 months. Police officials now acknowledge that the officers from those recruit classes of 1989 and 1990 were, in many cases, poorly screened and trained by the department.

"They just rushed through this stuff," said former lieutenant Lowell Duckett, who was a firearms instructor at the police academy then. "We had taken firearms training up to eight days. We were in the process of making it two weeks. After 1989, {with} the big flood of recruits . . . firearms went to five days, maybe three in some cases."

Of 93 accidental discharges studied by The Post where information about the officers' academy classes was available, 49 involved officers from the Classes of 1989 and 1990. In other words, half the accidental shootings involved a group of officers who never made up more than 35 percent of the force. He Had His Finger on the Trigger'

In the years after the department's 1990 report on Glock accidents, unintentional shootings continued to mount.

In October 1990, Officer Edward Wise fired accidentally and grazed a man's head during an undercover drug operation at a Southeast Washington housing complex, according to police and court documents. Wise said he had been struggling with the man, Barry Braxton, who was unarmed. Braxton sued and collected a $55,000 settlement from the District.

Sabrina Whittle, who was Wise's partner, said in a recent interview that she and her partner were not taught to keep their fingers off the triggers of their Glocks unless they intended to fire.

"The most we had to go on was common sense," said Whittle, then a 21-year-old police rookie, now a security guard. "It was dark and late and we were scared. I know that, both of us being scared, he had his finger on the trigger. Obviously, {with} your finger on the trigger, you're prepared."

Wise, who is still with the department, did not respond to messages seeking comment.

In May 1991, an officer accidentally shot Kenneth McSwain, 18, in the back when the officer slipped while serving a search warrant in Northeast Washington, court and police documents show. McSwain, who was unarmed and was not charged with any crime, collected a $42,000 settlement.

In August 1991, an officer accidentally shot Stephen Wills in the chest during a drug bust in Southeast Washington, according to court and police documents. Wills, who was unarmed and was not charged with any crime, collected a $40,000 settlement.

Four officers were wounded with their own guns in 1992. Over and over, officers fired unintentional rounds in the locker rooms at their district stations, or at home while cleaning or unloading their guns, according to police reports.

Officers are told during training to avoid such accidents by being attentive to the Glock's unique, simplified design: An officer cleaning a Glock has to pull the trigger before removing the slide to get access to the gun barrel. In many other pistols, taking the magazine of bullets from the gun renders it unable to fire. But the Glock has no "magazine safety" -- if an officer leaves a bullet in the chamber, the Glock will still fire if the trigger is pulled.

In March 1993, Officer Lakisha Poge fired a round through her bed while unloading a Glock in her apartment, a police report states. The bullet went through the floor and hit Glowdean Catching in the apartment below. Catching, who was wounded in both legs, has a suit pending against the District. Poge, who has left the department, could not be reached for comment.

"I submitted reports through channels and said, You have problems with this gun,' " former homicide branch chief William O. Ritchie, who chaired the department's Use of Service Weapon Review Board in 1993, said in an interview. "I talked to the union and said, There is a hazard here.' "

In January 1994, homicide detective Jeffrey Mayberry shot Officer James Dukes in the stomach at police headquarters. "I hear a loud bang and Dukes is slowly falling to the floor," Detective Joseph Fox, Mayberry's partner, said in a deposition. "Jeff jumps up and says, Dukes, I didn't mean to do it, I didn't mean to do it.' "

Dukes said in a recent interview, "He was playing with the weapon. This was the second time I had told {Mayberry} during that tour of duty not to point the weapon at me."

A lawyer for Dukes later said that Mayberry had been trying out a laser sight on his Glock when the gun went off. Mayberry denied that in a court proceeding.

Dukes, who took an early disability retirement because of his wound, was awarded an $880,000 judgment against Mayberry in D.C. Superior Court. But Dukes said he has been unable to collect any money, including $80,000 owed for his medical bills. Mayberry declined to comment.

Four days after Dukes was shot, Officer Juan Martinez Jr. accidentally shot his roommate, Frederick Broomfield, in the groin while awaiting dinner in their apartment, according to police and court records.

Martinez was unloading his Glock in his bedroom when Broomfield came in and asked Martinez how he wanted his chicken cooked. The gun abruptly went off.

"I looked down and I seen smoke coming from my crotch and then after that, you know, I looked at Jay and I said, Damn, Jay,' " Broomfield said later in a deposition. "Then my leg started shaking and I fell."

Broomfield, who nearly bled to death after the bullet pierced an artery in his groin, sued the District and Glock Inc. His attorneys compiled a voluminous case in D.C. Superior Court, marshaling gun experts who gave statements about the alleged dangers of the Glock and the deficiencies of the District's training.

In June, the District settled the case by paying Broomfield $797,500. Glock also settled, but a lawyer for Glock declined to disclose the amount. In court papers, Glock denied that its gun was dangerous or defective.

One factor that led the District to pay such a large sum was that Martinez had not trained with his Glock in more than two years. The department regulations requiring officers to visit the firing range at least every six months were not enforced through most of the 1990s.

"You get a factor like that in a case and you know your chances of prevailing before a jury are diminished," said D.C. Corporation Counsel John M. Ferren, whose office paid the settlement.

Martinez left the department for a reason unrelated to the shooting. He could not be reached for comment.

About the time that Detective Roosevelt Askew accidentally shot and killed an 18-year-old driver during a traffic stop in July 1994, then-Chief Fred Thomas publicly warned that lax firearms training could cost the department dearly. Thomas announced his intention to require all officers to comply with the semiannual training regimen or forfeit their weapons. But Thomas retired a year later and the lax training continued, documents obtained by The Post show. A department committee examining the Glock in 1994 found some design shortcomings but concluded that the gun was "reliable." Still, the committee's report declared that "training status must be improved" because less than 50 percent of the force had complied with the semiannual qualification standard.

Accidents also continued in 1996 and 1997, but at a slower pace -- dropping from a high of 27 in 1991 to eight last year. Although the numbers diminished, the tragic nature of the incidents didn't. In May 1996, Courtney Rusnak, the 3-year-old daughter of Officer George Rusnak, died after she apparently shot herself with her father's Glock in their District Heights home.

"It looks like she found the gun and started playing with it," Mark Polk, a spokesman for the Prince George's County police, said at the time. "The gun was fired once, and she was hit directly in the head." In June 1996, Officer Terrence Shepherd shot and killed 18-year-old Eric Anderson as Anderson sat unarmed in his car at a routine traffic roadblock in Southeast Washington. Although Shepherd said he fired because he thought Anderson posed a threat, his captain testified that Shepherd told him at the scene that he had his finger on the trigger and the gun "went off." The shooting, the captain added, appeared to be accidental.

When an officer's gun discharges accidentally, the shooting is generally ruled unjustified by the department, a review of department records shows. Discipline can follow, but an officer is not typically subjected to severe discipline unless the accidental shot kills or badly wounds someone, or the officer lies about the shooting.

Of the 12 officers involved in the shooting cases detailed in this account, two were charged or dismissed: Askew was indicted and convicted of lying about his accidental shooting, and Shepherd was fired for negligent use of force. Four other officers have left the department. Six remain with the force.

By 1997, the safety issue had turned some members of the D.C. police union against the Glock, according to Robertson, the former union official. Several officials wanted to switch to the Sig Sauer, a more expensive gun with a heavier trigger pull.

"Several kids were killed here when they picked up their fathers' guns," Robertson said in an interview. "A 2-year-old can pick up the Glock and kill someone. It doesn't take much to fire the weapon."

The push to switch guns apparently died when Soulsby retired as chief last year. But Robertson still thinks it is a good idea.

"The only thing about the Glock is, once you start pulling on that trigger, there's no coming back," Robertson said. "You don't get a second thought with it." Staff writer David Jackson, director of computer-assisted reporting Ira Chinoy, database specialist Jo Craven and researcher Alice Crites contributed to this report.
Accidental Discharges

Since D.C. police began carrying the Glock handgun in February 1989, accidental discharges have resulted in the following injuries: Feb. 2, 1989: Officer assigned to armorer's office shoots self in fingers while unloading gun during test-firing. Sept. 19, 1989: Officer suffers lacerations when bullet ricochets off wall in 7th District station. Oct. 10, 1989: Two-year-old daughter of D.C. police officer dies after shooting self in head with her father's pistol. March 25, 1990: Juvenile removes gun from officer's briefcase, shoots self in hand. May 31,

1990: Officer injures finger and left arm at 2nd District station. Sept. 21, 1990: Officer shoots self in upper right thigh while unholstering gun. Oct. 27, 1990: Gun goes off while officer struggles with suspect, striking suspect in back of head. Nov. 1, 1990: Suspect grabs officer's gun, bullet strikes another officer in chest. Dec. 5, 1990: Officer shoots self in right foot after husband bumps her while she unloads gun at home. Feb. 7, 1991: Officer shoots self in stomach after he stumbles while chasing drug suspects. May 23, 1991: Officer shoots 18-year-old in back after slipping while serving search warrant. Aug. 8, 1991: Officer shoots unarmed man in chest during drug arrest. Sept. 6, 1991: Officer shoots self in hand at home. Jan. 24, 1992: Officer shoots self in thigh while holstering gun. March 13, 1992: Officer shoots self in hand and knee at home. April 14, 1992: Officer shoots self in thigh while unloading gun at home. April 21, 1992: Officer shoots self in hand while holstering gun at home. March 10, 1993: Officer fires through floor of her apartment, hitting resident below in thigh and ankle. April 4, 1993: Officer shoots self in forearm while unloading gun at home. April 20, 1993: Officer shoots another officer in foot after removing magazine when bullet ricochets at 2nd District station. Aug. 17, 1993: Officer shoots another officer in finger when gun goes off in holster as he exits patrol car. Jan. 28, 1994: Officer shoots another officer in stomach while handling gun inside department headquarters. Feb. 2, 1994: Officer shoots roommate in groin inside their apartment. April 13, 1994: Officer shot in leg when gun goes off during struggle with suspect. June 17, 1994: Officer shot in stomach by his wife at their home. July 15, 1994: Officer fatally shoots driver in head during traffic stop. Nov. 9, 1994: Officer shoots self in the right leg while approaching suspect. Dec. 6, 1994: Officer shoots suspect in lower back, says gun went off when suspect grabbed it. Feb. 6, 1995: Officer shoots suspect accidentally during arrest. Nov. 15, 1995: Officer shot in buttocks. May 26, 1996: Three-year-old daughter of officer shoots self in head. Aug. 21, 1996: Officer shoots girlfriend in stomach after struggle over his gun. Nov. 7, 1997: Officer shot in upper left thigh. Source: MPD police reports, Use of Service Weapon Review Board records CAPTION: Officer Glenn Shaw fires his Glock at the D.C. police shooting range, and the gun ejects a shell casing. The Glock 17 fires far more easily than most other handguns and can shoot 18 bullets in nine seconds. ec CAPTION: Officers practice at the police shooting range. The administration of Chief Charles H. Ramsey is pushing officers to train more with their weapons; for several years, most officers ignored requirements that they requalify at the firing range twice a year. ec CAPTION: Accidental Discharge of Police Weapons, 1989-1998 ec

Comments