# Exhibit 26

# NEW YORK CITY POLICE DEPARTMENT
# ANNUAL FIREARMS DISCHARGE REPORT



# 2007

**Cover Art created by the New York City Police Department from a New York Daily News Photo (dated June 25, 2004) of police officers responding to a confirmed report of a man with a gun on the Brooklyn Bridge.**

# ANNUAL FIREARMS DISCHARGE REPORT

# 2007

The information in this report was compiled and analyzed by the New York City Police Department, Office of Management Analysis and Planning

THIS REPORT IS DEDICATED TO THE MEMORY OF POLICE OFFICER RUSSEL TIMOSHENKO, AUXILIARY POLICE OFFICER NICHOLAS PEKEARO, AND AUXILIARY POLICE OFFICER EUGENE MARSHALIK

# RAYMOND W. KELLY

**POLICE COMMISSIONER**

# MICHAEL J. FARRELL

**DEPUTY COMMISSIONER, STRATEGIC INITIATIVES**

# DEPUTY CHIEF JOHN P. GERRISH

**COMMANDING OFFICER, OFFICE OF MANAGEMENT ANALYSIS AND PLANNING**

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# TABLE OF CONTENTS


PAGE

INTRODUCTION........ i
USE OF FORCE........ ii
THE INVESTIGATION AND REVIEW PROCESS........ v
ANATOMY OF A FIREARMS INVESTIGATION........ viii
GLOSSARY OF TERMS........ ix
HISTORICAL SNAPSHOT 1997-2007........ xi
2007 FIREARMS DISCHARGE SNAPSHOT........ xii
2007 FIREARMS DISCHARGE SCOPE........ xiii
2007 FIREARMS DISCHARGE OVERVIEW........ xiv

**ANALYSIS OF 2007 FIREARMS DISCHARGES BY CATEGORY**

INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT
- OVERVIEW........ A-1
- REASON FOR DISCHARGES........ A-1
- DATES AND TIMES........ A-1
- LOCATIONS........ A-2
- REASONS OFFICER INVOLVED........ A-5
- INCIDENT DETAILS........ A-6
- OFFICER PEDIGREE........ A-8
- SUBJECT PEDIGREE........ A-10
- OUTCOME........ A-13
- CONCLUSION........ A-17

INTENTIONAL DISCHARGE – ANIMAL ATTACK
- OVERVIEW........ B-1
- REASON FOR DISCHARGE........ B-1
- DATES AND TIMES........ B-1
- LOCATIONS........ B-2
- REASONS OFFICER INVOLVED........ B-3
- INCIDENT DETAILS........ B-5
- OFFICER PEDIGREE........ B-7
- OUTCOME........ B-9
- CONCLUSION........ B-10

UNINTENTIONAL DISCHARGE........ C-1

UNAUTHORIZED USE OF A FIREARM........ D-1

**APPENDIX**

HISTORICAL DATA........ a
SUBJECTS KILLED IN ADVERSARIAL CONFLICT WITH POLICE........ d
OFFICERS KILLED IN THE LINE OF DUTY........ f

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# FIGURES


| | | PAGE |
|---|---|---|
| A.1 | Type of Threat Intentional Discharge – Adversarial Conflict (ID-AC) | A-1 |
| A.2 | Top 3 Precincts by Number of ID-AC Incidents | A-2 |
| A.3 | Borough of Occurrence | A-2 |
| A.4 | MAP: Locations of ID-AC vs Locations of Criminal Shootings, 2007 | A-3 |
| A.5 | Criminal Shootings vs ID-AC Incidents, by Borough | A-4 |
| A.6 | Criminal Shootings vs ID-AC Incidents by Borough | A-4 |
| A.7 | Top 5 Officer Assignments | A-5 |
| A.8 | Officer's Actions Prior to Shooting | A-5 |
| A.9 | Shots Fired by Officers | A-6 |
| A.10 | Shots Fired by Officers | A-6 |
| A.11 | Shots Fired per Incident | A-7 |
| A.12 | Race/Ethnicity of Officers | A-8 |
| A.13 | Rank of Officers Involved in ID-AC Incidents | A-9 |
| A.14 | Years of Service | A-9 |
| A.15 | Race/Ethnicity of 52 Known Subjects Involved in ID-AC Incidents | A-10 |
| A.16 | Race/Ethnicity of 19 Known Subjects Firing on Officers | A-10 |
| A.17 | Known Subjects Who Fired On Police vs Criminal Shooting Suspects, 2007 | A-11 |
| A.18 | Known Subjects Involved in ID-AC Incidents vs Persons Arrested for Firearms Possession, 2007 | A-11 |
| A.19 | 40 Known Subjects with Prior Arrests | A-12 |
| A.20 | List of Known Weapons Possessed/Used by Subjects | A-12 |
| A.21 | Officers Injured/Killed During ID-AC Incidents | A-14 |
| A.22 | Actions of Subjects Shot and Killed | A-15 |
| A.23 | Actions of Subjects Shot and Injured | A-15 |
| A.24 | Investigation and Review Findings and Recommendations | A-16 |
| | | |
| B.1 | Intentional Discharge – Animal Attack Incidents (ID-AA), by Tour | B-1 |
| B.2 | Jurisdiction of Incidents | B-2 |
| B.3 | ID-AA Incident Locations, by Borough | B-2 |
| B.4 | Location of Animal Attack | B-3 |
| B.5 | Type of Job Officer Assigned | B-3 |
| B.6 | MAP: Locations of ID-AA Incidents, 2007 | B-4 |
| B.7 | Locations of Officers' Assignment During ID-AA Incidents, 2 or More Incidents | B-5 |
| B.8 | Officer Assignment | B-5 |
| B.9 | Shots Fired per Officer | B-6 |
| B.10 | Shots Fired per Incident | B-6 |
| B.11 | Race/Ethnicity of Officers | B-7 |
| B.12 | Rank of Officers Discharging Firearm in ID-AA | B-8 |
| B.13 | Years of Service | B-8 |
| B.14 | Breed | B-9 |
| B.15 | Bite Location to Officer | B-9 |
| | | |
| C.1 | Discipline, All Unintentional Discharges | C-3 |

## THE ANNUAL FIREARMS DISCHARGE REPORT: AN INTRODUCTION

One of the single-most abrupt, dynamic, and potentially traumatic incidents that can happen in a police officer's career is the line-of-duty discharge of his or her firearm. As much as handcuffs, the uniform, or the shield, the gun is a symbol of the officer's authority. It is, moreover, a physical embodiment of the officer's responsibility. In New York City, the Sullivan Act (1911) ensures that essentially no one but law enforcement officers or peace officers, agents of the government, and soldiers may openly carry firearms. Because of this, as well as all the implications of the gun, the weapon on an officer's hip is a constant reminder—for officer and citizen alike—of the officer's role and the trust society has given.

Department Order SOP 9 (s.69) was adopted in 1969, with a procedural goal of collecting in-depth documentation of discharges during hostile encounters, for the stated purpose of "[increasing] the safety potential of each member of the force." But the order's mandate quickly expanded beyond police-involved combat to include the study of all firearms discharges by police. Since the early 1970s, the NYPD has endeavored to record and evaluate every instance in which an officer discharges his or her weapon, whether the discharge occurs purposefully, accidentally, or, in rare instances, criminally.

The SOP 9 process has been demonstrably effective. When annual recordkeeping began in 1971, there were 12 NYPD officers shot and killed by another person; 47 officers were shot and injured. Officers, in turn, shot and mortally wounded 93 subjects, and another 221 subjects were injured by police gunfire. These statistics are difficult to conceive of today, and that alteration of society's tolerance is largely the result of the success the Department has had in making restraint the norm. The past three decades of annual analysis have altered the way officers respond to, engage in, and even assess the need for firearms discharges. There has been Department-wide change—tactical, strategic, and cultural—with regard to how officers utilize and control their firearms. Today's annual totals, enumerated in the pages that follow, are tiny fractions of 1971's figures. The information gleaned from the annual reports has helped the Department save the lives of officers and subjects alike.

Today, the reports serve an additional but equally important role: they are statistical engines for the development of training, the adoption of new technologies, and even the deployment of Department assets. New instructional scenarios are implemented from these reports, new hardware—from bullet-resistant vests to speed loaders to semi-automatic handguns to controlled-energy devices—is introduced, and violence-prone hotspots are identified for inclusion in Operation Impact.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

It is with these goals in mind that this new format for the Annual Firearms Discharge Report is introduced.

## USE OF FORCE

Police officers are among a small, select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect arrest or prevent escape, as well as to protect property or people. With certain very specific exceptions, the ability of private citizens to resort to force is primarily limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing malefactors and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance, and the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist officers—officers have an ascending array of force options that they utilize in order to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., oleoresin capsicum spray, or pepper spray), impact weapons like nightsticks or the ASP, and, finally, deadly physical force. All of these are tools at the officer's disposal, and the officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm—or vice versa—if the situation dictates.

It is wrong, however, to assume that an officer's permission to use force is unlimited. According to both federal and state law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary. Reasonableness, more than any other factor, is the most salient aspect of an officer's legitimate use of force.

In federal case law, both Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989) delineate a standard of "objective reasonableness" (Graham) that restricts an officer's prerogative to compel or constrain another citizen. Tennessee v. Garner dismissed the long-standing precedent that flight from any felony was grounds for using deadly physical force, but retained the understanding that if the fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, requires that physical force be used by an officer only when the officer "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. And the state limits an officer's ability to exercise *deadly* physical force even further—Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three very specific instances: 1) when the subject has committed or is attempting to commit a felony *and* is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary; 2) when an armed felon resists arrest or flees; and 3) when the use of deadly physical force

is necessary to defend a person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and warns that "EXCESSIVE FORCE WILL NOT BE TOLERATED" (Patrol Guide 203-11). Specifically regarding the use of deadly physical force, the NYPD states that "Uniformed members of the service should use only the minimal amount of force necessary to protect human life" (Patrol Guide 203-12).

**GUIDELINES FOR THE USE OF FIREARMS**

To this end, the Department has promulgated nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

- Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.
- Police officers shall not discharge their weapons when doing so will unnecessarily endanger innocent persons.
- Police officers shall not discharge their weapons in defense of property.
- Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.
- Police officers shall not fire warning shots.
- Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.
- Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.
- Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.
- Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

**REASONABLENESS**

In the final telling, both legal standards and the Department's expectations are predicated on reasonableness, and it is as much that term as any generalized statutory definition that determines the appropriateness of an officer's exercise of deadly physical force. Police are regularly exposed to highly stressful, dangerous situations, and both the risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Holmes noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, the Supreme

Court wrote, in Graham v. Connor, that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51 NY2d 267, 271, the New York courts wrote "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good.

**TRAINING**

Latitude is not unrestricted discretion, of course, but rather an admission that reasonableness is fluid. In order to make the right conclusion about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, and skill, but most of all, on training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The main purpose of the Annual Firearms Discharge Report is to ensure that the NYPD's training is the best it can be.

## INVESTIGATION

The New York City Police Department recognizes the serious nature of police-involved firearms discharges, and, as the preceding pages make clear, it seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening thirty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents: 1) the Department's Patrol Guide, specifically Procedure 212-29; and 2) a handbook entitled "The Firearms Discharges Investigation Manual; The NYPD guide to the preparation of a Shooting Incident Report."

### THE SHOOTING TEAM

When an officer discharges his or her firearm, on- or off-duty, or when a firearm owned by an officer is discharged, the patrol supervisor who responds to the incident takes charge of the scene and secures and inspects the involved officer's firearm. He or she also immediately sends notifications up the chain of command. This results in the dispatch of a Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain who has been approved by the Chief of Department to conduct investigations into these types of incidents. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable in assisting the shooting-team leader.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, and begins by contacting and conferring with the District Attorney. In many instances—including nearly all instances in which a subject is killed or injured—the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney asks that the officer who fired not be interviewed, the shooting-team leader will direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR. If a firearms discharge causes death or injury, the shooting-team leader automatically reassigns the officer who fired to an office position, on a temporary basis (i.e., a minimum of the next three consecutive work days). In such discharges, the officer who fired is also required to submit to a Breathalyzer test.

Additionally, in discharges that result in either serious injury or death by gunfire to anyone involved, or injury to an officer by gunfire, a supervisor in the rank of Chief responds and supervises the investigation.

If the discharge incident appears legally or administratively problematic, or if the officer who fired is suspected of malfeasance, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the officer's weapon and modify or suspend the officer's duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# THE INVESTIGATION AND REVIEW PROCESS

The investigation conducted by the shooting-team leader is thorough and exhaustive, and includes canvasses, area searches, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analysis.

After conducting this investigation, the shooting-team leader collates all available investigatory results into a Shooting Incident Report, and forwards it to the Chief of Department, ordinarily within 24 hours of the incident.

**THE SHOOTING INCIDENT REPORT**

As much detail as possible is included in the Shooting Incident Report, but the constraints of producing an important document in a compressed timeframe mean that the information it contains is unavoidably preliminary. The primary means of mitigating this is the use of "The Firearms Discharge Investigation Manual."

The manual, in its current incarnation, is a 72-page instruction booklet that facilitates and standardizes the preparation of Shooting Incident Reports, and contains a template by which shooting-team leaders can produce accurate, data-rich reports in a timely manner. It provides a format that ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events, and investigating them can be too involved to do from memory alone. "The Firearms Discharge Investigation Manual" functions as a checklist, promoting both uniformity and specificity.

The last prescribed section in the Shooting Incident Report consists of a recommendation, made with appropriate caveats, about whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline.

In those instances in which involved officers have not been interviewed (usually at the request of the District Attorney), the shooting-team leader may state that the investigation is ongoing and that no recommendations can be made until the officers can offer their narratives. This does not preclude the shooting-team leader from offering a tentative determination, however, nor from commenting on the apparent tactics utilized during the incident.

**THE FINAL REPORT**

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed based on information that was not available to the shooting-team leader (e.g., detective bureau case files, forensic results, and medical reports).

Generally, with regard to discharges that occur during adversarial conflict and involve injury or death to a subject, the final report cannot be finished within the 90-day period. Instead, it must wait until the investigation into the incident has been completed, the officer or officers who fired have been interviewed, and any relevant legal proceedings have been concluded.

When a final report is delayed—whether because of ongoing legal proceedings or incomplete investigations—the Borough Investigation Unit submits monthly interim status reports. Once the final report is finished, however, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After firearms discharges have been investigated with regard to the facts of each incident and the final report has been prepared, and after the District Attorney's office determines whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination in order to assess the event from a procedural and training perspective and impose discipline, if necessary. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

### THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered, and conducted at the borough and Department levels. Members of the borough Firearms Discharge Advisory Board are executive-level supervisors assigned to the borough in which the incident took place. This board further scrutinizes the incident, with the benefit of new material contained in the final report. The borough Firearms Discharge Advisory Board issues preliminary findings, based on this accumulated evidence, regarding whether or not the officer's actions violated the Department's firearms or tactical guidelines or use-of-force policy. The borough Review Board also makes a preliminary disciplinary recommendation and appends both the findings and recommendation to the final report. The borough then presents the findings to the Chief of Department's Firearms Discharge Review Board for a final determination.

### THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The Department's Firearms Discharge Review Board is the last arbiter of any given discharge incident. It issues final determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the discipline to be administered. The Review Board gives due consideration to and often concurs with the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

Once the board's findings have been published, the incident is considered closed. The results of the 2007 findings are published throughout this report.

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
## ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION

An officer discharges a firearm **or** a firearm owned by an officer is discharged.

A **supervisor** responds, secures the scene and the firearm in question, and makes proper notifications.

If the discharge results in injury, **the Internal Affairs Bureau** Command Center is notified and IAB members respond to assist in the investigation; additionally, the officer who fired must submit to a Breathalyzer test.

A Shooting Team is established and a shooting-team leader (**Captain**) responds to conduct an investigation.

The **District Attorney** is notified in **all** cases and conducts a separate investigation (if warranted). The DA may present the case to a Grand Jury to determine justification.

The **Duty Inspector** responds and supervises the investigation.

The **Duty Chief** is notified and responds to supervise investigations for discharges that result in a serious injury by gunfire or death to anyone or when an officer is injured by gunfire.

The shooting-team leader prepares a preliminary Shooting Incident Report, which is submitted to the **Chief of Department.**

The morning after the shooting incident, the applicable Borough Chief or Bureau Chief and executive staff meet with and brief the **Police Commissioner.**

The **Commanding Officer** of the precinct of occurrence or of the Borough Investigations Unit prepares a final report within 90 days and submits it to the **Chief of Department.**

**The Borough Firearms Discharge Advisory Board** formally reviews the incident and submits preliminary findings and recommendations to the **Chief of Department**.

**The Chief of Department Firearms Discharge Review Board** reviews the incident and Borough Advisory Board findings and recommendations and then makes a determination.

If the officer receives *charges and specifications* the case is sent to the **Department Advocate** for a Department Trial.

In all matters related to the incident, the final determination rests with the **Police Commissioner**.

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# GLOSSARY OF TERMS

**Officer** — For this publication, refers to a sworn Uniformed Member of the New York City Police Department of any rank.

**Subject** — A person engaged in adversarial conflict with an officer or a third party, in which the conflict results in a firearms discharge.

**Civilian** — A person who is not the subject in the adversarial conflict but is included as a victim, bystander, and/or injured person.

**Firearms Discharge** — An incident in which an officer of the New York City Police Department discharges *any* firearm, or when a firearm belonging to an officer of the New York City Police Department is discharged by *any* person. This does not include a discharge during an authorized training session nor while lawfully engaged in target practice or hunting. Additionally, it does not include a firearms discharge at a firearms safety station within a Department facility.

**Intentional Firearms Discharge – Adversarial Conflict** — A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject. May include firearms discharges that are determined to be legally justified but outside Department guidelines. This does not include discharging a firearm against an animal attack.

**Intentional Firearms Discharge – Animal Attack** — A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another against an animal attack. May include firearms discharges that are determined to be legally justified but outside Department guidelines.

**Intentional Firearms Discharge – No Conflict** — A firearms discharge in which an officer intentionally discharges a firearm to summon assistance. May include firearms discharges that are determined to be legally justified but outside Department guidelines.

**Unintentional Firearms Discharge** — A firearms discharge in which an officer discharges a firearm without intent, regardless of the circumstance. Commonly known as an *accidental discharge*.

**Unauthorized Use of a Firearm** — A firearms discharge that is considered unauthorized and is not listed as an intentional firearms discharge. In these instances the firearm is being discharged without proper legal justification. This includes instances when an unauthorized person discharges an officer's firearm.

**Use/threaten the Use of a Firearm** — A contributing factor in which a subject discharges or threatens the discharge of a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening the use of a firearm.

**Firearm** — For this publication, includes any pistol, revolver, shotgun, rifle, or variation of such.

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# GLOSSARY OF TERMS

| | |
|---|---|
| **Imitation Firearm** | For this publication, includes any instrument that is designed by the manufacturer or modified by a person to appear as if it were a firearm. This includes air pistols, toy guns, prop guns, and replicas. |
| **Use/threaten the Use of a Cutting Instrument** | A contributing factor in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| **Cutting Instrument** | For this publication, includes any knife, razor, sword, or other sharp-edged instrument, such as a broken bottle. |
| **Use/threaten the Use of a Blunt Instrument** | A contributing factor in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |
| **Blunt Instrument** | For this publication, includes any solid bat, stick, pipe, metal knuckles, or other instrument that, when used as a weapon, can cause blunt force trauma to an individual. This includes automobiles and unbroken bottles. |
| **Use/threaten the Use of Overwhelming Physical Force** | An incident in which a subject or subjects physically attack a person or threaten or attempt to do the same, and while doing so put the person at risk of serious physical injury or death. This includes gang attacks and attempting to push a person from a roof or train platform. |
| **Proactive Policing** | Instances in which officers engage in operations or activities that actively seek out violators of the law. This includes undercover operations, traffic enforcement, checkpoints, verticals, street narcotics enforcement, warrant execution, quality-of-life enforcement, and anti-crime operations. |
| **Reactive Policing** | Instances in which officers respond to a call for service from the public. This includes calls of a man with a gun, crimes in progress, domestic disputes, and quality-of-life complaints. This also includes calls for service in which proactive police units respond. |
| **Attacked** | Instances in which officers are not engaging in proactive or reactive policing but are set upon by a subject. This includes off-duty instances when the officer is a victim of a crime (e.g., Robbery, Burglary, Assault), or involved in an altercation that is escalated by the subject (e.g., a traffic incident, a neighbor dispute). This also incorporates instances in which on-duty officers are performing administrative or non-patrol assignments (e.g., guarding a prisoner, processing reports, securing a location). |

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
## HISTORICAL SNAPSHOT 1997-2007

| CATEGORY | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADVERSARIAL CONFLICT | 114 | 105 | 61 | 63 | 57 | 55 | 61 | 51 | 59 | 60 | 45 |
| ANIMAL ATTACK | 83 | 78 | 43 | 39 | 40 | 38 | 35 | 26 | 32 | 30 | 39 |
| UNINTENTIONAL DISCHARGE | 42 | 55 | 37 | 26 | 27 | 24 | 25 | 27 | **25*** | 26 | 15 |
| MISTAKE | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNAUTHORIZED USE- FIREARM | 9 | 5 | 8 | 1 | 7 | 0 | 2 | 5 | **6* | **8* | **6 |
| SUICIDE/ATTEMPT | 5 | 5 | 5 | 5 | 5 | 2 | 7 | 5 | 3 | 3 | 6 |
| **TOTAL INCIDENTS FOR YEAR** | **253** | **249** | **155** | **134** | **136** | **119** | **130** | **114** | **125** | **127** | **111** |













* Numbers modified from earlier reports to include three incidents that occurred in stated year but were not recorded until 2007

** This section modified in 2005 to include officer's firearms that are discharged by persons other than officer (e.g., family member accidentally discharges weapon, perpetrator gains control of officer's firearm and discharges it, etc.)

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGE SNAPSHOT

| CATEGORY | 2006 | 2007 | %CHANGE |
|---|---|---|---|
| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 60 | 45 | -25% |
| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 30 | 39 | 30% |
| UNINTENTIONAL DISCHARGE | 26 | 15 | -42% |
| UNLAWFUL USE OF FIREARM | 11* | 12 | 9% |
| **TOTAL FIREARM DISCHARGES FOR YEAR** | **127*** | **111** | **-12.6%** |
| TOTAL OFFICERS FIRING | 157* | 148 | -6% |
| TOTAL SHOTS FIRED | 541* | 588 | 9% |
| TOTAL OFFICERS SHOT AND INJURED BY SUBJECT | 4 | 7 | 75% |
| TOTAL OFFICERS SHOT AND KILLED BY SUBJECT | 0 | 3 | N/A |
| TOTAL SUBJECTS SHOT AND INJURED BY OFFICER | 24 | 19 | -21% |
| TOTAL SUBJECTS SHOT AND KILLED BY OFFICER | 13 | 10 | -23% |

## BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT (SECTION A) | 2007 |
|---|---|
| SUBJECT USED/THREATENED THE USE OF A FIREARM | 34 |
| SUBJECT USED/THREATENED THE USE OF A CUTTING INSTRUMENT | 5 |
| SUBJECT USED/THREATENED THE USE OF A BLUNT OBJECT | 6 |
| SUBJECT USED/THREATENED THE USE OF OVERWHELMING PHYSICAL FORCE | 0 |
| OFFICER PERCEIVED THREAT OF DEADLY PHYSICAL FORCE | 0 |
| **TOTAL** | **45** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK (SECTION B) | 2007 |
|---|---|
| DOG ATTACK | 39 |
| OTHER ANIMAL ATTACK | 0 |
| **TOTAL** | **39** |

| UNINTENTIONAL DISCHARGE (SECTION C) | 2007 |
|---|---|
| DURING ADVERSARIAL CONFLICT | 5 |
| HANDLING FIREARM | 10 |
| **TOTAL** | **15** |

| UNLAWFUL USE OF FIREARM (SECTION D) | 2007 |
|---|---|
| SUICIDE | 6 |
| UNLAWFUL INTENTIONAL DISCHARGE | 3 |
| UNAUTHORIZED PERSON DISCHARGED OFFICER'S FIREARM | 3 |
| **TOTAL** | **12** |

***** Numbers modified from previous statistics to include one incident that occurred in 2006 but was not recorded until 2007.

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGE SCOPE

| CATEGORY | TOTAL NUMBER |
|---|---|
| **NEW YORK CITY**<br>TOTAL POPULATION<br>(U.S. Census, July 1, 2007) | 8,274,527 |
| **NYPD**<br>TOTAL OFFICER STAFFING<br>(2007 Annual Average) | 35,907 |
| TOTAL CIVILIAN CONTACTS (APPROXIMATE) | 23,000,000 |
| TOTAL RADIO-RECEIVED ASSIGNMENTS | 4,325,259 |
| INCREASED-RISK RADIO ASSIGNMENTS* | 1,884,613 |
| GUN-INVOLVED RADIO ASSIGNMENTS | 174,050 |
| WEAPONS ARRESTS | 30,911 |
| GUN ARRESTS | 4,032 |
| CRIMINAL SHOOTING AND HOMICIDE VICTIMS | 1,904 |
| CRIMINAL SHOOTING AND HOMICIDE INCIDENTS | 1,618 |
| INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 45 |
| SUBJECTS SHOT AND INJURED | 19 |
| SUBJECTS SHOT AND KILLED | 10 |
| OFFICERS SHOT AND INJURED | 7 |
| OFFICERS SHOT AND KILLED | 3 |
| **NOTE: *all numbers are for CY 2007*** | |

* This is a subjective category encompassing radio runs that would conceivably and reasonably put an officer in a higher-than-normal state of readiness as he or she prepares to respond. It includes radio runs for violent crimes in progress (e.g., Robbery, Burglary, and Assault), as well as weapons radio runs (e.g., firearms, knives, blunt instruments, etc), and also radio runs for which violence at the scene and/or subject resistance is more likely (e.g., disputes, disorderly persons, large crowds).

**NOTE:** The numbers and percentages described in this report are often rounded to the nearest whole number and are preliminary and subject to further review.

## TOTAL FIREARMS DISCHARGES

In 2007, the New York City Police Department saw the smallest number of firearms discharges since the recording of police shootings in the City began in 1971. Furthermore, the most serious category of discharges—shootings involving adversarial conflict with a subject—has also seen a steep historic decline, down 61 percent since 1997. In a city of 8.27 million people, from a Department of nearly 36,000 uniformed members who interacted with citizens in approximately 23 million instances, 80 officers were involved in 45 incidents of intentional firearms discharges during an adversarial conflict, with 19 subjects injured and ten killed.

The figures are a testament to police officers' restraint, diligence, and honorable performance of duty. But they also show that, over the past three decades, attacks on both police and citizens have steadily declined. The drastic reduction in violent crime over the past decade is sociologically reflexive: as crime decreases, criminals and police enter into conflict less often, and vice versa.

Neither the Department nor the officer on the street can afford complacency, however. Although crime (and the total number of police firearms discharges) is down**,** the number of subjects firing on police is up 54 percent from 2006.

Additionally, the number of officers killed or injured by gunfire is up from the previous year. Seven officers were shot and injured in 2007, and three officers were shot and killed. This fact illustrates the officer's perpetual need for vigilance, and for the training that these reports facilitate.

Like previous reports, the 2007 Annual Firearms Discharge Report is subdivided into several categories. Unlike previous reports, each category is analyzed based only on the information in that category. This allows the Department to better understand a specific type of incident and adjust training and policy to continue to reduce those incidents.

Insofar as statistical analysis is concerned, the small sample utilized in this document—111 discharge incidents total, only 45 of them in the category of "adversarial conflict"—limits the predictive value and conclusions that may be derived.

## CATEGORIES

Firearms discharges are broken down into four categories. Each category is analyzed based only on the information in the category.

- Intentional Discharge – Adversarial Conflict: when an officer intentionally discharges during a confrontation with a subject
- Intentional Discharge – Animal Attack: when an officer intentionally discharges to defend against an animal attack
- Unintentional Discharge: when an officer unintentionally discharges his or her firearm
- Unauthorized Use of a Firearm: when an officer unjustifiably discharges his or her firearm, or when another person illegally discharges an officer's firearm

## **2007 vs 2006**

In 2007, total firearms discharges **decreased 12.6 percent** compared to the previous year. The greatest reduction was realized in the category of unintentional discharges which was **reduced by 42 percent** from 2006. Intentional discharges during adversarial conflicts were also **reduced by 25 percent** from 2006.

Intentional discharges during an animal attack increased in 2007, **up 30 percent** from 2006, and there was a slight increase in unauthorized use of firearms, **up 9 percent** from 2006. The latter increase is the result of three incidents in which another person discharged an officer's firearm and an increase in officer suicides, which increased since 2006 from **three to six**.

The following pages present an analysis of each section and the study's findings. The report contains information compiled from preliminary and final shooting reports, detective case files, medical examiner reports, Firearm Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous yearly firearms discharge reports, as well as information complied from city and state computer databases and official websites.

# ANALYSIS OF 2007 FIREARMS DISCHARGE BY CATEGORY

## OVERVIEW

There were 45 incidents of intentional firearms discharge during an adversarial conflict in 2007. This represents a 25 percent decrease from 2006. Eighty officers intentionally fired their weapons during these incidents, down 1 percent from 2006. During these 45 incidents 18 officers were fired upon but did not return fire.

There were ten officers struck by gunfire during these incidents; seven of these officers were injured and three officers killed. The officers killed were **Police Officer Russel Timoshenko, Auxiliary Police Officer Nicholas Pekearo, and Auxiliary Police Officer Eugene Marshalik.** Of the ten officers who were injured or killed, only three returned fire.

There were 53 subjects involved in these 45 conflicts. Nineteen subjects were injured and ten subjects were killed. A more detailed analysis of the injury to all persons involved will be provided in the following pages.

[Note: the following statistics, graphs, and observations are based on this small sample of 45 incidents.]

## REASON FOR DISCHARGES

Officers intentionally discharging their firearms during adversarial conflict did so to defend themselves or others from the threat of serious physical injury or death.

In the overwhelming majority of these incidents (76 percent) the threat came in the form of a firearm. The remaining incidents were split between officers defending themselves from the use or threat of a cutting instrument (11 percent) or the use or threat of a blunt object (13 percent) [see Figure A.1].

## DATES AND TIMES OF DISCHARGES

The year 2007 began with a high number of intentional discharges during adversarial conflict—40 percent in the first quarter of the year—but these numbers then leveled off and slowed by the end of the year. The month of December saw no incidents of this type.

Intentional discharges during adversarial conflicts occurred most often on the weekend, with nearly half of the incidents transpiring between Friday night and Sunday morning.

The times of these incidents were split between the first and third platoons, with the majority (62 percent) occurring between ten o'clock at night and six o'clock in the morning.




Figure A.1

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 26 of 740 PageID #: 1576



## LOCATIONS OF DISCHARGES

All of the intentional discharges during adversarial conflict occurred within the city limits, with approximately 93 percent of the incidents transpiring under the jurisdiction of the patrol precincts.

The majority of the incidents occurred in the Bronx (31 percent) or Brooklyn North (29 percent). Staten Island had no incidents of this type occurring in 2007. The percentages of discharges per borough are depicted in Figure A.3 below.

These incidents took place in 32 separate precincts, with most of these precincts only experiencing a single incident. There were eight precincts that accrued more than one incident. The 46 Precinct and the 47 Precinct both had three incidents. The 75 Precinct led the city with five incidents [see Figure A.2].

Of the 45 incidents, 82 percent occurred outside. The map on the next page [Figure A.4] represents the exact location of all of the intentional discharges during adversarial conflict occurring in 2007. The incidents overlay all criminal shootings that occurred in 2007.

The New York City Police Department, for management purposes, divides the five geographic boroughs or counties into eight "Patrol Boroughs." Each of these patrol boroughs has eight to 12 police precincts, with the exception of Staten Island, which has three.




Figure A.2




Figure A.3

**LOCATIONS OF INTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT vs LOCATIONS OF CRIMINAL SHOOTINGS, 2007**



YELLOW- INDICATES INTENTIONAL FIREARMS DISCHARGE BY POLICE DURING ADVERSARIAL CONFLICT

BLUE- REPRESENTS CRIMINAL SHOOTINGS

Figure A.4

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 28 of 740 PageID #: 1578



**CRIMINAL SHOOTINGS**

When the locations of police shootings are compared to the locations of criminal shootings in 2007, a correlation appears [see Figure A.4 on previous page]. Specifically, these types of police firearms discharges occur most frequently in those areas most plagued by gun violence. Despite this correlation, the number of these police-discharge incidents is small when compared to the number of criminal shootings [see Figure A.5].

Another visual representation of this pattern is found in Figure A.6 below, which illustrates similar percentage dispersions, by borough, of these incidents.




Figure A.5




Figure A.6

## REASONS OFFICER INVOLVED

Officers become involved in incidents of intentional discharges during adversarial conflicts for a variety of reasons. For this report the actual incidents were categorized by whether the officers involved were engaged in proactive or reactive police work or were attacked. The incidents were mostly split between officers conducting proactive police work (40 percent) and reactive police work (44 percent). The remaining 16 percent of incidents involved officers who were not performing enforcement functions but were nonetheless attacked (e.g., one officer who was guarding a hospitalized prisoner when the prisoner broke free and bludgeoned the officer with a bedrail).

The plurality of officers discharging their firearms during these incidents (28 percent) was assigned to conduct anti-crime operations, which include actively seeking out perpetrators of violent crimes and armed individuals. The second-largest proportion of officers (20 percent) was assigned to patrol duties, which include responding to calls for service from the public [see Figure A.7].

Nearly 45 percent of the incidents involved officers responding to an assignment related to a firearm, robbery, or violent crime. Another quarter of the incidents involved officers stopping an auto or a subject [see Figure A.8].




Figure A.7




Figure A.8

## INCIDENT DETAILS

When officers did discharge their firearms during an adversarial conflict, the overwhelming majority of officers (68 percent) fired five or fewer times [see Figure A.9]. Twenty percent of the officers discharging their firearms in adversarial-conflict incidents only fired **one** shot [see Figure A.10 at the bottom of the page].

This pattern of restraint is again apparent when analyzing the number of shots fired per incident. The majority of incidents (58 percent) involved five or fewer shots being fired. In 24 percent of adversarial-conflict incidents, the total number of shots fired by all police officers involved was **one** [see Figure A.11].

A total of 478 shots were fired by officers during these incidents, up 31 percent from the previous year. This jump is the result of a single incident in which, during a long gunfight, five officers fired a total of 136 times at a subject who had assaulted a woman, carjacked and crashed several autos, shot a civilian, shot at emergency personnel responding to the scene, and actively engaged officers in an exchange of gunfire.

It must be noted that, because of the low number of shootings, the average number of shots fired per incident is not used. One incident with a large number of rounds fired (as the one described above) will skew the average. One officer firing a large number of rounds can also skew the average. Instead, a visual representation of the number of shots fired is offered. When working with such a small sample, typical use of means and medians can lead to false conclusions. In these instances, the mode




Figure A.9




Figure A.10




Figure A.11

can be most revelatory. **The mode for the number of shots fired by police is <u>one</u>.**

In keeping with the premise above, and owing to the fact that it is often never determined which officer fired the round that struck the subject, the average *hit percentage* is not used for this report. The ***objective completion rate per incident*** was calculated instead as it is both more accurate and instructive.

The objective completion rate per incident, like combat, is pass or fail. **If a person or persons fire at a specific target, did he, she, or they hit the target or not?** This rate is determined irrespective of the number of shots the person fired to hit the target.

Furthermore, several incidents involve multiple officers shooting or multiple subjects firing on police. Rather than attempt to discern intended targets or to approximate the number of shots fired by subjects—another detail that can never be accurately determined—the ***objective completion rate per incident*** is used.

Of these 45 incidents, officers hit at least one subject per incident 28 times, for an objective completion rate of 62.2 percent. During incidents when officers were actively being fired upon, the rate decreased to 50 percent. In incidents when officers were not actively being fired upon (e.g., the officer fired before the subject was able to shoot, or the officer was defending himself or another against knife or blunt instrument attack), the rate climbed to 70 percent. When subjects fired upon police in 2007 they hit at least one officer per incident 38.8 percent of the time. In two incidents one subject shot two separate officers (see OUTCOME section for further analysis and explanation).

**SHOOTING TECHNIQUE**

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but it is not always practical during an adversarial conflict. Although 70 percent of the reporting officers state that they were standing and 76 percent report that they gripped the firearm with two hands, only 45 percent stated that they were able to utilize the sights on their firearms. Sixty-one percent were able to make use of some type of cover during the incident.

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 32 of 740 PageID #: 1582



## OFFICER PEDIGREE

The majority of officers intentionally discharging their firearms during an adversarial conflict were males, who comprise 96 percent of the officers in this category.

Half of the officers intentionally discharging their firearms during an adversarial conflict were white. This is comparable to the percentage of white officers employed by the Department (54 percent).

When compared to Department staffing, most races of officers were slightly underrepresented in this category. The exception is found among Hispanic officers, who represent approximately 25 percent of the Department but represented 31 percent of the officers firing [see Figure A.12 below]. This is generally consistent with the Department's ethnic makeup.

Officers utilized their service weapon in the overwhelming majority of the incidents (93 percent). The remaining officers utilized off-duty weapons, with the exception of one undercover officer using a special-issue firearm.

The same number (36) of on-duty uniform and plainclothes officers intentionally discharged their firearms in adversarial conflict.

Considering that plainclothes officers represent a smaller portion of officers in the field than those in uniform, the higher percentage of plainclothes officers firing is noteworthy. It is possible that the high percentage is a reflection of the plainclothes officer's assignment. Of the 36 plainclothes officers involved in these incidents, 61 percent of these officers were conducting anti-crime operations. Another 22 percent, including three undercover officers, were investigating narcotics operations.

### YEARS OF SERVICE

In 2007, almost half of the officers who discharged their firearms during adversarial conflict (44 percent) had between one and five years of service. As the years of service




Figure A.12

increase, the numbers of incidents decrease [see Figure A.14].

These raw numbers only indicate the percentage of the Department who are in these categories of tenure; they do not indicate the assignments of those officers, nor their level of exposure to the dangers that increase the likelihood of an intentional police discharge.

As discussed earlier, officers assigned to patrol and anti-crime duties are often the first officers to respond to dangerous jobs involving firearms. The majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties.

**RANK**

When evaluating the rank of officers discharging their firearms during adversarial conflict, the same premise can be utilized as was for *years of service*. Nearly three quarters of the officers discharging their firearms in these incidents were in the rank of police officer [see Figure A.13]. Because police officers are the front line, and represent the majority of officers responding to violent jobs and actively seeking out criminals, this is unsurprising. Additionally, the rank of Police Officer forms the majority of the Department and therefore the pool of officers who may become involved in adversarial conflict is greater.




Figure A.13




Figure A.14

## SUBJECT PEDIGREE

There were 53 subjects involved in the 45 incidents of intentional police discharge during adversarial conflict. Unfortunately, a small number of subjects in these incidents remain at large and therefore some aspects of their pedigree information cannot be factored into the calculations below. In one particular incident, for example, a subject fired on officers from an automobile but was never identified or apprehended.

When analyzing the pedigree information for the known subjects involved in police-discharge incidents, one classification stands out: gender. All of the known subjects involved in these incidents in 2007 were male. The ages of the subjects range from 15 to 51, but a large percentage (60 percent) of the subjects were 17 to 27 years of age.

With regard to race, 61 percent of adversarial-conflict subjects were Black or identified by witnesses as such. Among subjects who fired on officers, the figure is higher: 74 percent were Black or identified by witnesses as such [see Figure A.15 & Figure A.16 on the right].

This number parallels the percentage of Black suspects identified in criminal shootings. In a city-wide analysis of crime victims and suspects covering the calendar year 2007, victims in approximately 75 percent of criminal complaints identified the shooter as being Black. This strong correlation also occurred when comparing the percentage of Hispanic subjects who fired on police (21 percent) with the number of Hispanic suspects identified in criminal shootings (22 percent) [see Figure A.17].

It must be noted that the correlation extends to victims as well. Seventy-four percent of the criminal shooting ***victims*** were Black and 23 percent were Hispanic.

When comparing the crime statistics from 2007 with the intentional discharge – adversarial attack incidents from 2007, certain similarities arise. The race of subjects in discharge incidents and the race of arrestees for firearms possession seem almost to mirror each other. See Figure A.18 on the following page for a visual representation of these comparisons.




Figure A.15




Figure A.16




Figure A.17




Figure A.18

**PRIOR ARRESTS**

Of the known subjects involved in these incidents, the large majority had prior arrests—and more than 60 percent had multiple arrests [see Figure A.19].

A given suspect's arrest history was most likely not known to the officer at the time of the incident, but it is indicative of a subject's propensity for criminal conduct and capacity for violently confronting a police officer. It can also evince itself in a subject's bearing, actions, and reactions. For example, a person who has an arrest history or pending charges or who is on parole may be more willing to attempt to avoid arrest by confronting the officer.

At least three subjects were wanted by authorities at the time of the incidents and four of the subjects were on parole. Over 60 percent of the subjects with prior arrests had been arrested for assaults, including three arrested for sexual assaults and five arrested for attempted murder. Forty-five percent of the subjects with prior arrests had arrests for weapons possession, including 12 subjects arrested for possessing or using a firearm. Thirty percent had prior robbery arrests. It should be noted that a single subject with multiple arrests may be identified in several of the previous categories.

Although the majority of known subjects in 2007 had prior arrest records it must also be noted that there were ten subjects who had no prior releasable arrest history. One of these subjects murdered a civilian and executed two auxiliary police officers.

**WEAPONS**

The subjects in these incidents utilized a variety of weapons when confronting the officer. The most frequently used weapon was a firearm. Of the known firearms used by subjects, the 9mm was the most popular, accounting for half of all the known firearms used [see Figure A.20 below].




Figure A.19




Figure A.20

## OUTCOME

Of the 45 intentional discharges occurring during adversarial conflict, 30 resulted in injury to either a subject or police officer or both.

### OFFICER INJURIES

Three officers were killed and seven injured by subject gunfire in 2007. Of those ten officers, **only three were able to return fire,** and only one possibly hit the subject. Of these ten officers shot in 2007, **all were fired upon first**.

These facts seem to be at the root of the objective-completion-rate discrepancy between officers who were actively fired upon and those involved in other adversarial conflicts (see page A-7). But although the objective completion rate for officers who are actively being fired upon is 50 percent compared to 62.2 percent for all adversarial conflict shootings, when an officer actively being fired upon is shot, officers' objective completion rates increase to 71.5 percent.

Further examination of the seven incidents during which ten officers were shot reveals that almost all shot officers were assisted by their partner(s) or responding officers who returned fire to stop the threat. This, coupled with the close proximity to the subject, may account for the increased objective completion rate.

In five of the seven incidents, the subject shot the officer(s) at close range as the officer(s) attempted physically to apprehend the subject. All of these subjects were shot when officers returned fire. In the other two incidents, the subject(s) fired from a vehicle and sped away as the officers returned fire. These subjects were not injured by gunfire and were subsequently apprehended after a police investigation.

Of the ten officers shot:

- Auxiliary Police Officer Nicholas Pekearo and Auxiliary Police Officer Eugene Marshalik were unarmed when shot and killed. Responding officers returned fire and ended the threat.

- Police Officers Russel Timoshenko and Herman Yan were shot during a car stop. Both officers were wounded, but Officer Yan was able to return fire. The subjects escaped but were eventually arrested. Officer Timoshenko later succumbed to his injuries.

- An undercover officer was attacked and shot while unarmed, but was assisted by another officer who returned fire and ended the threat.

- Police Officer Andrew Suarez was ambushed and shot while sitting in his auto; he was assisted by his partners who returned fire. The subjects escaped but were eventually arrested.

- Detectives Daniel Rivera and William Gonzalez were both shot while attempting to apprehend a subject who was wanted in relation to a double shooting. The detectives, as well as a third detective, were able to return fire and end the threat.

- Police Officer Annmarie Marchiondo was attempting to issue a summons when the subject withdrew a gun and grabbed

the officer. Officer Marchiondo was able to break free but was shot. The officer was unable to return fire but was assisted by her partners who returned fire and ended the threat.

- Police Officer Robert Tejada was frisking a subject suspected of possessing a firearm when the subject pulled out the firearm and shot the officer. The officer was unable to return fire but was assisted by his partners who returned fire and ended the threat.

Another four officers sustained non-gunfire injuries related during adversarial conflict. Three officers were struck and injured by blunt objects and one officer was stabbed with such force that the blade penetrated his skull. In all but one of these three incidents the subject was physically struggling with the officer and was shot at close range by the assaulted officer. In the final incident the subject struck the officer with his auto and fled uninjured but was later apprehended.

**BULLET RESISTANT VEST**

Of the three officers shot and killed, two were wearing bullet-resistant vests. Neither vest was defeated by a round, but the location where the round hit rendered the vest ineffective.

Of the seven officers shot and injured, one officer was struck in the chest by gunfire and was most likely saved by the stopping strength of his vest. The remaining officers were shot in areas not covered by the bullet-resistant vest, including one officer who was shot in the abdomen just under the vest.



Figure A.21

**SUBJECT INJURIES**

Of the 53 subjects involved, ten were killed and 19 injured by police gunfire. Of the ten subjects killed, 70 percent had already shot, stabbed, or struck an officer or civilian before they were stopped. The remaining 30 percent were killed while threatening the use of a firearm [see Figure A.22].

Of the subjects who were injured, 53 percent had already shot, shot at, stabbed, or struck an officer or civilian before they were stopped. Thirty-one percent had just committed or were in the process of committing a robbery at the time of the incident. The remaining 16 percent were menacing an officer with a weapon [see Figure A.23].

During the conflict or immediately before the officer's involvement, the various subjects involved had shot and murdered two civilian victims, shot and injured another six civilian victims, and stabbed and injured three civilian victims.

No civilians were killed or injured from police fire. It must be noted that during an off-duty incident in which a subject fired, the




Figure A.22




Figure A.23

friend of an involved officer suffered a graze wound to the hand. It could not be determined if the wound was a result of the officer's or subject's fire.

**MALFUNCTION**

Two officers experienced "stove pipe" malfunctions of their firearm, in which an expended bullet's shell casing fails to eject fully from the firearm's chamber. No officers were injured from these malfunctions.

**FINDINGS**

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical concerns and violations of procedure. It must be noted that discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures.

At the time of this report, the majority of the 45 incidents had been reviewed and findings had been issued. Among the officers involved in reviewed incidents, nine were mandated to attend corrective retraining. One officer was mandated to be retrained in street narcotics enforcement procedures, six officers on tactics, one officer on conserving ammunition, and one officer on proper loading of a firearm.

It must be noted that **all officers who discharge their firearms are sent to a firearms-retraining course**, regardless of the circumstances of the discharge. The officers noted above were mandated to attend specific, corrective retraining as a result of the investigation of the given incidents.

Five officers were found to have violated Department shooting procedures and were disciplined. Four officers were disciplined for discharging their firearms while fellow officers were in their line of fire (all stemming from the same incident) and one officer was disciplined for firing from the roof of a building at a subject on the ground below (this subject was firing at the officer).

Forty-six officers' actions did not warrant any type of discipline or corrective retraining. Reviews of the remaining incidents are pending [see Figure A.24].

**INVESTIGATION AND REVIEW FINDINGS AND RECOMMENDATIONS (80 OFFICERS)**




Figure A.24

## CONCLUSION

There were 45 intentional discharges during adversarial conflicts, involving 80 officers who fired. These conflicts involved 53 subjects, 20 who fired directly on police.

In 2007, there were more than 1,600 criminal shootings and homicide incidents that occurred in New York City, which resulted in the injury or death of more than 1,900 persons. The number of intentional firearms discharges by police, comparatively, is small, but every time an officer discharges a firearm he or she risks inflicting injury or death, to subjects, police, or innocent bystanders. Because of this, the Department strives to ensure that each incident is thoroughly investigated and analyzed in order to reduce these events, consequently reducing injury and death to citizens and officers alike.

One method of judging the Department's relative success is to compare the number of adversarial-conflict discharge incidents with the number of arrests of armed individuals made by officers each year. In 2007, New York City police officers made 30,911 weapons arrests, including 4,032 gun arrests. (This number does not include instances in which officers confront armed emotionally disturbed persons and transport those persons to the hospital rather than arresting them.)

**In other words, there were more than 31,000 incidents in which an officer took an armed subject into custody without firing his or her weapon**.

There were, on average, 35,907 uniformed officers employed by the NYPD in 2007. Of them, only 80 intentionally discharged a firearm at a subject. This means that 99.8 percent of all officers did not discharge their firearms intentionally during adversarial conflict, or only 0.2 percent did.

Even more significant is the fact that officers responded to more than **4.3 million calls for service in 2007**. Among these were more than 174,000 calls involving firearms and more than 32,000 calls involving knives.

**Of the millions of dangerous calls that thousands of officers responded to in 2007 (not including proactive incidents where officers were actively seeking out criminals), officers intentionally discharged their firearms in a total of a historically low 45 incidents.**

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE – ANIMAL ATTACK

## OVERVIEW

There were 39 incidents of intentional firearms discharge during an animal attack in 2007, up 30 percent from 2006 but down 53 percent from 1997. A total of 44 officers intentionally fired their weapons during these incidents, up 16 percent from 2006. Four officers were directly involved in the attack but did not fire. All of the attacks involved dogs. (It should be noted that the following statistics, graphs, and observations are based on this limited sample.)

There were 14 officers injured in these incidents. Ten officers were bitten by dogs and four officers suffered other injuries during the attack. Three civilians were also bitten by dogs during these incidents and one suffered injuries from shattering glass. These numbers do not encompass all dog attacks on officers or civilians, only dog-attack incidents involving intentional firearms discharges by police officers.

There were 12 dogs injured and 17 dogs killed during these conflicts. A more detailed analysis of the injury to all persons and animals involved will be provided in the following pages.

## REASON FOR DISCHARGES

Officers who intentionally discharged their firearms during animal attacks did so to defend themselves or others from the threat of physical injury, serious physical injury, or death. In all of the incidents the threat came in the form of a dog attack.

Officers, when able, attempt to prevent an animal attack using non-lethal options, including batons and OC spray. A police officer uses his or her firearm as a last resort to stop the animal attack.

## DATES AND TIMES OF DISCHARGES

Unlike intentional discharges during adversarial conflict, discharges during animal attacks were infrequent in the first half of the year but became more common during the second half—the third quarter consisted of almost as many incidents as the first two quarters combined, and the last six months of 2007 accounted for 64 percent of the incidents.

Discharges during animal attacks occurred most often on Wednesday (25 percent). These incidents occurred most often on the third platoon (46 percent). The remaining incidents were closely split between the first platoon (31 percent) and the second platoon (23 percent) [see Figure B.1 below].

One notable statistic is that 15 percent of these discharges occurred between 8:25 and 8:50 PM. Incidents taking place in this 25-minute window occurred throughout the year, irrespective of season.




Figure B.1

## LOCATIONS OF DISCHARGES

All but two of the intentional discharges during animal attacks occurred within the city limits, with 77 percent of the incidents transpiring under the jurisdiction of the patrol precincts. This is a departure from intentional discharges during adversarial conflict. While intentional discharges during adversarial conflict occurred within Housing jurisdiction only 2 percent of the time, intentional discharges during animal attacks occurred within Housing jurisdiction 18 percent of the time [see Figure B.2].

The Bronx experienced the most incidents (34 percent). The pie chart below [Figure B.3] shows the percentages of discharges per patrol borough.

These incidents took place in 26 separate precincts, with most of those precincts only experiencing a single incident. There were eight precincts that accrued more than one incident. The 44 Precinct, 47 Precinct, and 73 Precinct each had three incidents.




Figure B.2




Figure B.3

Of the 39 incidents, 67 percent occurred outdoors. This is less than the 82 percent for adversarial conflicts. The exact locations of the incidents vary from streets and sidewalks to roofs, stairwells, and apartments. The majority of locations were split between street/sidewalk (28 percent) and yard/lot (28 percent). Figure B.4 below indicates the locations and percentages of the incidents. Some lots were considered enclosed and were listed as indoor locations.

Figure B.6 maps the exact location of all of the intentional discharges during animal attacks occurring in 2007. The two attacks occurring outside New York City are not listed.

## REASONS OFFICER INVOLVED

A variety of reasons led officers to become involved in incidents of intentional discharges during animal attacks. The most common (32 percent) was responding to a call of a vicious dog. The next most frequent reasons were executing a search warrant (18 percent) and conducting a vertical (16 percent). Nine percent of the officers involved were simply attacked by the dog [see Figure B.5].

A large proportion of officers (41 percent) were assigned to patrol duties and foot posts, which include conducting verticals and responding to calls for service from the public, such as calls for vicious dogs. These calls, as mentioned above,




Figure B.4




Figure B.5

**LOCATIONS OF INTENTIONAL DISCHARGES DURING ANIMAL ATTACKS, 2007**

**(37 INCIDENTS*)**



*Does not include two (2) incidents that occurred outside the city limits

Figure B.6

account for 32 percent of the incidents [see Figure B.8 for officer assignment].

Figure B.7 indicates the top locations of assignment for officers involved in intentional discharges during animal attacks. As mentioned earlier, Housing units are more involved in these incidents than was the case for adversarial-conflict incidents. The units involved in the most incidents are Police Service Area 5 in Northeast Manhattan and Emergency Service Station # 3 in the Bronx; both have four incidents apiece.

## INCIDENT DETAILS

When officers did discharge their firearms during an animal attack, the overwhelming majority of officers (64 percent) fired only **one time** [see Figure B.9 on next page].

This pattern of restraint is also apparent when analyzing the number of shots fired per incident. The majority of these incidents (56 percent) involved only **one** shot being fired [see Figure B.10].

A total of 73 shots were fired by officers during these incidents; this is a **35 percent decrease** from the previous year.




Figure B.7




Figure B.8

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE – ANIMAL ATTACK




Figure B.9




Figure B.10

Although there were 30 percent more incidents and 16 percent more officers involved, there was still a significant decrease in the number of shots fired. This decrease is a demonstration of the officer's ability to acquire the target and shoot only the rounds necessary to stop the threat.

As explained in the chapter on Adversarial Conflict, the average number of shots fired per officer, per incident, and the hit rate percentage, have not been utilized.

During these 39 incidents, officers hit at least one animal per incident 29 times; this yields an objective completion rate of 74 percent per incident. This is higher than the objective completion rate during adversarial conflict and significantly higher than the objective completion rate of officers under fire [see OUTCOME section for explanation].

**SHOOTING TECHNIQUE**

The shooting techniques of officers defending against an animal attack vary greatly from those of officers involved in adversarial conflict. While 76 percent of officers report gripping the firearm with both hands during an adversarial conflict, 74 percent of the officers in animal attacks report gripping the firearm with one hand. This includes three officers that reported firing in a close combat position (with their firearm close to their side). This is possibly a result of an officer attempting to fend off an animal or shield another person with the officer's other hand.

Contrary to the 61 percent of officers in adversarial conflict who are able to utilize cover, the overwhelming majority of officers (91 percent) report having no cover during the discharge. Officers who can find cover from an animal attack may not find it necessary to fire.

The two types of incidents are similar when it comes to shooting position. As with adversarial conflicts, the majority of officers (93 percent) report being in a standing position.

Only 14 percent of officers report utilizing their sights when discharging their firearm during these confrontations.

## OFFICER PEDIGREE

As with adversarial conflicts, the majority of officers intentionally discharging their firearms during an animal attack were males, who comprise 89 percent of the officers in this category. As a percentage of the whole, females were more likely to discharge their firearms during animal attack (11 percent) than during adversarial conflict (4 percent). But with such small samples, this discrepancy only represents a few officers.

Once again, the race of the officers involved in intentional discharges during animal attacks mirrors that of the Department staffing. White officers where slightly underrepresented with 45 percent of the officers firing versus 54 percent of the Department staffing. As with adversarial conflict, Hispanic officers were slightly overrepresented with 36 percent of officers firing versus 25 percent of the Department staffing [see Figure B.11 below].

## FIREARM TYPE

Officers utilized their service weapons in the majority of the incidents (89 percent). The remaining officers discharged their off-duty weapons, with the exception of an Emergency Service officer who discharged a 9mm special weapon.

## ATTIRE

The majority of officers who discharged their weapons during animal attacks were attired in uniform (68 percent). This is a noticeably higher percentage of the whole than for in-uniform officers who fired during adversarial conflict (45 percent), possibly because uniformed officers more frequently respond to calls for service regarding vicious animals, and are more likely to conduct foot patrol and verticals. As noted, these three situations are common conditions in which animal attacks occur.




Figure B.11

**YEARS OF SERVICE**

As in adversarial conflicts, almost half of the officers who discharged their firearms during animal attacks (48 percent) had between one and five years of service. As years of service increase, the number of incidents decreases [see Figure B.13].

As discussed earlier, officers assigned to patrol are often the first officers to respond to dangerous jobs involving animals, and the majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties.

**RANK**

A significant majority of officers discharging their firearm in these incidents were police officers (77 percent); again, police are most likely to perform the duties associated with exposure to animal attack [see Figure B.12 to right].

More surprising, detectives represent 16 percent of officers discharging during animal attacks versus 8 percent during adversarial conflicts. A closer analysis reveals, however, that many Emergency Service Unit officers and most narcotics investigators hold the rank of detective; both specialties actively engage in search warrant execution, which is the second-most common job officers are performing when attacked.




Figure B.12




Figure B.13

## OUTCOME

Of the 39 intentional discharges occurring during animal attacks, 29 resulted in injury or death to the animal. Fourteen officers were injured, including ten who were bitten by dogs. (The remaining four officers suffered bruises and sprains related to the attack.) Half of the ten bites occurred to the officer's arm or hand [see Figure B.15].

Three civilians were bitten by dogs, including two children, and one civilian received slight lacerations from shattered glass caused by a discharge. One police dog was also injured when it was attacked by two other dogs. No civilians were injured or killed by police gunfire during these incidents.

Of the animals involved, 17 were killed and 12 injured by police gunfire. All of the animals involved were dogs, with 86 percent being pit bulls [see Figure B.14].

When officers fired at attacking animals they hit their targets in 74 percent of the incidents. This objective completion rate is higher than for adversarial attacks (62.2 percent) and significantly higher than for officers under fire (50 percent). A possible explanation is the distance between officer and animal. Although in animal attacks and adversarial conflict alike officers are often attempting to avoid injury by running for cover or physically pushing a subject or animal away, officers in animal attacks are more often within arm's reach of the animal. Over 70 percent of officers report being three feet or fewer from the attacking animal, and no officer reported being farther than eight feet. Officers in adversarial conflict, on the other hand, report being more than ten feet from the subject more than half of the time.

### MALFUNCTION

Two officers reported a firearm malfunction during an animal attack. The officers eventually cleared the malfunction and fired the weapon without further incident.




Figure B.14




Figure B.15

**FINDINGS**

All of the intentional firearms discharges during animal attacks in 2007 were investigated and findings and recommendations were offered. Of the 44 officers discharging their firearms, five were disciplined. As noted in the previous category, discipline does not always result from a violation of shooting procedure. Two officers received discipline for not following proper procedure when handling a stray animal, one officer was mandated to attend retraining on arrest procedures, and two officers were mandated to attend retraining on tactics.

## CONCLUSION

In 2007, police officers responded to more than 25,000 calls through 911 for incidents involving dogs and other animals. This number includes 4,936 complaints about vicious animals made through the 311 system. It does not account for incidents in which officers proactively encounter dogs or answer civilian complaints that were not processed through 911.

**Of the over 25,000 calls involving animals that thousands of officers responded to, as well as the uncounted incidents in which officers came into contact with dogs or other animals, a total of 39 instances resulted in officers discharging their firearms.**

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# UNINTENTIONAL DISCHARGES

## OVERVIEW

In 2007 there were 15 incidents of an unintentional firearms discharge, involving 15 officers. This marks a sharp decrease from 2006, when there were 26 incidents involving 27 officers—a reduction of 44 percent in the number of officers involved in these accidents.

There were six officers injured in these incidents (four officers were injured as a direct result of the discharge of the weapon and two were injured from struggling with perpetrators). No officers were killed as a result of these incidents.

No civilians or subjects were killed or injured as a result of these firearms discharges.

## REASON FOR DISCHARGES

Officers unintentionally discharging their firearms did so in two distinct circumstances—either purely unintentionally (ten incidents), or unintentionally during adversarial conflict (five incidents). Purely unintentional discharges occur while the officer is loading, unloading, or otherwise handling the firearm. Unintentional discharges during adversarial conflict occur while the officer is actively engaged in the arrest or apprehension of a subject actually present.

## PURELY UNINTENTIONAL

There were ten incidents in which an officer unintentionally discharged a firearm during times when there was no adversarial conflict or animal attack. In each of the ten incidents, only one shot was fired.

### LOADING/UNLOADING

The overwhelming majority of incidents occurred while the officer was loading or unloading the firearm (80 percent). These incidents occurred at the officer's residence or a police facility. The reasons for the loading or unloading vary from cleaning the firearm, to attempting to render the firearm safe, to testing the firearm's operability. The remaining 20 percent (or two incidents) occurred in the field while the officer was handling the firearm.

It is notable that **five of the eight firearms in loading/unloading incidents were not the officer's service or off-duty firearm.** These particular unintentional discharges could possibly be caused by the officer's unfamiliarity with the firearm in question. In two incidents the officers were cleaning another officer's firearm and failed to properly unload. In another two incidents officers were attempting to examine civilian firearms when they discharged. One of those firearms may have been so old and rusted that the round in the firearm exploded rather than discharged. The final weapon was a firearm that the officer purchased for himself that discharged while he was unloading.

Of the other three incidents in which the officer discharged his service or off-duty weapon during loading/unloading, two officers each discharged a firearm while attempting to disassemble the weapon to clean it, and one officer was unloading his firearm at a safety station while delivering a prisoner to the Department of Corrections.

**OTHERWISE HANDLING**

Of the final two purely unintentional discharges not relating to loading or unloading, one officer was struck by a swinging door with his service firearm in his hand and another officer's service firearm became entangled in crime-scene tape and, in attempting to untangle it, the firearm discharged.

**PEDIGREE OF OFFICER**

Besides the fact that all of the officers involved in these types of unintentional discharges were male, the rest of the pedigree information appears inconsequential. The age, race, years of service, and assignment vary at random.

Two anomalies were noted, but proved insignificant. The first was the coincidence that two separate incidents involving off-duty officers unintentionally discharging their firearms while unloading the weapons in their residences occurred in the confines of the 44 Precinct. A further analysis uncovered no connection between the two incidents, however.

The second anomaly was that of the rank of the officers. Almost half (40 percent) of the officers involved in these discharges held the rank of Detective. Because that rank comprises approximately 14 percent of the Department, 40 percent represents a sizeable discrepancy.

In actuality, however, that percentage represents only four detectives making purely unintentional discharges. A further analysis reveals that one detective, assigned to the Emergency Services Unit, was attempting to unload a civilian firearm, and another was a Firearms Analysis detective testing the operability of a civilian firearm. In both instances the civilian firearms were degraded or disfigured.

**INJURIES**

Of the ten purely unintentional discharges, four officers sustained injuries as a direct result of the discharge. Three officers sustained injuries to their hands and one officer sustained a contusion to his thigh. No civilians or subjects were injured or killed as a result of these unintentional discharges.

**FINDINGS**

The vast majority of these incidents resulted in some disciplinary action being taken against the officer. Seven officers received written discipline and two officers were ordered to attend a firearms retraining course.

In only one case did the officer receive no discipline. That incident involved the ESU officer attempting to render an old rusted firearm safe when the round exploded in the chamber. See the chart on the next page for a detailed breakdown of discipline against all involved officers.

## UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT

There were five incidents in which officers unintentionally discharged their firearms during an adversarial conflict. Three of the five incidents, or 60 percent, occurred while the officer was physically struggling with a subject. Another occurred while an

officer was chasing a suspected car thief. The final incident occurred when an officer, approaching a room that held an armed subject, heard a gunshot and fell to the floor to avoid being struck by a bullet. As a result, the officer's firearm discharged.

The sample size of this category is so small that no significant conclusions can be derived. Yet there were some observations worth noting.

First, three of the five incidents occurred in the Bronx, with the other two occurring in Brooklyn South. Second, three of the five incidents occurred on the third platoon. Finally, one incident involved the officer firing two times. This incident involved an undercover officer who was engaged in a violent struggle for his firearm with a drug dealer who discovered that the undercover officer was a police officer. Two rounds were discharged from the officer's firearm during the struggle.

**INJURIES**

There were two minor injuries to officers among the five unintentional discharges during adversarial conflict. Both injuries were a result of a struggle with a subject and **were not firearm related.**

No civilians or subjects were injured or killed as a result of these unintentional discharges. It should be noted that one subject shot and killed himself with his own gun during one of these incidents.

**FINDINGS**

All officers involved in unintentional firearms discharges during adversarial conflicts were mandated to attend some aspect of firearms retraining.

Figure C.1 below encompasses the discipline for all unintentional discharges.




Figure C.1

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# UNAUTHORIZED USE OF A FIREARM

## OVERVIEW

There were 12 firearms discharges in 2007 that were deemed to be unauthorized and outside the scope of the officers' employment. Half of these incidents involved the suicide of an officer. Of the other six incidents, three involved the discharge of an officer's weapon by someone other than the owner. The final three incidents were unauthorized events in which the highest level of disciplinary action has been undertaken against the officers involved.

## SUICIDE

Six officers committed suicide in 2007. This is double the number of officers who took their own lives during the previous year. The details of these incidents are not discussed in this report, but rather they are studied and investigated by other units within the Department.

## DISCHARGE BY OTHER THAN OFFICER

With regard to the three incidents in which officer-owned firearms were discharged by civilians, two of these incidents involved family members gaining access to improperly secured firearms. In both instances one shot was fired and nobody was injured. Both officers received Department discipline for failure to secure their firearms.

The remaining incident involved a line-of-duty struggle with a perpetrator who attempted, and eventually succeeded, in forcibly removing the officer's firearm from its holster. After obtaining the weapon, the perpetrator fired once before the officer regained control. The subject was arrested for the act. No one was injured and no disciplinary measures were taken against the officer; the officer was, however, re-trained in weapons retention.

## OTHER

The final three unauthorized incidents each resulted in the arrest and suspension of the officer involved.

## OUTCOME

The unauthorized use of a firearm owned by a New York City police officer is investigated thoroughly, and more often than not results in discipline against the officer discharging the weapon or the officer charged with the security of the weapon. In cases of serious misconduct, officers are suspended, arrested, and eventually terminated for their actions.

# APPENDIX

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# HISTORICAL DATA







* Includes two auxiliary officers shot and killed in the line of duty

# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# HISTORICAL DATA






# 2007 ANNUAL FIREARMS DISCHARGE REPORT
# HISTORICAL DATA







***** Numbers modified from earlier reports to include three incidents that occurred in stated year but were not recorded until 2007

**INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT RESULTING IN SUBJECT'S DEMISE**

***In 2007, ten subjects were shot and killed by officers intentionally discharging their weapons during adversarial conflict. The taking of life to protect life is a terrible contradiction, and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations can be analyzed and assessed in order to develop training that can provide officers with more use-of-force options or conflict-resolution opportunities so that, in the future, similar events may have different outcomes. A short encapsulation of each incident is found below.***

On March 10, at 0339 hours, a male black subject shot and wounded an off-duty officer after a verbal altercation in a Brooklyn nightclub in the confines of the 75 Precinct. A second off-duty officer, who had accompanied the wounded officer to the club, interceded and discharged eight rounds from his authorized weapon. The subject was struck and killed, and his weapon—a 9mm Stallard Arms semi-automatic, which suffered a stovepipe malfunction—was recovered. A civilian was also grazed and injured by gunfire during this incident; whether the source of the bullet was the off-duty officer or the subject is unknown. The subject had a lengthy criminal record and outstanding bench warrants in Canada, and had a felony weapons case pending in New York City at the time of his demise.

On March 13, at 2125 hours, Anti-Crime officers responded to reports that a man with a gun was present in a Manhattan restaurant in the confines of the 32 Precinct. Officers stopped the subject, a male black, who produced a weapon and then shot and wounded one of the officers. The other officers returned fire. The subject was struck and killed, and his weapon—a .45 caliber Colt 1911 semi-automatic—was recovered. The subject had an arrest history including narcotics sales and attempted murder, and had been convicted of and incarcerated for weapons possession; the subject was on parole at the time of the incident.

On March 15, at 2123 hours, a male white subject shot and murdered a civilian inside a Manhattan restaurant in the confines of the 6th Precinct. The subject fled the scene before the arrival of police, but was followed by two volunteer Auxiliary officers, uniformed but unarmed. The Auxiliary officers confronted the subject and, during a struggle, removed from his custody a bag containing a firearm and a large quantity of ammunition. The subject, however, produced a second firearm, and then chased and executed the two Auxiliary officers. Responding police officers pursued the subject and, when he fired upon them, they discharged their weapons, striking and killing him. The subject's weapons and large quantities of ammunition were recovered. The subject had no criminal history.

On May 18, at 2339 hours, an off-duty officer confronted a male Hispanic subject who was driving while intoxicated in the Bronx in the confines of the 41 Precinct. The subject had crashed his vehicle into several parked vehicles. When the off-duty officer identified himself and attempted to arrest the subject, the subject fled, dragging the officer with his vehicle. The officer fired, striking and killing the subject. The officer was placed on modified duty and later indicted; he is awaiting trial.

On July 7, at 1411 hours, a male black subject carjacked a vehicle at gunpoint from a civilian and his five-year-old daughter in Brooklyn in the confines of the 77 Precinct. The subject drove to the home of his female companion, whom he had assaulted earlier in the day. When she would not open her door, the subject fired twice at the door, then left in the carjacked vehicle, which he soon crashed. The subject attempted to carjack a second vehicle, but its driver fled. The subject discharged a round at the fleeing vehicle, missing, but striking an uninvolved civilian in the arm. The subject then successfully carjacked a third vehicle but promptly crashed it as well. When a passing ambulance stopped and attempted to render aid to the subject, he menaced them with his firearm. At this point, police officers responded

to the scene, and the subject fired on them. Five officers returned fire, and during a protracted gun battle the subject was shot and killed. The subject's weapon, a 9mm Glock semi-automatic, was recovered. At the time of the incident, the subject was on parole for weapons possession. The subject had cocaine in his system.

On September 8, at 1720 hours, three plainclothes Transit officers observed two persons moving between subway cars on the Number 4 train in the Bronx in the confines of the 46 Precinct. The officers removed these suspects to the platform to issue summonses, at which time one male Hispanic subject produced a firearm and took one officer hostage. The other person stopped, a male black, fled. The hostage officer was able to get away from the subject, who then fired on all three officers. The hostage officer was struck and wounded. The two officers not held hostage returned fire, killing the subject. The subject's weapon, a .45 caliber Hi-Point semi-automatic reported stolen in Ohio, was recovered. At the time of the incident the subject was on parole, having served time for robbery and for a murder committed while incarcerated. The subject had opioids in his system.

On September 28, at 2312 hours, two Anti-Crime officers responded to reports of a man with a gun in the confines of the 32 Precinct. The officers encountered the male black subject described in the reports, who produced a firearm and fled on foot. During the foot pursuit, the subject turned on officers and pointed his firearm. One officer discharged his weapon, striking and killing the subject. The subject's weapon, a 9mm Ruger semi-automatic, was recovered. The subject had a long criminal history, including arrests for narcotics and assault, and had been incarcerated for Robbery. At the time of the incident he was awaiting trial for attempted murder.

On October 21, at 0545 hours, an off-duty officer became involved in a verbal road-rage altercation with a male Hispanic subject in Manhattan in the confines of the 25 Precinct. After the altercation, the subject pursued the officer, blocking the officer's car with his own vehicle. The subject then verbally threatened the use of a firearm and made a sudden, aggressive gesture simulating the act of drawing and pointing a firearm. The officer discharged his weapon, at which time both vehicles fled the scene. The subject was struck by the discharge, which caused his demise. He was not in possession of a firearm. The officer did not report the incident for 19 hours and was subsequently suspended. A Manhattan Grand Jury declined to indict the officer, who now faces a Department trial.

On November 12, at 1906 hours, an emotionally disturbed male black subject made numerous violent threats and claimed to possess a firearm in Brooklyn in the confines of the 79 Precinct. The subject then barricaded himself in his bathroom with several knives as his family called police. Officers, Emergency Services units, and supervisory personnel responded and created a security perimeter and attempted to enter into a dialogue with the subject. The subject exited the apartment through a window, however, and confronted officers outside his home. The subject ignored numerous commands and made several physical indications that he possessed a firearm. When he made an aggressive gesture indicative of drawing a firearm, officers discharged their weapons, striking and killing the subject. No firearm was recovered. The subject had a felony arrest history, including robbery and assault.

On November 18, at 0704 hours, a male white subject stabbed his roommate with a knife in Brooklyn in the confines of the 75 Precinct. The subject then confronted responding officers with a broken bottle. The officers attempted to retreat and issued repeated orders that the subject ignored. When the subject lunged at officers they discharged their weapons, striking and killing him.

**FIDELIS AD MORTEM**

***In 2007, three officers made the ultimate sacrifice while performing their duties against armed, violent subjects. All three were subsequently awarded posthumous Medals of Honor, the New York City Police Department's highest award. These narratives are adapted from the officers' Medal Day citations.***

**AUXILIARY POLICE OFFICER EUGENE MARSHALIK**
**AND**
**AUXILIARY POLICE OFFICER NICHOLAS PEKEARO**

On March 14, 2007, Auxiliary Police Officer Nicholas Pekearo and Auxiliary Police Officer Eugene Marshalik were walking their beat in the 6 Precinct when they were alerted to a fatal shooting in a nearby restaurant. As the killer fled the scene, the auxiliary officers pursued him despite the fact that they were unarmed. The officers soon caught up to the gunman, and a confrontation ensued at which time they convinced him to drop a bag containing a handgun and 90 rounds of ammunition. Suddenly, the perpetrator produced a second weapon, which he used to shoot and kill both volunteer officers. The perpetrator raced off, stopping only to reload his weapon. Arriving officers intercepted him and the perpetrator fired on them. During the ensuing gun battle, the perpetrator was shot and killed, ending his rampage.

Auxiliary Police Officer Pekearo, 28, began his volunteer career with the NYPD in 2004. He is survived by his mother, Iola Latman, sister, Kelly, and brother, Chris.

Auxiliary Police Officer Marshalik, 19, began his volunteer career with the NYPD in 2006. He is survived by his mother, Maya, father, Boris, and brother, Max.

**POLICE OFFICER RUSSEL TIMOSHENKO**

On July 9, 2007, Police Officers Russel Timoshenko and Herman Yan were assigned to the 71 Precinct. A few hours after midnight, while on routine patrol in a marked police car, the officers observed a suspicious vehicle. They conducted a license plate check via the computer terminal in their patrol car, which indicated that the license plate did not belong to the SUV they had under observation. The officers initiated a car stop and with their patrol car positioned tactically, Officer Yan emerged from the driver side while Officer Timoshenko exited from the passenger side. Just as they got out of the car, numerous shots were fired from the stopped vehicle. Police Officer Timoshenko was struck twice in the face and fell to the ground. Police Officer Yan was struck once in the forearm and once in the chest; his life was saved by his bullet-resistant vest. Though driven to his knees by the impact of being shot at close range, Officer Yan swiftly recovered and valiantly returned fire. Forced to retreat by Officer Yan's remarkable resiliency under fire, the perpetrators fled the scene in their vehicle. Police Officer Yan quickly summoned assistance and both he and Officer Timoshenko were transported to the hospital. En route, Officer Yan provided descriptions that led to the speedy recovery of the perpetrators' vehicle and several firearms. Police Officer Yan was treated and released from the hospital a few days later. Police Officer Timoshenko succumbed to his injuries after five days in intensive care. Following this incident, an extensive investigation and wide-ranging manhunt ensued, leading to the capture of all three perpetrators with the assistance of the United States Marshall Service and the Pennsylvania State Police. The perpetrators were true career criminals, and we will never know how many lives were saved from these violent men as a result of the bravery of Police Officers Timoshenko and Yan. For the heroism the two officers displayed, Officer Timoshenko was posthumously promoted to Detective First Grade, and Officer Yan was promoted to Detective.

New York City Police Department
Office of Management Analysis and Planning
Resource Analysis Section
Inspector John K. Donohue, Commanding Officer

Lieutenant Thomas J. Taffe
Police Officer Jonathan C.W. Murad
Police Officer Charles M. Mills

# NEW YORK CITY POLICE DEPARTMENT ANNUAL FIREARMS DISCHARGE REPORT

# 2008

# ANNUAL FIREARMS DISCHARGE REPORT

# 2008

## RAYMOND W. KELLY
### POLICE COMMISSIONER

This report was produced by the New York City Police Department
Office of Management Analysis and Planning, Special Projects
© 2009, NYPD

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# TABLE OF CONTENTS


| | PAGE |
|---|---|
| INTRODUCTION | vii |
| USE OF FORCE | ix |
| THE INVESTIGATION AND REVIEW PROCESS | xiii |
| ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION | xvii |
| GLOSSARY OF TERMS | xviii |
| HISTORICAL SNAPSHOT 1998-2008 | xx |
| 2008 FIREARMS DISCHARGE SNAPSHOT | xxi |
| 2008 FIREARMS DISCHARGE SCOPE | xxii |
| 2008 FIREARMS DISCHARGE OVERVIEW | xxiii |

**ANALYSIS OF 2008 FIREARMS DISCHARGES BY CATEGORY**

INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT

| | |
|---|---|
| OVERVIEW | 3 |
| REASON FOR DISCHARGES | 3 |
| DATES AND TIMES | 3 |
| LOCATIONS | 3 |
| REASONS OFFICER INVOLVED | 7 |
| INCIDENT DETAILS | 7 |
| OFFICER PEDIGREE | 9 |
| SUBJECT PEDIGREE | 11 |
| INCIDENT OUTCOME | 15 |
| CONCLUSION | 18 |

INTENTIONAL DISCHARGE – ANIMAL ATTACK

| | |
|---|---|
| OVERVIEW | 21 |
| REASON FOR DISCHARGE | 21 |
| DATES AND TIMES | 21 |
| LOCATIONS | 21 |
| REASONS OFFICER INVOLVED | 23 |
| INCIDENT DETAILS | 25 |
| OFFICER PEDIGREE | 26 |
| INCIDENT OUTCOME | 28 |
| CONCLUSION | 29 |

| | |
|---|---|
| UNINTENTIONAL DISCHARGE | 31 |
| UNAUTHORIZED USE OF A FIREARM | 35 |

**APPENDIX**

| | |
|---|---|
| HISTORICAL DATA | 39 |
| ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE | 42 |
| SUBJECTS SHOT BY POLICE BY RACE/ETHNICITY, SINCE 1997 | 45 |
| SUPPLEMENTAL DATA | 47 |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# TABLES, CHARTS, AND FIGURES


PAGE

Anatomy of a Firearms Discharge Investigation xvii
Historical Snapshot by Category, 1998–2008 xx
Total Incidents for Year, 1998–2008 xx
Adversarial Conflict, 1998–2008 xx
Unintentional Discharge, 1998–2008 xx
Animal Attack, 1998–2008 xx
Comparison, 2007 to 2008 xxi
Breakdown by Category, 2008 xxi
Firearms Discharge Scope xxii

**INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT**

A.1 Type of Threat Intentional Discharge – Adversarial Conflict (ID-AC)................................ 3
A.2 Precincts with More than One ID-AC Incident................................ 4
A.3 Borough of Occurrence................................ 4
A.4 MAP: Locations of ID-AC vs Locations of Criminal Shootings, 2008................................ 5
A.5 Criminal Shootings vs ID-AC Incidents, by Borough................................ 6
A.6 Criminal Shootings vs ID-AC Incidents, by Borough................................ 6
A.7 Top 3 On-duty Assignments................................ 7
A.8 Officer's Actions Prior to Shooting................................ 7
A.9 Shots Fired by Officers................................ 8
A.10 Shots Fired by Officers................................ 8
A.11 Shots Fired per Incident................................ 9
A.12 Race/Ethnicity of Officers................................ 10
A.13 Years of Service................................ 11
A.14 Rank of Officers Involved in ID-AC Incidents................................ 11
A.15 Race/Ethnicity of 17 Known Subjects Firing on Officers................................ 12
A.16 Race/Ethnicity of 60 Known Subjects Involved in ID-AC Incidents................................ 12
A.17 Known Subjects Involved in ID-AC Incidents vs Persons Arrested for Firearms Possession, 2008................................ 13
A.18 Known Subjects Who Fired On Police vs Criminal Shooting Suspects, 2008................................ 13
A.19 52 Known Subjects with Prior Arrests................................ 14
A.20 List of Known Weapons Possessed/Used by Subjects................................ 15
A.21 Officers Injured/Killed During ID-AC Incidents................................ 16
A.22 Actions of Subjects Shot and Killed................................ 17
A.23 Actions of Subjects Shot and Injured................................ 17

**INTENTIONAL DISCHARGE – ANIMAL ATTACK**

B.1 Intentional Discharge – Animal Attack Incidents (ID-AA), by Tour................................ 21
B.2 Jurisdiction of Incidents................................ 22
B.3 ID-AA Incident Locations, by Borough................................ 22
B.4 Location of Animal Attack................................ 23
B.5 Type of Job to Which Officer Was Assigned................................ 23
B.6 MAP: Locations of ID-AA Incidents, 2008................................ 24
B.7 Bureau/Precinct of Assignment, 3 or More Officers................................ 25
B.8 Officer Assignment................................ 25

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# TABLES, CHARTS, AND FIGURES

PAGE

**INTENTIONAL DISCHARGE – ANIMAL ATTACK** continued


B.9 Shots Fired per Officer.......... 26
B.10 Shots Fired per Incident.......... 26
B.11 Race/Ethnicity of Officers.......... 27
B.12 Rank of Officers Discharging Firearm in ID-AA.......... 28
B.13 Years of Service.......... 28


**UNINTENTIONAL DISCHARGE**


C.1 Discipline, All Unintentional Discharges.......... 33


**UNAUTHORIZED USE OF A FIREARM**

None

**APPENDIX**


Officers Shot and Injured, 1971–2008 39
Officers Shot and Killed, 1971–2008 39
Subjects Shot and Injured by Officer, 1971–2008 40
Subjects Shot and Killed by Officer, 1971–2008 40
Total Shots Fired, 1971–2008 41
Total Incidents, 1971–2008 41
Subjects Shot by NYPD Officers, 1998–2008 45
Gunfire in New York City, 2008 46
Subjects Shot by Police — Race/Ethnicity 47
Discharge Incidents by Day of Week 47
Discharge Incidents by Tour 47
Discharge Incidents by Month 47
Discharge Incidents by Borough 48
Discharge Incidents by Precinct 48
Discharge Incidents by Duty Status 50
Breakdown by Incident, 2008 51

**THIS PAGE INTENTIONALLY LEFT BLANK**

## THE ANNUAL FIREARMS DISCHARGE REPORT: AN INTRODUCTION

One of the most abrupt, dynamic, and potentially traumatic incidents that can happen in a police officer's career is the line-of-duty discharge of his or her firearm. As much as handcuffs, the uniform, or the shield, the gun is a symbol of the officer's authority. It is, moreover, a physical embodiment of the officer's responsibility. The weapon on an officer's hip is a constant reminder—for officer and citizen alike—of the officer's role and the trust society has given.

Forty years ago, the New York City Police Department adopted Department Order SOP 9 (s.69) and began to collect in-depth documentation of discharges during hostile encounters, for the stated purpose of "[increasing] the safety potential of each member of the force." The policy quickly expanded beyond police-involved combat, however, and came to include the study of all firearms discharges by police. Since the early 1970s, the NYPD has endeavored to record and evaluate every instance in which an officer discharges his or her weapon, whether the discharge occurs purposefully, accidentally, or, in rare instances, criminally.

The SOP 9 process has been demonstrably effective. When annual recordkeeping began in 1971, there were 12 NYPD officers shot and killed by another person; 47 officers were shot and injured. Officers, in turn, shot and mortally wounded 93 subjects, and another 221 subjects were injured by police gunfire. These statistics are difficult to conceive of today. In 2008, no NYPD officers were killed; three were shot and injured. Police shot and mortally wounded 13 subjects, and injured 18. Four decades of annual analysis have altered the way officers respond to, engage in, and even assess the need for firearms discharges. Information gleaned from the annual reports has saved the lives of citizens and officers alike, and there has been Department-wide change—tactical, strategic, and cultural—with regard to how officers utilize and control their firearms. The Department has made restraint the norm.

Today, the reports serve an additional but equally important role: they are statistical engines for the development of training, the adoption of new technologies, and even the deployment of Department assets. New instructional scenarios are implemented from these reports, new hardware—from bullet-resistant vests to speed loaders to semi-automatic handguns to controlled-energy devices—is introduced, and violence-prone hotspots are identified for inclusion in Operation Impact.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## USE OF FORCE

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect arrest or prevent escape, as well as to protect property or people. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing malefactors and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance, and the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist officers—officers have an ascending array of force options that they utilize in order to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., pepper spray), impact weapons like batons, and, finally, deadly physical force. All of these are tools at the officer's disposal, and the officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm—or vice versa—if the situation dictates.

But an officer's permission to use force is not unlimited. According to both federal and state law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary. Reasonableness, more than any other factor, is the most salient aspect of an officer's legitimate use of force.

In federal case law, both Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989) delineate a standard of "objective reasonableness" (Graham) that restricts an officer's prerogative to compel or constrain another citizen. But Tennessee v. Garner affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. And the state limits an officer's ability to exercise *deadly* physical force even further—Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three very specific instances: 1) when the subject has committed or is attempting to commit a felony *and* is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary; 2) when an armed felon resists arrest or flees; and 3) when the use of deadly physical force is necessary to defend a person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and warns that "EXCESSIVE FORCE WILL NOT BE TOLERATED" (Patrol Guide 203-11). Specifically regarding the use of deadly physical force, the NYPD states that "Uniformed members of the service should use only the minimal amount of force necessary to protect human life" (Patrol Guide 203-12).

**GUIDELINES FOR THE USE OF FIREARMS**

To this end, the Department promulgates nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

> Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.
>
> Police officers shall not discharge their weapons when doing so will unnecessarily endanger innocent persons.
>
> Police officers shall not discharge their weapons in defense of property.
>
> Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.
>
> Police officers shall not fire warning shots.
>
> Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.
>
> Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.
>
> Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.
>
> Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

**REASONABLENESS**

In the final telling, both legal standards and the Department's expectations assess the appropriateness of an officer's exercise of deadly physical force based on reasonableness. Police are regularly exposed to highly stressful, dangerous situations, and the risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Holmes noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, the Supreme Court wrote, in Graham v. Connor, that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51 NY2d 267, 271, the New York courts wrote

"It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good.

**TRAINING**

Latitude is not unrestricted discretion, of course, but rather an admission that reasonableness is fluid. In order to make the right conclusion about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, and skill, but most of all, on training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The main purpose of the Annual Firearms Discharge Report is to ensure that the NYPD's training is the best it can be.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INVESTIGATION

The New York City Police Department recognizes the serious nature of police-involved firearms discharges, and it seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents: 1) Patrol Guide Procedure 212-29; and 2) a handbook entitled "The Firearms Discharges Investigation Manual; The NYPD guide to the preparation of a Shooting Incident Report."

### THE SHOOTING TEAM

When an officer discharges his or her firearm, on- or off-duty, or when a firearm owned by an officer is discharged, a patrol supervisor who responds to the incident takes charge of the scene and secures and inspects the involved officer's firearm. He or she also immediately notifies the chain of command. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, and begins by contacting and conferring with the District Attorney. In many instances—including nearly every instance in which a subject is killed or injured—the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to a Breathalyzer test. He or she is also automatically reassigned to an administrative position for the next three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, area searches, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analysis. Afterwards, all available investigatory results are collated into a Shooting Incident Report, and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# THE INVESTIGATION AND REVIEW PROCESS

## THE SHOOTING INCIDENT REPORT

As much detail as possible is included in the Shooting Incident Report, but the constraints of producing an important document in a compressed timeframe mean that the information it contains is unavoidably preliminary. The primary means of mitigating this is the use of "The Firearms Discharge Investigation Manual."

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. "The Firearms Discharge Investigation Manual" functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination, however, nor from commenting on the apparent tactics utilized during the incident.

## THE FINAL REPORT

A finalized version of the Shooting Incident Report is prepared within 90 days of the incident. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed based on information that was not initially available to the shooting-team leader (e.g., detective's case files, forensic results, and medical reports).

Generally, with regard to discharges that occur during adversarial conflict and involve injury or death to a subject, the final report cannot be finished within the 90-day period. Instead, it must wait until the investigation into the incident has been completed, the officer or officers who shot have been interviewed, and any relevant legal proceedings have been concluded.

When a final report is delayed—whether because of ongoing legal proceedings or incomplete investigations—the Borough Investigation Unit submits monthly interim status reports. Once the final report is finished, however, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After firearms discharges have been investigated and the final report has been prepared, and after the District Attorney's office determines whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination in order to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

### THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered, and conducted at the borough and executive levels. Members of the borough Firearms Discharge Advisory Board are command-level supervisors assigned to the borough in which the incident took place. This board further scrutinizes the incident, with the benefit of new material contained in the final report. Based on the accumulated evidence, the borough Firearms Discharge Advisory Board issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommend-ation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board for determination.

### THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The Department's Firearms Discharge Review Board is the penultimate arbiter of any given discharge incident. It issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The Review Board gives due consideration to and often concurs with the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The final decision in all matters rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination as to the incident.

Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2008 findings are published throughout this report.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION

An officer discharges a firearm **or** a firearm owned by an officer is discharged.

A **supervisor** responds, secures the scene and the firearm in question, and makes proper notifications.

If the discharge results in injury, **the Internal Affairs Bureau** Command Center is notified and IAB members respond to assist in the investigation; additionally, the officer who fired must submit to a Breathalyzer test.

A Shooting Team is established and a shooting-team leader (**Captain**) responds to conduct an investigation.

The **District Attorney** is notified in **all** cases and conducts a separate investigation (if warranted). The DA may present the case to a Grand Jury to determine justification.

The **Duty Inspector** responds and supervises the investigation.

The **Duty Chief** is notified and responds to supervise investigations for discharges that result in a serious injury by gunfire or death to anyone or when an officer is injured by gunfire.

The shooting-team leader prepares a preliminary Shooting Incident Report, which is submitted to the **Chief of Department.**

The morning after the shooting incident, the applicable Borough Chief or Bureau Chief and executive staff meet with and brief the **Police Commissioner.**

The **Commanding Officer** of the precinct of occurrence or of the Borough Investigations Unit prepares a final report within 90 days and submits it to the **Chief of Department.**

**The Borough Firearms Discharge Advisory Board** formally reviews the incident and submits preliminary findings and recommendations to the **Chief of Department**.

**The Chief of Department Firearms Discharge Review Board** reviews the incident and Borough Advisory Board findings and recommendations and then makes a determination.

If the officer receives *charges and specifications* the case is sent to the **Department Advocate** for a Department Trial.

In all matters related to the incident, the final determination rests with the **Police Commissioner**.

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# GLOSSARY OF TERMS

**Officer** — For this publication, refers to a sworn Uniformed Member of the New York City Police Department of any rank.

**Subject** — A person engaged in adversarial conflict with an officer or a third party, in which the conflict results in a firearms discharge.

**Civilian** — A person who is not the subject in the adversarial conflict but is included as a victim, bystander, and/or injured person.

**Firearms Discharge** — An incident in which an officer of the New York City Police Department discharges *any* firearm, or when a firearm belonging to an officer of the New York City Police Department is discharged by *any* person. This does not include a discharge during an authorized training session nor while lawfully engaged in target practice or hunting. Additionally, it does not include a firearms discharge at a firearms safety station within a Department facility.

**Intentional Firearms Discharge – Adversarial Conflict** — A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. This does not include discharging a firearm against an animal attack.

**Intentional Firearms Discharge – Animal Attack** — A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another against an animal attack. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines.

**Intentional Firearms Discharge – No Conflict** — A firearms discharge in which an officer intentionally discharges a firearm to summon assistance. May include firearms discharges that are determined to be legally justified but outside Department guidelines.

**Unintentional Firearms Discharge** — A firearms discharge in which an officer discharges a firearm without intent, regardless of the circumstance. Commonly known as an *accidental discharge*.

**Unauthorized Use of a Firearm** — A firearms discharge that is considered unauthorized and is not listed as an intentional firearms discharge. In these instances the firearm is being discharged without proper legal justification and/or outside the scope of the officer's employment. This includes instances when an unauthorized person discharges an officer's firearm.

**Use/threaten the Use of a Firearm** — A contributing factor in which a subject discharges or threatens the discharge of a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening the use of a firearm.

**Firearm** — For this publication, includes any pistol, revolver, shotgun, rifle, or variation of such.

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# GLOSSARY OF TERMS

**Imitation Firearm** For this publication, includes any instrument that is designed by the manufacturer or modified by a person to appear as if it were a firearm. This includes air pistols, toy guns, prop guns, and replicas.

**Use/threaten the Use of a Cutting Instrument** A contributing factor in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument.

**Cutting Instrument** For this publication, includes any knife, razor, sword, or other sharp-edged instrument, such as a broken bottle.

**Use/threaten the Use of a Blunt Instrument** A contributing factor in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument.

**Blunt Instrument** For this publication, includes any solid bat, stick, pipe, metal knuckles, or other instrument that, when used as a weapon, can cause blunt-force trauma to an individual. This includes automobiles and unbroken bottles.

**Use/threaten the Use of Overwhelming Physical Force** An incident in which a subject or subjects physically attack a person or threaten or attempt to do the same, and while doing so put the person at risk of serious physical injury or death. This includes gang attacks and attempting to push a person from a roof or train platform. This also includes attempting to take an officer's firearm.

**Proactive Policing** Instances in which officers engage in operations or activities that actively seek out violators of the law. This includes undercover operations, traffic enforcement, checkpoints, verticals, street narcotics enforcement, warrant execution, quality-of-life enforcement, and Anti-Crime operations.

**Reactive Policing** Instances in which officers respond to a call for service from the public. This includes calls of a man with a gun, crimes in progress, domestic disputes, and quality-of-life complaints. This also includes calls for service in which proactive police units respond.

**Attacked** Instances in which officers are not engaging in proactive or reactive policing but are set upon by a subject. This includes off-duty instances when the officer is a victim of a crime (e.g., robbery, burglary, assault), or involved in an altercation that is escalated by the subject (e.g., a traffic incident, a neighbor dispute). This also incorporates instances in which on-duty officers are performing administrative or non-patrol assignments (e.g., guarding a prisoner, processing reports, securing a location).

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# HISTORICAL SNAPSHOT 1998-2008

| CATEGORY | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADVERSARIAL CONFLICT | 105 | 61 | 63 | 57 | 55 | 61 | 51 | 59 | 60 | 45 | 49 |
| ANIMAL ATTACK | 78 | 43 | 39 | 40 | 38 | 35 | 26 | 32 | 30 | 39 | 30 |
| UNINTENTIONAL DISCHARGE | 55 | 37 | 26 | 27 | 24 | 25 | 27 | 25 | 26 | 15 | 15 |
| MISTAKE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNAUTHORIZED USE – FIREARM | 5 | 8 | 1 | 7 | 0 | 2 | 5 | **6 | **8 | **6 | **3 |
| SUICIDE/ATTEMPT | 5 | 5 | 5 | 5 | 2 | 7 | 5 | 3 | 3 | 6 | 8 |
| **TOTAL INCIDENTS FOR YEAR** | **249** | **155** | **134** | **136** | **119** | **130** | **114** | **125** | **127** | **111** | **105** |

** This category modified in 2005 to include incidents in which an officer's firearm is discharged by persons other than the officer (e.g., a family member accidentally discharges the weapon, a perpetrator gains control of an officer's firearm and discharges it, etc.).












# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGE SNAPSHOT

| CATEGORY | 2007 | 2008 | %CHANGE |
|---|---|---|---|
| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 45 | 49 | 9% |
| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 39 | 30 | -23% |
| UNINTENTIONAL DISCHARGE | 15 | 15 | 0% |
| UNAUTHORIZED USE OF FIREARM | 12 | 11 | -9% |
| **TOTAL FIREARM DISCHARGES FOR YEAR** | **111** | **105** | **-6%** |
| TOTAL OFFICERS FIRING | 148 | 125 | -16% |
| TOTAL SHOTS FIRED | 588 | 364 | -38% |
| TOTAL OFFICERS SHOT AND INJURED BY SUBJECT | 7 | 3 | -57% |
| TOTAL OFFICERS SHOT AND KILLED BY SUBJECT | 3 | 0 | N/A |
| TOTAL SUBJECTS SHOT AND INJURED BY OFFICER | 19 | 18 | -6% |
| TOTAL SUBJECTS SHOT AND KILLED BY OFFICER | 10 | 13 | 30% |

## BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT (SECTION A) | 2008 |
|---|---|
| SUBJECT USED/THREATENED THE USE OF A FIREARM | 31 |
| SUBJECT USED/THREATENED THE USE OF A CUTTING INSTRUMENT | 6 |
| SUBJECT USED/THREATENED THE USE OF A BLUNT OBJECT | 7 |
| SUBJECT USED/THREATENED THE USE OF OVERWHELMING PHYSICAL FORCE | 2 |
| OFFICER PERCEIVED THREAT OF DEADLY PHYSICAL FORCE | 3 |
| **TOTAL** | **49** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK (SECTION B) | 2008 |
|---|---|
| DOG ATTACK | 30 |
| OTHER ANIMAL ATTACK | 0 |
| **TOTAL** | **30** |

| UNINTENTIONAL DISCHARGE (SECTION C) | 2008 |
|---|---|
| DURING ADVERSARIAL CONFLICT | 3 |
| HANDLING FIREARM | 12 |
| **TOTAL** | **15** |

| UNAUTHORIZED USE OF FIREARM (SECTION D) | 2008 |
|---|---|
| SUICIDE | 7 |
| ATTEMPTED SUICIDE | 1 |
| UNAUTHORIZED INTENTIONAL DISCHARGE | 2 |
| UNAUTHORIZED PERSON DISCHARGED OFFICER'S FIREARM | 1 |
| **TOTAL** | **11** |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGE SCOPE

| CATEGORY | TOTAL NUMBER |
|---|---|
| **NEW YORK CITY**<br>TOTAL POPULATION<br>(U.S. Census, July 1, 2008) | 8,363,710 |
| **NYPD**<br>TOTAL OFFICER STAFFING<br>(2008 Annual Average) | 35,945 |
| TOTAL CIVILIAN CONTACTS (APPROXIMATE) | 23,000,000 |
| TOTAL RADIO-RECEIVED ASSIGNMENTS | 4,408,445 |
| INCREASED-RISK RADIO ASSIGNMENTS* | 2,302,221 |
| WEAPONS ARRESTS | 28,896 |
| GUN ARRESTS | 3,212 |
| CRIMINAL SHOOTING VICTIMS | 1,806 |
| CRIMINAL SHOOTING SUSPECTS | 1,655 |
| INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 49 |
| SUBJECTS SHOT AND INJURED | 18 |
| SUBJECTS SHOT AND KILLED | 13 |
| OFFICERS SHOT AND INJURED | 3 |
| OFFICERS SHOT AND KILLED | 0 |
| **NOTE:** ***all numbers are for CY 2008*** | |

* This is a subjective category encompassing radio runs that would conceivably and reasonably put an officer in a higher-than-normal state of readiness as he or she prepares to respond. It includes radio runs for violent crimes in progress (e.g., Robbery, Burglary, and Assault), as well as weapons radio runs (e.g., firearms, knives, blunt instruments, etc), and also radio runs for which violence at the scene and/or subject resistance is more likely (e.g., disputes, disorderly persons, large crowds).

**NOTE:** The numbers and percentages described in this report are often rounded to the nearest whole number and are preliminary and subject to further review.

## TOTAL FIREARMS DISCHARGES

In 2008, the New York City Police Department saw the smallest number of firearms discharges since the recording of police shootings in the City began. Furthermore, the most serious category of discharges—shootings involving adversarial conflict with a subject—has also seen a steep historic decline, down 53 percent since 1998. In a city of 8.3 million people, from a Department of nearly 36,000 uniformed members who interacted with citizens in approximately 23 million instances, 60 officers were involved in 49 incidents of intentional firearms discharges during an adversarial conflict, with 18 subjects injured and 12 killed.[1]

The figures are a testament to police officers' restraint, diligence, and honorable performance of duty. But they also show that, over the past four decades, attacks on both police and citizens have steadily declined. The drastic reduction in violent crime over the past decade is sociologically reflexive: as crime decreases, criminals and police enter into conflict less often.

Neither the Department nor the officer on the street can afford complacency, however. Although crime (and the total number of police firearms discharges) is down**,** the number of incidents of intentional discharges during adversarial conflict is up 8 percent since 2007. This fact illustrates the officer's perpetual need for vigilance, and for the training that these reports facilitate.

Like previous reports, the 2008 Annual Firearms Discharge Report is subdivided into several categories. Unlike previous reports (excepting 2007), each category is analyzed based only on the information in that category. This allows the Department to better understand a specific type of incident and adjust training and policy to continue to reduce those incidents.

Insofar as statistical analysis is concerned, the small sample utilized in this document—105 discharge incidents total, only 49 of them in the category of "adversarial conflict"—limits the predictive value and conclusions that may be derived.

## CATEGORIES

Firearms discharges are broken down into four categories. Each category is analyzed based only on the information in the category.

- Intentional Discharge – Adversarial Conflict: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- Intentional Discharge – Animal Attack: when an officer intentionally discharges his or her firearm to defend against an animal attack
- Unintentional Discharge: when an officer unintentionally discharges his or her firearm
- Unauthorized Use of a Firearm: when an officer discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm

[1] Thirteen subjects were killed by officers in 2008; twelve intentionally during adversarial conflict, one unintentionally during adversarial conflict.

## 2008 vs 2007

In 2008, total firearms discharges **decreased 6 percent** compared to the previous year. The greatest reduction was realized in the category of intentional discharge-animal attack which was **reduced by 30 percent** from 2007. Unauthorized use of a firearm was also **reduced by 8 percent** from 2007.

Intentional discharges during adversarial conflict increased in 2008, **up 9 percent** from 2007. The number of unintentional discharges remained the same from 2007 to 2008.

The following pages present an analysis of each section and the study's findings. The report contains information compiled from preliminary and final shooting reports, detective case files, medical examiner reports, Firearms Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous yearly firearms discharge reports, as well as information complied from city and state computer databases and official websites.

# 2008 FIREARMS DISCHARGES BY CATEGORY

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE — ADVERSARIAL CONFLICT

## OVERVIEW

There were 49 incidents of intentional firearms discharge during an adversarial conflict in 2008. This represents a 9 percent increase from 2007. Sixty officers intentionally fired their weapons during these incidents, down 25 percent from 2007. During these 49 incidents, nine officers were fired upon but did not return fire.

There were three officers struck and injured by gunfire during these incidents**.** Only one of these injured officers returned fire.

There were 61 subjects involved in these 49 conflicts. Eighteen subjects were injured and 12 subjects were killed. (A thirteenth subject was killed by an unintentional discharge during an adversarial conflict. This incident is not included in the following statistics, graphs, and observations; instead, it is discussed in the Unintentional Discharge section.)

## REASON FOR DISCHARGES

Officers intentionally discharging their firearms during adversarial conflict did so to defend themselves or others from the threat of serious physical injury or death.

In the majority of these incidents (64 percent) the threat came in the form of a firearm. Officers also acted to defend themselves from the use or threat of a blunt object (14 percent), the use or threat of a cutting instrument (12 percent), a perceived threat (6 percent), or the use or threat of overwhelming physical force (4 percent) [see Figure A.1].

## DATES AND TIMES OF DISCHARGES

The distribution of events in 2008 was remarkably even: 27 percent for the first quarter, 20 percent for the second, and 27 percent for the third and fourth. Each month had one or more incidents.

Eighty-two percent of these incidents occurred during the first or third platoons, and 43 percent occurred between ten o'clock at night and six o'clock in the morning. Nearly half the incidents (47 percent) occurred on a Friday or Saturday.

## LOCATIONS OF DISCHARGES

In 2007, all of the intentional discharges during adversarial conflict occurred within the city limits, but in 2008 three of 49 incidents occurred in Suffolk County. Of the remaining 46 incidents, nine discharges took place in or on New York City Housing Authority (NYCHA) premises, one was within the Metropolitan Transportation Authority (MTA) transit system, and 36 transpired within the jurisdiction of the patrol precincts. (Note: These




Figure A.1

percentage distributions differ somewhat from last year's annual report. In 2007, incidents were categorized according to the assignment of the personnel involved; in 2008 incidents have been categorized on the basis of geographical location. Thus, a conflict in which a precinct officer discharges his weapon on NYCHA premises is now recorded as a Housing event, rather than a Patrol event, as it would have been in 2007.)

The majority of the incidents occurred in Brooklyn North (32 percent) and the Bronx (20 percent). Percentages of discharges per borough are depicted in Figure A.3 below.

These incidents took place in 30 separate precincts, down from 32 in 2007. Eight precincts experienced two incidents, and the 52 Precinct, 75 Precinct, 79 Precinct, and 113 Precinct each had three [see Figure A.2].

Three-quarters of the incidents occurred outside. The map on the next page [Figure A.4] represents the exact location of all of the intentional discharges during adversarial conflict occurring within New York City in 2008. The incidents overlay all criminal shootings that occurred in 2008.

For management purposes, the Police Department divides New York City's five geographic boroughs or counties into eight "Patrol Boroughs." Each of these patrol boroughs has eight to 12 police precincts, with the exception of Staten Island, which has three.




Figure A.2




Figure A.3

**LOCATIONS OF INTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT vs LOCATIONS OF CRIMINAL SHOOTINGS, 2008 (46 ID-AC INCIDENTS*)**



● YELLOW — INDICATES INTENTIONAL FIREARMS DISCHARGE BY POLICE DURING ADVERSARIAL CONFLICT

● BLUE — REPRESENTS CRIMINAL SHOOTINGS

*Does not include three (3) incidents that occurred outside the city limits

**LOCATIONS OF CRIMINAL SHOOTINGS**

When the locations of police shootings are compared to the locations of criminal shootings in 2008, a correlation appears [see Figure A.4 on previous page]. Specifically, this type of police firearms discharge occurs most frequently in those areas most plagued by gun violence. The pattern is clear both by location and by relative frequency, as illustrated by Figure A.6 below, which shows similar percentage dispersions, by borough, of these incidents.

Despite this correlation, the absolute number of these police-discharge incidents is small when compared to the number of criminal shootings [see Figure A.5]. Only 3 percent of the city's shooting incidents involve police.




Figure A.5




Figure A.6

## REASONS OFFICER INVOLVED

Officers become involved in incidents of intentional discharge during adversarial conflict for a variety of reasons. The Annual Firearms Discharge Report categorizes incidents by whether the officers involved were engaged in reactive police work (49 percent) or proactive police work (35 percent), or were attacked (16 percent).

The plurality of officers discharging their firearms during these incidents (29 percent) was assigned to patrol duties, which include responding to calls for service from the public. The next largest proportions of officers were assigned to Anti-Crime units (22 percent) or the Organized Crime Control Bureau (OCCB, 20 percent), both of which deploy personnel to seek out armed individuals and perpetrators of violent crimes [see Figure A.7].

Nearly half of the incidents involved officers responding to an assignment related to a firearm, domestic incident, dispute, or a large crowd. Another 36 percent of the incidents involved officers stopping an auto or a subject [see Figure A.8].

## INCIDENT DETAILS

When officers did discharge their firearms during an adversarial conflict, the overwhelming majority of officers (84 percent) fired five or fewer times [see Figure A.9]. Forty-five percent of the officers discharging their firearms in adversarial-conflict incidents only fired **one** shot [see Figure A.10 on the next page]. Only two officers fired more than ten rounds.




Figure A.7




Figure A.8

This pattern of control is again apparent when analyzing the number of shots fired per incident. The majority of incidents (74 percent) involved five or fewer shots being fired. In 41 percent of adversarial-conflict incidents, the total number of shots fired by all police officers involved was **one** [see Figure A.11 on next page].

A total of 196 shots were fired by officers during these incidents, down 59 percent from the previous year. This sharp decrease owes much to officers' restraint, but is equally attributable to the fact that no incident involved a protracted gun battle. A single active exchange of gunfire can noticeably skew totals. In 2008, however, the data are more reflective of the Department's actual trends than they have been is some previous years.

Figure A.10 depicts a visual representation of the number of shots fired. When working with such small numbers of incidents, shooting officers, and rounds fired, typical use of means and medians can lead to false conclusions. Additionally, as noted above, a single incident can significantly distort averages. Because of this, the Department does not utilize averages. For small samples, the mode can be most revelatory. **The mode for the number of shots fired by police is one.**

Similarly, the Department does not calculate *average hit percentages*. Instead, the ***objective completion rate per incident*** is employed as it is both more accurate and more instructive.

Like combat, the objective completion rate per incident is pass or fail. When an officer properly and lawfully adjudges a threat se-




Figure A.9




Figure A.10




Figure A.11

vere enough to require the use of his or her firearm, and fires at a specific target, the only relevant measure is whether he or she hit the target or not. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired to hit the target.

Of these 49 incidents, officers hit at least one subject per incident 28 times, for an objective completion rate of 57 percent. During incidents when officers were being fired upon, however, the rate increased to 67 percent. Subjects firing upon police in 2008 hit at least one officer per incident 13 percent of the time. In one incident a single subject shot two officers (see OUTCOME section for further analysis and explanation).

**SHOOTING TECHNIQUE**

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but it is not always practical during an adversarial conflict. Of answering officers, 61 percent state that they were standing and 64 percent report that they gripped the firearm with two hands, while 32 percent stated that they were able to utilize the sights on their firearms. Only a quarter were able to make use of some type of cover during the incident.

## OFFICER PEDIGREE

Ninety-five percent of the officers who intentionally discharged a firearm during an adversarial conflict were males; 83 percent of the Department's uniformed personnel are males.

Forty-seven percent of the officers who intentionally discharged a firearm during an adversarial conflict were white. This is slightly less than the percentage of white officers employed by the Department (54 percent).

When compared to Department staffing, most races of officers were slightly underrepresented in this category. The exception is found among black officers, who represent approximately 16 percent of the Department but represented 23 percent of the officers firing [see Figure A.12].




Figure A.12

Officers utilized their service weapons in the overwhelming majority of the incidents (88 percent). The remaining officers utilized off-duty weapons.

The number of on-duty, plainclothes officers intentionally discharging their firearms in adversarial conflict was nearly identical to the number of uniformed officers who fired (i.e., 25 and 26, respectively).

Considering that plainclothes officers represent a smaller portion of officers in the field than those in uniform, their relative overrepresentation in discharge incidents is noteworthy, and is possibly a reflection of the plainclothes officers' assignments. Of the 25 plainclothes officers involved in these incidents, 44 percent were conducting Anti-Crime operations. Another 40 percent were engaging in OCCB operations.

**YEARS OF SERVICE**

In 2008, almost half of the officers who discharged their firearms during adversarial conflict (42 percent) had between one and five years of service. As the years of service increase, the numbers of incidents decrease.

Figure A.13 compares years-of-service distribution among officers who fired to years-of-service distribution throughout the Department. (The Department staffing numbers only indicate the percentage of officers who are in these categories of tenure; they do not indicate the assignments of those officers, nor their level of exposure to the dangers that increase the likelihood of an intentional police discharge.)

As discussed earlier, officers assigned to patrol and Anti-Crime duties are often the first officers to respond to dangerous jobs involving firearms. The majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties.




Figure A.13

**RANK**

When evaluating the rank of officers discharging their firearms during adversarial conflict, the same premise can be utilized as was for *years of service*. Nearly three quarters of the officers discharging their firearms in these incidents were in the rank of police officer [see Figure A.14]. Because police officers are the front line, and represent the majority of officers responding to violent jobs and actively seeking out criminals, this is unsurprising. Additionally, the rank of Police Officer forms the majority of the Department and therefore the pool of officers who may become involved in adversarial conflict is greater.




Figure A.14

## SUBJECT PEDIGREE

There were 61 subjects involved in the 49 incidents of intentional police discharge during adversarial conflict. Unfortunately, a small number of subjects in these incidents remain at large and therefore some aspects of their pedigree information cannot be factored into the calculations below. In one particular incident, for example, an unapprehended subject menaced an officer with a baseball bat, but because of light conditions and the subject's clothing, the officer could not describe the subject beyond his

gender and size.

When analyzing pedigree information for the subjects involved in police-discharge incidents, gender is the one classification that stands out. All of the subjects were male. The ages of the known subjects range from 16 to 49, but a large percentage (69 percent) of the subjects were 17 to 27 years of age.

With regard to race, 60 of 61 subjects could be identified by race. In NYPD paperwork concerning suspects, race is determined by complainants and/or victims. In arrest paperwork, the officer filling out the report generally determines the subject's race. This determination may be based on a subject's self-identification, existing documentation, racial/ethnic physical characteristics, or other factors. This makes for some subjectivity and fluctuations.

Additionally, although the Department subcategorizes Hispanics as black Hispanic or white Hispanic, this Annual Firearms Discharge Report combines all Hispanic persons into a single group.

Of 60 racially-identified adversarial-conflict subjects, 75 percent were black. This correlates to suspects identified in criminal shootings. In a city-wide analysis covering the calendar year 2008, victims in approximately 78 percent of criminal-shooting complaints identified the shooter as being black. Hispanic suspects were identified in 20 percent of criminal shootings and were 22 percent of adversarial-conflict subjects [see Figure A.16].

It must be noted that these correlations extend to victims as well. Seventy-six percent of the criminal shooting ***victims*** were black and 21 percent were Hispanic.

Among subjects who fired on officers, the figures change slightly. Of those firing on police, 82 percent were black and 12 percent were Hispanic. [See Figure A.15, below, and Figure A.18 on the next page for a visual comparison of the race of criminal shooting suspects and subjects firing on police.]

The races of persons arrested in 2008 for firearms possession also seem to mirror the races of persons who engaged in adversarial conflict with police. See Figure A.17 for a visual representation of these comparisons.




Figure A.15




Figure A.16

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## INTENTIONAL DISCHARGE — ADVERSARIAL CONFLICT




Figure A.17




* Of 1,655 shooting suspects in 2008, only 1,336 were identified by race.

Figure A.18

**PRIOR ARRESTS**

Of the known subjects involved in these incidents, **95 percent** had prior arrests—and 84 percent had multiple arrests [see Figure A.19].

Although there were three incidents in 2008 in which officers faced subjects about whom they had prior knowledge, this is generally not the case. A subject's arrest history is usually unknown to the officer at the time of a typical incident. Nevertheless, arrest history is pertinent. It is indicative of a subject's propensity for criminal conduct and capacity for violently confronting a police officer, and it can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole status may make a subject more willing to attempt to avoid arrest by confronting the officer.

Seven subjects were wanted by authorities at the time of the incidents and five of the subjects were on parole. One subject was a drug dealer who had been deported but returned to the country illegally, and one was on the FBI's "Most Wanted" list for the attempted murder of a law enforcement officer in Georgia. Seventy-nine percent of the subjects with prior arrests had been arrested for violent crimes such as robbery, assault, and resisting arrest, and four had been arrested for attempted murder. Fifty-two percent of the subjects with prior arrests had arrests for weapons possession, including 16 subjects arrested for possessing or using a firearm. Thirty-five percent had prior robbery arrests. (It should be noted that individual subjects may be identified in several of the previous categories.)




Figure A.19

**WEAPONS**

The subjects in these incidents utilized a variety of weapons when confronting officers. The most frequently used weapon was a firearm. Of the known firearms used by subjects, the 9mm was the most popular, accounting for ten of the 25 known firearms used [see Figure A.20 on the next page].

Six incidents involved subjects who attacked or menaced officers with cutting instruments. Each of these occurred indoors. Two involved emotionally disturbed persons and three originated from domestic-violence circumstances.

Three incidents involved subjects who employed an automobile as a weapon. Department policy forbids using firearms against subjects who so use a vehicle (absent another source of threat); the Penal Law, however, does not prohibit officers from doing so if they reasonably believe that force is necessary to defend themselves or another from the threat of deadly physical force. This is a prime example of the NYPD demanding more restraint than even the law requires. Accordingly, in two of three incidents in




Figure A.20

which officers discharged their firearms at subjects in vehicles, the Department disciplined those officers, irrespective of the legality of their actions.

## INCIDENT OUTCOME

Of the 49 intentional discharges occurring during adversarial conflict, 28 resulted in injury or death to either a subject or police officer or both.

### OFFICER INJURIES

Three officers in two incidents were injured by subject gunfire in 2008. Of those three, only one was able to return fire, although he was unable to strike the subject. All three officers were fired upon first.

Because ten officers were struck by gunfire in 2007, some statistical examination of that year's events was possible, particularly as it pertained to objective completion rates, officer-to-subject distances, and tactics. In 2008, with a sample of two, this sort of analysis is impossible. The two incidents are described as follows:

- Police Officer Jason Maass and Police Officer Shane Farina were both shot by a perpetrator while conducting Anti-Crime operations inside the Transit system. The officers had detained and were in the process of handcuffing a fare evader. As they secured one side of the cuffs, a violent struggle ensued. The perpetrator, who had been deported to the Dominican Republic in 1998 after a history of drug dealing and had returned to the country illegally, managed to gain control of Officer Maass's service weapon. He fired three rounds, striking Officer Farina in the torso, causing a perforated liver and collapsed lung, and striking Officer Maass in the buttock. Neither officer was able to return fire. The perpetrator fled the subway station, but before he could exit he was engaged in a gun battle by the officers' supervisor, a lieutenant. The perpetrator fired three more rounds, missing. The lieutenant returned fire six times, striking and wounding the perpetrator.

- Police Officer Antwane Reeves was shot while walking his dog. He was off duty at the time. A perpetrator confronted Officer

Reeves, who identified himself as a police officer. The perpetrator left but returned with a firearm and engaged Officer Reeves in a gun battle, during which Officer Reeves suffered a graze wound to his head. The perpetrator was not struck, but was apprehended, along with a 9mm Taurus reported stolen in Florida. Officer Reeves was awarded a Combat Cross for his actions.

Four additional officers sustained non-gunfire injuries during adversarial conflict. One off-duty detective was attacked by two perpetrators wielding cutting instruments; despite having his neck slashed with a razor, the detective was able to engage both perpetrators, killing one and wounding the other. Another off-duty officer was the victim of a gang assault, during which he was set upon by six perpetrators; the officer was able to defend himself, firing a single round and striking one of his assailants (the others fled but were subsequently apprehended). A third officer was dragged by a vehicle, and the fourth was struck by one.




Figure A.21

**BULLET-RESISTANT VEST**

Of the three officers shot, two were wearing bullet-resistant vests. Neither vest was defeated by a round, but the location where the round or rounds hit the body rendered the vest ineffective.

**SUBJECT INJURIES**

Of the 61 subjects involved, 12 were killed and 18 injured by police gunfire.

Of the 12 subjects killed, seven subjects possessed firearms, five of whom fired on police. Three subjects possessed knives, one of whom had severely slashed a detective. Two other subjects possessed and threatened the use of blunt instruments. **Nine of the 12 killed were intoxicated or had illegal narcotic or chemical substances in their systems at the time of the incidents.** Toxicology results can only be determined for subjects killed; the percentage of remaining subjects who may have been chemically altered cannot be known. [See Figure A.22 and the Appendix.]

Of the subjects who were injured, 67 percent had already shot, shot at, stabbed, or struck an officer or civilian before they were stopped. Seventeen percent menaced an officer with a firearm, cutting instrument, or blunt instrument. In the remaining three incidents, officers perceived a threat in the absence of a weapon—in two of these instances officers were disciplined accordingly (one officer was discharged from the Department, the other was suspended). The third case is pending [see Figure A.23].

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE — ADVERSARIAL CONFLICT




Figure A.22




Figure A.23

During the conflict or immediately before the officer's involvement, the various subjects who were injured had shot and injured two officers, shot and injured two civilians, slashed or stabbed two civilians, gang-assaulted an officer, gang-assaulted a civilian, and dragged an officer with a vehicle.

No civilians were killed or injured by police fire.

**MALFUNCTION**

One officer experienced a "stove pipe" malfunction of his firearm, in which an expended bullet's shell casing failed to eject fully from the firearm's chamber. Although this occurred as the subject was firing on the officer, no officers were injured because of this malfunction.

**FINDINGS**

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical concerns and violations of procedure. It must be noted that discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures.

At the time of this report, two-thirds of the 49 incidents had been reviewed and findings had been issued. Among the officers involved in reviewed incidents, one was retrained in undercover tactics, two were issued command disciplines, and five were issued Charges and Specifications, the Department's strictest remediation. One of these individuals was terminated from the NYPD.

Twenty-seven officers' actions did not warrant any type of discipline or corrective retraining. The undercover officer mentioned above was mandated to attend specific, corrective retraining as a result of the investigation of the incident in which he/she was involved. Three other officers were retrained in tactics (and two of these officers were also issued command disciplines). Reviews of the remaining incidents are pending.

It must be noted that **all officers who discharge their firearms are sent to a firearms-retraining course**, regardless of the circumstances of the discharge.

## CONCLUSION

There were 49 intentional discharges during adversarial conflicts, involving 60 officers who fired. These conflicts involved 61 subjects, including 17 who fired directly on police.

In 2008, there were more than 2,300 victims of criminal shootings and homicides in New York City. The number of intentional firearms discharges by police, comparatively, is small, but every time an officer discharges a firearm he or she risks inflicting injury or death, on subjects, police, or innocent bystanders. Because of this, the Department strives to ensure that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

One method of judging the Department's relative success is to compare the number of adversarial-conflict discharge incidents with the number of arrests of armed individuals

made by officers each year. In 2008, New York City police officers made 28,896 weapons arrests, including 3,212 gun arrests. (This number does not include instances in which officers confront armed emotionally disturbed persons and transport those persons to the hospital rather than arresting them.)

**In other words, there were nearly 30,000 incidents in which an officer took an armed subject into custody without firing his or her weapon**.

There were, on average, 35,945 uniformed officers employed by the NYPD in 2008. Of them, only 60—*0.2 percent*—intentionally discharged a firearm at a subject.

These officers responded to more than 4.4 million calls for service in 2008, of which more than half—2.3 million calls—were increased-risk radio assignments.

**Of the millions of dangerous calls that thousands of officers responded to in 2008 (not including proactive incidents during which officers were actively seeking out criminals), officers intentionally discharged their firearms in a total of 49 incidents.**

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE — ANIMAL ATTACK

## OVERVIEW

There were 30 incidents of intentional firearms discharge during an animal attack in 2008, down 23 percent from 2007 and down 62 percent from 1998. A total of 40 officers intentionally fired their weapons during these incidents, down 9 percent from 2007. One officer was directly involved in the attack but did not fire. All of the attacks involved dogs. (It should be noted that the following statistics, graphs, and observations are based on this limited sample.)

There were nine officers injured in these incidents. Five officers were bitten by dogs and four officers suffered other injuries during the attack. Four civilians were also bitten by dogs during these incidents, as well as a NYPD police dog that was attacked by another dog. These numbers do not encompass all dog attacks on officers or civilians, only dog-attack incidents involving intentional firearms discharges by police officers.

Of the 39 dogs involved, there were 11 dogs injured and 18 dogs killed during these conflicts. A more detailed analysis of injuries to all persons and animals involved will be provided in the following pages.

## REASON FOR DISCHARGES

Officers who intentionally discharged their firearms during animal attacks did so to defend themselves or others from the threat of physical injury, serious physical injury, or death. In all of the incidents the threat came in the form of a dog attack.

Officers, when able, attempt to prevent an animal attack using non-lethal options, including batons and OC spray. A police officer uses his or her firearm as a last resort to stop the animal attack.

## DATES AND TIMES OF DISCHARGES

Intentional discharges during animal attacks occurred fairly evenly throughout the four quarters of the year. The third quarter of the year saw nine incidents, while the remaining quarters each saw seven. January saw five incidents, the most incidents of any month; February was the only month to see zero.

Discharges during animal attacks occurred most often on Sunday (23 percent). These incidents occurred most often on the third platoon (60 percent), followed by the first platoon (27 percent) and the second platoon (13 percent) [see Figure B.1 below].




Figure B.1

## LOCATIONS OF DISCHARGES

All but two of the intentional discharges during animal attacks occurred within the city limits, with 67 percent of the incidents transpiring under the jurisdiction of the patrol

precincts. This is a slight departure from intentional discharges during adversarial conflict. While intentional discharges during adversarial conflict occurred within Housing jurisdiction only 18 percent of the time, intentional discharges during animal attacks occurred within Housing jurisdiction 27 percent of the time [see Figure B.2].

The Bronx experienced the most incidents (33 percent). The pie chart below shows the percentages of discharges per patrol borough [see Figure B.3].

These incidents took place in 21 separate precincts, with most of those precincts only experiencing a single incident. Six precincts accrued more than one incident. The 48th Precinct had three incidents.

Of the 30 incidents, 60 percent occurred outdoors. This is less than the 76 percent for adversarial conflicts. The exact locations of the incidents vary from streets and sidewalks to roofs, stairwells, and apartments.




Figure B.2




Figure B.3

The plurality of occurrences happened in yards, alleys, or lots (27 percent). Figure B.4 below indicates the locations and percentages of the incidents.

Figure B.6 on the next page maps the exact location of all of the intentional discharges during animal attacks occurring in 2008. The two attacks occurring outside New York City are not depicted.

## REASONS OFFICER INVOLVED

A variety of reasons led officers to become involved in incidents of intentional discharges during animal attacks. The most common (25 percent) was responding to a call of or observing a vicious dog. The next most frequent reasons were searching for or chasing a suspect (15 percent) and conducting a vertical (15 percent). Eight percent of the officers involved were simply attacked by the dog [see Figure B.5].

A large proportion of officers (45 percent) were assigned to patrol duties, which include conducting verticals and responding to calls for service from the public, such as calls for vicious dogs. These calls, as mentioned above, account for 40 percent of the incidents [see Figure B.8 on page 25 for officer assignment].




Figure B.4




Figure B.5

**LOCATIONS OF INTENTIONAL DISCHARGES DURING ANIMAL ATTACKS, 2008**
**(28 INCIDENTS*)**



*Does not include two (2) incidents that occurred outside the city limits

Figure B.7 indicates the top bureau or precinct of assignment for officers involved in intentional discharges during animal attacks. As mentioned earlier, Housing units are involved in these incidents more often by percentage than was the case for adversarial-conflict incidents. Housing officers accounted for six of the 40 officers involved in animal attack discharges.

## INCIDENT DETAILS

When officers did discharge their firearms during an animal attack, the plurality of officers (32 percent) fired only **one time** [see Figure B.9 on next page].

This pattern of restraint is also apparent when analyzing the number of shots fired per incident. The greatest portion of these incidents (36 percent) involved only **one** shot being fired [see Figure B.10 on next page].

A total of 142 shots were fired by officers during these incidents; this is a **95 percent increase** from the previous year.

Although there were 23 percent fewer incidents and 9 percent fewer officers involved, there was still a significant increase in the number of shots fired. This increase may be the result of eight incidents involving multiple dogs attacking the officer(s).




Figure B.7




Figure B.8




Figure B.9




Figure B.10

During these 30 incidents, officers hit at least one animal per incident 27 times; this yields an objective completion rate of 90 percent per incident. This is higher than the objective completion rate during adversarial conflict and higher than the objective completion rate of officers under fire [see OUTCOME section for explanation].

**SHOOTING TECHNIQUE**

Last year the shooting techniques of officers defending against an animal attack varied greatly from those of officers involved in adversarial conflict. This year they are more congruent. As with adversarial conflict incidents, 64 percent of the officers in animal attacks who reported their position, report gripping the firearm with two hands.

As the majority of reporting officers (76 percent) reported that they were unable to utilize cover during adversarial conflicts, the overwhelming majority of officers (90 percent) involved in animal attacks report having no cover during the discharge. Officers who can find cover from an animal attack may not find it necessary to fire.

The two types of incidents are also similar when it comes to shooting position. As with adversarial conflicts, the majority of officers report being in a standing position.

Only 39 percent of the reporting officers report utilizing their sights when discharging their firearm during these confrontations. This is similar to the 32 percent of the reporting officers who used their sights during adversarial conflict.

## OFFICER PEDIGREE

As with adversarial conflicts, the majority of officers intentionally discharging their firearms during an animal attack were males, who comprise 93 percent of the officers in this category.

Unlike adversarial conflict, the race of the officers involved in intentional discharges during animal attacks is slightly dissimilar to that of the Department staffing. White officers were underrepresented, comprising 33 percent of officers firing versus 54 percent of Department staffing. Hispanic and black officers were slightly over-represented with

Hispanics accounting for 35 percent of officers firing versus 25 percent of the Department staffing, and blacks accounting for 28 percent of officers firing versus 16 percent of Department staffing [see Figure B.11 ].

### FIREARM TYPE

Officers utilized their service weapons in the majority of the incidents (95 percent). The remaining officers discharged their off-duty weapons.

### ATTIRE

The majority of officers who discharged their weapons during animal attacks were attired in uniform (78 percent). This is a noticeably higher percentage of the whole than for in-uniform officers who fired during adversarial conflict (43 percent), possibly because uniformed officers more frequently respond to calls for service regarding vicious animals, and are more likely to conduct foot patrol and verticals. As noted, these situations are common conditions in which animal attacks occur.

### YEARS OF SERVICE

As in adversarial conflicts, approximately 40 percent of the officers who discharged firearms during animal attacks had between one and five years of service. As years of service increase, the number of incidents decreases [see Figure B.13].

As discussed earlier, officers assigned to patrol are often the first officers to respond to dangerous jobs involving animals, and the majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties.

### RANK

A significant majority of officers discharging their firearms in these incidents were police officers (77 percent); again, police officers are most likely to perform duties that expose them to animal attack [see Figure B.12 on next page].




Figure B.11




Figure B.12

## INCIDENT OUTCOME

Of the 30 intentional discharges occurring during animal attacks, 27 resulted in injury or death to at least one animal. Nine officers were injured, including five who were bitten by dogs. (The remaining four officers suffered bruises and sprains related to the attack.) The bites occurred to officers' arms, hands, or legs.

Four civilians were bitten by dogs, including a pregnant female who was bitten on the leg. One police dog was also injured when it was attacked by two other dogs. No civilians were injured or killed by police gunfire during these incidents.

Of the 39 animals involved, 18 were killed and 11 injured by police gunfire. All of the animals involved were dogs, with 87 percent being pit bulls.

When officers fired at attacking animals they hit their targets in 90 percent of the incidents. This objective completion rate is higher than for adversarial attacks (57 percent) and higher than for officers under fire (67 percent). A possible explanation is the distance between officer and animal. Although in both kinds of attack officers are often attempting to avoid injury by running for cover or physically pushing a subject or animal away, officers in animal attacks are more often within arm's reach of the animal. Almost 70 percent of officers report being five feet or fewer from the attacking animal,




Figure B.13

and no officer reported being farther than ten feet. Officers in adversarial conflict, on the other hand, report being within five feet of the subject only 45 percent of the time.

### MALFUNCTION

One officer reported a firearm malfunction during an animal attack. The malfunction did not affect the outcome of the incident. The firearm was tested and was found to be operational.

### FINDINGS

All of the intentional firearms discharges during animal attacks in 2008 were investigated and, at the time of this report, 75 percent offered findings and recommendations. Of the 30 officers in the completed investigations, two were disciplined. As noted in the previous category, discipline does not necessarily mean that there was a violation of shooting procedure. The two officers in these incidents received discipline for improper notification and recording of the incident. Nine other officers did not receive discipline but instead were sent to tactical retraining, and one was mandated to be retrained on the proper handling of dogs.

## CONCLUSION

In 2008, police officers responded to more than 25,800 calls through 911 for incidents involving dogs and other animals. This number includes 4,905 complaints about vicious animals made through the 311 system. It does not account for incidents in which officers proactively encounter dogs or answer civilian complaints that were not processed through 911.

**From among more than 25,800 calls involving animals that thousands of officers responded to, as well as uncounted incidents in which officers came into contact with dogs or other animals, a total of 30 instances resulted in officers discharging their firearms.**

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 119 of 740 PageID #: 1669


**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

In 2008, there were 15 incidents of unintentional firearms discharge, involving 15 officers. This is the same number as in 2007 but marks a sharp decrease from 2006, when there were 26 incidents involving 27 officers—a 44 percent reduction in the number of officers involved in these accidents.

There were five officers injured in these incidents (four officers were injured as a direct result of the discharge of the weapon and one was injured after being struck by a perpetrator's vehicle). No officers were killed as a result of these incidents.

There were four civilians injured and one subject killed in these firearms discharges.

## REASON FOR DISCHARGES

Officers unintentionally discharging their firearms did so in two distinct circumstances—either purely unintentionally (12 incidents), or unintentionally during adversarial conflict (three incidents). Purely unintentional discharges occur while the officer is loading, unloading, or otherwise handling the firearm. Unintentional discharges during adversarial conflict occur while the officer is actively engaged in the arrest or apprehension of a subject.

## PURELY UNINTENTIONAL

There were 12 incidents in which an officer unintentionally discharged a firearm during times when there was no adversarial conflict or animal attack. In each of the 12 incidents, only one shot was fired.

### LOADING/UNLOADING

The overwhelming majority of incidents occurred while the officer was loading, unloading, or inspecting the firearm (83 percent, or ten incidents). The majority of incidents occurred at the officer's residence or a police facility. The reasons for handling the firearm vary from cleaning the firearm, to attempting to render the firearm safe, to testing the firearm's operability.

It is notable that **five of the ten firearms discharged during loading/unloading incidents were not the officers' regular service or off-duty firearms.** (This trend was noted last year, as well). This may stem from the officers' lack of familiarity with the firearms in question. In three of the five incidents the officers were handling another officer's firearm. (It must be noted that in two of these three incidents the officers were firearms instructors who were ostensibly familiar with the type and model of firearm, if not the specific weapon itself.) In the remaining two incidents, the firearm was owned by the officer but was not the officer's regular service or off-duty weapon.

In 2008, as in 2007, one officer unintentionally discharged his firearm while unloading his weapon at a Department of Correction safety station. (Unintentionally discharging a firearm into a firearms safety station is not considered a firearms discharge when it occurs inside an NYPD facility.)

### OTHERWISE HANDLING

The remaining two purely unintentional incidents occurred while the officer was handling the firearm. In one incident the officer

dropped the firearm on the deck of a pool and it discharged. In another incident the officer discharged his firearm while holstering, unaware that an object was lodged in the trigger guard.

**PEDIGREE OF OFFICER**

Although all the officers involved in these types of unintentional discharges were male, the rest of the pedigree information appears inconsequential. Age, race, and assignment vary at random.

One anomaly was noted. Half of the officers involved in these purely unintentional discharges had three years of service or fewer. This anomaly is unique to 2008 and was not observed last year (the first year of the new analysis), when only one such officer unintentionally discharged his firearm.

**INJURIES**

Of the 12 purely unintentional discharges, four officers sustained injuries as a direct result of the discharge. Three officers sustained injuries to their legs/lower region, and one officer sustained a wound to his hand. Four civilians sustained injuries as a result of these unintentional discharges. None of the injuries was life-threatening and no civilians were killed. No subjects were killed or injured in these incidents.

**FINDINGS**

In all the cases for which a finding has been determined, the officer has received some sort of discipline. See the chart on the next page for a detailed breakdown of discipline against all involved officers.

## UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT

There were three incidents in which officers unintentionally discharged their firearms during an adversarial conflict. In two of the incidents the officer was physically struggling with a subject. In the other, the officer was struck by a subject driving a stolen vehicle, which caused the firearm to discharge.

The sample size of this category is so small that no significant conclusions can be derived. Yet there were some observations worth noting.

Just as in 2007, two thirds of the incidents occurred in the Bronx (albeit two of three incidents), with the other occurring in Brooklyn South. Also, two of the three incidents involved stolen vehicles.

**INJURIES**

One officer sustained injuries from being struck by a vehicle. There were no firearms-related injuries or deaths to officers as a result of these three incidents.

No civilians were injured or killed as a result of these unintentional discharges. One subject was killed when the officer unintentionally discharged his firearm after being struck by a stolen vehicle driven by the subject.

**FINDINGS**

All officers involved in unintentional firearms discharges during adversarial conflicts were mandated to attend some type of firearms retraining.

Figure C.1 to the right encompasses the discipline for all unintentional discharges, including all officers involved in the incident, regardless of whether or not they discharged a firearm. This includes officers whose firearms were discharged by another officer.




Figure C.1

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# UNAUTHORIZED USE OF A FIREARM

## OVERVIEW

There were 11 firearms discharges in 2008 that were deemed to be unauthorized and outside the scope of the officers' employment. The majority of these incidents involved the suicide of an officer (seven incidents) or the attempt (one incident). Of the other three incidents, one involved the discharge of an officer's weapon by someone other than the owner. The final two incidents were unauthorized events in which the highest level of disciplinary action has been undertaken against the officers involved.

## SUICIDE

Seven officers committed suicide in 2008. This is one more than the number of officers who took their own lives during the previous year. In one incident, an officer used a service weapon that was not his own.

An eighth officer attempted suicide by discharging his firearm in the direction of his head. That officer was not injured by the discharge. He was suspended for his actions but also provided with psychological counseling services.

The details of suicide incidents are not discussed in this report, but rather they are studied and investigated by other units within the Department.

## DISCHARGE BY OTHER THAN OFFICER

With regard to the one incident in which an officer-owned firearm was discharged by a civilian, this incident involved a family member's gaining access to an improperly secured firearm. The officer received Department discipline for failure to secure his firearm.

## OTHER

The final two unauthorized incidents each resulted in the arrest and suspension of the officer involved.

## OUTCOME

The unauthorized use of a firearm owned by a New York City police officer is investigated thoroughly, and more often than not results in discipline against the officer discharging the weapon or the officer charged with the security of the weapon. In cases of serious misconduct, officers are suspended, arrested, and eventually terminated for their actions.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# APPENDIX

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA






# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA






# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA






## ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE

***In 2008, twelve subjects were shot and killed by officers who intentionally discharged their weapons during adversarial conflict. Additionally, one subject was killed by an officer who unintentionally discharged his weapon during adversarial conflict.***

***The taking of life to protect life is a terrible contradiction, and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations can be analyzed and assessed in order to develop training that can provide officers with more use-of-force options or conflict-resolution opportunities so that, in the future, similar events may have different outcomes. A short narrative of each incident is found below. It is worthy of note that eleven of the thirteen had prior arrest histories, and ten of the thirteen had alcohol and/or controlled substances in their systems.***

On January 1, at 2120 hours, narcotics officers at a known drug location in the 75 precinct observed a male black subject adjusting his waistband in a manner indicative of possessing a firearm. When officers approached the subject, he fled and they gave chase. While being pursued, the subject produced a .38 caliber Rossi revolver and pointed it at the pursuing officers. Two officers fired five and two rounds, respectively, striking and killing the subject. Subsequently, the subject was discovered to be on the FBI's most-wanted list for the attempted murder of a police officer in Georgia in 2005.

On January 5, at 0140 hours, Anti-Crime officers in the 101 precinct observed a male black subject who was known to be a gang member and was wanted for weapons possession. When officers approached the subject, he fled and they gave chase. While being pursued, the subject produced a .380 caliber Beretta semiautomatic and pointed it at the pursuing officers. One of the officers fired a single round, missing the subject, but causing the subject to trip and fall. The officer collided with the subject and also fell. Both the officer and the subject were now prostrate on the ground, within three feet of one another. The subject rolled over and fired at the officer, who returned fire three times, striking and killing the subject. The subject had a long criminal history, including arrests for attempted murder and assault on a police officer, and was intoxicated at the time of the incident.

On May 28, at 2230 hours, an off-duty detective conducted a follow-up visit with a female complainant at her place of work in the confines of the 5th precinct. Two male Hispanic subjects entered the location and attacked the officer and female with cutting instruments. One subject slashed the detective with a razor, causing a laceration that later required three staples. The second subject assaulted the female with a broken bottle, severely cutting her nose, cheek, and leg. The detective retreated from the assault, drew his service weapon, and engaged the subjects. He identified himself, shouted "don't move, police!" and then fired a total of ten rounds, striking both subjects and killing one. Both subjects had violent arrest histories; the deceased subject had cocaine and cannabinoids in his system at the time of the incident.

On May 31, at 2340 hours, in the confines of the 52 precinct, an off-duty officer heard a male Hispanic subject attempting a gunpoint robbery of the officer's wife and three-year-old daughter in the hallway outside the officer's apartment. The officer retrieved his firearm and entered the hallway to confront the subject, who fled. The officer gave chase, and the subject turned and pointed a 9mm Jennings semiautomatic at the officer. The officer fired eight rounds, striking and killing the subject. The subject had prior narcotics arrests and had cocaine in his system at the time of the incident.

On July 12, at 2045 hours, an Anti-Crime sergeant and two plainclothes officers in the 81 precinct observed a male black subject acting in a furtive manner in a high-crime location. When they attempted to stop him, the subject produced a defaced .38 caliber Smith & Wesson revolver and fired on the officers. Police returned fire, discharging four, four, and six rounds, respectively. The subject was struck and killed. The subject had several prior arrests, including felonious assault on a correction officer, and had cannabinoids in his system at the time of the incident.

On July 17, at 2315 hours, uniformed officers in the 19th precinct were approached by the victim of a domestic assault. The female victim requested that the officers return with her to her apartment in order to retrieve clothes and possessions so that she might stay overnight at another location. Upon arriving at the victim's apartment and attempting to gain entry, the officers were confronted by the victim's live-in boyfriend, a male white subject. The subject brandished a large knife and menaced the officers and victim, forcing them out into the building's hallway. The subject advanced toward one officer, ignoring repeated orders to drop the weapon and stating "I'm going to kill you." When the subject closed to within a few feet and the officer had no further room to retreat, the officer fired one round, striking and killing the subject. The subject had priors in New Jersey, including an arrest for assault, and was intoxicated and had lithium in his system at the time of the incident.

On July 22, at 0650 hours, in the confines of the 120 precinct, a uniformed sergeant and three uniformed officers confronted an emotionally disturbed male white subject. The subject had escaped from a psychiatric hospital and was now engaged in a dispute with his family. The subject was also a retired NYPD sergeant, and was armed. Officers disarmed the subject of a 9mm Sig Sauer semiautomatic, and attempted to take him into custody but he broke free and produced a second weapon, a 9mm Glock semiautomatic. The subject entered a parked vehicle with his wife as officers took cover positions. When the subject opened fire, discharging eight rounds, the sergeant and one officer returned nine and ten rounds, respectively, striking and killing the subject.

On August 2, at 0855 hours, in the confines of the 73 precinct, two detectives from the 19th precinct squad went to the Brooklyn home of a male black subject who had attempted to cash forged checks in Manhattan. The detectives had informed the subject they were coming, and when they arrived, the subject was initially cooperative. When informed that he would have to accompany them to the 19th precinct, however, the subject produced a knife and began to advance slowly towards the detectives. One detective, a trained hostage negotiator, attempted to dissuade the subject and offered to leave and come back another time. The subject continued toward the detective with his knife pointed out at chest level. The detective, having nowhere to retreat, finally fired one round, which struck the subject in the chest. The subject later succumbed to his injury. The subject had one prior grand larceny arrest, and had cannabinoids in his system at the time of the incident.

On August 7, at 2000 hours, in the confines of the 67 precinct, uniformed members assigned to an auto-crime task force were parked in unmarked vehicles observing an unoccupied stolen Lincoln Town Car. While doing so, a Ford Mustang passed by, traveling at an extremely high rate of speed. A lieutenant and officer in one of the unmarked vehicles broke off the observation to follow the speeding Mustang. The officers ascertained that the Mustang was also stolen. The lieutenant requested backup from the officers in the second unmarked car. Using lights and sirens, the two unmarked cars were able to stop the Mustang. When the officers exited to confront the Mustang's operator, a male black subject, the subject endeavored again to flee, striking several other vehicles before mounting the sidewalk and striking a business's roll-down gate. Officers shouted repeated instructions which the subject ignored as he continued to move the vehicle back and forth to escape. The lieutenant, attempting to order the subject out of the vehicle at gunpoint, was instead struck by the subject who turned the car and accel-

erated in reverse. The lieutenant unintentionally discharged a single round, which struck the subject. At that time, the subject was able to extricate his vehicle and drive off, but crashed again a short distance away, where he succumbed to his injury. The subject had numerous priors, including robberies, firearm possession, and felonious assault. The subject had cannabinoids in his system at the time of the incident.

On October 26, at 0330 hours, two undercover officers observed a large, disorderly group exiting a party in the confines of the 67 precinct. The undercover officers notified a supervisor and withdrew. A lieutenant and police officer assigned to Brooklyn South narcotics responded, and upon arriving at the scene observed two male black subjects with firearms. One of the subjects fired his weapon into the crowd. When the officers exited their vehicle to confront the subjects, the subjects fired on the officers. Both the lieutenant and the officer returned fire, discharging one round and sixteen rounds respectively. The two subjects, who were brothers, were both struck and killed. A third subject, observed to possess a firearm, fled the scene. The first subject had priors for narcotics and assault, and was intoxicated and had cannabinoids in his system at the time of the incident. The second subject had an arrest history for disorderly conduct and had alcohol in his system at the time of the incident. A .45 caliber Colt semiautomatic was recovered beneath the first subject.

On November 7, at 1245 hours, a uniformed officer posted at a truancy center in the 60 precinct was informed by the facility custodian that an apparently emotionally disturbed Hispanic subject was acting suspiciously in the center's parking lot. The officer, accompanied by a second uniformed police officer and two uniformed school safety agents, went outside to investigate. The subject was holding a folding chair at shoulder level. The subject was told in English and Spanish to drop the chair, but he instead moved toward the officer, swinging the chair. The officer retreated, but the subject charged, and attempted to swing the chair at the officer's head. The officer discharged one round, striking and killing the subject. The subject was an undocumented immigrant with no criminal history.

On December 9, at 2340 hours, Anti-Crime officers in the 52 precinct responded to a neighbor dispute. Upon their arrival, officers confronted multiple persons screaming and threatening each other in an apartment hallway. One subject, a male Hispanic, held a baseball bat. The subject advanced on the officers, ignoring repeated instructions to drop the bat and cease and desist. With no avenue of retreat, one officer fired one round, striking and killing the subject. The subject had a criminal history, and was both intoxicated and had synthetic opioids in his system at the time of the incident.

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# SUBJECTS SHOT BY POLICE—RACE/ETHNICITY






# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# SUBJECTS SHOT BY POLICE—RACE/ETHNICITY

| | 1997 | | 1998 | | 1999 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 5 | 3 | 2 | 3 | 1 | 1 |
| BLACK | 23 | 11 | 29 | 7 | 24 | 8 |
| HISPANIC | 11 | 6 | 12 | 9 | 7 | 2 |
| ASIAN | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 39 | 20 | 43 | 19 | 32 | 11 |

| | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 0 | 6 | 2 | 0 | 0 | 0 |
| BLACK | 15 | 6 | 11 | 9 | 20 | 7 |
| HISPANIC | 4 | 2 | 4 | 2 | 4 | 6 |
| ASIAN | 1 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **20** | **14** | **17** | **11** | **24** | **13** |

| | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 1 | 1 | 1 | 1 | 4 | 0 |
| BLACK | 12 | 13 | 15 | 6 | 21 | 7 |
| HISPANIC | 10 | 0 | 7 | 4 | 3 | 2 |
| ASIAN | 1 | 0 | 0 | 0 | 1 | 0 |
| **TOTAL** | **24** | **14** | **23** | **11** | **29** | **9** |

| | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 1 | 1 | 0 | 2 | 0 | 2 |
| BLACK | 16 | 9 | 9 | 5 | 12 | 7 |
| HISPANIC | 6 | 3 | 9 | 3 | 6 | 4 |
| ASIAN | 0 | 0 | 1 | 0 | 0 | 0 |
| **TOTAL** | **23** | **13** | **19** | **10** | **18** | **13** |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# SUPPLEMENTAL DATA

| DAY OF WEEK | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| MONDAY | 3 | 5 | 3 | 1 | 12 |
| TUESDAY | 10 | 2 | 1 | 0 | 13 |
| WEDNESDAY | 3 | 3 | 3 | 0 | 9 |
| THURSDAY | 8 | 6 | 3 | 4 | 21 |
| FRIDAY | 10 | 4 | 1 | 3 | 18 |
| SATURDAY | 12 | 3 | 3 | 1 | 19 |
| SUNDAY | 3 | 7 | 1 | 2 | 13 |
| **TOTAL** | **49** | **30** | **15** | **11** | **105** |

| TOUR | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 0731-1530 | 9 | 4 | 10 | 4 | 27 |
| 1531-2330 | 21 | 18 | 4 | 2 | 45 |
| 2331-0730 | 19 | 8 | 1 | 5 | 33 |
| **TOTAL** | **49** | **30** | **15** | **11** | **105** |

| MONTH | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| JANUARY | 9 | 5 | 0 | 0 | 14 |
| FEBRUARY | 3 | 0 | 1 | 2 | 6 |
| MARCH | 1 | 2 | 1 | 1 | 5 |
| APRIL | 4 | 1 | 2 | 2 | 9 |
| MAY | 5 | 4 | 2 | 0 | 11 |
| JUNE | 1 | 2 | 1 | 0 | 4 |
| JULY | 8 | 4 | 2 | 0 | 14 |
| AUGUST | 3 | 2 | 2 | 1 | 8 |
| SEPTEMBER | 2 | 3 | 1 | 0 | 6 |
| OCTOBER | 5 | 2 | 0 | 3 | 10 |
| NOVEMBER | 5 | 3 | 1 | 1 | 10 |
| DECEMBER | 3 | 2 | 2 | 1 | 8 |
| **TOTAL** | **49** | **30** | **15** | **11** | **105** |

**ID-AC** – Intentional Discharge – Adversarial Conflict
**ID-AA** – Intentional Discharge – Animal Attack
**UD** – Unintentional Discharge
**UUF** – Unauthorized Use of Firearm

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# SUPPLEMENTAL DATA

| BOROUGH | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| BRONX | 10 | 10 | 4 | 2 | 26 |
| MANHATTAN | 6 | 2 | 3 | 2 | 13 |
| QUEENS | 9 | 3 | 0 | 2 | 14 |
| BROOKLYN | 20 | 11 | 4 | 3 | 38 |
| STATEN ISLAND | 1 | 2 | 0 | 2 | 5 |
| OUTSIDE CITY | 3 | 2 | 4 | 0 | 9 |
| **TOTAL** | **49** | **30** | **15** | **11** | **105** |

| MANHATTAN | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 1st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 5th PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 6th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 7th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 9th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 10th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 13th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 14th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 17th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 18th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 19th PRECINCT | 1 | 0 | 1 | 1 | 3 |
| 20th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 22nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 23rd PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 24th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 25th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 26th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 28th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 30th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 32nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 33rd PRECINCT | 2 | 1 | 0 | 0 | 3 |
| 34th PRECINCT | 0 | 1 | 0 | 1 | 2 |
| **TOTAL** | **6** | **2** | **3** | **2** | **13** |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## SUPPLEMENTAL DATA

| BRONX | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 40th PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 41st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 42nd PRECINCT | 2 | 1 | 0 | 0 | 3 |
| 43rd PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 44th PRECINCT | 0 | 2 | 1 | 0 | 3 |
| 45th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 46th PRECINCT | 1 | 1 | 1 | 0 | 3 |
| 47th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 48th PRECINCT | 1 | 3 | 0 | 0 | 4 |
| 49th PRECINCT | 1 | 0 | 1 | 1 | 3 |
| 50th PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 52nd PRECINCT | 3 | 1 | 0 | 0 | 4 |
| **TOTAL** | **10** | **10** | **4** | **2** | **26** |

| BROOKLYN | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 60th PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 61st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 62nd PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 63rd PRECINCT | 0 | 1 | 1 | 1 | 3 |
| 66th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 67th PRECINCT | 2 | 0 | 1 | 0 | 3 |
| 68th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 69th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 70th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 71st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 72nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 73rd PRECINCT | 1 | 1 | 1 | 0 | 3 |
| 75th PRECINCT | 3 | 2 | 0 | 1 | 6 |
| 76th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 77th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 78th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 79th PRECINCT | 3 | 1 | 0 | 0 | 4 |
| 81st PRECINCT | 2 | 2 | 0 | 0 | 4 |
| 83rd PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 84th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 88th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 90th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 94th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| **TOTAL** | **20** | **11** | **4** | **3** | **38** |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
# SUPPLEMENTAL DATA

| STATEN ISLAND | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 120th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 122nd PRECINCT | 0 | 0 | 0 | 2 | 2 |
| 123rd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **1** | **2** | **0** | **2** | **5** |

| QUEENS | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 100th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 101st PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 102nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 103rd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 104th PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 105th PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 106th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 107th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 108th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 109th PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 110th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 111th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 112th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 113th PRECINCT | 3 | 0 | 0 | 0 | 3 |
| 114th PRECINCT | 2 | 1 | 0 | 0 | 3 |
| 115th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **9** | **3** | **0** | **2** | **14** |

| DUTY STATUS | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| ON-DUTY | 51 | 36 | 8 | 0 | 95 |
| OFF-DUTY | 9 | 4 | 7 | 10 | 30 |
| **TOTAL** | **60** | **40** | **15** | **10** | **125** |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## SUPPLEMENTAL DATA

| ID-AC | TYPE OF THREAT FROM SUBJECT | MOS INVOLVED | MOS SHOTS | HITS | SUBJECTS INVOLVED | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 1 | FIREARM – SUBJECT FIRED AT OFFICER | 1 | 2 | HIT | 1 | MALE | BLACK | 22 | FIREARM |
| 2 | FIREARM – SUBJECT 1 FIRED AT CIVILIANS | 1 | 5 | | 2 | MALE | BLACK | 20 | FIREARM |
| | FIREARM – SUBJECT 2 FIRED AT CIVILIANS | | | | | MALE | BLACK | 22 | FIREARM |
| 3 | FIREARM – SUBJECT POINTED FIREARM | 2 | 5 and 2 | HIT | 1 | MALE | BLACK | 31 | FIREARM |
| 4 | FIREARM – SUBJECT POINTED FIREARM | 1 | 1 | | 1 | MALE | BLACK | 26 | FIREARM |
| 5 | FIREARM – SUBJECT FIRED AT OFFICER | 1 | 4 | HIT | 1 | MALE | BLACK | 21 | FIREARM |
| 6 | STRUGGLE FOR OFFICER'S FIREARM | 1 | 3 | HIT | 1 | MALE | BLACK | 24 | PHYSICAL FORCE |
| 7 | FIREARM – SUBJECT 1 SHOT CIVILIAN | 1 | 4 | | 2 | MALE | BLACK | 25 | FIREARM |
| | FIREARM – SUBJECT 2 SHOT CIVILIAN | | | | | MALE | BLACK | UNKNOWN | FIREARM |
| 8 | FIREARM – SUBJECT SHOT CIVILIAN | 1 | 1 | | 1 | MALE | BLACK | 16 | FIREARM |
| 9 | BLUNT INSTRUMENT – SUBJECT HIT TWO OFFICERS | 2 | 5 and 4 | | 1 | MALE | BLACK | 36 | VEHICLE |
| 10 | OFFICER PERCEIVED THREAT | 1 | 4 | HIT | 1 | MALE | HISPANIC | 37 | NONE |
| 11 | FIREARM – SUBJECT POINTED FIREARM | 1 | 2 | | 1 | MALE | BLACK | 21 | FIREARM |
| 12 | FIREARM – SUBJECT POINTED FIREARM | 1 | 1 | | 1 | MALE | BLACK | 25 | FIREARM |
| 13 | FIREARM – SUBJECT POINTED FIREARM | 2 | 1 and 5 | HIT | 1 | MALE | BLACK | 18 | FIREARM |
| 14 | FIREARM – SUBJECT FIRED AT OFFICERS | 1 | 1 | | 1 | MALE | BLACK | 19 | FIREARM |
| 15 | FIREARM – SUBJECT FIRED AT OFFICERS | 2 | 1 and 1 | HIT | 1 | MALE | BLACK | 21 | FIREARM |
| 16 | FIREARM – SUBJECT FIRED | 1 | 3 | | 1 | MALE | BLACK | 17 | FIREARM |
| 17 | BLUNT INSTRUMENT – SUBJECT HIT OFFICER | 1 | 3 | | 1 | MALE | HISPANIC | 26 | VEHICLE |
| 18 | FIREARM – SUBJECT SHOT OFFICER | 1 | 11 | | 1 | MALE | BLACK | 26 | FIREARM |
| 19 | CUTTING INSTRUMENT – SUBJECT 1 CUT OFFICER | 1 | 10 | HIT | 2 | MALE | HISPANIC | 22 | RAZOR |
| | CUTTING INSTRUMENT – SUBJECT 2 CUT CIVILIAN | | | HIT | | MALE | HISPANIC | 22 | BROKEN BOTTLE |
| 20 | FIREARM – SUBJECT SHOT CIVILIAN | 1 | 2 | HIT | 1 | MALE | BLACK | 28 | FIREARM |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## SUPPLEMENTAL DATA

| ID-AC | TYPE OF THREAT FROM SUBJECT | OFFICERS INVOLVED | SHOTS | HITS | SUBJECTS INVOLVED | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| **21** | SUBJECT 1 ATTACKED OFFICER | 1 | 1 | HIT | 6 | MALE | BLACK | 22 | PHYSICAL FORCE |
| | SUBJECT 2 ATTACKED OFFICER | | | | | MALE | BLACK | 22 | PHYSICAL FORCE |
| | SUBJECT 3 ATTACKED OFFICER | | | | | MALE | HISPANIC | 21 | PHYSICAL FORCE |
| | SUBJECT 4 ATTACKED OFFICER | | | | | MALE | BLACK | 19 | PHYSICAL FORCE |
| | SUBJECT 5 ATTACKED OFFICER | | | | | MALE | BLACK | 23 | PHYSICAL FORCE |
| | SUBJECT 6 ATTACKED OFFICER | | | | | MALE | BLACK | 18 | PHYSICAL FORCE |
| **22** | FIREARM – SUBJECT ROBBED OFFICER'S WIFE | 1 | 8 | HIT | 1 | MALE | HISPANIC | 38 | FIREARM |
| **23** | FIREARM – SUBJECT DREW FIREARM | 1 | 1 | | 1 | MALE | BLACK | 20 | FIREARM |
| **24** | CUTTING INSTRUMENT – SUBJECT CUT CIVILIAN | 1 | 1 | HIT | 1 | MALE | HISPANIC | 33 | KNIFE |
| **25** | FIREARM – SUBJECT FIRED AT OFFICER | 1 | 2 | | 1 | MALE | BLACK | 22 | FIREARM |
| **26** | FIREARM – SUBJECT FIRED AT OFFICERS | 3 | 4, 4, 6 | HIT | 1 | MALE | BLACK | 22 | FIREARM |
| **27** | FIREARM – SUBJECT FIRED AT OFFICER | 1 | 4 | HIT | 1 | MALE | BLACK | 22 | FIREARM |
| **28** | CUTTING INSTRUMENT – SUBJECT ATTACKED OFFICER | 1 | 1 | HIT | 1 | MALE | WHITE | 39 | KNIFE |
| **29** | OFFICER PERCEIVED THREAT | 1 | 1 | HIT | 1 | MALE | BLACK | 34 | NONE |
| **30** | FIREARM – SUBJECT FIRED AT OFFICERS | 2 | 9 and 10 | HIT | 1 | MALE | WHITE | 36 | FIREARM |
| **31** | OFFICER PERCEIVED THREAT | 1 | 2 | HIT | 1 | MALE | BLACK | 18 | NONE |
| **32** | CUTTING INSTRUMENT – SUBJECT ATTACKED OFFICER | 1 | 1 | HIT | 1 | MALE | BLACK | 20 | KNIFE |
| **33** | FIREARM – SUBJECT FIRED | 2 | 7 and 1 | HIT | 1 | MALE | BLACK | 19 | FIREARM |
| **34** | BLUNT INSTRUMENT – SUBJECT HIT OFFICER | 1 | 3 | | 1 | MALE | BLACK | 28 | VEHICLE |
| **35** | FIREARM – SUBJECT POINTED FIREARM | 1 | 1 | | 1 | MALE | BLACK | 21 | FIREARM |
| **36** | FIREARM – SUBJECT FIRED AT OFFICER | 1 | 1 | | 1 | MALE | BLACK | 23 | FIREARM |
| **37** | FIREARM – SUBJECT SHOT CIVILIAN | 3 | 1, 1, 5 | HIT | 1 | MALE | BLACK | 20 | FIREARM |
| **38** | FIREARM – SUBJECT SHOT TWO OFFICERS | 1 | 6 | HIT | 1 | MALE | HISPANIC | 32 | FIREARM |

# 2008 ANNUAL FIREARMS DISCHARGE REPORT
## SUPPLEMENTAL DATA

| ID-AC | TYPE OF THREAT FROM SUBJECT | OFFICERS INVOLVED | SHOTS | HITS | SUBJECTS INVOLVED | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 39 | CUTTING INSTRUMENT – BURGLARY OF OFFICER'S HOME | 1 | 1 | | 2 | MALE | BLACK | UNKNOWN | KNIFE |
| | PHYSICAL FORCE – BURGLARY OF OFFICER'S HOME | | | | | MALE | BLACK | UNKNOWN | ACCOMPLICE |
| 40 | FIREARM – SUBJECT 1 FIRED AT OFFICERS | 2 | 1 and 16 | HIT | 2 | MALE | BLACK | 21 | FIREARM |
| | FIREARM – SUBJECT 2 FIRED AT OFFICERS | | | HIT | | MALE | BLACK | 22 | FIREARM |
| 41 | BLUNT INSTRUMENT – BURGLARY OF OFFICER'S HOME | 1 | 1 | HIT | 1 | MALE | HISPANIC | 37 | TIRE IRON |
| 42 | BLUNT INSTRUMENT | 1 | 1 | | 1 | MALE | UNKNOWN | UNKNOWN | BAT |
| 43 | FIREARM – SUBJECT 1 FIRED AT OFFICER | 1 | 7 | HIT | 2 | MALE | HISPANIC | 20 | FIREARM |
| | FIREARM – SUBJECT 2 FIRED AT OFFICER | | | | | MALE | BLACK | 25 | FIREARM |
| 44 | BLUNT INSTRUMENT – SUBJECT ATTACKED OFFICER | 1 | 1 | HIT | 1 | MALE | HISPANIC | 46 | CHAIR |
| 45 | FIREARM – SUBJECT POINTED FIREARM | 1 | 2 | | 1 | MALE | HISPANIC | 24 | FIREARM |
| 46 | FIREARM – SUBJECT POINTED FIREARM | 1 | 1 | | 1 | MALE | BLACK | 16 | FIREARM |
| 47 | CUTTING INSTRUMENT – SUBJECT ATTACKED OFFICER | 1 | 1 | HIT | 1 | MALE | BLACK | 49 | BROKEN GLASS |
| 48 | BLUNT INSTRUMENT – SUBJECT ATTACKED OFFICER | 1 | 1 | HIT | 1 | MALE | HISPANIC | 40 | BAT |
| 49 | FIREARM – SUBJECT 1 ROBBED OFFICER AT GUNPOINT | 1 | 1 | | 2 | MALE | BLACK | UNKNOWN | FIREARM |
| | PHYSICAL FORCE – SUBJECT 2 ROBBED OFFICER | | | | | MALE | BLACK | UNKNOWN | ACCOMPLICE |

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 143 of 740
PageID #: 1693


**THIS PAGE INTENTIONALLY LEFT BLANK**

# NYPD

## RAYMOND W. KELLY
## POLICE COMMISSIONER

### MICHAEL J. FARRELL
### DEPUTY COMMISSIONER, STRATEGIC INITIATIVES

**DEPUTY CHIEF JOHN K. DONOHUE**
**COMMANDING OFFICER, OFFICE OF MANAGEMENT ANALYSIS AND PLANNING**

New York City Police Department
Office of Management Analysis and Planning
Special Projects Team
Deputy Inspector Terrence M. Riley, Commanding Officer

Lieutenant Thomas J. Taffe
Detective Jonathan C.W. Murad
Detective Charles M. Mills

# NEW YORK CITY POLICE DEPARTMENT
# ANNUAL FIREARMS DISCHARGE REPORT

# 2009

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 148 of 740 PageID #: 1698


# ANNUAL FIREARMS DISCHARGE REPORT

# 2009

## RAYMOND W. KELLY
### POLICE COMMISSIONER

This report was produced by the New York City Police Department
Office of Management Analysis and Planning, Special Projects
© 2010, NYPD

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# TABLE OF CONTENTS


**PAGE**

INTRODUCTION........ vii
USE OF FORCE........ ix
THE INVESTIGATION AND REVIEW PROCESS........ xii
ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION........ xv
GLOSSARY OF TERMS........ xvi
HISTORICAL SNAPSHOT 1999-2009........ xviii
2009 FIREARMS DISCHARGE SNAPSHOT........ xix
2009 FIREARMS DISCHARGE SCOPE........ xx
2009 FIREARMS DISCHARGE OVERVIEW........ xxi

**ANALYSIS OF 2009 FIREARMS DISCHARGES BY CATEGORY**

**INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT**

OVERVIEW........ 3
REASONS FOR DISCHARGES........ 3
DATES AND TIMES OF DISCHARGES........ 3
LOCATIONS OF DISCHARGES........ 3
REASONS OFFICER INVOLVED........ 6
OFFICER RESTRAINT........ 7
OFFICER PEDIGREE........ 9
SUBJECT PEDIGREE........ 11
INCIDENT OUTCOMES........ 15
CONCLUSION........ 18

**INTENTIONAL DISCHARGE – ANIMAL ATTACK**

OVERVIEW........ 21
REASONS FOR DISCHARGES........ 21
DATES AND TIMES OF DISCHARGES........ 21
LOCATIONS OF DISCHARGES........ 21
REASONS OFFICER INVOLVED........ 23
OFFICER RESTRAINT........ 25
OFFICER PEDIGREE........ 26
INCIDENT OUTCOMES........ 28
CONCLUSION........ 29

**UNINTENTIONAL DISCHARGE**

OVERVIEW........ 31
REASONS FOR DISCHARGES........ 31
PURELY UNINTENTIONAL DISCHARGES........ 31
UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT........ 31

**PAGE**

## ANALYSIS OF 2009 FIREARMS DISCHARGES BY CATEGORY continued

### UNAUTHORIZED USE OF A FIREARM

OVERVIEW.......... 35
SUICIDE.......... 35
DISCHARGE BY OTHER THAN OFFICER.......... 35
OTHER.......... 35
OUTCOME.......... 35

### MISTAKEN IDENTITY

OVERVIEW.......... 37
DEFINITION.......... 37
HISTORICAL CONTEXT.......... 37
MISTAKEN-IDENTITY SHOOTING OF OFFICER OMAR EDWARDS.......... 42
PREVENTING MISTAKE-IDENTITY INCIDENTS.......... 45

## APPENDIX

HISTORICAL DATA.......... 49
FIREARMS TRAINING.......... 52
ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE.......... 54
SUBJECTS SHOT BY POLICE BY RACE/ETHNICITY, SINCE 1997.......... 58
SUPPLEMENTAL DATA.......... 60

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# TABLES, CHARTS, AND FIGURES


| | | PAGE |
|---|---|---|
| | Anatomy of a Firearms Discharge Investigation | xv |
| | Historical Snapshot by Category, 1999–2009 | xviii |
| | Total Incidents for Year, 1999–2009 | xviii |
| | Adversarial Conflict, 1999–2009 | xviii |
| | Unintentional Discharge, 1999–2009 | xviii |
| | Animal Attack, 1999–2009 | xviii |
| | Comparison, 2008 to 2009 | xix |
| | Breakdown by Category, 2009 | xix |
| | Firearms Discharge Scope | xx |
| | **INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** | |
| A.1 | Type of Threat Intentional Discharge – Adversarial Conflict (ID-AC) | 3 |
| A.2 | Precincts with More than One ID-AC Incident | 4 |
| A.3 | ID-AC Incidents By Borough | 4 |
| A.4 | MAP: Locations of ID-AC vs Locations of Criminal Shootings, 2009 | 5 |
| A.5 | Criminal Shootings vs ID-AC Incidents, Frequency by Borough | 6 |
| A.6 | Criminal Shootings vs ID-AC Incidents, Percentage by Borough | 6 |
| A.7 | Top Five On-duty Assignments | 7 |
| A.8 | Officer's Actions Prior to Shooting | 7 |
| A.9 | Shots Fired by Officers | 8 |
| A.10 | Shots Fired per Incident | 9 |
| A.11 | Race/Ethnicity of Officers | 10 |
| A.12 | Years of Service | 11 |
| A.13 | Rank of Officers Involved in ID-AC Incidents | 11 |
| A.14 | Race/Ethnicity of 49 Known Subjects Involved in ID-AC Incidents | 12 |
| A.15 | Race/Ethnicity of Nine Known Subjects Firing on Officers | 12 |
| A.16 | Subjects Involved in ID-AC Incidents vs Persons Arrested for Firearms Possession, 2009 | 13 |
| A.17 | Subjects Who Fired on Police vs Criminal Shooting Suspects, 2009 | 13 |
| A.18 | 43 Known Subjects with Prior Arrests | 14 |
| A.19 | List of Known Weapons Possessed/Used by Subjects | 15 |
| A.20 | Officers Injured During ID-AC Incidents | 16 |
| A.21 | Actions of Subjects Shot and Killed | 17 |
| A.22 | Actions of Subjects Shot and Injured | 17 |
| | **INTENTIONAL DISCHARGE – ANIMAL ATTACK** | |
| B.1 | Intentional Discharge – Animal Attack Incidents (ID-AA), by Tour | 21 |
| B.2 | Jurisdiction of Incidents | 22 |
| B.3 | ID-AA Incidents by Borough | 22 |
| B.4 | Locations of Animal Attacks | 23 |
| B.5 | Type of Job to Which Officer Was Assigned | 23 |
| B.6 | MAP: Locations of ID-AA Incidents, 2009 | 24 |
| B.7 | Bureau/Precinct of Assignment, Two or More Officers | 25 |
| B.8 | Officer Assignment | 25 |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# TABLES, CHARTS, AND FIGURES

**PAGE**

**INTENTIONAL DISCHARGE – ANIMAL ATTACK** continued

B.9 Shots Fired per Officer.......... 26
B.10 Shots Fired per Incident.......... 26
B.11 Race/Ethnicity of Officers.......... 27
B.12 Rank of Officers Involved in ID-AA Incidents.......... 28
B.13 Years of Service.......... 28

**UNINTENTIONAL DISCHARGE**

C.1 Findings, All Unintentional Discharges.......... 33

**UNAUTHORIZED USE OF A FIREARM**

None

**MISTAKEN IDENTITY**

None

**APPENDIX**

Officers Shot and Injured by Subjects, 1971–2009.......... 49
Officers Shot and Killed by Subjects, 1971–2009.......... 49
Subjects Shot and Injured by Officers, 1971–2009.......... 50
Subjects Shot and Killed by Officers, 1971–2009.......... 50
Total Shots Fired, 1971–2009.......... 51
Total Incidents, 1971–2009.......... 51
Center Mass.......... 53
Subjects Shot by Police — Race/Ethnicity.......... 58
Subjects Shot by NYPD Officers, 1997–2009.......... 59
Gunfire in New York City, 2009.......... 59
Discharge Incidents by Day of Week.......... 60
Discharge Incidents by Tour.......... 60
Discharge Incidents by Month.......... 60
Discharge Incidents by Borough.......... 61
Discharge Incidents by Precinct.......... 61
Discharge Incidents by Duty Status.......... 63
Breakdown by Incident, 2009.......... 64

## THE ANNUAL FIREARMS DISCHARGE REPORT: AN INTRODUCTION

One of the most abrupt, dynamic, and potentially traumatic incidents that can happen in a police officer's career is the line-of-duty discharge of his or her firearm. As much as handcuffs, the uniform, or the shield, the gun is a symbol of the officer's authority. It is, moreover, a physical embodiment of the officer's responsibility. The weapon on an officer's hip is a constant reminder—for officer and citizen alike—of the officer's role and the trust society has given.

Forty years ago, the New York City Police Department adopted Department Order SOP 9 (s.69) and began to collect in-depth documentation of discharges during hostile encounters, for the stated purpose of "[increasing] the safety potential of each member of the force." The policy quickly expanded beyond police-involved combat, however, and came to include the study of all firearms discharges by police. Since the early 1970s, the NYPD has endeavored to record and evaluate every instance in which an officer discharges his or her weapon, whether the discharge occurs purposefully, accidentally, or, in rare instances, criminally.

The SOP 9 process has been demonstrably effective. When annual recordkeeping began in 1971, there were 12 NYPD officers shot and killed by another person; 47 officers were shot and injured. Officers, in turn, shot and mortally wounded 93 subjects, and another 221 subjects were injured by police gunfire. These statistics are difficult to conceive of today. *In 2009, for the first time since recordkeeping began, not a single NYPD officer was shot by a criminal subject, while police shot and mortally wounded 12 subjects, and injured 20*. Four decades of annual analyses have altered the way officers respond to, engage in, and even assess the need for firearms discharges. Information gleaned from the annual reports has saved the lives of citizens and officers alike, and there has been Department-wide change—tactical, strategic, and cultural—with regard to how officers use and control their firearms. The Department has made restraint the norm.

Today, the reports serve an additional but equally important role: they are statistical engines for the development of training, the adoption of new technologies, and even the deployment of Department assets. New instructional scenarios are implemented from these reports, new hardware—from bullet-resistant vests to speed loaders to semi-automatic handguns to controlled-energy devices—is introduced, and violence-prone hotspots are identified for inclusion in Operation Impact.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## USE OF FORCE

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect arrest or prevent escape, as well as to protect property or people. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing malefactors and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance, and the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist police—officers have an ascending array of force options to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., pepper spray), impact weapons like batons, and, finally, deadly physical force. All of these are tools at the officer's disposal, and the officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm—or vice versa—if the situation dictates.

But an officer's permission to use force is not unlimited. According to both federal and state law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary. Reasonableness, more than any other factor, is the most salient aspect of an officer's legitimate use of force.

In federal case law, both Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989) delineate a standard of "objective reasonableness" (Graham) that restricts an officer's prerogative to compel or constrain another citizen. Tennessee v. Garner, while disallowing the use of deadly physical force against any felon, affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. And the state limits an officer's ability to exercise *deadly* physical force even further—Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three very specific instances: 1) when the subject has committed or is attempting to commit a felony *and* is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary; 2) when an armed felon resists arrest or flees; and 3) when the use of deadly physical force is necessary to defend a person from "what the officer reasonably believes to be the use or imminent

use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and warns that "EXCESSIVE FORCE WILL NOT BE TOLERATED" (Patrol Guide 203-11). Specifically regarding the use of deadly physical force, the NYPD states that "Uniformed members of the service should use only the minimal amount of force necessary to protect human life" (Patrol Guide 203-12).

**GUIDELINES FOR THE USE OF FIREARMS**

To this end, the Department promulgates nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

> Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.
>
> Police officers shall not discharge their weapons when doing so will unnecessarily endanger innocent persons.
>
> Police officers shall not discharge their weapons in defense of property.
>
> Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.
>
> Police officers shall not fire warning shots.
>
> Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.
>
> Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.
>
> Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.
>
> Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

**REASONABLENESS**

In the final telling, both legal standards and the Department's expectations assess the appropriateness of an officer's exercise of deadly physical force based on reasonableness. Police are regularly exposed to highly stressful, dangerous situations, and the risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Holmes noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, the Supreme Court wrote, in Graham v. Connor, that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51

NY2d 267, 271, the New York courts wrote "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good.

**TRAINING**

Latitude is not unrestricted discretion, of course, but rather an admission that reasonableness is fluid. In order to make the right conclusion about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, and skill, but most of all, on training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The main purpose of the Annual Firearms Discharge Report is to ensure that the NYPD's training is the best it can be.

## INVESTIGATION

The New York City Police Department recognizes the serious nature of police-involved firearms discharges, and it seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents: 1) Patrol Guide Procedure 212-29; and 2) a handbook entitled "The Firearms Discharges Investigation Manual; The NYPD guide to the preparation of a Shooting Incident Report."

### THE SHOOTING TEAM

When an officer discharges his or her firearm, on- or off-duty, or when a firearm owned by an officer is discharged, a patrol supervisor responds to the incident and takes charge of the scene and secures and inspects the involved officer's firearm. He or she also immediately notifies the chain of command. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, and begins by contacting and conferring with the District Attorney. In many instances—including nearly every instance in which a subject is killed or injured—the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to a Breathalyzer test. He or she is also automatically reassigned to an administrative position for the next three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, area searches, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

**THE SHOOTING INCIDENT REPORT**

As much detail as possible is included in the Shooting Incident Report, but the constraints of producing an important document in a compressed timeframe mean that the information it contains is unavoidably preliminary. The primary means of mitigating this is the use of the Firearms Discharge Investigation Manual.

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination, however, nor from commenting on the apparent tactics utilized during the incident.

**THE FINAL REPORT**

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data is unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting-team leader (e.g., detective's case files, forensic results, and medical reports). And because information is more extant, more complete subjective assessments are possible.

Generally, with regard to discharges that occur during adversarial conflict and involve injury or death to a subject, the final report cannot be finished within the 90-day period. Instead, it must wait until the investigation into the incident has been completed, or at least until the district attorney from the county of occurrence has permitted the officer or officers who shot to be interviewed. At times it must wait even longer, until all relevant legal proceedings have been concluded.

When a final report is delayed—whether because of ongoing legal proceedings or incomplete investigations—the Borough Investigation Unit submits monthly interim-status reports. Once the final report is finished, however, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After a firearms discharge have been investigated and the final report has been prepared, and after the District Attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination in order to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

### THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered, and conducted at the borough and executive levels. Members of the borough Firearms Discharge Advisory Board are supervisors assigned to the borough in which the incident took place. This board further scrutinizes the incident, with the benefit of new material contained in the final report. Based on the accumulated evidence, the borough Firearms Discharge Advisory Board issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board for determination.

### THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The Department's Firearms Discharge Review Board is the penultimate arbiter of any given discharge incident. It issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The Review Board gives due consideration to and often concurs with the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report—a single document that memorializes and synthesizes the whole of the exhaustive investigation and review process—and presents it to the Police Commissioner.

### THE POLICE COMMISSIONER

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination as to the incident.

Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2009 findings are published throughout this report.

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION

An officer discharges a firearm **or** a firearm owned by an officer is discharged.

A **supervisor** responds, secures the scene and the firearm in question, and makes proper notifications.

A Shooting Team is established and a shooting-team leader (**Captain**) responds to conduct an investigation.

The **Duty Inspector** responds and supervises the investigation.

The shooting-team leader prepares a preliminary Shooting Incident Report, which is submitted to the **Chief of Department.**

The **Commanding Officer** of the precinct of occurrence or of the Borough Investigations Unit prepares a final report within 90 days and submits it to the **Chief of Department.**

**The Borough Firearms Discharge Advisory Board** formally reviews the incident and submits preliminary findings and recommendations to the **Chief of Department**.

**The Chief of Department Firearms Discharge Review Board** reviews the incident and Borough Advisory Board findings and recommendations and then makes a determination.

If the discharge results in injury, **the Internal Affairs Bureau** Command Center is notified and IAB members respond to assist in the investigation; additionally, the officer who fired must submit to a Breathalyzer test.

The **District Attorney** is notified in **all** cases and conducts a separate investigation (if warranted). The DA may present the case to a Grand Jury to determine justification.

The **Duty Chief** is notified and responds to supervise investigations for discharges that result in a serious injury by gunfire or death to anyone or when an officer is injured by gunfire.

The morning after the shooting incident, the applicable Borough Chief or Bureau Chief and executive staff meet with and brief the **Police Commissioner.**

If the officer receives *charges and specifications* the case is sent to the **Department Advocate** for a Department Trial.

In all matters related to the incident, the final determination rests with the **Police Commissioner**.

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## GLOSSARY OF TERMS

| | |
|---|---|
| **Officer** | For this publication, refers to a sworn Uniformed Member of the New York City Police Department of any rank. |
| **Subject** | A person engaged in adversarial conflict with an officer or a third party, in which the conflict results in a firearms discharge. |
| **Civilian** | A person who is not the subject in the adversarial conflict but is included as a victim, bystander, and/or injured person. |
| **Firearms Discharge** | An incident in which an officer of the New York City Police Department discharges *any* firearm, or when a firearm belonging to an officer of the New York City Police Department is discharged by *any* person. This does not include a discharge during an authorized training session nor while lawfully engaged in target practice or hunting. Additionally, it does not include a firearms discharge at a firearms safety station within a Department facility. |
| **Intentional Firearms Discharge – Adversarial Conflict** | A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. This does not include discharging a firearm against an animal attack. |
| **Intentional Firearms Discharge – Animal Attack** | A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another against an animal attack. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. |
| **Intentional Firearms Discharge – No Conflict** | A firearms discharge in which an officer intentionally discharges a firearm to summon assistance. May include firearms discharges that are determined to be legally justified but outside Department guidelines. |
| **Unintentional Firearms Discharge** | A firearms discharge in which an officer discharges a firearm without intent, regardless of the circumstance. Commonly known as an *accidental discharge*. |
| **Unauthorized Use of a Firearm** | A firearms discharge that is considered unauthorized and is not listed as an intentional firearms discharge. In these instances the firearm is being discharged without proper legal justification and/or outside the scope of the officer's employment. This includes instances when an unauthorized person discharges an officer's firearm. |
| **Use/threaten the Use of a Firearm** | A contributing factor in which a subject discharges or threatens the discharge of a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening the use of a firearm. |
| **Firearm** | For this publication, includes any pistol, revolver, shotgun, rifle, or variation of such. |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## GLOSSARY OF TERMS

| | |
|---|---|
| **Imitation Firearm** | For this publication, includes any instrument that is designed by the manufacturer or modified by a person to appear as if it were a firearm. This includes air pistols, toy guns, prop guns, and replicas. |
| **Use/threaten the Use of a Cutting Instrument** | A contributing factor in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| **Cutting Instrument** | For this publication, includes any knife, razor, sword, or other sharp-edged instrument, such as a broken bottle. |
| **Use/threaten the Use of a Blunt Instrument** | A contributing factor in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |
| **Blunt Instrument** | For this publication, includes any solid bat, stick, pipe, metal knuckles, or other instrument that, when used as a weapon, can cause blunt-force trauma to an individual. This includes automobiles and unbroken bottles. |
| **Use/threaten the Use of Overwhelming Physical Force** | An incident in which a subject or subjects physically attack a person or threaten or attempt to do the same, and while doing so put the person at risk of serious physical injury or death. This includes gang attacks and attempting to push a person from a roof or train platform. This also includes attempting to take an officer's firearm. |
| **Proactive Policing** | Instances in which officers engage in operations or activities that actively seek out violators of the law. This includes undercover operations, traffic enforcement, checkpoints, verticals, street narcotics enforcement, warrant execution, quality-of-life enforcement, and Anti-Crime operations. |
| **Reactive Policing** | Instances in which officers respond to a call for service from the public. This includes calls of a man with a gun, crimes in progress, domestic disputes, and quality-of-life complaints. This also includes calls for service in which proactive police units respond. |
| **Attacked** | Instances in which officers are not engaging in proactive or reactive policing but are set upon by a subject. This includes off-duty instances when the officer is a victim of a crime (e.g., robbery, burglary, assault), or involved in an altercation that is escalated by the subject (e.g., a traffic incident, a neighbor dispute). This also incorporates instances in which on-duty officers are performing administrative or non-patrol assignments (e.g., guarding a prisoner, processing reports, securing a location). |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# HISTORICAL SNAPSHOT 1999-2009

| CATEGORY | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADVERSARIAL CONFLICT | 61 | 63 | 57 | 55 | 61 | 51 | 59 | *59 | 45 | 49 | 47 |
| ANIMAL ATTACK | 43 | 39 | 40 | 38 | 35 | 26 | 32 | 30 | 39 | 30 | 28 |
| UNINTENTIONAL DISCHARGE | 37 | 26 | 27 | 24 | 25 | 27 | 25 | 26 | 15 | 15 | 22 |
| MISTAKEN IDENTITY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | *1 | 0 | 0 | 1 |
| UNAUTHORIZED USE – FIREARM | 8 | 1 | 7 | 0 | 2 | 5 | **6 | **8 | **6 | **3 | **4 |
| SUICIDE/ATTEMPT | 5 | 5 | 5 | 2 | 7 | 5 | 3 | 3 | 6 | 8 | 3 |
| **TOTAL INCIDENTS FOR YEAR** | **155** | **134** | **136** | **119** | **130** | **114** | **125** | **127** | **111** | **105** | **105** |

* Numbers modified from previous reports to include mistaken identity incident erroneously reported as adversarial conflict incident.

** This category modified in 2005 to include incidents in which an officer's firearm is discharged by persons other than the officer (e.g., a family member accidentally discharges the weapon, a perpetrator gains control of an officer's firearm and discharges it, etc.).












# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGE SNAPSHOT

| CATEGORY | 2008 | 2009 | %CHANGE |
|---|---|---|---|
| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 49 | 47 | -4% |
| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 30 | 28 | -7% |
| MISTAKEN IDENTITY | 0 | 1 | N/A |
| UNINTENTIONAL DISCHARGE | 15 | 22 | 47% |
| UNAUTHORIZED USE OF FIREARM | 11 | 7 | -36% |
| **TOTAL FIREARM DISCHARGES FOR YEAR** | **105** | **105** | **0.0** |
| TOTAL OFFICERS FIRING | 125 | 130 | 4% |
| TOTAL SHOTS FIRED | 364 | 296 | -19% |
| TOTAL OFFICERS SHOT AND INJURED BY SUBJECT | 3 | 0 | N/A |
| TOTAL OFFICERS SHOT AND KILLED BY SUBJECT | 0 | 0 | N/A |
| TOTAL SUBJECTS SHOT AND INJURED BY OFFICER | 18 | 20 | 11% |
| TOTAL SUBJECTS SHOT AND KILLED BY OFFICER | 13 | 12 | -8% |

## BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 2009 |
|---|---|
| SUBJECT USED/THREATENED THE USE OF A FIREARM | 30 |
| SUBJECT USED/THREATENED THE USE OF A CUTTING INSTRUMENT | 8 |
| SUBJECT USED/THREATENED THE USE OF A BLUNT OBJECT | 3 |
| SUBJECT USED/THREATENED THE USE OF OVERWHELMING PHYSICAL FORCE | 2 |
| OFFICER PERCEIVED THREAT OF DEADLY PHYSICAL FORCE | 4 |
| **TOTAL** | **47** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 2009 |
|---|---|
| DOG ATTACK | 28 |
| OTHER ANIMAL ATTACK | 0 |
| **TOTAL** | **28** |

| UNINTENTIONAL DISCHARGE | 2009 |
|---|---|
| DURING ADVERSARIAL CONFLICT | 8 |
| HANDLING FIREARM | 14 |
| **TOTAL** | **22** |

| UNAUTHORIZED USE OF FIREARM | 2009 |
|---|---|
| SUICIDE | 3 |
| ATTEMPTED SUICIDE | 0 |
| UNAUTHORIZED INTENTIONAL DISCHARGE | 2 |
| UNAUTHORIZED PERSON DISCHARGED OFFICER'S FIREARM | 2 |
| **TOTAL** | **7** |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## FIREARMS DISCHARGE SCOPE

| CATEGORY | TOTAL NUMBER |
|---|---|
| **NEW YORK CITY**<br>TOTAL POPULATION<br>(U.S. Census, July 1, 2009) | 8,391,881 |
| **NYPD**<br>TOTAL OFFICER STAFFING<br>(2009 Annual Average) | 34,953 |
| TOTAL CIVILIAN CONTACTS (APPROXIMATE) | 23,000,000 |
| TOTAL RADIO-RECEIVED ASSIGNMENTS | 4,444,091 |
| RADIO ASSIGNMENTS INVOLVING WEAPONS | 205,939 |
| WEAPONS ARRESTS | 29,807 |
| GUN ARRESTS | 6,238 |
| CRIMINAL SHOOTING VICTIMS | 1,729 |
| CRIMINAL SHOOTING SUSPECTS | 1,511 |
| INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 47 |
| SUBJECTS SHOT AND INJURED | 20 |
| SUBJECTS SHOT AND KILLED | 12 |
| OFFICERS SHOT AND INJURED | 0 |
| OFFICERS SHOT AND KILLED (MISTAKEN IDENTITY) | 1 |
| OFFICERS SHOT AND KILLED | 0 |
| **NOTE:** ***all numbers are for CY 2009*** | |

**NOTE:** The numbers and percentages described in this report are often rounded to the nearest whole number and are preliminary and subject to further review.

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGES OVERVIEW

## TOTAL FIREARMS DISCHARGES

In 2009, the New York City Police Department saw the same number of firearms discharges as in 2008: 105 total incidents, the smallest number of firearms discharges since the recording of police shootings in the City began. Furthermore, the most serious category of discharges—shootings involving adversarial conflict with a subject—has also seen a steady historic decline, down 25 percent since 1999. In a city of 8.4 million people, from a Department of nearly 36,000 uniformed members who interacted with citizens in approximately 23 million instances, 68 officers were involved in 47 incidents of intentional firearms discharges during an adversarial conflict, with 20 subjects injured and 12 killed.

The figures are a testament to police officers' restraint, diligence, and honorable performance of duty. But they also show that, over the past four decades, attacks on both police and citizens have steadily declined. The drastic reduction in violent crime over the past decade is sociologically reflexive: as crime decreases, criminals and police enter into conflict less often.

Neither the Department nor the officer on the street can afford complacency, however. Although crime (and the total number of police firearms discharges) is down**,** the number of incidents of intentional discharges during adversarial conflict is up 4 percent since 2007. This fact illustrates the officer's perpetual need for vigilance, and for the training that these reports facilitate.

The 2009 Annual Firearms Discharge Report is subdivided into several categories. Each category is analyzed based only on the information in that category. This allows the Department to better understand a specific type of incident and adjust training and policy to continue to reduce those incidents.

Insofar as statistical analysis is concerned, the small sample studied for this document—105 discharge incidents total, only 47 of them in the category of "adversarial conflict"—limits the predictive value and conclusions that may be derived.

## CATEGORIES

Firearms discharges are broken down into five categories.

- INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- INTENTIONAL DISCHARGE – ANIMAL ATTACK: when an officer intentionally discharges his or her firearm to defend against an animal attack
- UNINTENTIONAL DISCHARGE: when an officer unintentionally discharges his or her firearm
- UNAUTHORIZED USE OF A FIREARM: when an officer discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm
- MISTAKEN IDENTITY: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

## 2009 vs 2008

In 2009, total firearms discharges **remained the same** compared to the previous year, although all categories saw a fluctuation in percentages.

The greatest reduction was realized in the category of Unauthorized Use of a Firearm, which was **reduced by 36 percent** from 2008.

Intentional Discharge — Animal Attack was also **reduced by 7 percent** from 2008.

Intentional Discharges — Adversarial Conflict also decreased in 2009, **down 4 percent** from 2008.

The number of Unintentional Discharges in 2009 **increased 47 percent** from 2008, but has nevertheless declined historically, and is down 41 percent from 1999.

The following pages present an analysis of each section and the study's findings. The report contains information compiled from preliminary and final shooting reports, detective case files, medical examiner reports, Firearms Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous yearly firearms discharge reports, as well as information complied from city and state computer databases and official websites.

# 2009 FIREARMS DISCHARGES
# BY CATEGORY

THIS PAGE INTENTIONALLY LEFT BLANK

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE — ADVERSARIAL CONFLICT

## OVERVIEW

There were 47 incidents of intentional firearms discharge during an adversarial conflict in 2009. This represents a 4 percent decrease from 2008. Sixty-eight officers intentionally fired their weapons during these incidents, up 13 percent from 2008. During these 47 incidents, two officers were fired upon but did not return fire.

No officer was injured by gunfire during these incidents**.**

There were 49 subjects involved in these 47 conflicts. Twenty subjects were injured and 12 subjects were killed.

## REASONS FOR DISCHARGES

Officers intentionally discharging their firearms during adversarial conflict did so to defend themselves or others from the threat of serious physical injury or death.

In the majority of these incidents (64 percent) the threat came in the form of a firearm. Officers also acted to defend themselves from the use or threat of a blunt instrument (6 percent), the use or threat of a cutting instrument (17 percent), a perceived threat (9 percent), or the use or threat of overwhelming physical force (4 percent) [see Figure A.1].

## DATES AND TIMES OF DISCHARGES

Two-thirds of the adversarial conflict incidents in 2009 occurred in the second and fourth quarters. Seventeen percent occurred in the first quarter and only 15 percent occurred in the third quarter. Eleven incidents occurred in April, but each month had at least one incident.

Seventy-nine percent of these incidents occurred during the first or third platoons. More than a quarter of the incidents (26 percent) occurred on a Saturday.

## LOCATIONS OF DISCHARGES

Three of 47 incidents occurred outside of the city, in Nassau and Suffolk counties. Of the remaining 44 incidents, six discharges took place in or on New York City Housing Authority (NYCHA) premises, one was within the Metropolitan Transportation Authority (MTA) transit system, and 37 were in the jurisdiction of the patrol precincts.

The majority of the incidents occurred in the Bronx (28 percent) and Brooklyn North (23 percent). Percentages of discharges per borough are depicted in Figure A.3 on the following page.

These incidents took place in 27 separate precincts, down from 30 in 2008. Eleven pre-




Figure A.1

cincts experienced two incidents, and the 43 Precinct, 67 Precinct, and 77 Precinct each had three [see Figure A.2].

For management purposes, the Police Department divides New York City's five geographic boroughs or counties into eight "Patrol Boroughs." Each of these patrol boroughs has eight to 12 police precincts, with the exception of Staten Island, which has three.

Three-quarters of the incidents occurred outside.

**LOCATIONS OF CRIMINAL SHOOTINGS**

When the locations of police shootings are compared to the locations of criminal shootings in 2009, a correlation appears. The map on the next page [Figure A.4] depicts the precise location of the city's 1,420 criminal shootings (represented by blue asterisks) and overlays them with all 44 incidents of intentional discharge during adversarial conflict (represented by red dots) that occurred within New York City in 2009. The map shows, very clearly, that police go where they are needed: police firearms discharges occur in those areas of the city most plagued by gun violence.

As illustrated by Figure A.6 on page six, the correlation is explicit with regard to relative rate, as well—on a percentage basis, police-




Figure A.2




Figure A.3

**LOCATIONS OF 44 INTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT* vs LOCATIONS OF 1,420 CRIMINAL SHOOTINGS, 2009**



● RED — INTENTIONAL FIREARMS DISCHARGE BY POLICE DURING ADVERSARIAL CONFLICT

✳ BLUE — CRIMINAL SHOOTINGS

*Does not include three (3) incidents that occurred outside the city limits

Figure A.4

involved shootings and criminal shootings are dispersed similarly by borough.

Despite this correlation, the absolute number of these police-discharge incidents is small when compared to the number of criminal shootings [see Figure A.5]. Only 3 percent of the city's shooting incidents involve police.

## REASONS OFFICER INVOLVED

Officers become involved in incidents of intentional discharge during adversarial conflict for a variety of reasons. The Annual Firearms Discharge Report categorizes incidents by whether the officers involved were engaged in reactive police work (55 percent) or proactive police work (32 percent), or were attacked (13 percent).




Figure A.5




Figure A.6

Of on-duty officers discharging their firearms during these incidents, the plurality was assigned to Anti-Crime units (21 percent) or the Organized Crime Control Bureau, or OCCB (23 percent). Anti-Crime units and OCCB both deploy personnel to seek out armed individuals and perpetrators of violent crimes. The next-largest proportion of officers (18 percent) was assigned to patrol duties [see Figure A.7].




Figure A.7

The majority of incidents involved officers responding to reports of violent crime—including robberies, assaults, and shots fired—or to reports of emotionally disturbed persons. Another 19 percent of the incidents involved officers conducting stops based on reasonable suspicion [see Figure A.8].

## OFFICER RESTRAINT

When officers did discharge their firearms during an adversarial conflict, the overwhelming majority of officers (90 percent) fired five or fewer times [see Figure A.9]. Forty percent of the officers discharging their firearms in adversarial-conflict incidents only fired **one** shot. Only one officer fired more than eight rounds.

This pattern of control is again apparent when analyzing the number of shots fired per incident. The majority of incidents (84 percent) involved five or fewer shots being fired. In 36 percent of adversarial-conflict incidents, the total number of shots fired by all police officers involved was **one** .




Figure A.8

In total, 184 shots were fired by officers during these incidents, down 7 percent from 2008. This decrease highlights NYPD officers' restraint, but does not actually stem from it. Rather, it is largely attributable to the fact that no incident involved a protracted gun battle. A single anomalous exchange of high-volume gunfire can noticeably distort the real picture. Because of the absence of such a gunfight, however, 2009's data are more reflective of what has been the Department's trend over the past decade: **NYPD officers shoot rarely, and, when forced to fire, discharge few rounds**.




Figure A.9

When working with such small numbers of incidents, shooting officers, and rounds fired, typical use of means and medians can lead to false conclusions. Additionally, as noted above, a single incident can significantly skew averages. Because of this, the Department does not utilize mean averages. For small samples, the mode can be most revelatory. **The mode for the number of shots fired by police is <u>one</u>**.

**OBJECTIVE COMPLETION RATE**

Similarly, the Department does not calculate *average hit percentages*. Instead, the ***objective completion rate per incident*** is employed as it is both more accurate and more instructive.

Like combat, the objective completion rate per incident is pass/fail. When an officer properly and lawfully adjudges a threat severe enough to require the use of his or her firearm, and fires at a specific target, the only relevant measure is whether he or she hit the target. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the target.

In these 47 incidents, officers hit at least one subject per incident 31 times, for an objective completion rate of 66 percent. During the incidents in which officers were being fired upon, however, the objective completion rate decreased to 50 percent.

**SHOOTING TECHNIQUE**

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but it is not always practical during an adversarial conflict. Of officers reporting their shooting techniques, 62 percent gripped the firearm with two hands, 59 percent state that they were standing, and 31 percent stated that they were able to utilize the sights on their firearms.

Only 25 percent of reporting officers were able to make use of some type of cover during the incident. Lack of cover is a factor in




Figure A.10

the need for a firearms discharge.

### TRAINING

The Department's firearms training, which instructs officers to shoot to stop and to aim for center mass, is discussed at length in the Appendix, on page 52.

## OFFICER PEDIGREE

All 68 officers who intentionally discharged a firearm during an adversarial conflict were males; 83 percent of the Department's uniformed personnel are males.

Fifty-two percent of the officers who intentionally discharged a firearm during an adversarial conflict were white. This is slightly less than the percentage of white officers employed by the Department (53 percent). [See Figure A.11 on the next page.]

When compared to Department staffing, black officers who fired are slightly underrepresented, constituting approximately 16 percent of the Department but 12 percent of shooting officers. Hispanic officers, in contrast, are slightly overrepresented, constituting 26 percent of the Department but 30 percent of the officers firing.

### ATTIRE

The number of on-duty plainclothes officers intentionally discharging their firearms in adversarial conflict was higher than the number of on-duty uniformed officers who fired (36 and 25, respectively).

Considering that plainclothes officers represent a smaller portion of officers in the field than those in uniform, their relative overrepresentation in discharge incidents is noteworthy, and is possibly a reflection of the plainclothes officers' assignments. Of the 36 on-duty plainclothes officers involved in these incidents, 39 percent were conducting OCCB operations. Another 36 percent were engaging in Anti-Crime operations.

### YEARS OF SERVICE

In 2009, 47 percent of the officers who discharged their firearms during adversarial conflict had between one and five years of service [see Figure A.12 on the following page]. This means that a group of officers




Figure A.11

who constitute one third of the Department engage in almost half of its adversarial-conflict shootings. The most likely explanation for this discrepancy is that greater proportions of less-tenured officers perform patrol duties. Operation Impact, for example, under which officers are sent to crime hotspots throughout the city to assert a pro-active police presence, is staffed almost entirely by officers with one to five years of service. And, as discussed earlier, officers assigned to patrol and Anti-Crime duties are often the first officers to respond to dangerous jobs involving firearms. The majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties.

In a slight departure from last year's statistics, when officers with between 16 and 20 years of service represented 22 percent of staffing but only 10 percent of shooting officers, in 2009 officers in this category were involved in nearly twice as many adversarial-conflict incidents.

Figure A.12 compares years-of-service distribution among officers who fired to years-of-service distribution throughout the Department. (The Department staffing numbers only indicate the percentage of officers who are in these categories of tenure; they do not indicate the assignments of those officers, nor their level of exposure to the dangers that increase the likelihood of an intentional police discharge.)

**RANK**

Sixty-two percent of the officers discharging their firearms in these incidents were in the rank of police officer [see Figure A.13]. Because police officers are the front line, and represent the majority of officers responding to violent jobs and actively seeking out criminals, this is unsurprising. Additionally, the rank of Police Officer forms the majority of the Department and therefore the pool of officers who may become involved in adversarial conflict is greater.




Figure A.12

**POLICE WEAPONS**

Officers used their service weapons in the overwhelming majority of the incidents (82 percent). The remaining officers utilized off-duty weapons (13 percent) or weapons specific to the Emergency Services Unit (4 percent).

## SUBJECT PEDIGREE

There were 49 subjects involved in the 47 incidents of intentional police discharge during adversarial conflict. The identities of 48 are known. (One individual was not apprehended and remains at large; he is considered unknown and his specific pedigree information is unavailable. This individual was identified by race and gender, however; he was a male black.) Of all 49 subjects, 47 were male and two were female. For the 48 known subjects, their ages range from 15 to 49, although 58 percent were between of the ages of 15 and 25.




Figure A.13

**SUBJECT RACE**

All 49 subjects could be identified by race. In NYPD paperwork concerning suspects, race is determined by complainants and/or victims. In arrest paperwork, the officer filling out the report generally determines the subject's race. This determination may be based on a subject's self-identification, existing

government-issued documentation, racial/ethnic physical characteristics, or other factors.

Additionally, although the Department subcategorizes Hispanics as black Hispanic or white Hispanic, the Annual Firearms Discharge Report combines all Hispanic persons into a single group.




Figure A.14

Of the 49 adversarial-conflict subjects, 73 percent were black. This percentage is smaller than black suspects' representation among criminal-shooting suspects. In a city-wide analysis covering the calendar year 2009, approximately 80 percent of racially identified criminal-shooting suspects were black.

Hispanics, on the other hand, are over-represented among adversarial-conflict subjects in comparison to their representation among criminal-shooting suspects. Twenty-seven percent of adversarial-conflict subjects were Hispanic; approximately 18 percent of racially identified criminal-shooting suspects were Hispanic [see Figure A.14 and Figure A.17].

(The racial identification of black and Hispanic suspects is provided by victims, not the Department. And with regard to criminal-shooting victims, it must be noted that 73 percent of such victims are black and 23 percent are Hispanic.)

Among subjects who fired on officers, 56 percent were black and 44 percent were Hispanic. [See Figure A.15.]

The races of persons arrested in 2009 for firearms possession also seem to mirror the races of persons who engaged in adversarial conflict with police. See Figure A.16 for a visual representation of these comparisons.

**In summary, in 2009, blacks and Hispanics represent 51 percent of New York City's population, but represent 98 percent of racially-identified criminal-shooting suspects, 96 percent of criminal-shooting victims, 94 percent of those arrested for firearms possession, and 100 percent of those firing on police.**




Figure A.15

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE — ADVERSARIAL CONFLICT




Figure A.16




* Of 1,511 shooting suspects in 2009, only 988 were identified by race.

Figure A.17

**PRIOR ARRESTS**

Although there were five incidents in 2009 in which officers faced subjects about whom they had prior knowledge, this is generally not the case. A subject's arrest history is usually unknown to the officer at the time of a typical incident. Nevertheless, arrest history is pertinent. It is indicative of a subject's propensity for criminal conduct and capacity for violently confronting a police officer, and it can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole status may make a subject more willing to attempt to avoid arrest by confronting the officer.

Of the known subjects in these incidents, **<u>92 percent had prior arrests</u>**—and 77 percent had multiple prior arrests [see Figure A.18].




NB: *Individuals may be represented in more than one category*

Figure A.18

Two subjects were wanted by authorities at the time of the incidents and another was on parole. Twenty-eight of the subjects with prior arrests had been arrested for violent crimes such as robbery, assault, and resisting arrest, and two had been arrested for murder or attempted murder. Forty-six percent of the subjects with prior arrests had arrests for weapons possession, including 14 subjects arrested for possessing or using a firearm. Thirty-nine percent had prior robbery arrests. (It should be noted that individual subjects may be identified in several of the previous categories.)

**SUBJECT WEAPONS**

The subjects in these incidents utilized a variety of weapons when confronting officers. The most frequently used weapon was a firearm. Thirty-two subjects carried firearms, 13 of whom fired those weapons. Of the <u>known</u> firearms possessed or used by subjects, 9mm and .45 caliber semi-automatics were the most popular, accounting for 12 of the 28 known firearms used [see Figure A.19].

Eight incidents involved subjects who attacked or menaced officers with cutting instruments. Six of these incidents occurred indoors. Five involved emotionally disturbed persons and one was an attempted robbery.

Two incidents involved subjects who employed an automobile as a weapon. Department policy forbids using firearms against subjects who so use a vehicle as a weapon, unless the subject is also presenting a threat via another method, such as shooting a gun from a car. The Penal Law, however, does not prohibit officers from firing at vehicles if




Figure A.19

they reasonably believe that deadly physical force is necessary to defend themselves or another. This is a prime example of the NYPD demanding more restraint than even the law requires.

### ACCOMPLICES

While officers fired upon 49 individuals in these 47 incidents, at least 73 persons were present and complicit in the incidents. For example, in one instance in the Bronx, an officer observed an armed bank robber leaving the location of a robbery attempt and entering a waiting getaway vehicle occupied by two accomplices. When the officer went to stop the suspect, he observed that both the robbery suspect and one of the accomplices were armed. The officer only discharged his firearm at the robbery suspect, however, when that subject pointed a firearm at him. As a result, the accomplice, although armed as well, is not included in the list of subjects of intentional discharge during adversarial conflict.

Similar examples include two Anti-Crime officers who thwarted a store robbery by three perpetrators, at least two of whom were armed, but who fired only on the subject who pointed his firearm at them; and a sergeant and detective in the Bronx who observed four individuals in possession of a handgun firing shots on New Year's Eve but fired only on the one subject who fired at them.

## INCIDENT OUTCOMES

No police officer was killed by a perpetrator in adversarial conflict in 2009. And, for the first time since 1971, when the Police Department began tracking firearms-discharge incidents, no police officer was injured by gunfire during an adversarial conflict. Thirty-one of this year's 47 incidents resulted in injury to or the death of a subject.

### OFFICER INJURIES

Eight officers sustained non-gunfire injuries during adversarial conflict. Four officers were stabbed by perpetrators; one was saved from grievous injury by his bullet-resistant vest. Of the four, one was attacked and stabbed by an emotionally disturbed

male wielding a screw-driver; two were struck by barricaded emotionally disturbed males, including the officer saved by his vest; and one was severely slashed by an emotionally disturbed female.

Three officers were physically assaulted by subjects, including two undercover officers working on two separate narcotics operations; and one officer who was the victim of a robbery in which a subject struck him with a crowbar. [See Figure A.20]

**BULLET-RESISTANT VEST**

Of the eight officers attacked and injured, six were wearing bullet-resistant vests. In only one instance did the body armor affect the outcome of the attack.

**SUBJECT INJURIES**

Of the 49 subjects involved, 12 were killed and 20 injured by police gunfire.

Of the 12 subjects killed, six subjects possessed firearms, four of whom fired on police and/or civilians, one of whom attempted a gunpoint robbery of an undercover officer, and one of whom pointed his firearm at pursuing officers. Four subjects possessed knives—three had attacked and injured officers; the fourth had murdered one civilian and severely stabbed another. One subject attempted to run down officers and civilians with his vehicle. The final subject physically assaulted an undercover officer and then attempted to take the officer's firearm.

**OFFICERS INJURED DURING ID-AC INCIDENTS (8 OFFICERS)**




Figure A.20

Eight of the 12 killed were intoxicated or had illegal narcotic or controlled chemical substances in their systems at the time of the incidents. (Additionally, one subject's toxicology report was unavailable at the time of this writing.) Toxicology results can only be determined for subjects killed; the percentage of remaining subjects who may have been chemically altered cannot be known. [See Figure A.21 and the Appendix.]

Of the 20 subjects who were injured by police gunfire, 70 percent had firearms. Sixty-five percent had already shot, shot at, stabbed, robbed, or struck an officer or civilian before they were stopped. Five civilians had been shot and injured, and one civilian was stabbed. An officer was also stabbed and injured, and two others were physically assaulted, with one suffering injuries. [See Figure A.22]

**BYSTANDER INJURED**

One innocent civilian bystander was injured as a result of police gunfire when two Police Officers were attacked by a man with a screwdriver in the Transit system. During this incident, a total of five rounds were discharged. Three of these were intentionally




Figure A.21




Figure A.22

fired at the subject; two were unintentionally discharged by one officer and the subject when the subject attempted to gain control of the officer's firearm. It is probable that it was one of these rounds that struck the bystander in the leg.

### MALFUNCTION

Six officers experienced malfunctions of their firearms. Three of the officers were able to clear the malfunction and fire a subsequent round. No civilians or officers were injured as a result of these malfunctions.

### FINDINGS

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical concerns and violations of procedure. It must be noted that discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures.

At the time of this report, half of the 47 incidents had been reviewed and findings had been issued. Among the officers involved in reviewed incidents, two were held in violation and ordered retrained. Another individual was terminated from the NYPD.

Thirty-four officers' actions did not warrant any type of discipline or corrective retraining. Reviews of the remaining incidents are pending.

It must be noted that **all officers who discharge their firearms are sent to a firearms-retraining course**, regardless of the circumstances of the discharge.

## CONCLUSION

There were 47 intentional discharges during adversarial conflicts, involving 68 officers who fired. These conflicts involved 49 subjects, including nine who fired directly on police.

In 2009, there were nearly 2,000 victims of criminal shootings and homicides in New York City. The number of intentional firearms discharges by police, comparatively, is small, but every time an officer discharges a firearm he or she risks inflicting injury or death, on subjects, police, or innocent bystanders. Because of this, the Department strives to ensure that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

One method of judging the Department's relative success is to compare the number of adversarial-conflict discharge incidents with the number of arrests of armed individuals made by officers each year. In 2009, New York City police officers made 29,807 weapons arrests, including 6,238 gun arrests. More than 7,600 of these weapons recoveries stemmed from reasonable suspicion stops. (This number does not include instances in which officers confront armed emotionally disturbed persons and transport those persons to the hospital rather than arresting them.)

**In other words, there were nearly 30,000 incidents in which an officer took an armed subject into custody without firing his or her weapon**.

There were, on average, 34,953 uniformed officers employed by the NYPD in 2009. Of them, only 68—*0.2 percent*—intentionally discharged a firearm at a subject.

These officers responded to more than 4.4 million calls for service in 2009, of which more than 200,000 involved weapons.

**Of the millions of dangerous calls that thousands of officers responded to in 2009 (not including proactive incidents during which officers were actively seeking out criminals), officers intentionally discharged their firearms in a total of 47 incidents.**

**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

There were 28 incidents of intentional firearms discharge during an animal attack in 2009, down 7 percent from 2008 and down 53 percent from 1998. A total of 34 officers intentionally fired their weapons during these incidents, down 17 percent from 2008. Three officers were directly involved in the attack but did not fire. All of the attacks involved dogs. (It should be noted that the following statistics, graphs, and observations are based on this limited sample.)

There were eight officers injured in these incidents. Three officers were bitten by dogs and five officers suffered other injuries during the attacks. One civilian was also bitten by a dog in the course of an animal-attack incident. These numbers do not encompass all dog attacks on officers or civilians, only dog-attack incidents involving intentional firearms discharges by police officers.

Of the 31 dogs involved, 15 were killed and eight injured during these conflicts. A more detailed analysis of injuries to all persons and animals involved will be provided in the following pages.

## REASONS FOR DISCHARGES

Officers who intentionally discharged their firearms during animal attacks did so to defend themselves or others from the threat of physical injury, serious physical injury, or death. In all of the incidents the threat came in the form of a dog attack.

Officers, when able, attempt to prevent an animal attack using non-lethal options, including batons and OC spray. A police officer uses his or her firearm as a last resort to stop an animal attack.

## DATES AND TIMES OF DISCHARGES

Intentional discharges during animal attacks occurred fairly evenly throughout the four quarters of the year. The first quarter of the year saw six incidents, the second saw eight incidents, and the third and fourth each saw seven incidents. July saw four incidents, the most incidents of any month; every other month had between one and three incidents.

Discharges during animal attacks occurred most often on Friday (25 percent). These incidents occurred most often on the third platoon (57 percent), followed by the second platoon (25 percent) and the third platoon (18 percent) [see Figure B.1 below].




Figure B.1

## LOCATIONS OF DISCHARGES

All but one of the intentional discharges during animal attacks occurred within the city limits, with 64 percent of the incidents transpiring under the jurisdiction of the patrol

precincts. This is a noticeable departure from intentional discharges during adversarial conflict. While intentional discharges during adversarial conflict occurred within Housing jurisdiction only nine percent of the time, intentional discharges during animal attacks occurred within Housing jurisdiction 29 percent of the time [see Figure B.2].

The Bronx experienced the most incidents (36 percent). The pie chart below shows the percentages of discharges per patrol borough [see Figure B.3].

These incidents took place in 22 separate precincts, with most of those precincts only experiencing a single incident. Five precincts accrued two incidents.

Of the 28 incidents, 54 percent occurred outdoors. This is less than the 72 percent for adversarial conflicts. The exact locations of the incidents vary from streets and sidewalks to roofs, stairwells, and alleys.




Figure B.2




Figure B.3

The plurality of occurrences happened in hallways (29 percent). Figure B.4 below indicates the locations and percentages of the incidents.

Figure B.6 on the next page maps the exact location of all of the intentional discharges during animal attacks that occurred in 2009. The one attack that occurred outside New York City is not depicted.

## REASONS OFFICER INVOLVED

A variety of reasons led officers to become involved in incidents of intentional discharges during animal attacks. The most common (21 percent) was responding to a report of a vicious dog. The next most frequent reasons were responding to a dispute (15 percent), conducting a vertical (12 percent) and executing a warrant (12 percent) [see Figure B.5].

A large proportion of officers (53 percent) were assigned to patrol duties, which include conducting verticals and responding to calls for service from the public, such as calls for vicious dogs. These calls, as mentioned above, account for 44 percent of the incidents [see Figure B.8 on page 25 for officer assignment].




Figure B.4




Figure B.5

LOCATIONS OF 2009 ANIMAL ATTACK INCIDENTS
27 INCIDENTS*



*Does not include the location of the one (1) incident that occurred outside the city limits.

Figure B.7 indicates the top bureau or precinct of assignment for officers involved in intentional discharges during animal attacks. Housing officers accounted for 9 percent of the officers involved in animal attack discharges, compared to 13 percent of the officers involved in adversarial conflict incidents.

## OFFICER RESTRAINT

When officers did discharge their firearms during an animal attack, the plurality of officers (38 percent) fired only **one time** [see Figure B.9 on next page].

This pattern of restraint is also apparent when analyzing the number of shots fired per incident. In the majority of animal attacks (54 percent) officers fired only one or two rounds [see Figure B.10 on next page].

A total of 71 shots were fired by officers during these incidents; this is a **50 percent decrease** from 2008. Several factors likely contributed to this decrease. Seven percent fewer incidents took place in 2009 compared to 2008, and 15 percent fewer officers were involved in those incidents. In addition, only three incidents in 2009 involved multiple dogs attacking the officer(s), compared to eight such incidents in 2008.




Figure B.7




Figure B.8

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE — ANIMAL ATTACK




Figure B.9




Figure B.10

During these 28 incidents, officers hit at least one animal per incident 22 times; this yields an objective completion rate of 79 percent. This is higher than the objective completion rate during adversarial conflict (66 percent) and higher than the objective completion rate of officers under fire (60 percent) [see OUTCOME section for explanation].

**SHOOTING TECHNIQUE**

Last year the shooting techniques of officers defending against an animal attack were similar to those of officers involved in adversarial conflict. This year they are more divergent. Forty-five percent of the officers in animal attacks who reported their position, report gripping the firearm with two hands; compared to 62 percent of the reporting officers in adversarial conflicts.

The two types of incidents were more similar with regard to use of protective cover. The significant majority of reporting officers (75 percent) reported that they were unable to utilize cover during adversarial conflicts. Similarly, the majority of reporting officers (64 percent) involved in animal attacks also report having no cover during the discharge. Officers who can find cover from an animal attack may not find it necessary to fire.

Animal attacks and adversarial conflict incidents are also similar when it comes to shooting position. As with adversarial conflicts, the majority of officers involved in animal attack incidents report being in a standing position (59 and 72 percent, respectively).

Only 9 percent of the reporting officers report utilizing their sights when discharging their firearm during these confrontations, which is dramatically fewer than the 31 percent of the reporting officers who used their sights during adversarial conflict.

## OFFICER PEDIGREE

As with adversarial conflicts, all of the officers who intentionally discharged their firearms during an animal attack were male.

The race of the officers involved in intentional discharges during animal attacks is

slightly dissimilar to that of the Department staffing. White officers were underrepresented, comprising 41 percent of officers firing versus 53 percent of Department staffing. Hispanic officers were also slightly underrepresented, comprising 24 percent of officers firing versus 26 percent of Department staffing. Black and Asian officers were slightly over-represented, with blacks accounting for 26 percent of officers firing versus 16 percent of Department staffing and Asians accounting for 9 percent of officers firing and 5 percent of Department staffing [see Figure B.11 ].

**ATTIRE**

Most officers who discharged their weapons during animal attacks were attired in uniform (79 percent). This is a significantly higher percentage of the on-duty whole than for in-uniform officers who fired during adversarial conflict (41 percent), possibly because uniformed officers more frequently respond to calls for service regarding vicious animals, and are more likely to conduct foot patrol and verticals where animal attacks are more likely to occur.

**YEARS OF SERVICE**

As in adversarial conflicts, almost half of the officers who discharged firearms during animal attacks had between one and five years of service. As years of service increase, the number of intentional discharges during an animal attack decreases [see Figure B.13 on next page].

As discussed earlier, officers assigned to patrol are often the first officers to respond to dangerous jobs involving animals, and the majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties.

**RANK**

A significant majority of officers discharging their firearms in these incidents were police officers (68 percent); again, police officers are most likely to perform duties that expose them to animal attack [see Figure B.12 on the following page].




Figure B.11




Figure B.12

**POLICE WEAPONS**

Officers utilized their service weapons in 32 of the 34 incidents. One of the two remaining officers discharged his off-duty weapon and the other discharged a special weapon as a member of the Emergency Services Unit.

## INCIDENT OUTCOMES

Of the 28 intentional discharges occurring during animal attacks, 22 resulted in injury or death to at least one animal. Eight officers were injured, including three who were bitten by dogs. (The remaining five officers suffered sprains, strains and contusions related to the incidents.) The bites occurred to officers' arms, hands, or legs.

One civilian was bitten by a dog, and one civilian was injured by shrapnel from a police discharge during these incidents.

Of the 31 animals involved, 15 were killed and eight injured by police gunfire. All of the animals involved were dogs, with 87 percent being pit bulls.

When officers fired at attacking animals they hit their targets in 79 percent of the incidents. This objective completion rate is higher than for adversarial attacks (66 percent) and higher than for officers under fire (60 percent). A possible explanation is the




Figure B.13

distance between officer and animal. Although in both kinds of attack officers are often attempting to avoid injury by running for cover or physically pushing a subject or animal away, officers in animal attacks are more often within arm's reach of the animal. Sixty-two percent of officers report being five feet or fewer from the attacking animal, and no officer reported being farther than ten feet. Only 44 of the 68 officers who fired in adversarial conflict incidents reported their distance from the subject; of those 44, only 48 percent were within five feet of the subject.

### MALFUNCTION

One officer reported a firearm malfunction during an animal attack. The malfunction did not affect the outcome of the incident. The firearm was tested and was found to be operational.

### FINDINGS

All of the intentional firearms discharges during animal attacks in 2009 were investigated and, at the time of this report, 93 percent offered findings and recommendations. Of the 32 officers in the completed investigations, one was disciplined. As noted in the previous category, discipline does not necessarily mean that there was a violation of shooting procedure. The one officer in this incident received discipline for improper notification and recording of the incident. Nine other officers did not receive discipline but instead were sent to tactical re-training, including three who were mandated to be retrained on the proper handling of dogs.

## CONCLUSION

In 2009, police officers responded to more than 28,400 calls through 911 for incidents involving dogs and other animals. This number includes 4,531 complaints about vicious animals made through the 311 system. It does not account for incidents in which officers proactively encounter dogs or answer civilian complaints that were not processed through 911.

**From among more than 28,400 calls involving animals that thousands of officers responded to, as well as uncounted incidents in which officers came into contact with dogs or other animals, a total of 28 instances resulted in officers discharging their firearms.**

**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

In 2009, there were 22 incidents of unintentional firearms discharge, involving 22 officers. This is a substantial, 47 percent increase from the 15 incidents that occurred in 2007 and also in 2008. It must be noted, however, that unintentional discharges during those two previous years were anomalously low. From 2000 to 2006, the average number of unintentional discharges was 25.

There were three officers injured in these incidents. Two were a direct result of the discharge and one was a result of the firearm disassembling and cutting the officer's hand. No officers were killed as a result of these incidents.

No civilians or subjects were injured or killed in these firearms discharges.

## REASON FOR DISCHARGES

Officers unintentionally discharging their firearms did so in two distinct circumstances—either purely unintentionally (14 incidents), or unintentionally during adversarial conflict (eight incidents). Purely unintentional discharges occur while the officer is loading, unloading, or otherwise handling the firearm. Unintentional discharges during adversarial conflict occur while the officer is actively engaged in the arrest or apprehension of a subject.

## PURELY UNINTENTIONAL DISCHARGES

There were 14 incidents in which an officer unintentionally discharged a firearm during times when there was no adversarial conflict or animal attack. In each of the 14 incidents, only one shot was fired.

### LOADING/UNLOADING

The overwhelming majority of incidents occurred while the officer was loading, unloading, or inspecting the firearm (86 percent, or 12 incidents). The majority of incidents occurred at the officer's residence or a police facility. The reasons for handling the firearm vary from cleaning the firearm, to attempting to render the firearm safe, to testing the firearm's operability. Two incidents occurred during a forensic analysis of the firearm where the weapons malfunctioned and discharged.

It is notable that three of the 12 firearms discharged during loading/unloading incidents were not the officers' regular service or off-duty firearms. (This trend was noted over the last two years, as well). This may stem from the officers' lack of familiarity with the firearms in question.

Also notable is the fact that the remaining nine firearms were manufactured by Glock (five model 19s and four model 26s). This most likely has to do with the fact that the handler must depress the trigger to disassemble the firearm.

In 2009 two officers unintentionally discharged their firearms while unloading at a non-Department safety station. In 2009, as in 2008, one officer unintentionally discharged his firearm while unloading his weapon at a Department of Correction safety station. (Unintentionally discharging a firearm into a firearms safety station is not considered a firearms discharge when it oc-

curs inside an NYPD facility.)

**OTHERWISE HANDLING**

The remaining two purely unintentional incidents occurred while the officer was handling the firearm. In one incident a Highway officer unintentionally chambered a round in his shotgun, took the gun off safety, and depressed the trigger. In another incident the officer discharged his firearm while holstering, unaware that an object was lodged in the trigger guard.

**PEDIGREE OF OFFICER**

Pedigree information appears inconsequential. Gender, age, race, and assignment vary at random over the 14 incidents.

**INJURIES**

Three officers sustained injuries as a direct result of these 14 purely unintentional discharges. One officer sustained injuries to his buttock, and one officer sustained a wound to his hand. The third officer sustained a laceration to his hand related to the firearm falling apart during forensic testing.

**FINDINGS**

In all the cases for which a finding has been determined, the officer has received some sort of discipline or retraining. See the chart on the next page for a detailed breakdown of discipline against all officers involved in unintentional discharges.

## UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT

There were eight incidents in which officers unintentionally discharged their firearms during an adversarial conflict in 2009. This represents a sharp increase from the three incidents in 2008 and a large percentage of the increase in unintentional discharges for the year. In all incidents only one shot was fired.

(Additionally, there was one incident in which an officer discharged his weapon both intentionally and unintentionally. The officer and his partner were attacked by a screwdriver-wielding subject on a transit platform and the officer's partner was stabbed. The officer fired intentionally at the subject and then the officer's weapon was discharged again, unintentionally, when the subject attacked the officer and grappled with him for control of the weapon. A bystander was injured during this incident, possibly by one of the unintentionally discharged rounds. This incident is carried in the INTENTIONAL DISCHARGE — ADVERSARIAL CONFLICT section.)

**REASON FOR DISCHARGE**

Of these eight discharges, five involved officers actively struggling with a perpetrator. Of the other three, one slipped on ice while searching for a subject in a wooded area, another tripped while executing a search warrant, and the third discharged her firearm when the vehicle she was a passenger in came to an abrupt halt (while stopping to apprehend a suspect).

The sample size of this category is so small that no significant conclusions can be de-

rived. Yet there were some observations worth noting.

With one exception, each incident involved a male white officer. No incident involved precinct sectors; all incidents involved specialized units. All but two incidents occurred on the third platoon (the other two occurred on the first platoon). While Glock pistols predominated in purely unintentional discharges, in unintentional discharges during adversarial conflict Smith & Wesson firearms were the weapon in five of the eight incidents.

**INJURIES**

There were no firearms-related injuries or deaths to officers as a result of these eight incidents. No subjects or civilians were injured or killed as a result of these unintentional discharges.

**FINDINGS**

Seven of these eight cases of unintentional discharge during adversarial conflict have been finalized. Of the officers involved, all but one were mandated to attend some type of firearms retraining. One incident is still pending at the time of this report.

Figure C.1 below encompasses the discipline for <u>all</u> unintentional discharges, including all officers who discharged in the incident.




Figure C.1

**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

There were seven firearms discharges in 2009 that were deemed to be unauthorized and outside the scope of the officers' employment. Three of these incidents involved the suicide of an officer. Of the other four incidents, two involved the discharge of an officer's weapon by someone other than the owner and two incidents were unauthorized events in which the officers were suspended from service.

## SUICIDE

Three officers committed suicide in 2009. (In one incident, an officer killed his wife before killing himself.) This total is down from seven officers who took their own lives during the previous year.

The details of suicide incidents are not discussed in this report, but rather they are studied and investigated by other units within the Department.

## DISCHARGE BY OTHER THAN OFFICER

With regard to the two incidents in which an officer-owned firearm was discharged by a civilian, these incidents both involved a family member gaining access to an improperly secured firearm. One officer received Department discipline for failure to secure his firearm, the other was disciplined for an improper holster.

## OTHER

The final two unauthorized incidents involved personal disputes between the officer and subject(s) and were deemed unauthorized. Each resulted in the suspension of the officer involved. One incident resulted in a non-life threatening injury to a civilian by gunfire. It is unknown at the time of this report whether the wound was caused by the officer's discharge or by another subject, who witnesses observed firing a revolver.

## OUTCOME

The unauthorized use of a firearm owned by a New York City police officer is investigated thoroughly, and more often than not results in discipline against the officer discharging the weapon or the officer charged with the security of the weapon. In cases of serious misconduct, officers are suspended, arrested, and eventually terminated for their actions.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

In 2009, the New York City Police Department experienced a rare and terrible event—a mistaken-identity shooting. On Thursday, May 28, 2009, Police Officer Omar Edwards was shot and killed by another police officer under the mistaken belief that Officer Edwards was a criminal perpetrator armed with a firearm.

This event was an unmitigated tragedy, and the Department has endeavored to learn all it can from the incident and do all it can to prevent future, similar incidents.

Police Officer Edwards was posthumously promoted to Detective First Grade, and on June 8, 2010, he was posthumously awarded the Department's highest honor, the Medal of Honor.

## DEFINITION

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on another New York City police officer or other law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken-identity incidents are distinguished from crossfire incidents in that the shooting officer is purposefully and intentionally choosing to fire on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. Unauthorized discharges, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incidents), are also excluded.

## HISTORICAL CONTEXT

As the Department sought to learn from the incident that took Officer Edwards' life, part of the learning process involved determining a historical context for mistaken-identity shootings. Using myriad records, from half-century-old precinct log books to archived news reports to personnel orders, the Department culled its institutional memory for precedent. It became clear that these incidents, though lamentable, are markedly uncommon.

### MISTAKEN IDENTITY FATALITIES

Since 1930, there have been ten known mistaken-identity incidents that resulted in the death of an officer. These ten incidents, occurring over a span of eighty years, are synopsized below:

**Patrolman Edward P. Keenan, 02/23/1930**
On February 23, 1930, at approximately 0100 hours at Sixth Street and First Avenue in Manhattan, probationary Patrolman Edward P. Keenan was killed during an incident of mistaken identity. Probationary Patrolman Keenan was shot by probationary Patrolman Joseph Dugan. Both officers were off duty and in civilian clothes at the time; both were male whites. Patrolman Dugan, observing an altercation in which Patrolman Keenan was involved, confronted Patrolman Keenan. Mistaking Patrolman Keenan for a perpetrator about to draw a weapon, Patrolman Dugan shot him. Patrolman Keenan was transported to Bellevue Hospital, where he died. In 1931, Patrolman Keenan was posthumously awarded the Department's Medal of Honor.

**Patrolman John A. Holt, 02/12/1940**

On February 12, 1940, at approximately 2030 hours at Bradhurst and 155th Street in Manhattan, Patrolman John A. Holt was killed during an incident of mistaken identity. Patrolman Holt, a male black, was off duty and in civilian clothes. He was armed and searching for a burglar who had run from Patrolman Holt's apartment building and entered a neighboring building. During the pursuit, Patrolman Holt had fired several rounds. When a uniformed sergeant and patrolman responded they observed Patrolman Holt, with gun in hand, preparing to climb up to the roof. Upon being instructed to drop the weapon, Patrolman Holt instead turned towards the officers and was shot. He died at the scene. Patrolman Holt was posthumously awarded the Department's Medal of Honor.

**Patrolman Jacob J. Szwedowski, 04/29/1945**

On April 29, 1945, at approximately 1940 hours in front of 13 East 113th Street in Manhattan, Patrolman Jacob J. Szwedowski was killed during an incident of mistaken identity. Patrolman Szwedowski and his partner, both on duty and in plainclothes, had arrested a female for prostitution. The female resisted arrest, screaming that she was being kidnapped and causing a crowd to gather. Patrolman Szwedowski fired a warning shot in an attempt to disperse the crowd. Patrolman Phillip J. Ryan, on duty and in uniform, was drawn by the crowd and the shot. He fired at Patrolman Szwedowski, causing a fatal wound. Both patrolmen were male whites. Patrolman Szwedowski was posthumously awarded the Department's Medal of Honor.

**Patrolman Donald J. Rainey, 09/29/1965**

On September 29, 1965, at approximately 2300 hours in the 20 Precinct, Patrolman Donald J. Rainey was killed during an incident of mistaken identity. Patrolman Rainey, a white-shield detective, was off duty and in plainclothes in a bar and grill on 73rd Street when he was shot by off-duty Patrolman Richard Selkowitz, who was also wounded in the exchange. Both officers were male whites. A citizen had informed Patrolman Selkowitz that there was a man with a gun in a nearby café, and when Patrolman Selkowitz entered the establishment with his gun drawn, Patrolman Rainey, a patron of the café, mistook Patrolman Selkowitz for a perpetrator and fired on him, striking Patrolman Selkowitz twice in the hand. Patrolman Selkowitz returned fire, killing Patrolman Rainey.

**Patrolman David Turman, 10/13/1968**

On October 13, 1968, at approximately 0400 hours in front of 2495 7th Avenue in Harlem, probationary Patrolman David Turman, a male black, was killed during an exchange of gunfire resulting from a mistaken-identity incident. Patrolman Turman was off duty and in plainclothes at the time. He was shot by Housing Police Department Patrolman Taylor Johnson, a male black, who was also off duty and in civilian clothes. Patrolman Turman was attempting to effect an off-duty, gunpoint arrest of an individual who had impersonated an officer. When Patrolman Johnson observed the incident, he mistook Patrolman Turman for a perpetrator committing a robbery and drew his own weapon. Patrolman Turman, similarly mistaking Patrolman Johnson, turned his weapon on Patrolman Johnson. Both officers fired; Patrolman Johnson was struck in the

chest and wounded while Patrolman Turman was struck and killed. Patrolman Johnson was taken to Harlem Hospital in serious condition.

**Patrolman William R. Capers, 04/03/1972**
On April 3, 1972, at approximately 1600 hours in the 103 Precinct, second-grade Detective William R. Capers was shot and killed during an incident of mistaken identity. Detective Capers, a male black, was on duty in plainclothes, conducting investigations of a purse-snatching robbery pattern. Detective Capers was chasing a suspect who was in possession of a firearm and had fired a warning shot before stopping the suspect. Officer Robert Kenny, a male white, on duty and in uniform, responded to the scene and, mistaking Detective Capers for a perpetrator, shot and killed him. On May 26, 1972, a Grand Jury refused to indict Officer Kenny. The use of "color-of-the-day" armbands was widely expanded owing to this incident.

**Police Officer John Skagen, 06/28/1972**
On June 28, 1972, at approximately 1700 hours in the Hunts Point Avenue IRT subway station, Transit Police Department Police Officer John Skagen was shot and killed by NYPD officers during an incident of mistaken identity. Officer Skagen, a male white, off duty and in plainclothes, was returning home from court via the 6 Train subway when he observed a male black suspect in possession of a firearm. Officer Skagen attempted to effect an arrest but the perpetrator fled. The two exchanged gunfire, and both were wounded. Police Officers John Jacobson and George Wieber, two on-duty, male white uniformed officers of the NYPD's 41 Precinct, heard the gunfire and witnessed the perpetrator fleeing the transit system at the Hunts Point/Bruckner Boulevard station. The perpetrator, who had hidden his own weapon, told the patrolmen "There's a crazy man shooting," and the officers confronted Officer Skagen. Officer Wieber fired six rounds, striking Officer Skagen. Officer Skagen was removed to Lincoln Hospital where he succumbed to his injuries. The perpetrator was apprehended; he was later convicted of reckless manslaughter and sentenced to 15 years in prison.

**Police Officer Irving E. Wright, 03/05/1973**
On March 5, 1973, at approximately 0245 hours in the 28 Precinct, Police Officer Irving E. Wright was killed during an incident of mistaken identity. Officer Wright, a male black, was off duty and in plainclothes at the time. He was working in a grocery store when a perpetrator entered and robbed the store at gunpoint. After the robber fled, Officer Wright gave chase. He and the robber exchanged gunfire, and two on-duty, uniformed officers responded. The robber hid beneath a parked car, and Officer Wright was confronted by uniformed Police Officers Michael J. McShane and John H. Sether, both male whites. As Officer Wright turned towards the officers, his weapon accidentally discharged. The uniformed officers opened fire, striking Officer Wright and killing him.

**Police Officer Eric Hernandez, 01/28/2006**
On January 28, 2006, at approximately 0500 hours in the 46 Precinct, Police Officer Eric Hernandez was shot in an incident of mistaken identity. He succumbed to his injuries on February 8. He had been a member of the Department for 18 months. Officer Hernandez, a male Hispanic, was off duty and in plainclothes when he became the victim of a

gang assault in a Bronx restaurant. His attackers fled, and Officer Hernandez attempted to give chase. He stopped an uninvolved man outside the restaurant, mistakenly believing the man to be one of his attackers, and held the man at gunpoint. Two uniformed officers from the 46 Precinct arrived in a marked patrol car, responding to a radio call of a man assaulted, phoned in by witnesses to the assault in the restaurant. Upon exiting the vehicle, Police Officer Alfredo Toro, a male Hispanic who had been with the Department for 19 years, observed a man holding another man at gunpoint. Officer Toro gave several verbal commands to Officer Hernandez, ordering him to drop the gun. Officer Hernandez did not respond. Noticing that Officer Hernandez was holding a weapon commonly used by the NYPD, Officer Toro asked Officer Hernandez in sum and substance “Are you a cop?” but again received no response. At this point, Officer Toro discharged his weapon, firing three rounds and striking Officer Hernandez three times. Other officers arrived and established a crime scene and attempted to aid Officer Hernandez. It was at this time that Officer Hernandez’s shield was discovered in a jacket on the ground nearby and he was identified as a police officer. Officer Hernandez was removed to Saint Barnabas and died ten days later. The perpetrators who had assaulted him were subsequently arrested and, with one exception, convicted of felonious assault and sentenced to prison. Officer Toro’s actions were determined to be justified and within Department guidelines; he has since retired from the service.

**Police Officer Omar Edwards, 05/28.2009**

The incident involving Officer Edwards is described at length on page 42.

**NON-FATAL MISTAKEN IDENTITY INCIDENTS SINCE 1995**

Reaching as far back into the Department’s history for non-fatal incidents proved more difficult than the research into fatal incidents. By virtue of their severity and finality, fatal mistaken-identity incidents are more extant in the records than non-fatal incidents, some of which do not even result in injury to either party. The merger of the New York City Police Department with the New York City Housing Police Department and the New York City Transit Police Department in 1995 compounded the dearth of documentation. Because of the merger, what records there were for the two smaller departments had largely been abandoned or unaccounted for at various unknown repositories over which the NYPD does not have jurisdiction.

In the post-merger era, however, the Department’s recordkeeping has been comprehensive and complete. Since 1995, there have been four non-fatal mistaken-identity incidents. They are described below:

**Police Officer Dennis Labarbera, 01/31/1996**

On January 31, 1996, 0240 hrs, PO Dennis Labarbera was shot by Sergeant Marcus Renna in the 32 Precinct when officers responded to a burglary in progress. Officer Labarbera, a 26-year-old male white, and his partner, both in uniform, climbed a fire escape to the location’s roof while the uniformed Patrol Supervisor and his operator ascended the stairs. On opening the door to the roof, Sergeant Renna, a 37-year-old male white, observed Officer Labarbera. Although Officer Labarbera’s gun was hol-

stered, the sergeant mistook the uniformed officer for a perpetrator and fired once, striking Officer Labarbera in the shoulder and seriously injuring him. Sergeant Renna received charges and specifications.

**Police Officer Richard Padin, 10/24/1996**

On October 24, 1996, 0405 hrs, PO Richard Padin was shot by PO Richard Kuhnapfel in the basement of a bodega in the 83 Precinct. Officer Padin, a 29-year-old male Hispanic, and a sergeant had executed a search warrant at the bodega hours earlier and had returned, in plainclothes, to look for narcotics described by an arrestee. An employee of the bodega heard unknown persons in the basement and called in a possible burglary at the location. Uniformed officers responded and descended to the darkened basement where they encountered Officer Padin with his gun drawn. Officer Kuhnapfel, a 33-year-old male white, fired one round from about five feet away. He then retreated out of the basement and yelled down to identify himself and order the occupants out, at which point Officer Padin and the sergeant identified themselves as fellow officers. Officer Padin was struck once in the chest, suffering blunt-force injury, but was saved further harm by his bullet-resistant vest. The officers involved were assigned to the same precinct but belonged to different units.

**Detective James Conneely, 12/17/1998**

On December 17, 1998, 1310 hrs, Detective James Conneely was shot by fellow detective Robert Altieri during a search for a shooting suspect in the 47 precinct. Detective Altieri, a 36-year-old male white, heard a noise and saw a firearm come around the corner of a doorway; he shouted “drop the gun” and fired two rounds, one of which passed through a wall and struck Detective Conneely in the chest. Detective Conneely, a 36-year-old male white, suffered blunt-force injury, but was saved further harm by his bullet-resistant vest. All officers were in plainclothes.

**Retired Member of the Service, 09/27/1999**

On September 27, 1999, 0920 hrs, an on-duty, uniformed officer was involved in an exchange of gunfire with a retired member of the service in the 75 Precinct. The retired member, a 35-year-old male white, had been the victim of a gunpoint robbery and was chasing the suspects. Hearing a shot, the retired member fired on the suspects once. When the perpetrators turned and pointed a firearm at him, he fired again (two shots, zero hits). Sometime between the two shots, a sector car operated by PO Gavin Reece arrived. PO Reece, a 37-year-old male black, was in uniform. He heard the retired member shout “Stop them!” and, despite observing the retired member to be armed, attempted to apprehend the fleeing perpetrators. At that moment, however, the retired member fired his second round, which struck and shattered the windshield of PO Reece’s RMP. Feeling himself under fire, and no longer certain that the retired member was not in fact a perpetrator, PO Reece returned one round, which did not strike anything. The retired member identified himself and the perpetrators were arrested.

## MISTAKEN-IDENTITY SHOOTING OF OFFICER OMAR EDWARDS

### SUMMARY OF EVENTS

On Thursday, May 28, 2009, Police Officer Omar Edwards, appointed to the New York City Police Department on July 17, 2007, and assigned to the Housing Bureau Impact Response Team, was shot and killed by another police officer under the mistaken belief that Officer Edwards was a criminal perpetrator armed with a firearm.

### THE TRIGGERING INCIDENT

Police Officer Omar Edwards, a 25-year-old male black with two years of service, was assigned to Police Service Area 5, a Housing Bureau precinct located at 221 East 123 Street in East Harlem (within the confines of the 25th precinct). On the night of the incident, he had ended his tour at approximately 10 P.M., after receiving permission to leave work an hour and a half early.

Shortly after 10 P.M., having changed into blue jeans and an off-white overshirt, Officer Edwards walked to his private vehicle, which was parked on 2nd Avenue between 124th and 125th Streets, a short distance from the Police Service Area. As he neared his vehicle, he observed a male wearing a black short-sleeve jersey reaching through the driver-side window, which had been broken. Officer Edwards attempted to apprehend this perpetrator, later identified as Miguel Goitia, an undomiciled individual with a long criminal history. Mr. Goitia later alleged that Officer Edwards did not identify himself as a police officer. Mr. Goitia broke free from Officer Edwards's grip, most likely by sliding out of his jersey, which was found beside Officer Edwards's car. Mr. Goitia then fled. Officer Edwards pursued Mr. Goitia, north on Second Avenue and then eastbound on East 125th Street.

At an unknown point during the confrontation, but by the time of the pursuit, Officer Edwards removed his authorized service firearm from his waistband. He held his firearm—a silver Smith & Wesson Model 5946 9mm semi-automatic pistol—in his right hand. Officer Edwards was not wearing a holster. It is believed that Officer Edwards did not have time to call for assistance. His cell phone was recovered at the scene and there was no record of a call to 911.

### THE ANTI-CRIME TEAM

At the same time, the 25th precinct Anti-Crime team, consisting of one sergeant and two police officers, was patrolling the area around 125th Street and 1st Avenue.

Anti-Crime teams are precinct-based groups specifically tasked with interdicting crime and arresting perpetrators of violent crime and gun possession. Anti-Crime teams patrol in plainclothes, and their members are specially selected and trained.

On May 28, the 25th precinct Anti-Crime team consisted of:

- Sergeant John Anzelino, a 30-year-old male white with 13 years service
- Police Officer John Musante, a 28-year-old male white with six years of service
- Police Officer Andrew Dunton, a 29-year-old male white with five years of service

The team was patrolling in an unmarked, gray Chevy Impala, equipped with a siren and an emergency light package on the front and rear window. It is unknown whether lights or sirens were used at the time of the incident.

Officer Musante drove the vehicle, Officer Dunton was in the front passenger seat, and Sergeant Anzelino was seated in the rear seat directly behind Officer Dunton. Sometime before 10:30 P.M., while patrolling the precinct, the Anti-Crime team turned westbound on East 125th Street, traveling towards 2nd Avenue. As they did so they observed two males running towards their unmarked Impala on the south side of 125th Street. The team then observed the males cross over to the north side of the street in front of the vehicle, approximately 225 feet from 2nd Avenue. The second male was holding a firearm in his right hand.

**THE CONFRONTATION**

The Anti-Crime team, having observed Officer Edwards pursuing Mr. Goitia, prepared to exit the vehicle and confront both men. Officer Musante attempted to put the car in park when he saw the two men, but the parking mechanism failed to catch and the car continued to move forward. Officer Musante returned to the car to place it in park. Sergeant Anzelino lost his footing while attempting to exit the car from the rear passenger seat and fell to the ground.

Neither Officer Musante nor Sergeant Anzelino saw the actual confrontation, but each heard Officer Dunton shout “Police! Drop the gun!” As he fell, Sergeant Anzelino also saw Officer Edwards turn towards the unmarked vehicle.

Officer Dunton later testified that he shouted “Police! Stop!” as he exited the vehicle and confronted the armed male. The male with the firearm slowed down, made eye contact with Officer Dunton, and then turned his body to the right towards Officer Dunton. Officer Dunton shouted “Drop the gun! Drop the gun!” The male then extended his right arm parallel to the ground, with his elbow locked. Officer Dunton, fearing that he was in imminent danger, discharged his firearm—a Glock Model 19 9mm semi-automatic pistol—six times, mortally wounding Officer Edwards.

Sergeant Anzelino recovered from his fall and pursued Mr. Goitia, who continued to run eastbound on 125th Street toward 1st Avenue. He was apprehended near 1st Avenue. Officer Dunton secured the scene and was directed by Sergeant Anzelino to handcuff Officer Edwards, whom they believed to be a perpetrator. The Anti-Crime team did not transmit any information over the police radio about this pursuit.

**THE RESPONSE**

At 2229 hours, the 911 police operators began to receive several calls from persons stating that they had heard shots fired in the vicinity of 1st Avenue and 125th Street. An NYPD Emergency Service Unit, whose members are trained EMTs, arrived on the scene and began to render aid to Officer Edwards.

During the course of providing medical treatment, the Emergency Service detectives removed Officer Edwards’s outer garment and discovered that he was wearing a NYPD

Police Academy gym shirt underneath. Inscribed on the shirt was his company number and last name. They also found a police shield clipped inside Officer Edwards's left pocket.

At 2230, the police operator dispatched a signal 10-13 ("officer needs assistance") at East 125th Street between 1st and 2nd Avenues. This call also confirmed that a male was shot and that an ambulance was immediately needed at the location. Shortly after the radio transmission, additional police units responded to the scene. An additional Housing Anti-Crime unit responded to the scene and identified Police Officer Omar Edwards. Officer Edwards was transported to Harlem Hospital where he was pronounced dead at 2320 hours. The Internal Affairs Bureau arrived at the scene of the incident and, according to procedure, administered an alcohol test to Officer Dunton, who registered a blood-alcohol content of 0.0.

The Shooting Team conducted interviews and investigations at the scene and prepared an initial report for the Police Commissioner and Chief of Department, both of whom were present.

**THE INVESTIGATION**

The initial firearms discharge report sets the stage for an internal investigation by the Firearms Discharge Review Board (FDRB), which is chaired by the Chief of the Department. The review board handles disciplinary matters related to police-involved firearms discharges.

There are several levels to the FDRB process, including the Shooting Team leader's initial assessment of the incident and a Borough-based review of the incident, as well as investigations by Internal Affairs personnel.

The District Attorney also conducts investigations into officer-involved shootings. In almost all instances in which injury or death by gunfire is involved, the District Attorney will initiate a Grand Jury proceeding. In such cases, the Department defers its administrative investigation until the completion of the District Attorney's actions.

On the night of this incident, the Manhattan District Attorney's Office requested that Officer Dunton not be interviewed, and the Department complied with this request. The District Attorney then convened a grand jury to review the circumstances surrounding the death of Officer Edwards.

On August 13, 2009, after hearing testimony from 20 witnesses and reviewing 68 documents, the grand jury voted not to indict Police Officer Andrew Dunton on criminal charges related to the death of Detective Edwards. Because no criminal charges were filed against Officer Dunton, the Police Department moved forward with the next phases of its internal investigation into the incident.

At this stage, the Department was able to interview Officer Dunton and compel a statement from him. Officer Dunton's description of his actions was determined to be entirely consistent with the objective evidence related to the incident, and consistent as well with statements offered by other officers and civilian witnesses, alike. When Officer Edwards turned towards Officer Dunton, Officer Dunton believed himself to be in

imminent danger and reacted in a manner that was held to be within Department guidelines.

## PREVENTING MISTAKEN-IDENTITY INCIDENTS

Despite the fact that Officer Dunton's actions were held to be lawful by an independent Grand Jury, and within Department guidelines by an exhaustive, multi-tiered Firearms Discharge Review Board process, the outcome of the fatal mistaken-identity incident in the 25th Precinct was unacceptable. The loss of a dedicated young officer is a tragedy that has prompted the Department to explore numerous avenues of prevention.

Foremost among these avenues is an increased emphasis on training, both previously existing and newly developed, designed to minimize the risks inherent in confrontation situations in which officers, uniformed or not, on-duty or not, encounter one another during enforcement activities. In addition to creating training videos directed at undercover and plainclothes officers, the Department commissioned an independent study by a professor from the University of Chicago to research how police training can influence shoot/don't shoot decisions. And the Department also altered its pistol qualification course and other tactical training programs to incorporate identification procedures.

To facilitate intra-service recognition, the Department instituted an ongoing procedure to help uniformed patrol personnel, particularly newly assigned precinct officers, become familiar with plainclothes officers who perform duty in the same neighborhoods. Plainclothes officers from Patrol, Housing, and Transit commands visit roll calls for uniformed officers assigned to nearby commands and introduce themselves. The potential efficacy of a program such as this was quickly apparent when, just six weeks after Officer Edwards's death, an undercover officer was assaulted and was forced to use his firearm to defend himself. Responding uniformed officers saw an armed male whom they took to be a perpetrator, but a violent confrontation was forestalled by the fact that the uniformed officers recognized one of the undercover officer's plainclothes partners, as well as by the undercover officer's adherence to identification procedures established during training.

To help foment positive training changes throughout New York State, the Department also participated actively in the New York State Police-on-Police Shootings Task Force convened by Governor David Paterson.

Detective First Grade Omar Edwards was a dedicated, proud member of the New York City Police Department. The NYPD has pledged to ensure that his loss was not in vain, and to do all that it can to ensure that the incident that took his life is the last of its type.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# APPENDIX

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA







These charts represent officers who were shot by criminal subjects and do not represent accidental shootings, suicides, unauthorized shootings, incidents in which officers were personally involved, or mistaken-identity shootings

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA






# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA






## OVERVIEW

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives, those of bystanders, victims, and subjects—and of officers and their fellows, too. One of the grim realities of police work, however, is the terrible contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons from imminent death or serious physical injury. (This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury—e.g., when an officer confronts a subject menacing people with a firearm that is later revealed to be a replica.)

## SHOOT TO STOP

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to "stop the threat"—i.e., to end the subject's ability to threaten imminent death or serious physical injury to the officer or another person.

If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject's demise. Stated explicitly, however, **POLICE OFFICERS DO NOT "SHOOT TO KILL"**—they are trained to shoot to stop.

## WEAPONS CONTROL

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills. Unfortunately, in a combat situation, concentration and fine motor skills are sometimes among the first casualties. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## POPULAR CULTURE MISREPRESENTATIONS

One of the purposes of this report is to make it clear that, contrary to media-based misimpressions, police officers rarely use their firearms and show great restraint when they do so. (The Hollywood fiction that police shootings have no consequence—that officers are back on the street immediately after a firearms discharge, that officers may engage in multiple incidents on a regular basis—is also dispelled by this report.) Perhaps the worst of popular culture's purposeful inaccuracies concerns the accuracy of pistols. Thanks to the movies and TV, many ci-

vilians have an mistaken understanding of police and their firearms.

Action heroes routinely display miraculous precision with their guns, and they routinely use handguns instead of rifles or long guns. In real life, handguns are much more limited weapons. They are short, making axial sight misjudgment more likely, and they lack a third bracing point (such as a rifle's butt stock), and are thus more difficult to steady and aim. All NYPD service pistols are "double action only" (DAO), meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be "cocked," resulting in a one-stage trigger pull which is smoother and easier). Additionally, all NYPD weapons are also modified to have a heavier trigger pull than provided by factory settings; this diminishes the likelihood of unintentional discharges but also affects aiming.

## CENTER MASS

Both the impairment of fine motor skills during combat stress and the relative imprecision of pistols contribute to the fact that **ALL POLICE OFFICERS ARE TAUGHT TO SHOOT FOR CENTER MASS**. Police officers never aim for a subject's extremities; they fire at center mass.*

The human body's center mass, also called the center of gravity, is, by definition, the most central and largest area available as a point of aim. Physicians use a quick assessment tool known as "the rule of nines" to divide body surface by region. The torso

**CENTER MASS**



represents one third of a human's surface area, versus a mere 9 percent for an arm or 18 percent for a leg. The torso is also the most stationary portion of the body. Extremities, on the other hand, are smaller and far less static. Arms flail, legs pump, and in so doing they become nearly impossible to target. This is exacerbated by the stress and dynamism of a combat situation.

Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to the center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun. Stopping a subject from threatening imminent death or serious physical injury to another person is the sole reason an officer utilizes deadly physical force.

* In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center or "barycenter" of the exposed portion as a point of aim in lieu of center mass.

## ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE

***In 2009, twelve subjects were shot and killed by officers who intentionally discharged their weapons during adversarial conflict.***

***The taking of life to protect life is a terrible contradiction, and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations can be analyzed and assessed in order to develop training that can provide officers with more use-of-force options or conflict-resolution opportunities so that, in the future, similar events may have different outcomes. A short narrative of each incident is found below. It is worthy of note that eleven of the twelve subjects had prior arrest histories, and eight were intoxicated and/or had controlled substances in their systems (additionally, one subject's toxicology results were unavailable at the time of this report).***

On January 15, at 1640 hours, an undercover officer working in the confines of the 33 precinct attempted to purchase narcotics from a male black subject with whom the undercover officer had previously conducted similar transactions. In this instance, however, the undercover officer came to believe that the narcotics were counterfeit and refused to complete the sale. Failing in his attempt to defraud the officer, the subject produced a loaded .38 caliber revolver, pointed it at the officer, and demanded money. The officer tendered the cash using his left hand while simultaneously turning away and reaching with his right hand into his pocket where his firearm was secreted. In fear for his life, the officer fired three rounds, striking the subject. The subject was removed to St. Luke's Hospital where he succumbed to his injuries several days later. The subject had an arrest history for marijuana sales, and had cannabinoids in his system at the time of the incident.

On April 8, at 0730 hours, uniformed officers responded to a report of criminal mischief in the 69 precinct. A female black subject had done damage to her landlord's door, and then retreated to her own apartment. When officers went to her residence, they smelled a strong odor of natural gas. Police supervisors and members of the fire department were called to the scene. Officers and firefighters made entry into the apartment in order to address the dangerous condition whereupon they were attacked by the subject, who was armed with a knife. The subject stabbed one officer, causing deep lacerations to the officer's hand. She retreated but then attacked again, at which point two other officers fired three rounds and two rounds, respectively, striking her and causing her demise. The subject had an arrest history related to psychiatric incidents.

On April 12, at 1130 hours, uniformed members of the Emergency Service Unit engaged a barricaded emotionally disturbed male Hispanic subject in the confines of the 43 precinct. The subject had taken his family hostage and used his five-year-old son as a human shield. Responding officers entered into a dialogue with the subject and convinced him to release his

hostages after which he retreated to a bedroom. Following lengthy colloquy during which Emergency Service personnel entered the subject's apartment, the subject exited the bedroom armed with a knife. He refused several commands and attacked officers with the knife. Officers attempted to use less-than-lethal control devices, including a TASER device and a Sage Projectile Launcher, to no avail. When the subject continued to attack with his knife, a sergeant and a detective had no recourse but to fire four rounds and two rounds, respectively, striking the subject and causing his demise. The subject had prior arrests and had cocaine in his system at the time of the incident.

On May 9, at 1330 hours, an off-duty detective engaged in a gunfight with two robbery perpetrators in the confines of the 67 precinct. The detective was present at an auto-repair shop when two male black subjects entered and announced a robbery. One subject produced a .45 caliber firearm and attempted to remove a customer's gold chain. Surreptitiously drawing his firearm, the detective identified himself and immediately came under fire from the armed subject. The detective fired one round in return, striking the subject in the neck and killing him, but suffering a weapon malfunction in the process. This allowed the second subject to procure his fallen accomplice's gun and race from the garage, firing multiple rounds as he fled. The detective cleared his malfunction and returned one round, but the second subject entered a waiting vehicle and escaped. (He was subsequently apprehended.) The dead subject had multiple priors, including arrests for robbery and firearms possession. He had cannabinoids in his system at the time of the incident.

On July 11, at 2000 hours, an undercover officer working in the confines of the 88 precinct was attacked with overwhelming physical force by a male black subject. The undercover officer had been acting as an observer prepared to provide backup for another undercover purchasing narcotics. He was seated on the steps of a building from which the subject emerged and began abruptly striking the officer about the head and torso. The officer identified himself as a police officer but the subject continued to attack, and attempted to grab the officer's firearm. At this point the officer fired one round, striking the subject and causing his demise. The subject had numerous prior arrests and was a parolee who had been incarcerated for drug crimes. He had antidepressants in his system at the time of the incident.

On July 22, at 2010 hours, an Anti-Crime officer in the confines of the 34 precinct shot and killed a male Hispanic subject who had rammed several occupied vehicles and was attempting to run down the officer. The subject and his passengers had allegedly committed a robbery in the 33 precinct, and were briefly pursued by uniformed officers from that command. That pursuit had been terminated, however, owing to the risks posed to the public by the subject's reckless, desperate, and dangerous driving. When officers in the neighboring 34 precinct observed the subject, they reengaged. They attempted to box in the subject, but he proceeded to ram police cars and civilian cars. Among the civilian cars were occupied vehicles in the roadway and unoccupied parked vehicles. The subject also collided with a motorcycle, striking its rider. After officers exited their vehicle, the subject twice accelerated towards the officers.

One officer fired two rounds, striking the subject and causing his demise. The subject had numerous priors for burglary, narcotics-related crimes, and larceny. Forensic toxicology was unavailable at the time of this report.

On August 1, at 0230 hours, uniformed officers responded to a radio report of shots fired in the confines of the 41 precinct. A witness pointed out the subject, stating that he was in possession of a firearm. Earlier, the subject had menaced individuals who had allegedly robbed him some time before, and discharged at least one round in the air. When police officers confronted the subject, he produced a Davis .32 caliber semiautomatic and fired multiple rounds at the officers. Three officers returned fire, discharging twenty rounds, six rounds, and four rounds, respectively. The subject was struck and killed. The subject had no arrest history, but was intoxicated and had cocaine in his system at the time of the incident.

On September 12, at 1700 hours, in the confines of the 60 precinct, uniformed Emergency Service Unit officers shot and killed a male Hispanic subject who had attacked them with a knife. The subject had taken a female victim hostage; the subject and the victim had a long history of domestic violence. After the victim's mother called police, and police responded to the scene, the victim was able to escape. Officers established a dialogue with the subject and, over the course of nearly five hours, unsuccessfully attempted to entice him out of his barricaded position. When the subject broke off contact, it was determined that officers would make entry in order to deploy a camera device to continue to monitor the subject and then exit the premises. Upon making entry, however, the officers were attacked by the subject who wielded a knife and used a mattress as a shield. The subject swung his weapon viciously and violently at the officers, striking one detective in the side (the detective was saved by his ballistic vest). Two detectives fired one round and three rounds, respectively, from their MP-5 special weapons; one detective fired two rounds from his pistol. The subject was struck several times and was killed. The subject had a lengthy arrest history, including priors for felony assault, weapons possession, drug sales, and kidnapping.

On October 7, at 1845 hours, uniformed Impact Response Team officers responded to a 911 call for an assault in the confines of the 32 precinct. When officers arrived at the scene they encountered a seriously injured victim suffering from multiple stab wounds. Officers entered the building and, moving single file, encountered the subject on the narrow stairs between the second and third floors. The subject was armed with a long, two-bladed dagger of a type consistent with medieval fantasy designs. The subject refused numerous commands to drop the weapon and instead stated "You want some of this?" while continuing to advance until he was within an arm's length of the lead officer. With no avenue of retreat, the officer fired six rounds, striking the subject several times and causing his demise. Immediately thereafter, officers discovered the body of a neighbor, killed by the subject during the initial assault. The neighbor's two-year-old son was alone beside his father's body. The subject had a history of resisting arrest.

On November 15, at 0300 hours, plainclothes Anti-Crime officers responded to a nightclub brawl in the confines of the 75 precinct. While dispersing the crowd, officers heard gunfire inside the location. Moving inside, they confronted a male black subject armed with a Titan .25 caliber semi-automatic who had just shot a club employee in the chest (a bouncer who was saved by his bullet-resistant vest). When this subject pointed his firearm at police, one officer fired three rounds, striking the subject three times and causing him to fall to the floor. The wounded subject attempted to hand his weapon to a companion, and officers rushed in to secure him. As they did so, they became aware of a second male black subject armed with a revolver. This second subject was a convicted felon employed as a private security officer by the patrons who had rented the club. Surveillance footage from interior cameras shows him in possession of the firearm with his arm extended, pointing in the direction of police. Faced with an imminent threat, one officer fired one round, striking the second subject in the neck and causing his demise. A loaded .357 caliber Smith & Wesson was recovered from his person. The first, wounded subject was apprehended and his weapon recovered as well. The subject who was killed had multiple arrests for robbery and weapons possession.

On November 21, at 2330 hours, plainclothes officers assigned to Gang Squad Queens were patrolling the 101 precinct in response to recent shootings in the area. Observing three individuals walking in Bayswater Park after the park had closed, they attempted to stop the individuals. One of the suspects fled, and three officers gave chase. During the foot pursuit the male black subject was observed to be in possession of a silver handgun. As the officers gained ground on the subject, he turned and pointed his weapon at police. Three officers fired eight rounds, six rounds, and one round, respectively. The subject was struck multiple times and succumbed to his injuries. A loaded, defaced Jennings 9mm semi-automatic was recovered. The subject had priors for robbery and weapons possession and had cannabinoids in his system at the time of the incident.

On December 10, at 1115 hours, in the confines of the Midtown North precinct, a plainclothes Anti-Crime sergeant and police officer approached a male black subject selling illegal compact discs in Times Square. Upon sighting the officers, the subject fled and the police gave chase. Witnesses state that during the pursuit the sergeant gave several verbal orders that the subject ignored, and that the subject then produced a machine-pistol type firearm and pointed it at the sergeant. It was at this point, witnesses state, that the sergeant drew his own firearm. The subject fired at least two rounds at the sergeant, missing; the sergeant returned four rounds, striking the subject and causing him to fall to the ground. Despite his wounds, the subject continued to resist. Only with the quick arrival of other officers were police able to secure him and remove a 9mm Masterpiece Arms MAC-10 from his grip. (The weapon had been reported stolen in Virginia in August; it had also suffered a malfunction during the exchange of gunfire.) Once in custody the subject was removed to Roosevelt Hospital where he succumbed to his injuries. The subject had several previous arrests and had cannabinoids in his system at the time of the incident.

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUBJECTS SHOT BY POLICE—RACE/ETHNICITY

| | 1998 | | 1999 | | 2000 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 2 | 3 | 1 | 1 | 0 | 6 |
| BLACK | 29 | 7 | 24 | 8 | 15 | 6 |
| HISPANIC | 12 | 9 | 7 | 2 | 4 | 2 |
| ASIAN | 0 | 0 | 0 | 0 | 1 | 0 |
| **TOTAL** | **43** | **19** | **32** | **11** | **20** | **14** |

| | 2001 | | 2002 | | 2003 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 2 | 0 | 0 | 0 | 1 | 1 |
| BLACK | 11 | 9 | 20 | 7 | 12 | 13 |
| HISPANIC | 4 | 2 | 4 | 6 | 10 | 0 |
| ASIAN | 0 | 0 | 0 | 0 | 1 | 0 |
| **TOTAL** | **17** | **11** | **24** | **13** | **24** | **14** |

| | 2004 | | 2005 | | 2006 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 1 | 1 | 4 | 0 | 1 | 1 |
| BLACK | 15 | 6 | 21 | 7 | 16 | 9 |
| HISPANIC | 7 | 4 | 3 | 2 | 6 | 3 |
| ASIAN | 0 | 0 | 1 | 0 | 0 | 0 |
| **TOTAL** | **23** | **11** | **29** | **9** | **23** | **13** |

| | 2007 | | 2008 | | 2009 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 0 | 2 | 0 | 2 | 0 | 0 |
| BLACK | 9 | 5 | 12 | 7 | 14 | 8 |
| HISPANIC | 9 | 3 | 6 | 4 | 6 | 4 |
| ASIAN | 1 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **19** | **10** | **18** | **13** | **20** | **12** |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUBJECTS SHOT BY POLICE—RACE/ETHNICITY






# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# APPENDIX — SUPPLEMENTAL DATA

| DAY OF WEEK | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| MONDAY | 3 | 2 | 1 | 1 | 7 |
| TUESDAY | 6 | 5 | 4 | 0 | 15 |
| WEDNESDAY | 7 | 6 | 4 | 1 | 18 |
| THURSDAY | 9 | 3 | 6 | 0 | 18 |
| FRIDAY | 6 | 7 | 2 | 1 | 16 |
| SATURDAY | 12 | 3 | 4 | 2 | 21 |
| SUNDAY | 4 | 2 | 1 | 2 | 9 |
| **TOTAL** | **47** | **28** | **22** | **7** | **104** |

| TOUR | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 0731-1530 | 11 | 7 | 10 | 5 | 33 |
| 1531-2330 | 22 | 16 | 9 | 0 | 47 |
| 2331-0730 | 14 | 5 | 3 | 2 | 24 |
| **TOTAL** | **47** | **28** | **22** | **7** | **104** |

| MONTH | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| JANUARY | 4 | 2 | 3 | 2 | 11 |
| FEBRUARY | 1 | 1 | 1 | 0 | 3 |
| MARCH | 3 | 2 | 1 | 0 | 7 |
| APRIL | 11 | 4 | 1 | 1 | 16 |
| MAY | 2 | 2 | 3 | 0 | 7 |
| JUNE | 3 | 3 | 1 | 1 | 8 |
| JULY | 4 | 4 | 2 | 0 | 10 |
| AUGUST | 1 | 2 | 2 | 2 | 7 |
| SEPTEMBER | 2 | 1 | 3 | 0 | 6 |
| OCTOBER | 8 | 3 | 1 | 1 | 13 |
| NOVEMBER | 7 | 1 | 1 | 0 | 9 |
| DECEMBER | 1 | 3 | 3 | 0 | 7 |
| **TOTAL** | **47** | **28** | **22** | **7** | **104** |

**ID-AC** – Intentional Discharge – Adversarial Conflict
**ID-AA** – Intentional Discharge – Animal Attack
**UD** – Unintentional Discharge
**UUF** – Unauthorized Use of Firearm

**These numbers do not include the one Mistaken Identity incident in 2009**

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| BOROUGH | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| BRONX | 16 | 10 | 2 | 0 | 25 |
| MANHATTAN | 8 | 4 | 4 | 0 | 16 |
| QUEENS | 6 | 3 | 4 | 1 | 14 |
| BROOKLYN | 17 | 8 | 6 | 2 | 33 |
| STATEN ISLAND | 0 | 2 | 2 | 0 | 4 |
| OUTSIDE CITY | 3 | 1 | 4 | 4 | 12 |
| **TOTAL** | **47** | **28** | **22** | **7** | **104** |

| MANHATTAN | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 1st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 5th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 6th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 7th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 9th PRECINCT | 0 | 0 | 1 | 0 | 0 |
| 10th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 13th PRECINCT | 0 | 0 | 1 | 0 | 2 |
| 14th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 17th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 18th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 19th PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 20th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 22nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 23rd PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 24th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 25th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 26th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 28th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 30th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 32nd PRECINCT | 2 | 1 | 0 | 0 | 3 |
| 33rd PRECINCT | 3 | 0 | 0 | 0 | 3 |
| 34th PRECINCT | 1 | 0 | 1 | 0 | 2 |
| **TOTAL** | **8** | **4** | **4** | **0** | **16** |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# APPENDIX — SUPPLEMENTAL DATA

| BRONX | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 40th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 41st PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 42nd PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 43rd PRECINCT | 3 | 1 | 0 | 0 | 4 |
| 44th PRECINCT | 2 | 2 | 0 | 0 | 4 |
| 45th PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 46th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 47th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 48th PRECINCT | 0 | 1 | 1 | 0 | 2 |
| 49th PRECINCT | 0 | 2 | 0 | 0 | 2 |
| 50th PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 52nd PRECINCT | 0 | 1 | 0 | 0 | 1 |
| **TOTAL** | **13** | **10** | **2** | **0** | **25** |

| BROOKLYN | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 60th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 61st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 62nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 63rd PRECINCT | 0 | 1 | 1 | 1 | 3 |
| 66th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 67th PRECINCT | 3 | 1 | 0 | 0 | 4 |
| 68th PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 69th PRECINCT | 2 | 2 | 0 | 0 | 4 |
| 70th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 71st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 72nd PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 73rd PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 75th PRECINCT | 2 | 1 | 2 | 0 | 5 |
| 76th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 77th PRECINCT | 3 | 0 | 0 | 0 | 3 |
| 78th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 79th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 81st PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 83rd PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 84th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 88th PRECINCT | 1 | 1 | 1 | 0 | 3 |
| 90th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 94th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **17** | **8** | **6** | **2** | **33** |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
# APPENDIX — SUPPLEMENTAL DATA

| STATEN ISLAND | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 120th PRECINCT | 0 | 1 | 1 | 0 | 2 |
| 122nd PRECINCT | 0 | 1 | 1 | 2 | 2 |
| 123rd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **0** | **2** | **2** | **2** | **4** |

| QUEENS | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 100th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 101st PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 102nd PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 103rd PRECINCT | 0 | 1 | 2 | 0 | 3 |
| 104th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 105th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 106th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 107th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 108th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 109th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 110th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 111th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 112th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 113th PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 114th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 115th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| **TOTAL** | **6** | **3** | **4** | **1** | **14** |

| DUTY STATUS | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| ON-DUTY | 61 | 33 | 14 | 0 | 108 |
| OFF-DUTY | 7 | 1 | 8 | 5 | 21 |
| **TOTAL (MOS firing)** | **68** | **34** | **22** | **5** | **129** |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| ID-AC | TYPE OF THREAT FROM SUBJECTS FIRED UPON | OFFICERS INVOLVED | SHOTS | INJURY FATALITY | # SUBJECTS FIRED UPON | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 1 | FIREARM - SUBJECT FIRED AT OFFICER | 2 | 2 and 1 | | 1 | Male | Hispanic | 25 | FIREARM |
| 2 | FIREARM - SUBJECT POINTED FIREARM | 1 | 5 | | 1 | Male | Black | 28 | FIREARM |
| 3 | FIREARM - SUBJECT POINTED FIREARM | 1 | 3 | FATAL | 1 | Male | Black | 18 | FIREARM |
| 4 | OFFICER PERCEIVED THREAT - OBJECT IN HAND | 1 | 1 | INJURY | 1 | Male | Hispanic | 27 | NONE |
| 5 | FIREARM - SUBJECT DISPLAYED FIREARM | 1 | 1 | INJURY | 1 | Male | Black | 18 | FIREARM |
| 6 | BLUNT INSTRUMENT- SUBJECT MENACED OFFICER | 1 | 1 | | 1 | Male | Black | 19 | METAL PIPE |
| 7 | BLUNT INSTRUMENT - SUBJECT ATTEMPTED TO HIT OFFICER | 1 | 3 | | 1 | Male | Black | 36 | VEHICLE |
| 8 | FIREARM - SUBJECT SHOT CIVILIANS | 1 | 3 | INJURY | 1 | Male | Hispanic | 18 | FIREARM |
| 9 | FIREARM - SUBJECT POINTED FIREARM | 1 | 5 | | 1 | Male | Black | 22 | FIREARM |
| 10 | OFFICER PERCEIVED THREAT - SUBJ. RUNNING FROM SHOOTING | 2 | 3 and 1 | | 1 | Male | Black | 24 | NONE |
| 11 | FIREARM - SUBJECT DISPLAYED FIREARM | 1 | 1 | INJURY | 1 | Male | Black | 34 | FIREARM |
| 12 | CUTTING INSTRUMENT - SUBJECT STABBED OFFICER | 2 | 2 and 3 | FATAL | 1 | Female | Black | 48 | KNIFE |
| 13 | CUTTING INSTRUMENT - SUBJECT ATTACKED OFFICERS | 2 | 2 and 4 | FATAL | 1 | Male | Hispanic | 35 | KNIFE |
| 14 | FIREARM - SUBJECT FIRED AT OFFICER | 2 | 1 and 6 | | 1 | Male | Hispanic | 21 | FIREARM |
| 15 | FIREARM - SUBJECT SHOT CIVILIAN | 1 | 1 | INJURY | 1 | Male | Black | 33 | FIREARM |
| 16 | FIREARM - SUBJECT FIRED AT OFFICER | 2 | 8 and 4 | INJURY | 1 | Male | Hispanic | 21 | FIREARM |
| 17 | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 2 | | 1 | Male | Black | 27 | FIREARM |
| 18 | FIREARM - SUBJECT DISPLAYED FIREARM | 1 | 1 | | 1 | Male | Black | 26 | FIREARM |
| 19 | CUTTING INSTRUMENT - SUBJECT STABBED OFFICER | 2 | 2 and 3 | INJURY | 1 | Male | Black | 32 | SCREWDRIVER |
| 20 | FIREARM - SUBJECT POINTED FIREARM | 4 | 1, 1, 2, 1 | | 1 | Female | Black | 31 | FIREARM |
| 21 | FIREARM - SUBJECT 1 FIRED AT OFFICER | 1 | 2 | FATAL | 2 | Male | Black | 21 | FIREARM |
| | FIREARM - SUBJECT 2 FIRED AT OFFICER | | | | | Male | Black | UNKNOWN | FIREARM |
| 22 | CUTTING INSTRUMENT - SUBJECT STABBED CIVILIAN | 3 | 1, 2, 2 | INJURY | 1 | Male | Hispanic | 35 | KNIFE |
| 23 | BLUNT INSTRUMENT - SUBJECT HIT OFFICER | 1 | 1 | | 1 | Male | Black | 19 | CROWBAR |
| 24 | FIREARM - SUBJECT POINTED FIREARM | 2 | 2 and 2 | INJURY | 1 | Male | Black | 34 | FIREARM |
| 25 | FIREARM - SUBJECT POINTED FIREARM | 1 | 3 | INJURY | 1 | Male | Hispanic | 48 | FIREARM |

# 2009 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| D-AC | TYPE OF THREAT FROM SUBJECTS FIRED UPON | OFFICERS INVOLVED | SHOTS | INJURY FATALITY | SUBJECTS FIRED UPON | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 26 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | INJURY | 1 | Male | Black | 43 | FIREARM |
| 27 | OVERWHELMING PHYSICAL FORCE - SUBJECT ATTACKED & GRABBED OFFICER'S GUN | 1 | 2 | FATAL | 1 | Male | Black | 49 | NONE |
| 28 | BLUNT INSTRUMENT - SUBJECT ATTEMPTED TO HIT OFFICER | 1 | 2 | FATAL | 1 | Male | Hispanic | 28 | VEHICLE |
| 29 | FIREARM - SUBJECT FIRED AT OFFICER | 3 | 20, 4, 6 | FATAL | 1 | Male | Hispanic | 31 | FIREARM |
| 30 | FIREARM - SUBJECT DISPLAYED FIREARM | 1 | 2 | INJURY | 1 | Male | Black | 22 | FIREARM |
| 31 | KNIFE - SUBJECT STABBED OFFICER | 3 | 2, 1, 3 | FATAL | 1 | Male | Hispanic | 20 | KNIFE |
| 32 | FIREARM - SUBJECT POINTED FIREARM | 2 | 2 and 5 | INJURY | 1 | Male | Black | 21 | FIREARM |
| 33 | FIREARM - SUBJECT POINTED FIREARM | 1 | 2 | INJURY | 1 | Male | Black | 17 | FIREARM |
| 34 | KNIFE - SUBJECT MURDERED CIVILIAN | 1 | 6 | FATAL | 1 | Male | Black | 21 | KNIFE |
| 35 | KNIFE - SUBJECT ROBBED OFFICER | 1 | 1 | INJURY | 1 | Male | Black | 18 | KNIFE |
| 36 | FIREARM - SUBJECT DISPLAYED FIREARM | 1 | 1 | | 1 | Male | Black | 20 | FIREARM |
| 37 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | | 1 | Male | Black | 22 | FIREARM |
| 38 | OVERWHELMING PHYSICAL FORCE - SUBJECT HELD OFFICER WHILE ACCOMPLICE THREATENED WITH BLUNT INSTRUMENT | 1 | 1 | INJURY | 1 | Male | Hispanic | 18 | STEEL GARBAGE CAN (ACCOMPLICE) |
| 39 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | | 1 | Male | Hispanic | 19 | FIREARM |
| 40 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | INJURY | 1 | Male | Black | 15 | FIREARM |
| 41 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | INJURY | 1 | Male | Black | 25 | FIREARM |
| 42 | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 5 | | 1 | Male | Black | 25 | FIREARM |
| 43 | FIREARM - SUBJECT 1 SHOT CIVILIAN | 2 | 3 and 1 | INJURY | 2 | Male | Black | 19 | FIREARM |
| | FIREARM - SUBJECT 2 POINTED FIREARM | | | FATAL | | Male | Black | 43 | FIREARM |
| 44 | OFFICER PERCEIVED THREAT - SUBJECT BURGLARIZED OFFI-CER'S HOME | 1 | 1 | | 1 | Male | Black | UNKNOWN | NONE |
| 45 | KNIFE - SUBJECT THREATENED CIVILIANS | 1 | 1 | INJURY | 1 | Male | Black | 23 | KNIFE |
| 46 | FIREARM - SUBJECT POINTED FIREARM | 3 | 8, 1, 6 | FATAL | 1 | Male | Black | 18 | FIREARM |
| 47 | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 4 | FATAL | 1 | Male | Black | 25 | FIREARM |

**THIS PAGE INTENTIONALLY LEFT BLANK**

**NYPD**

# RAYMOND W. KELLY
# POLICE COMMISSIONER

## MICHAEL J. FARRELL
## DEPUTY COMMISSIONER, STRATEGIC INITIATIVES

### DEPUTY CHIEF JOHN K. DONOHUE
### COMMANDING OFFICER, OFFICE OF MANAGEMENT ANALYSIS AND PLANNING

New York City Police Department
Office of Management Analysis and Planning
Special Projects Team
Inspector Terrence M. Riley, Commanding Officer

Lieutenant Thomas J. Taffe
Detective Jonathan C.W. Murad
Detective Charles M. Mills
Police Officer Cheryl Shea
Staff Analyst Louisa Aviles

# NEW YORK CITY POLICE DEPARTMENT

## ANNUAL FIREARMS DISCHARGE REPORT



# ANNUAL FIREARMS DISCHARGE REPORT

# 2010

## RAYMOND W. KELLY
### POLICE COMMISSIONER

© 2011, NYPD

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# TABLE OF CONTENTS

**PAGE**

EXECUTIVE SUMMARY.......... vii
GLOSSARY OF TERMS.......... viii
THE ANNUAL FIREARMS DISCHARGES REPORT: AN INTRODUCTION.......... xi
2010 FIREARMS DISCHARGE SCOPE.......... xiii
HISTORICAL SNAPSHOT 1999-2009.......... xiv
2010 FIREARMS DISCHARGE SNAPSHOT.......... xv
USE OF FORCE.......... xvii
THE INVESTIGATION AND REVIEW PROCESS.......... xxi
ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION.......... xxv

**ANALYSIS OF 2010 FIREARMS DISCHARGES BY CATEGORY**

**INTENTIONAL DISCHARGE–ADVERSARIAL CONFLICT**
OVERVIEW.......... 3
REASONS FOR DISCHARGES.......... 3
DATES AND TIMES OF DISCHARGES.......... 3
LOCATIONS OF DISCHARGES.......... 3
REASONS OFFICER INVOLVED.......... 6
OFFICER RESTRAINT.......... 7
OFFICER PEDIGREE.......... 9
SUBJECT PEDIGREE.......... 12
INCIDENT OUTCOMES.......... 15
CONCLUSION.......... 18

**INTENTIONAL DISCHARGE–ANIMAL ATTACK**
OVERVIEW.......... 21
REASONS FOR DISCHARGES.......... 21
DATES AND TIMES OF DISCHARGES.......... 21
LOCATIONS OF DISCHARGES.......... 22
REASONS OFFICER INVOLVED.......... 23
OFFICER RESTRAINT.......... 26
OFFICER PEDIGREE.......... 27
INCIDENT OUTCOMES.......... 29
CONCLUSION.......... 30

**UNINTENTIONAL DISCHARGE**
OVERVIEW.......... 31
REASONS FOR DISCHARGES.......... 31
PURELY UNINTENTIONAL DISCHARGES.......... 31
UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT.......... 32

PAGE

## ANALYSIS OF 2010 FIREARMS DISCHARGES BY CATEGORY continued

### UNAUTHORIZED USE OF A FIREARM

OVERVIEW.......... 35
SUICIDE.......... 35
DISCHARGE BY OTHER THAN OFFICER.......... 35
OTHER.......... 35
OUTCOME.......... 35

## APPENDIX

HISTORICAL DATA.......... 41
FIREARMS TRAINING.......... 44
ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE.......... 47
SUBJECTS SHOT BY POLICE BY RACE/ETHNICITY, SINCE 1997.......... 51
SUPPLEMENTAL DATA.......... 53

# 2010 ANNUAL FIREARMS DISCHARGE REPORT TABLES, CHARTS, AND FIGURES


| | | PAGE |
|---|---|---|
| | Firearms Discharge Scope | xiii |
| | Historical Snapshot by Category, 2000–2010 | xiv |
| | Total Incidents for Year, 2000–2010 | xiv |
| | Adversarial Conflict, 2000–2010 | xiv |
| | Unintentional Discharge, 2000–2010 | xiv |
| | Animal Attack, 2000–2010 | xiv |
| | Comparison, 2009 to 2010 | xv |
| | Breakdown by Category, 2010 | xv |
| | **INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** | |
| A.1 | Type of Threat Intentional Discharge–Adversarial Conflict (ID-AC) | 3 |
| A.2 | Precincts with More than One ID-AC Incident | 4 |
| A.3 | ID-AC Incidents By Borough | 4 |
| A.4 | MAP: Locations of ID-AC vs Locations of Criminal Shootings, 2010 | 5 |
| A.5 | Criminal Shootings vs ID-AC Incidents, Frequency by Borough | 6 |
| A.6 | Criminal Shootings vs ID-AC Incidents, Percentage by Borough | 6 |
| A.7 | Officers' On-duty Assignments | 7 |
| A.8 | Officers' Actions Prior to On-duty Shooting | 7 |
| A.9 | Shots Fired by Officers | 8 |
| A.10 | Shots Fired per Incident | 8 |
| A.11 | Distance in Feet of 38 Reporting Officers | 9 |
| A.12 | Race/Ethnicity of Officers | 10 |
| A.13 | Years of Service | 11 |
| A.14 | Rank of Officers Involved in ID-AC Incidents | 11 |
| A.15 | Race/Ethnicity of 34 Subjects Involved in ID-AC Incidents | 12 |
| A.16 | Race/Ethnicity of 9 Subjects Firing on Officers | 13 |
| A.17 | 31 Known Subjects with Prior Arrests | 13 |
| A.18 | Subjects Involved in ID-AC Incidents vs Persons Arrested for Firearms Possession, 2010 | 14 |
| A.19 | Subjects Who Fired on Police vs Criminal Shooting Suspects, 2010 | 14 |
| A.20 | Weapons Possessed/Used by Subjects | 15 |
| A.21 | Actions of Subjects Shot and Killed | 17 |
| A.22 | Actions of Subjects Shot and Injured | 17 |
| | **INTENTIONAL DISCHARGE – ANIMAL ATTACK** | |
| B.1 | Overview Table | 21 |
| B.2 | Intentional Discharge–Animal Attack Incidents (ID-AA), by Tour | 22 |
| B.3 | Jurisdiction of Incidents | 22 |
| B.4 | ID-AA Incidents by Borough | 23 |
| B.5 | Locations of Animal Attacks | 23 |
| B.6 | MAP: Locations of 2010 ID-AA Incidents (27 Incidents) | 24 |
| B.7 | Type of Job to Which Officer Was Assigned | 25 |
| B.8 | Command/Precinct of Assignment, Two or More Officers | 25 |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# TABLES, CHARTS, AND FIGURES

**PAGE**

**INTENTIONAL DISCHARGE – ANIMAL ATTACK** continued

B.9 Officer Assignment (38 Officers)........ 25
B.10 Shots Fired per Officer........ 26
B.11 Shots Fired per Incident........ 26
B.12 Race/Ethnicity of Officers........ 27
B.13 Rank of Officers Involved in ID-AA Incidents........ 28
B.14 Years of Service........ 29

**UNINTENTIONAL DISCHARGE**

C.1 Findings, All Unintentional Discharges........ 33

**UNAUTHORIZED USE OF A FIREARM**

D.1 Suicide/Attempt, 2001 to 2010........ 35

**APPENDIX**

Officers Shot and Injured by Subjects, 1971–2010........ 41
Officers Shot and Killed by Subjects, 1971–2010........ 41
Subjects Shot and Injured by Officers, 1971–2010........ 42
Subjects Shot and Killed by Officers, 1971–2010........ 42
Total Shots Fired, 1971–2010........ 43
Total Incidents, 1971–2010........ 43
Center Mass........ 45
Subjects Shot by NYPD Officers by Race/Ethnicity, Trends, 1997–2010........ 51
Gunfire in New York City by Race/Ethnicity, 2010........ 51
Subjects Shot by Police by Race/Ethnicity, Tables,, 1999–2010........ 52
Discharge Incidents by Day of Week........ 53
Discharge Incidents by Tour........ 53
Discharge Incidents by Month........ 53
Discharge Incidents by Borough........ 54
Discharge Incidents by Precinct........ 54
Discharge Incidents by Duty Status........ 56
Breakdown by Incident, 2010........ 57

## EXECUTIVE SUMMARY

In 2010, the New York City Police Department saw a 13 percent decrease in the number of firearms discharges from 2009: 92 total incidents in 2010, down from 106 in 2009. This is the smallest number of firearms discharges since the recording of police shootings in the City began. Furthermore, the most serious category of discharges—shootings involving adversarial conflict with a subject—experienced an even larger decline, down 30 percent from 2009. In a city of 8.2 million people, from a Department of nearly 35,000 uniformed members who interacted with citizens in approximately 23 million instances, 52 officers were involved in 33 incidents of intentional firearms discharges during an adversarial conflict, with 16 subjects injured and eight killed. These numbers are all record lows.

The figures are a testament to police officers' restraint, diligence, and honorable performance of duty. But they also show that, over the past four decades, the drastic reduction in violent crime over the past decade has meant that criminals and police enter into conflict less often.

Neither the Department nor the officer on the street can afford complacency, however. Perpetrators shot and injured two officers in 2010—one of whom survived because of his bullet-resistant vest.

### 2010 vs 2009

In 2010, total firearms discharges **decreased 13 percent** compared to the previous year.

The greatest reduction was realized in the category of Intentional Discharge–Adversarial Conflict, which was **reduced by 30 percent** from 2009.

Intentional Discharge–Animal Attack **increased by 7 percent** from 2009.

Unintentional Discharges decreased in 2010, **down 9 percent** from 2009.

The number of Unauthorized Discharges **increased by 14 percent** from the previous year.

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# GLOSSARY OF TERMS

| | |
|---|---|
| **Officer** | For this publication, refers to a sworn Uniformed Member of the New York City Police Department of any rank. |
| **Subject** | A person engaged in adversarial conflict with an officer or a third party, in which the conflict results in a firearms discharge. |
| **Civilian** | A person who is not the subject in the adversarial conflict but is included as a victim, bystander, and/or injured person. |
| **Firearms Discharge** | An incident in which an officer of the New York City Police Department discharges *any* firearm, or when a firearm belonging to an officer of the New York City Police Department is discharged by *any* person. This does not include a discharge during an authorized training session nor while lawfully engaged in target practice or hunting. Additionally, it does not include a firearms discharge at a firearms safety station within a Department facility. |
| **Intentional Firearms Discharge – Adversarial Conflict** | A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. This does not include discharging a firearm against an animal attack. |
| **Intentional Firearms Discharge – Animal Attack** | A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another against an animal attack. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. |
| **Intentional Firearms Discharge – No Conflict** | A firearms discharge in which an officer intentionally discharges a firearm to summon assistance. May include firearms discharges that are determined to be legally justified but outside Department guidelines. |
| **Unintentional Firearms Discharge** | A firearms discharge in which an officer discharges a firearm without intent, regardless of the circumstance. Commonly known as an *accidental discharge*. |
| **Unauthorized Use of a Firearm** | A firearms discharge that is considered unauthorized and is not listed as an intentional firearms discharge. In these instances the firearm is being discharged without proper legal justification and/or outside the scope of the officer's employment. This includes instances when an unauthorized person discharges an officer's firearm. |
| **Use/threaten the Use of a Firearm** | A contributing factor in which a subject discharges or threatens the discharge of a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening the use of a firearm. |
| **Firearm** | For this publication, includes any pistol, revolver, shotgun, rifle, or variation of such. |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## GLOSSARY OF TERMS

**Imitation Firearm** For this publication, includes any instrument that is designed by the manufacturer or modified by a person to appear as if it were a firearm. This includes air pistols, toy guns, prop guns, and replicas.

**Use/threaten the Use of a Cutting Instrument** A contributing factor in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument.

**Cutting Instrument** For this publication, includes any knife, razor, sword, or other sharp-edged instrument, such as a broken bottle.

**Use/threaten the Use of a Blunt Instrument** A contributing factor in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument.

**Blunt Instrument** For this publication, includes any solid bat, stick, pipe, metal knuckles, or other instrument that, when used as a weapon, can cause blunt-force trauma to an individual. This includes automobiles and unbroken bottles.

**Use/threaten the Use of Overwhelming Physical Force** An incident in which an unarmed subject or subjects physically attack a person or threaten or attempt to do the same, and while doing so put the person at risk of serious physical injury or death. This includes gang attacks and attempting to push a person from a roof or train platform. This also includes attempting to take an officer's firearm.

**Proactive Policing** Instances in which officers engage in operations or activities that actively seek out violators of the law. This includes undercover operations, traffic enforcement, checkpoints, verticals, street narcotics enforcement, warrant execution, quality-of-life enforcement, and Anti-Crime operations.

**Reactive Policing** Instances in which officers respond to a call for service from the public. This includes calls of a man with a gun, crimes in progress, domestic disputes, and quality-of-life complaints. This also includes calls for service in which proactive police units respond.

**Attacked** Instances in which officers are not engaging in proactive or reactive policing but are set upon by a subject. This includes off-duty instances when the officer is a victim of a crime (e.g., robbery, burglary, assault), or involved in an altercation that is escalated by the subject (e.g., a traffic incident, a neighbor dispute). This also incorporates instances in which on-duty officers are performing administrative or non-patrol assignments (e.g., guarding a prisoner, processing reports, securing a location).

**THIS PAGE INTENTIONALLY LEFT BLANK**

## THE ANNUAL FIREARMS DISCHARGE REPORT: AN INTRODUCTION

One of the most abrupt, dynamic, and potentially traumatic incidents that can happen in a police officer's career is the line-of-duty discharge of his or her firearm. As much as handcuffs, the uniform, or the shield, the gun is a symbol of the officer's authority. It is, moreover, a physical embodiment of the officer's responsibility. The weapon on an officer's hip is a constant reminder—for officer and citizen alike—of the officer's role and the trust society has given.

More than forty years ago, the New York City Police Department adopted Department Order SOP 9 (s.69) and began to collect in-depth documentation of discharges during hostile encounters, for the stated purpose of "[increasing] the safety potential of each member of the force." The policy quickly expanded beyond police-involved combat, however, and came to include the study of all firearms discharges by police. Since the early 1970s, the NYPD has endeavored to record and evaluate every instance in which an officer discharges his or her weapon, whether the discharge occurs purposefully, accidentally, or, in rare instances, criminally.

The SOP 9 process has been demonstrably effective. When annual recordkeeping began in 1971, there were 12 NYPD officers shot and killed by another person; 47 officers were shot and injured. Officers, in turn, shot and mortally wounded 93 subjects, and another 221 subjects were injured by police gunfire. These statistics are difficult to conceive of today. ***In 2010, two NYPD officers were shot by criminal subjects, while police shot and mortally wounded eight subjects, and injured 16***. Four decades of annual analyses have altered the way officers respond to, engage in, and even assess the need for firearms discharges. Information gleaned from the annual reports has saved the lives of citizens and officers alike, and there has been Department-wide change—tactical, strategic, and cultural—with regard to how officers use and control their firearms. The Department has made restraint the norm.

Today, the reports serve an additional but equally important role: they are statistical engines for the development of training, the adoption of new technologies, and even the deployment of Department assets. New instructional scenarios are implemented from these reports, new hardware—from bullet-resistant vests to speed loaders to semi-automatic handguns to controlled-energy devices—is introduced.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

## CATEGORIES

The 2010 Annual Firearms Discharge Report is subdivided into five categories. Each category is analyzed based only on the information in that category. This allows the Department to better understand a specific type of incident and adjust training and policy to continue to reduce those incidents.

Firearms discharges are broken down into five categories.

- **Intentional Discharge–Adversarial Conflict**: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- **Intentional Discharge–Animal Attack**: when an officer intentionally discharges his or her firearm to defend against an animal attack
- **Unintentional Discharge**: when an officer unintentionally discharges his or her firearm
- **Unauthorized Use of a Firearm**: when an officer discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm
- **Mistaken Identity**: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

The following pages present an overview of the laws and policies that relate to an officer's ability to use force, a delineation of the Department's investigatory process for officer-involved shootings, and an analysis of the year's firearms discharges, grouped according to the categories above. This report contains information compiled from preliminary and final shooting reports, detective case files, medical examiner reports, Firearms Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous yearly firearms discharge reports, as well as information complied from city and state computer databases and official websites.

It should be noted that, insofar as statistical analysis is concerned, the small sample studied for this document—92 discharge incidents total, only 33 of them in the category of "adversarial conflict"—limits the predictive value and conclusions that may be derived.

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## FIREARMS DISCHARGE SCOPE

| CATEGORY | TOTAL NUMBER |
|---|---|
| **NEW YORK CITY**<br>TOTAL POPULATION<br>(U.S. Census, April 1, 2010) | 8,175,133 |
| **NYPD**<br>TOTAL OFFICER STAFFING<br>(2010 year-end total) | 34,565 |
| TOTAL CIVILIAN CONTACTS (APPROXIMATE) | 23,000,000 |
| TOTAL RADIO-RECEIVED ASSIGNMENTS | 4,481,440 |
| RADIO ASSIGNMENTS INVOLVING WEAPONS | 206,874 |
| ARRESTS INVOLVING WEAPONS USED/DISPLAYED/POSSESSED | 28,880 |
| GUN ARRESTS | 6,021 |
| CRIMINAL SHOOTING INCIDENTS | 1,473 |
| OFFICERS FIRING DURING INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 52 |
| INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 33 |
| SUBJECTS SHOT AND INJURED | 16 |
| SUBJECTS SHOT AND KILLED | 8 |
| OFFICERS SHOT AND INJURED | 2 |
| OFFICERS SHOT AND KILLED | 0 |
| **NOTE:** ***all numbers are for CY 2010*** | |

**NOTE:** The numbers and percentages described in this report are often rounded to the nearest whole number and are preliminary and subject to further review.

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# HISTORICAL SNAPSHOT 2000-2010

| CATEGORY | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADVERSARIAL CONFLICT | 63 | 57 | 55 | 61 | 51 | 59 | 59 | 45 | 49 | 47 | 33 |
| ANIMAL ATTACK | 39 | 40 | 38 | 35 | 26 | 32 | 30 | 39 | 30 | 28 | 30 |
| UNINTENTIONAL DISCHARGE | 26 | 27 | 24 | 25 | 27 | 25 | 26 | 15 | 15 | *23 | 21 |
| MISTAKEN IDENTITY | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| UNAUTHORIZED USE – FIREARM** | 1 | 7 | 0 | 2 | 5 | 6 | 8 | 6 | 3 | 4 | 6 |
| SUICIDE/ATTEMPT | 5 | 5 | 2 | 7 | 5 | 3 | 3 | 6 | 8 | 3 | 2 |
| **TOTAL INCIDENTS FOR YEAR** | **134** | **136** | **119** | **130** | **114** | **125** | **127** | **111** | **105** | ***106** | **92** |

* These numbers were modified from last year's reports to include a previously unreported incident.
** This category was modified in 2005 to include incidents in which an officer's firearm is discharged by persons other than the officer (e.g., a family member accidentally discharges the weapon, a perpetrator gains control of an officer's firearm and discharges it, etc.).












# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# FIREARMS DISCHARGE SNAPSHOT

| CATEGORY | 2009 | 2010 | %CHANGE |
|---|---|---|---|
| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 47 | 33 | -30% |
| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 28 | 30 | 7% |
| MISTAKEN IDENTITY | 1 | 0 | N/A |
| UNINTENTIONAL DISCHARGE | *23 | 21 | -9% |
| UNAUTHORIZED USE OF FIREARM | 7 | 8 | 14% |
| **TOTAL FIREARM DISCHARGES FOR YEAR** | ***106** | **92** | **-13%** |
| TOTAL OFFICERS FIRING (includes all categories) | *131 | 115 | -12% |
| TOTAL SHOTS FIRED (includes all categories) | *297 | 368 | 24% |
| TOTAL OFFICERS SHOT AND INJURED BY SUBJECT | 0 | 2 | N/A |
| TOTAL OFFICERS SHOT AND KILLED BY SUBJECT | 0 | 0 | 0 |
| TOTAL SUBJECTS SHOT AND INJURED BY OFFICER | 20 | 16 | -20% |
| TOTAL SUBJECTS SHOT AND KILLED BY OFFICER | 12 | 8 | -33% |

* Number modified from last year's report to include previously unreported incident

## BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 2010 |
|---|---|
| SUBJECT USED/THREATENED THE USE OF A FIREARM | 21 |
| SUBJECT USED/THREATENED THE USE OF A CUTTING INSTRUMENT | 8 |
| SUBJECT USED/THREATENED THE USE OF A BLUNT OBJECT | 1 |
| SUBJECT USED/THREATENED THE USE OF OVERWHELMING PHYSICAL FORCE | 1 |
| OFFICER PERCEIVED THREAT OF DEADLY PHYSICAL FORCE | 2 |
| **TOTAL** | **33** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 2010 |
|---|---|
| DOG ATTACK | 29 |
| OTHER ANIMAL ATTACK | 1 |
| **TOTAL** | **30** |

| UNINTENTIONAL DISCHARGE | 2010 |
|---|---|
| DURING ADVERSARIAL CONFLICT | 6 |
| HANDLING FIREARM | 15 |
| **TOTAL** | **21** |

| UNAUTHORIZED USE OF FIREARM | 2010 |
|---|---|
| SUICIDE | 2 |
| ATTEMPTED SUICIDE | 0 |
| UNAUTHORIZED INTENTIONAL DISCHARGE | 2 |
| UNAUTHORIZED PERSON DISCHARGED OFFICER'S FIREARM | 4 |
| **TOTAL** | **8** |

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 255 of 740
PageID #: 1805


**THIS PAGE INTENTIONALLY LEFT BLANK**

## USE OF FORCE

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect arrest or prevent escape, as well as to protect property or people. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing malefactors and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance, and the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist police—officers have an ascending array of force options to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., pepper spray), impact weapons like batons, and, finally, deadly physical force. All of these are tools at the officer's disposal, and the officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm—or vice versa—if the situation dictates.

But an officer's permission to use force is not unlimited. According to both federal and state law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary. Reasonableness, more than any other factor, is the most salient aspect of an officer's legitimate use of force.

In federal case law, both Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989) delineate a standard of "objective reasonableness" (Graham) that restricts an officer's prerogative to compel or constrain another citizen. Tennessee v. Garner, while disallowing the use of deadly physical force against any felon, affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. And the state limits an officer's ability to exercise *deadly* physical force even further—Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three very specific instances: 1) when the subject has committed or is attempting to commit a felony *and* is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary; 2) when an armed felon resists arrest or flees; and 3) when the use of deadly physical force is necessary to defend a person from "what the officer reasonably believes to be the use or imminent

use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and warns that "EXCESSIVE FORCE WILL NOT BE TOLERATED" (Patrol Guide 203-11). Specifically regarding the use of deadly physical force, the NYPD states that "Uniformed members of the service should use only the minimal amount of force necessary to protect human life" (Patrol Guide 203-12).

**GUIDELINES FOR THE USE OF FIREARMS**

To this end, the Department promulgates nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

> Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.
>
> Police officers shall not discharge their weapons when doing so will unnecessarily endanger innocent persons.
>
> Police officers shall not discharge their weapons in defense of property.
>
> Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.
>
> Police officers shall not fire warning shots.
>
> Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.
>
> Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.
>
> Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.
>
> Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

**REASONABLENESS**

In the final telling, both legal standards and the Department's expectations assess the appropriateness of an officer's exercise of deadly physical force based on reasonableness. Police are regularly exposed to highly stressful, dangerous situations, and the risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Holmes noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, the Supreme Court wrote, in Graham v. Connor, that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51

NY2d 267, 271, the New York courts wrote "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good.

**TRAINING**

Latitude is not unrestricted discretion, of course, but rather an admission that reasonableness is fluid. In order to make the right conclusion about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, and skill, but most of all, on training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The main purpose of the Annual Firearms Discharge Report is to ensure that the NYPD's training is the best it can be.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INVESTIGATION

The New York City Police Department recognizes the serious nature of police-involved firearms discharges, and it seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents: 1) Patrol Guide Procedure 212-29; and 2) a handbook entitled "The Firearms Discharges Investigation Manual; The NYPD guide to the preparation of a Shooting Incident Report."

### THE SHOOTING TEAM

When an officer discharges his or her firearm, on- or off-duty, or when a firearm owned by an officer is discharged, a patrol supervisor responds to the incident and takes charge of the scene and secures and inspects the involved officer's firearm. He or she also immediately notifies the chain of command. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, and begins by contacting and conferring with the District Attorney. In many instances—including nearly every instance in which a subject is killed or injured—the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to a Breathalyzer test. He or she is also automatically reassigned to an administrative position for a minimum of the next three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, area searches, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

### THE SHOOTING INCIDENT REPORT

A preliminary report—written usually within 8-hours of the incident—outlines, as much as possible, the shooting incident; however, the rapidly evolving nature of shooting investigations means information contained therein is unavoidably preliminary. The primary means of mitigating this is the use of the Firearms Discharge Investigation Manual.

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination, however, nor from commenting on the apparent tactics utilized during the incident.

### THE FINAL REPORT

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data is unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting-team leader (e.g., detective's case files, forensic results, and medical reports). And because information is more extant, more complete subjective assessments are possible.

Generally, with regard to discharges that occur during adversarial conflict and involve injury or death to a subject, the final report cannot be finished within the 90-day period. Instead, it must wait until the investigation into the incident has been completed, or at least until the district attorney from the county of occurrence has permitted the officer or officers who shot to be interviewed. At times it must wait even longer, until all relevant legal proceedings have been concluded.

When a final report is delayed—whether because of ongoing legal proceedings or incomplete investigations—the Borough Investigation Unit submits monthly interim-status reports. Once the final report is finished, however, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After a firearms discharge has been investigated and the final report has been prepared, and after the District Attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination in order to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

### THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered, and conducted at the borough and executive levels. Members of the borough Firearms Discharge Advisory Board are supervisors assigned to the borough in which the incident took place. This board further scrutinizes the incident, with the benefit of new material contained in the final report. Based on the accumulated evidence, the borough Firearms Discharge Advisory Board issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board for determination.

### THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The Department's Firearms Discharge Review Board is the penultimate arbiter of any given discharge incident. It issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The Review Board gives due consideration to and often concurs with the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report—a single document that memorializes and synthesizes the whole of the exhaustive investigation and review process—and presents it to the Police Commissioner.

### THE POLICE COMMISSIONER

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination as to the incident.

Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2010 findings are published throughout this report.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION

An officer discharges a firearm **or** a firearm owned by an officer is discharged.

A **supervisor** responds, secures the scene and the firearm in question, and makes proper notifications.

A Shooting Team is established and a shooting-team leader (**Captain**) responds to conduct an investigation.

The **Duty Inspector** responds and supervises the investigation.

The shooting-team leader prepares a preliminary Shooting Incident Report, which is submitted to the **Chief of Department.**

The **Commanding Officer** of the precinct of occurrence or of the Borough Investigations Unit prepares a final report within 90 days and submits it to the **Chief of Department.**

**The Borough Firearms Discharge Advisory Board** formally reviews the incident and submits preliminary findings and recommendations to the **Chief of Department**.

**The Chief of Department Firearms Discharge Review Board** reviews the incident and Borough Advisory Board findings and recommendations and then makes a determination.

If the discharge results in injury, **the Internal Affairs Bureau** Command Center is notified and IAB members respond to assist in the investigation; additionally, the officer who fired must submit to a Breathalyzer test.

The **District Attorney** is notified in **all** cases and conducts a separate investigation (if warranted). The DA may present the case to a Grand Jury to determine justification.

The **Duty Chief** is notified and responds to supervise investigations for discharges that result in a serious injury by gunfire or death to anyone or when an officer is injured by gunfire.

The morning after the shooting incident, the applicable Borough Chief or Bureau Chief and executive staff meet with and brief the **Police Commissioner.**

If the officer receives *charges and specifications* the case is sent to the **Department Advocate** for a Department Trial.

In all matters related to the incident, the final determination rests with the **Police Commissioner**.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2010 FIREARMS DISCHARGES BY CATEGORY

**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

There were 33 incidents of intentional firearms discharge during an adversarial conflict in 2010. This represents a 30 percent decrease from 2009. Fifty-two officers intentionally fired their weapons during these incidents, down 24 percent from 2009.

Four officers were injured by gunfire during these incidents. Two were shot by subjects and two were shot by other officers owing to crossfire.* No officers were killed during these incidents.

There were 34 subjects involved in these 33 conflicts. Sixteen subjects were injured and eight subjects were killed.

## REASONS FOR DISCHARGES

Officers intentionally discharging their firearms during adversarial conflict did so to defend themselves or others from the threat of serious physical injury or death.

In the majority of these incidents (64 percent) the threat came in the form of a firearm. Officers also acted to defend themselves or others from the use or threat of a blunt instrument (3 percent), the use or threat of a cutting instrument (24 percent), a perceived threat (6 percent), or the use or threat of overwhelming physical force (3 percent) [see Figure A.1].

*Crossfire incidents are distinguished from Mistaken Identity Discharges by the shooting officer's intent: in crossfire incidents, the officer who fired did not intend to shoot the officer he or she struck, whereas in incidents of mistaken identity, the shooting officer is purposefully firing upon the subject officer in the mistaken belief that the subject officer is a perpetrator. A crossfire incident always involves injury or death; mistaken identity incidents can involve a discharge with no hits. There were no mistaken identity incidents in 2010. See the Mistaken Identity chapter, page 37.

## DATES AND TIMES OF DISCHARGES

Adversarial-conflict incidents in 2010 occurred evenly over the four quarters of the year. Each quarter had between seven and nine incidents. Five incidents occurred in October, but each month had at least one incident.

The distribution was fairly equal over the three platoons, or police shifts, with ten occurring in the first platoon, ten in the second, and 13 in the third. Thirty percent of the incidents occurred on Mondays.

## LOCATIONS OF DISCHARGES

Of the 33 incidents, three discharges took place in or on New York City Housing Authority (NYCHA) premises, and 30 occurred in the jurisdiction of the patrol precincts.




Figure A.1

For management purposes, the Police Department divides New York City's five geographic boroughs or counties into eight "Patrol Boroughs." Each of these patrol boroughs has eight to 12 police precincts, with the exception of Staten Island, which has three.

Half of the incidents occurred in Brooklyn, with eight incidents in Brooklyn South and eight incidents in Brooklyn North. Seven incidents occurred in The Bronx. Percentages of discharges per borough are depicted in Figure A.3, below.

These incidents took place in 25 separate precincts, down from 27 in 2009. Six precincts experienced two incidents (down from 11 in 2009), and the 67 Precinct had three (as it did in 2009) [see Figure A.2].

Two-thirds of the incidents occurred outside.

**LOCATIONS OF CRIMINAL SHOOTINGS**

When the locations of police-involved shootings are compared to the locations of criminal shootings in 2010, an explicit association appears. The map on the next page [Figure A.4] depicts the precise location of the city's 1,473 criminal shootings (represented by blue asterisks) and overlays them with all 33 incidents of intentional discharge during adversarial conflict (represented by red dots) that occurred in 2010. The map shows, very clearly, that police go where they are needed: police firearms discharges occur in those areas of the city most plagued by gun violence.




Figure A.2




Figure A.3

**LOCATIONS OF 33 INTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT vs LOCATIONS OF 1,473 CRIMINAL SHOOTINGS, 2010**



● RED — INTENTIONAL FIREARMS DISCHARGE BY POLICE DURING ADVERSARIAL CONFLICT

✳ BLUE — CRIMINAL SHOOTINGS

Figure A.4

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE–ADVERSARIAL CONFLICT

As seen in Figure A.6, below, the association also exists with regard to relative rate—on a percentage-by-borough basis, police-involved shootings and criminal shootings are analogous, as well. Of course, given that there are nearly 45 criminal shootings for each police discharge citywide, the rates are not entirely parallel. Brooklyn South and the Bronx each saw appreciable differences between the percentages of the two categories.

Despite this association, the absolute number of these police-discharge incidents is small when compared to the number of criminal shootings [see Figure A.5]. Only 2 percent of the city's shooting incidents involve police.

## REASONS OFFICER INVOLVED

Officers become involved in incidents of intentional discharge during adversarial conflict




Figure A.5




Figure A.6

for a variety of reasons. The Annual Firearms Discharge Report categorizes incidents by whether the officers involved were engaged in reactive police work (39 percent) or proactive police work (61 percent).

Of on-duty officers discharging their firearms during these incidents, most were performing patrol duties (57 percent). This is unsurprising, as the Patrol Bureau forms the Department's core and is staffed accordingly. An additional third of those officers firing were assigned Anti-Crime units (32 percent), which actively seek out armed criminals and violent perpetrators. Although this is disproportional to these units' small numbers—officers assigned to Anti-Crime make up less than 8 percent of any given precinct's headcount—it is predictable given the units' mandate [see Figure A.7].




Figure A.7

The majority of officers who ultimately fired their weapons (53 percent) became involved in the precipitating situation owing to 911 calls. Such calls—or "radio runs," in police parlance—can involve reports of ongoing or developing conditions or calls for assistance from crime victims or witnesses. Fifteen percent of the incidents involved officers conducting stops based on reasonable suspicion [see Figure A.8].

## OFFICER RESTRAINT

Of officers discharging their firearms during an adversarial conflict, 77 percent fired five or fewer times [see Figure A.9]. At the other end of the scale, three officers fired 16 rounds, emptying their firearms. All three of these officers were fired upon before they them-




Figure A.8




Figure A.9

In total, 236 shots were fired by officers during these incidents, up 28 percent from 2009's record low of 184 shots. This increase is largely attributable to the fact that, in 2009, no incident involved a protracted gun battle. An appurtenance of the NYPD's small number of shootings is that a single anomalous exchange of high-volume gunfire can noticeably distort the real picture. Because 2010 included two such gunfights, the number of total shots fired has increased. These two incidents accounted for almost 30 percent of all the shots fired in adversarial conflict incidents.

selves fired; one of them had been shot and severely injured by the subject with whom he exchanged gunfire.

Nevertheless, restraint is the norm. A quarter of the officers discharging their firearms in adversarial-conflict incidents only fired **one** shot. And this pattern of control is also apparent when analyzing the number of shots fired per incident, rather than per officer. Sixty percent of the incidents involved five or fewer shots being fired. In 27 percent of adversarial-conflict incidents, the total number of shots fired by all police officers involved was **one**.

When working with such a small number of incidents, shooting officers, and rounds fired, typical use of means and medians can lead to false conclusions. Additionally, as noted above, a single incident can significantly skew averages. For this reason, with small samples, the mode can be most revelatory [see Figure A.10]. **The mode for the number of shots fired by police is one**.

**OBJECTIVE COMPLETION RATE**

Similarly, the Department does not calculate




Figure A.10

*average hit percentages*. Instead, the ***objective completion rate per incident*** is employed as it is both more accurate and more instructive.

Like combat itself, the objective completion rate per incident is pass/fail. When an officer properly and lawfully adjudges a threat severe enough to require the use of his or her firearm, and fires at a specific subject, the most relevant measure is whether he or she ultimately hits and stops the subject. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the subject.

In these 33 incidents, officers hit at least one subject per incident 23 times, for an objective completion rate of 70 percent. During the incidents in which officers were being fired upon, however, the objective completion rate increased to 78 percent.

### SHOOTING TECHNIQUE

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but it is not always practical during an adversarial conflict. Of officers reporting their shooting techniques, there was a nearly even split between officers who gripped the firearm with two hands and those who gripped the firearm with one hand. More than half of officers who reported their stance state that they were standing (58 percent). And although only 40 percent of officers made any report of whether or not they had used their sights, it is notable that only one officer reported in the affirmative.

Only 25 percent of reporting officers were able to make use of some type of cover during the incident. Lack of cover can be a factor in the need for a firearms discharge.

### DISTANCE

Although officers are trained to fire on a target from as far away as 75 feet, the majority of adversarial conflict discharges occur when the officer is closer than ten feet to the subject. Nevertheless, in 2010, one officer reported firing from a distance of 50 feet. He did not hit the subject. More typically, the greatest percentage of officers fired at a range of six to ten feet [see Figure A.11].

## OFFICER PEDIGREE

Although approximately 83 percent of the Department's uniformed personnel are males, 90 percent of officers who discharged their firearms during an adversarial conflict were males (47 of 52 officers).

With regard to race, 50 percent of the officers who intentionally discharged a firearm during an adversarial conflict were white. This is slightly less than the percentage of white officers employed by the Department (53 percent) [see Figure A.12].




Figure A.11




Figure A.12

When compared to Department staffing, black officers who fired were overrepresented in 2010, constituting 16 percent of the Department but 23 percent of shooting officers. Hispanic officers were slightly underrepresented, constituting 26 percent of staff but 25 percent of the officers firing.

**ATTIRE**

Fewer on-duty plainclothes officers intentionally discharged their firearms during adversarial conflict than did on-duty uniformed officers (14 plainclothes officers versus 38 uniformed officers).

Since plainclothes officers make up a smaller portion of officers in the field than those in uniform, their relative representation in discharge incidents should not be noteworthy. But this is a break from previous years, in which the number of plainclothes officers firing often equaled and sometimes exceeded the number of uniformed officers doing so, despite the significant disparity in their overall staffing percentages.

2010's reduction in adversarial conflict incidents is largely due to the decrease in on-duty plainclothes officers firing. This is especially true with regard to officers assigned to the Organized Crime Control Bureau, or OCCB, which includes officers specializing in combating narcotics, vice offenses, and auto-related crimes. Over the past several years it was observed that OCCB officers were increasingly involved in on-duty discharge incidents (from six officers in 2007, to 11 officers in 2008, to 14 officers in 2009. In 2010, however, only three discharging officers were on-duty OCCB personnel.

**YEARS OF SERVICE**

Figure A.13 compares years-of-service distribution among officers who fired to years-of-service distribution throughout the Department. (The Department staffing numbers only indicate the percentage of officers who are in these categories of tenure; they do not indicate the assignments of those officers, nor their level of exposure to the dangers that increase the likelihood of an intentional po-




Figure A.13

lice discharge.) Younger officers, who are more likely to be on patrol in the field, are overrepresented. In 2010, 38 percent of the officers who discharged their firearms during adversarial conflict had between one and five years of service. The decrease may be attributable to the small numbers of officers hired over the past three years, and the resulting rise in tenure among the Department as a whole.

## RANK

Sixty-seven percent of the officers discharging their firearms in these incidents were in the rank of police officer [see Figure A.14]. Because police officers are the front line, and represent the majority of officers responding to violent jobs and actively seeking out criminals, this is unsurprising. Additionally, the rank of Police Officer forms the majority of the Department and therefore the pool of officers who may become involved in adversarial conflict is greater.




Figure A.14

Worthy of note, however, is the involvement of an Inspector in an adversarial-conflict discharge incident in 2010. It is rare that shooters come from the ranks above Lieutenant. Still, the Inspector's involvement emphasizes that, for all police officers, the possibility of adversarial conflict never ceases being a part of the job.

### POLICE WEAPONS

The overwhelming majority of officers discharged their service weapons during these incidents (87 percent). The remaining officers fired off-duty weapons (11 percent) or weapons specific to the Emergency Services Unit (2 percent). [See Appendix]

## SUBJECT PEDIGREE

There were 34 subjects involved in the 33 incidents of intentional police discharge during adversarial conflict. (One subject was not apprehended but is known by gender and race.) Thirty-three subjects were male and one was female. Of the 33 apprehended subjects, ages ranged from 17 to 69, although 61 percent were between of the ages of 17 and 27.

### SUBJECT RACE

In NYPD paperwork concerning suspects, race is determined by complainants and/or victims. In arrest paperwork, the officer filling out the report generally determines the subject's race. This determination may be based on a subject's self-identification, existing government-issued documentation, racial/ethnic physical characteristics, or other factors. The Department also sub-categorizes Hispanics as black Hispanic or white Hispanic in arrest paperwork, although the Annual Firearms Discharge Report combines all Hispanic persons into a single group.

All 34 subjects were identified by race [see Figure A.15]. The majority of subjects (53 percent) were black. This percentage is significantly smaller than black suspects' representation among criminal-shooting suspects. In 2010, 74 percent of criminal-shooting suspects who were identified by race were black.




Figure A.15

Hispanics, on the other hand, are slightly overrepresented among adversarial-conflict subjects in comparison to their representation among racially identified criminal-shooting suspects. Twenty-six percent of adversarial-conflict subjects were Hispanic; approximately 24 percent of racially identified criminal-shooting suspects were Hispanic [see Figure A.15 and Figure A.19].

Among subjects who fired on officers, 67 percent were black, 22 percent were Hispanic, and 11 percent were white [see Figure A.16 and Figure A.19].

The races of persons arrested in 2010 for firearms possession are also closely aligned to the races of persons who engaged in adversarial conflict with police. See Figure A.18 for a visual representation of these comparisons.




Figure A.16

In summary, in 2010, blacks and Hispanics represent 52 percent of New York City's population, 98 percent of racially-identified criminal-shooting suspects, 96 percent of criminal-shooting victims, 94 percent of those arrested for firearms possession, 89 percent of those firing on police, and 79% of those fired on by police.

**PRIOR ARRESTS**

A subject's arrest history is usually unknown to the officer at the time of a typical incident. Nevertheless, arrest history is pertinent. It is indicative of a subject's propensity for criminal conduct and capacity for violently confronting a police officer, and it can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole status may also make a subject more willing to attempt to avoid arrest by confronting the officer.

Of the 33 identified subjects in these incidents, **94 percent had been previously arrested**—and 91 percent had multiple prior arrests [see Figure A.17].

Four subjects were on parole or probation at the time of the incidents, and one was out on bail, awaiting trial for possession of a loaded gun. Twenty-six of the subjects with prior arrests had been arrested for violent crimes such as robbery, assault, and resisting arrest, and four had been arrested for murder or attempted murder. Fifty-two percent of the subjects with prior arrests had arrests for weapons possession, including eight subjects arrested for possessing or using a firearm. Thirty-six percent had prior robbery arrests. (It should be noted that individual subjects may be identified in several of the previous categories.)




NB: *Individuals may be represented in more than one category*

Figure A.17




Figure A.18




Figure A.19

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE–ADVERSARIAL CONFLICT

**SUBJECT WEAPONS**

The subjects in these incidents utilized a variety of weapons when confronting officers. The most frequently used weapon was a firearm. Twenty-two subjects carried firearms; nine of them fired those weapons. Of the known firearms possessed or used by subjects, 9mm semi-automatic pistols and .38 caliber revolvers were the most popular, accounting for 11 of the 20 known firearms used [see Figure A.20].

Eight incidents involved subjects who attacked or menaced officers with cutting instruments. Half of these occurred indoors, and six of the eight involved emotionally disturbed persons. In one cutting-instrument-involved incident, a knife was wielded by a 69-year-old bank robber who, the previous day, had been released from prison after 21 years incarceration. Officers in three incidents first attempted to use OC spray before being forced to resort to their firearms; a sergeant in another incident deployed a conducted energy device, or TASER, to no avail.

One subject viciously beat his mother with a frying pan, causing skull and facial fractures. Another emotionally disturbed person attacked a police car with a cobblestone, and then attempted to take a responding officer's firearm via overwhelming physical force. In two incidents subjects made purposeful and aggressive gestures indicative of drawing a firearm, and thereby caused the officers to perceive an immediate threat.

## INCIDENT OUTCOMES

Of the 33 incidents, 24 resulted in injury or death to a subject or police officer.

**OFFICER DEATH**

No police officer was killed by a perpetrator during adversarial conflict in 2010.

**OFFICER INJURIES**

Four officers were injured, however, two severely. One officer was shot twice in the abdomen and critically injured. (That officer was struck in the chest, as well, but saved by his bullet-resistant vest.) Another officer was struck in the femoral artery and very nearly exsanguinated. Additionally, two officers were struck by fellow police during a particularly chaotic gun battle: one was struck super-




Figure A.20

ficially in the hand, and a second was struck in his vest, suffering blunt-force trauma. Two other officers were injured by physical assault during these incidents.

**BULLET-RESISTANT VEST**

Two officers were saved from rounds that impacted their chests by their bullet-resistant vests. In only one instance did the body armor affect the outcome of the attack.

**MALFUNCTION**

One officer, an off-duty investigator assigned to OCCB, observed a subject firing on other, uninvolved individuals in the Bronx. When the officer identified himself and confronted the subject, the subject turned and pointed his firearm at the officer. The officer fired one round, but then experienced a malfunction, He was able to clear the weapon and reacquire the subject. Additionally, a female police officer assigned to Anti-Crime experienced a magazine malfunction after firing on a subject menacing her partner with a loaded revolver. Fortunately, she was able to fire her chambered round, striking and stopping the subject, before her magazine disengaged and fell to the ground. No civilians or officers were injured as a result of these malfunctions.

**SUBJECT DEATH**

Eight subjects were killed by police bullets in 2010. Of these, seven of the eight had prior arrest histories. The one individual with no prior arrest history shot a police officer three times. Five of the eight killed were intoxicated or had illegal narcotic or controlled chemical substances in their systems at the time of the incidents.

Five subjects who were killed were in possession of firearms; three of these had fired on or shot police. Two menaced officers with knives, and one was attempting to kill his mother with a frying pan [see Figure A.21].

Additionally, a ninth subject took his own life after firing upon a sergeant and being struck in the leg by her return gunfire.

For narratives describing all incidents in which a subject was killed by police gunfire, see the Appendix.

**SUBJECT INJURIES**

Of the 16 subjects who were injured by police gunfire, half had firearms. Five of the subjects fired on police, and one of those five struck and critically injured an officer. Another of those five—a burglar on parole, whose criminal history included 17 prior arrests—fired on a female sergeant, and, after being struck by her return fire, stopped in the street and took his own life. Six subjects were shot and injured after menacing or attacking civilians and/or officers with knives. One subject was wounded after making an aggressive gesture indicative of drawing a firearm while attempting to steal an off-duty sergeant's motorcycle, and another subject was shot in the shoulder while attempting to take an officer's firearm [see Figure A.22].

**BYSTANDER INJURED**

Three innocent civilian bystanders were injured during a particularly chaotic gun battle. Although two perpetrators also fired during the incident, the bystanders were very possibly struck by police rounds. None of the bystanders' injuries were life-threatening.




Figure A.21




Figure A.22

**FINDINGS**

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical concerns and violations of procedure. It must be noted that discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures.

**All officers who discharge their firearms are sent to a firearms-retraining course, regardless of the circumstances of the discharge.**

At the time of this report, the actions of 22 of the 52 officers involved had been reviewed and findings had been issued. (It must be noted that the Police Commissioner has the authority to change the findings of "finalized" cases.)

Among the officers involved in reviewed incidents, one officer—who was violently assaulted and injured by two would-be home invaders on his stoop, then broke away and retrieved his firearm, and then re-confronted the two perpetrators—was held in violation for not retreating and summoning assistance. (When one home invader made a gesture indicative of drawing a firearm, the officer fired on him. The home invaders were not identified or apprehended.) Seven other officers were ordered to additional retraining: four were reinstructed on how to deal with barricaded persons, one was reinstructed on shooting tactics, one was reinstructed on tactically approaching suspects, and one was reinstructed on maintaining proper ammunition loads.

Thirteen officers' actions were determined to involve no violation and require no corrective action. Finally, one officer, whose discharge was deemed proper, was issued a command discipline for failing to carry a conducted energy device as required, although it was determined that the device would not have been a prudent option in the incident. Reviews of the remaining incidents are pending.

## CONCLUSION

There were 33 intentional discharges during adversarial conflicts in 2010, involving 52 officers who fired. These conflicts involved 34 subjects, including nine who fired directly on police.

In 2010, there were nearly 1,775 victims of criminal shootings in New York City. The number of intentional firearms discharges by police, comparatively, is small, but every time an officer discharges a firearm he or she risks inflicting injury or death on subjects, fellow police officers, or innocent bystanders. Because of this, the Department strives to ensure that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

One method of judging the Department's relative success is to compare the number of adversarial-conflict discharge incidents with the number of arrests of armed individuals made by officers each year. In 2010, New York City police officers made 28,880 weapons arrests, including 6,021 gun arrests. (These numbers do not include instances in which officers confront armed emotionally disturbed persons and transport those persons to the hospital rather than arresting them.)

**In other words, there were nearly 29,000 incidents in which an officer took an armed subject into custody without firing his or her weapon**.

There were, on average, 34,565 uniformed officers employed by the NYPD in 2010. Of them, only 52—*0.15 percent*—intentionally discharged a firearm at a subject.

These officers responded to more than five million calls for service in 2010, of which more than 206,874 involved weapons.

**Of the millions of dangerous calls that thousands of officers responded to in 2010 (not including proactive incidents during which officers were actively seeking out criminals), officers intentionally discharged their firearms in a total of 33 incidents.**

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE–ANIMAL ATTACK

## OVERVIEW

There were 30 incidents of intentional firearms discharge during an animal attack in 2010, up three percent from 2009 and down 23 percent from 2000.

To contextualize these 30 incidents, it is worth noting that in 2010, police officers responded to approximately 28,000 calls for service involving dogs and other animals. It does not account for incidents in which officers proactively encounter dogs or investigate incidents that were not processed through 911 or 311.)

A total of 38 officers intentionally fired their weapons during these 30 incidents, up 12 percent from 2009. Four officers were directly involved in the attack but did not fire. All but one of the attacks involved dogs. The outlier involved an attacking raccoon.

(It should be noted that the following statistics, graphs, and observations are based on this limited sample.)

There were 12 officers injured in these incidents. Nine officers were bitten by dogs and three officers suffered injuries from ballistic fragments during the attacks. Six civilians were also bitten by dogs in the course of these animal-attack incidents. These numbers do not encompass all dog attacks on officers or civilians, only dog-attack incidents involving intentional firearms discharges by police officers.

| | |
|---|---|
| Total Incidents | 30 |
| Total Animals Involved | 33 |
| Total Officers Involved | 38 |
| Officers Bitten | 9 |
| Civilians Bitten | 6 |

Figure B.1

Of the 32 dogs involved, 19 were killed and seven injured during these conflicts. The raccoon was unharmed. A more detailed analysis of injuries to all persons and animals involved will be provided in the following pages.

## REASONS FOR DISCHARGES

Officers who intentionally discharged their firearms during animal attacks did so to defend themselves or others from the threat of physical injury, serious physical injury, or death. In all but one of the incidents the threat came in the form of a dog attack.

When able, officers attempt to prevent an animal attack using non-lethal options, including batons and OC spray. Emergency Service Units possess dog nooses to restrain animals at a safe distance, as well as $CO_2$ pistols and rifles capable of firing tranquilizer darts containing Ketaset, a veterinary anesthetic. In rapidly evolving situations, however, these other options are not always prudent or possible. Nevertheless, a police officer uses his or her firearm as a last resort to stop an animal attack.

## DATES AND TIMES OF DISCHARGES

Half of the intentional discharges during animal attacks occurred during the first four months of the year. March saw eight incidents, the most incidents of any month. Every other month had between one and four incidents.

The first quarter of the year saw 12 incidents, the second quarter of the year saw five incidents, the third saw six, and the fourth saw seven incidents.

Discharges during animal attacks occurred most often on Friday (37 percent). These incidents occurred most often on the third platoon (47 percent), followed by the first platoon (33 percent) and the second platoon (20 percent) [see Figure B.2].

## LOCATIONS OF DISCHARGES




Figure B.2

All but three of the intentional discharges during animal attacks occurred within the city limits, with 70 percent of the incidents transpiring under the jurisdiction of the patrol precincts. This is a noticeable departure from intentional discharges during adversarial conflict. While intentional discharges during adversarial conflict occurred within Housing jurisdiction only 9 percent of the time, intentional discharges during animal attacks occurred within Housing jurisdiction 20 percent of the time [see Figure B.3].

The Bronx experienced the most incidents (37 percent). The pie chart on the following page shows the percentages of discharges per patrol borough [see Figure B.4].

These incidents took place in 17 separate precincts, with most of those precincts only experiencing a single incident. Ten precincts accrued two incidents.

Of the 30 incidents, 40 percent occurred outdoors. This is less than the 67 percent for adversarial conflicts. The exact locations of the incidents vary from streets and sidewalks to roofs, living rooms, and hallways.




Figure B.3

The plurality of occurrences happened in a residence (33 percent), with seven of those ten incidents occurring in the living room. Figure B.5 below indicates the locations and percentages of the incidents.

Figure B.6 on the next page maps the exact location of all of the intentional discharges during animal attacks that occurred in 2010. The three attacks that occurred outside New York City are not depicted.

## REASONS OFFICER INVOLVED

A variety of reasons led officers to become involved in incidents of intentional discharges during animal attacks. The most common (26 percent) was effecting an arrest. The next most frequent reasons were executing a warrant or responding to an unleashed or vicious dog (21 percent each)




Above, Figure B.4

Below, Figure B.5



## LOCATIONS OF 2010 ANIMAL ATTACK INCIDENTS
## 27 INCIDENTS*




*Does not include the locations of three incidents that occurred outside the city limits.

Figure B.6




Figure B.7

[see Figure B.7].

A large proportion of officers (45 percent) were assigned to precinct and housing patrol duties, which include conducting verticals, effecting arrests, and responding to calls for service from the public, such as calls for vicious dogs. These types of jobs, as mentioned in figure B.7, account for 52 percent of the incidents [see Figure B.9 below for officer assignment].

Figure B.8 indicates the top command or precinct of assignment for officers involved in intentional discharges during animal attacks. Bronx Narcotics officers accounted for 18 percent of the officers involved in animal-attack discharges, compared to 4 percent of the officers involved in adversarial-




Figure B.8




Figure B.9

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# INTENTIONAL DISCHARGE–ANIMAL ATTACK




Figure B.10




Figure B.11

conflict incidents.

One off-duty officer, arriving at his residence in Westchester County, observed a raccoon fighting with a skunk. When the raccoon became aware of the officer, it abandoned the skunk and advanced on the officer, hissing. The officer discharged one round, and both the raccoon and skunk fled.

## OFFICER RESTRAINT

When officers did discharge their firearms during an animal attack, the plurality of officers (37 percent) fired only **one time** [see Figure B.10].

This pattern of restraint is also apparent when analyzing the number of shots fired per incident. In the majority of animal attacks (57 percent) officers fired only one or two rounds [see Figure B.11].

A total of 101 shots were fired by officers during these incidents; this is a **42 percent increase** from 2009 but a 29 percent decrease from 2008. Several factors likely contributed to these fluctuations, including changes in the number of officers firing and the number of incidents involving multiple dogs. Additionally, three incidents in which more than ten shots were fired skew the totals.

During these 30 incidents, officers hit at least one animal per incident 26 times; this yields an objective completion rate of 87 percent. This is higher than the objective completion rate during adversarial conflict (70 percent) and higher than the objective completion rate of officers under fire (78 percent) [see OUTCOME section for explanation].

### SHOOTING TECHNIQUE

Fifty-four percent of the officers in animal attacks who reported their position, report gripping the firearm with two hands; similar to the 50 percent of officers in adversarial conflict.

Seventy-five percent of reporting officers reported that they were unable to utilize cover during adversarial conflicts. Yet, all of reporting officers involved in animal attacks

report having no cover during the discharge. Officers who can find cover from an animal attack may not find it necessary to fire.

Animal attacks and adversarial conflict incidents are usually similar with regard to shooting position. As with adversarial conflicts, the majority of officers involved in animal attack incidents report being in a standing position, yet this year the numbers have grown slightly further apart with 58 percent standing during adversarial conflict and 87 percent standing during animal attacks.

Half of the reporting officers report utilizing their sights when discharging their firearm during these confrontations, which is dramatically different from the single reporting officer who used his sights during adversarial conflict. (It was noted in adversarial conflict that only 40 percent of officers made a notation of sights use.)

## OFFICER PEDIGREE

Two of the 38 officers firing in animal attack incidents were female.

The race of the officers involved in intentional discharges during animal attacks is slightly dissimilar to the racial makeup of the Department's staffing. White officers were overrepresented, comprising 63 percent of officers firing versus 53 percent of Department staffing. Hispanic officers were underrepresented, comprising 13 percent of officers firing versus 26 percent of Department staffing. Black officers were overrepresented, with blacks accounting for 24 percent of officers firing versus 16 percent of Department staffing. No Asian officers fired on animals in 2010 [see Figure B.12].

### ATTIRE

Slightly more than half of the officers who discharged their weapons during animal attacks were attired in uniform (53 percent). This is a significant reduction from last year when they represented nearly 80 percent of




Figure B.12




Figure B.13

officers firing. While the number of plainclothes officers discharging their firearm in adversarial conflict incidents has significantly decreased in 2010 the number discharging firearms during animal attack have significantly increased. This statistic is driven by plainclothes OCCB officers who, in 2010, accounted for 29 percent of officers discharging during animal attack (they accounted for only nine percent in 2009), yet they have significantly reduced the number of adversarial conflict discharges in that same year, from 26 percent in 2009 to eight percent in 2010.

### YEARS OF SERVICE

Almost half of the officers who discharged firearms during animal attacks had between one and five years of service. As years of service increase, the number of intentional discharges during animal attacks tends to decrease [see Figure B.13].

Officers assigned to patrol are often the first officers to respond to dangerous jobs involving animals, and the majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties. The notable exception in 2010 was the larger percentage of officers in the 16-20 *year of service* range. This is a result of several off-duty incidents and incidents involving supervisors (including a Captain) and precinct detectives, both of which ranks require more time in service than that held by the average police officer.

### RANK

Half of officers discharging their firearms in these incidents were police officers, who are most likely to perform duties that expose them to animal attack [see Figure B.14]. Yet this is a significant decrease from the 68 percent in 2009. As mentioned earlier, this is also a result of the increase in OCCB officers discharging their firearms during animal attack. The number of detectives discharging




Figure B.14

firearms during these incidents increased from 12 percent in 2009 to 34 percent in 2010.

**POLICE WEAPONS**

Officers utilized their service weapons in 34 of the 38 incidents. The remaining officers discharged their off-duty weapons.

## INCIDENT OUTCOMES

Of the 30 intentional discharges occurring during animal attacks, 26 resulted in injury or death to at least one animal. Twelve officers were also injured, including nine who were bitten by dogs (up from three in 2009). The remaining three officers suffered ballistic injuries from the shrapnel of the fired bullets.

Six civilians were bitten by dogs. No civilians were injured by a police discharge during these incidents.

Of the 33 animals involved, 19 were killed and seven injured by police gunfire. All but one of the animals involved were dogs, with 30 of the 32 dogs being pit bulls. One animal was a raccoon.

When officers fired at attacking animals they hit their targets in 87 percent of the incidents. This objective completion rate is higher than for adversarial attacks (70 percent) and higher than for officers under fire (78 percent). A possible explanation is the distance between officer and animal. Although in both kinds of attack officers are often attempting to avoid injury by running for cover or physically pushing a subject or animal away, officers in animal attacks are more often within arm's reach of the animal. All of the officers who reported their distance report being five feet or closer to the attacking animal. Of the officers who fired in adversarial conflict incidents who reported their distance from the subject, only 26 percent were within five feet of the subject.

**MALFUNCTION**

No officer reported a firearm malfunction during an animal attack in 2010.

**FINDINGS**

All of the intentional firearms discharges during animal attacks in 2010 were investigated and, at the time of this report, 58 percent offered findings and recommendations. Of the 22 officers in the completed investigations, all were found not in violation of procedure or law.

## CONCLUSION

**From among approximately 28,000 calls involving animals answered by thousands of officers, as well as uncounted incidents in which officers came into contact with dogs or other animals, a total of 30 instances resulted in officers discharging their firearms.**

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# UNINTENTIONAL DISCHARGES

## OVERVIEW

In 2010, there were 22 reported incidents of unintentional firearms discharge, involving 22 officers. One of these incidents occurred in 2009 and was not reported until 2010. This increases the number of 2009 incidents to 23. Twenty-one incidents occurred in 2010. The unreported 2009 incident involved an off-duty officer accidentally discharging his firearm in his living room. No injuries were sustained from this incident. The officer was suspended for failing to report the incident.

There were three officers injured in the 21 (2010) incidents. Two were a result of being struck by debris from the discharge and one sustained a gunshot wound to the leg. No officers were killed as a result of these incidents.

No civilians or subjects were injured or killed in these firearms discharges.

## REASON FOR DISCHARGES

Officers unintentionally discharging their firearms did so in two distinct circumstances—either purely unintentionally (15 incidents), or unintentionally during adversarial conflict (six incidents). Purely unintentional discharges occur while the officer is loading, unloading, or otherwise handling the firearm. Unintentional discharges during adversarial conflict occur while the officer is actively engaged in the arrest or apprehension of a subject.

## PURELY UNINTENTIONAL DISCHARGES

There were 15 incidents in which an officer unintentionally discharged a firearm during times when there was no adversarial conflict or animal attack. In 14 incidents only one shot was fired. In one incident the officer unintentionally fired twice. In that incident the first bullet struck the officer and he reacted to the pain by pulling the trigger again.

### LOADING/UNLOADING/HANDLING

Half of the incidents occurred while the officer was unloading the firearm. The other half occurred while the officer was handling the firearm. The reasons for handling the firearm vary from inspecting or cleaning the firearm, to attempting to render the firearm safe, to testing the firearm's operability. In two incidents the officers were attempting to render a perpetrators firearm safe. Another incident occurred during a forensic analysis of the firearm when the weapon malfunctioned and discharged. The majority of incidents occurred at the officer's residence or a police facility. Only two incidents occurred outside, and another occurred inside a police vehicle.

It is notable that five of the 15 firearms discharged during purely unintentional incidents involved weapons that were not the officers' regular service or off-duty firearms. (This trend was noted over the last three years, as well). This may stem from the officers' lack of familiarity with the firearms in question.

Also notable is the fact that six of the re-

maining nine firearms were manufactured by Glock (four model 19s and two model 26s). This most likely has to do with the fact that the handler must depress the trigger to disassemble the firearm.

**PEDIGREE OF OFFICER**

Pedigree information appears inconsequential. Gender, age, race, and assignment vary at random over the 15 incidents. It is worthy to note that one police recruit unintentionally discharged his newly issued firearm. He was suspended for failure to notify the Department of the incident.

**INJURIES**

Three officers sustained injuries as a direct result of these 15 purely unintentional discharges. One officer sustained a gunshot injury to his leg, and one officer sustained a laceration to the head after being struck by fragments of a tile that was shattered during the discharge. The third officer sustained injuries to his eyes when during forensic operability testing a round discharged from a defective handgun the officer was attempting to render safe.

**FINDINGS**

In all but one of the cases for which a finding has been determined, the officer has received some sort of discipline or retraining. The one case where the officer was found not in violation was the forensic-testing incident referred to in the preceding paragraph.

See the chart on the next page for a detailed breakdown of discipline against <u>all</u> officers involved in unintentional discharges.

**<u>UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT</u>**

There were six incidents in which officers unintentionally discharged their firearms during an adversarial conflict in 2010. This is a decrease from the eight incidents in 2009. In all incidents only one shot was fired.

**REASON FOR DISCHARGE**

Of these six discharges, three involved officers chasing a suspect with their firearm in their hand. Two involved officers actively struggling with a perpetrator while holding their firearm. The final incident involved an officer who discharged her firearm when exiting a police vehicle to apprehend a suspect after a vehicle pursuit.

The sample size of this category is so small that no significant conclusions can be derived. Yet there were some observations worth noting.

In 2009, no incident involved precinct sectors; all incidents involved specialized units. In 2010, all but one incident involved patrol officers. All officers involved were in uniform and four of the six officers were from Brooklyn South precincts. All of the incidents occurred outdoors. Four of the six firearms were Glock 19s and one was a shotgun.

**INJURIES**

There were no firearms-related injuries or deaths to officers as a result of these six incidents. Although three officers sustained injuries related to chasing or struggling with a suspect. No subjects or civilians were injured or killed as a result of these unintentional discharges.

**FINDINGS**

Only two of the six cases of unintentional discharge during adversarial conflict have been finalized. Both of the officers in those two cases were found in violation and both received retraining. The other four cases are pending. It must be noted that the Police Commissioner has the authority to change the findings of "finalized" cases. Therefore, the below chart is preliminary and subject to further review.

Figure C.1 below encompasses the discipline for all unintentional discharges, including all officers who discharged in the incident. It should be noted that disciplined officers also usually receive retraining that may not be reflected in the chart below.




Figure C.1

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# UNAUTHORIZED USE OF A FIREARM

## OVERVIEW

There were eight firearms discharges in 2010 that were deemed to be unauthorized and outside the scope of the officers' employment. Two of these incidents involved the suicide of an officer. Of the other six incidents, four involved the discharge of an officer's weapon by someone other than the officer and two incidents were unauthorized events in which the officers were suspended from service and arrested.

## SUICIDE

Two officers committed suicide in 2010. This total is down from three officers who took their own lives during the previous year. It is also a significantly lower figure than represented by the seven officers who committed suicide in 2008 (and an eighth officer attempted suicide as well).

The details of suicide incidents are not discussed in this report, but rather they are studied and investigated by other units within the Department.




Figure D.1

## DISCHARGE BY OTHER THAN OFFICER

With regard to the four incidents in which an officer-owned firearm was discharged by a civilian, three of these incidents involved a family member gaining access to an improperly secured firearm. One of these incidents resulted in injury (the officer's stepson committed suicide using the firearm) The final incident occurred when a drug suspect was being arrested. During a struggle, the suspect momentarily gained control of the officer's firearm and fired a single shot. No one was injured in that discharge.

## OTHER

The final two unauthorized incidents involved **personal disputes** between the officers and subjects and were deemed unauthorized. Each resulted in the suspension and arrest of the officer involved. Both incidents resulted in injury to the subjects.

## OUTCOME

The unauthorized use of a firearm owned by a New York City police officer is investigated thoroughly, and more often than not results in discipline against the officer discharging the weapon or the officer charged with the security of the weapon. In cases of serious misconduct, officers are suspended, arrested, and eventually terminated for their actions.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## DEFINITION

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on another New York City police officer or other law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken-identity incidents are distinguished from crossfire incidents in that the shooting officer is purposefully and intentionally choosing to fire on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. Unauthorized discharges, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incidents), are also excluded. This definition comports with the New York State Task Force on Police-on-Police Shootings' definition of "Police-on-Police Confrontations."

## 2010 INCIDENTS

There were no incidents of Mistaken Identity in 2010.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# APPENDIX

**THIS PAGE INTENTIONALLY LEFT BLANK**

2010 ANNUAL FIREARMS DISCHARGE REPORT
APPENDIX — HISTORICAL DATA







These charts represent officers who were shot by criminal subjects and do not represent accidental shootings, suicides, unauthorized shootings, incidents in which officers were personally involved, or mistaken-identity shootings

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — HISTORICAL DATA






# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# APPENDIX — HISTORICAL DATA







*2009 incident number increased by one from previous reports. This is due to a previously unreported unintentional discharge from that year.

## OVERVIEW

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives, those of bystanders, victims, and subjects—and of officers and their fellows, too. One of the grim realities of police work, however, is the terrible contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons from imminent death or serious physical injury. (This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury—e.g., when an officer confronts a subject menacing people with a firearm that is later revealed to be a replica.)

## SHOOT TO STOP

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to "stop the threat"—i.e., to end the subject's ability to threaten imminent death or serious physical injury to the officer or another person.

If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject's demise. Stated explicitly, however, **POLICE OFFICERS DO NOT "SHOOT TO KILL"**—they are trained to shoot to stop.

## WEAPONS CONTROL

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills. Unfortunately, in a combat situation, concentration and fine motor skills are sometimes among the first casualties. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## POPULAR CULTURE MISREPRESENTATIONS

One of the purposes of this report is to make it clear that, contrary to media-based misimpressions, police officers rarely use their firearms and show great restraint when they do so. (The risible Hollywood fiction that police shootings have no consequence—that officers are back on the street immediately after a firearms discharge, that officers may engage in multiple incidents on a regular basis—is also dispelled by this report.) Perhaps the worst of popular culture's purposeful inaccuracies concerns the accuracy of pistols. Thanks to the movies and TV, many ci-

vilians have a mistaken understanding of police and their firearms.

Action heroes routinely display miraculous precision with their guns, and they routinely use handguns instead of rifles or long guns. In real life, handguns are much more limited weapons. They are short, making axial sight misjudgment more likely, and they lack a third bracing point (such as a rifle's butt stock), and are thus more difficult to steady and aim.

### NYPD PISTOLS

There are three pistol models that are authorized as on-duty service weapons for NYPD officers: the Glock 19, the Sig Sauer P226, and the Smith & Wesson 5946. These weapons are semi-automatic, chambered in 9mm, and equipped with 15-round magazines. (Additionally, there are several weapons authorized for off-duty carry, such as the Glock 26, Smith & Wesson 3914, and the Beretta 8000D Mini Cougar. A handful of officers carry .38 caliber revolvers; these officers are senior members whose weapons have been grandfathered in; revolvers have not been issued as service weapons since 1992.) All NYPD service pistols are "double action only" (DAO), meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be "cocked," resulting in a one-stage trigger pull, which is smoother and easier). Additionally, all NYPD weapons are also modified to have a heavier-than-stock 12-lb trigger pull; this diminishes the likelihood of unintentional discharges but also affects aiming. Nevertheless, it balances the fact that NYPD pistols do not have safeties, and are carried "hot," with a round in the chamber. The NYPD uses a 124 grain, hollow-point bullet

**CENTER MASS**



that is designed to prevent over-penetration and ricochets.

### CENTER MASS

Ersatz experts in police tactics who have never been police officers occasionally claim that shooting to wound is a valid choice even in life-or-death combat situations: they are mistaken. Both the impairment of fine motor skills during combat stress and the relative imprecision of pistols contribute to the fact that **ALL POLICE OFFICERS ARE TAUGHT TO SHOOT FOR CENTER MASS**. Police officers never aim for a subject's extremities; they fire at center mass.*

* In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center or "barycenter" of the exposed portion as a point of aim in lieu of center mass.

The human body's center mass, also called the center of gravity, is, by definition, the most central and largest area available as a point of aim. Physicians use a quick assessment tool known as "the rule of nines" to divide body surface by region. The torso represents one third of a human's surface area, versus a mere 9 percent for an arm or 18 percent for a leg. The torso is also the most stationary portion of the body. Extremities, on the other hand, are smaller and far less static. Arms flail, legs pump, and in so doing they become nearly impossible to target. This is exacerbated by the stress and dynamism of a combat situation.

Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to the center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun. Stopping a subject from threatening imminent death or serious physical injury to another person is the sole reason an officer utilizes deadly physical force.

## ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE

***In 2010, eight subjects were shot and killed by officers who intentionally discharged their weapons during adversarial conflict—the smallest number of such incidents in the Department's recorded history.***

***The very essence of police work is the desire to protect life. Because of this, taking a life in order to protect another is a terrible contradiction, and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations can be analyzed and assessed in order to develop training that can provide officers with more use-of-force options or conflict-resolution opportunities so that, in the future, similar events may have different outcomes. A short narrative of each incident is found below. It is worthy of note that*** **seven of the eight subjects had prior arrest histories*, and* five were intoxicated and/or had controlled substances in their systems** ***when these incidents occurred.***

***In addition to the incidents below, there was one adversarial-conflict incident in which a subject fired upon a female sergeant, and was struck in the leg by the sergeant's return fire, but then took his own life. Because the subject's demise was not the result of police gunfire, it is not included here.***

On February 22, at 0009 hours, in the confines of the 40th Precinct, a uniformed sergeant and police officer discharged their weapons at a male Indian subject who was beating his mother with a metal pan. Approximately 50 minutes earlier, officers had responded to the location for a wellness check, initiated by the subject's brother (who is also the victim's son). Although the officers could hear a disturbance inside the location, they were unable to gain entry. A supervisor was called to the scene and, via telephone, the subject's brother suggested contacting the building's superintendant to gain entry. The sergeant was able to open the door with the superintendant's keys, although there was a security chain in place as well. Through the partly opened door, however, officers were able to see the victim, covered in blood and seated on a couch. The officers forcibly entered and then observed the subject, standing over his bloodied mother, with the frying pan raised as if to strike her again. When officers confronted the subject, stating "Police! Don't move!" he briefly turned towards them, approached, then turned back to his mother and again prepared to strike her. The officers shouted warnings again but were ignored. One police officer and the sergeant then discharged four rounds and one round, respectively, striking the subject and causing his demise. The subject had an arrest history that included felony assault and resisting arrest.

On March 8, at 1511 hours, in the confines of the 61st Precinct, a uniformed police officer responded to a 911 call of a man with a gun present in a schoolyard. Witnesses had seen the man acting erratically and pointing the firearm at passerby. Once at the location, the officer, who was on solo patrol, encountered a white male subject carrying a silver firearm. With his

firearm drawn, the officer shouted “Police! Don’t move!” but the subject turned his back to the officer. As the officer radioed that he had the subject stopped, the subject abruptly spun and pointed his firearm directly at the officer while cursing him. The officer fired three rounds, striking the subject three times, and causing his demise. Subsequently, the subject’s firearm was determined to be an imitation pistol that had been painted silver and black. The subject had an arrest history for criminal mischief and false personation. At the time of the incident, the subject’s blood alcohol content was three and a half times the legal limit for driving and he had phencyclidine (PCP) in his system, as well as anti-anxiety drugs and other substances consistent with reports that he had stolen and then consumed significant quantities of cough suppressant.

On March 22, at 1225 hours, in the confines of the 44th Precinct, four uniformed officers responded to a 911 call about a dispute involving a firearm. Upon arrival at the Morrisania Air Rights Houses, the officers were met by a female complainant who had been assaulted and menaced at gunpoint by the adult son of an elderly woman for whom the complainant was a home attendant. Proceeding to the elderly woman’s apartment, the officers discovered that the subject, a male Hispanic, had retreated to a bedroom just past the living room. A second adult son informed the subject in English and Spanish that the police were present. One officer approached the bedroom door and forcibly opened it, at which point the subject opened fire with a .38 caliber Smith & Wesson revolver. The officer at the bedroom door was struck in the chest, but saved by his bullet resistant vest. As he fell back, injured, he returned fire, but was also fired upon again by the subject. In this second exchange he was struck twice in the lower abdomen, beneath his vest, and severely injured. He nevertheless returned fire, ultimately discharging all 16 rounds from his weapon, and the subject fell back into the bedroom. The three other officers, who were also in the line of fire, discharged two, one, and two rounds, respectively, as they dragged their wounded partner back to the living room and safety. At this point supervisors arrived on scene, and ordered the location locked down and the wounded evacuated. Emergency Services deployed mechanical means and a canine officer to assess the scene, and determined that the subject had been struck three times and killed. His revolver, with four spent rounds and a live round in the cylinder, was recovered. The subject had no arrest history.

On April 1, at 1413 hours, in the confines of the 72nd Precinct, plainclothes officers were canvassing for a robbery suspect with a sketch and photo in hand. They observed a male Hispanic subject who they believed resembled the suspect and attempted to address him from their unmarked vehicle. As the vehicle operator called to the subject, the two other officers in the vehicle exited and positioned themselves at the front and rear of the automobile. The subject suddenly and aggressively approached the vehicle, saying “You want my fuckin’ ID? I’ll show you my fuckin’ ID!” At the same time, he reached into a bag he was carrying and withdrew a silver revolver, which he pointed into the car and at the officer in the driver’s seat. A brief struggle ensued, but was ended when the female officer positioned at the front end of the vehicle fired a single round, striking the subject and causing his demise. The subject’s weapon, a

loaded .357 caliber Rossi revolver, was recovered, as was a stolen .44 caliber Ruger revolver also on his person, several bags of marijuana, and in excess of $2,000 in US currency. The subject had 39 prior arrests, for offenses including robbery, burglary, and criminal possession of firearms. The subject had cannabinoids in his system at the time of the incident.

On June 24, at 0918 hours, during the execution of a search warrant in the confines of the 41st Precinct, two officers discharged their firearms at a male black subject who fired on one of the officers. As an Emergency Services Unit team entered the subject's location for a narcotics warrant, the subject attempted to escape via a rear basement door. He was in possession of a black semi-automatic handgun which he pointed at an officer posted at the rear entrance. That officer fired five rounds at the subject, who then retreated back into the location. An Emergency Services detective armed with an MP-5 special weapon took a tactical position with oversight of the back yard. Once again the subject again attempted to exit, and now fired one round at the Emergency Services detective. The detective fired one round in return, and the subject retreated again into the basement where he was apprehended, having suffered bullet wounds in his torso and leg. His loaded 9mm Hi Point pistol was recovered. The subject was removed to the hospital where he succumbed to his injuries. The subject had an arrest history that included sex abuse, and he had alcohol, cannabinoids, cocaine, and levamisole, a veterinary dewormer that is used as a cocaine adulterant and has been linked to necrosis and psychosis, in his system at the time of the incident.

On August 8, at approximately 0300 hours, in the confines of the 32nd Precinct, four officers became involved in an exchange of gunfire with two male Hispanic subjects, resulting in the demise of one subject and injuries to the other. Two officers were injured during this incident, and three bystanders were struck and injured, as well. The event was precipitated by a fight between the two subjects, during which the first subject produced a firearm and possibly fired on the second subject. Police heard gunfire and responded: one uniformed officer approached from the south as an unmarked vehicle with one plainclothes sergeant and two plainclothes officers approached from the north. At some point, the second subject achieved control of the firearm, and possibly fired on the first subject. He also discharged a round at the lone uniformed officer, who had now closed to within several feet. The uniformed officer returned fire, while the plainclothes officers at the opposite end of the block also began to shoot. Of the two rounds fired by the uniformed officer, one struck one of the two plainclothes officers in the chest—the officer was saved from this crossfire by his bullet-resistant vest. The plainclothes sergeant discharged 16 rounds, and the two plainclothes officers discharged 16 rounds and 12 rounds, respectively. During the gunfire, a fifth officer, who did not fire, was struck in the wrist and injured, and the three previously mentioned civilian bystanders were also struck. Of the criminal participants, the first subject was struck six times and succumbed to his injuries, and the second subject was struck 23 times, but survived. (A grand jury refused to indict the second subject for firing on the uniformed officer.) The deceased subject had 13 prior arrests, including robbery, burglary, and resisting arrest. The deceased subject's blood-alcohol content was twice the legal limit for driving at the time of his demise.

On October 3, at approximately 0545 hours, in the confines of the 34th Precinct, ten uniformed officers responded to a radio run for a violent emotionally disturbed person. A male Hispanic subject had called 911 and stated "I'm ready to kill some cops right now... Get 'em, I'll be right here." As they converged on the location, they observed the subject with a black knife in his hand. Maintaining cover behind parked cars, the officers surrounded the subject and issued orders to drop the knife, which the subject ignored. The subject made threatening statements, and acted belligerently. A sergeant on scene deployed a conducted energy device, but it was ineffective and the subject was able to pull the prongs from his body. At this time the subject began to move, and the sergeant on scene instructed the officers to move with him while maintaining a proper zone of safety. Two officers, however, found themselves backed against parked vehicles as the subject abruptly changed direction and advanced upon them while swinging the knife. With no means of escape available, the two officers discharged their firearms, five rounds and four rounds, respectively. The subject was struck multiple times and succumbed to his injuries. The subject had an arrest history for crimes including reckless endangerment and drugs sales, and was on federal probation for heroin trafficking at the time of the incident.

On December 22, at approximately 2145 hours, in the confines of the 104th Precinct, a female complainant called 911 to state that her adult son, against whom she had an order of protection, was menacing her with a knife. A uniformed sergeant and five uniformed officers responded to the scene and were joined by another sergeant and two officers. The first, larger group proceeded to the backyard of the location, after being informed by the complainant that her son sometimes fled via a rear window. The second group went to the front door and used the complainant's keys to enter. Inside, they immediately encountered a male white subject armed with several knives. The subject rushed at the sergeant and two officers, who, with no room to retreat, fired three rounds, four rounds, and one round, respectively, striking and killing the subject. A knife with a five-inch blade was recovered from the subject's hand, and two additional knives were found in his immediate vicinity. The subject had an arrest history that included assault, criminal possession of a weapon, and menacing. At the time of his demise, the subject had a blood-alcohol content two-and-a-half times the legal limit for driving, and had anti-depressants and anti-anxiety medications in his system.

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUBJECTS SHOT BY POLICE—RACE/ETHNICITY






# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUBJECTS SHOT BY POLICE—RACE/ETHNICITY

| | 1999 | | 2000 | | 2001 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 1 | 1 | 0 | 6 | 2 | 0 |
| BLACK | 24 | 8 | 15 | 6 | 11 | 9 |
| HISPANIC | 7 | 2 | 4 | 2 | 4 | 2 |
| ASIAN | 0 | 0 | 1 | 0 | 0 | 0 |
| **TOTAL** | **32** | **11** | **20** | **14** | **17** | **11** |

| | 2002 | | 2003 | | 2004 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 0 | 0 | 1 | 1 | 1 | 1 |
| BLACK | 20 | 7 | 12 | 13 | 15 | 6 |
| HISPANIC | 4 | 6 | 10 | 0 | 7 | 4 |
| ASIAN | 0 | 0 | 1 | 0 | 0 | 0 |
| **TOTAL** | **24** | **13** | **24** | **14** | **23** | **11** |

| | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 4 | 0 | 1 | 1 | 0 | 2 |
| BLACK | 21 | 7 | 16 | 9 | 9 | 5 |
| HISPANIC | 3 | 2 | 6 | 3 | 9 | 3 |
| ASIAN | 1 | 0 | 0 | 0 | 1 | 0 |
| **TOTAL** | **29** | **9** | **23** | **13** | **19** | **10** |

| | 2008 | | 2009 | | 2010 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 0 | 2 | 0 | 0 | 3 | 2 |
| BLACK | 12 | 7 | 14 | 8 | 9 | 1 |
| HISPANIC | 6 | 4 | 6 | 4 | 3 | 4 |
| ASIAN | 0 | 0 | 0 | 0 | 1 | 1 |
| **TOTAL** | **18** | **13** | **20** | **12** | **16** | **8** |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| DAY OF WEEK | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| MONDAY | 10 | 6 | 0 | 4 | 20 |
| TUESDAY | 3 | 2 | 4 | 0 | 9 |
| WEDNESDAY | 2 | 3 | 2 | 1 | 8 |
| THURSDAY | 4 | 4 | 5 | 1 | 14 |
| FRIDAY | 4 | 11 | 6 | 0 | 21 |
| SATURDAY | 4 | 3 | 3 | 0 | 10 |
| SUNDAY | 6 | 1 | 0 | 2 | 9 |
| **TOTAL** | **33** | **30** | **20*** | **8** | **91*** |

*The *day of week* for one unintentional discharge is unknown because it was not reported by the officer.

| TOUR | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 0731-1530 | 10 | 6 | 5 | 2 | 23 |
| 1531-2330 | 13 | 14 | 12 | 4 | 43 |
| 2331-0730 | 10 | 10 | 3 | 2 | 25 |
| **TOTAL** | **33** | **30** | **20*** | **8** | **91*** |

*The *tour* for one unintentional discharge is unknown because it was not reported by the officer.

| MONTH | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| JANUARY | 1 | 2 | 2 | 0 | 5 |
| FEBRUARY | 4 | 2 | 0 | 1 | 7 |
| MARCH | 4 | 8 | 2 | 0 | 14 |
| APRIL | 4 | 3 | 2 | 0 | 9 |
| MAY | 1 | 2 | 1 | 1 | 5 |
| JUNE | 3 | 0 | 2 | 1 | 6 |
| JULY | 3 | 3 | 2 | 1 | 9 |
| AUGUST | 2 | 1 | 3 | 2 | 8 |
| SEPTEMBER | 2 | 2 | 3 | 0 | 7 |
| OCTOBER | 5 | 4 | 1 | 0 | 10 |
| NOVEMBER | 2 | 1 | 2 | 2 | 7 |
| DECEMBER | 2 | 2 | 1 | 0 | 5 |
| **TOTAL** | **33** | **30** | **21** | **8** | **92** |

**ID-AC** – Intentional Discharge – Adversarial Conflict
**ID-AA** – Intentional Discharge – Animal Attack
**UD** – Unintentional Discharge
**UUF** – Unauthorized Use of Firearm

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
# APPENDIX — SUPPLEMENTAL DATA

| BOROUGH | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| BRONX | 7 | 11 | 2 | 0 | 20 |
| MANHATTAN | 6 | 0 | 5 | 1 | 12 |
| QUEENS | 4 | 2 | 3 | 2 | 11 |
| BROOKLYN | 16 | 10 | 10 | 2 | 38 |
| STATEN ISLAND | 0 | 4 | 0 | 0 | 4 |
| OUTSIDE CITY | 0 | 3 | 1 | 3 | 7 |
| **TOTAL** | **33** | **30** | **21** | **8** | **92** |

| MANHATTAN | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 1st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 5th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 6th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 7th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 9th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 10th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 13th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 14th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 17th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 18th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 19th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 20th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 22nd PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 23rd PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 24th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 25th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 26th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 28th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 30th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 32nd PRECINCT | 1 | 0 | 0 | 1 | 2 |
| 33rd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 34th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| **TOTAL** | **6** | **0** | **5** | **1** | **12** |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| BRONX | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 40th PRECINCT | 2 | 2 | 0 | 0 | 4 |
| 41st PRECINCT | 2 | 1 | 1 | 0 | 4 |
| 42nd PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 43rd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 44th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 45th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 46th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 47th PRECINCT | 0 | 2 | 0 | 0 | 2 |
| 48th PRECINCT | 0 | 2 | 0 | 0 | 2 |
| 49th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 50th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 52nd PRECINCT | 0 | 1 | 1 | 0 | 2 |
| **TOTAL** | **7** | **11** | **2** | **0** | **20** |

| BROOKLYN | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 60th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 61st PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 62nd PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 63rd PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 66th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 67th PRECINCT | 3 | 0 | 2 | 0 | 5 |
| 68th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 69th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 70th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 71st PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 72nd PRECINCT | 1 | 0 | 0 | 1 | 2 |
| 73rd PRECINCT | 2 | 1 | 0 | 0 | 3 |
| 75th PRECINCT | 2 | 0 | 2 | 0 | 4 |
| 76th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 77th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 78th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 79th PRECINCT | 2 | 2 | 0 | 0 | 4 |
| 81st PRECINCT | 0 | 1 | 0 | 1 | 2 |
| 83rd PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 84th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 88th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 90th PRECINCT | 0 | 2 | 0 | 0 | 2 |
| 94th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **16** | **10** | **10** | **2** | **38** |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| STATEN ISLAND | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 120th PRECINCT | 0 | 2 | 0 | 0 | 2 |
| 122nd PRECINCT | 0 | 2 | 0 | 0 | 2 |
| 123rd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **0** | **4** | **0** | **0** | **4** |

| QUEENS | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| 100th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 101st PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 102nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 103rd PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 104th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 105th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 106th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 107th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 108th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 109th PRECINCT | 0 | 0 | 1 | 1 | 2 |
| 110th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 111th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 112th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 113th PRECINCT | 1 | 0 | 0 | 1 | 2 |
| 114th PRECINCT | 0 | 1 | 1 | 0 | 2 |
| 115th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **4** | **2** | **3** | **2** | **11** |

| DUTY STATUS | ID-AC | ID-AA | UD | UUF | TOTAL |
|---|---|---|---|---|---|
| ON-DUTY | 47 | 34 | 17 | 1 | 99 |
| OFF-DUTY | 5 | 4 | 4 | 3 | 16 |
| **TOTAL (MOS firing)** | **52** | **38** | **21** | **4** | **115** |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| ID-AC | TYPE OF THREAT FROM SUBJECTS FIRED UPON | OFFICERS INVOLVED | SHOTS | INJURY FATALITY | # SUBJECTS FIRED UPON | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 1 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | | 1 | Male | Black | 20 | FIREARM |
| 2 | FIREARM - SUBJECT FIRED AT OFFICER | 2 | 8 and 2 | | 1 | Male | Black | 22 | FIREARM |
| 3 | FIREARM - SUBJECT POINTED FIREARM | 1 | 2 | INJURY | 1 | Male | White | 61 | IMITATION |
| 4 | BLUNT INSTRUMENT - ATTACKING CIVILIAN | 2 | 1 and 4 | FATAL | 1 | Male | Asian | 27 | FRYING PAN |
| 5 | CUTTING INSTRUMENT - SUBJECT MENACED OFFICER | 1 | 13 | INJURY | 1 | Male | Black | 49 | MACHETE |
| 6 | FIREARM - SUBJECT POINTED FIREARM | 1 | 3 | FATAL | 1 | Male | Whites | 23 | IMITATION |
| 7 | FIREARM - SUBJECT SHOT CIVILIAN | 1 | 1 | | 1 | Male | Black | 20 | FIREARM |
| 8 | CUTTING INSTRUMENT - SUBJECT MENACED OFFICER | 1 | 2 | INJURY | 1 | Male | Hispanic | 33 | KNIVES |
| 9 | FIREARM - SUBJECT SHOT OFFICER | 4 | 16,2,1,2 | FATAL | 1 | Male | Hispanic | 57 | FIREARM |
| 10 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | FATAL | 1 | Male | Hispanic | 32 | FIREARMS |
| 11 | FIREARM - SUBJECT FIRED AT CIVILIAN | 1 | 7 | | 1 | Male | Black | 26 | FIREARM |
| 12 | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 2 | INJURY | 1 | Male | White | 47 | FIREARM |
| 13 | CUTTING INSTRUMENT - SUBJECT MENACED OFFICER | 1 | 1 | INJURY | 1 | Female | Black | 31 | KNIFE |
| 14 | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 5 | INJURY | 1 | Male | Black | 17 | FIREARM |
| 15 | CUTTING INSTRUMENT - SUBJECT ATTACKED OFFICER | 1 | 1 | INJURY | 1 | Male | Black | 19 | KNIFE |
| 16 | CUTTING INSTRUMENT - SUBJECT MENACED OFFICER | 1 | 1 | INJURY | 1 | Male | Asian | 19 | MACHETE |
| 17 | FIREARM - SUBJECT FIRED AT OFFICER | 2 | 5 and 1 | FATAL | 1 | Male | Black | 48 | FIREARM |
| 18 | FIREARM - SUBJECT POINTED FIREARM | 1 | 15 | | 1 | Male | Hispanic | 58 | FIREARM |
| 19 | FIREARM - SUBJECT FIRED AT CIVILIAN | 2 | 5 and 5 | INJURY | 1 | Male | Black | 21 | FIREARM |
| 20 | OVERWHELMING FORCE - SUBJECT ATTACKED OFFICER | 1 | 1 | | 1 | Male | Black | UNKNOWN | UNKNOWN |
| 21 | FIREARM - SUBJECT 1 FIRED AT SUBJECT 2 | 4 | 16,16,2,12 | FATAL | 2 | Male | Hispanic | 21 | FIREARM |
| | FIREARM - SUBJECT 2 FIRED AT OFFICER | | | INJURY | | Male | Hispanic | 23 | FIREARM |
| 22 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | | 1 | Male | Black | 22 | FIREARM |
| 23 | FIREARM - SUBJECT FIRED AT OFFICERS | 3 | 3,8,8 | | 1 | Male | Black | 22 | FIREARM |
| 24 | FIREARM - SUBJECT POINTED FIREARM | 1 | 1 | | 1 | Male | Black | 26 | FIREARM |
| 25 | FIREARM - SUBJECT POINTED FIREARM | 4 | 10,3,2,2 | INJURY | 1 | Male | Hispanic | 35 | FIREARM |

# 2010 ANNUAL FIREARMS DISCHARGE REPORT
## APPENDIX — SUPPLEMENTAL DATA

| ID-AC | TYPE OF THREAT FROM SUBJECTS FIRED UPON | OFFICERS INVOLVED | SHOTS | INJURY FATALITY | SUBJECTS FIRED UPON | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| **26** | CUTTING INSTRUMENT - SUBJECT MENACED OFFICERS | 2 | 5 and 4 | FATAL | 1 | Male | Hispanic | 24 | KNIFE |
| **27** | CUTTING INSTRUMENT - SUBJECT MENACED OFFICER | 1 | 2 | INJURY | 1 | Male | White | 69 | KNIFE |
| **28** | FIREARM - SUBJECT SHOT OFFICER | 2 | 6 and 5 | INJURY | 1 | Male | Black | 17 | FIREARM |
| **29** | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 5 | INJURY | 1 | Male | Black | 20 | FIREARM |
| **30** | OVERWHELMING FORCE - SUBJECT GRABBED GUN | 1 | 3 | INJURY | 1 | Male | Black | 35 | NONE |
| **31** | PERCEIVED THREAT - SUBJECT SIMULATED FIREARM | 1 | 4 | INJURY | 1 | Male | Black | 35 | NONE |
| **32** | CUTTING INSTRUMENT - SUBJECT ATTACKED OFFICERS | 3 | 3,4,1 | FATAL | 1 | Male | White | 21 | KNIVES |
| **33** | FIREARM - SUBJECT FIRED AT CIVILIANS | 1 | 2 | | 1 | Male | Hispanic | 26 | FIREARM |

New York City Police Department
Office of Management Analysis and Planning
Special Projects Team
Captain Edward Carrasco, Commanding Officer

Sergeant Ronald J. Wilhelmy
Detective Jonathan C.W. Murad
Detective Charles M. Mills
Police Officer Cheryl Shea

NYPD

# RAYMOND W. KELLY
# POLICE COMMISSIONER

## MICHAEL J. FARRELL
## DEPUTY COMMISSIONER, STRATEGIC INITIATIVES

### DEPUTY CHIEF JOHN K. DONOHUE
### COMMANDING OFFICER, OFFICE OF MANAGEMENT ANALYSIS AND PLANNING

# NEW YORK CITY POLICE DEPARTMENT

## ANNUAL FIREARMS DISCHARGE REPORT

2011



# ANNUAL FIREARMS DISCHARGE REPORT

# 2011

## RAYMOND W. KELLY
### POLICE COMMISSIONER

© August 2012, NYPD

**THIS PAGE INTENTIONALLY LEFT BLANK**

# IN MEMORIAM

**Police Officer Alain Schaberger, 84 Precinct**
*March 13, 2011*

**Detective First Grade Peter J. Figoski, 75 Precinct**
*December 12, 2011*

**THIS PAGE INTENTIONALLY LEFT BLANK**

PAGE

EXECUTIVE SUMMARY........ ix
GLOSSARY OF TERMS........ x
2011 FIREARMS DISCHARGE SCOPE........ xiii
SNAPSHOTS........ xiv

## ANALYSIS OF 2011 FIREARMS DISCHARGES BY CATEGORY

**INTRODUCTION**........ 3

**USE OF FORCE**........ 7

**INVESTIGATION AND REVIEW**........ 11

**INTENTIONAL DISCHARGE–ADVERSARIAL CONFLICT**

- OVERVIEW........ 17
- REASONS FOR DISCHARGES........ 17
- DATES AND TIMES OF DISCHARGES........ 17
- LOCATIONS OF DISCHARGES........ 19
- REASONS OFFICER INVOLVED........ 22
- OFFICER RESTRAINT........ 23
- OFFICER PEDIGREE........ 25
- SUBJECT PEDIGREE........ 27
- INCIDENT OUTCOMES........ 31
- CONCLUSION........ 33

**INTENTIONAL DISCHARGE–ANIMAL ATTACK**

- OVERVIEW........ 37
- REASONS FOR DISCHARGES........ 37
- DATES AND TIMES OF DISCHARGES........ 37
- LOCATIONS OF DISCHARGES........ 38
- REASONS OFFICER INVOLVED........ 40
- OFFICER RESTRAINT........ 40
- OFFICER PEDIGREE........ 41
- INCIDENT OUTCOMES........ 43
- CONCLUSION........ 43

**UNINTENTIONAL DISCHARGE**

- OVERVIEW........ 47
- REASONS FOR DISCHARGES........ 47
- PURELY UNINTENTIONAL DISCHARGES........ 47
- UNINTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT........ 49

**PAGE**

## ANALYSIS OF 2011 FIREARMS DISCHARGES BY CATEGORY continued

### UNAUTHORIZED USE OF A FIREARM

OVERVIEW .......... 53
DISCHARGE BY OTHER THAN OFFICER .......... 53
SUICIDE .......... 53
OTHER .......... 53
OUTCOME .......... 53

### MISTAKEN IDENTITY

DEFINITION .......... 57
2011 INCIDENT .......... 57

## APPENDIX

IN MEMORIAM .......... 61
HISTORICAL DATA .......... 63
FIREARMS TRAINING .......... 67
ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE .......... 71
SUBJECTS SHOT BY POLICE BY RACE/ETHNICITY, SINCE 1997 .......... 75
SUPPLEMENTAL DATA .......... 77

PAGE

Firearms Discharge Scope ........ xiii
Historical Snapshot by Category, 2002–2011 ........ xiv
Total Incidents by Year, 2002–2011 ........ xiv
Adversarial Conflict by Year, 2002–2011 ........ xiv
Unintentional Discharge by Year, 2002–2011 ........ xiv
Animal Attack by Year, 2002–2011 ........ xiv
Comparison, 2010 to 2011 ........ xv
Breakdown by Category, 2011 ........ xv

**INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT**

A.1 Type of Threat, ID-AC ........ 17
A.2 ID-AC Incidents, 2007 to 2011, by Calendar Date ........ 18
A.3 ID-AC Incidents By Borough ........ 19
A.4 MAP: Locations of ID-AC vs Locations of Criminal Shootings, 2011 ........ 20
A.5 Criminal Shootings vs ID-AC Incidents, by Borough ........ 21
A.6 Criminal Shootings vs ID-AC Incidents, Percentage by Borough ........ 21
A.7 On-duty Officers' Assignments ........ 22
A.8 Situations Precipitating Discharge Incidents ........ 22
A.9 Shots Fired per Officer ........ 23
A.10 Shots Fired per ID-AC Incident ........ 23
A.11 Distance to Target (in Yards) of 53 Reporting Officers ........ 24
A.12 Race/Ethnicity, ID-AC Officers vs Department Staffing ........ 25
A.13 Years of Service, ID-AC Officers vs Department Staffing ........ 26
A.14 Ranks of Officers, ID-AC Officers vs Department Staffing ........ 27
A.15 Race/Ethnicity of 27 ID-AC Subjects Armed with Firearms ........ 27
A.16 Race/Ethnicity of 28 ID-AC Subjects Struck by Police Gunfire ........ 27
A.17 Race/Ethnicity of 12 ID-AC Subjects Firing on Police ........ 28
A.18 Race/Ethnicity of 9 ID-AC Subjects Killed by Police ........ 28
A.19 Officers Compared to Subjects, by Race ........ 29
A.20 Subjects Who Fired on Police vs Racially Identified Criminal-Shooting Suspects ........ 29
A.21 Subjects with Prior Arrests ........ 30
A.22 Weapons Possessed/Used by Subjects ........ 30

**INTENTIONAL DISCHARGE – ANIMAL ATTACK**

B.1 Overview Table ........ 37
B.2 ID-AA Incidents, by Tour ........ 38
B.3 Jurisdiction, ID-AC vs ID-AA ........ 38
B.4 MAP: Locations of ID-AA Incidents ........ 39
B.5 ID-AA Incidents, by Patrol Borough ........ 39
B.6 ID-AA Incidents, by Location Type ........ 40
B.7 On-duty Officers' Actions Precipitating ID-AA Incidents ........ 40
B.8 Shots Fired per Officers ........ 41

PAGE

**INTENTIONAL DISCHARGE – ANIMAL ATTACK** continued

B.9 Shots Fired per Incident.......... 41
B.10 Race/Ethnicity of ID-AA Officers.......... 42
B.11 Years of Service for ID-AA Officers.......... 42
B.12 Ranks of ID-AA Officers.......... 43

**UNAUTHORIZED USE OF A FIREARM**

D.1 Suicide/Attempt by Firearm, 2002 to 2011.......... 53

**APPENDIX**

Officers Shot and Injured by Subjects, 1971–2011.......... 63
Officers Shot and Killed by Subjects, 1971–2011.......... 63
Subjects Shot and Injured by Officers, 1971–2011.......... 64
Subjects Shot and Killed by Officers, 1971–2011.......... 64
Total Shots Fired, 1971–2011.......... 65
Total Incidents, 1971–2011.......... 65
Center Mass.......... 68
Subjects Shot by NYPD Officers by Race/Ethnicity, Trends, 1998–2011.......... 75
Gunfire in New York City by Race/Ethnicity, 2011.......... 75
Subjects Shot by Police by Race/Ethnicity, Tables, 2000–2011.......... 76
Discharge Incidents by Day of Week.......... 77
Discharge Incidents by Tour.......... 77
Discharge Incidents by Month.......... 77
Discharge Incidents by Borough.......... 78
Discharge Incidents by Precinct.......... 78
Discharge Incidents by Duty Status.......... 80
Breakdown by Incident, 2011.......... 81

## EXECUTIVE SUMMARY

In 2011, the number of firearms discharge incidents involving members of the New York City Police Department remained unchanged from the previous year: 92 total incidents. As was true last year, this is the smallest number of firearms discharges since the recording of police shootings in the City began. While it must be acknowledged that the most serious category of discharges—shootings involving adversarial conflict with a subject—increased by 9 percent over last year's record low, it is also true that experiencing 36 adversarial-conflict incidents during a year makes for a remarkably infrequent rate. In context, the rarity is even more apparent: in a city of 8.2 million people, from a Department of nearly 35,000 uniformed members who interacted with citizens in approximately 23 million instances, 62 officers were involved in 36 incidents of intentional firearms discharges during an adversarial conflict, with 19 subjects injured and nine killed. This is an impressive record of firearms control.

Neither the Department nor the officer on the street can afford complacency, however. Protecting the public from those who disdain the law is a noble calling, but it carries dangers. Two officers were murdered in 2011—one as a result of being pushed to his death, the other slain by gunfire during an incident in which no officer fired—and in other incidents three additional officers were shot and injured. Furthermore, as this report was being prepared, the first six months of 2012 saw eight officers injured by gunfire.

It is true that the drastic reduction in violent crime over the past decade has meant that criminals and police enter into conflict less often. But the declining figures associated with officer-involved firearms discharges are equally a testament to police officers' restraint, diligence, and honorable performance of duty. In this arena, the Department and its officers have provided an example for law enforcement nationwide.

| | |
|---|---|
| **Officer** | For this publication, refers to a sworn Uniformed Member of the New York City Police Department of any rank. |
| **Subject** | A person engaged in adversarial conflict with an officer or a third party, in which the conflict results in a firearms discharge. |
| **Civilian** | A person who is not the subject in the adversarial conflict but is included as a victim, bystander, and/or injured person. |
| **Firearms Discharge** | An incident in which an officer of the New York City Police Department discharges *any* firearm, or when a firearm belonging to an officer of the New York City Police Department is discharged by *any* person. This does not include a discharge during an authorized training session nor while lawfully engaged in target practice or hunting. Additionally, it does not include a firearms discharge at a firearms safety station within a Department facility. |
| **Intentional Firearms Discharge – Adversarial Conflict** | A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. This does not include discharging a firearm against an animal attack. |
| **Mistaken Identity Discharge** | A firearms discharge in which an officer intentionally discharges a firearm at another law-enforcement officer whom the discharging officer mistakenly believes to be a perpetrator. Not to be confused with so-called "*friendly fire*" or *crossfire* incidents in which the discharging officer did not intentionally fire on or strike the other officer. |
| **Intentional Firearms Discharge – Animal Attack** | A firearms discharge in which an officer intentionally discharges a firearm in defense of self or another against an animal attack. May include firearms discharges that are inside the scope of the officer's employment but outside Department guidelines. |
| **Intentional Firearms Discharge – No Conflict** | A firearms discharge in which an officer intentionally discharges a firearm to summon assistance. May include firearms discharges that are determined to be legally justified but outside Department guidelines. |
| **Unintentional Firearms Discharge** | A firearms discharge in which an officer discharges a firearm without intent, regardless of the circumstance. Commonly known as an *accidental discharge*. |
| **Unauthorized Use of a Firearm** | A firearms discharge that is considered unauthorized and is not listed as an intentional firearms discharge. In these instances the firearm is being discharged without proper legal justification and/or outside the scope of the officer's employment. This includes instances when an unauthorized person discharges an officer's firearm. |
| **Use/threaten the Use of a Firearm** | A contributing factor in which a subject discharges or threatens the discharge of a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening the use of a firearm. |

| | |
|---|---|
| **Firearm** | For this publication, includes any pistol, revolver, shotgun, rifle, or variation of such. |
| **Imitation Firearm** | For this publication, includes any instrument that is designed by the manufacturer or modified by a person to appear as if it were a firearm. This includes air pistols, toy guns, prop guns, and replicas. |
| **Use/threaten the Use of a Cutting Instrument** | A contributing factor in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| **Cutting Instrument** | For this publication, includes any knife, razor, sword, or other sharp-edged instrument, such as a broken bottle. |
| **Use/threaten the Use of a Blunt Instrument** | A contributing factor in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |
| **Blunt Instrument** | For this publication, includes any bat, stick, pipe, metal knuckles, or other instrument that, when used as a weapon, can cause blunt-force trauma to an individual. Includes automobiles and unbroken bottles. |
| **Use/threaten the Use of Overwhelming Physical Force** | An incident in which an unarmed subject or subjects physically attack a person or threaten or attempt to do the same, and while doing so put the person at risk of serious physical injury or death. This includes gang attacks and attempting to push a person from a roof or train platform. This also includes attempting to take an officer's firearm. |
| **Proactive Policing** | Instances in which officers engage in operations or activities that actively seek out violators of the law. This includes undercover operations, traffic enforcement, checkpoints, verticals, street narcotics enforcement, warrant executions, quality-of-life enforcement, and Anti-Crime operations. |
| **Reactive Policing** | Instances in which officers respond to a call for service from the public. This includes calls of a man with a gun, crimes in progress, domestic disputes, and quality-of-life complaints. This also includes calls for service in which proactive police units respond. |
| **Attacked** | Instances in which officers are not engaging in proactive or reactive policing but are set upon by a subject. This includes off-duty instances when the officer is a victim of a crime (e.g., robbery, burglary, assault), or involved in an altercation that is escalated by the subject (e.g., a traffic incident, a neighbor dispute). This also incorporates instances in which on-duty officers are performing administrative or non-patrol assignments (e.g., guarding a prisoner, processing reports, securing a location). |

**THIS PAGE INTENTIONALLY LEFT BLANK**

| CATEGORY | TOTAL NUMBER |
|---|---|
| **NEW YORK CITY**<br>TOTAL POPULATION<br>(U.S. Census, July 1, 2011) | 8,244,910 |
| **NYPD**<br>TOTAL OFFICER STAFFING<br>(July 1, 2011) | 33,497 |
| TOTAL CIVILIAN CONTACTS (APPROXIMATE) | 23,000,000 |
| TOTAL RADIO-RECEIVED ASSIGNMENTS | 5,119,535 |
| RADIO ASSIGNMENTS INVOLVING WEAPONS | 251,791 |
| ARRESTS INVOLVING WEAPONS USED/DISPLAYED/POSSESSED | 28,075 |
| GUN ARRESTS | 6,087 |
| CRIMINAL SHOOTING INCIDENTS | 1,510 |
| OFFICERS FIRING DURING INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 62 |
| INCIDENTS OF INTENTIONAL POLICE DISCHARGE DURING ADVERSARIAL CONFLICT | 36 |
| SUBJECTS SHOT AND INJURED | 19 |
| SUBJECTS SHOT AND KILLED | 9 |
| OFFICERS SHOT AND INJURED | 3 |
| OFFICERS SHOT AND KILLED | *1 |
| **NOTE:** ***all numbers are for CY 2011*** | |

* The officer who was shot and killed was murdered in an incident that did not involve an NYPD discharge; the particulars of that incident are therefore not incorporated into this report.

**NOTE:** The numbers and percentages described in this report are often rounded to the nearest whole number and are preliminary and subject to further review.

| CATEGORY | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| ADVERSARIAL CONFLICT | 55 | 61 | 51 | 59 | 59 | 45 | 49 | 47 | 33 | 36 |
| ANIMAL ATTACK | 38 | 35 | 26 | 32 | 30 | 39 | 30 | 28 | 30 | 36 |
| UNINTENTIONAL DISCHARGE | 24 | 25 | 27 | 25 | 26 | 15 | 15 | 23 | 21 | 15 |
| MISTAKEN IDENTITY | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| UNAUTHORIZED USE – FIREARM* | 0 | 2 | 5 | 6 | 8 | 6 | 3 | 4 | 6 | 2 |
| SUICIDE/ATTEMPT** | 2 | 7 | 5 | 3 | 3 | 6 | 8 | 3 | 2 | 3 |
| **TOTAL INCIDENTS FOR YEAR** | **119** | **130** | **114** | **125** | **127** | **111** | **105** | **106** | **92** | **92** |

* This category was modified in 2005 to include incidents in which an officer's firearm is discharged by persons other than the officer (e.g., a family member accidentally discharges the weapon, or a perpetrator gains control of an officer's firearm and discharges it, etc.).
** Suicide/Attempt is a subcategory of Unauthorized Use of a Firearm, but the numbers for the category and sub-category have been disaggregated in the table above. Additionally, it should be noted that this report only tallies firearms-related suicides and attempts. In 2011, only one officer took his own life, and he did so with a firearm.

**TOTAL INCIDENTS BY YEAR**




**ADVERSARIAL CONFLICT BY YEAR**




**UNINTENTIONAL DISCHARGE BY YEAR**




**ANIMAL ATTACK BY YEAR**



| CATEGORY | 2010 | 2011 | %CHANGE |
|---|---|---|---|
| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 33 | 36 | 9% |
| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 30 | 36 | 20% |
| MISTAKEN IDENTITY | 0 | 0 | N/A |
| UNINTENTIONAL DISCHARGE | 21 | 15 | -29% |
| UNAUTHORIZED USE OF FIREARM | 8 | 5 | -38% |
| **TOTAL FIREARM DISCHARGES FOR YEAR** | **92** | **92** | **N/A** |
| TOTAL OFFICERS FIRING (includes all categories) | 115 | 124 | 11% |
| TOTAL SHOTS FIRED (includes all categories) | 368 | 416 | 13% |
| TOTAL OFFICERS SHOT AND INJURED BY SUBJECT | 2 | 3 | 50% |
| TOTAL OFFICERS SHOT AND KILLED BY SUBJECT | 0 | *1 | N/A |
| TOTAL SUBJECTS SHOT AND INJURED BY OFFICER | 16 | 19 | 19% |
| TOTAL SUBJECTS SHOT AND KILLED BY OFFICER | 8 | 9 | 13% |

* Note: Because no officer discharged a weapon during the incident that claimed Detective Peter Figoski's life, that incident is not otherwise tallied in this report.

## BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | 2011 |
|---|---|
| SUBJECT USED/THREATENED THE USE OF A FIREARM | 24 |
| SUBJECT USED/THREATENED THE USE OF A CUTTING INSTRUMENT | 4 |
| SUBJECT USED/THREATENED THE USE OF A BLUNT INSTRUMENT | 2 |
| SUBJECT USED/THREATENED THE USE OF OVERWHELMING PHYSICAL FORCE | 3 |
| OFFICER PERCEIVED THREAT OF DEADLY PHYSICAL FORCE | 3 |
| **TOTAL** | **36** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK | 2011 |
|---|---|
| DOG ATTACK | 36 |
| OTHER ANIMAL ATTACK | 0 |
| **TOTAL** | **36** |

| UNINTENTIONAL DISCHARGE | 2011 |
|---|---|
| DURING ADVERSARIAL CONFLICT | 2 |
| HANDLING FIREARM | 13 |
| **TOTAL** | **15** |

| UNAUTHORIZED USE OF A FIREARM | 2011 |
|---|---|
| SUICIDE** | 1 |
| ATTEMPTED SUICIDE** | 1 |
| UNAUTHORIZED INTENTIONAL DISCHARGE | 2 |
| UNAUTHORIZED PERSON DISCHARGED OFFICER'S FIREARM | 1 |
| **TOTAL** | **5** |

** Note: This report only tallies firearms-related suicides and attempts. In 2011, only one officer took his own life, and he did so with a firearm.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# 2011 ANNUAL FIREARMS DISCHARGE REPORT

**THIS PAGE INTENTIONALLY LEFT BLANK**

## THE ANNUAL FIREARMS DISCHARGE REPORT: AN INTRODUCTION

One of the most abrupt, dynamic, and potentially traumatic incidents that can happen in a police officer's career is the line-of-duty discharge of his or her firearm. As much as handcuffs, the uniform, or the shield, the gun is a symbol of the officer's authority. It is, moreover, a physical embodiment of the officer's responsibility. The weapon on an officer's hip is a constant reminder—for officer and citizen alike—of the officer's role and society's trust.

More than forty years ago, the New York City Police Department adopted Department Order SOP 9 (s.69) and began to collect in-depth documentation of discharges during hostile encounters, for the stated purpose of "[increasing] the safety potential of each member of the force." The policy quickly expanded beyond police-involved combat, however, and came to include the study of all firearms discharges by police. Since the early 1970s, the NYPD has endeavored to record and evaluate every instance in which an officer discharges his or her weapon, whether the discharge occurs purposefully, accidentally, or, in rare instances, criminally. More recently, in 2005, the policy's mandate was expanded further: today, the Department tracks any incident in which an NYPD gun is discharged, even if the person discharging the weapon was not the officer.

The SOP 9 process has been demonstrably effective. By making oversight manifest, the Department made it clear than each and every discharge is a matter of immediate concern. When annual recordkeeping began in 1971, there were 12 NYPD officers shot and killed by another person; 47 officers were shot and injured. Officers, in turn, shot and mortally wounded 93 subjects, and another 221 subjects were injured by police gunfire. These statistics are difficult to conceive of today. ***In 2011, one NYPD officer was shot and killed and three officers were shot and injured by criminal subjects, while police shot and mortally wounded nine subjects, and injured 19***. Four decades of annual analyses have altered the way officers respond to, engage in, and even assess the need for firearms discharges. Information gleaned from the annual reports has saved the lives of citizens and officers alike, and there has been Department-wide change—tactical, strategic, and cultural—with regard to how officers use and control their firearms. The Department has made restraint the norm.

Today, the reports serve an additional but equally important role: they are statistical engines for the development of training, the adoption of new technologies, and even the deployment of Department assets. New instructional scenarios are implemented from these reports, new hardware—from bullet-resistant vests to speed loaders to semi-automatic handguns to conducted-energy devices—is introduced.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

**CATEGORIES**

The 2011 Annual Firearms Discharge Report is subdivided into five categories. Each category is analyzed based only on the information in that category. This allows the Department to better understand a specific type of incident and adjust training and policy to continue to reduce those incidents.

Firearms discharges are broken down into five categories*.

- **Intentional Discharge–Adversarial Conflict**: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- **Intentional Discharge–Animal Attack**: when an officer intentionally discharges his or her firearm to defend against an animal attack
- **Unintentional Discharge**: when an officer unintentionally discharges his or her firearm
- **Unauthorized Use of a Firearm**: when an officer discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm
- **Mistaken Identity**: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

The following pages present an overview of the laws and policies that relate to an officer's ability to use force, a delineation of the Department's investigatory process for officer-involved shootings, and an analysis of the year's firearms discharges, grouped according to the categories above. This report contains information compiled from preliminary and final shooting reports, detective case files, medical examiner reports, Firearms Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous yearly firearms discharge reports, as well as information complied from city and state computer databases and official websites.

It should be noted that, insofar as statistical analysis is concerned, the small sample studied for this document—92 discharge incidents total, only 36 of them in the category of "adversarial conflict"—limits the predictive value and conclusions that may be derived.

* The possibility of a sixth category—Intentional Discharge–No Conflict—exists, but its occurrence is extremely uncommon. Intentional Discharge–No Conflict involves an officer discharging his or her firearm to summon assistance. Because of the rarity of this type of discharge, it is not regularly tracked in the annual report, but is addressed on an as-it-occurs basis. In 2011, no such discharge occurred.

**WHAT'S NOT INCLUDED IN THIS REPORT**

Two police officers were murdered in 2011, but because no officer discharged a firearm during either of those incidents, they are not included in this report. Police Officer Alain Schaberger was pushed from a staircase, sustaining injuries that took his life; Detective First Grade Peter J. Figoski was ambushed and shot by a home-invading robber. (Detective Figoski's partner, who witnessed the assault, chased down the perpetrator and, despite the perpetrator's possession of a firearm, apprehended the murderer without firing a shot.) These two incidents, and the officers' heroism, are described at length in the appendix, but they are not statistically included in this report. Similarly, incidents in which officers were injured by violent perpetrators but did not discharge their firearms are excluded.

This report also excludes the handful of instances each year in which perpetrators fire upon officers to no effect, and officers do not return fire. Furthermore, it excludes the uncounted instances when officers encounter situations in which it would be lawful for them to use deadly physical force but instead manage, through courage and calmness, to effect peaceful resolutions. There were 28,075 weapons arrests in 2011, of which 6,087 were gun arrests, and each of those arrests carried the potential for violence. On October 8, 2011, for example, a sergeant investigating livery cab robberies encountered a suspect armed with a revolver. The suspect violently resisted arrest, and during the struggle pressed his firearm into the sergeant's belly. It was only owing to the sergeant's wedging his finger between the revolver's hammer and its cylinder that a shooting was prevented. In that incident, neither the sergeant—who broke his finger during the struggle—nor his partner discharged his firearm, and the incident is therefore excluded from this report, as are numerous similar, albeit less dramatic incidents in which armed suspects were arrested.

But weapons need not be involved for danger to be present. On November 29, 2011, a police officer observed a male suspect smoking marijuana in a College of Staten Island restroom. The officer attempted to apprehend the suspect, who fled outside and then continued to resist arrest. During an intense struggle, the suspect fought the officer for control of his firearm, to the extent that the weapon's slide was pulled back, ejecting a live round. No discharge occurred, however. Ultimately, the subject's vigorous resistance caused a medical crisis, which allowed the officer to arrest him, but also resulted in the suspect's demise. It was later determined that the subject was living in New York under an assumed identity, having absconded probation and an ongoing felony assault trial in Texas.

Incidents such as this, wherein unarmed subjects violently resist officers in circumstances that might otherwise justify an officer's use of deadly physical force, are not statistically examined included in this report.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## USE OF FORCE

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect arrest or prevent escape, as well as to protect property or people. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing malefactors and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance, and the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist police—officers have an ascending array of force options to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., pepper spray), Conducted Energy Devices, impact weapons like batons, and, finally, deadly physical force. All of these are tools at the officer's disposal, and the officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm—or vice versa—if the situation dictates.

But an officer's permission to use force is not unlimited. According to the law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary. Reasonableness, more than any other factor, is the most salient aspect of an officer's legitimate use of force—but it is a reasonableness assessed in light of a police officer's modes of understanding.

Police are regularly exposed to highly stressful, dangerous situations, and the risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Oliver Wendell Holmes, Jr., noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, in Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court wrote that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51 NY2d 271, the New York State courts observed that "it would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good. But latitude is not unrestricted discretion—rather, it is an admission that reasonableness is fluid. In fact, even as they have shown willingness to appreciate the difficult situations in which officers make life-or-death decisions, lawmakers and the courts have also continually restricted the situations in which force, especially deadly physical force, may be used.

In Tennessee v. Garner, 471 U.S. 1 (1985), the Supreme Court disallowed the use of deadly physical force against *any* fleeing felon, but affirmed an officer's right to use such force against certain suspects. The opinion stated that if a fleeing suspect were to inflict or threaten anyone

with serious physical harm, the use of deadly force would "pass constitutional muster." And Graham v. Connor (1989) delineated a standard of "objective reasonableness" that restricts an officer's prerogative to compel or constrain another citizen.

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. And the state limits an officer's ability to exercise *deadly* physical force even further—Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three very specific instances:

1) when the subject has committed or is attempting to commit a felony *and* is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary;
2) when an armed felon resists arrest or flees; and
3) when the use of deadly physical force is necessary to defend any person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. Additionally, according to the laws of New York State, it is not unlawful for an officer to shoot at the driver of a vehicle who is using the vehicle so that it poses an imminent threat of deadly physical force. Such a firearms discharge would violate Department guidelines, however.

NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and warns that "EXCESSIVE FORCE WILL NOT BE TOLERATED" (Patrol Guide 203-11). Specifically regarding the use of deadly physical force, the NYPD states that "Uniformed members of the service should use only the minimal amount of force necessary to protect human life" (Patrol Guide 203-12).

## GUIDELINES FOR THE USE OF FIREARMS

To ensure that officers use only the minimal amount of force, the Department promulgates nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

1. Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.

2. Police officers shall not discharge their weapons when, in their professional judgment, doing so will unnecessarily endanger innocent persons.

3. Police officers shall not discharge their weapons in defense of property.

4. Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.

5. Police officers shall not fire warning shots.

6. Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.

7. Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.

8. Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.

9. Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

## PROFESSIONAL JUDGMENT AND TRAINING

Both the Department and the courts will assess an officer's exercise of deadly physical force according to the measure of "reasonableness." This complex gauge uses the letter of the law, the totality of circumstances surrounding an incident, and an appreciation for an officer's professional judgment to determine whether that officer's actions were appropriate.

In 2012, in acknowledgment of this, the NYPD made professional judgment an explicit part of its guidelines. Patrol Guide Procedure 203-12 was clarified to include the following definition:

> PROFESSIONAL JUDGMENT — judgment based not only on experience as an individual, but taking into account the knowledge, experience, and training gained through employment as a police officer.

Additionally, the subordinate prepositional phrase "in their professional judgment" was added to the second guideline for the use of firearms.

Experience and training are the foundations of professional judgment. Officers forced to make determinations about whether and how to use deadly force rely on nerve and skill, but even more on experience and, perhaps most of all, on training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The main purpose of the Annual Firearms Discharge Report is to ensure that the NYPD's training is the best it can be.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INVESTIGATION

The New York City Police Department recognizes the serious nature of police-involved firearms discharges, and it seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents:

1) Patrol Guide Procedure 212-29; and
2) a handbook entitled "The Firearms Discharges Investigation Manual; The NYPD Guide to the Preparation of a Shooting Incident Report."

### THE SHOOTING TEAM

When an officer discharges his or her firearm, whether on or off duty, or when a firearm owned by an officer is discharged, a patrol supervisor responds to the incident, takes charge of the scene, and secures and inspects the involved officer's firearm. He or she also immediately notifies the chain of command. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, and begins by contacting and conferring with the District Attorney. In many instances—including nearly every instance in which a subject is killed or injured—the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to a Breathalyzer test. He or she is also automatically reassigned to an administrative position for a minimum of the next three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, area searches, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

**THE SHOOTING INCIDENT REPORT**

A preliminary report—usually written within eight hours of the incident—outlines, as much as possible, the shooting incident; however, the rapidly evolving nature of shooting investigations means information contained therein is unavoidably preliminary. The primary means of mitigating this is the use of the Firearms Discharge Investigation Manual.

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination, however, nor from commenting on the apparent tactics utilized during the incident.

**THE FINAL REPORT**

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data is unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting-team leader (e.g., detective's case files, forensic results, and medical reports). And because information is more extant, more complete subjective assessments are possible.

Generally, with regard to discharges that occur during adversarial conflict and involve injury or death to a subject, the final report cannot be finished within the 90-day period. Instead, it must wait until the investigation into the incident has been completed, or at least until the district attorney from the county of occurrence has permitted the officer or officers who shot to be interviewed. At times it must wait even longer, until all relevant legal proceedings have been concluded.

If a final report is delayed—whether because of ongoing legal proceedings or incomplete investigations—the Borough Investigation Unit submits monthly interim-status reports. Once the final report is finished, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After a firearms discharge has been investigated and the final report has been prepared, and after the District Attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

### THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered, and conducted at the borough and executive levels. Members of the borough Firearms Discharge Advisory Board are supervisors assigned to the borough in which the incident took place. This board further scrutinizes the incident, with the benefit of new material contained in the final report. Based on the accumulated evidence, the borough Firearms Discharge Advisory Board issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board for determination.

### THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The Department's Firearms Discharge Review Board is the penultimate arbiter of any given discharge incident. It issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The Review Board gives due consideration to and often concurs with the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report—a single document that memorializes and synthesizes the whole of the exhaustive investigation and review process—and presents it to the Police Commissioner.

### THE POLICE COMMISSIONER

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination as to the incident. Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2011 findings are published throughout this report.

An officer discharges a firearm **or** a firearm owned by an officer is discharged.

A **supervisor** responds, secures the scene and the firearm in question, and makes proper notifications.

If the discharge results in injury, **the Internal Affairs Bureau** Command Center is notified and IAB members respond to assist in the investigation; additionally, the officer who fired must submit to a Breathalyzer test.

A Shooting Team is established and a shooting-team leader (**Captain**) responds to conduct an investigation.

The **District Attorney** is notified in **all** cases and conducts a separate investigation (if warranted). The DA may present the case to a Grand Jury to determine justification.

The **Duty Inspector** responds and supervises the investigation.

The **Duty Chief** is notified and responds to supervise investigations for discharges that result in a serious injury by gunfire or death to anyone or when an officer is injured by gunfire.

The shooting-team leader prepares a preliminary Shooting Incident Report, which is submitted to the **Chief of Department.**

The morning after the shooting incident, the applicable Borough Chief or Bureau Chief and executive staff meet with and brief the **Police Commissioner.**

The **Commanding Officer** of the precinct of occurrence or of the Borough Investigations Unit prepares a final report within 90 days and submits it to the **Chief of Department.**

**The Borough Firearms Discharge Advisory Board** formally reviews the incident and submits preliminary findings and recommendations to the **Chief of Department**.

**The Chief of Department Firearms Discharge Review Board** reviews the incident and Borough Advisory Board findings and recommendations and then makes a determination.

If the officer receives *charges and specifications* the case is sent to the **Department Advocate** for a Department Trial.

In all matters related to the incident, the final determination rests with the **Police Commissioner**.

# Intentional Discharge
# During Adversarial Conflict

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INTENTIONAL DISCHARGE–ADVERSARIAL CONFLICT: OVERVIEW

There were 36 incidents of intentional firearms discharge during an adversarial conflict in 2011. This represents a 9 percent increase from 2010. Sixty-two officers intentionally fired their weapons during these incidents, up 19 percent from 2010.

Five officers were injured by gunfire during these incidents**.** Three were shot by subjects and two were shot by other officers owing to crossfire.* Additionally, two officers suffered injuries from being physically attacked by unarmed subjects—one of these officers was choked almost to unconsciousness. No officers were killed during these incidents.

There were 41 subjects involved in these 36 conflicts. Nineteen subjects were injured and nine subjects were killed.

## REASONS FOR DISCHARGES

Officers intentionally discharging their firearms during adversarial conflict did so to defend themselves or others from the threat of serious physical injury or death.

In two-thirds of these incidents, the threat came in the form of a firearm. Officers also acted to defend themselves or others from the use or threat of a cutting instrument (11 percent), a perceived threat (8 percent), the use or threat of overwhelming physical force (8 percent), or the use or threat of a blunt instrument (6 percent) [see Figure A.1]. In both incidents in which officers were threatened with a blunt instrument, the threat involved a vehicle.

## DATES AND TIMES OF DISCHARGES

In 2010, Adversarial-conflict incidents occurred evenly over the four quarters of the year, but in 2011 there was a pronounced summer spike, with 39 percent of the year's incidents occurring in July, August, or September. Each month but February had at least one incident.

The distribution across days of the week showed no pattern: Mondays, Thursdays, and Sundays saw four incidents each, while Tuesdays, Wednesdays, Fridays, and Saturdays saw six incidents each. Sixteen incidents occurred during the first platoon, or midnight police shift (2331 to 0730 hours); while the second platoon (1531 to 2330 hours) saw 13 incidents. Perhaps unsurprisingly, the day tou (0731 to 1530 hours) saw about half that, with seven incidents.

**TYPE OF THREAT, ID-AC**
**(INTENTIONAL DISCHARGE–ADVERSARIAL CONFLICT)**
**(36 INCIDENTS)**




Figure A.1

*Crossfire incidents are distinguished from Mistaken Identity Discharges by the shooting officer's intent: in crossfire incidents, the officer who fired did not intend to shoot the officer he or she struck, whereas in incidents of mistaken identity, the shooting officer is purposefully firing upon the subject officer in the mistaken belief that the subject officer is posing an imminent threat. A crossfire incident always involves injury or death; mistaken identity incidents can involve a discharge with no hits. There were no mistaken identity incidents in 2011. See the Mistaken Identity

## ID-AC INCIDENTS, 2007 TO 2011, BY CALENDAR DATE




note: some dates saw more than one incident. In such cases, the date is coded with the color for the most "severe" type of discharge.

Figure A.2

The graphic on the preceding page shows the calendar-day distribution of adversarial-conflict incidents over the past five years. It displays only randomness, and betrays no seasonal nor week-based pattern. The chart illustrates what police officers have long known: there is no predicting when these incidents will occur, only that they will.

## LOCATIONS OF DISCHARGES

Of the 36 incidents, two discharges took place outside New York City, three discharges took place in or on New York City Housing Authority (NYCHA) premises, and one incident occurred in a Metropolitan Transportation Authority facility. Thirty-one incidents—86 percent—occurred in the jurisdiction of the patrol precincts. (The Police Department divides New York City's five geographic counties into eight "Patrol Boroughs." Each of the patrol boroughs has eight to 12 police precincts, with the exception of Staten Island, which has three.) Four of every five incidents took place outside.

Brooklyn saw the most incidents, although they were evenly divided between the two Brooklyn patrol boroughs, with five incidents in Brooklyn South and five incidents in Brooklyn North. Nine incidents occurred in the Bronx, the most of any single patrol borough. Percentages of discharges per patrol borough are depicted in Figure A.3.

These incidents took place in 30 separate precincts, up from 25 in 2010. Only four precincts saw more than one incident, compared to seven in 2010 and fourteen in 2009. Each of those four precincts—the 34 Precinct, 42 Precinct, 47 Precinct, and 122 Precinct—experienced two incidents. As with the calendar-day graphic, this precinct distribution illustrates the fact that adversarial conflicts occur irrespective of arbitrary boundaries.

**ID-AC INCIDENTS BY BOROUGH, 2011**
**(36 INCIDENTS)**




Figure A.3

**LOCATIONS OF 34 INTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT*
vs LOCATIONS OF 1,510 CRIMINAL SHOOTING INCIDENTS, 2011**



● RED — INTENTIONAL FIREARMS DISCHARGE BY POLICE DURING ADVERSARIAL CONFLICT

✱ BLUE — CRIMINAL SHOOTING INCIDENTS

* does not include two Intentional Discharge – Adversarial Conflict incidents that took place outside the city, one in Nassau County and one in Miami, Florida

Figure A.4

## LOCATIONS OF CRIMINAL SHOOTINGS

While the locations of police-involved shootings are not anchored to specific precincts, however, they are closely associated with larger geographic crime patterns. This is especially true when comparing adversarial-conflict locations to the locations of criminal shootings in 2011. The map on the preceding page [Figure A.4] depicts the location of the city's 1,510 incidences of criminal shootings (represented by blue asterisks), resulting in 1,821 people shot, and overlays them with all 34 incidents of intentional discharge during adversarial conflict that occurred in the city (represented by red dots). The map shows, very clearly, that police go where they are needed: police firearms discharges occur in those areas of the city most plagued by gun violence.

## CRIMINAL SHOOTING INCIDENTS vs ID AC INCIDENTS, BY BOROUGH




Figure A.5

## CRIMINAL SHOOTING INCIDENTS vs ID-AC INCIDENTS, PERCENTAGE BY BOROUGH




Figure A.6

## REASONS OFFICER INVOLVED

Officers become involved in incidents of intentional discharge during adversarial conflict for a variety of reasons. The Annual Firearms Discharge Report categorizes incidents by whether the officers involved were engaged in reactive police work (60 percent) or proactive police work (36 percent), or were attacked (5 percent).

Of 56 on-duty officers discharging their firearms during these incidents, 46 percent were assigned to proactive crime-control units such as Anti-Crime teams, conditions units, or Task Force. These units actively seek out armed criminals and violent perpetrators. Although this is disproportionate to these units' small numbers—for example, officers assigned to Anti-Crime make up less than 8 percent of any given precinct's headcount—it is predictable given the units' mandate. Nearly as many officers were performing patrol or Operation Impact duties (41 percent). This, too, is unsurprising, as the Patrol Bureau forms the Department's core and is staffed accordingly. An additional 9 percent of shooting officers were assigned to investigative units and/or the Organized Crime Control Bureau (OCCB) and 4 percent were assigned to Emergency Services Units (ESU) [see Figure A.7].

**ON-DUTY OFFICERS' ASSIGNMENTS (56 OFFICERS)**




Figure A.7

One out of every three on-duty officers who fired was on routine patrol or answering a 911 call—or "radio run," in police parlance—before the incident. An additional 30 percent were investigating, canvassing, or chasing a suspect. Five officers were engaged in police work related to narcotics enforcement, and five were investigating suspected criminal activity.

In 2011, 85 percent of all discharge incidents were precipitated by four basic situations. A third of all incidents occurred when officers responded to—or sometimes were victims of—robberies,

**SITUATIONS PRECIPITATING DISCHARGE INCIDENTS (36 INCIDENTS)**




Figure A.8

**SHOTS FIRED PER OFFICER (62 OFFICERS)**




Figure A.9

burglaries, or assaults. One out of four occurred after officers observed or were made aware of gunshots or armed subjects. And nearly one out of five stemmed from car stops, illustrating how dangerous that police action can be [see Figure A.8]. (The remaining 15 percent of incidents—five incidents—occurred when officers made arrests, or reasonable suspicion stops, or were engaged in other patrol duties.)

## OFFICER RESTRAINT

Of officers discharging their firearms during an adversarial conflict, 69 percent fired five or fewer times [see Figure A.9]. At the other end of the scale, three officers fired 16 rounds each, emptying their firearms. (No officer reloaded in any incident.) One of these officers was fired upon and severely injured before he himself fired; the other two were confronting an armed subject who had just murdered a civilian and then, even after being struck by police gunfire, repeatedly pointed his weapon at officers.

Nevertheless, restraint is the norm. More than a quarter of the officers discharging their firearms in adversarial-conflict incidents only fired **one** shot. And this pattern of control is also apparent when analyzing the number of shots fired per incident, rather than per officer. Sixty-one percent of the incidents involved five or fewer shots being fired. In 31 percent of adversarial-conflict incidents, the total number of shots fired by all police officers involved was **one**.

In total, 311 shots were fired by officers during these incidents, up 32 percent from 2010. An appurtenance of the NYPD's small number of shootings is that a single anomalous exchange of high-volume gunfire can noticeably distort the real picture. There were two such outliers in 2011—one incident in which eight officers fired 73 rounds, and another in which eight officers fired 45 rounds. Both incidents involved armed subjects firing on police or civilians, and combined they accounted for 38 percent of all the shots fired in all adversarial-conflict incidents.

**SHOTS FIRED PER ID-AC INCIDENT, BY PERCENT (36 INCIDENTS)**




Figure A.10

When working with such a small number of incidents, officers, and rounds fired, typical use of means and medians can lead to false conclusions. Additionally, as noted above, a single incident can significantly skew averages. For this reason, with small samples, the mode can be most revelatory [see Figure A.10]. **The mode for the number of shots fired by police is <u>one</u>**.

### OBJECTIVE COMPLETION RATE

Similarly, the Department does not calculate *average hit percentages*. Instead, the ***objective completion rate per incident*** is employed as it is both more accurate and more instructive.

Like combat itself, the objective completion rate per incident is pass/fail. When an officer properly and lawfully adjudges a threat severe enough to require the use of his or her firearm, and fires at a specific subject, the most relevant measure is whether he or she ultimately hits and stops the subject. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the subject.

In these 36 incidents, officers hit at least one subject per incident 28 times, for an objective completion rate of 78 percent. When officers were being fired upon, however, they struck subjects two thirds of the time (six out of nine incidents).

### SHOOTING TECHNIQUE

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but it is not always practical during an adversarial conflict. Of officers reporting their shooting techniques, 71 percent gripped the firearm with two hands. Sixty percent of officers who reported their stance state that they were standing, while 31 percent were moving or struggling. Finally, thirty-four officers reported whether or not they had used their sights, with 44 percent reporting in the affirmative.

Of 62 officers shooting, 58 responded as to whether or not they took cover. Of those 58, three quarters were not able to make use of any type of cover during the incident. Lack of cover can be a factor in the need for a firearms discharge, because a protected defensive position often allows officers to control the pace of an incident.

### DISTANCE

Although officers are trained to fire on a target from as far away as 75 feet, the majority of adversarial conflict discharges occur when the officer is closer than fifteen feet to the subject. Nevertheless, in 2011, five officers reported firing from distances greater than 45 feet [see Figure A.11]. One officer fired at and struck a subject on a balcony three stories above him; that subject was stabbing a woman to death.




Figure A.11

**RACE/ETHNICITY OF ID-AC OFFICERS, 2011**




Figure A.12

## OFFICER PEDIGREE

Although 17 percent of the Department's uniformed personnel are females, only 3 percent of officers who discharged their firearms during an adversarial conflict were females (two of 62 officers). This one-to-31 discrepancy significantly exceeds the Department's overall female-male ratio of approximately one-to-five.

With regard to race, 65 percent of the officers who intentionally discharged a firearm during an adversarial conflict were white. This is somewhat higher than the percentage of white officers employed by the Department (53 percent) [see Figure A.12].

When compared to Department staffing, black officers who fired were underrepresented in 2011, constituting 16 percent of the Department but 13 percent of shooting officers. Hispanic officers* were slightly underrepresented, constituting 26 percent of staff but 21 percent of the officers firing.

## ATTIRE

Fewer on-duty plainclothes officers intentionally discharged their firearms during adversarial conflict than did on-duty uniformed officers (22 plainclothes officers versus 34 uniformed officers). Since there are fewer plainclothes officers in the field than uniformed officers, this discrepancy is unsurprising, although it actually marks only the second year of a pattern reversal that began in 2010. Previously, the number of plainclothes officers firing often equaled and sometimes exceeded the number of uniformed officers doing so, despite the significant disparity in their overall staffing percentages.

*In personnel records, the Department further sub-categorizes Hispanics as black Hispanic or white Hispanic, but the Annual Firearms Discharge Report does not. All Hispanic persons are combined into a single group. This is true for officers and subjects.

**YEARS OF SERVICE FOR ID-AC OFFICERS, 2011**




Figure A.13

2011 also marks the second year in a continued reduction of shooting officers assigned to the Organized Crime Control Bureau (OCCB). These officers specialize in combating narcotics, vice offenses, and auto-related crimes, and over the past several years it was observed that they were increasingly involved in on-duty discharge incidents (from six officers in 2007, to 11 officers in 2008, to 14 officers in 2009). In 2011, however, as in 2010, only three discharging officers were on-duty OCCB personnel.

**YEARS OF SERVICE**

Figure A.13 compares years-of-service distribution among officers who fired to the Department's overall years-of-service distribution. Younger officers, who are more likely to be on patrol in the field, are overrepresented—but by a slimmer margin than in the past. In 2011, 34 percent of the officers who discharged their firearms during adversarial conflict had between one and five years of service, whereas the figure was 44 percent in 2007, 42 percent in 2008, 47 percent in 2009, and 38 percent in 2010. This significant decrease from years past may be attributable to the historically small numbers of officers hired by the Department in 2009, 2010, and 2011. (Normally, the NYPD hires two classes of recruits each year, with approximately 1,400 recruits per class, but in 2011, only one class was hired.) The Department's overall tenure has also risen accordingly.

**RANK**

Sixty-nine percent of the officers discharging their firearms in these incidents were in the rank of police officer [see Figure A.14]. Because police officers are the front line, and represent the majority of officers responding to violent jobs and actively seeking out criminals, this is unsurprising. Additionally, the rank of Police Officer forms the majority of the Department and

Case 1:23-cv-00327-JCN Document 69-28 Filed 07/25/25 Page 370 of 740
PageID #: 1920



**RANKS OF OFFICERS, ID-AC vs STAFFING**




Figure A.14

therefore the pool of officers who may become involved in adversarial conflict is greater.

Nine sergeants and eight detectives were involved in adversarial-conflict discharges, as well as two lieutenants. No officer of higher rank—i.e., captains or officers in discretionary ranks such as Inspector or Chief—were represented in this category in 2011.

**POLICE WEAPONS**

The overwhelming majority of officers discharged their service weapons during these incidents (94 percent). The remaining four officers fired off-duty weapons.

## SUBJECT PEDIGREE

There were 41 subjects involved in the 36 incidents of intentional police discharge during adversarial conflict. Forty subjects were male and one was female. (One subject was not apprehended but is known by gender and race.) Of the 40 apprehended subjects, ages ranged from 17 to 57, although half the subjects fell within the first quartile of this range (i.e., 17 to 26 years of age).

**SUBJECT RACE**

Suspects' races are determined by complainants and/or victims. Subjects' races are generally determined by the officer who encountered or arrested the subject. This determination may be based on a subject's self-identification, existing government-issued documentation, racial/ethnic physical characteristics, or other factors.

All 41 subjects were identified by race. A slim majority of subjects (51 percent) were black.

**RACE/ETHNICITY OF 27 ID-AC SUBJECTS ARMED WITH FIREARMS**




Figure A.15

**RACE/ETHNICITY OF 28 ID-AC SUBJECTS STRUCK BY POLICE GUNFIRE**




Figure A.16

This percentage is significantly smaller than the representation of blacks among criminal-shooting suspects: in 2011, 73 percent of criminal-shooting suspects who were identified by race were black. (Blacks were also 74 percent of all shooting victims.)

Hispanics, on the other hand, are slightly overrepresented among adversarial-conflict subjects in comparison to their representation among racially identified criminal-shooting suspects. About a third of adversarial-conflict subjects were Hispanic, whereas about a quarter of racially identified criminal-shooting suspects were Hispanic. (Hispanics were also 22 percent of all shooting victims.)

Among subjects who fired on officers, 67 percent were black and 33 percent were Hispanic. No whites fired on police [see Figure A.18 and A.20]. The races of persons who exchanged gunfire with police in 2011 closely mirrored the races of persons who were identified as criminal shooting suspects.

In summary, in 2011, blacks and Hispanics represented 52 percent of New York City's population but 97 percent of racially-identified criminal-shooting suspects, 96 percent of all criminal-shooting victims, and 96 percent of victims killed by criminal gunfire. Additionally, every person who fired at police was black or Hispanic. Blacks and Hispanics represented only 85 percent of those fired on by police, however, and only 79 percent of those struck by police gunfire.

**PRIOR ARRESTS**

A subject's arrest history is usually unknown to the officer at the time of a typical incident. Nevertheless, arrest history is pertinent. It is indicative of a subject's propensity for criminal conduct and capacity for violently confronting a police officer, and it can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole status may also make a subject more willing to attempt to avoid arrest by confronting the officer.

Of the 40 identified subjects in these incidents, **93 percent had been previously arrested**—and each of those 37 individuals had multiple prior arrests [see Figure A.21]. Of the three individuals with no prior arrest record, two had shot civilians immediately prior to being engaged by police officers. For the 37 individuals with prior arrests, the number of those priors ranged from two to 27, and more than half of the individuals had ten or more priors.

Three subjects were on parole or wanted on a warrant at the time of the incidents. Thirty-

**RACE/ETHNICITY OF NINE ID-AC SUBJECTS KILLED BY POLICE**




Figure A.17

**RACE/ETHNICITY OF 12 ID-AC SUBJECTS FIRING ON POLICE**




Figure A.18

**62 OFFICERS vs 41 SUBJECTS INVOLVED IN ID-AC, BY RACE**



**49 OFFICERS vs 28 SUBJECTS STRUCK BY POLICE GUNFIRE DURING ID-AC, BY RACE**



**20 OFFICERS vs 12 SUBJECTS WHO FIRED AT POLICE DURING ID-AC, BY RACE**






Figure A.19

**12 SUBJECTS WHO FIRED ON OFFICERS vs 972 RACIALLY IDENTIFIED CRIMINAL-SHOOTING SUSPECTS, BY RACE**




Figure A.20

three subjects had been arrested for drug-related crimes, thirty-two for violent crimes such as robbery, assault, and resisting arrest, and three had been arrested for murder or attempted murder. Sixty-two percent of the subjects with prior arrests had arrests for weapons possession, and 60 percent had prior robbery arrests. (It should be noted that individual subjects may be identified in several of the previous categories.)

**38 SUBJECTS WITH PRIOR ARRESTS**




NB: *Individuals may be represented in more than one category*

Figure A.21

### SUBJECT WEAPONS

The subjects in these incidents utilized a variety of weapons when confronting officers. The most frequently used weapon was a firearm. Twenty-seven subjects carried firearms, fifteen of them fired those weapons, and twelve exchanged gunfire with police. Nine millimeter and .380 semi-automatic pistols and .38 revolvers were the most popular of the known firearms, accounting for 13 of 18 known firearms used [see Figure A.22].

Four incidents involved subjects who attacked or menaced officers with cutting instruments. Half of these occurred indoors, and three of the four involved emotionally disturbed persons. In one cutting-instrument incident, a man stabbed a woman on their third-floor balcony, but was shot by a responding officer who fired from the ground below. A second cutting-instrument incident involved an emotionally disturbed subject who attacked his family members and then attacked officers with

**33 WEAPONS POSSESSED/USED BY SUBJECTS**




Figure A.22

two box cutters. Officers attempted to use OC spray and a conducted-energy device to no avail, before a lieutenant was forced to resort to his firearm.

Five subjects used overwhelming physical force against officers, including one who, after sexually abusing two female civilians, attempted to throw an arresting officer in front of an oncoming subway train. In another incident, a drug suspect violently resisted a lone detective's arrest, whereupon the suspect's friend joined the fray, and nearly choked the detective unconscious. In fear for his life, the detective shot and killed the subject choking him. (The drug suspect was apprehended.) A second detective was attacked by two would-be robbers while off duty. They violently attempted to take his firearm; he fired and struck both subjects.

## INCIDENT OUTCOMES

Of the 36 incidents, 28 resulted in injury or death to a subject or police officer.

### OFFICER DEATH

No police officer was killed by a perpetrator during adversarial conflict in 2011. One officer was killed by perpetrator's gunfire, however, and another officer was killed by a perpetrator's physical resistance. Because neither of those incidents involved an NYPD officer discharging his or her firearm, the incidents are not statistically included in this report. (The incidents are described in the Appendix.)

### OFFICER INJURIES

Five officers were injured by gunfire during adversarial conflict, one of them severely. That officer, who was set upon by two armed robbers, was shot in the thigh, and sustained significant blood loss. He lapsed into a coma, but not before returning fire and striking both of his attackers, who fled and were later apprehended. (The officer has made a recovery.) Two other officers were grazed by a perpetrator's gunfire during a high-volume exchange of gunfire, and the final two were struck by crossfire from fellow officers in a separate incident.

### BULLET-RESISTANT VEST

No officer suffered a bullet strike to his or her bullet-resistant vest in 2011.

### MALFUNCTION

One officer experienced a phase-one malfunction, which did not affect the outcome of the discharge incident.

### SUBJECT DEATH

Nine subjects were killed by police bullets in 2011. Seven of the nine had prior arrest histories. Both of the individuals with no arrest histories shot civilians—in one case, killing one—

immediately before confronting police. Five toxicology reports were available at the time of this writing and show four had illegal narcotic or controlled chemical substances in their systems at the time of the incidents; one did not.

Five subjects who were killed were in possession of firearms; two of these had shot civilians. Two other subjects menaced officers with knives, and a third nearly choked a detective unconscious.

The ninth subject used his vehicle as a weapon, injuring four civilians and threatening officers. Three officers discharged their firearms in this incident.

For narratives describing all incidents in which a subject was killed by police gunfire, see the Appendix.

**SUBJECT INJURIES**

Of the 19 subjects who were injured by police gunfire, 12 had firearms. Seven of these 12 subjects fired on police, and one officer was struck and critically injured. Two subjects attacked civilians or menaced police with cutting instruments; one of these killed a woman before he was stopped. Three subjects used overwhelming physical force against officers. One subject dragged an officer with his vehicle, and another, identified by a complainant as being in possession of a gun, made an aggressive gesture indicative of drawing a firearm, causing the officer approaching him to fire. No weapon was found.

**BYSTANDER KILLED**

One innocent civilian bystander was killed during a particularly chaotic incident, which occurred when a subject shot and murdered a rival, who witnesses stated was also armed. When police responded, the subject turned on them and, despite being wounded in two volleys of gunfire, continued to attempt to rise and point his firearm at officers. Sometime during the incident, a female civilian bystander several doors down from the location of the shooting was struck and killed. Forensics were unable to determine definitively whose round caused her death. Two officers were also injured by crossfire during the incident.

**FINDINGS**

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical concerns and violations of procedure. It must be noted that discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures. Additionally, **all officers who discharge their firearms are sent to a firearms-retraining course, regardless of the circumstances of the discharge.**

At the time of this report, the actions of 44 of the 62 officers involved had been reviewed and findings had been issued.

Among the officers involved in reviewed incidents, four officers who fired on subjects in vehicles were held in violation owing to the Patrol Guide's clear proscription regarding vehicles: "Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by

means other than a moving vehicle." This determination does not mean that their actions were unlawful or unjustified, however, only that they were in violation of Department policy, which is stricter than the New York State Penal Law.

Six other officers were ordered to attend specific retraining, in addition to the automatic retraining all discharging officers receive. Despite the fact that these six officers' shootings were not held to violate procedure, four were reinstructed on cover, crossfire, and concealment, one was reinstructed on apprehending armed subjects, and one was reinstructed in general tactics.

Thirty-four officers' actions were determined to involve no violation and require no corrective action. Reviews of the remaining incidents are pending.

## CONCLUSION

There were 36 intentional discharges during adversarial conflicts in 2011, involving 62 officers who fired. These conflicts involved 41 subjects, including 12 who fired directly on police.

In 2011, there were nearly 1,821 victims of criminal shootings in New York City. The number of intentional firearms discharges by police, comparatively, is small, but every time an officer discharges a firearm he or she risks inflicting injury or death on subjects, fellow police officers, or innocent bystanders. Because of this, the Department strives to ensure that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

One method of judging the Department's relative success is to put the rate at which its officers engage in adversarial-conflict discharges in perspective. There were, on average, 34,565 uniformed officers employed by the NYPD in 2011. Of them, only 62—*0.18 percent*—intentionally discharged a firearm at a subject.

Another method is to compare the number of adversarial-conflict discharge incidents to the number of high-risk radio runs and the number of arrests of armed individuals made by officers each year. In 2011, officers responded to more than four million calls for service, of which more than 200,000 involved weapons. During the same year, New York City police officers also made 28,075 weapons arrests, including 6,087 gun arrests. (These numbers do not include instances in which officers confront armed emotionally disturbed persons and transport those persons to the hospital rather than arresting them.)

**In other words, there were more than 28,000 incidents in which an officer took an armed subject into custody without firing his or her weapon**.

**Of the millions of dangerous calls that thousands of officers responded to in 2011 (not including proactive incidents during which officers were actively seeking out criminals), officers intentionally discharged their firearms during adversarial conflict in a total of 36 incidents.**

**THIS PAGE INTENTIONALLY LEFT BLANK**

# Intentional Discharge During Animal Attack

**THIS PAGE INTENTIONALLY LEFT BLANK**

## INTENTIONAL DISCHARGE–ANIMAL ATTACK: OVERVIEW

There were 36 incidents of intentional firearms discharge during an animal attack in 2011, up 20 percent from 2010 and down 5 percent from 2002.

To contextualize these 36 incidents, it is worth noting that in 2011, police officers responded to approximately 28,000 calls for service involving dogs and other animals. It does not account for incidents in which officers encounter dogs while executing search-warrants or investigate incidents that were not processed through 911 or 311.

A total of 43 officers intentionally fired their weapons during these 36 incidents, up 13 percent from 2010. Additional officers were directly involved in attacks but did not fire. All of the animal attacks involved dogs.

(It should be noted that the following statistics, graphs, and observations are based on this limited sample.)

There were six officers injured in these incidents. Five officers were bitten by dogs and one officers suffered injuries from ballistic fragments during the attacks. Two civilians were also bitten by dogs in the course of these animal-attack incidents. These numbers do not encompass all dog attacks on officers or civilians, only dog-attack incidents involving intentional firearms discharges by police officers.

| INTENTIONAL DISCHARGE–ANIMAL ATTACK (ID-AA) INCIDENTS, 2011 | |
|---|---|
| Total Incidents | 36 |
| Total Animals Involved | 43 |
| Total Officers Firing | 43 |
| Officers Bitten | 5 |
| Civilians Bitten | 2 |

Figure B.1

Of the 43 dogs involved, 12 were killed and 19 injured during these conflicts.

## REASONS FOR DISCHARGES

Officers who intentionally discharged their firearms during animal attacks did so to defend themselves or others from the threat of physical injury, serious physical injury, or death. In all but one of the incidents the threat came in the form of a dog attack.

When able, officers attempt to prevent an animal attack using non-lethal options, including batons and OC spray. Emergency Service Units possess dog nooses to restrain animals at a safe distance, as well as $CO_2$ pistols and rifles capable of firing tranquilizer darts containing Ketaset, a veterinary anesthetic. In rapidly evolving situations, however, these other options are not always prudent or possible. Nevertheless, a police officer uses his or her firearm as a last resort to stop an animal attack.

## DATES AND TIMES OF DISCHARGES

Twenty-eight percent of the intentional discharges during animal attacks occurred during the first four months of the year, whereas half of 2010's 30 incidents occurred during the same period. July saw seven incidents, the most of any month. Every month had at least one incident.

**ID-AA**
**(INTENTIONAL DISCHARGE–ANIMAL ATTACK)**
**BY TOUR (36 INCIDENTS)**




Figure B.2

The first quarter of the year saw eight incidents, the second quarter of the year saw five incidents, the third saw 14, and the fourth saw nine incidents.

Discharges during animal attacks occurred least often on Sunday (6 percent). These incidents occurred most often on the third platoon (47 percent), followed by the first platoon (33 percent) and the second platoon (19 percent) [see Figure B.2].

## LOCATIONS OF DISCHARGES

All but one of the intentional discharges during animal attacks occurred within the city limits, and 83 percent of the incidents transpired under the jurisdiction of the patrol precincts. Whereas only 8 percent of adversarial-conflict discharges occurred within the jurisdiction of the Housing Bureau (i.e., in the buildings or on the grounds of the New York City Housing Authority), 14 percent of intentional discharges during animal attacks occurred in Housing [see Figure B.3].

These incidents took place in 23 separate precincts, with most of those precincts only experiencing a single incident. Seven precincts accrued two or more incidents; the largest number—four—occurred in the 52 Precinct.

Figure B.4 on the next page maps the exact location of the 35 intentional discharges during animal attacks that occurred in 2011. (The single attack that occurred outside New York City is not depicted on the map.) The Bronx experienced the most incidents of any patrol borough (39 percent). Figure B.5 presents a percentage breakdown of locations by patrol borough.

Of the 36 incidents, 64 percent occurred outdoors. This is less than for adversarial-conflict discharges, 81 percent of which occurred outside.

Location types vary from streets and sidewalks to roofs, living rooms, and hallways. The plurality of incidents happened on the street or on a sidewalk (39 percent), a significant change from last year when 33 percent of these incidents occurred inside a residence. On page 40, Figure B.6 indicates the locations and percentages of the incidents.

**JURISDICTION, ID-AC vs ID-AA**




Figure B.3

**LOCATIONS OF INTENTIONAL DISCHARGES DURING ANIMAL ATTACK, 2011**
**35 INCIDENTS***



*Does not include the location of one incident that occurred outside the city limits

Figure B.4

**ID-AA INCIDENTS, BY PATROL BOROUGH (36 INCIDENTS)**




Figure B.5

## ID-AA INCIDENTS, BY LOCATION TYPE (36 INCIDENTS)




Figure B.6

## ON-DUTY OFFICERS' ACTIONS PRECIPITATING ID-AA INCIDENTS (42 OFFICERS)




Figure B.7

## REASONS OFFICER INVOLVED

For the 42 on-duty officers involved in animal attacks, a variety of events precipitated the incidents. Most commonly, on-duty officers were responding to radio dispatches, many of which were animal-involved radio runs. Other officers were engaged in routine patrol (21 percent) or were executing search warrants (14 percent) when they encountered aggressive animals. Figure B.7 illustrates these and other precipitating events.

Two thirds of on-duty officers were assigned to precinct or housing patrol duties, which include conducting verticals, effecting arrests, and responding to calls for service from the public, including calls about vicious dogs. These specific jobs account for 61 percent of the incidents. It is interesting to note, however, that 29 percent of on-duty officers were assigned to the Organized Crime Control Bureau (OCCB), a much larger percentage than that command's share of Department staffing would suggest. This stems largely from the fact that OCCB officers are much more likely to conduct search warrants than officers in other assignments.

## OFFICER RESTRAINT

A total of 79 shots were fired by officers during animal-attack incidents; this is a **22 percent decrease** from 2010. Seventy percent of officers discharging their firearms fired only **one time**, and no officer fired more than six rounds [see Figure B.8]. This pattern of restraint is also apparent when analyzing the number of shots fired per incident. In three out of every four animal attacks, two or fewer rounds were fired [see Figure B.9].

**SHOTS FIRED PER OFFICER (43 OFFICERS)**




Figure B.8

**SHOTS FIRED PER INCIDENT (36 INCIDENTS)**




Figure B.9

Of the 43 animals involved, 31 were struck. At least one animal was hit in 29 of the 36 incidents. This yields a per-incident objective completion rate of 81 percent per incident, slightly higher than the objective completion rate during adversarial conflict (78 percent) and noticeably higher than the objective completion rate of adversarial-conflict officers under fire (66 percent). A likely explanation for this is the proximity of the animal to the shooter in most animal-attack incidents, as well as the fact that the animal, unlike a human opponent, does not make any attempt to avoid gunfire.

**SHOOTING TECHNIQUE**

Of officers who reported their shooting techniques, only 32 percent report gripping the firearm with two hands, which is radically divergent from the 71 percent of officers involved in adversarial conflict who used a two-handed grip. This likely stems from the fact that animal attacks are often abrupt, close-quartered affairs, in which the animal rushes towards the officer and the officer seeks to ward off the animal even as he or she draws and fires. In all but one incident, the animal was within five yards of the officer.

Only three officers (7 percent of those reporting) used their sights when discharging their firearm during these confrontations, which is dramatically different from the 44 percent of reporting officers who used sights during adversarial conflict. This, too, likely derives from the immediacy and proximity of most animal attacks.

Eighty-four percent of reporting officers indicated that they were unable to utilize cover, versus 75 percent of reporting officers in adversarial-conflict incidents. Fully 88 percent of reporting officers stated that they were standing when they discharged, versus 60 percent of reporting officers in adversarial-conflict incidents.

**OFFICER PEDIGREE**

Two of the 43 officers firing in animal attack incidents were female. The race of the officers involved in intentional discharges during animal attacks diverges slightly from the racial makeup of the Department's staffing. By a thin margin, white officers were underrepresented,

## RACE/ETHNICITY OF ID-AA OFFICERS, 2011




Figure B.10

comprising 51 percent of officers firing versus 53 percent of Department staffing. Hispanic officers were noticeably overrepresented, however, comprising 33 percent of officers firing versus 26 percent of Department staffing. Black officers accounted for 16 percent of both groups [see Figure B.10].

### YEARS OF SERVICE

More than a third of the officers who discharged firearms during animal attacks had between one and five years of service. As years of service increase, the number of intentional discharges during animal attacks trends down [see Figure B.11]. This is to be expected, as officers assigned to patrol are often the first officers to respond to dangerous jobs involving animals, and the majority of officers with fewer than five years of service are assigned to patrol precincts performing these types of duties. There is an interesting exception to the trend: officers with 16 to 20 years of service are slightly overrepresented. A possible explanation is that officers of this tenure are more likely to have transitioned into elite assignments such as the Warrants Squad and OCCB.

## YEARS OF SERVICE FOR ID-AA OFFICERS, 2011




Figure B.11

**RANKS OF ID-AA OFFICERS (43)**




Figure B.12

**RANK**

More than half of officers discharging their firearms in these incidents were police officers, who are most likely to perform duties that expose them to animal attack [see Figure B.12]. The next-most represented rank was that of detective, which is also the second-most numerous rank in Department staffing. Whereas 2010 saw a spike in the involvement of detectives in animal attacks, from 12 percent of 34 officers in 2009 to 34 percent of 38 officers in 2010, that figure has fallen this year, to 21 percent of 43 officers.

**ATTIRE**

Exactly half of the on-duty officers who discharged their weapons during animal attacks were attired in plainclothes. This statistic is driven by plainclothes OCCB officers who accounted for 29 percent of officers discharging firearms during animal attack in 2011.

**POLICE WEAPONS**

Officers utilized their service weapons in each of the 36 incidents, including the one off-duty incident. No officer reported a firearms malfunction during an animal attack in 2011.

## INCIDENT OUTCOMES

Of the 36 intentional discharges occurring during animal attacks, 29 resulted in injury or death to at least one animal. Five officers were bitten by dogs (down from nine in 2010).

Two civilians were bitten by dogs. No civilians were injured by a police gunfire during these incidents.

Of the 43 animals involved, 12 were killed and 19 injured by police gunfire. All of the animals involved were dogs.

**FINDINGS**

All of the intentional firearms discharges during animal attacks in 2011 were investigated and, at the time of this report, 64 percent offered findings and recommendations. Of the 28 officers in the completed investigations, none was in violation of procedure or law.

## CONCLUSION

**From among approximately 28,000 calls involving animals answered by thousands of officers, as well as uncounted incidents in which officers came into contact with dogs or other animals, a total of 36 instances resulted in officers discharging their firearms.**

**THIS PAGE INTENTIONALLY LEFT BLANK**

# Unintentional Discharge

**THIS PAGE INTENTIONALLY LEFT BLANK**

## UNINTENTIONAL DISCHARGES: AN OVERVIEW

In 2011, there were 15 reported incidents of unintentional firearms discharge, involving 15 officers. (There were 21 such incidents in 2010.) The unreported 2009 incident involved an off-duty officer accidentally discharging his firearm in his living room. No injuries were sustained from this incident. The officer was suspended for failing to report the incident.

There were six officers injured in the 15 incidents. Two sustained through-and-through injuries to their thighs, one shot herself in the buttocks, two were struck by rounds or spall in their hands, and one was struck in his ankle. No officers were killed as a result of these incidents.

No civilians or subjects were killed in these discharges; one civilian was injured.

## REASON FOR DISCHARGES

Officers unintentionally discharging their firearms did so in two distinct circumstances—either purely unintentionally (13 incidents), or unintentionally during adversarial conflict (two incidents). Purely unintentional discharges usually occur while the officer is loading, unloading, or otherwise handling the firearm. Unintentional discharges during adversarial conflict occur while the officer is actively engaged in the arrest or apprehension of a subject.

## PURELY UNINTENTIONAL DISCHARGES

There were 13 incidents in which an officer unintentionally discharged a firearm absent an adversarial conflict or animal attack. In each of the 13 incidents, only one shot was fired.

### LOADING/UNLOADING

Six of the purely unintentional incidents occurred while the officer was loading or unloading the firearm. Five of the officers were males; one was a female. Four of the six incidents involved off-duty officers, including one member who ill-advisedly sought to use his gun safe as a loading/unloading safety station. When the officer accidentally discharged a round, it ricocheted back out of the safe, striking him in a finger. Two of the incidents occurred while officers were at work and in the course of their duties. In one, a detective in the Firearms Analysis Section, working at the Police Laboratory in Queens, did not properly unload an evidence firearm that was being tested for operability. Another instance occurred when an Anti-Crime officer attempted to render a recovered weapon safe but fired instead. This last incident was the only loading/unloading incident that occurred outdoors. Three incidents resulted in injuries to the officers who fired.

## HANDLING

Of the other seven purely unintentional discharges, five occurred while the officer was holstering or otherwise handling the firearm. Four of the officers were males; two were females. The majority of incidents occurred at the officer's residence or a police facility. One occurred at Rikers Island and two occurred in vehicles; one of those vehicles was in the parking lot of the police department's firing range in the Bronx. Three incidents resulted in gunshot injuries to the officers who fired.

Two incidents occurred during the execution of search warrants. The more notable of these involved an detective assigned to the Emergency Services Unit (ESU) who, in attempting to adjust the flashlight attached to his weapon, inadvertently fired the pistol. A resident of the location for which the warrant had been issued was struck and seriously injured. (The individual, a 76-year-old man, was the father of the subject of the search warrant. He was struck in the abdomen but survived. The warrant resulted in the recovery of narcotics.)

## WEAPONS

Three of the 13 firearms discharged during purely unintentional incidents were weapons that were not the officers' regular service or off-duty firearms—two were perpetrator's weapons, and one was an ESU Glock 19 equipped with an under-the-barrel flashlight.

More notably, six of the remaining ten firearms were also manufactured by Glock (three model 19s and three model 26s). In fact, with regard to officers experiencing unintentional discharges while loading or unloading their own firearms, 75 percent of such incidents involved Glocks. Their overrepresentation in this category has been seen consistently over the past five years: since 2007, there have been 31 incidents in which officers unintentionally discharged their own firearms during loading/unloading, and 22 of those incidents—71 percent—have involved Glocks. This most likely stems from the fact that a person disassembling a Glock must depress the trigger to do so.

## OFFICER PEDIGREE

No pattern can be discerned in the pedigree information. Gender, age, race, years of service and assignment vary without significance across the 13 incidents. The fact of the matter is that, with 35,000 officers and an even larger number of authorized firearms, accidents occur.

## FINDINGS

In nine of the purely unintentional discharge cases, findings have been determined—in each of those cases, the officer who fired was determined to have violated Department guidelines and was subject to discipline and/or retraining. Findings for four cases are pending.

## UNINTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT

There were two incidents in which officers unintentionally discharged their firearms during an adversarial conflict in 2011. (This is a decrease from six such incidents in 2010.) In each incident only one shot was fired.

### REASON FOR DISCHARGE

The first of these discharges involved an officer wielding a bunker a bullet-resistant shield during a search-warrant execution. Officers assigned a bullet-resistant shield must carry the shield in one hand and their firearm in the other, usually their non-dominant hand. In this instance, a subject of the warrant attacked the officer; during the struggle, the officer inadvertently discharged his weapon.

The second incident involved an officer who accidentally discharged his firearm when he was almost struck by a fleeing car thief driving a stolen vehicle.

### INJURIES

There were no injuries or deaths as a result of either of these incidents.

### FINDINGS

Only one of the two cases of unintentional discharge during adversarial conflict has been finalized. It was determined that the officer involved in the finalized incident, in which he was attacked during a search warrant execution, was not in violation of Department guidelines.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# Unauthorized Use of a Firearm

**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

There were five firearms discharges in 2011 that were deemed to be unauthorized and outside the scope of the officers' employment. Three of these incidents involved suicides or attempts, one involved the discharge of an officer's weapon by someone other than the officer, and one remains under investigation.

## DISCHARGE BY OTHER THAN OFFICER

In one incident, an off-duty sergeant failed to secure his revolver, which was discovered by his 14-year-old son. The boy accidentally discharged the weapon into the floor of his home, causing no injuries and minor property damage.

**SUICIDE OR ATTEMPT BY FIREARM, 2002 to 2011**




Figure D.1

## SUICIDE

One officer committed suicide in 2011. And two others attempted suicide by firearm.

Suicide incidents, whether firearms-related or otherwise, are tracked and investigated by the Department, but they are not discussed in this public report.

## OTHER

The final unauthorized incident remains under investigation. It resulted in a modification of the involved officer's duty status. Preliminary investigations have determined that there was no property damage nor were there any injuries to any party as a result of the incident.

## OUTCOME

The unauthorized use of a firearm owned by a New York City police officer is investigated thoroughly, and more often than not results in discipline against the officer discharging the weapon or the officer charged with the security of the weapon. In cases of serious misconduct, officers are suspended, arrested, and eventually terminated for their actions.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# Mistaken Identity

**THIS PAGE INTENTIONALLY LEFT BLANK**

## DEFINITION

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on another New York City police officer or other law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken-identity incidents are distinguished from crossfire incidents in that the shooting officer is purposefully and intentionally choosing to fire on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. Unauthorized discharges, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incidents), are also excluded. This definition comports with the 2010 New York State Task Force on Police-on-Police Shootings' definition of "Police-on-Police Confrontations."

## 2011 INCIDENTS

In 2011 there was an incident of Mistaken Identity in which an NYPD officer was involved, although that officer's firearms discharge was not the mistaken discharge.

On December 31st, in Nassau County, an off-duty NYPD officer and a retired lieutenant from the Nassau County Police Department were alerted to an ongoing robbery and altercation at a nearby pharmacy. They rushed to the scene, and observed two men engaged in a violent struggle over a firearm.

At some point, the retired lieutenant deemed one of the two men who were fighting to be an apparent threat, and discharged his firearm at that individual. Sadly, this was a mistaken-identity discharge: the subject of the retired lieutenant's discharge was in fact an off-duty federal law-enforcement officer who had been inside the pharmacy when the other man had perpetrated an armed robbery. The federal officer had pursued and fired upon the robber, and a struggle ensued. After the retired lieutenant intentionally but mistakenly shot the federal officer, the robber gained control of the federal officer's firearm. At this point the off-duty NYPD officer correctly adjudged the robber to be a threat and fired three rounds, striking and killing him. Tragically, the federal officer subsequently succumbed to his injuries, as well.

Because the NYPD officer in this incident discharged his weapon intentionally at an adversary, rather than mistakenly at a fellow law-enforcement officer, the Department categorizes this as an Intentional Discharge–Adversarial Conflict, and it is statistically included in that chapter of this report.

**THIS PAGE INTENTIONALLY LEFT BLANK**

# APPENDIX

**THIS PAGE INTENTIONALLY LEFT BLANK**

# IN MEMORIAM

***The accounts below are adapted from narratives associated with the New York City Police Department's 2012 Medal Day honors. On June 12, 2012, both Officer Schaberger and Detective Figoski were posthumously recognized with the Department's highest award, the Medal of Honor.***






On March 13, 2011, Police Officer Alain Schaberger, 42, was on patrol with his partner when they responded to a domestic-violence incident in the 84 precinct. They were met by a female complainant who stated that her boyfriend had threatened to kill her and directed them to his residence. The officers traveled to the residence, identified the subject, and escorted him onto the front steps of the location, where they attempted to take him into custody. At this point, the subject resisted and pushed Officer Schaberger over a railing, causing him to fall nine feet down a cement stairwell. Additional responding officers used a conducted energy device to subdue the subject. As a result of the fall, Officer Schaberger suffered severe trauma to his head and neck and later succumbed to his injuries at the hospital. The subject was convicted of manslaughter in the first degree in connection with Officer Schaberger's death and was sentenced to 28½ years to life in prison. Police Officer Alain Schaberger is survived by his parents, Paul and May, by his sister, Tracey, and her husband Jeff and their twins Kate and Jill, and by his fiancée, Shonshone.



On December 12, 2011, at 0200, then-Police Officer Peter J. Figoski, 47, was on patrol with his partner when they responded as backup to a radio run for a burglary in progress at a basement apartment in the 75 precinct. Unbeknownst to the arriving officers, two subjects were hiding at the location, waiting for a chance to escape. After the first officers on scene passed their hiding spot, the subjects attempted to flee—just as Officer Figoski and his partner descended the stairs to the apartment. A fierce struggle ensued, during which one of the subjects shot Officer Figoski, critically wounding him. Officer Figoski's partner disengaged from the subject he was fighting and chased the armed subject who had shot his partner, and was able to apprehend him after a foot pursuit without firing his weapon. Tragically, Officer Figoski later succumbed to his wounds at a nearby hospital. Officer Figoski, a 22-year veteran of the Department with a long history of decorations, arrests, and dedication to duty, was posthumously promoted to Detective First Grade on December 18, 2011. His murderer and the man's accomplices await trial. Detective Figoski is survived by his four daughters, Christine, Caitlyn, Caroline, and Corinne; their mother, Paulette; his parents, Frank and Mary Ann; and a brother, Robert, a retired NYPD Police Officer.

**THIS PAGE INTENTIONALLY LEFT BLANK**







These two charts represent officers who were shot by criminal subjects and do not represent accidental shootings, suicides, unauthorized shootings, incidents in which officers were personally involved, crossfire incidents, or mistaken-identity shootings


SUBJECTS SHOT AND INJURED BY OFFICERS
1971-2011
221
145
118
80
87
79
88
78
80
101
91
87
63
48
47
38
36
46
61
72
81
63
58
61
58
48
39
43
32
20
19
24
22
23
26
24
19
18
20
16
19
1971
1972
1973
1974
1975
1976
1977
1978
1979
1980
1981
1982
1983
1984
1985
1986
1987
1988
1989
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
2000
2001
2002
2003
2004
2005
2006
2007
2008
2009
2010
2011


SUBJECTS SHOT AND KILLED BY OFFICERS
1971-2011
93
66
58
41
44
25
30
37
28
25
33
33
29
26
11
18
14
24
30
39
27
24
22
29
26
30
20
19
11
14
11
13
14
11
9
13
10
13
12
8
9
1971
1972
1973
1974
1975
1976
1977
1978
1979
1980
1981
1982
1983
1984
1985
1986
1987
1988
1989
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
2000
2001
2002
2003
2004
2005
2006
2007
2008
2009
2010
2011




Since 2005, the shots-fired data have included all rounds discharged from an NYPD officer's gun, even if the officer did not fire.



**THIS PAGE INTENTIONALLY LEFT BLANK**

## OVERVIEW

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives: those of bystanders, victims, and subjects—and of officers and their fellows, too. One of the grim realities of police work, however, is the terrible contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons from imminent death or serious physical injury. (This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury—e.g., when an officer confronts a subject menacing people with a firearm that is later revealed to be a replica.)

## SHOOT TO STOP

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to "stop the threat"—i.e., to end the subject's ability to threaten imminent death or serious physical injury to the officer or another person.

If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject's demise. Stated explicitly, however, **POLICE OFFICERS DO NOT "SHOOT TO KILL"**—they are trained to shoot to stop.

## WEAPONS CONTROL

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills. Unfortunately, in a combat situation, concentration and fine motor skills are sometimes among the first casualties. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## POPULAR CULTURE MISREPRESENTATIONS

One of the purposes of this report is to make it clear that, contrary to media-fostered misimpressions, police officers rarely use their firearms and show great restraint when they do so. (The risible Hollywood fiction that police shootings have no consequence—that officers are back on the street immediately after a firearms discharge, that officers may engage in multiple incidents on a regular basis—is also dispelled by this report.) Perhaps the worst of popular cul-

ture's purposeful inaccuracies concerns the accuracy of pistols. Thanks to the movies and TV, many civilians have a mistaken understanding of police and their firearms.

Action heroes routinely display miraculous precision with their guns, and they routinely use handguns instead of rifles or long guns. In real life, handguns are much more limited weapons. They are short, making axial sight misjudgment more likely, and they lack a third bracing point (such as a rifle's butt stock), and are thus more difficult to steady and aim.

**CENTER MASS**



**NYPD PISTOLS**

There are three pistol models that are authorized as on-duty service weapons for NYPD officers: the Glock 19, the Sig Sauer P226, and the Smith & Wesson 5946. These weapons are semi-automatic, chambered in 9mm, and equipped with 15-round magazines. (Additionally, there are several weapons authorized for off-duty carry, such as the Glock 26, Smith & Wesson 3914, and the Beretta 8000D Mini Cougar. A handful of officers carry .38 caliber revolvers; these officers are senior members whose weapons have been grandfathered in; revolvers have not been issued as service weapons since 1992.) All NYPD service pistols are "double action only" (DAO), meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be "cocked," resulting in a one-stage trigger pull, which is smoother and easier). Additionally, all NYPD weapons are also modified to have a heavier-than-stock 12-lb trigger pull; this diminishes the likelihood of unintentional discharges but also affects aiming. Nevertheless, it balances the fact that NYPD pistols do not have safeties, and are carried "hot," with a round in the chamber. The NYPD uses a 124 grain, hollow-point bullet that is designed to prevent over-penetration and ricochets.

**CENTER MASS**

Ersatz experts in police tactics who have never been police officers occasionally claim that shooting to wound is a valid choice, even in life-or-death combat situations: they are mistaken. Both the impairment of fine motor skills during combat stress and the relative imprecision of pistols contribute to the fact that **ALL POLICE OFFICERS ARE TAUGHT TO SHOOT FOR CENTER MASS**. Police officers never aim for a subject's extremities; they fire at center mass.*

The human body's center mass, also called the center of gravity, is, by definition, the most central and largest area available as a point of aim. Physicians use a quick assessment tool known as "the rule of nines" to divide body surface by region. The torso represents one third

* In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center or "barycenter" of the exposed portion as a point of aim in lieu of center mass.

of a human's surface area, versus a mere 9 percent for an arm or 18 percent for a leg. The torso is also the most stationary portion of the body. Extremities, on the other hand, are smaller and far less static. Arms flail, legs pump, and in so doing they become nearly impossible to target. This is exacerbated by the stress and dynamism of a combat situation.

Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to the center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun. Stopping a subject from threatening imminent death or serious physical injury to another person is the sole reason an officer utilizes deadly physical force.

**THIS PAGE INTENTIONALLY LEFT BLANK**

## ADVERSARIAL CONFLICT RESULTING IN A SUBJECT'S DEMISE

***In 2011, nine subjects were shot and killed by officers who intentionally discharged their weapons during adversarial conflict.***

***The very essence of police work is the desire to protect life. Because of this, taking a life in order to protect another is a terrible contradiction, and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations can be analyzed and assessed in order to develop training that can provide officers with more use -of-force options or conflict-resolution opportunities so that, in the future, similar events may have different outcomes. A short narrative of each incident is found below. It is worthy of note that seven of the nine subjects had prior arrest histories; Five toxicology reports were available at the time of publication and show that four were intoxicated and/or had controlled substances in their systems when these incidents occurred.***

On March 20, at 2328 hours, in the confines of the 49th Precinct, several uniformed police officers responded to a 911 call describing a violent dispute with a knife. Upon arriving at the location, the officers encountered a male shouting "Help! They're going to kill each other!" Officers ascended to a fifth-floor apartment where they observed a victim attempting to use a chair to fend off a male white subject who was menacing him with a large kitchen knife. A female officer and her male partner were able to pull the victim out of the room but then faced the subject, who refused repeated instructions to discard the knife and instead charged at the officers. Both officers fired, striking the subject and causing his demise. The subject had a long arrest history that included assaults and resisting-arrest charges, and had controlled substances in his system at the time of the incident.

On March 26, at 0002 hours, in the confines of the 40th Precinct, three officers had occasion to discharge their firearms at an individual who was aggressively attempting to run them and other officers down with a vehicle, and had already injured civilians while doing so. A short time prior, two plainclothes officers had observed a sports utility vehicle with defective equipment and had attempted to stop the driver. After refusing to pull over, the male Hispanic driver fled, running red lights and driving on sidewalks as he did so. Other officers, included uniformed officers in marked vehicles, joined the pursuit. The subject attempted to enter an expressway, but was blocked by traffic, and began to use his vehicle to ram other occupied cars. Several officers exited their vehicles and approached the subject, who continued to crash his SUV into the automobiles blocking his path, injuring civilians, and also attempted to run over the officers. Three officers discharged their weapons, striking the subject and causing his demise. A passenger in the SUV was unhurt. The subject, who had controlled substances in his system at the time of his death, had a long felony history, including arrests for assault and weapons possession, and had served nine years in prison. At the time of the incident, there was a warrant for the subject's arrest.

On May 11, at 1934 hours, in the confines of the 83rd Precinct, an undercover detective exe-

cuting a firearms purchase was the victim of a gunpoint-robbery attempt. The undercover officer had arranged to meet an illegal firearms dealer and purchase several guns. Upon arriving at the agreed location, both the seller and the undercover officer were accosted by a male Hispanic armed with a .380 caliber semiautomatic pistol who ordered them to the ground. Fearing for his life, the undercover officer drew his firearm and discharged three rounds, striking the subject and causing his demise. The subject had numerous felony priors, including arrests for robbery and assault. His toxicology report was unavailable at the time of this writing.

On May 17, at 1230 hours, in the confines of 123rd Precinct, an officer assigned to the Emergency Services Unit discharged his weapon at an armed male white subject who had just murdered one civilian and seriously injured another. Upon receiving reports of a shooting, patrol units responded and were able to interview the victim who had been shot and injured. She stated that the subject, a business associate of her husband, had come to their house and, without preamble, shot her and then shot and killed her husband. Patrol officers entered the house and encountered the subject, who was still armed. An on-scene police executive ordered a tactical evacuation, and while moving out of the house officers heard a gunshot. Police established a secure perimeter, and awaited the response of the Emergency Services Unit. When the unit arrived, they determined that the gunshot heard might have been the subject injuring himself, and entered the house in order to assess the situation. The lead officer encountered the subject, who pointed a .25 caliber semiautomatic pistol at the officer. The officer discharged his weapon several times, striking the subject and causing his demise. The subject had no prior arrest history, and had controlled substances in his system at the time of the incident.

On June 30, at 1650 hours, in the confines of the 75th Precinct, officers responded to a radio call for a robbery during which a man had been shot. A male white subject had entered an auto repair shop, abruptly produced a revolver, and shot and injured the owner. He then fled. Numerous officers converged on the location to canvas for the subject. One uniformed sergeant and officer were alerted by a passerby that the subject had hailed a livery cab. Upon locating and stopping the cab, the sergeant and officer approached the vehicle, at which point the subject suddenly opened the cab's rear door and menaced the officers with pistol in hand. The subject refused orders to relinquish his weapon, and a struggle over the gun ensued. When the subject wrested the .38 revolver away and pointed it at the officers, each officer discharged a single round, striking the subject and causing his demise. The subject had no prior arrest history, and had controlled substances in his system at the time of the incident.

On July 14, at 1120 hours, in the confines of the 42nd Precinct, an undercover detective engaged in a narcotics transaction was the victim of a gunpoint-robbery attempt. The undercover officer agreed to purchase crack cocaine from a male black subject, and the subject retired to a second location to retrieve the narcotics while the undercover waited in a vestibule. When the subject returned, however, he refused to show the undercover officer any drugs, and instead produced a .25 caliber semiautomatic pistol and demanded money. In fear for his life, the undercover officer drew his firearm and discharged four rounds, striking the subject and causing his demise. The subject had prior narcotics and weapons possession arrests.

On September 6, at 1700 hours, in the confines of the 34th Precinct, a detective observed a narcotics transaction conducted by a known male Hispanic subject with a history of arrests for drug sales and possession. When the detective attempted to effect an arrest, the subject resisted violently. The fight spilled from the vestibule where the transaction had occurred into the street, at which point a male Hispanic neighbor attempted to intercede on the drug dealer's behalf. This second subject choked the detective, nearly causing him to lose consciousness. In fear for his life, the detective fired a single round, striking the second subject and causing his demise. The first subject fled but was subsequently apprehended. The second subject had prior arrests associated with narcotics. His toxicology report was unavailable at the time of this writing.

On October 02, at 2030 hours, in the confines of the 17th Precinct, two uniformed officers were alerted to a dispute. They observed a female black subject armed with two knives and chasing another female. The officers confronted the subject and shouted numerous instructions, all of which the subject ignored. In lieu of compliance, the subject brandished her weapons and aggressively advanced on the officers. Both officers discharged their weapons, striking the subject and causing her demise. The subject had prior arrests for assault, weapons possession, burglary, and narcotics. Her toxicology report was unavailable at the time of this writing.

On December 31st, in Nassau County, an off-duty NYPD officer and a retired lieutenant from the Nassau County Police Department were alerted to an ongoing robbery and altercation at a nearby pharmacy. They rushed to the scene, and observed two men engaged in a violent struggle over a firearm. At some point, the retired lieutenant deemed one of the two men who were fighting to be an apparent threat, and discharged his firearm at that individual. Sadly, the subject of the retired lieutenant's discharge was in fact an off-duty federal law-enforcement officer who had been inside the pharmacy when the other man had perpetrated an armed robbery. The federal officer had pursued and fired upon the robber, and a struggle ensued. After the retired lieutenant intentionally but mistakenly shot the federal officer, the robber gained control of the federal officer's firearm. At this point the off-duty NYPD officer correctly adjudged the robber to be a threat and fired three rounds, striking and killing him. Tragically, the federal officer subsequently succumbed to his injuries, as well. The criminal subject had served time in prison for previous robbery convictions and was on parole at the time of the incident; His toxicology report was unavailable at the time of this writing.

**THIS PAGE INTENTIONALLY LEFT BLANK**

**SUBJECTS SHOT BY NYPD OFFICERS, 1998 TO 2011, BY RACE**




**GUNFIRE IN NEW YORK CITY, 2011, BY RACE**



| | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 0 | 6 | 2 | 0 | 0 | 0 |
| BLACK | 15 | 6 | 11 | 9 | 20 | 7 |
| HISPANIC | 4 | 2 | 4 | 2 | 4 | 6 |
| ASIAN | 1 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | **20** | **14** | **17** | **11** | **24** | **13** |

| | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 1 | 1 | 1 | 1 | 4 | 0 |
| BLACK | 12 | 13 | 15 | 6 | 21 | 7 |
| HISPANIC | 10 | 0 | 7 | 4 | 3 | 2 |
| ASIAN | 1 | 0 | 0 | 0 | 1 | 0 |
| TOTAL | **24** | **14** | **23** | **11** | **29** | **9** |

| | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 1 | 1 | 0 | 2 | 0 | 2 |
| BLACK | 16 | 9 | 9 | 5 | 12 | 7 |
| HISPANIC | 6 | 3 | 9 | 3 | 6 | 4 |
| ASIAN | 0 | 0 | 1 | 0 | 0 | 0 |
| TOTAL | **23** | **13** | **19** | **10** | **18** | **13** |

| | 2009 | | 2010 | | 2011 | |
|---|---|---|---|---|---|---|
| | WOUNDED | KILLED | WOUNDED | KILLED | WOUNDED | KILLED |
| WHITE | 0 | 0 | 3 | 2 | 2 | 4 |
| BLACK | 14 | 8 | 9 | 1 | 10 | 2 |
| HISPANIC | 6 | 4 | 3 | 4 | 7 | 3 |
| ASIAN | 0 | 0 | 1 | 1 | 0 | 0 |
| TOTAL | **20** | **12** | **16** | **8** | **19** | **9** |

| DAY OF WEEK | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| SUNDAY | 4 | 2 | 3 | 0 | 9 |
| MONDAY | 4 | 6 | 2 | 0 | 12 |
| TUESDAY | 6 | 6 | 1 | 1 | 14 |
| WEDNESDAY | 6 | 6 | 3 | 0 | 15 |
| THURSDAY | 4 | 5 | 1 | 1 | 11 |
| FRIDAY | 6 | 5 | 2 | 3 | 16 |
| SATURDAY | 6 | 6 | 3 | 0 | 15 |
| **TOTAL** | **36** | **36** | **15** | **5** | **92** |

| TOUR | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| 0731-1530 | 7 | 7 | 4 | 1 | 19 |
| 1531-2330 | 13 | 17 | 8 | 2 | 40 |
| 2331-0730 | 16 | 12 | 3 | 2 | 33 |
| **TOTAL** | **36** | **36** | **15** | **5** | **92** |

| MONTH | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| JANUARY | 3 | 2 | 2 | 0 | 7 |
| FEBRUARY | 0 | 3 | 2 | 0 | 5 |
| MARCH | 2 | 3 | 2 | 1 | 8 |
| APRIL | 2 | 2 | 2 | 0 | 6 |
| MAY | 4 | 2 | 0 | 2 | 8 |
| JUNE | 2 | 1 | 0 | 0 | 3 |
| JULY | 5 | 7 | 0 | 0 | 12 |
| AUGUST | 3 | 3 | 3 | 0 | 9 |
| SEPTEMBER | 6 | 4 | 1 | 1 | 12 |
| OCTOBER | 5 | 3 | 0 | 1 | 9 |
| NOVEMBER | 2 | 5 | 1 | 0 | 8 |
| DECEMBER | 2 | 1 | 2 | 0 | 5 |
| **TOTAL** | **36** | **36** | **15** | **5** | **92** |

**ID-AC** – Intentional Discharge – Adversarial Conflict
**ID-AA** – Intentional Discharge – Animal Attack
**UNINT** – Unintentional Discharge
**UNAUTH** – Unauthorized Use of Firearm

| BOROUGH | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| BRONX | 9 | 14 | 5 | 0 | 28 |
| MANHATTAN | 6 | 1 | 1 | 2 | 10 |
| QUEENS | 5 | 3 | 2 | 0 | 10 |
| BROOKLYN | 10 | 15 | 3 | 1 | 29 |
| STATEN ISLAND | 4 | 2 | 2 | 0 | 8 |
| OUTSIDE CITY | 2 | 1 | 2 | 2 | 7 |
| **TOTAL** | **36** | **36** | **15** | **5** | **92** |

| MANHATTAN | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| 1st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 5th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 6th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 7th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 9th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 10th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 13th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| MTS PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 17th PRECINCT | 1 | 0 | 0 | 1 | 2 |
| MTN PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 19th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 20th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| CENT PARK PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 23rd PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 24th PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 25th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 26th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 28th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 30th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 32nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 33rd PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 34th PRECINCT | 2 | 0 | 0 | 0 | 2 |
| **TOTAL** | **6** | **1** | **1** | **2** | **10** |

| BRONX | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| 40th PRECINCT | 1 | 1 | 1 | 0 | 3 |
| 41st PRECINCT | 1 | 2 | 1 | 0 | 4 |
| 42nd PRECINCT | 2 | 0 | 1 | 0 | 3 |
| 43rd PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 44th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 45th PRECINCT | 0 | 1 | 1 | 0 | 2 |
| 46th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 47th PRECINCT | 2 | 1 | 0 | 0 | 3 |
| 48th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 49th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 50th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 52nd PRECINCT | 0 | 4 | 0 | 0 | 4 |
| **TOTAL** | **9** | **14** | **5** | **0** | **28** |

| BROOKLYN | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| 60th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 61st PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 62nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 63rd PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 66th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 67th PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 68th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 69th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 70th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 71st PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 72nd PRECINCT | 0 | 0 | 0 | 1 | 1 |
| 73rd PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 75th PRECINCT | 1 | 3 | 1 | 0 | 5 |
| 76th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 77th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 78th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 79th PRECINCT | 0 | 3 | 0 | 0 | 3 |
| 81st PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 83rd PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 84th PRECINCT | 0 | 0 | 1 | 0 | 1 |
| 88th PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 90th PRECINCT | 1 | 1 | 0 | 0 | 2 |
| 94th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **10** | **15** | **3** | **1** | **29** |

| QUEENS | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| 100th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 101st PRECINCT | 1 | 0 | 1 | 0 | 2 |
| 102nd PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 103rd PRECINCT | 0 | 2 | 1 | 0 | 3 |
| 104th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 105th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 106th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 107th PRECINCT | 0 | 1 | 0 | 0 | 1 |
| 108th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 109th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 110th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 111th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 112th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 113th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| 114th PRECINCT | 1 | 0 | 0 | 0 | 1 |
| 115th PRECINCT | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **5** | **3** | **2** | **0** | **10** |

| STATEN ISLAND | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| 120th PRECINCT | 1 | 2 | 0 | 0 | 3 |
| 122nd PRECINCT | 2 | 0 | 0 | 0 | 2 |
| 123rd PRECINCT | 1 | 0 | 2 | 0 | 3 |
| **TOTAL** | **4** | **2** | **2** | **0** | **8** |

| DUTY STATUS | ID-AC | ID-AA | UNINT | UNAUTH | TOTAL |
|---|---|---|---|---|---|
| OFFICERS ON-DUTY | 56 | 42 | 11 | 1 | 110 |
| OFFICERS OFF-DUTY | 6 | 1 | 4 | 4 | 15 |
| **TOTAL (MOS firing)** | **62** | **43** | **15** | **4*** | **124*** |

* It must be noted that the number of officers involved will not equal the number of officers firing due to incidents where an officers' firearm was discharged by a person other than a member of this Department .

| ID-AC | TYPE OF THREAT FROM SUBJECTS FIRED UPON | OFFICERS INVOLVED | SHOTS | INJURY FATALITY | # SUBJECTS FIRED UPON | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 1 | BLUNT INSTRUMENT - VEHICLE | 1 | 4 | INJURY | 1 | male | white | 24 | VEHICLE |
| 2 | FIREARM - SUBJECT FIRED AT OFFICER | 1 | 2 | | 1 | male | black | 23 | FIREARM |
| 3 | FIREARM - SUBJECT FIRED AT OFFICERS | 3 | 5, 5, 3 | INJURY | 1 | male | white | 61 | FIREARM |
| 4 | CUTTING INSTRUMENT - SUBJECT ATTACKED CIVILIAN | 2 | 1 and 2 | FATAL | 1 | male | white | 49 | KNIFE |
| 5 | BLUNT INSTRUMENT - VEHICLE | 3 | 9, 9, 1 | FATAL | 1 | male | Hispanic | 28 | VEHICLE |
| 6 | FIREARM - SUBJECT FIRED AT POLICE | 1 | 8 | INJURY | 1 | male | black | 20 | FIREARM |
| 7 | IMITATION FIREARM - SUBJECT MENACED POLICE | 3 | 9, 5, 4 | INJURY | 1 | male | black | 20 | IMITATION |
| 8 | FIREARM - SUBJECT MENACED OFFICER THEN FLED | 1 | 1 | unk | 1 | male | black | unk | FIREARM |
| 9 | FIREARM - SUBJECT ATTEMPTED TO ROB UNDERCOVER | 1 | 3 | FATAL | 1 | male | Hispanic | 31 | FIREARM |
| 10 | FIREARM - SUBJECT MURDERED CIVILIAN | 1 | 7 | FATAL | 1 | male | white | 48 | FIREARM |
| 11 | OFFICER PERCEIVED THREAT | 1 | 1 | INJURY | 1 | male | black | 23 | NONE |
| 12 | OFFICER PERCEIVED THREAT | 1 | 1 | | 1 | male | black | 19 | FIREWORKS |
| 13 | FIREARM - SUBJECT SHOT CIVILIAN | 2 | 1 and 1 | FATAL | 1 | male | white | 45 | FIREARM |
| 14 | FIREARM - SUBJECT FIRED AT OFFICERS | 1 | 9 | INJURY | 1 | male | Hispanic | 26 | FIREARM |
| 15 | CUTTING INSTRUMENT - SUBJECT MURDERED CIVILIAN | 1 | 3 | INJURY | 1 | male | black | 53 | KNIFE |
| 16 | FIREARM - SUBJECT ATTEMPTED TO ROB UNDERCOVER | 1 | 4 | FATAL | 1 | male | black | 17 | FIREARM |
| 17 | FIREARM - SUBJECTS SHOT AND SERIOUSLY INJURED OFFICER | 1 | 16 | INJURY | 2 | male | black | 28 | FIREARM |
| | | | | INJURY | | male | Hispanic | 35 | FIREARM |
| 18 | FIREARM - SUBJECT MENACED OFFICER | 1 | 2 | INJURY | 1 | male | black | 21 | FIREARM |
| 19 | CUTTING INSTRUMENT - SUBJECT MENACED OFFICER | 1 | 1 | INJURY | 1 | male | black | 42 | FIREARM |
| 20 | OFFICER PERCEIVED THREAT | 1 | 1 | | 1 | male | Hispanic | 21 | UNKNOWN |
| 21 | FIREARM - SUBJECT MENACED OFFICER | 1 | 1 | | 1 | male | black | 25 | FIREARM |
| 22 | FIREARM - SUBJECT FIRED AT OFFICERS, SHOT CIVILIANS | 1 | 13 | INJURY | 1 | male | Hispanic | 19 | FIREARM |
| 23 | FIREARM - SUBJECT MURDERED CIVILIAN | 8 | 73 total | INJURY | 1 | male | black | 35 | FIREARM |
| 24 | OVERWHELMING PHYS FORCE - SUBJECT CHOKED OFFICER | 1 | 1 | FATAL | 1 | male | Hispanic | 43 | PHYS FORCE |
| | | | | | | male | Hispanic | 24 | PHYS FORCE |

| ID-AC | TYPE OF THREAT FROM SUBJECTS FIRED UPON | OFFICERS INVOLVED | SHOTS | INJURY FATALITY | SUBJECTS FIRED UPON | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| **25** | IMITATION FIREARM - SUBJECT MENACED OFFICER | 1 | 1 | | 1 | male | Hispanic | 32 | PAINTBALL GUN |
| **26** | FIREARM - SUBJECT FIRED AT OFFICERS | 2 | 4 and 7 | | 3 | male | black | 34 | FIREARM |
| | | | | | | male | black | 20 | SHOTGUN |
| | | | | | | male | black | 32 | FIREARM |
| **27** | FIREARM - SUBJECT FIRED AT OFFICERS, STRIKING TWO | 8 | 45 total | INJURY | 1 | male | black | 30 | FIREARM |
| **28** | CUTTING INSTRUMENT - SUBJECT ATTACKED CIVILIAN | 2 | 8 and 5 | FATAL | 1 | female | black | 57 | KNIVES |
| **29** | FIREARM SUBJECT ATTEMPTED TO ROB DINER | 2 | 10 and 3 | INJURY | | male | white | 41 | FIREARM |
| **30** | OVERWHELMING PHYS. FORCE - SUBJECTS ATTEMPTED | 1 | 8 | INJURY | 2 | male | Hispanic | 21 | PHYS FORCE |
| | TO TAKE OFFICER'S FIREARM | | | INJURY | | male | Hispanic | 19 | PHYS FORCE |
| **31** | FIREARM | 1 | 3 | | 1 | male | Hispanic | 32 | FIREARM |
| **32** | FIREARM | 1 | 1 | | 1 | male | black | 18 | FIREARM |
| **33** | FIREARM SUBJECT FIRED AT OFFICERS | 2 | 4 and 1 | | 1 | male | black | 26 | FIREARM |
| **34** | FIREARM | 1 | 1 | INJURY | 1 | male | Hispanic | 27 | FIREARM |
| **35** | OVERWH. PHYS. FORCE - SUBJECT PUSHED OFFICER AT TRACKS | 1 | 1 | INJURY | 1 | male | black | 22 | PHYS FORCE |
| **36** | FIREARM | 1 | 3 | FATAL | 1 | male | white | 43 | FIREARM |

New York City Police Department
Office of Management Analysis and Planning
Special Projects
Deputy Inspector Edward Carrasco, Commanding Officer

Detective Jonathan C.W. Murad
Police Officer Mark Danon
Detective Cheryl Shea
Detective Charles Mills
Graphic Artist II Kevin Gleeson

# NYPD

## RAYMOND W. KELLY
## POLICE COMMISSIONER

### MICHAEL J. FARRELL
### DEPUTY COMMISSIONER, STRATEGIC INITIATIVES

**ASSISTANT CHIEF JOHN K. DONOHUE**
**COMMANDING OFFICER, OFFICE OF MANAGEMENT ANALYSIS AND PLANNING**

# NEW YORK CITY POLICE DEPARTMENT

## ANNUAL FIREARMS DISCHARGE REPORT

# 2012



# Annual Firearms Discharge Report

# 2012

## Raymond W. Kelly

**Police Commissioner**

© October 2013, NYPD

# TABLE OF CONTENTS


| | |
|---|---|
| **PART I: OVERVIEW** | **1** |
| **Glossary** | 2 |
| **Introduction** | 6 |
| **Use of Force** | 7 |
| Guidelines for the Use of Firearms | 8 |
| Reasonableness | 8 |
| Training | 9 |
| **Investigation** | 9 |
| The Shooting Team | 9 |
| The Shooting Incident Report | 10 |
| The Final Report | 10 |
| Review | 10 |
| The Borough Firearms Discharge Advisory Board | 11 |
| The Chief of Department’s Firearms Discharge Review Board | 11 |
| The Police Commissioner | 11 |
| **Exclusions** | 13 |
| **Categories** | 13 |

| | |
|---|---|
| **PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** | **14** |
| **Overview** | 15 |
| **Reasons for Discharges** | 15 |
| **Dates and Times of Discharges** | 15 |
| **Locations of Discharges** | 16 |
| Locations of Criminal Shootings | 16 |
| **Reasons Officer Involved** | 19 |
| **Officer Restraint** | 20 |
| Objective Completion Rate | 21 |
| Shooting Technique | 21 |
| Distance | 21 |

| | |
|---|---|
| **Officer Pedigree** | 22 |
| Attire | 22 |
| Years of Service | 22 |
| Rank | 23 |
| Police Weapons | 23 |
| **Subject Pedigree** | 24 |
| Subject Race | 24 |
| Prior Arrests | 25 |
| Subject Weapons | 25 |
| **Incident Outcomes** | 26 |
| Officer Death | 26 |
| Officer Injuries | 26 |
| Bullet-Resistant Vests | 26 |
| Malfunction | 26 |
| Subject Death | 26 |
| Subject Injuries | 27 |
| Bystander Injuries | 27 |
| Findings | 27 |
| **Summary** | 28 |

| | |
|---|---|
| **PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK** | **29** |
| **Overview** | 30 |
| **Reasons for Discharges** | 30 |
| **Dates and Times of Discharges** | 30 |
| **Locations of Discharges** | 31 |
| **Reasons Officer Involved** | 32 |
| **Officer Restraint** | 33 |
| Shooting Technique | 33 |
| **Officer Pedigree** | 34 |
| Years of Service | 34 |
| Rank | 35 |

| | |
|---|---|
| Attire | 35 |
| Police Weapons | 35 |
| **Incident Outcomes** | 35 |

| | |
|---|---|
| **PART IV: UNINTENTIONAL DISCHARGE** | **36** |
| **Overview** | 37 |
| Weapons | 37 |
| Officer Pedigree | 37 |
| **Purely Unintentional Discharges** | 39 |
| Loading/Unloading | 39 |
| Handling | 39 |
| **Unintentional Discharges During Adversarial Conflict** | 39 |
| **Incident Outcomes** | 39 |

| | |
|---|---|
| **PART V: UNAUTHORIZED USE OF A FIREARM** | **40** |
| **Overview** | 41 |
| **Officer Pedigree** | 41 |
| **Suicide** | 43 |
| **Discharges by Other Than an Officer** | 43 |
| **Incident Outcomes** | 43 |

| | |
|---|---|
| **PART VI: MISTAKEN IDENTITY** | **44** |
| **Overview** | 45 |
| **2012 Incidents** | 45 |

| | |
|---|---|
| **APPENDICES** | **46** |
| **Appendix A: Firearms Discharges, 1971-2012** | 46 |
| **Appendix B: Firearms Training** | 49 |
| **Appendix C: Subjects Killed During ID-AC Incidents** | 51 |
| **Appendix D: Subject Race, 2002-2012** | 55 |
| **Appendix E: 2012 Firearms Discharge Details** | 57 |

# TABLES, CHARTS, AND FIGURES


| **PART I: OVERVIEW** | | **1** |
|---|---|---|
| 1.1 | 2012 Firearms Discharge Scope | 3 |
| 1.2 | Firearms Discharge Incidents, 2002-2012 | 4 |
| 1.3 | Adversarial Conflict, 2002-2012 | 4 |
| 1.4 | Unintentional Discharge, 2002-2012 | 4 |
| 1.5 | Animal Attack, 2002-2012 | 4 |
| 1.6 | Total Discharges, 2002-2012 | 4 |
| 1.7 | 2012 by Category | 5 |
| 1.8 | Anatomy of a Firearms Discharge Investigation | 12 |

| **PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** | | **14** |
|---|---|---|
| 2.1 | Threat Type, ID-AC Incidents | 15 |
| 2.2 | ID-AC Incidents by Borough | 16 |
| 2.3 | ID-AC Incidents vs. Criminal Shooting Incidents | 17 |
| 2.4 | Criminal Shootings vs. ID-AC Incidents, Frequency by Borough | 18 |
| 2.5 | Criminal Shootings vs. ID-AC Incidents, Percentage by Borough | 18 |
| 2.6 | On-Duty Officer Assignments | 19 |
| 2.7 | Rounds Fired Per Officer, ID-AC Incidents | 20 |
| 2.8 | Rounds Fired Per ID-AC Incident | 20 |
| 2.9 | Distance to Target | 21 |
| 2.10 | Race, ID-AC Officers vs. Department Staffing | 22 |
| 2.11 | Years of Service, ID-AC Officers vs. Department Staffing | 23 |
| 2.12 | Rank, ID-AC Officers vs. Department Staffing | 23 |
| 2.13 | Subjects Armed with Firearms | 24 |
| 2.14 | Subjects Struck by Police Gunfire | 24 |
| 2.15 | Subjects Killed by Police Gunfire | 24 |
| 2.16 | Subjects Firing on Police | 24 |
| 2.17 | Subjects Firing on Police vs. Identified Shooting Suspects | 25 |
| 2.18 | Subject Weapons | 26 |

| PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK | | 29 |
|---|---|---|
| 3.1 | ID-AA Incidents by Tour | 30 |
| 3.2 | ID-AA Incidents by Borough | 31 |
| 3.3 | ID-AA Locations | 31 |
| 3.4 | ID-AA Incidents by Location Type | 32 |
| 3.5 | Situations Precipitating On-Duty ID-AA Incidents | 32 |
| 3.6 | ID-AA Rounds Fired Per Officer | 33 |
| 3.7 | Rounds Fired Per ID-AA Incident | 33 |
| 3.8 | Race, ID-AA Officers vs. Department Staffing | 34 |
| 3.9 | Years of Service, ID-AA Officers vs. Department Staffing | 34 |
| 3.10 | ID-AA Officers by Rank | 35 |

| PART IV: UNINTENTIONAL DISCHARGE | | 36 |
|---|---|---|
| 4.1 | Race, Unintentional Discharges vs. Department Staffing | 37 |
| 4.2 | Years of Service, Unintentional Discharges vs. Department Staffing | 38 |
| 4.3 | Rank, Unintentional Discharges vs. Department Staffing | 38 |

| PART V: UNAUTHORIZED USE OF A FIREARM | | 40 |
|---|---|---|
| 5.1 | Race, Unauthorized Discharges vs. Department Staffing | 41 |
| 5.2 | Years of Service, Unauthorized Discharges vs. Department Staffing | 42 |
| 5.3 | Rank, Unauthorized Discharges vs. Department Staffing | 42 |
| 5.4 | Police Officer Suicides by Firearm, 2002-2012 | 43 |

| PART VI: MISTAKEN IDENTITY | | 44 |
|---|---|---|
| | None | |

| APPENDICES | | 46 |
|---|---|---|
| A.1 | Officers Shot and Injured by Subjects, 1971-2012 | 46 |
| A.2 | Officers Shot and Killed by Subjects, 1971-2012 | 46 |
| A.3 | Subjects Shot and Injured by Officers, 1971-2012 | 47 |
| A.4 | Subjects Shot and Killed by Officers, 1971-2012 | 47 |

| | | |
|---|---|---|
| A.5 | Total Shots Fired from NYPD Guns, 1971-2012 | 48 |
| A.6 | Total Shooting Incidents, 1971-2012 | 48 |
| A.7 | Gunfire in New York City, 2012 | 55 |
| A.8 | Subjects Wounded by Police, 2002-2012 | 55 |
| A.9 | Subjects Killed by Police, 2002-2012 | 56 |
| A.10 | Subjects Shot by Officers, 2002-2012 | 56 |
| A.11 | Total Firearms Discharge Incidents by Day, 2012 | 57 |
| A.12 | Total Firearms Discharge Incidents by Tour, 2012 | 57 |
| A.13 | Total Firearms Discharge Incidents by Month, 2012 | 58 |
| A.14 | Total Firearms Discharge Incidents by Borough, 2012 | 58 |
| A.15 | Total Firearms Discharge Incidents by Precinct, Manhattan, 2012 | 59 |
| A.16 | Total Firearms Discharge Incidents by Precinct, Bronx, 2012 | 60 |
| A.17 | Total Firearms Discharge Incidents by Precinct, Brooklyn, 2012 | 61 |
| A.18 | Total Firearms Discharge Incidents by Precinct, Queens, 2012 | 62 |
| A.19 | Total Firearms Discharge Incidents by Precinct, Staten Island, 2012 | 62 |
| A.20 | Total Firearms Discharge Incidents by Location, 2012 | 63 |
| A.21 | Total Firearms Discharge Incidents by Officer Duty Status, 2012 | 63 |
| A.22 | ID-AC Incidents, 2012 | 64 |

# PART I: OVERVIEW

| GLOSSARY | |
|---|---|
| **Officer** | A uniformed member of the New York City Police Department of any rank. |
| **Subject** | A person engaged in adversarial conflict with an officer or a third party, which results in a firearms discharge. |
| **Civilian** | A person who is not the subject of an adversarial conflict, but is a victim, bystander, and/or injured person. |
| **Firearms Discharge** | An incident in which an officer discharges any firearm, or when a firearm belonging to an officer is discharged by any person, excluding discharges during authorized training sessions, lawful target practice or hunting, or at a firearm safety station within a Department facility. |
| **Intentional Discharge – Adversarial Conflict** | An incident in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject, including those inside the scope of the officer's employment but outside Department guidelines. This does not include a discharge against an animal attack. |
| **Mistaken Identity Discharge** | An incident in which an officer intentionally discharges a firearm at another law-enforcement officer whom the discharging officer mistakenly believes to be a criminal. This does not include crossfire incidents in which a discharging officer unintentionally strikes another officer. |
| **Intentional Discharge – Animal Attack** | An incident in which an officer intentionally discharges a firearm in defense of self or another against an animal attack, including those inside the scope of the officer's employment but outside Department guidelines. |
| **Intentional Discharge – No Conflict** | An incident in which an officer intentionally discharges a firearm to summon assistance, including those inside the scope of the officer's employment but outside Department guidelines. |
| **Unintentional Firearms Discharge** | An incident in which an officer discharges a firearm without intent, regardless of the circumstance. |
| **Unauthorized Use of a Firearm** | An incident in which an officer discharges a firearm without proper legal justification and/or outside the scope of the officer's employment, or an incident in which an unauthorized person discharges an officer's firearm. |
| **Use/Threaten the Use of a Firearm** | A contributing factor to a firearms discharge in which a subject discharges or threatens to discharge a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening to use a firearm. |
| **Firearm** | A pistol, revolver, shotgun, or rifle, including a variation of any of these (e.g. a sawed-off shotgun). |
| **Imitation Firearm** | Any instrument that is designed to appear as if it were a firearm, or modified to appear as if it were a firearm, including air pistols, toy guns, prop guns, and replicas. |
| **Use/Threaten the Use of a Cutting Instrument** | A contributing factor to a firearms discharge in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| **Cutting Instrument** | Any knife, razor, sword, or other sharp-edged object such as a broken bottle. |
| **Use/Threaten the Use of a Blunt Instrument** | A contributing factor to a firearms discharge in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |
| **Blunt Instrument** | Any bat, stick, pipe, metal knuckles, or other object which, when used as a weapon, can cause blunt-force injury to a person, including motor vehicles and unbroken bottles. |

| | |
|---|---|
| **Use/Threaten the Use of Overwhelming Physical Force** | An incident in which an unarmed subject physically attacks a person or threatens or attempts to do the same, and by doing so puts the victim at risk of serious physical injury or death, including gang assaults, attempts to push a person from a roof or train platform, and attempts to take an officer's firearm. |

| **2012 FIREARMS DISCHARGE SCOPE** | |
|---|---|
| New York City Population[1] | 8,244,910 |
| NYPD Average Annual Uniformed Staffing | 34,920 |
| Total Civilian Contacts (Approximate) | 23,000,000 |
| Total Radio Assignments | 4,835,484 |
| Radio Assignments Involving Weapons | 246,621 |
| Arrests Involving Weapons Used/Displayed/Possessed | 26,019 |
| Gun Arrests | 5,689 |
| Criminal Shooting Incidents | 1,374 |
| Adversarial Conflict: Total Number of Officers Who Intentionally Fired | 60 |
| Adversarial Conflict: Total Number of Firearms Discharge Incidents | 45 |
| Subjects Shot and Injured | 14 |
| Subjects Shot and Killed | 16 |
| Officers Shot and Injured | 13 |
| Officers Shot and Killed | 0 |

Figure 1.1

[1] U.S. Census, July 1, 2012

| FIREARMS DISCHARGE INCIDENTS, 2002-2012 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Adversarial Conflict | 55 | 61 | 51 | 59 | 59 | 45 | 49 | 47 | 33 | 36 | 45 |
| Animal Attack | 38 | 35 | 26 | 32 | 30 | 39 | 30 | 28 | 30 | 36 | 24 |
| Unintentional Discharge | 24 | 25 | 27 | 25 | 26 | 15 | 15 | 23 | 21 | 15 | 21 |
| Mistaken Identity | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Unauthorized Use of a Firearm[2] | 0 | 2 | 5 | 6 | 8 | 6 | 3 | 4 | 6 | 2 | 6 |
| MOS Suicide/ Attempt[3] | 2 | 7 | 5 | 3 | 3 | 6 | 8 | 3 | 2 | 3 | 9 |
| **Total** | **119** | **130** | **114** | **125** | **127** | **111** | **105** | **106** | **92** | **92** | **105** |

Figure 1.2




Figure 1.3




Figure 1.4




Figure 1.5




Figure 1.6

[2] This category was modified in 2005 to include incidents in which an unauthorized person discharges an officer's firearm
[3] MOS Suicide/Attempt is a subcategory of Unauthorized Use of a Firearm – the numbers have been disaggregated in this table

## 2012 BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | |
|---|---|
| Subject Used/Threatened the Use of a Firearm or Simulated Firearm | 32 |
| Subject Used/Threatened the Use of a Cutting Instrument | 7 |
| Subject Used/Threatened the Use of a Blunt Instrument | 4 |
| Subject Used/Threatened the Use of Overwhelming Physical Force | 0 |
| Unknown | 2 |
| **Total** | **45** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK | |
|---|---|
| Dog Attack | 24 |
| **Total** | **24** |

| UNINTENTIONAL DISCHARGE | |
|---|---|
| During Adversarial Conflict | 9 |
| Handling Firearm | 12 |
| **Total** | **21** |

| UNAUTHORIZED USE OF A FIREARM | |
|---|---|
| Officer Suicide | 8 |
| Attempted Officer Suicide | 1 |
| Unauthorized Intentional Discharge | 2 |
| Unauthorized Person Discharged Officer's Firearm | 4 |
| **Total** | **15** |

| | |
|---|---|
| **TOTAL FIREARMS DISCHARGES** | **105** |

Figure 1.7

# INTRODUCTION

The New York City Police Department began to collect in-depth documentation of firearm discharges during hostile encounters in 1971, for the purpose of "[increasing] the safety potential of each member of the force." The policy quickly expanded beyond police-involved combat, however, and came to include the study of other categories, such as unintentional discharges. Today, the Department tracks any incident in which a Department firearm is discharged, even if the person discharging the weapon is not an officer.

Four decades of annual analyses have altered the way officers respond to, engage in, and assess the need for firearms discharges. Information gleaned from the annual reports has saved lives, and there has been Department-wide change with regard to firearms safety, retention, and tactics. The Department has made restraint the norm. When annual recordkeeping began in 1971, 12 officers were shot and killed by another person, and 47 officers were shot and injured. Officers, in turn, shot and killed 93 subjects, and injured another 221. By contrast, in 2012, 13 officers were shot and injured by subjects, while police shot and killed 16 subjects, and injured 14 others; no officer was killed by subject gunfire in 2012.

Today, the reports additionally serve as statistical support for the development of training, the adoption of new technology, and the deployment of Department resources. New instructional scenarios are implemented as a result of this analysis, and new hardware—from bullet-resistant vests to conducted-energy devices—have been introduced.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

# USE OF FORCE

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect arrest or prevent escape, as well as to protect property or people. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing malefactors and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance, and the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist police—officers have an ascending array of force options to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (i.e. pepper spray), conducted energy devices, impact weapons like batons, and, finally, deadly physical force. All of these are tools at the officer's disposal, and the officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm—or vice versa—if the situation dictates.

In federal case law, Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989) delineate a standard of "objective reasonableness" that restricts an officer's prerogative to compel or constrain another citizen. But Tennessee v. Garner affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. And the state limits an officer's ability to exercise deadly physical force even further—Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three very specific instances:

1) When the subject has committed or is attempting to commit a felony and is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary;

2) When an armed felon resists arrest or flees; and

3) When the use of deadly physical force is necessary to defend any person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. Additionally, according to the laws of New York State, it is lawful for an officer to shoot at the driver of a vehicle who is using the vehicle so that it poses an imminent threat of deadly physical force. Such a firearms discharge would violate Department guidelines, however.

NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and "excessive force will not be tolerated," (Patrol Guide 203-11). Specifically regarding the use of deadly physical force, Department policy states, "uniformed members of the service should use only the minimal amount of force necessary to protect human life," (Patrol Guide 203-12).

## GUIDELINES FOR THE USE OF FIREARMS

To ensure that officers use only the minimal amount of force, the Department has nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

1) Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.

2) Police officers shall not discharge their weapons when, in their professional judgment, doing so will unnecessarily endanger innocent persons.

3) Police officers shall not discharge their weapons in defense of property.

4) Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.

5) Police officers shall not fire warning shots.

6) Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.

7) Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.

8) Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.

9) Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

## REASONABLENESS

An officer's permission to use force is not unlimited. According to the law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary.

Police are regularly exposed to highly stressful, dangerous situations, and the risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Oliver Wendell Holmes, Jr., noted that, "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, in Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court wrote that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51 NY2d 271, the New York State courts observed that, "it would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good.

TRAINING

Latitude is not unrestricted discretion – rather, it is an admission that reasonableness is fluid. In order to make the right conclusion about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, and skill, but most of all, on training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The main purpose of the Annual Firearms Discharge Report is to ensure that the NYPD's training is the best it can be.

## INVESTIGATION

The New York City Police Department recognizes the serious nature of police-involved firearms discharges and seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents:

1) Patrol Guide Procedure 212-29

2) A handbook entitled, "The Firearms Discharges Investigation Manual; The NYPD Guide to the Preparation of a Shooting Incident Report."

THE SHOOTING TEAM

When an officer discharges his or her firearm, whether on or off duty, or when a firearm owned by an officer is discharged, a patrol supervisor responds to the incident, takes charge of the scene, and secures and inspects the involved officer's firearm. He or she also immediately notifies the chain of command. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of Captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, and begins by contacting and conferring with the District Attorney. In many instances—including nearly every instance in which a subject is killed or injured—the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to a Breathalyzer test. He or she is also automatically reassigned to an administrative position for a minimum of the next three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, area searches, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

## THE SHOOTING INCIDENT REPORT

A preliminary report—usually written within eight hours of the incident—outlines, as much as possible, the shooting incident; however, the rapidly evolving nature of shooting investigations means information contained therein is unavoidably preliminary. The primary means of mitigating this is the use of the Firearms Discharge Investigation Manual.

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination, however, nor from commenting on the apparent tactics utilized during the incident.

## THE FINAL REPORT

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data is unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting-team leader (e.g., detective's case files, forensic results, and medical reports).

Generally, with regard to discharges that occur during adversarial conflict and involve injury or death to a subject, the final report cannot be finished within the 90-day period. Instead, it must wait until the investigation into the incident has been completed, or at least until the district attorney from the county of occurrence has permitted the officer or officers who shot to be interviewed. At times it must wait even longer, until all relevant legal proceedings have been concluded.

If a final report is delayed—whether because of ongoing legal proceedings or incomplete investigations—the Borough Investigation Unit submits monthly interim-status reports. Once the final report is finished, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After a firearms discharge has been investigated, the final report prepared, and after the District Attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered and conducted at the borough and executive levels. Members of the borough Firearms Discharge Advisory Board are supervisors assigned to the borough in which the incident occurred. This board further scrutinizes the incident with the benefit of new material contained in the final report. Based on the accumulated evidence, the borough Firearms Discharge Advisory Board issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board for determination.

THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The Department's Firearms Discharge Review Board issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The Review Board gives due consideration to, and often concurs with, the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report—a single document that memorializes and synthesizes the whole of the exhaustive investigation and review process—and presents it to the Police Commissioner.

THE POLICE COMMISSIONER

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination regarding the incident. Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2012 findings are published throughout this report.

## ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION




Figure 1.8

## EXCLUSIONS

The report excludes instances of perpetrators attacking officers with deadly physical force, including firing on officers, when officers do not return fire. Although no police officer was murdered in 2012, 13 officers were shot. Several notable events are not part of the report's statistical analysis:

The first event occurred on January 1, when a group of officers were fired on in a marked police van. An unknown assailant fired at least 7 rounds from an unrecovered semiautomatic handgun; bullet fragments were recovered from the vehicle's roof and from the sidewalk. No one was injured during this attack. Officers did not return fire. The second event occurred on January 31. Officers responded to a report of shots fired on the first floor of an apartment building in Brooklyn and spotted a man armed with a black revolver. The perpetrator fired a single shot into the base of a detective's skull, nearly killing him. Officers did not return fire. The third event occurred on April 17, when an emotionally disturbed person stabbed an officer in the temple with a six-inch serrated knife, causing severe brain trauma. The perpetrator was apprehended – no officer discharged a weapon.

## CATEGORIES

The 2012 Annual Firearms Discharge Report is subdivided into the following five categories.[4] Each category is analyzed based on the information in that category. This allows the Department to better understand a specific type of incident and adjust training and policy accordingly.

- **INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT**: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- **INTENTIONAL DISCHARGE – ANIMAL ATTACK**: when an officer intentionally discharges his or her firearm to defend against an animal attack
- **UNINTENTIONAL DISCHARGE**: when an officer unintentionally discharges his or her firearm
- **UNAUTHORIZED USE OF A FIREARM**: when an officer discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm
- **MISTAKEN IDENTITY**: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

The report contains information compiled from preliminary and final Shooting reports, detective's case files, Medical Examiner's reports, Firearms Discharge Assault reports, Arrest and Complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous Annual Firearm Discharge reports.

The relatively small sample studied for the report—105 discharge incidents, 45 in the Adversarial Conflict category—can limit the predictive value and conclusions that may be derived.

[4] The possibility of a sixth category—Intentional Discharge–No Conflict—exists, but its occurrence is extremely uncommon. Intentional Discharge–No Conflict involves an officer discharging his or her firearm to summon assistance. Because of the rarity of this type of discharge, it is not regularly tracked in the annual report, but is addressed on an as-it-occurs basis. In 2012, no such discharge occurred.

# Part II: Intentional Discharge – Adversarial Conflict

## OVERVIEW

There were 45 incidents of intentional firearms discharge during adversarial conflict (ID-AC) in 2012, a 25% increase from 2011, when there were 36. A total of 60 officers intentionally fired their weapons during these incidents in 2012, a 3% decrease from 2011, when 62 officers fired their weapons. 46 subjects were involved in these 45 incidents, 14 of whom were injured (a decrease of 26% from 2011, when 19 were injured) and another 16 were killed (as compared to 9 in 2011). A total of 13 officers were shot by criminals in 2012, a 225% increase from 2011, when 4 were shot.

Of the officers shot by criminals in 2012, 11 were shot within the category of an adversarial conflict, a 267% increase from 2011, when 3 were shot within this category. An additional 4 officers were injured during ID-AC incidents in 2012 (for a total of 15 injured officers), 2 of whom were stabbed, and 2 more were injured by blunt trauma. No officer was struck by crossfire in 2012, nor was any officer killed in an ID-AC incident.

## REASONS FOR DISCHARGES

Officers intentionally discharging their firearms during ID-AC incidents did so to defend themselves or others from the threat of serious physical injury or death.

In 71% of 2012 ID-AC incidents, the threat came either in the form of a firearm or a simulated firearm. Additionally, officers were fired upon in 19 of the 45 incidents (42%). Officers also acted to defend themselves or others from the use or threat of a cutting instrument (16%), or the use or threat of a blunt instrument (9%), including 3 cases where officers were threatened with a moving vehicle. See Figure 2.1.

**Threat Type, ID-AC Incidents**




Figure 2.1

## DATES AND TIMES OF DISCHARGES

In 2012, 31% of ID-AC incidents occurred in June, July and August. Each month but December had at least 2 ID-AC incidents.

The distribution across days of the week showed no significant pattern; however, ID-AC shootings were most numerous on Thursday and Friday, with 11 and 9 events occurring on those 2 days respectively. 20 incidents occurred during the third platoon (1531 to 2330 hours), 14 incidents occurred during the first platoon (2331 to 0730 hours), and 12 incidents occurred during the second platoon (0731 to 1530 hours).

# LOCATIONS OF DISCHARGES

All 45 ID-AC incidents in 2012 took place within New York City, 8 on New York City Housing Authority premises (18%), 1 within the Metropolitan Transportation Authority transit system (2%), and 36 within the jurisdiction of the patrol precincts (80%).

The Department divides New York City's 5 counties into 8 Patrol Boroughs, each of which is further divided into precincts. In 2012, Brooklyn accounted for the most ID-AC incidents of any borough (15 incidents – 33% of the citywide total), 11 in Patrol Borough Brooklyn North and 4 in Patrol Borough Brooklyn South. 9 ID-AC incidents occurred in Patrol Borough Bronx (20% of the citywide total). None occurred in Staten Island. See Figure 2.2.

ID-AC incidents took place in 32 separate precincts in 2012. 8 precincts had 2 incidents (the 7th, 23rd, 43rd, 46th, 83rd, 105th, 111th, and Midtown South precincts), and the 75th precinct had 4 incidents.

80% of all incidents occurred outdoors.



Figure 2.2

## LOCATIONS OF CRIMINAL SHOOTINGS

The locations of ID-AC incidents tend to be associated with larger geographic crime patterns, which can be seen when comparing ID-AC locations to the locations of criminal shootings. See Figure 2.3, which depicts the location of the City's 1,374 criminal shooting incidents (represented by light blue asterisks), resulting in 1,625 people shot, and overlays them with all 45 ID-AC incidents (represented by dark blue dots). The map shows that police firearms discharges occur in those areas of the City most plagued by gun violence.

Since the Annual Firearms Discharge Report first introduced this map in 2007, the data has always identified the same correlation. The frequency of criminal gun activity within New York City directly and proportionally affects the frequency and location of police involved shootings. As illustrated by Figure 2.5, the correlation is explicit with regard to relative rate, as well – on a percentage basis, police-involved shootings and criminal shootings are dispersed similarly by borough. Despite this correlation, the number of ID-AC incidents (45) is small when compared to the number of criminal shootings (1,373). See Figure 2.4.

## ID-AC Incidents vs. Criminal Shooting Incidents




Figure 2.3




Figure 2.4




Figure 2.5

## REASONS OFFICER INVOLVED

Officers become involved in ID-AC incidents for a variety of reasons. 54 officers were on-duty during their involvement in an ID-AC incident, 35% (19) of whom were assigned to proactive crime-control initiatives such as Anti-Crime teams, Conditions units, or Patrol Borough Task Forces. 41% (22) of the on-duty officers involved were assigned to uniformed patrol. Another 11% (6) were assigned to investigative units, including the Organized Crime Control Bureau (OCCB), and 13% (7) were assigned to Emergency Service Units (ESU). See Figure 2.6. There were also 6 officers involved in an ID-AC incident while off-duty, 50% of whom were involved because they were victims of crimes and 50% of whom were involved because they were taking police action.



Figure 2.6

The 39 on-duty ID-AC incidents that occurred in 2012 were precipitated by a variety of situations, including 15 “radio runs” (i.e. 911 calls) – 5 for emotionally disturbed persons, 4 for firearms, 4 for robberies, burglaries, or larcenies, and 2 for disputes, including 1 domestic dispute. Officers encountered crimes in progress while on routine patrol on 4 occasions – 2 disorderly groups, 1 robbery, and 1 male shot. Reasonable suspicion encounters of armed subjects (7), investigations of past crimes (6), car stops (4), vertical patrols (1), summonses (1), and tips from the public (1) led to other incidents.

## OFFICER RESTRAINT

Of the 60 officers who discharged their firearms during an ID-AC incident in 2012, 42% fired 1 shot, and 72% fired no more than 5 times. 15% of officers involved fired between 6 and 10 rounds, and 10% fired between 11 and 16 rounds. More than 16 rounds were fired by 2 officers in 1 incident, at a suspect who fired at police after shooting 2 people. See Figure 2.7.

Officer restraint is also apparent when examining the number of shots fired per ID-AC incident. In 31% of incidents, 1 shot was fired by the police, and in 64% of incidents, 5 or fewer shots were fired by the police.




Figure 2.7




Figure 2.8

A total of 331 shots were fired from officers' guns during ID-AC incidents in 2012, an increase of 6% from 2011, when 311 shots were fired. However, 2 incidents involving subjects firing on officers, 1 in which 84 rounds were fired and 1 in which 29 rounds were fired, accounted for 34% of all ID-AC shots fired. High volume outliers such as these can significantly skew median averages when the total number of incidents is as low as 45; a more telling figure perhaps is the mode, which, during ID-AC incidents in 2012, was 1 shot fired by officers.

OBJECTIVE COMPLETION RATE

The Department does not consider average hit percentages for the Annual Firearms Discharge Report. Instead, the objective completion rate per incident is employed, as it is both more accurate and more instructive. Like combat itself, the objective completion rate per incident is pass/fail. When an officer properly and lawfully adjudges a threat severe enough to require the use of his or her firearm, and fires at a specific threat, the most relevant measure is whether he or she ultimately hits and stops the threat. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the subject.

In 2012, officers hit at least 1 subject 29 times during ID-AC incidents, for an objective completion rate of 64%. Because subjects were not apprehended in 9 incidents, it is possible that the objective completion rate is higher. During the 19 incidents in 2012 in which officers were being fired upon, officers hit at least 1 subject 12 times, for an objective completion rate of 63%. Subjects were not apprehended in 7 of these incidents.

SHOOTING TECHNIQUE

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but it is not always practical during an adversarial conflict. Of the 33 officers who reported their shooting techniques for ID-AC incidents in 2012, 61% (20) gripped the firearm with two hands. All 60 officers reported their stance; 77% (46) stated that they were standing, while 20% (12) were moving or struggling and 3% (2) were seated. Of the 29 officers who reported sight usage, 38% (11) stated that they were able to use their sights.

Lack of cover can be a factor in the need for a firearms discharge, because a protected defensive position may allow officers to control the pace of an incident. Of the 60 officers who fired, 56 were able to recall if they took cover – 16 (26%) reported that they took cover, and 40 (67%) reported that they were not able to take cover.

DISTANCE

In 2012, 44 officers were able to report how far they were from their targets during ID-AC incidents. Although officers are trained to fire on a target from as far away as 25 yards, the majority (75%) of ID-AC discharges occurred when the officer was 15 yards or fewer from the subject. See Figure 2.9.




Figure 2.9

# OFFICER PEDIGREE

Of the 60 officers who intentionally discharged their firearms during ID-AC incidents, 2 (3%) were female, and 58 (97%) were male; 17% of the Department's uniformed personnel are female, and 83% are male.

As illustrated by Figure 2.10, the race of officers involved in ID-AC incidents corresponds to the race of the Department's uniformed personnel – 53% of ID-AC officers were White, 32% were Hispanic, 12% were Black, and 3% were Asian. Of the Department's uniformed personnel, 52% are White, 26% are Hispanic, 16% are Black, and 6% are Asian.

Considering current data and data from prior years, no discernable pattern emerges with regard to the likelihood that an officer of any particular pedigree will become involved in a shooting.




Figure 2.10

## ATTIRE

Of the 54 on-duty officers who intentionally fired during ID-AC incidents, 18 (33%) were wearing plainclothes and 36 (67%) were in uniform. Although plainclothes officers represent a smaller portion of officers in the field than uniformed officers, this marks the third year of a pattern reversal that began in 2010; previously, the number of plainclothes officers firing often equaled and sometimes exceeded the number of uniformed officers doing so, despite a difference in their overall staffing percentages.

## YEARS OF SERVICE

In 2012, 15% of officers who intentionally discharged their firearms during ID-AC incidents had between 1 and 5 years of service, compared to 25% of Department personnel. Officers with 1 to 5 years of service are more likely to be assigned to perform patrol duties, and historically have been overrepresented in shooting incidents compared to more experienced officers. The decrease in 2012 may be attributable to the small number of officers hired by the Department in 2009, 2010, and 2011 – the Department's overall tenure has also risen accordingly. See Figure 2.11.



Figure 2.11

RANK

Generally, officers in the rank of police officer are the front line, and represent the majority of Department personnel responding to violent crimes and actively seeking out criminals. Historically, they have represented the majority of officers involved in ID-AC incidents. The rank of officers involved in ID-AC incidents is in parity with the Department's overall uniformed staffing; 63% of ID-AC officers were police officers, 18% were detectives, 15% were sergeants, 2% were lieutenants, and 2% were captains and above. Of the Department's uniformed personnel, 66% are police officers, 14% are detectives, 13% are sergeants, 5% are lieutenants, and 2% are captains and above. See Figure 2.12.



Figure 2.12

POLICE WEAPONS

The majority of officers (56, or 93%) involved in all ID-AC incidents (both on and off duty) discharged their on-duty service firearms. The remaining 4 officers (7%) discharged authorized off-duty firearms. Department regulations allow officers to carry their on-duty service firearms while off-duty, and authorized off-duty firearms as secondary weapons while on-duty. No officer reported a firearms malfunction during an ID-AC incident in 2012.

## SUBJECT PEDIGREE

There were 46 subjects involved in the 45 ID-AC incidents in 2012. All subjects, including 9 unapprehended subjects, are known by sex and race. The majority (44, or 96%) were male; 2 (4%) were female. Of the 37 apprehended subjects, ages ranged from 17 to 58, although 46% (17) were 25 or younger.

### SUBJECT RACE

The race of a crime suspect is determined by eyewitness reports, usually that of the victim. The race of a subject is determined by the officer who encountered or arrested the subject. This determination may be based on a subject's self-identification, existing government-issued documentation, racial/ethnic physical characteristics, or other factors.

Although 25% of the City's population is Black, among all criminal shooting suspects identified by race Citywide in 2012, 77% were Black, and 74% of shooting victims were Black. Blacks were similarly represented as subjects in ID-AC incidents in 2012; 34 (74%) were Black. Among subjects who were armed with firearms during ID-AC incidents, 75% were Black (Figure 2.13), and among subjects who fired at officers, 79% were Black (Figure 2.16).




Figure 2.13




Figure 2.14




Figure 2.15




Figure 2.16




Figure 2.17

PRIOR ARRESTS

A subject's arrest history is usually unknown to the officer at the time of an incident. Nevertheless, arrest history is pertinent because it is indicative of a subject's propensity for criminal conduct and capacity for violently confronting a police officer, and it can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole status may also make a subject more willing to attempt to avoid arrest by confronting the officer.

Of the 46 subjects involved in ID-AC incidents, 9 were unapprehended and their criminal histories could not be identified. Of the 37 remaining subjects, 4 (11%) had no criminal history. However, 3 of the 4 had histories of mental illness, and the remaining subject had just committed a murder. Of the 33 subjects with a criminal history, all had multiple prior arrests, ranging from 2 to 103, for numerous offenses including murder, the attempted murder of a police officer, armed robberies, and possession of firearms. The average number of prior arrests for ID-AC subjects was 11. No subjects were on parole or wanted on a parole warrant at the time of the incidents.

SUBJECT WEAPONS

The subjects involved in ID-AC incidents utilized a variety of weapons when confronting officers. The most frequently used weapon was a firearm: 29 subjects carried firearms, 19 of whom fired at police, 12 of whom fired prior to being confronted by police. All of the firearms were handguns: 12 were semi-automatic pistols, 10 were revolvers, and 7 were unknown handguns. An additional 2 subjects carried imitation firearms.

7 incidents involved subjects who attacked or menaced officers with cutting instruments, 5 of which occurred indoors, giving officers less time and space to isolate and contain subjects. Emotionally disturbed persons were involved in 6 of the 7 cutting instrument attacks.

Of the 4 blunt instruments involved, 1 was a wooden cane that a subject used to strike an off-duty officer in the course of an attempted robbery of the officer, and 3 were vehicles that subjects employed as weapons.

## Subject Weapons




Figure 2.18

## INCIDENT OUTCOMES

### OFFICER DEATH

No officer was killed by a perpetrator during an adversarial conflict in 2012.

### OFFICER INJURIES

12 officers were injured by gunfire during adversarial conflict in 2012, 2 of whom were severely injured. An additional officer was shot in the base of the skull during a violent struggle with a perpetrator. However, because police did not return fire, this incident is not included as an ID-AC incident in this report. In one particularly violent encounter with an armed perpetrator, 5 officers were either grazed or struck by direct gunfire. No officers were injured by crossfire.

### BULLET-RESISTANT VESTS

Of the 12 officers shot and injured, 7 were known to have been wearing bullet-resistant vests, 3 were not wearing vests because they were off-duty at the time they were shot, and it is unknown whether 2 who suffered graze wounds were wearing vests. One officer was saved by his vest; a deformed bullet was recovered from the vest, directly above the officer's heart. Another officer was struck in the magazine pouch on his belt.

### MALFUNCTION

No officer reported a malfunction during an adversarial conflict in 2012.

### SUBJECT DEATH

Of the 46 subjects involved in ID-AC incidents, 16 were killed by police gunfire. Although the number of subjects killed by police gunfire increased from 2011 to 2012 (9 in 2011 vs. 16 in 2012, a 78% increase), the number of subjects struck by police gunfire increased much less significantly, from 28 in 2011 to 30 in 2012 – a 7% increase.

12 of the 16 (75%) had prior arrest histories, 2 were emotionally disturbed persons armed with knives, and 1 had shot and killed a civilian immediately before being confronted by the police. As of September 2013, toxicology reports were available for 15 of the 16 subjects killed, and showed that 12 subjects (80%) were intoxicated or had illegal narcotics or controlled substances in their systems at the time of the incidents.

Of the 16 subjects killed, 10 were armed with firearms, 1 of whom had shot a civilian, and 4 menaced officers with knives. One subject, who had just committed a gunpoint robbery and was driving a stolen vehicle, used the vehicle as a weapon and was dragging the officer before he discharged his firearm.

Narratives describing all 16 ID-AC incidents in which subjects were killed can be found in Appendix C.

## SUBJECT INJURIES

Of the 46 subjects involved in ID-AC incidents, 14 were injured, but not killed, by police gunfire. Of the 14 injured, 10 were armed with firearms, 7 fired at police, 1 shot and injured 5 police officers, and 2 shot and seriously injured a police officer. 2 of those injured were emotionally disturbed persons who menaced civilians or police with cutting instruments. All 14 were armed with either a gun or a knife.

## BYSTANDER INJURIES

10 bystanders were injured by police bullets during 2 ID-AC incidents in 2012. During the first incident, a bystander was injured when an emotionally disturbed person lunged at officers with a carving knife inside an apartment.

The second incident resulted in injuries to 9 bystanders. The subject involved had shot and killed his former employer on a crowded sidewalk in front of the Empire State Building at approximately 0900 hours. A witness pointed out the subject to 2 officers, who attempted to stop him. As they approached, he turned and pointed a loaded semi-automatic pistol at the officers. The officers fired a total of 16 rounds, striking the subject 9 times. 9 bystanders were injured by police bullets or fragments.

## FINDINGS

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical concerns and violations of procedure. Discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures. Additionally, all officers who discharge their firearms are sent to a firearms retraining course, regardless of the circumstances of the discharge.

Of the investigations that have been completed at the time of this report (October 2013), 89% have found that the involved officers were in compliance with Department procedures and with the law. 1 officer was found in violation of Department procedures, and Charges and Specifications were conferred.

## SUMMARY

There were 45 ID-AC incidents in 2012, involving 60 officers who fired. These conflicts involved 46 subjects, including 19 who fired directly at police.

In 2012, there were 1,625 victims of criminal shootings in New York City. The number of intentional firearms discharges by police, comparatively, is small, but every time an officer discharges a firearm he or she risks inflicting injury or death on subjects, fellow police officers, or innocent bystanders. Because of this, the Department ensures that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

One method of judging the Department's restraint is to compare the number of ID-AC incidents to Department staffing – there were, on average, 34,920 uniformed officers employed by the NYPD in 2012. Of them, only 60 – 0.17% – intentionally discharged a firearm at a subject. Another method is to compare the number of ID-AC incidents to the number of high-risk radio runs and the number of arrests of armed suspects made by officers each year.

In 2012, officers responded to more than 4.8 million calls for service, of which more than 246,000 involved weapons. Officers also had millions of additional contacts with the public, including reasonable suspicion encounters, car stops, and summonses. Officers made 26,091 weapons arrests, including 5,689 gun arrests, and escorted thousands of emotionally disturbed persons to hospitals. In other words, there were more than 26,000 incidents in which an officer took an armed subject into custody without firing his or her weapon.

# Part III: Intentional Discharge – Animal Attack

## OVERVIEW

There were 24 intentional firearms discharges during an animal attack (ID-AA) in 2012, a 33% decrease from 2011, when there were 36; 22 (92%) were on-duty incidents and 2 (8%) were off-duty incidents. A total of 28 officers discharged their firearms, a 35% decrease from 2011, when 43 officers discharged their firearms. A total of 29 animals were involved, all of them dogs; there were 5 incidents involving 2 dogs. 2 officers and 1 civilian were bitten. An additional civilian was unintentionally injured during an ID-AA incident when he was struck by a round from an officer's gun. Of the 29 dogs involved, 9 (31%) were killed, a decrease of 25% from 2011, when 12 were killed. An additional 8 dogs (28%) were injured. 22 of the 29 dogs were pit bulls (79%).

These numbers do not encompass all dog attacks on officers or civilians; only incidents involving intentional firearms discharges by police officers. In 2012, police officers responded to approximately 28,000 calls for service involving dogs and other animals, and encountered many more while on patrol, executing search warrants, or investigating complaints that were not processed through 911 or 311.

## REASONS FOR DISCHARGES

Officers who intentionally discharged their firearms during animal attacks did so to defend themselves or others from the threat of physical injury, serious physical injury, or death. Police officers use their firearm only as a last resort to stop an animal attack. When possible, officers attempt to prevent an animal attack using non-lethal options, including batons and OC spray. Emergency Service Unit personnel carry restraining devices to keep animals at a safe distance, as well as $CO_2$ pistols and rifles capable of firing tranquilizer darts containing Ketaset, a veterinary anesthetic. In rapidly evolving situations, however, these options are not always prudent or possible.

## DATES AND TIMES OF DISCHARGES

**ID-AA Incidents by Tour (24)**




Figure 3.1

In 2012, ID-AA incidents occurred fairly evenly throughout the months of the year. No month saw more than 3 incidents, and every month except September had at least 1 incident. Similarly, the distribution across days of the week showed no significant pattern; Tuesday experienced the most ID-AA incidents with 5, and Wednesday and Thursday experienced the least, with 2 each.

ID-AA incidents occurred most often during the 1531-2330 tour of duty (14 incidents – 58%). The 0731-1530 tour saw 6 incidents (25%), and the 2331-0730 tour saw 4 incidents (17%). See Figure 3.1.

## LOCATIONS OF DISCHARGES

All 24 ID-AA incidents in 2012 took place within New York City – 18 within the jurisdiction of the patrol precincts (75%) and 6 on New York City Housing Authority premises (25%). No incidents took place within the Metropolitan Transportation Authority transit system. In 2012, Brooklyn accounted for the most ID-AA incidents of any borough (9 incidents – 37% of the citywide total). See Figure 3.2. ID-AA incidents occurred in 18 separate precincts, including 4 precincts that had 2 incidents (the 83rd, 79th, 23rd, and 122nd precincts) and 1 precinct that had 3 incidents (the 75th precinct).




Figure 3.2




Figure 3.3

79% of all ID-AA incidents occurred outdoors (19). More occurred on streets and sidewalks (42%) than any other location type. Of the 5 incidents that occurred indoors, 3 were inside stairwells or hallways, and 2 were inside apartments. See Figure 3.4.




Figure 3.4

## REASONS OFFICER INVOLVED

A total of 28 officers fired during a total of 24 ID-AA incidents in 2012. Most (22) incidents, involving 26 officers, occurred while the officers were on-duty. A variety of reasons led on-duty officers to become involved – the 2 most common reasons were officers responding to 911 calls of animal attacks and conducting vertical patrols of apartment buildings (27% each). See Figure 3.5. All of the ID-AA incidents precipitated by vertical patrols occurred in New York City Housing Authority locations.

The remaining 2 ID-AA incidents, involving 2 officers, occurred while the officers were off-duty; one off-duty officer was attacked by loose dogs while walking his dog, and another was taking police action to protect his neighbors from a dog when he was bitten.




Figure 3.5

## OFFICER RESTRAINT

A total of 78 shots were fired by officers during ID-AA incidents in 2012, a decrease of 1% from 2011, when 79 shots were fired. Of officers discharging their firearms during ID-AA incidents, 43% fired 1 shot, and another 43% fired between 2 and 5 times, for a total of 86% of officers firing no more than 5 rounds. No officer fired more than 8 times. See Figure 3.6.

Restraint is also apparent when analyzing the average number of shots fired per incident. In 63% of incidents, 1 or 2 rounds were fired, and in 21% of incidents, between 3 and 5 shots were fired. The most fired at any incident was 13. See Figure 3.7.



Figure 3.6



Figure 3.7

SHOOTING TECHNIQUE

Of the 23 officers who reported their shooting techniques for ID-AA incidents in 2012, 43% (10) gripped the firearm with two hands. 27 officers reported their stance; 96% (26) stated that they were standing, and 1 was prone, having been knocked over by the dog. Of the 22 officers who reported sight usage, 27% (6) stated that they were able to use their sights. Only 1 officer was able to take cover.

Compared to ID-AC incidents, officers involved in ID-AA incidents had lower rates of two-handed grip usage (43% for ID-AA incidents vs. 60% for ID-AC incidents), sight usage (27% for ID-AA incidents vs. 38% of ID-AC incidents), and cover (4% for ID-AA incidents vs. 26% for ID-AC incidents). The fast-paced nature of dog attacks may account for this difference. How quickly an attacking dog can be within striking distance of an officer is further illustrated by the proximity of officers to their targets during ID-AA incidents – 86% of officers (24) fired when the dog was within 15 feet, compared to 41% of officers who fired when the subject was within 15 feet during ID-AC incidents.

## OFFICER PEDIGREE

Of the 28 officers who intentionally discharged their firearms during ID-AA incidents, 1 (4%) was female, and 27 (96%) were male. As with ID-AC incidents, and as illustrated by Figure 3.8, the race of officers involved in ID-AA incidents corresponds to the race of the Department's uniformed personnel – 50% of ID-AA officers were White, 21% were Hispanic, 21% were Black, and 7% were Asian. Of the Department's uniformed personnel, 52% are White, 26% are Hispanic, 16% are Black, and 6% are Asian. Considering current data and data from prior years, no discernable pattern emerges with regard to the likelihood that an officer of any particular pedigree will become involved in an ID-AA incident.




Figure 3.8

YEARS OF SERVICE

In 2012, 43% of officers who intentionally discharged their firearms during ID-AA incidents had between 1 and 5 years of service, compared to 25% of Department personnel. Officers with 1 to 5 years of service are more likely to be assigned to perform patrol duties, which may account for their overrepresentation in shooting incidents compared to more experienced officers. See Figure 3.9.




Figure 3.9

RANK

In 2012, 71% of ID-AA officers were police officers, 21% were detectives, and 4% were sergeants. The remaining officer, representing 4% of the total, was an undercover and his rank is undisclosed. See Figure 3.10. Officers in the rank of police officer and detective are slightly overrepresented compared to Department staffing – 66% of total uniformed personnel are police officers, and 14% are detectives. However, these two ranks are much more likely to be assigned to respond to calls for animal attacks, to conduct vertical patrols, to effect arrests, and to other assignments that were the most likely to precipitate ID-AA incidents.



Figure 3.10

ATTIRE

Of the 26 on-duty officers who intentionally fired during ID-AC incidents, 17 (65%) were in uniform and 9 (35%) were wearing plainclothes. The plainclothes officers were assigned to OCCB, the Detective Bureau, and the Warrant Section.

POLICE WEAPONS

All 26 on-duty officers who fired during ID-AA incidents in 2012 utilized their service weapons. The 2 officers who fired off-duty utilized authorized off-duty firearms. No officer reported a firearms malfunction during an animal attack in 2012.

## INCIDENT OUTCOMES

The 24 ID-AA incidents in 2012 involving 28 officers resulted in 9 of 29 dogs killed and 8 dogs injured. 2 officers and 1 civilian were bitten, and 1 civilian was injured when he set a dog on officers as they attempted to affect an arrest – he was unintentionally struck by a round that one of the officers fired at the attacking dog.

Of the investigations that have been completed at the time of this report (October 2013), 100% have found that the involved officers were in compliance with Department procedures and with the law.

# Part IV: Unintentional Discharge

# OVERVIEW

There were 21 incidents of unintentional firearms discharges in 2012, a 40% increase from 2011, when there were 15. The increase was driven by a 350% increase in unintentional discharges during adversarial conflict (from 2 in 2011 to 9 in 2012). Each incident involved 1 officer.

These incidents resulted in injuries to 6 officers, all relatively minor, including several wounds to hands or fingers, and 2 graze wounds to legs. Civilians were injured during 2 incidents: a woman suffered graze wounds to her arm and leg when an officer unintentionally discharged a round during the execution of a search warrant and the round passed through the floor of the apartment into the apartment below, and a suspect was struck in the leg when an officer was attempting to holster his firearm while handcuffing the suspect to place him under arrest. One civilian was killed during an armed robbery, when he fled a store that was being held up by 3 armed suspects and ran directly into the officer's drawn firearm, knocking the officer to the ground and causing the officer to unintentionally discharge a round as a result of the collision.

## WEAPONS

Of the 21 firearms that were unintentionally discharged in 2012, 13 (62%) were the officers' service weapons, 6 were authorized off-duty firearms (29%), and 2 were other firearms that were otherwise legally possessed (9%). Revolvers accounted for 3 of the firearms (14%), and semi-automatics accounted for 18 (86%). Of the 13 service weapons involved, 4 (31%) were Glocks, 6 (46%) were Smith & Wessons, and 3 (23%) were Sig Sauers.

## OFFICER PEDIGREE

Of the 21 officers who unintentionally discharged firearms in 2012, 1 (4%) was female and 20 (96%) were male; 17% of the Department's uniformed personnel are female and 83% are male.

5 officers involved in unintentional firearms discharges were Black (24%), 10 (48%) were White, and 6 (28%) were Hispanic; of the Department's uniformed personnel, 52% are White, 26% are Hispanic, 16% are Black, and 6% are Asian (see Figure 4.1).




Figure 4.1

5 officers involved in unintentional firearms discharges had between 1 and 5 years of service (24%), 10 (48%) had between 6 and 10 years of service, 5 (24%) had between 11 and 15 years of service, and 1 (4%) had between 16 and 20 years of service; of the Department's uniformed personnel, 25% have between 1 and 5 years of service, 30% have between 6 and 10 years of service, 15% have between 11 and 16 years of service, 20% have between 16 and 20 years of service, and 10% have more than 20 years of service (see Figure 4.2).




Figure 4.2

16 officers involved in unintentional firearms discharges were police officers (76%), 4 (20%) were detectives, and 1 (4%) was a sergeant; of the Department's uniformed personnel, 66% are police officers, 14% are detectives, 13% are sergeants, 5% are lieutenants, and 2% are captains and above (see Figure 4.3).




Figure 4.3

The sample size of officers involved in unintentional firearms discharges as depicted in Figures 4.1, 4.2, and 4.3 is 21, or 0.06% of the Department's uniformed personnel. These figures are therefore not useful in determining the likelihood that an officer of any particular pedigree will become involved in an unintentional firearms discharge.

## PURELY UNINTENTIONAL DISCHARGES

Purely unintentional discharges occur when an officer is loading or unloading, cleaning, or otherwise handling a firearm. In 2012, 12 (57%) of the 21 total unintentional firearm discharges were purely unintentional. In each of the 12 incidents, 1 officer was involved and 1 round was fired. No civilians were injured or killed as a result of purely unintentional discharges.

### LOADING/UNLOADING

Officers were either loading or unloading a firearm while 5 of the 12 incidents occurred. The only on-duty incident of the 5 occurred in a Department of Correction firearms safety station; had this discharge occurred into a Police Department firearms safety station, it would not have been included in this report. In order to incentivize the use of firearms safety stations, the Department does not define these discharges as Department firearms discharges. Firearms safety stations are installed at all Department facilities where firearms may be present. The other 4 officers who discharged rounds while loading or unloading firearms were off-duty at the time of the incidents.

### HANDLING

7 officers were handling firearms for reasons other than loading or unloading while the remaining incidents occurred, including cleaning a firearm or moving a firearm from one location to another. Two of these firearms discharged when objects became caught inside the trigger guard of firearms that were being carried inside duffle bags. One incident occurred in a police facility – a locker room – and 6 occurred inside the officer's residence. One officer involved was a recruit assigned to the Police Academy. One officer was handling an unfamiliar revolver with no trigger guard.

## UNINTENTIONAL DISCHARGES DURING ADVERSARIAL CONFLICT

Unintentional discharges during adversarial conflict or animal attack occur during the course of lawful police conduct and are brought about either wholly or in part by mitigating factors, such as a suspect grabbing an officer's firearm, an officer losing his or her balance, or when an officer's shooting hand is struck by an object. In 2012, 9 of the 21 total unintentional discharges occurred during an adversarial conflict or animal attack (43%). In each of the 9 incidents, 1 officer was involved and 1 round was fired. These 9 incidents represent a 350% increase from 2011, when there were 2. As detailed above, 2 civilians were injured and 1 was killed.

The reasons for unintentional discharge during adversarial conflict vary. Subjects grabbed an officer's firearm causing a discharge on 2 occasions, officers lost their balance in the course of conflict on 2 occasions (including an officer who was struck by a moving vehicle), officers were executing warrants inside apartments on 2 occasions, and officers were engaged in physical combat with violent suspects on 3 occasions.

## INCIDENT OUTCOMES

The Department investigates all unintentional firearms discharges thoroughly. Of the investigations that have been completed at the time of this report (October 2013), the Firearms Discharge Review Board found that officers were in violation of Department guidelines in 5 cases. The recommended discipline for involved officers ranged from none (e.g. the officer who discharged a round into the firearms safety station) to suspension. Retraining on relevant tactics was recommended in 5 cases. There were 4 cases where officers were found to be within Department guidelines.

# Part V: Unauthorized Use of a Firearm

## OVERVIEW

There were 15 firearms discharges in 2012 that were determined to be unauthorized and outside the scope of the officers' employment, an increase of 200% from 2011, when there were 5 Unauthorized Use of a Firearm incidents. Of the 15 incidents, 8 were officer suicides, 1 was an attempted officer suicide, 1 was a suicide by a civilian using an officer's firearm, 3 were discharges by criminals who gained control of an officer's firearm during a struggle, and 2 incidents remain under investigation.

## OFFICER PEDIGREE

Of the 15 officers who were involved in unauthorized firearms discharges in 2012, 2 (13%) were female and 13 (87%) were male; 17% of the Department's uniformed personnel are female and 83% are male.

3 officers involved in unauthorized firearms discharges were Black (20%), 7 (47%) were White, and 5 (33%) were Hispanic; of the Department's uniformed personnel, 52% are White, 26% are Hispanic, 16% are Black, and 6% are Asian (see Figure 5.1).




Figure 5.1

3 officers involved in unauthorized firearms discharges had between 1 and 5 years of service (20%), 4 (27%) had between 6 and 10 years of service, 3 (20%) had between 11 and 15 years of service, and 5 (33%) had between 16 and 20 years of service; of the Department's uniformed personnel, 25% have between 1 and 5 years of service, 30% have between 6 and 10 years of service, 15% have between 11 and 16 years of service, 20% have between 16 and 20 years of service, and 10% have more than 20 years of service (see Figure 5.2).



Figure 5.2

10 officers involved in unauthorized firearms discharges were police officers (67%), 2 (13%) were detectives, and 3 (20%) were sergeants; of the Department's uniformed personnel, 66% are police officers, 14% are detectives, 13% are sergeants, 5% are lieutenants, and 2% are captains and above (see Figure 5.3).



Figure 5.3

The sample size of officers involved in unauthorized firearms discharges as depicted in Figures 5.1, 5.2, and 5.3 is 15, or 0.04% of the Department's uniformed personnel. These figures are therefore not useful in determining the likelihood that an officer of any particular pedigree will become involved in an unauthorized firearms discharge.

## SUICIDE

The increase in Unauthorized Use of a Firearm incidents in 2012 was driven by a 200% increase in officers who committed or attempted to commit suicide, from 3 in 2011 to 9 in 2012 (8 suicides and 1 attempted suicide). See Figure 5.4, which depicts successful suicides by firearm only, not suicides by other method and not attempts. Of the 8 officers who committed suicide, 7 were off-duty and 1 was on-duty; 7 were male and 1 was female; 6 were police officers and 2 were sergeants.




Figure 5.4

## DISCHARGES BY OTHER THAN AN OFFICER

There were 4 incidents of Unauthorized Use of a Firearm in 2012 in which someone other than an officer discharged an officer's gun. One incident occurred when an officer's wife committed suicide using his firearm. The 3 remaining incidents occurred when criminals gained control of an officer's firearm during a struggle; 1 of these incidents was an on-duty incident, and 2 were off-duty incidents.

The on-duty incident occurred when a subject tore an officer's gun belt in the course of close physical combat, and was able to remove the officer's firearm from the damaged belt and fire a round. The round did not strike anyone, and the subject was arrested. One of the 2 off-duty incidents resulted in an officer being shot once in the shoulder with his own firearm; the other resulted in a subject firing several rounds in the air with an officer's firearm.

## INCIDENT OUTCOMES

The Department investigates all Unauthorized Use of a Firearm incidents thoroughly. Incidents other than officer suicides often result in discipline against the officer discharging the weapon or the officer charged with the security of the weapon. In cases of serious misconduct, officers are suspended, arrested, and eventually terminated for their actions. As of October 2013, the Firearms Discharge Review Board has found that 9 officers violated Department guidelines during Unauthorized Use of a Firearm incidents in 2012 – 5 of these cases were suicides, 3 resulted in Charges and Specifications for the involved officers, and 1 was arrested in Nassau County and is no longer employed by the Department – and that 1 officer, whose firearm was taken from him during a struggle, did not violate Department guidelines. The remaining cases are under investigation.

# Part VI: Mistaken Identity

## OVERVIEW

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on any law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken identity incidents are distinguished from crossfire incidents in that the shooting officer is intentionally firing on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. Unauthorized discharges, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incidents), are also excluded. This definition comports with the 2010 New York State Task Force on Police-on-Police Shootings' definition of "Police-on-Police Confrontations."

## 2012 INCIDENTS

In 2012 there were no incidents of mistaken identity.

# APPENDIX A: FIREARMS DISCHARGES, 1971-2012




Figure A.1




Figure A.2




Figure A.3




Figure A.4




Figure A.5




Figure A.6

# APPENDIX B: FIREARMS TRAINING

## OVERVIEW

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives: those of bystanders, victims, subjects, and other officers. One of the grim realities of police work, however, is the terrible contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons from imminent death or serious physical injury. This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury – e.g., when an officer confronts a subject menacing people with a firearm that is later revealed to be a replica.

## SHOOT TO STOP

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to "stop the threat" – i.e., to end the subject's ability to threaten imminent death or serious physical injury to the officer or another person.

If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject's demise. Stated explicitly, however, police officers do not "shoot to kill" – they are trained to shoot to stop.

## WEAPONS CONTROL

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills. Unfortunately, in a combat situation, concentration and fine motor skills are sometimes among the first casualties. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## NYPD PISTOLS

There are 3 semi-automatic 9mm pistol models that are authorized as on-duty service weapons for NYPD officers: the Glock 19, the Sig Sauer P226, and the Smith & Wesson 5946. These weapons are equipped with 15 round magazines, and each firearm is capable of holding 16 total rounds. Additionally, there are several weapons authorized for off-duty carry, such as the Glock 26, Smith & Wesson 3914, and the Beretta 8000D Mini Cougar. Some officers carry .38 caliber revolvers; these officers are senior members whose weapons have been grandfathered in; revolvers have not been issued as service weapons since 1992. Current NYPD service pistols are all "double action only," meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be "cocked," resulting in a one-stage trigger pull). Additionally, all NYPD weapons are modified to have a heavier-than-stock 12-lb trigger pull; this diminishes the likelihood of unintentional discharges. The NYPD uses a 124 grain, hollow-point bullet that is designed to prevent over-penetration and ricochets.

**CENTER MASS**



Because combat stress can contribute to the impairment of fine motor skills, and because of the relative imprecision of pistols, police officers are taught to shoot for center mass – usually, the torso. In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center of the exposed portion as a target.

The human body's center mass is the largest area available as a point of aim. The torso represents approximately 33% of a human's surface area, compared to 9% for an arm or 18% for a leg. The torso is also the most stationary portion of the body; extremities are much smaller and less static and therefore a far less certain target. Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to the center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun. Stopping a subject from threatening imminent death or serious physical injury to another person is the sole reason an officer utilizes deadly physical force.

# APPENDIX C: SUBJECTS KILLED DURING ID-AC INCIDENTS

In 2012, sixteen subjects were shot and killed by officers who intentionally discharged their weapons during adversarial conflict. The taking of a life in order to protect another life is a terrible contradiction and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations are analyzed and assessed in order to develop training that can provide officers with more use-of-force options or conflict-resolution opportunities so that similar events in the future may have different outcomes. Of the sixteen subjects intentionally shot by police in 2012, 11 (69%) had prior arrest histories; fifteen toxicology reports were available at the time of publication and show that 12 subjects (80%) were intoxicated when these incidents occurred. A short narrative of each incident is found below.

On January 12, at 2236 hours, in the 75th Precinct, officers responded to a robbery in progress via 911. Upon arrival, the officers canvassed the area and located the female caller who stated that the father of her child was being robbed by two men with guns and that they had taken him inside a nearby location. After moving the female caller to safety and getting more information, the officers then approached the location and observed a man, who they determined to be the robbery victim, exit the location. Shortly thereafter, the male subject emerged from the location, armed with a silver revolver. Upon seeing the firearm, the officers ordered the man to stop and drop the weapon, but the subject raised the weapon and pointed it directly towards the officers. One of the officers fired one round at the subject, striking him once and causing his demise. The subject had numerous prior arrests, including assault, weapons possession, and drug offenses.

On January 26, at 0413 hours, in the 75th Precinct, an off duty Emergency Service Unit lieutenant observed a masked man drive a minivan into a light pole and flee the scene of the accident on foot. Officers assigned to the 75th Precinct responded to the accident, and the lieutenant identified himself to them as an off-duty member of the service and pointed out the subject as the driver of the vehicle. The lieutenant followed the subject in his personal vehicle, and the officers followed in their marked vehicle. The subject pulled out a revolver as he ran and fired a round at the lieutenant, who returned fire, striking the subject once, causing his demise. Further investigation revealed that the subject had carjacked the minivan in the 102nd Precinct at gunpoint approximately 20 minutes before he crashed the stolen vehicle. The subject had 8 prior arrests, including Criminal Possession of a Weapon.

On January 29, at 2346 hours, in the 83rd Precinct, an off-duty detective discharged his firearm in self-defense at a perpetrator. The detective was leaving his residence when he noticed that two men were following him. One of the men, the subject, struck the detective with a wooden cane. The detective took out his shield and identified himself as an officer, and the subject tried to strike the detective with the cane again. The detective discharged his firearm once, striking the subject in the forearm and the chest, causing his demise. The other perpetrator was later apprehended. Both individuals have extensive arrest history for violent crimes, including robbery and assault.

On February 2, at 1501 hours, in the 47th Precinct, a police officer assigned to the Street Narcotics Enforcement Unit discharged his weapon once resulting in the death of a male subject. The officer, along with several other officers assigned to that unit, had been on patrol when they observed three men walking down the block. The officers observed one of the men holding his waistband, an indication that he may have been carrying a firearm, and then saw the group quickly enter and exit a nearby store. These actions led the officers to suspect that the group may be preparing to commit a crime. The group of men then broke apart and moved in different directions. Following the person they suspected possessed a firearm, one of the officers transmitted a description of the man with the gun. The subject, matching the description of the person suspected to be carrying the firearm, passed two of the officers, who got out of their car and attempted to stop the subject. The subject entered a building through the front door. After gaining entry to the building, one of the officers observed the subject, and believing that he was in possession of a firearm, pursued him inside an apartment in the building at which time the officer discharged one round from his weapon, striking the subject and causing his demise. The subject had prior arrests dating back to 2009, including burglary, robbery, drug sales, and weapons possession.

On February 14, at 1614 hours, in the 30th Precinct, a detective assigned to the Queens Violent Felony Squad was with his team conducting an operation to apprehend a subject who was wanted for felony assault, having shot a woman in the face the day before. While tracking the subject's movements via cell phone, his location was established and the detectives observed the subject enter the NYC Transit System. While moving in to apprehend the subject, the detective called to the subject, identifying himself and ordering the subject to stop. The subject then turned toward the detective and fired five rounds from a .22 caliber revolver, striking the detective in the left arm. The detective returned fire, discharging 13 rounds from his weapon, striking the subject three times and causing his demise. The subject had numerous prior arrests, including robbery, assault, burglary, and firearms possession.

On May 10, at 2037 hours, in the 111th Precinct, an officer discharged his firearm at an emotionally disturbed person who was stabbing a woman with a knife. The officer, assigned to the Precinct Conditions Team, responded to a radio run of a suicidal man. Upon arrival at the scene, the officers observed subject on top of a woman and stabbing her while the victim was trying to defend herself from the attack. The officers ordered the subject to drop the knife, and, because of the imminent threat posed to the victim, one of the officers fired one round at the subject, striking him and causing him to fall to the ground. The subject then got back up and advanced towards the officer with the knife raised, causing the officer to fire one additional round at the subject, striking him again and causing his demise. The victim was critically injured in the assault and suffered numerous lacerations and stab wounds resulting in a collapsed lung. The subject had no prior arrest history.

On June 14, at 1740 hours, in the 67th Precinct, a detective assigned to the Narcotics Division discharged his firearm at a subject who attempted to run him over with a stolen car. The detective and his partner observed a driver passing traffic on the wrong side of double yellow lines and run several steady red lights at a high rate of speed. The detectives then observed the vehicle hit a minivan, careen onto the sidewalk, and come to a stop. They pulled up behind the vehicle and approached with their firearms drawn. The driver, the sole occupant of the vehicle, slid over to the passenger side door and attempted to escape. The detective on the passenger side reholstered his firearm, reached inside, and attempted to physically remove the driver. She struggled and managed to put the vehicle in reverse, driving backwards approximately 19 feet, striking the detective on the passenger's side. The detective on the driver's side fired one shot at the subject, striking her in the chest and causing her demise. The subject had numerous prior arrests, including assault, three weapons possession cases, and kidnapping.

On June 29, at 1000 hours, in the 83rd Precinct, a sergeant and a police officer conducting routine patrol were approached by a victim who stated that a man with a firearm was trying to break into his house. The officers asked the man to get into their vehicle to let them know if he saw the man with the firearm. After canvassing the area with negative results, the officers took the man back to his home, where the attempted break-in had occurred, to complete their report. On the way back to the location, the victim spotted the subject and pointed him out to the officers. When the officers tried to approach the subject, he turned and brandished a silver revolver and pointed it in the direction of the officers while fleeing on foot. Hearing the officers' radio transmissions for help, two additional officers and a lieutenant responded to the area and began looking for the subject, who had carjacked a second victim. While approaching the vehicle, the lieutenant observed the subject again point the firearm at the officers and flee on foot. During the foot pursuit, an officer fired one round at the subject, striking him in the head and causing his demise. The subject had numerous prior arrests, including robbery and attempted murder.

On August 11, at 1505 hours, in the Midtown South Precinct, two officers stopped a subject that they had observed smoking marijuana in public. When informed that he was going to be placed under arrest, the subject brandished a knife. The officers drew their firearms and attempted to use verbal commands and pepper spray to contain the subject, who was walking in the middle of the street. The subject, still holding the knife in his hand, then lunged at one of two other officers who had responded to the call for assistance. Two officers fired their weapons, striking the subject and causing his demise. The subject had numerous prior arrests dating back to 1978, most recent for felony weapons possession in 2008.

On August 24, at 0902 hours, in the Midtown South Precinct, two officers from the Bronx assigned to a counterterrorism post in the vicinity of the Empire State Building shot and killed a subject who was in possession of a firearm that he had used to shoot and kill a victim, his former employer, moments before. A witness to the homicide found the two officers on their post, informed them that the subject had shot another person, and pointed out the subject to the officers. The officers then pursued and attempted to apprehend the subject. The subject removed a black .45 caliber semiautomatic pistol from a bag and pointed it at the pursuing officers. The officers opened fire, striking the subject and causing his demise. The subject had no prior arrest history.

On September 7, at 1659 hours, in the 105th Precinct, an officer and his partner responded to a call for an emotionally disturbed person who was in possession of a knife. Upon arriving at the location, the officers encountered family members who told them that the subject was in a room on the second floor of the house, and that he was holding a knife to his own throat. Once they were able to confirm that the subject was in possession of a knife, the officers radioed for help. A sergeant armed with a Taser arrived and ordered the subject to drop the knife multiple times. While the officers attempted to maintain isolation and containment of the subject, the subject lunged at one of the officers with the knife still in his hand. The sergeant tried to stop the subject with the Taser, but fired and missed. One of the officers fired one round at the subject, striking him in the shoulder and causing his demise. The subject had several arrests dating back to 2005.

On September 21, at 2203 hours, in the 76th Precinct, a sergeant working with a team conducting prostitution enforcement activities discharged his firearm at a subject who was armed with a firearm. The subject, who was one of four men in a vehicle who had propositioned a female officer posing as a prostitute, fled the vehicle after being stopped by members of the arrest team. Two officers and the sergeant pursued the subject on foot and eventually caught up with him. A violent struggle ensued as the subject attempted to resist arrest. The officers attempted to gain control of the subject by utilizing a baton and pepper spray, both without success. The subject then put his hand underneath his body, retrieved a 9mm pistol, and pointed it at the officers. The sergeant fired one round at the subject, striking him in the head and causing his demise. The subject had several arrests dating back to 2007.

On September 25, at 1941 hours, in the 26th Precinct, officers assigned to the Emergency Service Unit responded to a request for assistance regarding an emotionally disturbed subject with a psychiatric history who was barricaded in his apartment and in possession of a knife. The subject's family had called the police after trying to communicate with the subject unsuccessfully. Once the Emergency Services Unit arrived and took their positions outside the apartment, numerous unsuccessful attempts were made to communicate with the subject. The doorframe to the apartment was breached in order to insert a camera, which allowed the officers to observe the subject and determine his position and actions. The subject opened the door and attacked several of the officers with the knife. The officers attempted unsuccessfully to stop the subject with Tasers and a less-lethal plastic round, but he continued his attack. Three of the officers discharged their firearms at the subject, striking him and causing his demise. The subject had no prior arrest history.

On October 4, at 0515 hours, in the 115th Precinct, a detective assigned to an Emergency Service Unit Apprehension Team conducted a car stop of a vehicle that was being driven recklessly and weaving between lanes. The detective attempted to stop the vehicle with lights and sirens, but the driver continued to evade the detective until the vehicle finally came to a stop on the Grand Central Parkway. While shouting commands for the driver to show his hands, the detective approached the vehicle, which was occupied by three people, with his firearm pointed in the direction of the vehicle. As he approached the vehicle, the detective fired one round from his weapon, striking the male driver in the abdomen, causing his demise. The subject did not have any prior arrest history.

On October 24, at 1837 hours, in the 46th Precinct, an off-duty officer was sitting in a parked vehicle with a friend, when he saw two men rob another man at gunpoint on the other side of the street. The officer got out of his car and approached the men. As soon as he identified himself as a police officer, the subject, one of the individuals involved in the robbery, turned and fired one round at the officer, striking him in the chest from about ten feet away. The men then fled on foot, while the officer went back to his vehicle, clutching his chest. The officer's friend tried to drive away, only to get stuck in traffic behind a white Mustang which was stopped in front of them. The Mustang sped off and crashed up the street. Three individuals, including the subject, fled the Mustang. When the officer saw them, he pursued, still clutching his chest. The officer ordered bystanders to get down for their safety, and while taking cover behind a vehicle, fired eight rounds at the perpetrators, striking the subject once in the head and causing his demise. The other individuals who participated in the robbery were apprehended later. The subject had two prior arrests, for Robbery and Criminal Possession of a Weapon.

On December 8, at 2243 hours, in the 104th Precinct, two detectives assigned to the Narcotics Bureau fired at a subject who pointed an imitation pistol at them. The detectives were conducting a "buy and bust" operation and were attempting to place a suspect under arrest when the subject approached the detectives. The subject inquired as to what was happening and removed what appeared to be a black handgun from his waistband and pointed it at the detectives. The detectives both fired at the subject, striking him and causing his demise. The subject had an extensive criminal history, including more than 60 arrests, 22 of them felonies. The subject's felony arrest history included eight arrests for violent felonies and three for firearms possession.

# APPENDIX D: SUBJECT RACE, 2002-2012




Figure A.7

| SUBJECTS WOUNDED BY POLICE, 2002-2012 | | | | | |
|---|---|---|---|---|---|
| | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2002** | 0 | 20 | 4 | 0 | 24 |
| **2003** | 1 | 12 | 10 | 1 | 24 |
| **2004** | 1 | 15 | 7 | 0 | 23 |
| **2005** | 4 | 21 | 3 | 1 | 29 |
| **2006** | 1 | 16 | 6 | 0 | 23 |
| **2007** | 0 | 9 | 9 | 1 | 19 |
| **2008** | 0 | 12 | 6 | 0 | 18 |
| **2009** | 0 | 14 | 6 | 0 | 20 |
| **2010** | 3 | 9 | 3 | 1 | 16 |
| **2011** | 2 | 10 | 7 | 0 | 19 |
| **2012** | 1 | 10 | 3 | 0 | 13 |

Figure A.8

| SUBJECTS KILLED BY POLICE, 2002-2012 | | | | | |
|---|---|---|---|---|---|
| | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2002** | 0 | 7 | 6 | 0 | 13 |
| **2003** | 1 | 13 | 0 | 0 | 14 |
| **2004** | 1 | 6 | 4 | 0 | 11 |
| **2005** | 0 | 7 | 2 | 0 | 9 |
| **2006** | 1 | 9 | 3 | 0 | 13 |
| **2007** | 2 | 5 | 3 | 0 | 10 |
| **2008** | 2 | 7 | 4 | 0 | 13 |
| **2009** | 0 | 8 | 4 | 0 | 12 |
| **2010** | 2 | 1 | 4 | 1 | 8 |
| **2011** | 4 | 2 | 3 | 0 | 9 |
| **2012** | 2 | 11 | 2 | 1 | 16 |

Figure A.9

**Subjects Shot by Officers, 2002-2012**




Figure A.10

# APPENDIX E: 2012 FIREARMS DISCHARGE DETAILS

| TOTAL FIREARMS DISCHARGE INCIDENTS BY DAY, 2012 | | | | | |
|---|---|---|---|---|---|
| | ID-AC | ID-AA | Unintentional | Unauthorized | Total |
| Sunday | 7 | 4 | 3 | 4 | 18 |
| Monday | 2 | 4 | 0 | 2 | 8 |
| Tuesday | 7 | 5 | 6 | 2 | 20 |
| Wednesday | 5 | 2 | 2 | 2 | 11 |
| Thursday | 11 | 2 | 3 | 3 | 19 |
| Friday | 9 | 3 | 3 | 2 | 17 |
| Saturday | 4 | 4 | 4 | 0 | 12 |
| **Total** | **45** | **24** | **21** | **15** | **105** |

Figure A.11

| TOTAL FIREARMS DISCHARGE INCIDENTS BY TOUR, 2012 | | | | | |
|---|---|---|---|---|---|
| | ID-AC | ID-AA | Unintentional | Unauthorized | Total |
| 2331-0730 Hours | 13 | 4 | 12 | 5 | 34 |
| 0731-1530 Hours | 13 | 6 | 3 | 4 | 26 |
| 1531-2230 Hours | 19 | 14 | 6 | 6 | 45 |
| **Total** | **45** | **24** | **21** | **15** | **105** |

Figure A.12

| TOTAL FIREARMS DISCHARGE INCIDENTS BY MONTH, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **January** | 6 | 1 | 1 | 4 | 12 |
| **February** | 3 | 3 | 2 | 2 | 10 |
| **March** | 3 | 3 | 2 | 2 | 10 |
| **April** | 5 | 2 | 2 | 2 | 11 |
| **May** | 3 | 3 | 0 | 0 | 6 |
| **June** | 6 | 3 | 1 | 0 | 10 |
| **July** | 2 | 2 | 4 | 1 | 9 |
| **August** | 6 | 3 | 2 | 2 | 13 |
| **September** | 3 | 0 | 2 | 0 | 5 |
| **October** | 5 | 1 | 0 | 0 | 6 |
| **November** | 2 | 1 | 4 | 1 | 8 |
| **December** | 1 | 2 | 1 | 1 | 5 |
| **Total** | **45** | **24** | **21** | **15** | **105** |

Figure A.13

| TOTAL FIREARMS DISCHARGE INCIDENTS BY BOROUGH, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Manhattan** | 12 | 5 | 6 | 0 | 23 |
| **Bronx** | 9 | 4 | 3 | 4 | 20 |
| **Brooklyn** | 15 | 9 | 4 | 1 | 29 |
| **Queens** | 9 | 4 | 3 | 3 | 19 |
| **Staten Island** | 0 | 2 | 2 | 1 | 5 |
| **Outside City** | 0 | 0 | 3 | 6 | 9 |
| **Total** | **45** | **24** | **21** | **15** | **105** |

Figure A.14

| TOTAL FIREARMS DISCHARGE INCIDENTS BY PRECINCT, MANHATTAN, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **1st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **5th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **6th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **7th Precinct** | 2 | 0 | 0 | 0 | 2 |
| **9th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **10th Precinct** | 0 | 1 | 2 | 0 | 3 |
| **13th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Midtown South** | 2 | 0 | 0 | 0 | 2 |
| **17th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Midtown North** | 0 | 0 | 0 | 0 | 0 |
| **19th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **20th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Central Park** | 0 | 0 | 0 | 0 | 0 |
| **23rd Precinct** | 2 | 2 | 0 | 0 | 4 |
| **24th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **25th Precinct** | 1 | 0 | 1 | 0 | 2 |
| **26th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **28th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **30th Precinct** | 1 | 0 | 1 | 0 | 2 |
| **32nd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **33rd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **34th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **Total** | **12** | **0** | **6** | **0** | **23** |

Figure A.15

| TOTAL FIREARMS DISCHARGE INCIDENTS BY PRECINCT, BRONX, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **40th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **41st Precinct** | 1 | 0 | 0 | 0 | 1 |
| **42nd Precinct** | 0 | 1 | 1 | 0 | 2 |
| **43rd Precinct** | 2 | 0 | 0 | 0 | 2 |
| **44th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **45th Precinct** | 1 | 0 | 0 | 1 | 2 |
| **46th Precinct** | 2 | 1 | 0 | 0 | 3 |
| **47th Precinct** | 1 | 0 | 0 | 1 | 2 |
| **48th Precinct** | 0 | 1 | 1 | 1 | 3 |
| **49th Precinct** | 1 | 1 | 0 | 1 | 3 |
| **50th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **52nd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **Total** | **9** | **4** | **3** | **4** | **20** |

Figure A.16

| TOTAL FIREARMS DISCHARGE INCIDENTS BY PRECINCT, BROOKLYN, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **60th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **61st Precinct** | 1 | 0 | 0 | 1 | 2 |
| **62nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **63rd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **66th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **67th Precinct** | 1 | 0 | 1 | 0 | 2 |
| **68th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **69th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **70th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **71st Precinct** | 0 | 0 | 1 | 0 | 1 |
| **72nd Precinct** | 0 | 1 | 0 | 0 | 1 |
| **73rd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **75th Precinct** | 4 | 3 | 1 | 0 | 8 |
| **76th Precinct** | 2 | 0 | 0 | 0 | 2 |
| **77th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **78th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **79th Precinct** | 2 | 2 | 0 | 0 | 4 |
| **81st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **83rd Precinct** | 2 | 2 | 0 | 0 | 4 |
| **84th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **88th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **90th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **94th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **15** | **9** | **4** | **1** | **29** |

Figure A.17

| TOTAL FIREARMS DISCHARGE INCIDENTS BY PRECINCT, QUEENS, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **100th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **101st Precinct** | 0 | 1 | 0 | 0 | 1 |
| **102nd Precinct** | 0 | 1 | 0 | 0 | 1 |
| **103rd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **104th Precinct** | 1 | 0 | 0 | 1 | 2 |
| **105th Precinct** | 2 | 1 | 1 | 0 | 4 |
| **106th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **107th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **108th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **109th Precinct** | 0 | 0 | 0 | 1 | 1 |
| **110th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **111th Precinct** | 2 | 0 | 0 | 1 | 3 |
| **112th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **113th Precinct** | 0 | 1 | 1 | 0 | 2 |
| **114th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **115th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **Total** | **9** | **4** | **3** | **3** | **19** |

Figure A.18

| TOTAL FIREARMS DISCHARGE INCIDENTS BY PRECINCT, STATEN ISLAND, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **120th Precinct** | 0 | 0 | 2 | 0 | 2 |
| **122nd Precinct** | 0 | 2 | 0 | 0 | 2 |
| **123rd Precinct** | 0 | 0 | 0 | 1 | 1 |
| **Total** | **0** | **2** | **2** | **1** | **5** |

Figure A.19

| TOTAL FIREARMS DISCHARGE INCIDENTS BY LOCATION, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Within City** | 45 | 24 | 18 | 9 | 96 |
| **Outside City** | 0 | 0 | 3 | 6 | 9 |
| **Total** | **45** | **24** | **21** | **15** | **105** |

Figure A.20

| TOTAL FIREARMS DISCHARGES BY OFFICER DUTY STATUS, 2012 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **On Duty** | 54 | 26 | 13 | 2 | 95 |
| **Off Duty** | 6 | 2 | 8 | 10 | 26 |
| **Total** | **60** | **28** | **21** | **12** | **121** |

Figure A.21

| ID-AC Incidents, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Subject Weapon** | **Officers Involved** | **Rounds Fired** | **Subjects** | **Subject Injury** | **Subject Gender** | **Subject Race** | **Subject Age** |
| Firearm | 1 | 1 | 1 | Fatality | Male | Black | 27 |
| Firearm | 1 | 1 | 1 | None | Male | Black | 25 |
| Imitation Firearm | 1 | 1 | 1 | Injury | Male | Black | 46 |
| Firearm (Fired at Police) | 1 | 2 | 1 | Fatality | Male | White | 22 |
| Simulated Firearm / Blunt Instrument | 1 | 1 | 2 | Fatality | Male/Male | Black/Black | 17/15 |
| Unknown | 1 | 1 | 1 | Fatality | Male | Black | 18 |
| Firearm (Fired at Police) | 1 | 13 | 1 | Fatality | Male | Black | 52 |
| Firearm (Fired at Police) | 2 | 11 | 1 | Injury | Male | Hispanic | 25 |
| Blunt Instrument | 1 | 2 | 1 | None | Male | Black | 35 |
| Cutting Instrument | 2 | 2 | 1 | Injury | Female | Black | 43 |
| Firearm (Fired at Police) | 1 | 2 | 1 | Injury | Male | Black | 23 |
| Firearm (Fired at Police) | 1 | 8 | 1 | Unknown | Male | Black | Unknown |
| Firearm (Fired at Police) | 5 | 16 | 1 | Injury | Male | Black | 34 |
| Cutting Instrument | 1 | 1 | 1 | None | Male | Hispanic | 49 |
| Firearm | 1 | 3 | 1 | Fatality | Male | Black | 24 |
| Firearm | 1 | 2 | 1 | Injury | Male | Black | 30 |
| Firearm (Fired at Police) | 2 | 39 | 1 | Injury | Male | Black | 29 |
| Firearm (Fired at Police) | 2 | 11 | 1 | Injury | Male | Black | 19 |
| Cutting Instrument | 2 | 2 | 1 | Injury | Male | Hispanic | 23 |
| Cutting Instrument | 1 | 2 | 1 | Fatality | Male | Black | 50 |
| Firearm (Fired at Police) | 1 | 5 | 1 | Unknown | Male | Hispanic | Unknown |
| Firearm (Fired at Police) | 1 | 2 | 1 | None | Male | Black | 34 |
| Blunt Instrument | 1 | 1 | 1 | Fatality | Female | Black | 23 |
| Firearm | 1 | 12 | 1 | None | Male | Black | 17 |
| Firearm (Fired at Police) | 1 | 12 | 1 | Injury | Male | Hispanic | 21 |

| Subject Weapon | Officers Involved | Rounds Fired | Subjects | Subject Injury | Subject Gender | Subject Race | Subject Age |
|---|---|---|---|---|---|---|---|
| Firearm | 1 | 1 | 1 | Fatality | Male | Asian | 28 |
| Firearm (Fired at Police) | 1 | 4 | 1 | Unknown | Male | Black | Unknown |
| Firearm | 1 | 1 | 1 | None | Male | Black | 55 |
| Firearm (Fired at Police) | 2 | 6 | 1 | Injury | Male | Black | 20 |
| Firearm (Fired at Police) | 1 | 6 | 1 | Unknown | Male | Black | Unknown |
| Cutting Instrument | 2 | 3 | 1 | Fatality | Male | Black | 48 |
| Firearm | 1 | 1 | 1 | Unknown | Male | Black | Unknown |
| Firearm (Fired at Police) | 1 | 2 | 1 | Unknown | Male | Black | Unknown |
| Firearm | 2 | 7 | 1 | Fatality | Male | White | 58 |
| Cutting Instrument | 1 | 1 | 1 | Fatality | Male | Black | 27 |
| Firearm | 1 | 1 | 1 | Fatality | Male | Black | 22 |
| Cutting Instrument | 3 | 3 | 1 | Fatality | Male | Black | 28 |
| Unknown | 1 | 1 | 1 | Fatality | Male | Hispanic | 22 |
| Firearm (Fired at Police) | 2 | 9 | 1 | Injury | Male | Black | 29 |
| Firearm | 1 | 2 | 1 | Unknown | Male | White | Unknown |
| Firearm | 1 | 8 | 1 | Fatality | Male | Black | 17 |
| Firearm | 1 | 1 | 1 | None | Male | Black | 36 |
| Firearm (Fired at Police) | 3 | 3 | 1 | Injury | Male | Black | 30 |
| Blunt Instrument | 1 | 3 | 1 | Unknown | Male | Black | Unknown |
| Imitation Firearm | 2 | 5 | 1 | Fatality | Male | Hispanic | 45 |

Figure A.22

New York City Police Department
Raymond W. Kelly, Police Commissioner
Michael J. Farrell, Deputy Commissioner, Strategic Initiatives

Office of Management Analysis and Planning
Assistant Chief John K. Donohue, Commanding Officer
Special Projects Section
Deputy Inspector Edward Carrasco, Commanding Officer

Sergeant Daniel Weadock
Detective Charles Mills
Detective Adelaide Spence
Police Officer Mark Danon

# New York City Police Department Annual Firearms Discharge Report

# 2013



# ANNUAL FIREARMS DISCHARGE REPORT

# 2013

**William J. Bratton**
**Police Commissioner**

2014, New York City Police Department

# TABLE OF CONTENTS

**PART I: OVERVIEW** …… **1**

**Introduction** …… 2

**Use of Force** …… 3

Guidelines for the Use of Firearms …… 4

Reasonableness …… 4

Training …… 5

**Investigation and Review Process** …… 5

The Shooting Team …… 5

The Shooting Incident Report …… 6

The Final Report …… 7

Review …… 7

The Borough Firearms Discharge Advisory Board …… 7

The Chief of Department's Firearms Discharge Review Board …… 8

The Police Commissioner …… 8

**Glossary** …… 10

**2013 by Category** …… 13

**2013 Report** …… 14

Total Firearms Discharges …… 14

Categories …… 15

**PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** …… **16**

**Overview** …… 17

**Dates and Times of Discharges** …… 17

**Locations of Discharges** …… 18

Locations of Criminal Shootings …… 18

Location Type …… 20

**Reasons Officer Involved** …… 21

Threat Type……………………………………………………………………………………… 22

**Officer Restraint**…………………………………………………………………………………... 23

**Objective Completion Rate**………………………………………………………………………... 23

**Officer Firearms**……………………………………………………………………………………... 24

Shooting Technique……………………………………………………………………………….. 24

**Officer Pedigree**……………………………………………………………………………………... 24

**Subject Pedigree**……………………………………………………………………………………. 26

Prior Arrests……………………………………………………………………………………….. 27

**Incident Outcomes**………………………………………………………………………………….. 27

Officer Death……………………………………………………………………………………….. 27

Officer Injuries……………………………………………………………………………………… 27

Bullet-Resistant Vests……………………………………………………………………………… 28

Subject Death……………………………………………………………………………………… 28

Subject Injuries……………………………………………………………………………………... 28

Bystander Injuries…………………………………………………………………………………. 28

Discipline…………………………………………………………………………………………… 28

**Summary**……………………………………………………………………………………………… 29

**PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK**………………………………………..…. **30**

**Overview**……………………………………………………………………………………………… 31

**Dates and Times of Discharges**…………………………………………………………………….. 31

**Locations of Discharges**…………………………………………………………………………….. 32

**Reasons Officer Involved**…………………………………………………………………..…… 33

**Officer Restraint**…………………………………………………………………………………... 34

**Objective Completion Rate**………………………………………………………………………….. 35

**Officer Firearms**……………………………………………………………………………………... 35

Shooting Technique………………………………………………………………………………... 35

**Officer Pedigree**……………………………………………………………………………………... 35

**Incident Outcomes**………………………………………………………………………………….. 37

**PART IV: UNINTENTIONAL DISCHARGE** …… **38**

**Overview** …… 39

**Non-Adversarial Unintentional Discharges** …… 39

Loading/Unloading …… 39

Handling …… 39

**Adversarial Unintentional Discharges** …… 39

**Firearms** …… 40

**Officer Pedigree** …… 40

**Incident Outcomes** …… 42

**PART V: UNAUTHORIZED USE OF A FIREARM** …… **43**

**Overview** …… 44

**Officer Pedigree** …… 44

**Suicide** …… 44

**Discharges by Other Than an Officer** …… 45

**Incident Outcomes** …… 45

**PART VI: MISTAKEN IDENTITY** …… **46**

**Overview** …… 47

**2013 Incidents** …… 47

**APPENDICES** …… **48**

**Appendix A: Historical Data** …… 49

**Appendix B: Firearms Training** …… 52

**Appendix C: Subjects Killed During ID-AC Incidents** …… 54

**Appendix D: Subject Race, 2009-2013** …… 57

**Appendix E: Supplemental Data** …… 58

# TABLES, CHARTS AND FIGURES

**PART I: OVERVIEW**………………………………………………………………………………………. **1**

1.1 Anatomy of a Firearms Discharge Investigation……………………………………………….. 9

1.2 Historical Snapshot, 2003-2013………………………………………………………………… 11

1.3 Adversarial Conflict, 2003-2013………………………………………………………………. 12

1.4 Animal Attack, 2003-2013……………………………………………………………………... 12

1.5 Unintentional Discharges, 2003-2013………………………………………………………... 12

1.6 Total Discharges, 2003-2013…………………………………………………………………. 12

1.7 2012 v. 2013 Snapshot………………………………………………………………………… 12

1.8 2013 Firearms Discharge Scope……………………………………………………………… 14

**PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT**…………………………………… **16**

2.1 ID-AC Incidents by Tour……………………………………………………………………….. 17

2.2 ID-AC Incidents by Borough…………………………………………………………………… 18

2.3 ID-AC Incidents vs. Criminal Shooting Incidents…………………………………………… 19

2.4 Criminal Shooting Incidents vs. ID-AC Incidents, Percentage by Borough…………………. 20

2.5 Criminal Shooting Incidents vs. ID-AC Incidents, Frequency by Borough………………….. 20

2.6 ID-AC Incidents by Location Type……………………………………………………………. 21

2.7 On-Duty Officer Assignments, ID-AC Incidents……………………………………………... 21

2.8 Situations Precipitating On-Duty ID-AC Incidents…………………………………………... 22

2.9 Threat Type, ID-AC Incidents…………………………………………………………………. 22

2.10 Rounds Fired Per ID-AC Officer……………………………………………………………… 23

2.11 Rounds Fired Per ID-AC Incident…………………………………………………………….. 23

2.12 ID-AC Distance to Target……………………………………………………………………… 24

2.13 Race, ID-AC Officers vs. Department Staffing……………………………………………… 25

2.14 Years of Service, ID-AC Officers vs. Department Staffing………………………………… 25

2.15 Rank, ID-AC Officers vs. Department Staffing……………………………………………… 26

2.16 Criminal Shooting Suspects vs. ID-AC Subjects by Race…………………………………. 26

**PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK** …… **30**

3.1 ID-AA Incidents by Tour …… 31
3.2 Locations of Discharges …… 32
3.3 ID-AA Incidents by Borough …… 32
3.4 ID-AA Incidents by Location Type …… 33
3.5 Officer Assignment, ID-AA Incidents …… 33
3.6 Situations Precipitating On-Duty ID-AA Incidents …… 34
3.7 Rounds Fired Per ID-AA Officer …… 34
3.8 Rounds Fired Per ID-AA Incident …… 35
3.9 Race, ID-AA Officers vs. Department Staffing …… 36
3.10 Years of Service, ID-AA Officers vs. Department Staffing …… 36
3.11 Rank, ID-AA Officers vs. Department Staffing …… 37

**PART IV: UNINTENTIONAL DISCHARGE** …… **38**

4.1 Race, Unintentional Discharges vs. Department Staffing …… 41
4.2 Years of Service, Unintentional Discharges vs. Department Staffing …… 41
4.3 Rank, Unintentional Discharges vs. Department Staffing …… 42

**PART V: UNAUTHORIZED USE OF A FIREARM** …… **43**

5.1 Police Officer Suicides by Firearm, 2003-2013 …… 45

**PART VI: MISTAKEN IDENTITY** …… **46**

**APPENDICES** …… **48**

A.1 Officers Shot and Injured by Subjects, 1971-2013 …… 49
A.2 Officers Shot and Killed by Subjects, 1971-2013 …… 49
A.3 Subjects Shot and Injured by Officers, 1971-2013 …… 50
A.4 Subjects Shot and Killed by Officers, 1971-2013 …… 50
A.5 Total Shots Fired, 1971-2013 …… 51
A.6 Total Shooting Incidents, 1971-2013 …… 51

A.7 Gunfire in New York City, 2013……………………………………………………………….. 57

A.8 Subjects Wounded by Officers, 2009-2013………………………………………………….. 57

A.9 Subjects Killed by Officers, 2009-2013……………………………………………………… 57

A.10 Firearms Discharge Incidents by Day, 2013………………………………………………… 58

A.11 Firearms Discharge Incidents by Tour, 2013……………………………………………….. 58

A.12 Firearms Discharge Incidents by Month, 2013……………………………………………… 59

A.13 Firearms Discharge Incidents by Borough, 2013…………………………………………… 59

A.14 Firearms Discharge Incidents by Precinct, Manhattan, 2013……………………………… 60

A.15 Firearms Discharge Incidents by Precinct, Bronx, 2013…………………………………… 61

A.16 Firearms Discharge Incidents by Precinct, Brooklyn, 2013………………………………... 62

A.17 Firearms Discharge Incidents by Precinct, Queens, 2013…………………………………. 63

A.18 Firearms Discharge Incidents by Precinct, Staten Island, 2013…………………………... 63

A.19 Firearms Discharge Incidents by Location, 2013………………………………………… 64

A.20 Firearms Discharge Incidents by Officer Duty Status, 2013……………………………….. 64

A.21 ID-AC Incidents, 2013…………………………………………………………………………. 65

# PART I: OVERVIEW

# INTRODUCTION

The New York City Police Department began to collect in-depth documentation of firearm discharges during hostile encounters in 1971, for the purpose of "[increasing] the safety potential of each member of the force." The policy quickly expanded beyond police-involved combat, however, and came to include the study of other categories, such as unintentional discharges. Today, the Department tracks any incident in which a Department firearm is discharged, even if the person discharging the weapon is not an officer.

Four decades of annual analyses have altered the way officers respond to, engage in, and assess the need for firearms discharges. Information gleaned from the annual reports has saved lives, and there has been Department-wide change with regard to firearms safety, retention, and tactics. The Department has made restraint the norm. When annual recordkeeping began in 1971, 12 officers were shot and killed by another person, and 47 officers were shot and injured. Officers, in turn, shot and killed 93 subjects, and injured another 221. By contrast, in 2013, three officers were shot and injured by subjects, while police shot and killed eight subjects, and injured 17 others; no officer was killed by subject gunfire in 2013.

Today, the reports additionally serve as statistical support for the development of training, the adoption of new technology, and the deployment of Department resources. New instructional scenarios are implemented as a result of this analysis, and new hardware — from bullet-resistant vests to conducted-energy devices — have been introduced.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option exists other than the use of a firearm.

# USE OF FORCE

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to affect an arrest or prevent an escape, as well as to protect life and property. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing perpetrators and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance; the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient — when people choose to ignore or actively resist police — officers have an ascending array of force options to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (i.e. pepper spray), conducted energy devices, impact weapons (i.e. batons), and deadly physical force. All of these are tools at the officer's disposal. The officer is under no obligation to move sequentially from one to the next; he or she may jump from verbal force to pointing a firearm — or vice versa — if the situation dictates.

Federal case law (Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989)) delineates a standard of "objective reasonableness" that restricts an officer's prerogative to compel or constrain another citizen. But Tennessee v. Garner affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. Additionally, the state limits an officer's ability to exercise deadly physical force even further — Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three instances:

1) When the subject has committed or is attempting to commit a felony and is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary;

2) When an armed felon resists arrest or flees; and

3) When the use of deadly physical force is necessary to defend any person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property (e.g., to prevent or terminate arson or burglary); the Department does not. Additionally, according to the laws of New York State, it is lawful for an officer to shoot at the driver of a vehicle who is using the vehicle so that it poses an imminent threat of deadly physical force. However, such a firearms discharge would violate Department guidelines.

NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and "excessive force will not be tolerated," (Patrol Guide 203-11). Regarding the use of deadly physical force, Department policy states, "uniformed members of the service should use only the minimal amount of force necessary to protect human life," (Patrol Guide 203-12).

## GUIDELINES FOR THE USE OF FIREARMS

To ensure that officers use only the minimal amount of force, the Department has nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

1) Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.

2) Police officers shall not discharge their weapons when, in their professional judgment, doing so will unnecessarily endanger innocent persons.

3) Police officers shall not discharge their weapons in defense of property.

4) Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.

5) Police officers shall not fire warning shots.

6) Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.

7) Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.

8) Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.

9) Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

## REASONABLENESS

An officer's permission to use force is not unlimited. According to the law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary.

Police officers are regularly exposed to highly stressful, dangerous situations. The risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In Brown v. United States, 256 U.S. 335 (1921), Justice Oliver Wendell Holmes, Jr. noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, in Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court wrote that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in People v. Benjamin, 51 NY2d 267 (1980), the New York State courts observed that "it would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who carry the shield and protect the common good.

### TRAINING

Latitude is not unrestricted discretion; rather, it is an admission that reasonableness is fluid. In order to make the right decision about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, skill, and most importantly, training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

## INVESTIGATION AND REVIEW PROCESS

The New York City Police Department recognizes the serious nature of police-involved firearms discharges and seeks to record and evaluate every such incident. The mandate for such recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents: 1) Patrol Guide Procedure 212-29; and 2) a handbook entitled, "The Firearms Discharges Investigation Manual; The NYPD Guide to the Preparation of a Shooting Incident Report."

### THE SHOOTING TEAM

When an officer discharges his or her firearm, whether on or off-duty, or when a firearm owned by an officer is discharged by another person, a patrol supervisor responds to the incident, takes command of the scene, and secures and inspects the involved officer's firearm. He or she also immediately notifies the chain of command. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of Captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an Inspector, undertakes an in-depth examination of the discharge incident, beginning by contacting and conferring with the District Attorney. In many cases, including nearly every case in which a subject is killed or injured, the District Attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the Grand Jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to an Intoxilyzer test to determine level of intoxication, if any. He or she is also automatically reassigned to an administrative position for a minimum of three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

## THE SHOOTING INCIDENT REPORT

A preliminary report (usually written within eight hours of the incident) outlines, as much as possible, the shooting incident; however, the rapidly evolving nature of shooting investigations means information contained therein is unavoidably preliminary. The primary means of mitigating this is the use of the Firearms Discharge Investigation Manual.

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic, incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination or from commenting on the apparent tactics utilized during the incident.

## THE FINAL REPORT

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data is unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting-team leader (e.g., detective's case files, forensic results, and medical reports).

When discharges that occur during adversarial conflict involve injury or death to a subject, the final report often cannot be finished within the 90-day period. Instead, the final report must wait until the investigation into the incident has been completed, or at least until the district attorney from the county of occurrence has permitted the officer or officers who fired to be interviewed. At times, it must wait even longer, until all relevant legal proceedings have been concluded.

If a final report is delayed, whether because of ongoing legal proceedings or incomplete investigations, the Borough Investigation Unit submits monthly interim status reports. Once the final report is finished, it is forwarded, through channels, to the Chief of Department.

## REVIEW

After a firearms discharge has been investigated, the final report prepared, and after the District Attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

## THE BOROUGH FIREARMS DISCHARGE ADVISORY BOARD

The review of firearms discharges is two-tiered and conducted at the borough and executive levels. Members of the borough Firearms Discharge Advisory Board (FDAB) are supervisors assigned to the borough in which the incident occurred. This board further scrutinizes the incident with the benefit of new material contained in the final report. Based on the accumulated evidence, the borough FDAB issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board (FDRB) for determination.

## THE CHIEF OF DEPARTMENT'S FIREARMS DISCHARGE REVIEW BOARD

The FDRB issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The FDRB gives due consideration to, and often concurs with, the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report, which is a single document that memorializes and synthesizes the whole of the exhaustive investigation and review process. It is then presented to the Police Commissioner.

## THE POLICE COMMISSIONER

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination regarding the incident. Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2013 findings are published throughout this report.

# ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION




Figure 1.1

| GLOSSARY | |
|---|---|
| **Officer** | A uniformed member of the New York City Police Department of any rank. |
| **Subject** | A person engaged in adversarial conflict with an officer or a third party, which results in a firearms discharge. |
| **Civilian** | A person who is not the subject of an adversarial conflict, but is a victim, bystander, and/or injured person. |
| **Firearms Discharge** | An incident in which an officer discharges any firearm, or when a firearm belonging to an officer is discharged by any person, excluding discharges during authorized training sessions, lawful target practice, or at a firearm safety station within a Department facility. |
| **Intentional Discharge – Adversarial Conflict** | An incident in which an officer intentionally discharges a firearm in defense of self or another during an adversarial conflict with a subject, including those inside the scope of the officer's employment but outside Department guidelines. This does not include a discharge against an animal attack. |
| **Mistaken Identity Discharge** | An incident in which an officer intentionally discharges a firearm at another law-enforcement officer whom the discharging officer mistakenly believes to be a criminal. This does not include crossfire incidents in which a discharging officer unintentionally strikes another officer. |
| **Intentional Discharge – Animal Attack** | An incident in which an officer intentionally discharges a firearm in defense of self or another against an animal attack, including those inside the scope of the officer's employment but outside Department guidelines. |
| **Intentional Discharge – No Conflict** | An incident in which an officer intentionally discharges a firearm to summon assistance, including those inside the scope of the officer's employment but outside Department guidelines. |
| **Unintentional Firearms Discharge** | An incident in which an officer discharges a firearm without intent, regardless of the circumstance. |
| **Unauthorized Use of a Firearm** | An incident in which an officer discharges a firearm without proper legal justification and/or outside the scope of the officer's employment, or an incident in which an unauthorized person discharges an officer's firearm. |
| **Use/Threaten the Use of a Firearm** | A contributing factor to a firearms discharge in which a subject discharges or threatens to discharge a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening to use a firearm. |
| **Firearm** | A pistol, revolver, shotgun, or rifle, including a variation of any of these (e.g. a sawed-off shotgun). |
| **Imitation Firearm** | Any instrument that is designed to appear as if it were a firearm, or modified to appear as if it were a firearm, including air pistols, toy guns, prop guns, and replicas. |
| **Use/Threaten the Use of a Cutting Instrument** | A contributing factor to a firearms discharge in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| **Cutting Instrument** | Any knife, razor, sword, or other sharp-edged object such as a broken bottle. |
| **Use/Threaten the Use of a Blunt Instrument** | A contributing factor to a firearms discharge in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |

| | |
|---|---|
| **Blunt Instrument** | Any bat, stick, pipe, metal knuckles, or other object which, when used as a weapon, can cause blunt-force injury to a person, including motor vehicles and unbroken bottles. |
| **Use/Threaten the Use of Overwhelming Physical Force** | An incident in which an unarmed subject physically attacks a person or threatens or attempts to do the same, and by doing so puts the victim at risk of serious physical injury or death, including gang assaults, attempts to push a person from a roof or train platform, and attempts to take an officer's firearm. |

| **HISTORICAL SNAPSHOT, 2003-2013** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** |
| Adversarial Conflict | 61 | 51 | 59 | 59 | 45 | 49 | 47 | 33 | 36 | 45 | 40 |
| Animal Attack | 35 | 26 | 32 | 30 | 39 | 30 | 28 | 30 | 36 | 24 | 19 |
| Unintentional Discharge | 25 | 27 | 25 | 26 | 15 | 15 | 23 | 21 | 15 | 21 | 12 |
| Mistaken Identity | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Unauthorized Use of a Firearm[1] | 2 | 5 | 6 | 8 | 6 | 3 | 4 | 6 | 2 | 6 | 2 |
| MOS Suicide/ Attempt[2] | 7 | 5 | 3 | 3 | 6 | 8 | 3 | 2 | 3 | 9 | 8 |
| **Total** | **130** | **114** | **125** | **127** | **111** | **105** | **106** | **92** | **92** | **105** | **81** |

Figure 1.2

[1] This category was modified in 2005 to include incidents in which an unauthorized person discharges an officer's firearm
[2] MOS Suicide/Attempt is a subcategory of Unauthorized Use of a Firearm – the numbers have been disaggregated in this table




Figure 1.3




Figure 1.4




Figure 1.5




Figure 1.6

| 2012 v. 2013 SNAPSHOT | | | |
|---|---|---|---|
| **CATEGORY** | **2012** | **2013** | **CHANGE** |
| Intentional Discharge – Adversarial Conflict | 45 | 40 | -11% |
| Intentional Discharge – Animal Attack | 24 | 19 | -21% |
| Unintentional Discharge | 21 | 12 | -43% |
| Unauthorized Use of a Firearm | 15 | 10 | -33% |
| **Total Firearms Discharges** | **105** | **81** | **-23%** |
| Total Officers Firing | 120 | 98 | -18% |
| Total Shots Fired | 444 | 248 | -44% |
| Total Officers Shot and Injured by Subjects | 13 | 3 | -77% |
| Total Officers Shot and Killed by Subjects | 0 | 0 | None |
| Total Subjects Shot and Injured by Officers | 14 | 17 | 21% |
| Total Subjects Shot and Killed by Officers | 16 | 8 | -50% |

Figure 1.7

# 2013 BY CATEGORY

| INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT | |
|---|---|
| Subject Used/Threatened the Use of a Firearm | 21 |
| Subject Used/Threatened the Use of a Cutting Instrument | 5 |
| Subject Used/Threatened the Use of a Blunt Instrument or Vehicle | 6 |
| Subject Used/Threatened the Use of Overwhelming Physical Force | 3 |
| Simulated Firearm/Perceived Threat of Deadly Physical Force | 5 |
| **Total** | **40** |

| INTENTIONAL DISCHARGE – ANIMAL ATTACK | |
|---|---|
| Dog Attack | 19 |
| Other Animal Attack | 0 |
| **Total** | **19** |

| UNINTENTIONAL DISCHARGE | |
|---|---|
| During Adversarial Conflict | 6 |
| Handling Firearm | 6 |
| **Total** | **12** |

| UNAUTHORIZED USE OF A FIREARM | |
|---|---|
| Suicide | 6 |
| Attempted Suicide | 2 |
| Other Unauthorized Intentional Discharge | 1 |
| Unauthorized Person Discharged Officer's Firearm | 1 |
| **Total** | **10** |

| | |
|---|---|
| **Total Firearms Discharges** | **81** |

| 2013 FIREARMS DISCHARGE SCOPE | |
|---|---|
| New York City Population (U.S. Census, July 1, 2013) | 8,405,837 |
| NYPD Average Annual Uniformed Staffing | 35,182 |
| Total Radio Assignments | 4,580,953 |
| Radio Assignments Involving Weapons | 80,768 |
| Arrests Involving Weapons Used/Displayed/Possessed | 25,568 |
| Gun Arrests | 5,078 |
| Criminal Shooting Incidents | 1,103 |
| Adversarial Conflict: Total Number of Officers Who Intentionally Fired | 55 |
| Adversarial Conflict: Total Number of Firearms Discharge Incidents | 40 |
| Subjects Shot and Injured | 17 |
| Subjects Shot and Killed | 8 |
| Officers Shot and Injured | 3 |
| Officers Shot and Killed | 0 |

Figure 1.8

## 2013 REPORT

### TOTAL FIREARMS DISCHARGES

In 2013, the New York City Police Department saw the smallest number of firearms discharges since the recording of police shootings in the City began. Furthermore, the most serious category of discharges (shootings involving adversarial conflict with a subject) has also seen a steep decline, down 34 percent since 2003. In a city of 8.3 million people, from a Department of approximately 35,000 officers, 55 officers were involved in 40 incidents of intentional firearms discharges during an adversarial conflict, with 17 subjects injured and eight killed.

The figures are a testament to police officers' restraint, diligence, and honorable performance of duty. But they also show that, over the past four decades, attacks on both police and citizens have steadily declined. The drastic reduction in violent crime over the past two decades is sociologically reflexive: as crime decreases, criminals and police enter into conflict less often.

The report is subdivided into five categories. Each category is analyzed based only on the information in that category, allowing the Department to better understand a specific type of incident and adjust training and policy to continue to reduce those incidents. The relatively small sample studied for the report (81 discharge incidents, 40 in the Adversarial Conflict category) can limit the predictive value and conclusions that may be derived.

The report contains information compiled from preliminary and final Shooting reports, detective's case files, Medical Examiner's reports, Firearms Discharge Assault reports, Arrest and Complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous Annual Firearm Discharge reports.

Due to rounding, some charts may not precisely equal 100 percent.

## CATEGORIES

- **Intentional Discharge – Adversarial Conflict**: when an officer intentionally discharges his or her firearm during a confrontation with a subject

- **Intentional Discharge – Animal Attack**: when an officer intentionally discharges his or her firearm to defend against an animal attack

- **Unintentional Discharge**: when an officer unintentionally discharges his or her firearm

- **Unauthorized Use Of A Firearm**: when an officer discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm

- **Mistaken Identity**: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

The possibility of a sixth category, Intentional Discharge – No Conflict, exists, but its occurrence is extremely uncommon. Intentional Discharge – No Conflict involves an officer discharging his or her firearm to summon assistance. Because of the rarity of this type of discharge, it is not regularly tracked in the annual report, but is addressed on an as-it-occurs basis. In 2013, no such discharge occurred.

# PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT

# OVERVIEW

There were 40 incidents of intentional firearms discharge during adversarial conflict (ID-AC) in 2013, an 11 percent decrease from 2012. A total of 55 officers intentionally fired their weapons during these incidents, down eight percent from 2012.

Thirty-nine known subjects were involved in ID-AC incidents, and one incident involved an unknown number of subjects. Twenty-five subjects were shot in 2013, a 17 percent decrease from 2012. Although there was a 21 percent increase in the number of subjects injured by police gunfire, there was a 50 percent decrease in the number of subjects shot and killed.

Three officers were shot and injured by criminals in 2013, down from 13 in 2012. Two of the three injured officers were shot within the category of adversarial conflict, both during the same incident; one of these officers was saved by his bullet-resistant vest. The other shooting occurred when a criminal managed to get control of an officer's firearm and shot and injured his partner with it; this shooting falls within the Unauthorized Discharge category (Part V of this report). No officer was struck by crossfire in 2013, nor was any officer killed during an ID-AC incident.

On seven occasions, officers intervened in attacks on civilians (three in stabbings, three in firearms attacks, and one in an attack with a metal chain). Six times officers interrupted subjects who were firing indiscriminately into the air.

# DATES AND TIMES OF DISCHARGES

The distribution of ID-AC incidents was fairly even throughout the year. Between one and six incidents occurred in every month except July, when there were no firearms discharges of any category.

ID-AC Incidents were most likely to occur on Saturday (13 incidents), and least likely to occur on Sunday or Monday (two incidents each).

More than half occurred during the third platoon, between three thirty in the afternoon and eleven thirty at night. See Figure 2.1. No officer had been working more than eight hours at the time of the incident.

**ID-AC INCIDENTS BY TOUR**




Figure 2.1

# LOCATIONS OF DISCHARGES




Figure 2.2

In 2013, 39 ID-AC incidents occurred within New York City, and one occurred in Suffolk County.

Nearly half of all ID-AC incidents occurred in Brooklyn, and a quarter occurred in the Bronx. See Figure 2.2.

ID-AC incidents occurred in 26 separate precincts, including seven precincts that had multiple ID-AC incidents. The 73rd Precinct in Brownsville, Brooklyn had the most incidents with five, and the 75th Precinct in East New York, Brooklyn had the second most, with four.

## LOCATIONS OF CRIMINAL SHOOTINGS

The locations of ID-AC incidents tend to be associated with larger geographic crime patterns, which can be seen by comparing ID-AC locations to the locations of criminal shootings. See Figure 2.3, which depicts the location of the 1,103 criminal shooting incidents that occurred in New York City in 2013, resulting in 1,299 people shot, and the location of the 40 ID-AC incidents. The map shows that police firearms discharges occur most often in those areas of the City most plagued by gun violence.

Since the Annual Firearms Discharge Report first introduced this map in 2007, the data has consistently identified the same correlation. The frequency of criminal gun activity within New York City directly and proportionally affects the frequency and location of police involved shootings. As illustrated by Figure 2.4, the correlation is explicit with regard to relative rate, as well – police-involved shootings and criminal shootings are dispersed similarly by borough. Despite this correlation, the number of ID-AC incidents (40) is small when compared to the number of criminal shootings (1,103). Only three percent of the City's shooting incidents involve the police. See Figure 2.5. Note that the ID-AC incident that occurred outside the City is not included in figures 2.3, 2.4 and 2.5.

## ID-AC INCIDENTS v. CRIMINAL SHOOTING INCIDENTS




Figure 2.3

**CRIMINAL SHOOTING INCIDENTS v. ID-AC INCIDENTS, PERCENTAGE BY BOROUGH**




Figure 2.4

**CRIMINAL SHOOTING INCIDENTS v. ID-AC INCIDENTS, FREQUENCY BY BOROUGH**




Figure 2.5

## LOCATION TYPE

The majority of ID-AC incidents occurred outdoors (78 percent), all but two of which occurred on streets and sidewalks. See Figure 2.6.

Thirty-two ID-AC incidents were within the jurisdiction of the patrol precincts, six were on New York City Housing Authority (NYCHA) premises, and one was within the Metropolitan Transportation Authority transit system. Of the six ID-AC incidents that occurred on NYCHA property, three were in Brooklyn (two in the Brownsville Houses and one in the Cypress Hills Houses), two were in the Bronx (one in the Castle Hill Houses and one in the Patterson Houses), and one was in Queens (in the Beach 41st Street Houses).

### ID-AC INCIDENTS BY LOCATION TYPE




Figure 2.6

## REASONS OFFICER INVOLVED

Officers became involved in ID-AC incidents for a variety of reasons. Most (96 percent) were on-duty at the time of the incidents. Of the three officers who became involved while off-duty, two were victims of crimes, and one intervened to protect a victim of a crime. The majority of the on-duty officers (65 percent) were in uniform, and most were assigned to the Patrol, Housing, or Transit Bureaus (91 percent).

The majority of officers (52 percent) were either on uniformed foot posts or in sector cars assigned to respond to calls for service from the public when they became involved in ID-AC incidents. Although officers assigned to plain-clothes anti-crime and conditions units represent a small proportion of the Department's uniformed personnel, 33 percent of ID-AC incidents involved these officers; this is likely due to their mandate to proactively seek criminals rather than answer calls for service. There was one case of an officer becoming involved while assigned to court, and another while assigned to secure a vehicle, illustrating an officer's perpetual need for vigilance. See Figure 2.7.

### ON-DUTY OFFICER ASSIGNMENT, ID-AC INCIDENTS




Figure 2.7

A wide variety of situations precipitated officers becoming involved in ID-AC incidents. The most common was encountering armed subjects or shots fired while on routine patrol (30%). See Figure 2.8. The "Radio Run – Other" category includes two 911 calls for disputes, one call for threats, and one call for a stabbing. 65 percent of incidents occurred as the result of pick-up assignments (situations officers encounter on patrol without being directed to a location by a radio dispatcher). Four of the pick-up assignments were for emotionally disturbed persons; one was attacking passers-by with a metal chain, one attacked a woman with scissors, one attacked officers with a cane, and one pointed what appeared to be a firearm at officers.

**SITUATIONS PRECIPITATING ON-DUTY ID-AC INCIDENTS**




Figure 2.7

Figure 2.8

## THREAT TYPE

Department policy requires officers who intentionally discharge their firearms during ID-AC incidents to do so only to defend themselves or others from the imminent threat of serious physical injury or death.

The subjects involved in ID-AC incidents utilized a variety of weapons when confronting officers. Twenty-one subjects carried handguns: ten were semi-automatic pistols, ten were revolvers, and one was unrecovered and described as a silver handgun. Four of the threats categorized as "perceived" came from simulated firearms, and four of the threats categorized as blunt instruments came from moving vehicles. See Figure 2.9.

**THREAT TYPE, ID-AC INCIDENTS**




Figure 2.9

## OFFICER RESTRAINT

Officers fired a total of 162 rounds during ID-AC incidents in 2013, a decrease of 51 percent from 2012, when 331 rounds were fired. The majority of officers fired five or fewer rounds (86 percent). The most common number of rounds fired was one (44 percent). No officer fired more than 16 times, or was required to reload their firearm during an incident. See Figure 2.10.

Restraint is also apparent when analyzing the number of shots fired per ID-AC incident. The most common number of rounds fired per ID-AC incident was also one (47 percent); this includes two fatal shootings in which only one round was fired. The most rounds fired during any incident was 17. See Figure 2.11.

**ROUNDS FIRED PER ID-AC OFFICER**




Figure 2.10

**ROUNDS FIRED PER ID-AC INCIDENT**




Figure 2.11

## OBJECTIVE COMPLETION RATE

The Department does not consider average hit percentages, in part because it is often unknown (in cases when a subject flees), and also because of the widely varying circumstances between incidents. Instead, the objective completion rate per incident is employed, as it is both more accurate and more instructive. Like combat itself, the objective completion rate per incident is pass/fail. When an officer properly and lawfully perceives a threat severe enough to require the use of his or her firearm, and fires at a specific threat, the most relevant measure is whether he or she ultimately hits and stops the threat. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the subject. The objective completion rate is used for statistical purposes and is not a factor in individual investigations.

In 2013, officers hit at least one subject in 25 of the 40 ID-AC incidents, for an objective completion rate of 63 percent. Because subjects were not apprehended in four incidents, the objective completion rate may be higher. During the five incidents in 2013 in which officers were being fired upon, officers hit at least one subject three times, for an objective completion rate of 60 percent. All five subjects known to have fired at the police were apprehended.

## OFFICER FIREARMS

The majority of officers (96 percent) involved in all ID-AC incidents (both on and off duty) discharged their on-duty service firearms: 24 were Glocks, 19 were Smith & Wessons, and ten were Sig Sauers. The remaining two officers discharged authorized off-duty firearms; one was a Glock and one was a Sig Sauer. Department regulations allow officers to carry their on-duty service firearms while off-duty, and authorized off-duty firearms as secondary weapons while on-duty. Two officers reported firearms malfunctions – one was a Glock and one was a Sig Sauer. Neither malfunction ultimately prevented the officer from firing his weapon.

### SHOOTING TECHNIQUE

Utilizing a two-handed grip, standing, carefully lining up a target, and using the firearm's sights is not always practical during an adversarial conflict. Thirty-five of the 55 officers reported how they held their firearms; 80 percent of those held their firearms in the two-hand supported position, and the rest fired with one hand. Thirty-five officers reported sight usage; of those, 29 percent reported that they had been able to use their sights. Fifty-four officers reported their stance; 76 percent of those were standing, 11 percent were running, 11 percent were struggling with the subject, and two percent were seated.

Lack of cover can be a factor in the need for a firearms discharge, because a protected defensive position may allow officers to better control the pace of an incident. Only six officers reported that they were able to take cover during ID-AC incidents, three behind vehicles, two behind a wall, and one did not specify the type of cover used.

Thirty-nine officers were able to report how far they were from their targets during ID-AC incidents. Although officers are trained to fire on a target from as far away as 25 yards, all but one officer reported that he was 15 yards or less from the target at the time of the shooting. See Figure 2.12.

Forty-two officers reported lighting conditions; 38 percent reported poor or dark lighting, and 25 percent of those reported that they were able to use their flashlights.

**ID-AC DISTANCE TO TARGET**




Figure 2.12

## OFFICER PEDIGREE

Of the 55 officers who intentionally discharged their firearms during ID-AC incidents in 2013, two were female (4 percent) and 53 were male (96 percent); 17 percent of the Department's uniformed personnel are female and 83 percent are male.

Considering current data and data from prior years, no discernable pattern emerges with regard to the likelihood that an officer of any particular race will become involved in an ID-AC incident. See Figure 2.13.

There is a greater likelihood that officers in the rank of police officer and those with fewer years of service will become involved in ID-AC incidents. Officers in the rank of police officer were involved in 82 percent of ID-AC incidents in 2013, although they accounted for 66 percent of uniformed members of the service, and officers with ten years of service or less were involved in 82 percent of ID-AC incidents, although they accounted for 54 percent of uniformed members of the service. These officers are more likely to be assigned to patrol functions and to conduct other assignments that are the most likely to precipitate ID-AC incidents compared to longer tenured officers and those of higher rank. See Figures 2.14 and 2.15.

**RACE, ID-AC OFFICERS v. DEPARTMENT STAFFING**




Figure 2.13

**YEARS OF SERVICE, ID-AC INCIDENTS v. DEPARTMENT STAFFING**




Figure 2.14

**RANK, ID-AC OFFICERS v. DEPARTMENT STAFFING**




Figure 2.15

## SUBJECT PEDIGREE

There were 36 apprehended subjects involved in ID-AC incidents in 2013; four incidents involved unapprehended subjects. Two unapprehended subjects are known by sex and race, one is known by sex but not race, and one incident involved a vehicle with an unknown number of subjects who are not known by sex or race.

All 39 known subjects were male. Of the 36 apprehended subjects, ages ranged from 14 to 50 years old, with a median age of 27; 44 percent were 25 years old or younger.

The race of a criminal suspect is determined by eyewitness reports, usually that of the victim. The race of a subject is determined by the officer who encountered the subject. This determination may be based on a subject's self-identification, existing government-issued documentation, racial/ethnic physical characteristics or other factors.

**CRIMINAL SHOOTING SUSPECTS v. ID-AC SUBJECTS BY RACE**




Figure 2.16

The race of subjects involved in ID-ACs corresponds to the race of subjects involved in criminal shootings. See Figure 2.16. Similarly, victims of criminal shootings tend to come from the same communities as the suspects; among criminal shooting victims identified by race in New York City in 2013, three percent were white, 74 percent were black, 22 percent were Hispanic, and one percent were Asian.

### PRIOR ARRESTS

Generally, a subject's arrest history is unknown to the officer at the onset of an incident. Nevertheless, arrest history is pertinent because it is indicative of a subject's propensity for criminal conduct and capacity for violence when confronting a police officer; it can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole/probation status may also make a subject more willing to confront a police officer in an attempt to avoid arrest.

Four subjects were unapprehended and their criminal histories could not be identified. Of the known subjects, three had no criminal history, one of whom had a history of mental illness and attacked several civilians with a metal chain. The other two subjects without criminal histories were in the process of committing crimes when the shootings occurred; one had just stabbed a woman and menaced responding officers with a knife, and the other fled a car stop and pointed a handgun at the officers who attempted to stop him.

Of the 33 subjects with a criminal history, 32 had multiple prior arrests, ranging from two to 33, for numerous offenses including murder, robbery, and weapons possession. The median number of prior arrests for ID-AC subjects was nine.

## INCIDENT OUTCOMES

Of the 40 ID-AC incidents in 2013, 28 resulted in some injury or death; to a police officer, a subject, or both.

### OFFICER DEATH

No officers were killed by a perpetrator during an adversarial conflict in 2013.

### OFFICER INJURIES

Three officers were injured by gunfire during adversarial conflicts in 2013. Two were struck by a subject's bullets in the same incident, and one was shot in the hand during a violent off-duty struggle with a subject. One of the officers who was struck by a subject's bullets was able to return fire, resulting in the death of the subject. No officers were injured by crossfire.

## BULLET-RESISTANT VESTS

All 52 on-duty officers who were involved in ID-AC incidents in 2013 were wearing bullet-resistant vests. The three off-duty officers involved in ID-AC incidents were not wearing vests. One officer was saved by his vest; he was struck in the back of his vest by a subject's bullet and suffered a blunt force trauma injury as a result.

## SUBJECT DEATH

Of the 39 known subjects involved in ID-AC incidents, eight were killed by police gunfire, down 50 percent from 2012, when 16 subjects were shot and killed by the police. The number of subjects shot and killed in 2013 was, along with 2010, the lowest number since the Department began collecting in-depth statistics in 1971. All eight subjects had prior arrest histories, and two were found to be intoxicated at the time of the incidents. Of the eight subjects killed, six were armed with firearms and two were armed with cutting instruments. Narratives describing the eight ID-AC incidents in which subjects were killed can be found in Appendix C.

## SUBJECT INJURIES

Seventeen subjects were shot and injured by police gunfire in 2013, 15 of whom had criminal records. Nine were armed with firearms, three were armed with blunt instruments, three were armed with cutting instruments, and one had an imitation firearm.

## BYSTANDER INJURIES

Two bystanders were injured by police bullets in 2013, both during the same incident involving an emotionally disturbed subject. One suffered a graze wound to the buttocks and the other a gunshot wound to the right calf.

## DISCIPLINE

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical errors and violations of procedure. Discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures. Additionally, all officers who discharge their firearms are sent to a firearms retraining course, regardless of the circumstances of the discharge.

Of the nine investigations that have been completed at the time of this report (June 2014), all nine have found that the involved officers were in compliance with Department procedures and with the law. Forty-six cases are pending.

# SUMMARY

There were 40 ID-AC incidents in 2013, involving 55 officers who discharged their firearms. These conflicts involved 39 known subjects, including five who fired directly at officers.

In 2013, there were 1,299 victims of criminal shootings in New York City, who were shot during 1,103 criminal shooting incidents. The number of intentional firearms discharges by police, comparatively, is very small, but every time an officer discharges a firearm he or she risks inflicting injury or death on subjects, fellow police officers, or innocent bystanders. Because of this, the Department ensures that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

One method of judging the Department's restraint is to compare the number of ID-AC incidents to Department staffing. There were, on average, 35,182 uniformed officers employed by the NYPD in 2013. Of them, only 55 (0.15 percent) intentionally discharged a firearm at a subject.

Other instructive ratios are the number of ID-AC incidents to the number of high-risk radio runs and the number of arrests of armed suspects made by officers each year. In 2013, officers responded to more than 4.5 million calls for service, of which 80,768 involved weapons. Officers also had millions of additional contacts with the public, including reasonable suspicion encounters, car stops, and summonses. Officers made 25,568 weapons arrests, including 5,078 gun arrests, and escorted thousands of emotionally disturbed persons to hospitals; in the vast majority of incidents in which officers took an armed subject or an emotionally disturbed person into custody, they did not fire their weapons.

# PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK

## OVERVIEW

Department policy requires officers who intentionally discharge their firearms during animal attacks to do so only to defend themselves or others from the threat of physical injury, serious physical injury, or death, and to use their firearm only as a last resort to stop an animal attack. Officers are equipped with non-lethal tools that can be used to cope with animal attacks, including batons and OC spray, but these options are not always feasible or effective. Emergency Service Unit personnel carry restraining devices to keep animals at a safe distance, as well as $CO_2$ pistols and rifles capable of firing tranquilizer darts containing Ketaset, a veterinary anesthetic, and Animal Care and Control is also available to assist officers in capturing dangerous dogs or other animals. In rapidly evolving situations, however, when officers may not have prior knowledge that a dog is present, these options are not always prudent or possible.

There were 19 intentional firearms discharges during an animal attack (ID-AA) in 2013, a 21 percent decrease from 2012. All 19 were on-duty incidents, one of which involved both on and off-duty members of the service. A total of 22 officers discharged their firearms, a 21 percent decrease from 2012. Three incidents involved two shooters, and 16 incidents involved one shooter.

A total of 23 animals were involved, all of them dogs; there were two incidents involving two dogs, and one incident involving three dogs. Four officers and four civilians were bitten. No officers or civilians were shot during ID-AA incidents. Of the 23 dogs involved, seven were killed, a decrease of 22 percent from 2012. An additional eight dogs were injured. Twenty-two of the dogs were Pit Bulls, and one was a Bull Mastiff.

These numbers do not encompass all dog attacks on officers or civilians; only incidents involving intentional firearms discharges by police officers. In 2013, police officers responded to thousands of calls for service involving dogs and other animals, and they encountered many more while on patrol, executing search warrants, or investigating complaints – incidents that were not processed through 911 or 311.

**ID-AA INCIDENTS BY TOUR**




Figure 3.1

## DATES AND TIMES OF DISCHARGES

ID-AA incidents occurred fairly evenly throughout the year in 2013. April had the most incidents with five, and February, July, and November had no incidents.

ID-AA incidents occurred most often on Tuesday (four incidents), with two or three incidents all other days. The majority of these incidents occurred during the third platoon, between three thirty in the afternoon and eleven thirty at night (53 percent). See Figure 3.1.

## LOCATIONS OF DISCHARGES




Figure 3.2

All 19 ID-AA incidents in 2013 took place within New York City – 17 within the jurisdiction of the patrol precincts and two on New York City Housing Authority premises (one in the Coney Island Houses and one in Washington Heights Rehab). No incidents took place within the Metropolitan Transportation Authority transit system. In 2013, Brooklyn and the Bronx accounted for the most ID-AA incidents (six incidents each). See Figure 3.3. ID-AA incidents occurred in 16 separate precincts, including three precincts that had two incidents (the 40, 44 and 113 precincts). Eleven ID-AA incidents occurred outdoors, and eight occurred indoors. More occurred in the common areas of residential buildings (58 percent) than any other location type; this category includes both outdoor (courtyards) and indoor (hallways) locations. See Figure 3.4.

**ID-AA INCIDENTS BY BOROUGH**




Figure 3.3

**ID-AA INCIDENTS BY LOCATION TYPE**




Figure 3.4

## REASONS OFFICER INVOLVED

Officers became involved in ID-AA incidents for a variety of reasons. Twenty-one officers were on-duty at the time of the incident, and one was off-duty. One incident involved one on-duty officer and one off-duty officer, both of whom heard screams from a nearby park from two women who were attempting to break up a dog fight and ran to help. Fifteen officers were in uniform, and seven officers, including the off-duty officer, were in plainclothes. Seventeen were assigned to the Patrol Services Bureau, and five to the Organized Crime Control Bureau (three to Narcotics and two to Warrants).

Officers were assigned to a variety of duties when they became involved in ID-AA incidents, the most common of which was uniformed patrol (eight officers). See Figure 3.5.

**OFFICER ASSIGNMENT, ID-AA INCIDENTS**




Figure 3.5

The most common reasons that led to officers becoming involved in ID-AA incidents were search warrants and 911 calls for vicious animals (four incidents each). See Figure 3.6. The "Radio Run – Other" category includes two 911 calls for emotionally disturbed persons and three calls for crimes in progress. Both of the ID-AA incidents precipitated by vertical patrols occurred in New York City Housing Authority locations.

Forty-seven percent of ID-AA incidents were received via radio assignment, 32 percent occurred while officers were conducting canvasses or investigations, and 21 percent occurred when officers encountered dogs while on patrol.

**SITUATIONS PRECIPITATING ID-AA INCIDENTS**




Figure 3.6

**ROUNDS FIRED PER ID-AA OFFICER**




Figure 3.7

## OFFICER RESTRAINT

A total of 53 rounds were fired by officers during ID-AA incidents in 2013, a decrease of 32 percent from 2012, when 78 rounds were fired. The majority of officers fired either one or two rounds (77 percent). The most common number of rounds fired was one (45 percent). No officer fired more than 13 times, or was required to reload their firearm during an incident. See Figure 3.7.

Restraint is also apparent when analyzing the number of shots fired per ID-AA incident. In 74 percent of incidents, only one or two total rounds were fired. The most common number of rounds fired per incident was two (49 percent). The most rounds fired during any incident was 13. See Figure 3.8.

## OBJECTIVE COMPLETION RATE

In 2013, officers hit at least one animal during 15 ID-AA incidents, for an objective completion rate of 79 percent. This is higher than the objective completion rate during ID-AC incidents (63 percent) and higher than for officers under fire (60 percent). One likely explanation is that all 22 officers involved in ID-AA incidents were 7 yards or less from the animal when they fired.

**ROUNDS FIRED PER ID-AA INCIDENT**




Figure 3.8

## OFFICER FIREARMS

All 22 officers who fired during ID-AA incidents in 2013 utilized their service 9mms – 12 were Glocks, five were Smith & Wessons and five were Sig Sauers. No officer reported a firearm malfunction.

### SHOOTING TECHNIQUE

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but the fast-paced nature of dog attacks often makes this impossible. Thirty-six percent of officers reported that they held their firearm with one hand during ID-AA incidents, 50 percent reported that they held their firearm with two hands, and 14 percent did not report how they held their firearm. Thirty-six percent of officers reported that they had been able to use their sights, 50 percent were unable to use their sights, and 14 percent did not report sight usage. Fifteen officers reported their stance; 11 were standing, three were moving, and one was kneeling.

All 22 officers fired when the dog was between 0-7 yards of the officer; 64 percent fired when the dog was within one yard of the officer. Only one officer was able to take cover during the attack, behind a bunker shield.

Twenty-one officers reported lighting conditions; five reported poor or dark lighting, and two reported that they used their flashlights.

## OFFICER PEDIGREE

Of the 22 officers who intentionally discharged their firearms during ID-AA incidents in 2013, three were female (14 percent) and 19 were male (86 percent); 17 percent of the Department's uniformed personnel are female and 83 percent are male.

Considering current data and data from prior years, no discernable pattern emerges with regard to the likelihood that an officer of any particular race will become involved in an ID-AA incident. There is a greater likelihood that officers in the ranks of police officer or detective and those with fewer years of service will become involved in ID-AA incidents. These officers are more likely to be assigned to respond to calls for animal attacks, to conduct vertical patrols, to effect arrests, and to conduct other assignments that are the most likely to precipitate ID-AA incidents. See Figures 3.9, 3.10 and 3.11.

**RACE, ID-AA OFFICERS v. DEPARTMENT STAFFING**




Figure 3.9

**YEARS OF SERVICE, ID-AA OFFICERS v. DEPARTMENT STAFFING**




Figure 3.10

**RANK, ID-AA OFFICERS v. DEPARTMENT STAFFING**




Figure 3.11

## INCIDENT OUTCOMES

As of June 2014, the Firearms Discharge Review Board has issued findings in 15 ID-AA incidents, and found no violation of Department firearms guidelines in 14 cases. No corrective action was recommended in 12 of these cases, tactics retraining was recommended in two cases, and a Command Discipline unrelated to firearms guidelines was issued in one of the cases where tactics retraining was recommended. In the 15th case, an officer was found to be in violation of Department firearms guidelines (she was found to have fired when there was no immediate threat to a person at the time of the discharge) and was issued Charges and Specifications. Seven cases are pending.

# PART IV: UNINTENTIONAL DISCHARGE

## OVERVIEW

There were 12 incidents of unintentional firearms discharges in 2013, a 43 percent decrease from 2012, when there were 21. Each incident involved a single officer who fired one round.

These incidents resulted in injuries to two officers, one who shot himself in the hand and one who shot himself in the leg. A subject was injured during one incident, when an officer attempting to extract a barricaded suspect was struck in the hand by a door resulting in an unintentional discharge that struck the suspect in the wrist.

Four unintentional discharges occurred while the officer was off duty, and eight occurred on duty. Four occurred outside (two on the street, one on a roof, and one in the parking lot of a Department facility), and eight occurred inside (three inside residences during radio runs or search warrants, one in a commercial establishment, and four inside Department facilities).

## NON-ADVERSARIAL UNINTENTIONAL DISCHARGES

Non-adversarial unintentional discharges occur when an officer is loading or unloading, cleaning, or otherwise handling a firearm. In 2013, six of the 12 total unintentional firearm discharges were purely unintentional.

### LOADING/UNLOADING

Two of the incidents occurred while officers were unloading a firearm; both occurred on duty, in the stationhouse, and both officers were attempting to unload Glock 9mms. Although firearms safety stations are installed at all Department facilities where firearms may be present, neither officer was using one at the time the incidents occurred. In order to incentivize the use of firearms safety stations, the Department does not define discharges that occur at safety stations as Department firearms discharges.

### HANDLING

Four officers were handling firearms for reasons other than loading or unloading while the remaining incidents occurred. One officer was attempting to move a firearm from one holster to another, one officer was attempting to holster a firearm, one officer was attempting to assist a lieutenant in securing another officer's firearm from a locker, and one officer had a firearm inside his pocket without a holster.

## ADVERSARIAL UNINTENTIONAL DISCHARGES

Unintentional discharges during adversarial conflict or animal attack occur during the course of lawful police conduct and are brought about either wholly or in part by aggravating factors, such as a suspect grabbing an officer's firearm, an officer losing his or her balance, or when an officer's shooting hand is struck by an object. In 2013, six of the 12 total unintentional discharges occurred during an adversarial conflict or animal attack. As detailed above, one civilian was injured and none were killed.

The reasons for unintentional discharge during adversarial conflict vary. Three were caused when an object struck the officer's shooting hand, two of which were doors and one of which was a hammer with which the officer was being attacked. Two officers fired rounds during the execution of search warrants (one of whom was one of the two officers who were struck by doors), one was attempting to holster his firearm at the scene of a domestic dispute and shot himself in the leg, and another fired a round into the dashboard of a Department vehicle during a car stop.

## FIREARMS

Of the 12 firearms that were unintentionally discharged in 2013, eight were the officers' service weapons, three were authorized off-duty firearms, and one was a firearm that was legally possessed but not authorized for off-duty carry. Revolvers accounted for two of the firearms, and semi-automatics accounted for ten. Of the eight service weapons involved, five were Glocks and three were Sig Sauers. Both revolvers were Smith & Wessons. One Glock duty 9mm had a phase three ("stovepipe") malfunction after the officer shot himself in the leg.

## OFFICER PEDIGREE

All 12 of the officers who unintentionally discharged firearms in 2013 were male; 17 percent of the Department's uniformed personnel are female and 83 percent are male.

Although the percentage of white and Hispanic officers involved in unintentional firearms discharges is less than their representation within the Department, the sample size of officers involved in unintentional firearms discharges is 12, or 0.03 percent of the Department's uniformed personnel. These figures are therefore not useful in determining the likelihood that an officer of any particular race will become involved in an unintentional firearms discharge. See Figure 4.1.

**RACE, UNINTENTIONAL DISCHARGES v. DEPARTMENT STAFFING**




Figure 4.1

Officers with five years of service or less were most likely to be involved in unintentional firearms discharges. Three of these officers had graduated from the Police Academy less than a year before the discharge occurred. See Figure 4.2.

**YEARS OF SERVICE, UNINTENTIONAL DISCHARGES v. DEPT STAFFING**




Figure 4.2

All of the officers involved in unintentional firearms discharges were either police officers or detectives. See Figure 4.3.

**RANK, UNINTENTIONAL DISCHARGES v. DEPARTMENT STAFFING**




Figure 4.3

## INCIDENT OUTCOMES

The Department investigates all unintentional firearms discharges thoroughly. Of the investigations that have been completed at the time of this report (June 2014), the Firearms Discharge Review Board found that officers were in violation of Department guidelines in five cases. The recommended discipline for involved officers ranged from none (e.g. an officer who discharged a round when a door slammed on his hand) to Charges and Specifications. Retraining on relevant tactics was recommended in four cases. Seven cases are pending.

# PART V: UNAUTHORIZED USE OF A FIREARM

## OVERVIEW

There were ten firearms discharges in 2013 that were determined to be unauthorized, a decrease of 33 percent from 2012, when there were 15 unauthorized use of a firearm incidents. Six were officer suicides, two were attempted suicides, and one was an incident of an officer firing an unauthorized round into the air. One incident was a discharge by a criminal who gained control of an officer's firearm during a struggle.

## OFFICER PEDIGREE

Of the nine officers who were involved in unauthorized firearms discharges in 2013, one was female and eight were male; three were white, three were black and three were Hispanic. Three had between zero and five years of service, two had between six and ten years of service, two had between 11 and 15 years of service, one had between 16 and 20 years of service, and one had more than 20 years of service. Eight officers were police officers and one was a lieutenant.

Because the sample size of officers involved in unauthorized firearms discharges is only nine, or 0.03% of the Department's uniformed personnel, these statistics are not useful in determining the likelihood that an officer of any particular pedigree will become involved in an unauthorized firearms discharge.

## SUICIDE

Six police officers committed suicide in 2013, including two murder/suicides and one attempted murder/suicide, and two officers attempted suicide. One suicide was committed on duty, by an officer assigned to a detective squad in his personal vehicle parked outside the stationhouse, and one attempted suicide was committed on duty by an officer in the locker room of the stationhouse. Five suicides and one attempted suicide were committed off-duty. Of the three murder or attempted murder/suicides, the victims were all members of the officers' families.

The Department and a number of external organizations provide mental health resources specifically targeted to uniformed members of the service who may be at risk for suicide. Department resources include the Early Intervention Unit, the Counseling Services Unit, the Chaplain's Unit, the NYPD Helpline, and the Psychological Evaluation Unit. External resources include Police Officers Providing Peer Assistance (POPPA), the Police Self Support Group, and Columbia Cares (COPE). The Department actively promotes these resources to all uniformed members of the service.

Figure 5.1 depicts successful suicides by firearm only, not suicides by other method and not attempts.

**POLICE OFFICER SUICIDES BY FIREARM, 2003-2013**




Figure 5.1

## DISCHARGES BY OTHER THAN AN OFFICER

There was one incident of unauthorized use of a firearm in 2013 in which someone other than an officer discharged an officer's gun. The incident occurred when an emotionally disturbed person who was being transported to a hospital for a psychiatric evaluation gained control of an officer's firearm during a struggle and fired two rounds, striking the officer's partner in the foot. No bystanders were injured.

## INCIDENT OUTCOMES

The Department investigates all unauthorized use of a firearm incidents thoroughly. In the rare case of an unauthorized discharge other than suicide, the disciplinary process will be initiated against the officer discharging the weapon, and/or the officer charged with the security of the weapon. In cases of serious misconduct, officers are arrested, suspended, and eventually terminated for their actions.

As of June 2014, the Firearms Discharge Review Board has found that three officers violated Department guidelines during unauthorized use of a firearm incidents in 2013. Two cases were suicides, and one was the incident in which an unauthorized person gained control of the officer's firearm. The remaining seven cases are under investigation.

# PART VI: MISTAKEN IDENTITY

## OVERVIEW

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on any law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken identity incidents are distinguished from crossfire incidents in that the shooting officer is intentionally firing on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. Unauthorized discharges, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incidents), are also excluded. This definition comports with the 2010 New York State Task Force on Police-on-Police Shootings' definition of "Police-on-Police Confrontations."

## 2013 INCIDENTS

In 2013 there were no incidents of mistaken identity.

# APPENDICES

# APPENDIX A: HISTORICAL DATA

## OFFICERS SHOT AND INJURED BY SUBJECTS, 1971-2013




Figure A.1

## OFFICERS SHOT AND KILLED BY SUBJECTS 1971-2013




Figure A.2

**SUBJECTS SHOT AND INJURED BY OFFICERS, 1971-2013**




Figure A.3

**SUBJECTS SHOT AND KILLED BY OFFICERS, 1971-2013**




Figure A.4

## TOTAL SHOTS FIRED, 1971-2013




Figure A.5

## TOTAL SHOOTING INCIDENTS, 1971-2013




Figure A.6

# APPENDIX B: FIREARMS TRAINING

## OVERVIEW

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives: those of bystanders, victims, subjects, and other officers. One of the realities of police work, however, is the contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons from imminent death or serious physical injury. This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury.

## SHOOT TO STOP

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to “stop the threat” – i.e., to end the subject’s ability to threaten imminent death or serious physical injury to the officer or another person.

If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject’s demise. Stated explicitly, however, police officers do not “shoot to kill” – they are trained to shoot to stop.

## WEAPONS CONTROL

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills. Unfortunately, in a combat situation, concentration and fine motor skills are sometimes among the first casualties. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## NYPD PISTOLS

There are three semi-automatic 9mm pistol models that are authorized as on-duty service weapons for NYPD officers: the Glock 19, the Sig Sauer P226, and the Smith & Wesson 5946. These weapons are equipped with 15 round magazines, and each firearm is capable of holding 16 total rounds. Additionally, there are several weapons authorized for off-duty carry, such as the Glock 26, the Smith & Wesson 3914, and the Beretta 8000D Mini Cougar. Some officers carry .38 caliber revolvers. These officers are senior members whose weapons have been grandfathered in; revolvers have not been issued as service weapons since 1992. Current NYPD service pistols are all “double action only,” meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be “cocked,” resulting in a one-stage trigger pull). Additionally, all NYPD weapons are modified to have a heavier-than-stock 12-pound trigger pull; this diminishes the likelihood of unintentional discharges. The NYPD uses a 124-grain, hollow-point bullet that is designed to prevent over-penetration and ricochets.

## CENTER MASS



Because combat stress can contribute to the impairment of fine motor skills, and because of the relative imprecision of pistols, police officers are taught to shoot for center mass – usually, the torso. In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center of the exposed portion as a target.

The human body’s center mass is the largest area available as a point of aim. The torso represents approximately one third of a human’s surface area, compared to nine percent for an arm or 18 percent for a leg. The torso is also the most stationary portion of the body; extremities are much smaller and less static and therefore a far less certain target. Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to the center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun.

# APPENDIX C: SUBJECTS KILLED DURING ID-AC INCIDENTS

In 2013, eight subjects were shot and killed by officers who intentionally discharged their weapons during adversarial conflict. The taking of a life in order to protect another life is a terrible contradiction and no officer relishes the prospect of encounters such as these. When facing armed, violent suspects, however, these events are a possibility for which officers must be prepared. The tactics used in these confrontations are analyzed and assessed in order to develop training that can provide officers with more use-of-force options or conflict-resolution opportunities so that similar events in the future may have different outcomes. A short narrative of each incident is found below.

On Thursday, January 3, 2013, at approximately 1932 hours, on a Manhattan bound N train at the Fort Hamilton Parkway subway station in Brooklyn, two plain-clothes police officers observed the subject enter a subway car through the emergency exit door, in violation of Transit Authority rules. The officers identified themselves to the subject and requested that he step off of the train with them. The subject walked towards the door of the train, and when he reached it, he turned towards the officers, removed a firearm from his waistband, and fired six rounds at the officers, striking them both as well as a bystander on the train. One of the officers returned fire, striking the subject and causing his demise. One officer sustained gunshot wounds to his leg and scrotum, the other officer was struck in his bullet-resistant vest, and the bystander who was shot by the subject sustained a graze wound to the leg. The subject had been arrested 13 times prior to the incident in both New York and Los Angeles, for crimes including Assault in the 1st Degree, Criminal Possession of a Weapon, Assault with a Deadly Weapon, Attempted Robbery, and Possession of a Firearm in Court.

On Sunday, March 9, 2013, at approximately 2324 hours, on 52nd Street and Church Avenue in Brooklyn, in the vicinity of a party that was attended by a large number of youths, a plain-clothes sergeant and a plain-clothes police officer observed the subject adjusting the waistband of his clothing in a manner that caused them to believe he may have had a firearm. The officers approached the subject and identified themselves. The subject drew a revolver and pointed it first at the police officer, then at the sergeant, and then back at the police officer. Both officers fired at the subject, striking him and causing his demise. The subject had been arrested four times prior to the incident, for crimes including Grand Larceny and Riot in the 2nd Degree. The subject's toxicology report indicated positive for the presence of alcohol and marijuana.

On Friday, March 22, 2013, at approximately 2001 hours, in front of 543 Court Street in Brooklyn, two uniformed officers responded to a radio run of a person stabbed. When the officers arrived on the scene, they encountered the stabbing victim, who gave them a description of the perpetrator. As they were interviewing the victim, the victim noticed the subject walking towards the officers with his hands in his pockets, and identified him as the man who had stabbed him. The officers approached the subject and repeatedly requested that he remove his hands from his pockets. When he was approximately five feet from the officers, the subject removed his hands from his pockets and lunged at them with a knife in his right hand. One officer fired one round at the subject, and the other officer fired eight rounds. The subject was struck nine times, causing his demise. The subject had been arrested three times prior to the incident, for crimes including Criminal Possession of a Weapon and Reckless Endangerment. His toxicology report indicated positive for the presence of marijuana.

On Wednesday, June 19, 2013, at approximately 0108 hours, in front of 367 Hinsdale Street in Brooklyn, two officers on patrol were flagged down by a cab driver who told them that a shooting was happening down the block. The officers observed the subject and a civilian victim struggling over a firearm, and heard several shots go off. The officers took cover behind parked cars on both sides of the street, and ordered the subject to drop the weapon. The subject pointed his gun at one of the officers, who shot one time, striking the subject. The subject ran away from the officers and hid under a parked car, where he was found along with his firearm. The victim informed the officers that the subject had pointed the gun at him and attempted to rob him. The subject, who later succumbed to his injuries, had been arrested nine times prior to the incident, eight times for Robbery and one time for Attempted Rape. He had spent more than 25 years in prison.

On Sunday, August 4, 2013, at approximately 0255 hours, at East 151st Street and Courtlandt Avenue in the Bronx, two officers on foot heard several shots being fired and observed the subject holding a firearm. The officers took cover behind a parked minivan and ordered the subject to drop his weapon. The subject pointed his firearm at one of the officers and fired another round. The officer fired one shot at the subject, causing his demise. The subject, a juvenile, had three prior arrests, for possession of a firearm, robbery, and murder, and was observed by a civilian witness firing at a group of young men and chasing them shortly before the confrontation with officers.

On Thursday, October 31, 2013, at approximately 2300 hours, at Seward Avenue and Castle Hill Avenue in the Bronx, two Housing Bureau Impact foot post officers responded to a radio run of shots fired. As they approached the subject, who matched the description of the suspect, the subject drew a firearm and pointed it at the officers. The officers fired eight rounds at the subject, who fled on foot. The officers called for assistance over the radio and followed the subject. At the intersection of Randall Avenue and Olmstead Avenue, two marked cars, a Housing Bureau sector and a Patrol Sector, stopped the subject. The subject pointed his firearm at two of the officers, who fired four rounds, and then at the other two officers, who fired five rounds. The subject was struck by seven rounds, which caused his demise. The subject had been arrested seven times prior to the incident, for crimes including Grand Larceny and Criminal Possession of a Weapon.

On Monday, November 18, 2013, at approximately 1454 hours, in front of 902 Heart Street in Brooklyn, officers responded to a radio run of phone threats. As they approached the building, the subject ran up to their marked car and struck the car with a knife. The officers drove down the block to a location where it was safe for them to get out of the car, and, as they were parking, the subject threw a glass at the car. The officers moved the car further down the block, got out, and drew their firearms at the subject, who advanced on the officers while menacing them with the knife. The subject ignored the officers' repeated orders to drop the knife. When the subject was approximately three feet from the officers, one of the officers fired five rounds at the subject, causing his demise. The officers later learned that the subject had a long history of violent psychiatric problems, including an incident in which he was arrested for breaking the window of an ambulance with a baseball bat, and an incident in which he threw a hammer inside a classroom.

On Thursday, December 26, 2013, at approximately 0415 hours, in front of 5 West Burnside Avenue in the Bronx, officers were flagged down by a complainant who told them he had been robbed at gunpoint in the ATM vestibule of a nearby Chase bank. The officers canvassed the area with the victim, who spotted the subject and pointed him out to the officers as the man who had robbed him. The officers attempted to stop the subject, who pointed a firearm at them before a foot pursuit ensued. The officers were soon joined by other officers, who responded to their radio call for assistance. The foot pursuit continued into the vestibule of 1985 Davidson Avenue, where the officers caught up with the subject, who was holding the firearm in his right hand. Officers knocked the subject to the ground and attempted to wrestle the firearm out of his grip, but he managed to point the firearm at one of their heads. Another officer fired three shots at the subject at close range, resulting in his demise. The subject had been arrested 33 times prior to the incident, for crimes including Criminal Possession of a Weapon, Robbery, and Criminal Sale of a Controlled Substance. His toxicology report indicated positive for the presence of alcohol and cocaine.

# APPENDIX D: SUBJECT RACE, 2009-2013

## GUNFIRE IN NEW YORK CITY, 2013




Figure A.7

| SUBJECTS WOUNDED BY OFFICERS, 2009-2013 | | | | | |
|---|---|---|---|---|---|
| | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2009** | 0 | 14 | 6 | 0 | 20 |
| **2010** | 3 | 9 | 3 | 1 | 16 |
| **2011** | 2 | 10 | 7 | 0 | 19 |
| **2012** | 1 | 9 | 3 | 0 | 13 |
| **2013** | 1 | 12 | 4 | 0 | 17 |

Figure A.8

| SUBJECTS KILLED BY OFFICERS, 2009-2013 | | | | | |
|---|---|---|---|---|---|
| | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2009** | 0 | 8 | 4 | 0 | 12 |
| **2010** | 2 | 1 | 4 | 1 | 8 |
| **2011** | 4 | 2 | 3 | 0 | 9 |
| **2012** | 2 | 11 | 2 | 1 | 16 |
| **2013** | 0 | 6 | 2 | 0 | 8 |

Figure A.9

# APPENDIX E: 2013 SUPPLEMENTAL DATA

| FIREARMS DISCHARGE INCIDENTS BY DAY, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Sunday** | 2 | 2 | 0 | 1 | 5 |
| **Monday** | 2 | 3 | 1 | 5 | 11 |
| **Tuesday** | 6 | 4 | 0 | 0 | 10 |
| **Wednesday** | 3 | 2 | 2 | 1 | 8 |
| **Thursday** | 7 | 2 | 5 | 1 | 15 |
| **Friday** | 7 | 3 | 1 | 1 | 12 |
| **Saturday** | 13 | 3 | 3 | 1 | 20 |
| **Total** | **40** | **19** | **12** | **10** | **81** |

Figure A.10

| FIREARMS DISCHARGE INCIDENTS BY TOUR, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **2331-0730 Hours** | 11 | 4 | 3 | 2 | 20 |
| **0731-1530 Hours** | 7 | 5 | 6 | 4 | 22 |
| **1531-2230 Hours** | 22 | 10 | 3 | 4 | 39 |
| **Total** | **40** | **19** | **12** | **10** | **81** |

Figure A.11

| FIREARMS DISCHARGE INCIDENTS BY MONTH, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **January** | 5 | 4 | 1 | 0 | 10 |
| **February** | 3 | 0 | 0 | 0 | 3 |
| **March** | 5 | 1 | 0 | 2 | 8 |
| **April** | 1 | 5 | 1 | 1 | 8 |
| **May** | 2 | 1 | 1 | 0 | 4 |
| **June** | 3 | 1 | 1 | 2 | 7 |
| **July** | 0 | 0 | 0 | 0 | 0 |
| **August** | 6 | 1 | 5 | 0 | 12 |
| **September** | 3 | 2 | 0 | 0 | 5 |
| **October** | 2 | 3 | 2 | 2 | 9 |
| **November** | 6 | 0 | 1 | 1 | 8 |
| **December** | 4 | 1 | 0 | 2 | 7 |
| **Total** | **40** | **19** | **12** | **10** | **81** |

Figure A.12

| FIREARMS DISCHARGE INCIDENTS BY BOROUGH, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Manhattan** | 3 | 1 | 4 | 1 | 9 |
| **Bronx** | 10 | 6 | 5 | 0 | 21 |
| **Brooklyn** | 19 | 6 | 1 | 5 | 31 |
| **Queens** | 5 | 5 | 1 | 1 | 12 |
| **Staten Island** | 2 | 1 | 0 | 0 | 3 |
| **Outside City** | 1 | 0 | 1 | 3 | 5 |
| **Total** | **40** | **19** | **12** | **10** | **81** |

Figure A.13

| FIREARMS DISCHARGE INCIDENTS BY PRECINCT, MANHATTAN, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **1st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **5th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **6th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **7th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **9th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **10th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **13th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Midtown South** | 1 | 0 | 0 | 0 | 1 |
| **17th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Midtown North** | 0 | 0 | 0 | 0 | 0 |
| **19th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **20th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Central Park** | 0 | 0 | 0 | 0 | 0 |
| **23rd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **24th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **25th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **26th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **28th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **30th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **32nd Precinct** | 0 | 0 | 1 | 1 | 2 |
| **33rd Precinct** | 0 | 1 | 0 | 0 | 1 |
| **34th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **Total** | **3** | **1** | **4** | **1** | **9** |

Figure A.14

| FIREARMS DISCHARGE INCIDENTS BY PRECINCT, BRONX, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **40th Precinct** | 3 | 2 | 0 | 0 | 5 |
| **41st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **42nd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **43rd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **44th Precinct** | 0 | 2 | 2 | 0 | 4 |
| **45th Precinct** | 1 | 0 | 2 | 0 | 3 |
| **46th Precinct** | 2 | 0 | 1 | 0 | 3 |
| **47th Precinct** | 1 | 1 | 0 | 0 | 2 |
| **48th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **49th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **50th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **52nd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **Total** | **10** | **6** | **5** | **0** | **21** |

Figure A.15

| FIREARMS DISCHARGE INCIDENTS BY PRECINCT, BROOKLYN, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **60th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **61st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **62nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **63rd Precinct** | 0 | 1 | 0 | 1 | 2 |
| **66th Precinct** | 0 | 0 | 0 | 1 | 1 |
| **67th Precinct** | 1 | 1 | 0 | 0 | 2 |
| **68th Precinct** | 1 | 0 | 0 | 2 | 3 |
| **69th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **70th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **71st Precinct** | 1 | 0 | 0 | 0 | 1 |
| **72nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **73rd Precinct** | 5 | 0 | 0 | 1 | 6 |
| **75th Precinct** | 4 | 0 | 0 | 0 | 4 |
| **76th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **77th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **78th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **79th Precinct** | 2 | 1 | 0 | 0 | 3 |
| **81st Precinct** | 1 | 0 | 1 | 0 | 2 |
| **83rd Precinct** | 1 | 1 | 0 | 0 | 2 |
| **84th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **88th Precinct** | 1 | 1 | 0 | 0 | 2 |
| **90th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **94th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **19** | **6** | **1** | **5** | **31** |

Figure A.16

| FIREARMS DISCHARGE INCIDENTS BY PRECINCT, QUEENS, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **100th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **101st Precinct** | 2 | 1 | 0 | 0 | 3 |
| **102nd Precinct** | 0 | 0 | 1 | 0 | 1 |
| **103rd Precinct** | 1 | 1 | 0 | 1 | 3 |
| **104th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **105th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **106th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **107th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **108th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **109th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **110th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **111th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **112th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **113th Precinct** | 0 | 2 | 0 | 0 | 2 |
| **114th Precinct** | 2 | 0 | 0 | 0 | 2 |
| **115th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **5** | **5** | **1** | **1** | **12** |

Figure A.17

| FIREARMS DISCHARGE INCIDENTS BY PRECINCT, STATEN ISLAND, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **120th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **121st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **122nd Precinct** | 1 | 1 | 0 | 0 | 2 |
| **123rd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **2** | **1** | **0** | **0** | **3** |

Figure A.18

| FIREARMS DISCHARGE INCIDENTS BY LOCATION, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Within City** | 39 | 19 | 11 | 7 | 76 |
| **Outside City** | 1 | 0 | 1 | 3 | 5 |
| **Total** | **40** | **19** | **12** | **10** | **81** |

Figure A.19

| FIREARMS DISCHARGES BY OFFICER DUTY STATUS, 2013 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **On Duty** | 37 | 18 | 8 | 2 | 65 |
| **Off Duty** | 3 | 1 | 4 | 7 | 15 |
| **Unauthorized Person** | 0 | 0 | 0 | 1 | 1 |
| **Total** | **40** | **19** | **12** | **10** | **81** |

Figure A.20

| ID-AC INCIDENTS, 2013 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| # | Subject Weapon | Officers Involved | Rounds Fired | Subjects | Subject Injury | Subject Gender | Subject Race | Subject Age |
| 1 | Hand Gun | 1 | 1 | 1 | None | Male | Black | 20 |
| 2 | Vehicle | 1 | 1 | 1 | Gunshot | Male | Hispanic | 31 |
| 3 | Cutting Instrument | 1 | 2 | 1 | Gunshot | Male | Black | 40 |
| 4 | Hand Gun | 1 | 7 | 1 | Killed | Male | Black | 37 |
| 5 | Hand Gun | 1 | 1 | 1 | Gunshot | Male | Black | 18 |
| 6 | Hand Gun | 2 | 2 | 1 | Gunshot | Male | Black | 28 |
| 7 | Hand Gun | 2 | 3 | 1 | Gunshot | Male | Black | 16 |
| 8 | Hand Gun | 1 | 1 | 1 | Gunshot | Male | Black | 31 |
| 9 | Vehicle | 1 | 1 | 1 | None | Male | Black | 26 |
| 10 | Hand Gun | 1 | 3 | 1 | Gunshot | Male | Black | 33 |
| 11 | Hand Gun | 2 | 11 | 1 | Killed | Male | Black | 16 |
| 12 | Hand Gun | 2 | 3 | 1 | Gunshot | Male | Black | 20 |
| 13 | Cutting Instrument | 2 | 9 | 1 | Killed | Male | Black | 29 |
| 14 | Vehicle | 1 | 1 | 1 | None | Male | Black | Unk. |
| 15 | Imitation Firearm | 1 | 1 | 1 | None | Male | White | 24 |
| 16 | Hand Gun | 1 | 1 | 1 | None | Male | Black | 28 |
| 17 | Blunt Instrument | 1 | 1 | 1 | Gunshot | Male | Hispanic | 32 |
| 18 | Physical Force | 1 | 3 | 1 | Gunshot | Male | Hispanic | 40 |
| 19 | Hand Gun | 1 | 1 | 1 | Killed | Male | Black | 50 |
| 20 | Hand Gun | 1 | 1 | 1 | Killed | Male | Black | 14 |
| 21 | Physical Force | 1 | 1 | 1 | None | Male | Black | 28 |
| 22 | Vehicle | 2 | 2 | 1 | None | Male | Unk. | Unk. |
| 23 | Hand Gun | 2 | 9 | 1 | None | Male | Black | 27 |
| 24 | Hand Gun | 1 | 4 | 1 | Gunshot | Male | Black | 17 |
| 25 | Cutting Instrument | 1 | 1 | 1 | Gunshot | Male | Hispanic | 32 |

| # | Subject Weapon | Officers Involved | Rounds Fired | Subjects | Subject Injury | Subject Gender | Subject Race | Subject Age |
|---|---|---|---|---|---|---|---|---|
| 26 | Cutting Instrument | 1 | 2 | 1 | Gunshot | Male | Black | 49 |
| 27 | Imitation Firearm | 2 | 3 | 1 | None | Male | Black | 35 |
| 28 | Hand Gun | 1 | 4 | 1 | None | Male | Black | Unk. |
| 29 | Imitation Firearm | 1 | 1 | 1 | None | Male | Black | 19 |
| 30 | Hand Gun | 6 | 17 | 1 | Killed | Male | Black | 26 |
| 31 | Perceived Threat | 1 | 7 | Unk. | None | Unk. | Unk. | Unk. |
| 32 | Hand Gun | 1 | 4 | 1 | Gunshot | Male | Black | 25 |
| 33 | Hand Gun | 1 | 8 | 1 | None | Male | Black | 20 |
| 34 | Hand Gun | 1 | 4 | 1 | Gunshot | Male | Black | 25 |
| 35 | Cutting Instrument | 1 | 5 | 1 | Killed | Male | Hispanic | 22 |
| 36 | Physical Force | 1 | 1 | 1 | None | Male | Black | 23 |
| 37 | Blunt Instrument | 1 | 1 | 1 | Gunshot | Male | White | 27 |
| 38 | Imitation Firearm | 1 | 16 | 1 | Gunshot | Male | Black | 15 |
| 39 | Hand Gun | 1 | 3 | 1 | Killed | Male | Hispanic | 44 |
| 40 | Hand Gun | 3 | 15 | 1 | None | Male | Black | 19 |

Figure A.21

# New York City Police Department

# Annual Firearms Discharge Report

# 2014



# Annual Firearms Discharge Report

# 2014

William J. Bratton

Police Commissioner

New York City Police Department, October 2015

Cover photo by Iván Lara (https://www.flickr.com/photos/ivan-lara/)

# *In Memoriam*

Det 1st Grade Rafael Ramos, 84th Precinct

December 20, 2014

Det 1st Grade Wenjian Liu, 84th Precinct

December 20, 2014

# Contents

**ANNUAL FIREARMS DISCHARGE REPORT** ........ **I**

***IN MEMORIAM*** ........ **II**

FIGURES ........ VI

**PART I: OVERVIEW** ........ **1**

INTRODUCTION ........ 2
USE OF FORCE ........ 3
*Guidelines for the Use of Firearms* ........ *4*
*Reasonableness* ........ *5*
*Training* ........ *5*
*Investigation and Review Process* ........ *5*
*The Shooting Team* ........ *5*
*The Shooting Incident Report* ........ *6*
*The Final Report* ........ *7*
*Review* ........ *7*
*The Borough Firearms Discharge Advisory Board* ........ *7*
*The Chief of Department's Firearms Discharge Review Board* ........ *8*
*The Police Commissioner* ........ *8*
GLOSSARY ........ 10
2014 REPORT ........ 16
*Total Firearms Discharges* ........ *16*
*Categories* ........ *16*

**PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** ........ **18**

OVERVIEW ........ 19
DATES AND TIMES OF DISCHARGES ........ 19
LOCATIONS OF DISCHARGES ........ 20
*Locations of Criminal Shootings* ........ *20*
*Location Type* ........ *23*
REASONS OFFICER INVOLVED ........ 23
*Threat Type* ........ *25*
OFFICER RESTRAINT ........ 25
OBJECTIVE COMPLETION RATE ........ 26
OFFICER FIREARMS ........ 27
*Shooting Technique* ........ *27*
OFFICER PEDIGREE ........ 27
SUBJECT PEDIGREE ........ 29
*Prior Arrests* ........ *30*
*Officer Deaths* ........ *31*
*Officer Injuries* ........ *31*

*Bullet-Resistant Vests* ........ *31*
*Subject Deaths* ........ *31*
*Subject Injuries* ........ *31*
*Bystander Death & Injuries* ........ *32*
SUMMARY ........ 32

**PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK ........ 33**

OVERVIEW ........ 34
DATES AND TIMES OF DISCHARGES ........ 34
LOCATIONS OF DISCHARGES ........ 36
REASONS OFFICER INVOLVED ........ 36
OFFICER RESTRAINT ........ 38
OBJECTIVE COMPLETION RATE ........ 38
FIREARMS ........ 39
*Shooting Techniques* ........ *39*
OFFICER PEDIGREE ........ 39
INCIDENT OUTCOMES ........ 41

**PART IV: UNINTENTIONAL DISCHARGE ........ 42**

OVERVIEW ........ 43
NON-ADVERSARIAL UNINTENTIONAL DISCHARGES ........ 43
*Loading/Unloading* ........ *43*
*Handling* ........ *43*
ADVERSARIAL UNINTENTIONAL DISCHARGES ........ 44
FIREARMS ........ 44
OFFICER PEDIGREE ........ 44
INCIDENT OUTCOMES ........ 46

**PART V: UNAUTHORIZED USE OF A FIREARM ........ 47**

OVERVIEW ........ 48
OFFICER PEDIGREE ........ 48
SUICIDE ........ 48
DISCHARGES BY OTHER THAN AN OFFICER ........ 49
INCIDENT OUTCOMES ........ 49

**PART VI: MISTAKEN IDENTITY ........ 50**

OVERVIEW ........ 51
2014 INCIDENTS ........ 51

**APPENDICES ..... 52**

Appendix A: Tribute ..... 53
Appendix B: Historical Data 1971-2014 ..... 54
Appendix C: Firearms Training ..... 57
*Overview ..... 57*
*Shoot to Stop ..... 57*
*Weapons Control ..... 57*
*NYPD Pistols ..... 57*
*Center Mass ..... 58*
Appendix D: Subjects Killed During ID-AC Incidents ..... 59
Appendix E: Subject Injury & Race ..... 63
Appendix F: Incident Breakdown Tables ..... 65

# Figures

**Part I: Overview**

Figure 1 – Anatomy of a Firearms Discharge Investigation ....... 9
Figure 2 – Historical Snapshot, 2004-2014 ....... 12
Figure 3 – Adversarial Conflict, 2004-2014 ....... 12
Figure 4 – Animal Attack, 2004-2014 ....... 12
Figure 5 – Unintentional Discharges, 2004-2014 ....... 12
Figure 6 – Total Discharge Incidents, 2004-2014 ....... 12
Figure 7 – 2013 v. 2014 Snapshot ....... 13
Figure 7A – 2014 by category ....... 14
Figure 8 – 2014 Firearms Discharge Scope ....... 15

**Part II: Intentional Discharge - Adversarial Conflict**

Figure 9 – ID-AC Incidents by Tour ....... 19
Figure 10 – ID-AC Incidents by Borough ....... 20
Figure 11 – ID-AC Incidents vs Criminal Shooting Incidents ....... 21
Figure 12 – ID-AC Incidents vs Criminal Shooting Incidents, Percentage by Borough ....... 22
Figure 13 – ID-AC Incidents vs Criminal Shooting Incidents, Frequency by Borough ....... 22
Figure 14 – ID-AC Incidents by Location Type ....... 23
Figure 15 – On-Duty Officer Assignment Type Per Incident, ID-AC Incidents ....... 24
Figure 16 – Situations Precipitating On-Duty ID-AC Incidents ....... 25
Figure 17 – Threat Type: ID-AC Incidents ....... 25
Figure 18 – Rounds Fired per ID-AC Officer ....... 26
Figure 19 – Rounds Fired per ID-AC Incident ....... 26
Figure 20 – ID-AC Distance to Target ....... 27
Figure 21 – Race, ID-AC Officers vs Department Staffing ....... 28
Figure 22 – Years of Service, ID-AC Officers vs Department Staffing ....... 28
Figure 23 – Rank, ID-AC Officers vs Department Staffing ....... 29
Figure 24 – Criminal Shooting Suspects vs ID-AC Subjects, by Race ....... 30

**Part III: Intentional Discharge - Animal Attack**

Figure 25 – ID-AA Incidents by Tour ....... 34
Figure 26 – ID-AA Incidents ....... 35
Figure 27 – ID-AA Incidents by Borough ....... 36
Figure 28 – ID-AA Incidents by Location Type ....... 36
Figure 29 – On Duty Officer Assignment, ID-AA Incidents ....... 37
Figure 30 – Situations Precipitating ID-AA Incidents ....... 38
Figure 31 – Rounds Fired per ID-AA Incident ....... 38
Figure 32 – Rounds Fired per ID-AA Officer ....... 39
Figure 33 – Race, ID-AA Officers vs Department Staffing ....... 40
Figure 34 – Years of Service, ID-AA Officers vs Department Staffing ....... 40

FIGURE 35 – RANK, ID-AA OFFICERS VS DEPARTMENT STAFFING ........ 41

**PART IV: UNINTENTIONAL DISCHARGE**

FIGURE 36 – RACE, UNINTENTIONAL DISCHARGES VS DEPARTMENT STAFFING ........ 45
FIGURE 37 – YEARS OF SERVICE, UNINTENTIONAL DISCHARGES VS DEPARTMENT STAFFING ........ 45
FIGURE 38 – RANK, UNINTENTIONAL DISCHARGES VS DEPARTMENT STAFFING ........ 46

**PART V: UNAUTHORIZED USE OF A FIREARM**

FIGURE 39 – POLICE OFFICER SUICIDES BY FIREARM ........ 49

**PART VI: MISTAKEN IDENTITY**

**APPENDICES**

FIGURE 40 – OFFICERS SHOT AND INJURED BY SUBJECTS, 1971-2014 ........ 54
FIGURE 41 – OFFICERS SHOT AND KILLED BY SUBJECTS, 1971-2014 ........ 54
FIGURE 42 – SUBJECTS SHOT AND INJURED, 1971-2014 ........ 55
FIGURE 43 – SUBJECTS SHOT AND KILLED BY OFFICERS, 1971-2014 ........ 55
FIGURE 44 – TOTAL SHOTS FIRED, 1971-2014 ........ 56
FIGURE 45 – TOTAL SHOOTING INCIDENTS INVOLVING OFFICERS, 1971-2014 ........ 56
FIGURE 46 – CENTER MASS DIAGRAM ........ 58
FIGURE 47 – GUNFIRE IN NEW YORK CITY, 2014 ........ 63
FIGURE 48 – SUBJECTS WOUNDED BY OFFICER, 2009-2014 ........ 63
FIGURE 49 – SUBJECTS KILLED BY OFFICERS, 2009-2014 ........ 64
FIGURE 50 – FIREARMS DISCHARGE INCIDENTS BY DAY, 2014 ........ 65
FIGURE 51 – FIREARMS DISCHARGE INCIDENTS BY MONTH, 2014 ........ 65
FIGURE 52 – FIREARMS DISCHARGE INCIDENTS BY BOROUGH, 2014 ........ 66
FIGURE 53 – FIREARMS DISCHARGE INCIDENTS BY PRECINCT, MANHATTAN, 2014 ........ 67
FIGURE 54 – FIREARMS DISCHARGE INCIDENTS BY PRECINCT, BRONX, 2014 ........ 68
FIGURE 55 – FIREARMS DISCHARGE INCIDENTS BY PRECINCT, BROOKLYN, 2014 ........ 69
FIGURE 56 – FIREARMS DISCHARGE INCIDENTS BY PRECINCT, QUEENS, 2014 ........ 70
FIGURE 57 – FIREARMS DISCHARGE INCIDENTS BY PRECINCT, STATEN ISLAND, 2014 ........ 71
FIGURE 58 – FIREARMS DISCHARGE INCIDENTS BY PRECINCT, OUTSIDE CITY, 2014 ........ 71
FIGURE 59 – FIREARMS DISCHARGE INCIDENTS BY LOCATION, 2014 ........ 71
FIGURE 60 – FIREARMS DISCHARGE INCIDENTS BY OFFICER DUTY STATUS, 2014 ........ 71
FIGURE 61 – ID-AC INCIDENTS, 2014 ........ 72

# Part I: Overview

# Introduction

One of the most traumatic and life-changing incidents that can occur in the course of a police officer's career is the line-of-duty discharge of his or her firearm. In an effort to guarantee that these incidents only occur when necessary, and thus prevent avoidable Member of Service (MOS) and civilian trauma, the Department began collecting in-depth data of police related firearms discharges in 1971. Today, the Department records all officer-related discharges, whether purposeful, accidental, or, more rarely, criminal, as well as discharges of a police firearm by a third party.

Analysis of this data over more than four decades has indelibly altered the way that officers respond to, engage in, and assess the need for firearms discharges. By making oversight manifest, the Department has made it clear that each and every discharge is a matter of immediate concern. When recordkeeping began in 1971, 12 officers were shot and killed by another person, and 47 officers were shot and injured. In turn, officers shot and mortally wounded 93 subjects, with a further 221 subjects injured by police gunfire. In 2014, by contrast, two officers were shot and killed by another person, and six were injured (three by gunshot)[1], while police shot and mortally wounded eight subjects and injured 14. Information gleaned from these reports has initiated a Department-wide tactical, strategic, and cultural shift with regard to how officers use and control their firearms. The Department has made restraint the norm.

Today, these reports serve as a statistical engine for the development of training, the adoption of new technology, and the deployment of Department resources. New instructional scenarios are implemented as a result of this analysis and new hardware—from bullet-resistant vests to conducted energy weapons—has been introduced.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option existed other than the use of a firearm.

[1] Of these officers shot and injured or killed, three officers were unable to return fire. Therefore, because the events were not classified as firearms discharge incidents, the details are not analyzed in this report. Nevertheless, the officers shot are tallied in Appendix B.

# Use of Force

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect an arrest or prevent an escape, as well as to protect life and property. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing perpetrators and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance; the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist police—officers have an ascending array of force options to compel others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., pepper spray), conducted energy weapons, impact weapons (e.g., batons), and deadly physical force. All of these are tools at the officer's disposal. The officer is under no obligation to move sequentially from one to the next; he or she may transition from verbal force to pointing a firearm—or vice versa—if the situation dictates.

Federal case law (*Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989)) delineates a standard of "objective reasonableness" that restricts an officer's prerogative to compel or constrain another citizen. But *Tennessee v. Garner* affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. Additionally, the state limits an officer's ability to exercise deadly physical force even further. Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three instances:

> 1) When the subject has committed or is attempting to commit a felony and is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary;
>
> 2) When an armed felon resists arrest or flees; and
>
> 3) When the use of deadly physical force is necessary to defend any person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property

(e.g., to prevent or terminate arson or burglary); the Department does not. Additionally, according to the laws of New York State, it is lawful for an officer to shoot at the driver of a vehicle who is using the vehicle so that it poses an imminent threat of deadly physical force. Such a firearms discharge would violate Department guidelines, however.

NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and "excessive force will not be tolerated," (Patrol Guide 203-11). Regarding the use of deadly physical force, Department policy states, "uniformed members of the service should use only the minimal amount of force necessary to protect human life," (Patrol Guide 203-12).[2]

## Guidelines for the Use of Firearms

To ensure that officers use only the minimal amount of force, the Department has nine rules that guide a New York City police officer in his or her use of deadly physical force. They are as follows:

1) Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.

2) Police officers shall not discharge their weapons when, in their professional judgment, doing so will unnecessarily endanger innocent persons.

3) Police officers shall not discharge their weapons in defense of property.

4) Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.

5) Police officers shall not fire warning shots.

6) Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.

7) Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.

8) Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.

9) Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

---

[2] In October 2015, the Department announced the implementation of a new series of Patrol Guide procedures concerning the use-of-force, from physical force to firearms discharges. This new series will revise and replace 203-11 and 203-12.

## Reasonableness

An officer's permission to use force is not unlimited. According to the law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary.

Police officers are regularly exposed to highly stressful, dangerous situations. The risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In *Brown v. United States*, 256 U.S. 335 (1921), Justice Oliver Wendell Holmes, Jr. noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, in *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court wrote that "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in *People v. Benjamin*, 51 NY2d 267 (1980), the New York State courts observed that "it would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who are delegated the authority to enforce the law and maintain public order.

## Training

Latitude is not unrestricted discretion; rather, it is an admission that reasonableness is fluid. In order to make the right decision about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, skill, and most importantly, training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

## Investigation and Review Process

The New York City Police Department recognizes the serious nature of police-involved firearms discharges and seeks to record and evaluate every incident. The mandate for recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty years have greatly refined the NYPD's process. Today, investigations are conducted in accordance with two guiding documents: 1) Patrol Guide Procedure 212-29; and 2) a handbook entitled, "The Firearms Discharge Investigation Manual; The NYPD Guide to the Preparation of a Shooting Incident Report."

## The Shooting Team[3]

When an officer discharges his or her firearm, whether on or off-duty, or when a firearm owned by an officer is discharged by another person, a patrol supervisor responds to the incident, takes command of

[3] Beginning in June of 2015, the NYPD abolished the shooting team model and replaced it with an investigatory unit, known as the Force Investigation Division (FID) dedicated to officer-involved shootings. The investigation and reporting process described below was applicable to 2014, however.

the scene, and secures and inspects the involved officer's firearm. He or she also immediately notifies the desk officer, who in turn notifies the patrol borough command and operations. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an inspector, undertakes an in-depth examination of the discharge incident, beginning by contacting and conferring with the district attorney. In many cases, including nearly every case in which a subject is killed or injured, the district attorney will advise that any officer who fired should not be interviewed, in order to preserve the integrity of the grand jury process. Whether or not the district attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who fired to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to an Intoxilyzer 5000EN test to determine whether there is any alcohol in their system. He or she is also automatically reassigned to an administrative position for a minimum of three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, ordinarily within 24 hours of the incident.

## The Shooting Incident Report

A preliminary report (usually written within eight hours of the incident) outlines, as much as possible, the shooting incident; however, the rapidly evolving nature of shooting investigations means the report is unavoidably preliminary. The primary means of mitigating this is the use of the Firearms Discharge Investigation Manual.

The manual, in its current incarnation, is a 72-page instruction booklet that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic, incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination or from commenting on the apparent tactics utilized during the incident.

## The Final Report

Within 90 days of the incident, the commanding officer of either the precinct of occurrence or the applicable Borough Investigation Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data are unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting team leader (e.g., detective's case files, forensic results, and medical reports).

When discharges that occur during adversarial conflict involve injury or death to a subject, the final report often cannot be finished within the 90-day period. Instead, the final report must wait until the investigation into the incident has been completed, or at least until the district attorney from the county of occurrence has permitted the officer or officers who discharged to be interviewed. At times, it must wait even longer, until all relevant legal proceedings have been concluded.

If a final report is delayed, whether because of ongoing legal proceedings or incomplete investigations, the Borough Investigation Unit submits monthly interim status reports. Once the final report is finished, it is forwarded, through channels, to the Chief of Department.

## Review

After a firearms discharge has been investigated, the final report prepared, and after the district attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

## The Borough Firearms Discharge Advisory Board

The review of firearms discharges is two-tiered and conducted at the patrol borough and executive levels. Members of the borough Firearms Discharge Advisory Board (FDAB) are supervisors assigned to the patrol borough command, in which the incident occurred, with oversight over the precinct. This board further scrutinizes the incident with the benefit of new material contained in the final report. Based on the accumulated evidence, the patrol borough FDAB issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary

findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board (FDRB) for determination.

## The Chief of Department's Firearms Discharge Review Board

The FDRB issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken. The FDRB gives due consideration to, and often concurs with, the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report, which is a single document that memorializes and synthesizes the whole exhaustive investigation-and-review process. It is then presented to the Police Commissioner.

## The Police Commissioner

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from both the Advisory and the Review Boards, the Police Commissioner makes a final determination regarding the incident. Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2014 findings are published throughout this report.

# Anatomy of a Firearms Discharge Investigation




*Figure 1*

## Glossary

| | |
|---|---|
| Officer | A uniformed member of the New York City Police Department of any rank. |
| Subject | A person engaged in adversarial conflict with an officer or a third party, which results in a firearms discharge. |
| Civilian | A person who is not the subject of an adversarial conflict, but is a crime-victim, bystander, and/or injured person. |
| Firearms Discharge | An incident in which an officer discharges any firearm, or when a firearm belonging to an officer is discharged by any person, excluding discharges during authorized training sessions, lawful target practice, or at a firearms safety station within a Department facility. |
| Intentional Discharge – Adversarial Conflict | An incident in which an officer intentionally discharges a firearm in defense of self, or another, during an adversarial conflict with a subject, including those inside the scope of the officer's employment but outside Department guidelines. This does not include a discharge against an animal attack. |
| Mistaken Identity Discharge | An incident in which an officer intentionally discharges a firearm at another law-enforcement officer whom the discharging officer mistakenly believes to be a criminal. This does not include crossfire incidents in which a discharging officer unintentionally strikes another officer. |
| Intentional Discharge – Animal Attack | An incident in which an officer intentionally discharges a firearm in defense of self, or another, against an animal attack, including those inside the scope of the officer's employment but outside Department guidelines. |
| Intentional Discharge – No Conflict | An incident in which an officer intentionally discharges a firearm to summon assistance, including those inside the scope of the officer's employment but outside Department guidelines. |
| Unintentional Firearms Discharge | An incident in which an officer discharges a firearm without intent, regardless of the circumstance. |
| Unauthorized Use of a Firearm | An incident in which an officer intentionally discharges a firearm without proper legal justification and/or outside the scope of the officer's employment, or an incident in which an unauthorized person discharges an officer's firearm. This includes suicides. |
| Use/Threaten the Use of a Firearm | A contributing factor to a firearms discharge in which a subject discharges or threatens to discharge a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a |

| | |
|---|---|
| | gesture indicative of threatening to use a firearm. |
| Firearm | A pistol, revolver, shotgun, or rifle, including a variation of any of these (e.g., a sawed-off shotgun). |
| Imitation Firearm | Any instrument that is designed to appear as if it were a firearm, or modified to appear as if it were a firearm, including air pistols, toy guns, prop guns, and replicas. |
| Use/Threaten the Use of a Cutting Instrument | A contributing factor to a firearms discharge in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| Cutting Instrument | Any knife, razor, sword, or other sharp-edged object such as a broken bottle. |
| Use/Threaten the Use of a Blunt Instrument | A contributing factor to a firearms discharge in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |
| Blunt Instrument | Any bat, stick, pipe, metal knuckles, or object which, when used as a weapon, can cause blunt-force injury to a person, including motor vehicles and unbroken bottles. |
| Use/Threaten the Use of Overwhelming Physical Force | An incident in which an unarmed subject physically attacks a person or threatens or attempts to do the same, and by doing so puts the victim at risk of serious physical injury or death, including gang assaults, attempts to push a person from a roof or train platform, and attempts to take an officer's firearm. |

| Historical Snapshot, 2004-2014 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Adversarial Conflict** | 51 | 59 | 59 | 45 | 49 | 47 | 33 | 36 | 45 | 40 | 35 |
| **Animal Attack** | 26 | 32 | 30 | 39 | 30 | 28 | 30 | 36 | 24 | 19 | 18 |
| **Unintentional Discharge** | 27 | 25 | 26 | 15 | 15 | 23 | 21 | 15 | 21 | 12 | 18 |
| **Mistaken Identity** | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| **Unauthorized use of a Firearm** | 5 | 6 | 8 | 6 | 3 | 4 | 6 | 2 | 6 | 2 | 4 |
| **MOS Suicide/Attempted Suicide** | 5 | 3 | 3 | 6 | 8 | 3 | 2 | 3 | 9 | 8 | 4 |
| **Total** | **114** | **125** | **127** | **111** | **105** | **106** | **92** | **92** | **105** | **81** | **79** |

*Figure 2*




*Figure 3*




*Figure 4*




*Figure 5*




*Figure 6*

| **2013 v. 2014 Snapshot** | | | |
|---|---|---|---|
| **Category** | **2013** | **2014** | **Change** |
| Intentional Discharge - Adversarial Conflict | 40 | 35 | -12.50% |
| Intentional Discharge - Animal Attack | 19 | 18 | -5.26% |
| Unintentional Discharge | 12 | 18 | 50.00% |
| Unauthorized Use of a Firearm | 10 | 8 | -20.00% |
| **Total Firearms Discharges** | **81** | **79** | **-2.47%** |
| Total Officers Firing | 98 | 104 | 6.12% |
| Total Shots Fired | 248 | 282 | 13.71% |
| Total Officers Shot and Injured by Subjects | 3 | 2 | -33.33% |
| Total Officers Shot and Killed by Subjects | 0 | 2 | ***.**% |
| Total Subjects Shot and Injured by Officers during ID-AC | 17 | 14 | -17.65% |
| Total Subjects Shot and Killed by Officers during ID-AC | 8 | 8 | 0.00% |

*Figure 7*

## 2014 by Category

| Intentional Discharge - Adversarial Conflict | |
|---|---|
| Subject Used/Threatened Use of a Firearm | 23 |
| Subject Used/Threatened Use of a Cutting Instrument | 8 |
| Subject Used/Threatened use of a Blunt Instrument or Vehicle | 3 |
| Subject Used/Threatened use of Overwhelming Physical Force | 1 |
| **Total** | 35 |

| Intentional Discharge - Animal Attack | |
|---|---|
| Dog Attack | 18 |
| Other Animal Attack | 0 |
| **Total** | 18 |

| Unintentional Discharge | |
|---|---|
| During Adversarial Conflict | 2 |
| Handling/Cleaning Firearm | 16 |
| **Total** | 18 |

| Unauthorized Use of Firearm | |
|---|---|
| Suicide | 4 |
| Attempted Suicide | 0 |
| Unauthorized Person Discharged Officer's Firearm | 0 |
| Other | 4 |
| **Total** | 8 |
| **Total Firearms Discharges** | 79 |

*Figure 7A*

## 2014 Firearms Discharge Scope

| **2014 Firearms Discharge Scope** | |
|---|---|
| New York Population (U.S. Census, 2013) | 8,405,837 |
| NYPD Average Annual Uniformed Staffing | 34,857 |
| Total Radio Assignments | 4,802,694 |
| Radio Assignments Involving Weapons | 66,723 |
| Gun Arrests | 4,779 |
| Criminal Shooting Incidents | 1,172 |
| Adversarial Conflict: Total Number of Officers Who Intentionally Fired | 58 |
| Adversarial Conflict: Total Number of Firearms Discharge Incidents | 35 |
| Subjects Shot and Injured during ID-AC | 14 |
| Subjects Shot and Killed during ID-AC | 8 |
| Officers Shot and Injured during ID-AC | 2 |
| Officers Shot and Killed | 2 |

*Figure 8*

# 2014 Report

## Total Firearms Discharges

In 2014, the Department experienced a continuation in the overall decline in discharge incidents (See Figure 2). In fact, 2014 saw the lowest recorded level of discharge incidents since recording began in 1971. In particular, the most serious category of discharges (Intentional Discharge – Adversarial Conflict) also mirrors this trend, down 31% since 2004, and 13% since 2013 (See Figure 7). In a city of 8.4 million, from a Department of approximately 35,000 uniformed officers, 58 officers were involved in a total of 35 incidents of intentional firearms discharges during adversarial conflict, resulting in 14 injured subjects, and eight killed (See Figure 8).

These data are a testament to police officers' restraint, diligence, and honorable performance of duty. But they also show that, over the past four decades, attacks on both police and citizens have steadily declined. The drastic reduction in violent crime over the past 25 years is sociologically reflexive: as crime decreases, criminals and police enter into less criminal conflict.

This report is subdivided into five categories. Each category is analyzed based only on the information in that category, allowing the Department to understand specific types of incidents and adjust training and policy to continue to reduce them. Nevertheless, the relatively small sample studied for the report (79 discharge incidents, 35 in the Adversarial Conflict category) can limit the predictive value and conclusions that may be derived.

The report contains information compiled from preliminary and final Shooting Incident Reports, detective case files, medical examiner's reports, Firearms Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous Annual Firearms Discharge Reports.

Because of rounding, some charts may not precisely equal 100%.

## Categories

- **Intentional Discharge – Adversarial Conflict**: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- **Intentional Discharge – Animal Attack**: when an officer intentionally discharges his or her firearm to defend against an animal attack
- **Unintentional Discharge**: when an officer unintentionally discharges his or her firearm
- **Unauthorized Use of a Firearm**: when an officer intentionally discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm
- **Mistaken Identity**: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

The possibility of a sixth category, *Intentional Discharge – No Conflict*, exists, but its occurrence is extremely uncommon. *Intentional Discharge – No Conflict* involves an officer discharging his or her firearm to summon assistance. Because of the rarity of this type of discharge, it is not regularly tracked in the annual report, but is addressed on an as-it-occurs basis. In 2014, no such discharge occurred; no such discharge has occurred in more than a decade.

# Part II: Intentional Discharge – Adversarial Conflict

## Overview

There were 35 incidents of intentional firearms discharge during adversarial conflict (ID-AC) in 2014, constituting a 13% decrease from 2013 (See Figure 7). In total, 58 officers were involved in these incidents, a 5% increase from the previous year.

Thirty-five subjects were involved in ID-AC incidents in 2014, 22 of whom were shot in the course of the conflict, a 12% decrease overall from 2013 (See Figure 7). While the number of subject deaths as a result of ID-AC incidents was maintained in 2014 from 2013 (eight vs. eight), the number of subject injuries decreased by 18%.

Two officers were shot and injured by criminals in ID-AC incidents 2014, one fewer than 2013, and significantly lower than the 13 incidents recorded in 2012. Both officers were shot in separate ID-AC incidents; neither officer suffered a wound that could have been mitigated by a bullet-resistant vest[4]. No officer was struck by crossfire in 2014, and, despite two line-of-duty deaths by firearm in 2014,[5] no officer died during an ID-AC incident.

On 11 occasions, officers intervened in attacks on civilians (six in firearms attacks and three in stabbings). On one occasion, officers interrupted a subject who was firing indiscriminately into a crowd.

## Dates and Times of Discharges

The distribution of ID-AC incidents was extremely consistent throughout the year. With the exceptions of December, which had one, August, which had three, and May, which had five, either two or four incidents were recorded in every month (See Appendix E).

ID-AC incidents were most likely to occur on a Sunday (ten incidents), and least likely to occur on a Tuesday or Wednesday (two incidents each). This is in contrast to 2013, which recorded Sunday as the day with the fewest number of incidents.

In 2014, more than half (57%) of the incidents occurred during the third platoon (between 3:30 pm and 11:30 pm), consistent with 2013 which recorded 55% (See Figure 9). Ten, or 17%, of the officers had been working more than eight hours at the time of the incident.

**ID-AC Incidents by Tour, 2014**




*Figure 9*

---

[4] One officer was shot and injured during the execution of an arrest warrant in 2014. The officer was hit in the vest and survived. Because the officer was unable to return fire, this incident is not reported in this analysis.

[5] Detectives Ramos and Liu were ambushed and unable to return fire. Therefore, that incident is not counted in this section but the officer deaths are discussed in Appendix A and, along with the above injured officer, are tallied in Appendix B.

## Locations of Discharges

In 2014, all 35 ID-AC incidents occurred within the borders of New York City. More than half of 2014's incidents occurred in Brooklyn, while nearly a quarter occurred in the Bronx (See Figure 10).

ID-AC incidents occurred in 25 separate precincts, eight of which had multiple incidents. The 71st and 75th precincts had the most incidents at three each; this is a decrease from 2013, when a single precinct recorded five incidents.




*Figure 10*

## Locations of Criminal Shootings

The locations of ID-AC incidents largely correspond with wider geographic crime patterns, which can be seen when comparing ID-AC locations to locations of criminal shootings. Figure 11 depicts the 35 ID-AC incidents overlaying the locations of the 1,172 criminal shootings that occurred in New York City in 2014. The map shows that police firearms discharges occur in those areas of the city already suffering from high gun violence.

Since the introduction of this map in the 2007 Firearms Discharge Report, this correlation has been preserved. The frequency of criminal gun activity within New York City directly, and proportionally, affects the frequency and location of police involved shootings; this proportionality is visible at the borough level in figure 12. Despite this correlation, the number of ID-AC incidents (35) is comparatively small against the backdrop of City-wide criminal shootings, with police involved in only 3% of total shootings for the city in 2014 (See Figure 13).

# ID-AC Incidents vs Criminal Shooting Incidents




*Figure 11*




*Figure 12*




*Figure 13*

## Location Type

At 69%, the majority of ID-AC incidents occurred outdoors, and primarily on streets or sidewalks (See Figure 14). Thirty-one ID-AC incidents were within the jurisdiction of patrol precincts, and four were on New York City Housing Authority (NYCHA) property.

Of these four ID-AC incidents that occurred on NYCHA property, two were in Brooklyn (one in the Bushwick houses and one in the Farragut houses), one in the Bronx (in the Patterson houses), and one in Manhattan (in the Washington houses).




*Figure 14*

## Reasons Officer Involved

Officers become involved in ID-AC incidents for a variety of reasons. Mirroring 2013, at 98%, the vast majority of the ID-AC incidents involved officers who were on-duty. The single officer who became involved while off-duty intervened to protect fellow officers who were in pursuit of a suspect. The majority of officers (72%) were in uniform, and most (91%) were assigned to the Patrol or Housing Bureaus.

The majority of officers (63%) were either on uniformed foot posts or in sector cars assigned to respond to calls for service from the public when they became involved in ID-AC incidents (See Figure 15). Although officers assigned to plain-clothes, anti-crime, and conditions units represent a small proportion of the Department's uniformed personnel, 26% of ID-AC incidents involved these officers. This is almost certainly attributable to their mandate to proactively seek criminals rather than answer calls for service. The variety of scenarios that precipitated the involvement of these officers in ID-AC encounters is indicative of an officer's need for perpetual vigilance.

## On-Duty Officer Assignment Type Per Incident, ID-AC Incidents




*Figure 15*

As discussed, the variety of situations precipitating officers becoming involved in ID-AC incidents was broad. The most common was encountering armed subjects or shots fired while on routine patrol (26%) (See Figure 16). The "Pick Up: Other" category includes three instances of furtive behavior, one instance of reckless driving, and one instance of theft of service on an MTA bus as the precipitating factors of ID-AC encounters. Forty-seven percent of incidents occurred as a result of pick-up assignments (situations that officers encounter on patrol without being directed to a location by a dispatcher); when inclusive of the three incidents involving on-duty officers who experienced an attack or robbery, this percentage climbs to 56%.

Situations Precipitating On-Duty ID-AC Incidents




*Figure 16*

## Threat Type

Department policy requires officers who intentionally discharge their firearms during ID-AC incidents to do so only as a means of defending themselves or others from imminent serious physical injury or death.

The subjects involved in ID-AC incidents utilized a variety of weapons when confronting officers. Twenty-three subjects in 23 incidents possessed firearms: 15 were semi-automatic pistols, seven were revolvers, and one incident involved a subject armed with a shotgun. Cutting instruments were predominantly knives, although in one instance officers were attacked—and two were seriously injured—with a hatchet. Two of the three blunt instruments in that category were moving vehicles (See Figure 17).

Threat type - ID-AC Incidents




*Figure 17*

## Officer Restraint

Officers discharged a total of 201 rounds during ID-AC incidents in 2014, an increase of 24% from 2013 when 162 rounds were fired, but still 39% lower than the total of 331 recorded in 2012. The majority of officers fired five or fewer rounds (77%). The most common number of rounds fired by an officer was one (41%). No individual officer fired more than 12 times, or was required to reload his or her firearm during an incident (See Figure 18).

Restraint is also apparent when analyzing the number of shots fired per ID-AC incident as opposed to per officer. The most common number of rounds fired during any incident was also one (43%); this figure includes two fatal shootings in which only one round was fired (See Figure 19). The most rounds fired during any one incident was 29.

**Rounds Fired per ID-AC Officer**




*Figure 18*

**Rounds fired per ID-AC Incident**




*Figure 19*

## Objective Completion Rate

The Department does not consider hit percentages, in part because it is often unknown (e.g., in cases when a subject flees), and also because of the widely varying circumstances among incidents. Instead, the objective completion rate per incident is employed, as it is both more accurate and more instructive. Like combat itself, the objective completion rate per incident is pass/fail. When an officer properly and lawfully perceives a threat severe enough to require the use of his or her firearm, and fires at a specific threat, the most relevant measure is whether he or she ultimately stops the threat. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the subject. The objective completion rate is used for statistical purposes and is not a factor in individual investigations.

In 2014, officers hit at least one subject in 22 of the 35 ID-AC incidents, for an objective completion rate of 63%. Because the subject of one incident was not apprehended, the objective completion rate may be higher. During six incidents in 2014 in which officers were fired upon, officers hit at least one subject in four of those six incidents, for an objective completion rate of 66%; all six subjects were apprehended in the wake of these encounters. In a further incident of returned fire from officers, the subject was un-apprehended. As such, the objective completion rate may again be higher than listed here.

## Officer Firearms

In 2014, every officer involved in ID-AC incidents (both on and off-duty) discharged their on-duty service firearm: 30 were Glocks, 15 were Smith & Wessons, and 13 were Sig Sauers. Department regulations allow officers to carry their on-duty service firearms while off-duty, and authorized off-duty firearms as secondary weapons while on-duty. No officer reported a firearms malfunction.

### Shooting Technique

Utilizing a two-handed grip, standing, carefully lining up a target and using the firearm's sights is not always practical during adversarial conflict. Of the officers who reported how they held their firearms: 63% utilized a two-handed, supported position, and the rest fired with one hand. Of the officers who reported their stance: 56% were standing, 33% were moving, and 11% were seated.

Lack of cover can be a factor in the need for a firearms discharge, because a protected defensive position may allow officers to better control the pace of an incident. Only three officers reported that they were able to take cover during ID-AC incidents, one behind a vehicle, one behind a display rack, and the remaining incident unspecified.




*Figure 20*

Twenty-six officers provided information about how far they were from their targets during ID-AC incidents. Although officers are trained to fire on a target from as far away as seventy-five feet, all but one officer reported that he was 15 feet or fewer from the target at the time of the shooting (See Figure 20).

Twenty-eight officers provided information about light conditions at the time of their ID-AC encounters: 36% reported poor or dark lighting, and 10% of these reported that they were able to use their flashlights.

## Officer Pedigree

Of the 58 officers who intentionally discharged their firearms during ID-AC incidents in 2014, four were female (7%) and 54 were male (93%); 18% of the Department's uniformed personnel are female and 82% are male.

Considering current data and data from prior years, no discernible pattern emerges with regard to the likelihood that an officer of any particular race will become involved in an ID-AC incident (See Figure 21).

There is a greater likelihood that officers in the rank of police officer and those with fewer years of service will become involved in ID-AC incidents. Officers in the rank of police officer were involved in 88% of ID-AC incidents in 2014, although they accounted for 65% of the uniformed members of service. Similarly, officers with ten years of service or less were involved in 82% of ID-AC incidents, although they accounted for 54% of uniformed members of the service. These officers are more likely to be assigned to patrol roles and assignments that increase their chances of being involved in an ID-AC incident over those of longer tenured officers or officers of higher rank (See Figures 22 & 23).




*Figure 21*




*Figure 22*




*Figure 23*

## Subject Pedigree

There were 34 apprehended subjects involved in ID-AC incidents in 2014, and one incident that involved an un-apprehended subject, who is known by sex and race.

Of the 35 subjects, 33 were male and two were female. Known subject ages ranged from 16 to 49, but a single incident involved an 86-year-old perpetrator, giving a median age range of 51 (or 32 exclusive of the outlier). Forty-seven percent were 26 years of age or younger.

The race of a criminal suspect is determined by eyewitness reports, usually that of the victim(s). The race of a subject is determined by a subject's self-identification, existing government-issued documentation, racial/ethnic physical characteristics, medical examiner reports, or other factors.

The race of subjects involved in ID-AC incidents corresponds to the race of subjects involved in criminal shootings (See Figure 24). Similarly, victims of criminal shootings tend to come from the same communities as the suspects. Among criminal-shooting victims identified by race in New York City in 2014, 75% were black, 21% were Hispanic, 2% were white, and 2% were Asian or other.




*Figure 24*

## Prior Arrests

Generally, a subject's arrest history is unknown to the officer at the onset of an incident. Nevertheless, arrest history is pertinent because it is indicative of a subject's propensity for criminal conduct and capacity for violence when confronting a police officer. It can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole/probation status may also make a subject more willing to confront a police officer in an attempt to avoid arrest.

One subject was un-apprehended and his criminal history could not be identified. Of the known subjects, three had no criminal history, one of whom suffered from mental illness and was not in possession of her correct prescription medication at the time of the incident. The remaining two subjects without criminal histories were in the process of committing crimes when the shootings occurred; one pointed a firearm at an officer and one had just stabbed a civilian and was advancing on responding officers in a menacing manner.

Of the 31 subjects with a criminal history, 27 had multiple prior arrests, ranging from two to 26. These arrests were for numerous offenses, including murder, robbery, and assault. The median number of prior arrests for ID-AC subjects was seven.

## Officer Deaths

No officers were killed during ID-AC incidents. Two officers were assassinated by a perpetrator in 2014, but because the officers did not discharge their firearms during the incident, the details of this event are not included statistically in this report.

## Officer Injuries

Five officers were injured in the course of ID-AC incidents[6]. Two were struck by a subject's bullets, one of whom was able to return fire causing the subject to flee. One officer sustained lacerations and a fractured skull as a result of an assault with a crowbar, and one officer sustained wounds to his head and another to his arm as a result of an assault with a hatchet.

## Bullet-Resistant Vests

All 57 on-duty officers who were involved in ID-AC incidents in 2014 were wearing bullet-resistant vests. The single off-duty officer involved in an ID-AC incident was not wearing his vest. No officer was struck in the torso by a subject's weapon, and as such, no case of an officer being saved by their vest was recorded in ID-AC incidents 2014[7].

## Subject Deaths

Of the 34 known subjects involved in ID-AC incidents in 2014, eight were killed by police gunfire. This figure is maintained from 2013, but down 50% from 2012 when 16 subjects were shot and killed by police officers. The number of subjects shot and killed in 2014 represents, along with 2013 and 2010, the lowest number recorded since the Department began collecting in-depth statistics in 1971. Seven of the eight subjects had prior arrest histories, and, of the six toxicology reports available at time of writing, four showed the presence of narcotics or alcohol. Six of the eight were armed with cutting instruments and two were armed with firearms. Narratives describing the eight ID-AC incidents in which subjects were killed can be found in Appendix C.

## Subject Injuries

Thirteen subjects were shot and injured by police gunfire in 2014, 13 of whom had prior arrests. Nine were armed with firearms, two were armed with cutting instruments, one was using a vehicle as a weapon, and one was unarmed but physically attacking the officer.

---

[6] One officer was shot and injured during the execution of an arrest warrant in 2014. The officer was hit in the vest and survived. Because the officer was unable to return fire, this incident is not reported in this analysis.

[7] Ibid.

## Bystander Deaths and Injuries

Two bystanders were injured by police bullets in 2014 in two separate incidents during ID-AC incidents. One was struck in the left upper thigh and the other in the lower right back; both were subsequently listed as stable. In a separate incident, a victim of a violent assault was inadvertently struck and killed by police gunfire when officers attempted to prevent the perpetrator from attacking others.

## Discipline

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical errors and violations of procedure. Discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures. Additionally, all officers who discharge their firearms are sent to a firearms retraining course, regardless of the circumstances of the discharge.

Of the four investigations that have been completed at the time of this report, three were determined to have been in compliance with Department procedures and the law, and one was found to be in violation of Department guidelines. Thirty-one cases are pending.

# Summary

There were 35 ID-AC incidents in 2014, involving 58 officers who discharged their firearms. These conflicts involved 34 known subjects and one un-apprehended subject, including seven subjects who fired directly at officers.

In 2014, there were 1,391 victims of criminal shootings in New York City. The number of intentional firearms discharges by police, comparatively, is very small, but every time an officer discharges a firearm he or she risks inflicting injury or death on subjects, fellow police officers, or innocent bystanders. And in 2014, two bystanders were injured and one was killed by police gunfire. Because of this, the Department ensures that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

There were, on average, 34,857 uniformed officers employed by the NYPD in 2014. Of them, only 58 (0.17%) intentionally discharged a firearm at a subject.

Other instructive metrics involve comparing the number of ID-AC incidents to the number of high risk radio runs, or to the number of arrests of armed suspects made by officers each year. Over the course of 2014, officers responded to more than 4.5 million calls for service, of which more than 65,000 involved weapons. Of the thousands of weapons arrests that resulted from these encounters, 4,779 were gun-related. Officers also had millions of additional interactions with the public, including reasonable suspicion encounters, car stops, and violation stops, and further, escorted thousands of emotionally disturbed persons to hospitals and care facilities. In the overwhelming majority of incidents in which officers took an armed subject or an emotionally disturbed person into custody, they did not fire their weapons.

# Part III: Intentional Discharge – Animal Attack

## Overview

Department policy requires officers who intentionally discharge their firearms during animal attacks to do so only to defend themselves or others from the threat of physical injury, serious physical injury, or death, and to use their firearm only as a last resort to stop an animal attack. Officers are equipped with non-lethal tools that can be used to cope with animal attacks, including batons and OC spray, but these options are not always feasible or effective. Emergency Service Unit personnel carry restraining devices to keep animals at a safe distance, as well as $CO_2$ pistols and rifles capable of firing tranquilizer darts containing Ketaset, a veterinary anesthetic, and Animal Care and Control is also available to assist officers in capturing dangerous dogs or other animals. In rapidly evolving situations, however, when officers may not have prior knowledge that a dog is present, these options are not always prudent or possible.

There were 18 intentional firearms discharges during an animal attack (ID-AA) in 2014, a 5% decrease from 2013. All 18 were on-duty incidents, one of which involved both on and off-duty members. A total of 20 officers discharged their firearms. Two incidents involved two shooting officers, and 16 incidents involved one shooting officer.

A total of 24 animals were involved, all of them dogs; there were two incidents involving two dogs and two incidents involving three dogs. Two officers were bitten. One officer and one civilian were shot during ID-AA incidents. Of the 24 dogs involved, nine were killed. An additional nine dogs were injured. Sixteen of the dogs were Pit Bulls, one was a Chow-chow, and one was a Rottweiler.

**ID-AA Incidents by Tour**




*Figure 25*

These numbers do not encompass all dog attacks on officers or civilians; only incidents involving intentional firearms discharges by police officers are included. In 2014, police officers responded to thousands of calls for service involving dogs and other animals, and they encountered many more while on patrol, executing search warrants, or investigating complaints—incidents that were not processed through 911 or 311.

## Dates and Times of Discharges

ID-AA incidents occurred fairly evenly throughout the year in 2014. March had the most incidents with three, and December had no incidents.

ID-AA incidents occurred most often on Friday (six incidents), with four on Tuesday, three on Monday, and between one and two on Thursday, Saturday, and Sunday; there were no incidents on Wednesday. The majority of these incidents occurred during the third platoon, between 1530 in the afternoon and 2330 at night (See Figure 25).

# ID-AA Incidents




*Figure 26*

## Locations of Discharges

All 18 ID-AA incidents in 2014 took place within New York City—17 within the jurisdiction of patrol precincts and one on New York City Housing Authority (Brooklyn) property. No incidents took place within the Metropolitan Transportation Authority transit system. In 2014, Brooklyn and Queens accounted for the most ID-AA incidents (six incidents each) (See Figure 27). ID-AA incidents occurred in 13 separate precincts, including one precinct that had three incidents (75 precinct) and three precincts that had two incidents (44, 47, 73, and 101 precincts). Nine ID-AA incidents occurred outdoors, and nine occurred indoors. More incidents occurred inside of residential locations and their common areas than any other location type; this category includes both outdoor (e.g. courtyards) and indoor (e.g. hallways) locations (See Figure 28).




*Figure 27*




*Figure 28*

## Reasons Officer Involved

Officers became involved in ID-AA incidents for a variety of reasons. All 20 officers were on-duty at the time of the incident. Fifteen officers were in uniform and five officers were attired in plainclothes. Twelve were assigned to the Patrol Services Bureau, three were assigned to the Narcotics Division, two were

assigned to the Housing Bureau, two were assigned to the Warrants Section, and one was assigned to the Emergency Services Unit.

Officers were assigned to a variety of duties when they became involved in ID-AA incidents, the most common of which was uniformed patrol (12 officers) (See Figure 29).




*Figure 29*

The most common single reason that led to officers becoming involved in ID-AA incidents were search warrants, comprising six (33%) of the 18 total animal attack incidents. The second largest category, “Radio Run – Other,” comprises two different types of 911 calls that precipitated ID-AA incidents: three disputes and one wellness check. The single vertical patrol took place in the confines of a New York City Housing Authority location (See Figure 30).




*Figure 30*

## Officer Restraint

A total of 44 rounds were fired by officers during ID-AA incidents in 2014, a decrease of 17% from 2013, when 53 rounds were fired. The majority of officers fired either one or two rounds. The most common number of rounds fired was one. No officer fired more than five times, or was required to reload his or her firearm during an incident (See Figure 32).

Restraint is also apparent when analyzing the number of shots fired per ID-AA incident. In 44% of incidents, only one round in total was fired. The most rounds fired during any incident were six (See Figure 31).




*Figure 31*

## Objective Completion Rate

In 2014, officers struck at least one animal during 15 ID-AA incidents, for an objective completion rate of 83%. This is significantly higher than the objective completion rate for ID-AC incidents. A likely explanation for this higher rate of completion is that, where listed, officers involved in ID-AA incidents were predominantly between one and five feet from the animal when they fired.

## Firearms

All 20 officers who fired during ID-AA incidents in 2014 utilized their service 9mms—12 were Glocks, four were Smith & Wessons, and four were Sig Sauers. One officer reported a malfunction during an animal attack incident.

**Rounds Fired per ID-AA Officer**




*Figure 32*

## Shooting Techniques

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but the fast-paced nature of dog attacks often makes this impossible. Seventeen of the 20 officers who discharged their firearm during an animal attack incident reported their grip. Forty-one percent utilized a two-handed supported grip, while the remaining 59% reported that they held their firearm with one hand. Of the 15 officers who reported on their use of sights, 27% were able to employ them during the incident, and 73% were unable. Fourteen officers reported their stance; 13 were standing and one was moving.

All but one officer reported his or her distance; all of these officers discharged their firearms when the dogs were between zero and six feet away; 63% fired when the dog was within two feet or closer. Three officers were able to take cover during an animal attack; two were behind ballistic shields, and one was behind a police vehicle.

Fifteen officers reported on light conditions; eight reported adequate light, four reported poor or dark lighting, and three reported that they used their flashlights.

## Officer Pedigree

Of the 20 officers who intentionally discharged their firearms during ID-AA incidents in 2014, one was female and 19 were male; 18% of the Department's uniformed personnel are female and 82% are male.

Considering current data and data from prior years, no discernable pattern emerges with regard to the likelihood that an officer of any particular race will become involved in an ID-AA incident. There is a greater likelihood that officers in the ranks of police officer or detective and those with fewer years of service will become involved in ID-AA incidents. These officers are more likely to be assigned to respond to calls involving animal attacks, to conduct vertical patrols, to effect arrests, and to conduct other assignments that are more likely to precipitate ID-AA incidents (See Figures 33 & 34).




*Figure 33*




*Figure 34*




*Figure 35*

## Incident Outcomes

As of June 2015, the Firearms Discharge Review Board has issued findings in 11 ID-AA incidents, and found no violation of Department firearms guidelines in any. As such, no corrective action or re-training was recommended for any of the officers involved. Seven cases are pending.

# Part IV: Unintentional Discharge

## Overview

There were 18 incidents of unintentional firearms discharges in 2014, a 50% increase from 2013, when there were 12. All eighteen incidents involved a single officer, and all except one resulted in a single discharge; in the outlying incident two rounds were fired.

Four incidents resulted in injuries to four officers, in the left hand, pinky finger, left leg, and right buttock, respectively. One bystander was shot and killed as a result of an alleged unintentional discharge. That officer has been indicted and, at the time of this report, he is currently on trial.

Eight unintentional discharges occurred while the officer was off-duty, and 10 occurred on duty. Six occurred outside (two in the parking lot of department facilities, two in vehicles, one in a public parking lot, and one on a street), and 12 occurred inside (five inside officers' residences, four inside Department stationhouses, two inside residences during radio runs or vertical patrol, and one at a hospital firearm safety station).

## Non-Adversarial Unintentional Discharges

Non-adversarial unintentional discharges occur when an officer is loading or unloading, cleaning, or otherwise handling a firearm. In 2014, 16 of the 18 total unintentional discharges were non-adversarial, and therefore fall into this category.

### Loading/Unloading

Two of the unintentional discharge incidents that occurred in 2014 were related to loading/unloading. One officer was off-duty and was reloading her off-duty firearm when the slide unlocked and initiated a discharge. The second officer was on-duty, within the confines of a hospital, and was attempting to unload her service firearm at a designated safety station when the discharge occurred. Although current policy incentivizes the use of firearms safety stations by not defining discharges at NYPD safety stations as unintentional discharge incidents, this does not apply to safety stations in civilian locations, and as such, this incident has been included in the total.

### Handling

The remaining 14 non-adversarial unintentional discharges were a result of handling unrelated to loading/unloading. Five of these incidents transpired during firearm cleaning, and resulted in two injuries to officers (left hand and pinky finger). Three of the incidents occurred off-duty in private residences, and two incidents occurred on-duty in precinct stationhouses. Of the remaining nine, two occurred in vehicles while the firearm was holstered, two occurred when an officer was holstering his service weapon, one when an officer was removing his un-holstered off-duty weapon from his waistband, and one occurred

during the recovery of a subject's weapon from a vehicle door. Finally, three occurred in the course of general handling, with one of these incidents resulting in the death of a bystander.

## Adversarial Unintentional Discharges

Unintentional discharges during adversarial conflict or animal attack occur during the course of lawful police conduct and are brought about either wholly, or in part, by aggravating factors, such as a suspect grabbing an officer's firearm, an officer losing his or her balance, or when an officer's shooting hand is struck by an object. In 2014, just two of the 18 total unintentional discharges occurred during an adversarial conflict or animal attack.

In the first incident, while clearing an apartment in response to a radio run, an ESU officer entered a utility room and was struck in the helmet by an unknown object. The strike caused the officer to lose grip of his firearm, and in the attempt to secure his grip discharged one round.

In the second incident, an off-duty officer was the victim of a violent robbery, during which a struggle for the officer's firearm ensued. As a result of this struggle, two rounds were discharged.

## Firearms

Of the 18 firearms that were unintentionally discharged in 2014, nine were the officer's service weapons, seven were authorized off-duty firearms, one was a legally owned private firearm, and one was a suspect's recovered firearm. Nine of the firearms were Glocks, five were Smith and Wesson, two were Sig Sauers, one was a Colt, and one was a Davis.

## Officer Pedigree

Of the 18 officers who unintentionally discharged firearms in 2014, 16 were male and two were female; 82% of the Department's uniformed personnel are male and 18% are female.

Although the percentages of white and black officers involved in unintentional discharge are, to varying extents, at odds with their representation within the Department, the sample size of officers involved in unintentional discharges is just 18, or 0.05% of the Department's uniformed personnel. These figures are therefore not useful in determining the likelihood that an officer of any particular race will become involved in an unintentional firearms discharge (See Figure 36).




*Figure 36*

Officers with fewer years of service were more likely to be involved in unintentional firearms discharges. Of the officers with five years of service or fewer, two had graduated from the Police Academy less than a year before the discharge occurred (See Figure 37).




*Figure 37*

Of the officers involved, 16 were police officers, one was a sergeant, and one was a captain (See Figure 38).




*Figure 38*

## Incident Outcomes

The Department investigates all unintentional firearms discharges thoroughly. Of the investigations that have been completed at the time of this report (September 2015), the Firearms Discharge Review Board found that officers were in violation of Department guidelines in thirteen cases and committed no violation in one. The recommended discipline for involved officers ranged from none to *Charges and Specifications*. Retraining on relevant tactics was recommended in nine cases. Five cases are pending. In the case of the discharge that caused the bystander's death, that investigation is on hold and the case is tentatively deemed as an unintentional discharge pending the outcome of the criminal trial.

# Part V: Unauthorized Use of a Firearm

## Overview

There were eight firearms discharges in 2014 that were determined to be unauthorized, a 20% decrease from 2013, when ten unauthorized use of a firearm incidents were recorded. Four incidents were officer suicides, one was an unintentional discharge by an officer unfit for duty, one was an officer firing at an unoccupied vehicle, one was an officer firing into the air, and one was an officer firing at an adjacent vehicle resulting in critical injuries to a passenger.

## Officer Pedigree

Of the eight officers who were involved in unauthorized firearms discharges in 2014, one was female and seven were male; four were white, two were black, one was Hispanic, and one was Asian. One had between zero and five years of service, three had between six and ten years of service, two had between 11 and 15 years of service, and two had more than 20 years of service. Five officers held the rank of police officer, two were detectives, and one was a sergeant.

Because the sample size of officers involved in unauthorized firearms discharges is only eight, or 0.02% of the Department's uniformed personnel, these statistics are not useful in determining the likelihood that an officer of any particular pedigree will become involved in an unauthorized firearms discharge.

## Suicide

Four police officers committed suicide by firearm in 2014, including two apparent suicides; all four suicides were committed off-duty (See Figure 39*).

The Department and a number of external organizations provide mental health resources specifically targeted to uniformed members of the service who may be at risk for suicide. Department resources include the Employee Assistance Unit, the Counseling Services Unit, the Chaplain's Unit, the NYPD Helpline, and the Psychological Evaluation Unit. External resources include Police Officers Providing Peer Assistance (POPPA), the Police Self Support Group, and Columbia Cares (COPE). The Department actively promotes these resources to all uniformed police members of the service.

**Because of the focus of this report Figure 39 depicts officer suicides by firearm only. Suicides or attempted suicides by other methods were not included.*




*Figure 39*

## Discharges by Other than an Officer

There were no incidents of unauthorized use of a firearm in 2014 in which someone other than an officer discharged an officer's gun.

## Incident Outcomes

The Department investigates all incidents of unauthorized use of a firearm thoroughly. In the rare case of an unauthorized discharge other than suicide, the disciplinary process will be initiated against the officer discharging the weapon, and/or the officer charged with the security of the weapon. In cases of serious misconduct, officers are arrested, suspended, and eventually terminated for their actions.

As of the time of this report, the Firearms Discharge Review Board has found that three officers violated Department guidelines during an incident involving the unauthorized use of a firearm in 2014. Two cases were suicide and one was an officer discharging his firearm into the air. The remaining five cases are pending. In the case of an officer discharging his firearm into a vehicle, causing injury to two bystanders, that officer has plead guilty to attempted murder and is serving 9 years.

# Part VI: Mistaken Identity

## Overview

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on any law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken identity incidents are distinguished from crossfire incidents in that the shooting officer is intentionally firing on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. Unauthorized discharges, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incidents), are also excluded. This definition comports with the 2010 New York State Task Force on Police-on-Police Shootings' definition of "Police-on-Police Confrontations."

## 2014 Incidents

In 2014 there were no incidents of mistaken identity.

# Appendices

# Appendix A – Tribute

**DETECTIVE FIRST GRADE WENJIAN LIU**
*84 Precinct*



On December 20, 2014, Police Officer WenJian Liu and his partner, Police Officer Rafael Ramos, both assigned to the 84 Precinct, were sitting in their patrol car performing duty in the 79 Precinct as a Critical Response Vehicle (CRV) Post at the corner of Tompkins and Myrtle Avenues. A man approached their RMP and unprovoked, assassinated Police Officer Liu and his partner, Police Officer Ramos. Shortly thereafter, the gunman took his own life.

Police Officer Liu first joined the New York City Police Department as an auxiliary police officer. He was sworn in as a New York City police officer in July 2007. After completing training at the Police Academy, he was assigned to the 73 Precinct. One year later, he was transferred to the 84 Precinct.

He is survived by his wife, Pei Xia Chen, and his parents, Xiu Yan Li and Wei Tang Liu. Police Officer Liu held an Associate in Applied Science degree in Accounting from the City University of New York. On December 27, 2014, Police Commissioner William J. Bratton posthumously promoted Police Officer Wen Jian Liu to Detective First Grade.

**DETECTIVE FIRST GRADE RAFAEL L. RAMOS**
*84 Precinct*



On December 20, 2014, Police Officer Rafael L. Ramos and his partner, Police Officer Wen Jian Liu, both assigned to the 84 Precinct, were sitting in their patrol car performing duty in the 79 Precinct as a Critical Response Vehicle (CRV) Post at the corner of Tompkins and Myrtle Avenues. A man approached their RMP and unprovoked, assassinated Police Officer Ramos and his partner, Police Officer Liu. Shortly thereafter, the gunman took his own life.

Police Officer Ramos joined the New York City Police Department in August 2009, as a School Safety Agent assigned to the 122 Precinct School Safety Unit, on Staten Island. In January 2012, he was sworn in as a New York City police officer fulfilling his life-long dream of becoming one of New York's Finest. He began his career as an officer assigned to the 79 Precinct as part of the command's Impact Zone. In November 2013, Police Officer Ramos was transferred to the 84 Precinct.

Police Officer Ramos is survived by his wife, Maritza; two sons: Justin, 18, and Jaden, 13; his mother, Julia Romero; and sister, Sindy Ramos. He was a prominent member of his church, the Christ Tabernacle Church in Glendale, Queens, and was near completion of his bachelor's degree in Religion at Faith Evangelical College and Seminary.

On December 27, 2014, during his funeral, Police Commissioner William J. Bratton posthumously promoted Police Officer Ramos to Detective First Grade, as well as making him an honorary chaplain of the 84 Precinct. Additionally, the Faith Evangelical College and Seminary posthumously awarded him his Bachelor of Arts degree in Religion.

# Appendix B – Historical Data 1971-2014




*Figure 40*




*Figure 41*

## Subjects Shot and Injured, 1971-2014




*Figure 42*

## Subjects Shot and Killed by Officers, 1971-2014




*Figure 43*




*Figure 44*




*Figure 45*

# Appendix C: Firearms Training

## Overview

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives: those of bystanders, victims, subjects, and other officers. One of the realities of police work, however, is the contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this Report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons present from imminent death or serious physical injury. This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury.

## Shoot to Stop

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to “stop the threat” – i.e., to end the subject’s ability to threaten imminent death or serious physical injury to the officer or another person. If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject’s demise. Stated explicitly, however, police officers do not “shoot to kill” – they are trained to shoot to stop.

## Weapons Control

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills, both of which are unfortunately the first factors impacted in a combat scenario. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## NYPD Pistols

There are three semi-automatic 9mm pistol models that are authorized as on-duty service weapons for NYPD officers: the Glock 19, the Sig Sauer P226, and the Smith & Wesson 5946. These weapons are equipped with 15 round magazines, and, with one round in the chamber, each firearm is capable of holding 16 total rounds. Additionally, there are several weapons authorized for off-duty carry, such as the Glock 26, the Smith & Wesson 3914, and the Beretta 8000D Mini Cougar. Some officers carry .38 caliber revolvers. These officers are senior members whose weapons have been grandfathered in; revolvers have not been issued as service weapons since 1992. Current NYPD service pistols are all "double action only," meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be "cocked," resulting in a one-stage trigger pull). Additionally, all NYPD weapons are modified to have a heavier-than-stock 12 pound trigger pull; this diminishes the likelihood of unintentional discharges. The NYPD uses a 124-grain, hollow-point bullet that is designed to prevent over-penetration and ricochets.

Because combat stress can contribute to the impairment of fine motor skills, and because of the relative imprecision of pistols, police officers are taught to shoot for center mass – usually, the torso. In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center of the exposed portion as a target.

The human body's center mass is the largest area available as a point of aim. The torso represents approximately one third of a human's surface area, compared to nine percent for an arm or 18 percent for a leg. The torso is also the most stationary portion of the body; extremities are much smaller and less static and therefore a far less certain target. Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to the center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun (See Figure 46).

**Center Mass**



*Figure 46*

# Appendix D: Subjects Killed During ID-AC Incidents

**Incident 1**

On Saturday April 12, 2014, at approximately 1117 hours, four officers responded to a radio run at an address known to the Department. The male caller had informed the 911 operator that he had shot his daughter and dog, and that he was going to kill himself. Two officers arrived initially, and upon reaching the front stoop of the residence the lead officer observed the perpetrator approaching them armed with a shotgun. Both officers retreated to street level and were approximately 10 feet away from the front door when the perpetrator exited the residence still armed. The perpetrator ignored repeated commands by officers to drop his weapon and aimed at one of the officers. Said officer discharged two rounds from his service firearm, striking the perpetrator at least once in the abdomen, causing him to the fall to the ground; the perpetrator was subsequently secured by responding personnel. Inside the residence the officers discovered an injured dog and a female victim of an apparent gunshot.

Both the female victim—determined to be the perpetrator's daughter—and perpetrator were transported to the hospital where both would subsequently succumb to their injuries. The animal was transported to a veterinary hospital and was not found to be seriously injured. Subject toxicology yielded no presence of narcotics or alcohol.

**Incident 2**

On Friday May 16, 2014, at approximately 1350 hours, an individual known to the Department committed a gunpoint robbery at 1302 2nd avenue. During the event an employee secreted a GPS device into the package taken by the perpetrator, who then fled the store. Two officers, having responded to a radio assignment, arrived at the location of the crime and, accompanied by the store manager, initiated a canvass of the area for the suspect; their search was supplemented with location information transmitted to them by personnel at the NYPD Real Time Crime Center who were receiving data from the GPS device. At this stage, operating under the belief that the suspect was travelling in a motor vehicle, officers coordinated the interception and blocked the route of the GPS device. After being alerted by the Real Time Crime Center that the signal was stopped in traffic all involved officers converged on the signal's location and four RMP vehicles were parked in close proximity to the suspect. At this point five officers exited their vehicles and began to canvass through the stopped traffic. One officer, having identified the suspect, and with five fellow officers surrounding the vehicle, began ordering the suspect to raise his hands. The suspect, refusing to comply with repeated orders to remain still, reached to the floor and produced a black semi-automatic pistol. On witnessing this movement, several of the officers relocated to safer positions and aimed their service weapons at the subject. Again ignoring repeated orders to comply, the subject aimed his weapon at one of the officers, causing four of the responding officers to discharge their firearms, resulting in the subject's demise. The subject's firearm was removed from the vehicle and, upon investigation, was found to be loaded with eight live rounds. Subject toxicology revealed the presence of narcotics.

**Incident 3**

At approximately 2048 hours on Sunday, May 18, 2014, inside an apartment within the confines of the 70th precinct, a female victim sustained a violent unprovoked attack at the hands of her husband, during which she was stabbed in the chest with a cutting instrument. The victim then fled with her children while the perpetrator returned to his apartment. In response, seven officers arrived on the scene and discovered the injured victim between two parked cars. Six of these officers then proceeded to the perpetrator's apartment where they found smoke emanating from under the door. With the safety of neighbors and the subject of paramount concern, and with the arrival time of ESU uncertain, the officers began to force entry into the apartment while simultaneously beginning the evacuation of surrounding neighbors. The officers then entered the apartment where, on opening the door of the back bedroom, observed the suspect beginning to advance on them armed with scissors. The suspect was ordered to drop his weapon but refused and continued to advance. As a result, a single officer discharged his firearm causing the subject to drop to one knee. In spite of further warnings the subject returned to his feet and continued to advance, forcing a second officer to discharge his weapon. The perpetrator was subsequently disarmed and pronounced dead by paramedics. Subject toxicology revealed the presence of alcohol.

**Incident 4**

At approximately 1922 hours on Monday, September 29, 2014, six officers responded to a 911 call about a knife assault in progress within the confines of the 70th precinct. Upon arrival at the apartment in which the assault was audibly ongoing the officers met a civilian who was attempting to gain entry. He was successful in doing so and entered the apartment before the officers could prevent him. The officers followed the civilian in a tactical formation and observed a second male, armed with a knife, exit a back bedroom, make a stabbing motion towards the first civilian, and advance on the officers. Orders of compliance were unheeded and as the perpetrator continued to advance, three officers were forced to discharge their service weapons, killing the subject but also striking the civilian. With the threat neutralized, the officers moved deeper into the apartment where a female and her two children were discovered hiding in a bathroom and were removed to safety. The male civilian was discovered bleeding from apparent stab and gunshot wounds, and although transported rapidly to hospital he subsequently succumbed to his injuries. Subject toxicology revealed the presence of alcohol.

**Incident 5**

At approximately 1927 hours on Friday, October 3, 2014, seven officers responded to a 911 call for an armed dispute, occurring within the confines of the 61st precinct. The first two officers on the scene were met by a female who informed them that her son was in her apartment armed with four knives and threatening to kill her. The officers had responded to the same address earlier in the evening, as the subject had choked his mother but fled before the police arrived. With no access through the front door according to the female victim, the officers moved to the rear of the building where they observed the suspect on an upper level. Upon being challenged by the armed officers, the suspect re-entered the

building and locked the door behind him. The officers, supported by recently arrived colleagues, unlocked the door with a key and entered the apartment. The officers discovered the suspect seated on the couch with four knives in front of him. When ordered by the officers to raise his hands, he instead grabbed the knives (two in each hand) and stood. The suspect then began daring the officers to shoot him before advancing towards them. The officers retreated until they could go no further and one was forced to discharge his service weapon, striking the subject in the chest. The subject was removed to the hospital where he was pronounced DOA. Subject toxicology revealed the presence of alcohol, narcotics, and marijuana.

**Incident 6**

At approximately 1359 hours, on Thursday October 23, 2014, four officers, present in front 162-10 Jamaica Ave, were asked by an independent party to pose for a photograph. Immediately after the photo was taken an individual removed a hatchet from his backpack and ran towards the police officers, proceeding to swing the weapon at them, and striking one on the forearm and one on the side of the head. The two uninjured officers unholstered and discharged their firearms at the perpetrator striking him a minimum of six times and causing his demise. A bystander in proximity to the event was also injured by another's stray bullet. Subject toxicology yielded no presence of narcotics or alcohol.

**Incident 7**

At approximately 0726 hours, on October 26, 2014, four officers responded to a radio call at New York Queens Hospital, where, upon arrival, they met with security personnel. The officers were informed that approximately four hours previously, a recent patient had approached a nurse demanding syringes, and, on being challenged by security officers, produced and brandished a knife. The hospital provided information on the suspect to the officers who then proceeded to the suspect's address. On arrival, the suspect was observed in front of the building but, on being challenged, moved down an adjacent walkway. Officers moved to surround the suspect and, on noticing one of the officers following him, he lunged with a box cutter before continuing. It was at this point that the suspect noticed a second officer moving towards him from the opposite direction of the walkway and ignoring directions moved towards the officer the with box-cutter in hand. Said officer then discharged his service firearm two times, striking the subject, who was pronounced dead on removal to the hospital. Subject toxicology revealed the presence of narcotics.

**Incident 8**

At approximately 0135 hours on Tuesday, December 9, 2014, an individual entered 770 Eastern Parkway and stabbed a man who had been praying inside the location. An officer posted to a nearby location, aware of the situation due to noise and witness information, began to move toward the location, whereupon he observed a victim with a head injury; a congregated crowd clarified that the perpetrator was still within the building. The officer called for backup and entered the location where he found the suspect, still armed

with a knife, in a common area. The officer, along with newly arrived colleagues, gave verbal commands but despite initial signs that the suspect was willing to comply he instead proceeded to roam the common area freely. The suspect then doubled back, and while still ignoring commands came within 3-4 ft. of an officer who was then forced to discharge his firearm; the suspect was removed to the hospital and pronounced DOA. Subject toxicology revealed the presence of narcotics.

# Appendix E – Subject Injury & Race




*Figure 47*

| Subjects Wounded by Officers, 2009-2014 | | | | | |
|---|---|---|---|---|---|
| **Year** | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2009** | 0 | 14 | 6 | 0 | 20 |
| **2010** | 3 | 9 | 3 | 1 | 16 |
| **2011** | 2 | 10 | 7 | 0 | 19 |
| **2012** | 1 | 9 | 3 | 0 | 13 |
| **2013** | 1 | 12 | 4 | 0 | 17 |
| **2014** | 0 | 8 | 6 | 0 | 14 |

*Figure 48*

| Subjects Killed by Officers, 2009-2014 | | | | | |
|---|---|---|---|---|---|
| **Year** | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2009** | 0 | 8 | 4 | 0 | 12 |
| **2010** | 2 | 1 | 4 | 1 | 8 |
| **2011** | 4 | 2 | 3 | 0 | 9 |
| **2012** | 2 | 11 | 2 | 1 | 16 |
| **2013** | 0 | 6 | 2 | 0 | 8 |
| **2014** | 2 | 4 | 2 | 0 | 8 |

*Figure 49*

# Appendix F – Incident Breakdown Tables

| Firearms Discharge Incidents by Day, 2014 | | | | | |
|---|---|---|---|---|---|
| **Day** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Monday** | 5 | 3 | 5 | 1 | **14** |
| **Tuesday** | 2 | 4 | 1 | 0 | **7** |
| **Wednesday** | 2 | 0 | 3 | 2 | **7** |
| **Thursday** | 4 | 2 | 3 | 2 | **11** |
| **Friday** | 6 | 6 | 2 | 0 | **14** |
| **Saturday** | 6 | 1 | 3 | 2 | **12** |
| **Sunday** | 10 | 2 | 1 | 1 | **14** |
| **Total** | **35** | **18** | **18** | **8** | **79** |

*Figure 50*

| Firearms Discharge Incidents by Month, 2014 | | | | | |
|---|---|---|---|---|---|
| ***Month*** | ***ID-AC*** | ***ID-AA*** | ***Unintentional*** | ***Unauthorized*** | ***Total*** |
| **January** | 4 | 1 | 2 | 0 | **7** |
| **February** | 2 | 1 | 1 | 0 | **4** |
| **March** | 2 | 3 | 4 | 0 | **9** |
| **April** | 2 | 2 | 2 | 3 | **9** |
| **May** | 5 | 2 | 2 | 1 | **10** |
| **June** | 4 | 2 | 1 | 2 | **9** |
| **July** | 2 | 1 | 0 | 0 | **3** |
| **August** | 3 | 1 | 2 | 0 | **6** |
| **September** | 4 | 2 | 1 | 0 | **7** |
| **October** | 4 | 2 | 0 | 0 | **6** |
| **November** | 2 | 1 | 2 | 1 | **6** |
| **December** | 1 | 0 | 1 | 1 | **3** |
| **Total** | **35** | **18** | **18** | **8** | **79** |

*Figure 51*

| Firearm Discharge Incidents by Borough, 2014 | | | | | |
|---|---|---|---|---|---|
| ***Borough*** | ***ID-AC*** | ***ID-AA*** | ***Unintentional*** | ***Unauthorized*** | ***Total*** |
| **Bronx** | 8 | 4 | 6 | 0 | **18** |
| **Brooklyn** | 18 | 6 | 1 | 1 | **26** |
| **Manhattan** | 4 | 1 | 1 | 0 | **6** |
| **Queens** | 5 | 6 | 5 | 3 | **19** |
| **Staten Island** | 0 | 1 | 2 | 0 | **3** |
| **Outside City** | 0 | 0 | 3 | 4 | **7** |
| **Total** | **35** | **18** | **18** | **8** | **79** |

*Figure 52*

| Firearm Discharge Incidents by Precinct, Manhattan, 2014 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **1st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **5th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **6th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **7th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **9th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **10th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **13th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Midtown South** | 0 | 0 | 0 | 0 | 0 |
| **17th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Midtown North** | 0 | 0 | 0 | 0 | 0 |
| **19th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **20th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Central Park** | 0 | 0 | 0 | 0 | 0 |
| **23rd Precinct** | 1 | 0 | 0 | 0 | 1 |
| **24th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **25th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **26th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **28th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **30th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **32nd Precinct** | 0 | 1 | 0 | 0 | 1 |
| **33rd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **34th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **MNTF*** | 0 | 0 | 1 | 0 | 1 |
| **Total** | **4** | **1** | **1** | **0** | **6** |

*Figure 53*

*Manhattan North Task Force.

| Firearm Discharge Incidents by Precinct, Bronx, 2014 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **40th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **41st Precinct** | 1 | 0 | 1 | 0 | 2 |
| **42nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **43rd Precinct** | 1 | 0 | 2 | 0 | 3 |
| **44th Precinct** | 0 | 2 | 1 | 0 | 3 |
| **45th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **46th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **47th Precinct** | 0 | 2 | 0 | 0 | 2 |
| **48th Precinct** | 1 | 0 | 1 | 0 | 2 |
| **49th Precinct** | 2 | 0 | 0 | 0 | 2 |
| **50th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **52nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **8** | **4** | **6** | **0** | **18** |

*Figure 54*

| Firearm Discharge Incidents by Precinct, Brooklyn, 2014 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **60th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **61st Precinct** | 1 | 0 | 0 | 0 | 1 |
| **62nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **63rd Precinct** | 0 | 0 | 0 | 1 | 1 |
| **66th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **67th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **68th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **69th Precinct** | 2 | 0 | 0 | 0 | 2 |
| **70th Precinct** | 2 | 0 | 0 | 0 | 2 |
| **71st Precinct** | 3 | 0 | 0 | 0 | 3 |
| **72nd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **73rd Precinct** | 0 | 2 | 0 | 0 | 2 |
| **75th Precinct** | 3 | 3 | 1 | 0 | 7 |
| **76th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **77th Precinct** | 2 | 1 | 0 | 0 | 3 |
| **78th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **79th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **81st Precinct** | 2 | 0 | 0 | 0 | 2 |
| **83rd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **84th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **88th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **90th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **94th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **18** | **6** | **1** | **1** | **26** |

*Figure 55*

| Firearm Discharge Incidents by Precinct, Queens, 2014 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **100th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **101st Precinct** | 0 | 2 | 0 | 0 | 2 |
| **102nd Precinct** | 0 | 1 | 0 | 0 | 1 |
| **103rd Precinct** | 2 | 0 | 0 | 0 | 2 |
| **104th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **105th Precinct** | 0 | 1 | 0 | 1 | 2 |
| **106th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **107th Precinct** | 0 | 0 | 1 | 0 | 1 |
| **108th Precinct** | 0 | 0 | 0 | 1 | 1 |
| **109th Precinct** | 1 | 1 | 0 | 0 | 2 |
| **110th Precinct** | 1 | 0 | 1 | 0 | 2 |
| **111th Precinct** | 0 | 0 | 1 | 1 | 2 |
| **112th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **113th Precinct** | 0 | 1 | 0 | 0 | 1 |
| **114th Precinct** | 1 | 0 | 0 | 0 | 1 |
| **115th Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **5** | **6** | **5** | **3** | **19** |

*Figure 56*

| Firearm Discharge Incidents by Precinct, Staten Island, 2014 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **120th Precinct** | 0 | 1 | 1 | 0 | 2 |
| **121st Precinct** | 0 | 0 | 0 | 0 | 0 |
| **122nd Precinct** | 0 | 0 | 1 | 0 | 1 |
| **123rd Precinct** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **0** | **1** | **2** | **0** | **3** |

*Figure 57*

| Firearm Discharge Incidents by Precinct, Outside City, 2014 | | | | | |
|---|---|---|---|---|---|
| ***Precinct*** | ***ID-AC*** | ***ID-AA*** | ***Unintentional*** | ***Unauthorized*** | ***Total*** |
| **New Jersey** | 0 | 0 | 0 | 1 | 1 |
| **Rockland** | 0 | 0 | 1 | 1 | 2 |
| **Suffolk** | 0 | 0 | 2 | 0 | 2 |
| **Westchester** | 0 | 0 | 0 | 2 | 2 |
| **Total** | **0** | **0** | **3** | **4** | **7** |

*Figure 58*

| Firearm Discharge Incidents by Location, 2014 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Within City** | 35 | 18 | 15 | 4 | 72 |
| **Outside City** | 0 | 0 | 3 | 4 | 7 |
| **Total** | **35** | **18** | **18** | **8** | **79** |

*Figure 59*

| Firearm Discharge Incidents by Officer Duty Status, 2014 | | | | | |
|---|---|---|---|---|---|
| **Status** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **On-Duty** | 34 | 18 | 10 | 1 | 63 |
| **Off-Duty** | 1 | 0 | 8 | 7 | 16 |
| **Total** | **35** | **18** | **18** | **8** | **79** |

*Figure 60*

| ID-AC Incidents, 2014 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **#** | **Subject Weapon** | **Officers Involved** | **Rounds Fired** | **Subjects** | **Subject Injury** | **Subject Gender** | **Subject Race** | **Subject Age** |
| **1** | Firearm | 2 | 4 | 1 | Gunshot | M | H | 31 |
| **2** | Firearm | 1 | 1 | 1 | None | M | B | 17 |
| **3** | Firearm | 1 | 1 | 1 | None | M | B | 21 |
| **4** | Vehicle | 5 | 19 | 1 | None | M | B | 39 |
| **5** | Cutting instrument | 1 | 1 | 1 | Gunshot | F | B | 35 |
| **6** | Firearm | 2 | 7 | 1 | None | M | B | 28 |
| **7** | Firearm | 1 | 3 | 1 | Gunshot | M | H | 22 |
| **8** | Firearm | 1 | 1 | 1 | None | F | B | 44 |
| **9** | Firearm | 1 | 1 | 1 | None | M | B | 26 |
| **10** | Firearm | 1 | 2 | 1 | Killed | M | W | 86 |
| **11** | Firearm | 1 | 1 | 1 | Gunshot | M | B | 24 |
| **12** | Firearm | 1 | 5 | 1 | Gunshot | M | B | 23 |
| **13** | Firearm | 4 | 29 | 1 | Killed | M | H | 45 |
| **14** | Firearm | 2 | 15 | 1 | Gunshot | M | H | 23 |
| **15** | Cutting instrument | 2 | 4 | 1 | Killed | M | B | 39 |
| **16** | Firearm | 1 | 2 | 1 | None | M | B | 16 |
| **17** | Firearm | 1 | 1 | 1 | None | M | B | 20 |
| **18** | Firearm | 1 | 6 | 1 | Gunshot | M | B | 23 |
| **19** | Firearm | 2 | 19 | 1 | None | M | H | Unknown |
| **20** | Vehicle | 1 | 1 | 1 | Gunshot | M | H | 38 |
| **21** | Firearm | 1 | 1 | 1 | None | M | B | 28 |
| **22** | Cutting instrument | 2 | 2 | 1 | Gunshot | M | H | 34 |
| **23** | Firearm | 2 | 5 | 1 | None | M | H | 24 |

| ID-AC Incidents, 2014 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **24** | Firearm | 3 | 13 | 1 | Gunshot | M | B | 22 |
| **25** | Firearm | 1 | 1 | 1 | None | M | B | 26 |
| **26** | Physical Force | 1 | 1 | 1 | Gunshot | M | H | 28 |
| **27** | Firearm | 1 | 4 | 1 | Gunshot | M | B | 19 |
| **28** | Cutting instrument | 3 | 18 | 1 | Killed | M | H | 47 |
| **29** | Cutting instrument | 1 | 1 | 1 | Killed | M | W | 28 |
| **30** | Cutting Instrument | 2 | 19 | 1 | Killed | M | B | 32 |
| **31** | Cutting instrument | 1 | 2 | 1 | Killed | M | B | 29 |
| **32** | Firearm | 1 | 3 | 1 | None | M | B | 22 |
| **33** | Firearm | 4 | 5 | 1 | Gunshot | M | B | 25 |
| **34** | Blunt Instrument | 2 | 2 | 1 | Gunshot | M | B | 19 |
| **35** | Cutting instrument | 1 | 1 | 1 | Killed | M | B | 49 |

*Figure 61*

New York City Police Department

**William J. Bratton,**

**Police Commissioner**

NYPD



# 2015

# Annual Firearms Discharge Report

POLICE DEPARTMENT CITY OF NEW YORK

**JAMES P. O'NEILL**
Police Commissioner

# Annual Firearms Discharge Report

# 2015

James P. O'Neill

Police Commissioner

New York City Police Department, October 2016

Cover photo by Iván Lara (https://www.flickr.com/photos/ivan-lara/)



# *In Memoriam*

Detective
Brian Moore
105 PCT
May 4, 2015

Detective
Randolph Holder
PSA 5
October 20, 2015

*Fidelis Ad Mortem*

# Contents

**ANNUAL FIREARMS DISCHARGE REPORT** .......... **I**

***IN MEMORIAM*** .......... **II**

FIGURES .......... VI

**PART I: OVERVIEW** .......... **1**

INTRODUCTION .......... 2
USE OF FORCE .......... 3
*Guidelines for the Use of Firearms* .......... *4*
*Reasonableness* .......... *5*
*Training* .......... *5*
*Investigation and Review Process* .......... *5*
*The Shooting Team* .......... *6*
*The Shooting Incident Report* .......... *7*
*The Final Report* .......... *7*
*Review* .......... *8*
*The Borough Firearms Discharge Advisory Board* .......... *8*
*The Chief of Department's Firearms Discharge Review Board* .......... *8*
*The Police Commissioner* .......... *8*
*Force Investigation Division* .......... *9*
GLOSSARY .......... 11
2015 REPORT .......... 17
*Total Firearms Discharges* .......... *17*
*Categories* .......... *17*

**PART II: INTENTIONAL DISCHARGE – ADVERSARIAL CONFLICT** .......... **19**

OVERVIEW .......... 20
DATES AND TIMES OF DISCHARGES .......... 20
LOCATIONS OF DISCHARGES .......... 21
*Locations of Criminal Shootings* .......... *21*
*Location Type* .......... *25*
REASONS OFFICER INVOLVED .......... 25
*Threat Type* .......... *27*
OFFICER RESTRAINT .......... 27
OBJECTIVE COMPLETION RATE .......... 28
OFFICER FIREARMS .......... 29
*Shooting Technique* .......... *29*
OFFICER PEDIGREE .......... 29
SUBJECT PEDIGREE .......... 31
*Prior Arrests* .......... *32*
*Officer Deaths* .......... *33*

*Officer Injuries* ... *33*
*Bullet-Resistant Vests* ... *33*
*Subject Deaths* ... *33*
*Subject Injuries* ... *34*
*Bystander Death & Injuries* ... *34*
*Discipline* ... *34*
SUMMARY ... 35

**PART III: INTENTIONAL DISCHARGE – ANIMAL ATTACK ... 36**

OVERVIEW ... 37
DATES AND TIMES OF DISCHARGES ... 38
LOCATIONS OF DISCHARGES ... 40
REASONS OFFICER INVOLVED ... 40
OFFICER RESTRAINT ... 41
OBJECTIVE COMPLETION RATE ... 42
FIREARMS ... 42
*Shooting Techniques* ... *42*
OFFICER PEDIGREE ... 43
INCIDENT OUTCOMES ... 44

**PART IV: UNINTENTIONAL DISCHARGE ... 45**

OVERVIEW ... 46
NON-ADVERSARIAL UNINTENTIONAL DISCHARGES ... 46
*Loading/Unloading* ... *46*
*Handling* ... *46*
ADVERSARIAL UNINTENTIONAL DISCHARGES ... 47
FIREARMS ... 47
OFFICER PEDIGREE ... 47
INCIDENT OUTCOMES ... 48

**PART V: UNAUTHORIZED USE OF A FIREARM ... 49**

OVERVIEW ... 50
OFFICER PEDIGREE ... 50
SUICIDE ... 50
DISCHARGES BY OTHER THAN AN OFFICER ... 51
INCIDENT OUTCOMES ... 51

**PART VI: MISTAKEN IDENTITY ... 52**

OVERVIEW ... 53
2015 INCIDENTS ... 53

**APPENDICES .......... 54**

APPENDIX A: TRIBUTE .......... 55
APPENDIX B: HISTORICAL DATA 1971-2015 .......... 56
APPENDIX C: FIREARMS TRAINING .......... 59
*Overview .......... 59*
*Shoot to Stop .......... 59*
*Weapons Control .......... 59*
*NYPD Pistols .......... 60*
*Center Mass .......... 60*
APPENDIX D: SUBJECTS KILLED DURING ID-AC INCIDENTS .......... 61
APPENDIX E: SUBJECT INJURY & RACE .......... 65
APPENDIX F: INCIDENT BREAKDOWN TABLES .......... 67

# Figures

**PART I: OVERVIEW**

FIGURE 1 – ANATOMY OF A FIREARMS DISCHARGE INVESTIGATION ........ 10
FIGURE 2 – HISTORICAL SNAPSHOT, 2005-2015 ........ 13
FIGURE 3 – ADVERSARIAL CONFLICT, 2005-2015 ........ 13
FIGURE 4 – ANIMAL ATTACK, 2005-2015 ........ 13
FIGURE 5 – UNINTENTIONAL DISCHARGES, 2005-2015 ........ 13
FIGURE 6 – TOTAL DISCHARGE INCIDENTS, 2005-2015 ........ 13
FIGURE 7 – 2014 V. 2015 SNAPSHOT ........ 14
FIGURE 7A – 2015 BY CATEGORY ........ 15
FIGURE 8 – 2015 FIREARMS DISCHARGE SCOPE ........ 16

**PART II: INTENTIONAL DISCHARGE - ADVERSARIAL CONFLICT**

FIGURE 9 – ID-AC INCIDENTS BY TOUR ........ 20
FIGURE 10 – ID-AC INCIDENTS BY LOCATION ........ 21
FIGURE 11 – ID-AC INCIDENTS VS CRIMINAL SHOOTING INCIDENTS ........ 22
FIGURE 12 – CY 2015 SHOTSPOTTER INCIDENTS ........ 23
FIGURE 13 – ID-AC INCIDENTS VS CRIMINAL SHOOTING INCIDENTS, PERCENTAGE BY BOROUGH ........ 24
FIGURE 14 – ID-AC INCIDENTS VS CRIMINAL SHOOTING INCIDENTS, FREQUENCY BY BOROUGH ........ 24
FIGURE 15 – ID-AC INCIDENTS BY LOCATION TYPE ........ 25
FIGURE 16 – ON-DUTY OFFICER ASSIGNMENT, ID-AC INCIDENTS ........ 26
FIGURE 17 – SITUATIONS PRECIPITATING ON-DUTY ID-AC INCIDENTS ........ 27
FIGURE 18 – THREAT TYPE: ID-AC INCIDENTS ........ 27
FIGURE 19 – ROUNDS FIRED PER ID-AC INCIDENT ........ 28
FIGURE 20 – ROUNDS FIRED PER ID-AC OFFICER ........ 28
FIGURE 21 – ID-AC DISTANCE TO TARGET ........ 29
FIGURE 22 – RACE, ID-AC OFFICERS VS DEPARTMENT STAFFING ........ 30
FIGURE 23 – YEARS OF SERVICE, ID-AC OFFICERS VS DEPARTMENT STAFFING ........ 31
FIGURE 24 – RANK, ID-AC OFFICERS VS DEPARTMENT STAFFING ........ 31
FIGURE 25 – CRIMINAL SHOOTING SUSPECTS VS ID-AC SUBJECTS, BY RACE ........ 32

**PART III: INTENTIONAL DISCHARGE - ANIMAL ATTACK**

FIGURE 26 – ID-AA INCIDENTS BY TOUR ........ 38
FIGURE 27 – ID-AA INCIDENTS ........ 39
FIGURE 28 – ID-AA INCIDENTS BY LOCATION ........ 40
FIGURE 29 – ID-AA INCIDENTS BY LOCATION TYPE ........ 40
FIGURE 30 – ON DUTY OFFICER ASSIGNMENT, ID-AA INCIDENTS ........ 41
FIGURE 31 – SITUATIONS PRECIPITATING ID-AA INCIDENTS ........ 41
FIGURE 32 – ROUNDS FIRED PER ID-AA OFFICER ........ 42
FIGURE 33 – ROUNDS FIRED PER ID-AA INCIDENT ........ 42
FIGURE 34 – RACE, ID-AA OFFICERS VS DEPARTMENT STAFFING ........ 43

Figure 35 – Years of Service, ID-AA Officers vs Department Staffing ........ 44
Figure 36 – Rank, ID-AA Officers vs Department Staffing ........ 44

**Part IV: Unintentional Discharge**

Figure 37 – Race, Unintentional Discharges vs Department Staffing ........ 47
Figure 38 – Years of Service, Unintentional Discharges vs Department Staffing ........ 48
Figure 39 – Rank, Unintentional Discharges vs Department Staffing ........ 48

**Part V: Unauthorized Use of a Firearm**

Figure 40 – Police Officer Suicides by Firearm ........ 51

**Part VI: Mistaken Identity**

**Appendices**

Figure 41 – Officers Shot and Injured by Subjects, 1971-2015 ........ 56
Figure 42 – Officers Shot and Killed by Subjects, 1971-2015 ........ 56
Figure 43 – Subjects Shot and Injured, 1971-2015 ........ 57
Figure 44 – Subjects Shot and Killed by Officers, 1971-2015 ........ 57
Figure 45 – Total Shots Fired, 1971-2015 ........ 58
Figure 46 – Total Shooting Incidents involving Officers, 1971-2015 ........ 58
Figure 47 – Center Mass Diagram ........ 60
Figure 48 – Gunfire in New York City, 2015 ........ 65
Figure 49 – Subjects Wounded by Officer, 2010-2015 ........ 66
Figure 50 – Subjects Killed by Officers, 2010-2015 ........ 66
Figure 51 – Firearms Discharge Incidents by Day, 2015 ........ 67
Figure 52 – Firearms Discharge Incidents by Month, 2015 ........ 67
Figure 53 – Firearms Discharge Incidents by Borough, 2015 ........ 67
Figure 54 – Firearms Discharge Incidents by Precinct, Manhattan, 2015 ........ 68
Figure 55 – Firearms Discharge Incidents by Precinct, Bronx, 2015 ........ 69
Figure 56 – Firearms Discharge Incidents by Precinct, Brooklyn, 2015 ........ 70
Figure 57 – Firearms Discharge Incidents by Precinct, Queens, 2015 ........ 71
Figure 58 – Firearms Discharge Incidents by Precinct, Staten Island, 2015 ........ 72
Figure 59 – Firearms Discharge Incidents by Precinct, Outside City, 2015 ........ 72
Figure 60 – Firearms Discharge Incidents by Location, 2015 ........ 72
Figure 61 – Firearms Discharge Incidents by Officer Duty Status, 2015 ........ 72
Figure 62 – ID-AC Incidents, 2015 ........ 73

# Part I: Overview

# Introduction

One of the most traumatic and life-changing incidents that can occur in the course of a police officer's career is the line-of-duty discharge of his or her firearm. In an effort to guarantee that these incidents only occur when necessary, and thus prevent avoidable Member of Service (MOS) and civilian trauma, the Department began collecting in-depth data of police related firearms discharges in 1971. Today, the Department records all officer-related discharges, whether purposeful, accidental, or, more rarely, criminal, as well as discharges of a police firearm by a third party.

Analysis of these data over more than four decades has indelibly altered the way that officers respond to, engage in, and assess the need for firearms discharges. By making oversight manifest, the Department has made it clear that each and every firearm discharge is a matter of immediate concern. When recordkeeping began in 1971, 12 officers were shot and killed by another person, and 47 officers were shot and injured. In turn, officers shot and mortally wounded 93 subjects, with a further 221 subjects injured by police gunfire. In 2015, by contrast, two officers were shot and killed by another person, and three were injured, while police shot and fatally wounded eight subjects and injured 15. Information gleaned from these reports has initiated a Department-wide tactical, strategic, and cultural shift with regard to how officers use and control their firearms. The Department has made restraint the norm.

Today, these reports serve as a statistical engine for the development of training, the adoption of new technology, and the deployment of Department resources. New instructional scenarios are implemented as a result of this analysis and new hardware—from bullet-resistant vests to conducted energy weapons—has been introduced.

Tracking how, when, where, and why officers discharge their weapons is an invaluable tool for working towards the Department's ultimate goal of guaranteeing that, for every discharge, no option existed other than the use of a firearm.

# Use of Force

Police officers are among a select few to whom society has granted the right to use force in the course of their duty. Under New York State law, police may use force to effect an arrest or prevent an escape, as well as to protect life and property. With certain very specific exceptions, a private citizen's ability to resort to force is limited to self-defense and is also predicated on first exhausting all attempts at retreat. Police, on the other hand, are not only obligated to stand their ground, but required to pursue fleeing perpetrators and use force, if necessary, to terminate that flight.

An officer's role encompasses service, crime control, and order maintenance; the last two regularly require officers to issue instructions and orders. Compliance in these matters is not optional. The vast majority of police encounters involve nothing more than words, but when words are insufficient—when people choose to ignore or actively resist police—officers have an ascending array of force options to induce others to submit to their lawful authority.

These options extend from professional presence up through verbal force, physical force, non-impact weapons (e.g., pepper spray), conducted energy weapons, impact weapons (e.g., batons), and deadly physical force. All of these are tools at the officer's disposal. The officer is under no obligation to move sequentially from one to the next; he or she may transition from verbal force to pointing a firearm—or vice versa—if the situation dictates.

Federal case law (*Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989)) delineates a standard of "objective reasonableness" that restricts an officer's prerogative to compel or constrain another citizen. But *Tennessee v. Garner* affirmed an officer's right to use force against certain suspects, stating that if a fleeing suspect were to inflict or threaten anyone with serious physical harm, the use of deadly force would "pass constitutional muster."

The New York State Penal Law, for its part, allows an officer to use physical force only when he or she "reasonably believes such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. Additionally, the State limits an officer's ability to exercise deadly physical force even further. Penal Law §35.30(1) provides that police may only use deadly physical force against a subject in three instances:

> 1) When the subject has committed or is attempting to commit a felony and is using or about to use physical force against a person, or when the subject has committed or is attempting to commit kidnapping, arson, escape, or burglary;
>
> 2) When an armed felon resists arrest or flees; and
>
> 3) When the use of deadly physical force is necessary to defend any person from "what the officer reasonably believes to be the use or imminent use of deadly physical force."

The use of deadly physical force, then, is properly restricted by statute. But NYPD policy represents an even more stringent guideline, and the Department goes further than the law in its efforts to control the use of force by its personnel. State law, for example, allows the use of deadly physical force to protect property

(e.g., to prevent or terminate arson or burglary); the Department does not. Additionally, according to the laws of New York State, it is lawful for an officer to shoot at the driver of a vehicle who is using the vehicle so that it poses an imminent threat of deadly physical force. However, such a firearms discharge would violate Department guidelines.

NYPD policy emphasizes that "only the amount of force necessary to overcome resistance will be used," and "excessive force will not be tolerated," (Patrol Guide 203-11). Regarding the use of deadly physical force, Department policy states, "uniformed members of the service should use only the minimal amount of force necessary to protect human life," (Patrol Guide 203-12).[1]

## Guidelines for the Use of Firearms

To ensure that officers use only the minimal amount of force, the Department has nine rules that guide a New York City police officer in his or her use of deadly physical force and discharging a firearm. They are as follows:

1) Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.

2) Police officers shall not discharge their weapons when, in their professional judgment, doing so will unnecessarily endanger innocent persons.

3) Police officers shall not discharge their weapons in defense of property.

4) Police officers shall not discharge their weapons to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.

5) Police officers shall not fire warning shots.

6) Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.

7) Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.

8) Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.

9) Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

[1] In June of 2016, the Department announced the implementation of a new series of Patrol Guide procedures concerning the use of force, from physical force to firearms discharges. Patrol Guide series 221 revised and replaced 203-11 and 203-12.

## Reasonableness

An officer's permission to use force is not unlimited. According to the law, as well as the Department's regulations, officers may exercise only as much force as they believe to be reasonably necessary.

Police officers are regularly exposed to highly stressful, dangerous situations. The risks they face and the experience they gain are appreciated and conceded by those who write and interpret the law. In *Brown v. United States*, 256 U.S. 335 (1921), Justice Oliver Wendell Holmes, Jr. noted that "detached reflection cannot be demanded in the presence of an uplifted knife." Sixty-eight years later, in *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court wrote that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." And in *People v. Benjamin*, 51 NY2d 267 (1980), the New York State courts observed that "it would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety."

These rulings explicitly acknowledge the strain under which officers make life-or-death use-of-force decisions. The law should and does provide latitude for those who are delegated the authority to enforce the law and maintain public order.

## Training

Latitude is not unrestricted discretion; rather, it is an admission that reasonableness is fluid. In order to make the right decision about whether and how to use deadly force, an officer in these situations relies on nerve, judgment, skill, and most importantly, training. It is training that sets the officer apart from the civilian, and is an anchor in those dangerous situations that most people never face.

The NYPD Training Bureau is in the process of developing an annual in-service training program. In-service training options will include sessions on the latest tactics, de-escalation strategies, intervention skills, and changes in the law and police procedures, as well as ways to positively interact and collaborate with community members. The first iteration of this program commenced in July 2015, and concluded in June 2016; comparable programs will continue on an annual basis moving forward. Program content will include tactical skills that emphasize the "3 Cs" – Cover, Concealment and Containment – as well as a critical fourth "C" which is Communication. As much as possible, officers and supervisors will be trained by platoon in the company of officers with whom they usually work and during the hours that they usually perform duty. Platoon training will prevent needless and disruptive changes to officers' schedules and have the added benefit of reinforcing situational awareness, team tactics and decision-making among a group of officers who usually work together.

## Investigation and Review Process

The New York City Police Department recognizes the serious nature of police-involved firearms discharges and seeks to record and evaluate every incident. The mandate for recordkeeping was first published in Department Order SOP 9 (s. 1969), but the intervening forty-six years have greatly refined the NYPD's process. In 2015, investigations were conducted in accordance with two guiding documents: 1) Patrol

Guide Procedure 212-29; and 2) a handbook entitled, "The Firearms Discharge Investigation Manual; The NYPD Guide to the Preparation of a Shooting Incident Report."

## The Shooting Team[2]

When an officer discharges his or her firearm, whether on or off-duty, or when a firearm owned by an officer is discharged by another person, a patrol supervisor responds to the incident, takes command of the scene, and secures and inspects the involved officer's firearm. He or she also immediately notifies the desk officer, who in turn notifies the Patrol Borough command and Operations Unit. A Patrol Borough Shooting Team, led by a shooting-team leader in the rank of captain, is then dispatched. The shooting team is an ad hoc entity that may be comprised of personnel from investigatory units, community affairs units, the Emergency Service Unit, the Firearms and Tactics Section, and/or any other personnel whose training or expertise may prove valuable to the pending investigation.

The shooting-team leader, under the supervision of an inspector, undertakes an in-depth examination of the discharge incident, beginning by contacting and conferring with the District Attorney. In many cases, including nearly every case in which a subject is killed or injured, the District Attorney will advise that any officer who discharged their weapon should not be interviewed, in order to preserve the integrity of the grand jury process. Whether or not the District Attorney allows an interview, the shooting-team leader will, in every instance, direct the officer who discharged their weapon to prepare a Firearms Discharge/Assault Report, or FDAR.

If a discharge causes death or injury, the officer who fired is required to submit to an Intoxilyzer 5000EN test to determine whether there is any alcohol in their system. He or she is also automatically reassigned to an administrative position for a minimum of three consecutive work days. Investigations into discharges that cause death or injury are supervised by executives in the rank of Chief.

If the discharge incident appears legally or administratively problematic, or if malfeasance is suspected, the shooting-team leader, in conjunction with personnel from the Internal Affairs Bureau, will remove the shooting officer's weapon and modify or suspend his or her duty status. An officer's weapon must also be removed in all instances of self-inflicted injury (absent extenuating circumstances).

Each shooting investigation is thorough and exhaustive, and includes canvasses, witness interviews, subject interviews, evidence collection, crime-scene sketches and investigation, hospital visits, and firearms/ballistics analyses. Afterwards, all available investigatory results are collated into a Shooting Incident Report and forwarded to the Chief of Department, the highest ranking uniformed member of the NYPD, ordinarily within 24 hours of the incident.

---

[2] Beginning in July of 2015, the NYPD abolished the shooting team model and replaced it with an investigatory unit; known as the Force Investigation Division (FID) dedicated to officer-involved shootings. See page 9.

## The Shooting Incident Report

A preliminary report (usually written within eight hours of the occurrence) outlines, as much as possible, the shooting incident; however, the rapidly evolving nature of shooting investigations means the report is unavoidably preliminary. The primary means of mitigating this is via the use of the Firearms Discharge Investigation Manual.[3]

The manual, in its current incarnation, is a 72-page instruction manual that provides a template by which shooting-team leaders can produce accurate, data-rich Shooting Incident Reports in a timely manner. It ensures that pertinent questions are asked and relevant avenues of investigation are pursued, even in the wake of a dynamic, sometimes chaotic, incident. Firearms discharges, especially those that occur during adversarial conflict, can be tremendously complex events. The Firearms Discharge Investigation Manual functions as a checklist, promoting both uniformity and specificity.

Each Shooting Incident Report should end with a statement, made with appropriate caveats, assessing whether or not the discharge was consistent with Department guidelines and whether or not the involved officers should be subject to Departmental discipline. Often, if involved officers have not been interviewed, the shooting-team leader may not make a determination, but rather state that the investigation is ongoing. This does not preclude the shooting-team leader from offering a tentative determination or from commenting on the apparent tactics utilized during the incident.

## The Final Report

Within 90 days of the incident, the commanding officer of either the Precinct of occurrence or the applicable Borough Investigations Unit prepares a finalized version of the Shooting Incident Report. This final report is a reiteration of the original, but includes any clarifications or re-evaluations that may have been developed in the meantime. Because of the speed with which the initial report is prepared, tentative data are unavoidable. Accordingly, the final report will contain material that was not initially available to the shooting team leader (e.g., detective's case files, forensic results, medical reports, etc.).

When discharges that occur during adversarial conflict involve injury or death to a subject, the final report often cannot be finished within the 90-day period. Instead, the final report must wait until the investigation into the incident has been completed, or at least until the District Attorney from the county of occurrence has permitted the officer or officers who discharged to be interviewed. At times, it must wait even longer, until all relevant legal proceedings have been concluded.

If a final report is delayed, whether because of ongoing legal proceedings or incomplete investigations, the Borough Investigations Unit submits monthly interim status reports. Once the final report is finished, it is forwarded, through channels, to the Chief of Department.

[3] This reporting process was applicable for the first half of 2015.

## Review

After a firearms discharge has been investigated, the final report prepared, and after the District Attorney's office has determined whether the incident requires prosecutorial action, the NYPD initiates a tertiary examination to assess the event from a procedural and training perspective and, if necessary, to impose discipline. This third layer of oversight is under the purview of the Firearms Discharge Advisory Board and the Firearms Discharge Review Board.

## The Borough Firearms Discharge Advisory Board

The review of firearms discharges is two-tiered and conducted at the Patrol Borough and executive levels. Members of the Patrol Borough Firearms Discharge Advisory Board (FDAB) are supervisors assigned to the Patrol Borough command, in which the incident occurred, with oversight over the Precinct. This board further scrutinizes the incident with the benefit of new material contained in the final report. Based on the accumulated evidence, the Patrol Borough FDAB issues preliminary findings regarding whether or not the officer's actions violated the Department's firearms guidelines or use-of-force policy. The preliminary findings, along with a preliminary disciplinary recommendation, are appended to the final report and presented to the Chief of Department's Firearms Discharge Review Board (FDRB) for determination.

## The Chief of Department's Firearms Discharge Review Board

The FDRB issues determinations concerning the tactics used during the incident, the propriety of the officer's actions, and the disciplinary action to be taken, if any. The FDRB gives due consideration to, and at times concurs with, the original recommendations of the shooting-team leaders and the subsequent findings and recommendations of the Borough Advisory Board, but in some cases it overrides, alters, or clarifies the preceding assessments and arrives at new, more accurate findings or more appropriate disciplinary results.

The Chief of Department then produces a Final Summary Report, which is a single document that memorializes and synthesizes the whole exhaustive investigation-and-review process. It is then presented to the Police Commissioner.

## The Police Commissioner

The final decision in all matters related to these incidents rests with the Police Commissioner. Using the recommendations from the Advisory and the Review Boards, the Police Commissioner makes a final determination regarding the incident. Once the Commissioner has issued this final determination, the incident is considered closed. The results of the 2015 findings are published throughout this report.

## Force Investigation Division

As of July 1, 2015, under the supervision of the First Deputy Commissioner, the Force Investigation Division (FID) is the sole unit responsible for investigating all aspects of firearms discharges by members of the service and deaths in custody related to police activity. FID is comprised of seasoned supervisors and investigators, many of whom have been involved in officer-involved shootings. Their purpose is to maximize the timeliness, transparency, and thoroughness of investigations into officer-involved shootings.

Investigations into officer involved shootings are multi-faceted. The duties and responsibilities of FID personnel include the building of prosecutorial cases against perpetrators involved in criminal acts against officers, as well as assessing the culpability of officers' actions and determining if they comply with New York State Law, and adhere to Department guidelines with regard to their application of deadly physical force. The completed investigations are presented to the First Deputy Commissioner's Use of Force Review Board for final determination. This Board is chaired by the First Deputy Commissioner and has officially absorbed the duties and responsibilities of the Borough Firearms Discharge Review Board and Chief of Department's FDRB.

Investigators take an objective look at the circumstances of discharges as they relate to the tactics employed, equipment available, and what can be learned and improved upon from these rapidly unfolding incidents. A team of investigators assesses strategies, creates lesson plans, and lectures in-service audiences so that members performing enforcement duty are made aware of best practices and tactical concerns in a timely manner.

# Anatomy of a Firearms Discharge Investigation




*Figure 1*

*The Department adopted a new model midway through 2015. The 2016 AFDR will reflect the new model as 2016 is the first full year of use.

| Glossary | |
|---|---|
| Officer | A uniformed member of the New York City Police Department of any rank. |
| Subject | A person engaged in adversarial conflict with an officer or a third party, which results in a firearms discharge. |
| Civilian | A person who is not the subject of an adversarial conflict, but is a crime-victim, bystander, and/or injured person. |
| Firearms Discharge | An incident in which an officer discharges any firearm, or when a firearm belonging to an officer is discharged by any person, excluding discharges during authorized training sessions, lawful target practice, or at a firearms safety station within a Department facility. |
| Intentional Discharge – Adversarial Conflict | An incident in which an officer intentionally discharges a firearm in defense of self, or another, during an adversarial conflict with a subject, including those inside the scope of the officer's employment but outside Department guidelines. This does not include a discharge against an animal attack. |
| Mistaken Identity Discharge | An incident in which an officer intentionally discharges a firearm at another law-enforcement officer whom the discharging officer mistakenly believes to be a criminal. This does not include crossfire incidents in which a discharging officer unintentionally strikes another officer. |
| Intentional Discharge – Animal Attack | An incident in which an officer intentionally discharges a firearm in defense of self, or another, against an animal attack, including those inside the scope of the officer's employment but outside Department guidelines. |
| Intentional Discharge – No Conflict | An incident in which an officer intentionally discharges a firearm to summon assistance, including those inside the scope of the officer's employment but outside Department guidelines. |
| Unintentional Firearms Discharge | An incident in which an officer discharges a firearm without intent, regardless of the circumstance. |
| Unauthorized Use of a Firearm | An incident in which an officer intentionally discharges a firearm without proper legal justification and/or outside the scope of the officer's employment, or an incident in which an unauthorized person discharges an officer's firearm. This includes suicides. |
| Use/Threaten the Use of a | A contributing factor to a firearms discharge in which a subject discharges |

| | |
|---|---|
| Firearm | or threatens to discharge a firearm by displaying a firearm or what reasonably appears to be a firearm, or by simulating a firearm or making a gesture indicative of threatening to use a firearm. |
| Firearm | A pistol, revolver, shotgun, or rifle, including a variation of any of these (e.g., a sawed-off shotgun, etc.). |
| Imitation Firearm | Any instrument that is designed to appear as if it were a firearm, or modified to appear as if it were a firearm, including air pistols, toy guns, prop guns, and replicas. |
| Use/Threaten the Use of a Cutting Instrument | A contributing factor to a firearms discharge in which a subject cuts, stabs, or slashes a person with any cutting instrument or threatens or attempts to do the same while armed with a cutting instrument or what reasonably appears to be a cutting instrument. |
| Cutting Instrument | Any knife, razor, sword, or other sharp-edged object such as a broken bottle. |
| Use/Threaten the Use of a Blunt Instrument | A contributing factor to a firearms discharge in which a subject strikes another person with a blunt instrument or threatens or attempts to do the same while armed with a blunt instrument or what reasonably appears to be a blunt instrument. |
| Blunt Instrument | Any bat, stick, pipe, metal knuckles, or object which, when used as a weapon, can cause blunt-force injury to a person, including motor vehicles and unbroken bottles. |
| Use/Threaten the Use of Overwhelming Physical Force | An incident in which an unarmed subject physically attacks a person or threatens or attempts to do the same, and by doing so puts the victim at risk of serious physical injury or death, including gang assaults, attempts to push a person from a roof or train platform, and attempts to take an officer's firearm. |

| Historical Snapshot, 2005-2015 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** |
| **Adversarial Conflict** | 59 | 59 | 45 | 49 | 47 | 33 | 36 | 45 | 40 | 35 | 33 |
| **Animal Attack** | 32 | 30 | 39 | 30 | 28 | 30 | 36 | 24 | 19 | 18 | 15 |
| **Unintentional Discharge** | 25 | 26 | 15 | 15 | 23 | 21 | 15 | 21 | 12 | 18 | 15 |
| **Mistaken Identity** | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Unauthorized Use of a Firearm** | 6 | 8 | 6 | 3 | 4 | 6 | 2 | 6 | 2 | 4 | 2 |
| **MOS Suicide/Attempted Suicide** | 3 | 3 | 6 | 8 | 3 | 2 | 3 | 9 | 8 | 4 | 2 |
| **Total** | **125** | **127** | **111** | **105** | **106** | **92** | **92** | **105** | **81** | **79** | **67** |

*Figure 2*




*Figure 3*




*Figure 4*




*Figure 5*




*Figure 6*

| 2014 vs. 2015 Snapshot | | | |
|---|---|---|---|
| **Category** | **2014** | **2015** | **Change** |
| Intentional Discharge - Adversarial Conflict | 35 | 33 | -5.7% |
| Intentional Discharge - Animal Attack | 18 | 15 | -16.7% |
| Unintentional Discharge | 18 | 15 | -16.7% |
| Unauthorized Use of a Firearm (Including Suicide) | 8 | 4 | -50.0% |
| **Total Firearms Discharges** | **79** | **67** | **-15.2%** |
| Total Officers Firing | 104 | 89 | -14.4% |
| Total Shots Fired | 315 | 351 | 11.4% |
| Total Officers Shot and Injured by Subjects | 2 | 3 | 50.0% |
| Total Officers Shot and Killed by Subjects | 2 | 2 | 0.0% |
| Total Subjects Shot and Injured by Officers during ID- AC | 14 | 15 | 7.1% |
| Total Subjects Shot and Killed by Officers during ID-AC | 8 | 8 | 0.0% |

*Figure 7*

| 2015 by Category | |
|---|---|
| **Intentional Discharge - Adversarial Conflict** | |
| Subject Used/Threatened Use of a Firearm | 23 |
| Subject Used/Threatened Use of a Cutting Instrument | 4 |
| Subject Used/Threatened Use of a Blunt Instrument or Vehicle | 2 |
| Subject Used/Threatened Use of Overwhelming Physical Force | 2 |
| Perceived Threat | 2 |
| **Total** | **33** |
| **Intentional Discharge - Animal Attack** | |
| Dog Attack | 15 |
| Other Animal Attack | 0 |
| **Total** | **15** |
| **Unintentional Discharge** | |
| During Adversarial Conflict | 1 |
| Handling/Cleaning Firearm | 14 |
| **Total** | **15** |
| **Unauthorized Use of Firearm** | |
| Suicide | 2 |
| Attempted Suicide | 0 |
| Unauthorized Person Discharged Officer's Firearm | 1 |
| Other | 1 |
| **Total** | **4** |
| **Total Firearms Discharges** | **67** |

*Figure 7A*

## 2015 Firearms Discharge Scope

| 2015 Firearms Discharge Scope | |
|---|---|
| New York Population (U.S. Census, 2015) | 8,175,133 |
| NYPD Average Annual Uniformed Staffing | 35,217 |
| Total Radio Assignments | 4,580,537 |
| Radio Assignments Involving Weapons | 66,477 |
| Gun Arrests | 4,924 |
| Criminal Shooting Incidents | 1,138 |
| Adversarial Conflict: Total Number of Officers Who Intentionally Fired | 55 |
| Adversarial Conflict: Total Number of Firearms Discharge Incidents | 33 |
| Subjects Shot and Injured during ID-AC | 15 |
| Subjects Shot and Killed during ID-AC | 8 |
| Officers Shot and Injured during ID-AC | 3 |
| Officers Shot and Killed | 2 |

*Figure 8*

# 2015 Report

## Total Firearms Discharges

In 2015, the Department continued to experience a decline in discharge incidents (See Figure 2). In fact, 2015 was the lowest recording of discharge incidents since official recording began in 1971. In particular, total discharges decreased 40% since 2007, when the new reporting model began, and 15% since 2014 (see Figure 7). Likewise, the most serious category of discharges (Intentional Discharge – Adversarial Conflict) also mirrors this trend, down 27% since 2007, and 5.7% since 2014 (see Figure 7). Approximately 35,000 uniformed officers police the City's 8.2 million residents; of approximately 35,000 uniformed members, 55 officers were involved in a total of 33 incidents of intentional firearms discharges during adversarial conflict, resulting in 15 injured subjects, and eight killed (see Figure 8).

These data are a testament to NYPD police officers' restraint, diligence, and honorable performance of duty. They also show that, over the past four decades, attacks on both police and citizens have steadily declined. The drastic reduction in violent crime over the past 25 years is sociologically reflexive: as crime decreases, criminals and police enter into less adversarial conflict.

This report is subdivided into five categories. Each category is analyzed based only on the information in that category, allowing the Department to understand specific types of incidents and adjust training and policy to continue to reduce them. Nevertheless, the relatively small sample studied for the report (67 discharge incidents, 33 in the Adversarial Conflict category) can limit the predictive value and conclusions that may be derived.

The report contains information compiled from preliminary and final Shooting Incident Reports, detective case files, medical examiner's reports, Firearms Discharge Assault Reports, arrest and complaint reports, Firearms Analysis Section reports, Firearms Discharge Review Board findings, and previous Annual Firearms Discharge Reports.

Because of rounding, some charts may not precisely equal 100%.

## Categories

- **Intentional Discharge – Adversarial Conflict**: when an officer intentionally discharges his or her firearm during a confrontation with a subject
- **Intentional Discharge – Animal Attack**: when an officer intentionally discharges his or her firearm to defend against an animal attack
- **Unintentional Discharge**: when an officer unintentionally discharges his or her firearm
- **Unauthorized Use of a Firearm**: when an officer intentionally discharges his or her firearm outside the scope of his or her employment, or when another person illegally discharges an officer's firearm

- **Mistaken Identity**: when an officer intentionally fires on another officer in the mistaken belief that the other officer is a criminal subject

The possibility of a sixth category, *Intentional Discharge – No Conflict*, exists, but its occurrence is extremely uncommon. *Intentional Discharge – No Conflict* involves an officer discharging his or her firearm to summon assistance. Because of the rarity of this type of discharge, it is not regularly tracked in the annual report, but is addressed on an as-it-occurs basis. In 2015, no such discharge occurred; no such discharge has occurred in more than a decade.

# Part II: Intentional Discharge – Adversarial Conflict

## Overview

There were 33 total incidents of intentional firearm discharges during adversarial conflict (ID-AC) in 2015, constituting a 5.7% decrease from 2014 (see Figure 7). In total, 55 officers were involved in these incidents, a 5.2% decrease from the previous year.

Forty-seven subjects were involved in ID-AC incidents in 2015, 23 of whom were shot in the course of the conflict, one more than the previous year where 22 subjects were shot (see Figure 7). Overall, the number of subject deaths as a result of ID-AC incidents remained unchanged from 2014 to 2015 (eight vs. eight).

Three officers were shot and injured by criminals in ID-AC incidents in 2015, one more than the previous year, and significantly lower than the 13 incidents recorded in 2012. Three officers were shot in two separate ID-AC incidents; of the three officers shot and injured, none suffered a wound that could have been mitigated by a bullet-resistant vest. There were two line-of-duty deaths by firearm in 2015, with one officer death during an ID-AC incident.[4] Also, no officers were struck by crossfire in 2015.

On six separate occasions, officers intervened during assaults on civilians (five involving a firearms attack and one during a knife assault).

## Dates and Times of Discharges

The distribution of ID-AC incidents was relatively consistent throughout the calendar year. Exceptions included February, with zero incidents for the entire month, July, which had one, and June, which had six. Two, three, or four incidents were recorded in every other month (see Appendix G). Overall, ID-AC incidents exhibited no discernible seasonable pattern in 2015.

ID-AC incidents were most likely to occur on either Wednesday or Friday of a given week (eight incidents each), with Sunday being the day that was least likely to incur an ID-AC incident (one incident). This is in contrast to 2014, which recorded Sunday as the day with the highest number of ID-AC incidents (ten incidents).



*Figure 9*

In 2015, approximately 40% of ID-AC incidents occurred during the third platoon (between 1531 hours and 2330 hours), while in the preceding year, 57% occurred on the third platoon (see Figure 9).

[4] Since the officers were unable to return gunfire in one incident, it was not recorded as an ID-AC incident and, therefore, not reflected in this report.

## Locations of Discharges

Most firearms discharges by members of the service transpire within the five counties comprising New York City. In 2015, 30 of the 33 ID-AC incidents occurred within City limits, with the remaining three occurring in Westchester County. Of the 30 within-City incidents, 17 of those occurred in Brooklyn. Each Borough experienced at least two ID-AC incidents; despite Brooklyn comprising over half of the 2015 total (see Figure 10).

ID-AC incidents occurred in 21 separate precincts throughout the City, seven of which had more than one incident. The 75th and 83rd Precincts were the only precincts with three distinct ID-AC incidents in 2015; this is a decrease from 2014, when a single precinct recorded five incidents.

**ID-AC Incidents by Location**




*Figure 10*

## Locations of Criminal Shootings

The locations of ID-AC incidents largely correspond with wider geographic crime patterns, which can be seen when comparing ID-AC locations to locations of criminal shootings. Figure 11 depicts the 30 ID-AC incidents overlaying the locations of the 1,138 criminal shootings that occurred in New York City in 2015. The map shows that police firearms discharges occur in those areas of the City already suffering from high gun violence. In addition, figure 12 depicts confirmed ShotSpotter incidents from March to December 2015. ShotSpotter is a relatively new technological innovation that cues officers to the locations where gunfire is erupting. Upon juxtaposition of figures 11 and 12, it is evident that the clustering of confirmed ShotSpotter detections correlates well with the location of ID-AC incidents.

Since introduction of the map depicting both criminal shooting incidents and ID-AC in the 2007 Firearms Discharge Report, this correlation has been generally preserved. The frequency of criminal gun activity within New York City directly, and proportionally, affects the frequency and location of police involved shootings; this proportionality is visible at the borough level in figure 13, although in 2015 Brooklyn showed an increase in the percentage of ID-AC incidents as compared to criminal shootings and the Bronx showed a decrease. However, the number of within the City ID-AC incidents (30) is comparatively small against the backdrop of Citywide criminal shootings, with police involved in less than 3% of total shootings for the City in 2015 (see Figure 14).


2015 Shooting Incidents and Intentional Discharges - Adversarial
Legend
Firearm Discharge - Adversarial (30) within NYC
Shooting Incidents (1,138)
Precinct Boundary
N
W
E
S

*Figure 11*


CY 2015 ShotSpotter Incidents
Legend
ShotSpotter Incident, N=1805
Precinct Boundary
Incident Data: DAS-Lite

*Figure 12*




*Figure 13*




*Figure 14*

## Location Type

Of the 33 ID-AC incidents in 2015, 27 occurred in outdoor settings, primarily on streets and sidewalks, and the remaining six occurred indoors, encompassing residential buildings and their immediate areas (see Figure 15). Twenty-five within-City incidents occurred within the jurisdiction of the Patrol Services Bureau (PSB), with the remaining five on New York City Housing Authority (NYCHA) property.

Of the five ID-AC incidents that occurred on NYCHA property, four occurred in Brooklyn (encompassing the Van Dyke, Pennsylvania Avenue-Wortman Avenue, Lafayette Gardens, and Walt Whitman Houses) and one in Manhattan (Vladeck Houses). Of these, three incidents occurred outdoors, one occurred in an apartment, and the last in a stairwell.




*Figure 15*

## Reasons Officer Involved

Fifty-five officers were involved in 33 discrete ID-AC incidents in 2015. The variety of officer motive is apparent given the variable nature of policing and the myriad functions that officers fulfill on a daily basis. Similar to 2014, the vast majority (95%) of ID-AC incidents involved officers who were on-duty. Three incidents involved officers who were off-duty. In two off-duty incidents, the officer was the victim of a robbery and in the third; the officer was the victim of a larceny. The majority of officers (55%) were in plainclothes or civilian attire at the outset of the incident. Uniformed officers accounted for 45% of ID-AC incidents, and approximately two-thirds (62%) were assigned to the Patrol, Transit, or Housing Bureaus.

Approximately 31% of officers were either on uniformed foot posts or in sector cars assigned to respond to 9-1-1 calls from the public when they became involved in ID-AC incidents (see Figure 16). Although officers assigned to specialty units (i.e., anti-crime) represent a small proportion of the Department's uniformed

personnel, roughly one-third of ID-AC incidents involved these officers. This is almost certainly attributable to their mandate to proactively pursue criminals rather than answer calls for service. The variety of scenarios that precipitated the involvement of these officers in ID-AC encounters is indicative of an officer's need for perpetual vigilance.




*Figure 16*

As discussed, the variety of situations precipitating officers becoming involved in ID-AC incidents was broad. The most common, constituting roughly one-third of all within-City incidents, was either a random pick-up assignment (i.e., pick-up shots fired), or 9-1-1 call involving shots fired while on routine patrol (see Figure 17). Over half of the within-City ID-AC incidents occurred as a result of pick-up assignments (i.e., situations that officers encounter on patrol without being directed to a location by a dispatcher), indicating that the majority of encounters are precipitated by officer observation of criminal activity in the field.




*Figure 17*

## Threat Type

Department policy requires officers who intentionally discharge their firearms during ID-AC incidents to do so only as a means of defending themselves or others from imminent serious physical injury or death.

The subjects involved in ID-AC incidents utilized a variety of weapons when confronting officers. Twenty subjects in 33 incidents possessed firearms: 15 were semi-automatic pistols, four were revolvers, and one was an assault rifle. Three subjects carried imitation firearms (BB guns and pellet guns). Four subjects were armed with knives. On one occasion, the subject utilized a blunt instrument (hammer), and during two incidents, officers perceived the threat of a weapon (subject reached for a knife and subject made gestures indicative of threatening the use of a firearm) (see Figure 18).




*Figure 18*

## Officer Restraint

Officers discharged a total of 306 rounds during ID-AC incidents in 2015, an increase of 34.8% from 2014 when 227 rounds were fired, but still 8% lower than the total of 331 recorded in 2012. The majority of officers fired five rounds or fewer (65%) during incidents of adversarial conflict. The most common number of rounds fired by an officer was two to five rounds (36%). Six officers fired more than 15 rounds, constituting 11% of the total numbers of officers involved in an ID-AC incident (see Figure 20).




*Figure 19*




*Figure 20*

Restraint is also apparent when analyzing the number of rounds discharged per ID-AC incident as opposed to per officer. The most common number of rounds fired during any incident was two to five (39%); combining this figure with the number incidents in which officers fired only one round, and approximately three-quarters of all ID-AC incidents involved the discharge of 5 rounds or less (see Figure 19). The most rounds fired during any one incident was 84. During this one exceptional incident, four officers assigned to the 83rd Precinct and two officers assigned to the 81st Precinct were involved in a protracted foot pursuit with a male perpetrator who recently assaulted a person with a firearm. During the pursuit, the perpetrator fired multiple rounds indiscriminately toward responding officers. After a prolonged engagement, officers were able to subdue the subject, with the subject sustaining a gunshot wound to his calf. One .45 caliber semi-automatic pistol was recovered from the scene.

## Objective Completion Rate

The Department does not consider hit percentages, in part because it is often unknown (e.g., in cases when a subject flees), and also because of the widely varying circumstances among incidents. Instead, the objective completion rate per incident is employed, as it is both more accurate and more instructive. Like combat itself, the objective completion rate per incident is pass/fail. When an officer properly and lawfully perceives a threat severe enough to require the use of his or her firearm, and fires at a specific threat, the most relevant measure is whether he or she ultimately stops the threat. This is the objective completion rate, and it is determined irrespective of the number of shots the officer fired at the subject. The objective completion rate is used for statistical purposes and is not a factor in individual investigations.

In 2015, officers hit at least one subject in 23 of the 33 ID-AC incidents, for an objective completion rate of 70%. The objective completion rate in 2014 was 63%. Because subjects in three incidents were not apprehended, the objective completion rate may be higher. In ten instances where officers were directly fired upon, officers hit at least one subject in six of those incidents, for an objective completion rate of 60%; three subjects were killed during these exchanges.

## Officer Firearms

In 2015, officers involved in ID-AC incidents discharged rounds from the following firearms: 21 were from Glocks, 16 were from Smith & Wessons, and 12 were from Sig Sauer 9mm's; five were from Colt M4's, and one was from a Heckler & Koch MP5. Department regulations allow officers to carry their on-duty service firearms while off-duty, and authorized off-duty firearms as secondary weapons while on-duty. No officer reported a firearms malfunction.

### Shooting Technique

Utilizing a two-handed grip, standing, carefully lining up a target and using the firearm's sights is not always practical during adversarial conflict. Of the officers who reported how they held their firearms: 48% utilized a two-handed, supported position, while 12% reported a one-handed, unsupported position. With respect to officer stance, 87% of officers were in a standing position, 4% were in a seated position, and the position or posture of the remaining 9% of officers is undetermined.



*Figure 21*

Lack of cover can be a factor in the need for a firearms discharge, because a protected defensive position may allow officers to better control the pace of an incident. Eighteen officers reported that they were able to take cover during ID-AC incidents; during one incident in particular, seven officers assigned to the Emergency Service Unit took cover behind an armoured vehicle/rolling bunker. Overall, most of the officers involved utilized a vehicle, or part of a vehicle (i.e., door or door frame) as their primary form of ballistic protection.

Fifteen officers provided information about how far they were from their targets during ID-AC incidents. Although officers are trained to fire on a target from as far away as seventy-five feet, seven officers reported that they were 15 feet or fewer from the target at the time of the shooting (see Figure 21).

Information was provided with respect to lighting conditions in 11 separate incidents: 45% reported poor or dark lighting, including one incident that occurred in the rain, and 55% reported that there was ample lighting, either from sunlight or artificial lighting.

## Officer Pedigree

Of the 55 officers who intentionally discharged their firearms during ID-AC incidents in 2015, 2 were female (4%) and 53 were male (96%); 17% of the Department's uniformed personnel are female and 83% are male.

Considering both current data and data from prior years, no discernible pattern emerges with regard to the likelihood that an officer of any particular race will become involved in an ID-AC incident (See Figure 22). Historically, members of the service in the rank of police officer with fewer years of aggregate service are significantly more likely to be involved in ID-AC incidents when compared with those officers of longer tenure, or officers of higher rank. Officers in the rank of police officer were involved in 56% of ID-AC incidents in 2015, although they accounted for 65% of the Department's total uniformed staffing. Officers in the rank of detective were involved in 29% of ID-AC incidents, though they comprise 14% of the Department's total uniformed staffing. Fifty percent of the detectives involved in ID-AC incidents were assigned to the Emergency Service Unit (ESU) and, as such, are regularly requested to respond to incidents that involve armed subjects. In one incident, six detectives assigned to ESU discharged their firearms at a subject armed with an assault rifle who had been firing the assault rifle at the officers. Officers with ten years of service or less were involved in 52% of ID-AC incidents, although they accounted for 55% of the Department's total uniformed staffing. Typically, officers with fewer years of aggregate service have a greater likelihood of becoming embroiled in ID-AC incidents (see Figures 23 & 24)




*Figure 22*




*Figure 23*




*Figure 24*

## Subject Pedigree

There were a total of 47 perpetrators involved in ID-AC incidents in 2015, all of whom were male. Forty-two of the 47 subjects were apprehended, while five remain un-apprehended, four of whom are known only by sex and race.

Known subject ages ranged from 16 to 58 years-of-age, with a median age of 27. Approximately 70% of involved subjects were 30 years-of-age or younger.

The race of a criminal suspect is determined by eyewitness reports, usually that of the victim(s). The race of a subject is determined by a subject's self-identification, existing government-issued documentation, racial/ethnic physical characteristics, medical examiner reports, or other factors.

The race of subjects involved in ID-AC incidents corresponds to the race of subjects involved in criminal shootings (see Figure 25). Similarly, victims of criminal shootings tend to come from the same communities as the suspects. Among criminal-shooting victims identified by race in New York City in 2015, 73% were black, 13% were Hispanic, 9% were white, and 4% were Asian or other.




*Figure 25*

## Prior Arrests

Generally, a subject's arrest history is unknown to the officer at the onset of an incident. Nevertheless, arrest history is pertinent because it is indicative of a subject's propensity for criminal conduct and capacity for violence when confronting a police officer. It can evince itself in a subject's bearing, actions, and reactions. An arrest history, pending charges, or parole/probation status may also make a subject more willing to confront a police officer in an attempt to avoid arrest.

All but one apprehended subject involved in ID-AC incidents had a known criminal history. Four subjects still remain unidentified at the time of this report. Of the 41 subjects with a known criminal history, 36 had multiple prior arrests, ranging from two to 23 arrests. These arrests were for numerous offenses, including attempted murder, robbery, assault, and criminal possession of a weapon. The distribution of prior arrests across known subjects remains relatively symmetric—with the mean, median, and modal number of prior arrests nearing 10. Although the status of a criminal offender remains unknown during adversarial engagements, it is certainly predictive of an offender's involvement in violent altercations with law enforcement.

## Officer Deaths

One officer was killed during an ID-AC incident in 2015. The plainclothes officer was fatally shot while responding to a shooting incident that occurred within the confines of Police Service Area 5. After the officer confronted the fleeing perpetrator in the nearby 25th Precinct, the perpetrator fired one round in the officer's direction, striking him in the head. His partner at the time exchanged gunfire with the perpetrator.

One additional officer was shot and killed in 2015; however, the officers involved did not discharge their weapons during the incident so data with respect to this incident is not included within this report. The plainclothes police officer was killed in the confines of the 105th Precinct while on routine patrol. While seated in their unmarked vehicle, both the deceased officer and his partner confronted a person believed to be concealing a firearm in his waistband. The perpetrator brandished a loaded firearm from his waist and discharged multiple rounds into the officers' vehicle. One of the officers was fatally wounded during this assault and succumbed to his injuries two days later.

## Officer Injuries

Five officers were injured in the course of ID-AC incidents. Three were struck by a subject's bullets, one of whom was able to return fire causing the subject to flee. One officer sustained abrasions to her shoulder and back as a result of an assault with a hammer, and one officer sustained wounds to his shoulder from a knife assault.

## Bullet-Resistant Vests

Out of 52 on-duty officers who were involved in ID-AC incidents in 2015, 47 were wearing bullet-resistant vests. Three off-duty officers involved in an ID-AC incident were not wearing their vests during the conflict. One off-duty officer was injured by a subject's firearm. No officers were struck in the torso by a subject's weapon, and as such, no case of an officer being saved by their vest was recorded in ID-AC incidents in 2015.

## Subject Deaths

Of the 47 known subjects involved in ID-AC incidents in 2015, eight were killed by police gunfire. This figure has remained constant since 2013, but down 50% from 2012 when 16 subjects were shot and killed by police officers. The number of subjects shot and killed between 2013 and 2015 inclusive, represents the lowest figures recorded since the Department began collecting in-depth statistics in 1971. All eight subjects that were killed by police gunfire during an ID-AC incident had prior arrest histories, and, of the seven toxicology reports available at time of this report, four showed the presence of drugs or alcohol.

Officer's perceived the presence of a dangerous weapon in six of the eight incidents. Four were actual firearms capable of discharging live rounds, and one was a pellet gun. In one incident the perpetrator was killed after he assaulted the officer with a knife. Of the remaining two incidents in which no weapons were

recovered at the scene, the officers discharged their weapons while they were attempting to restrain the perpetrators; during one incident in particular the perpetrator was attempting to remove the officer's firearm from his holster. Narratives describing the eight ID-AC incidents in which subjects were killed can be found in Appendix D.

## Subject Injuries

Fifteen subjects were shot and injured by police gunfire in 2015, all of whom had prior arrests. Eight were armed with firearms, two were armed with imitation pistols, two were armed with knives, one was armed with a hammer, and one was reaching for a knife.

## Bystander Deaths and Injuries

One bystander was killed by police gunfire in 2015. An undercover officer assigned to the Firearms Investigation Unit (FIU) was engaged in an ongoing investigating into the sale of illegal firearms. The undercover officer became the victim of a robbery, by a person known to this Department, while attempting to engage in a firearms transaction. During the confrontation, the officer was fired upon by the suspect. One bystander was fatally wounded as the officer returned gunfire. During the follow-up investigation, an imitation pistol (BB gun) was recovered at the scene.

In two other incidents, bystanders suffered non-fatal injuries. During an exchange of gunfire between officers and an armed perpetrator, one discharged round went through the windshield of a vehicle; shards of glass resulted in a civilian eyewitness suffering a laceration to her eye. In another incident, the perpetrator held a civilian at gunpoint before turning the weapon on responding officers; the civilian suffered a non-fatal gunshot wound to her left shoulder. At the time of this report, it is unclear whether the civilian's injuries were caused by discharged rounds belonging to the responding officers' or perpetrator.

## Discipline

Even when intentional firearms discharges are deemed justifiable in a court of law, they are still reviewed by the Department for tactical errors and violations of procedure. Discipline in these cases does not always relate to the actual discharge of the firearm, but can result from a violation of other Department procedures. Additionally, all officers who discharge their firearms are sent to a firearms retraining course, regardless of the circumstances of the discharge.

Of the seven investigations that have been completed at the time of this report, six were determined to have been in compliance with Department procedures and the law, and one was found to be in violation of Department guidelines.

## Summary

There were 33 ID-AC incidents in 2015, involving 55 officers who discharged their firearms. These conflicts involved 42 known subjects and five unknown and/or un-apprehended subjects. In ten separate ID-AC incidents at least 11 subjects fired directly at officers.

In 2015, there were 1,138 victims of criminal shootings in New York City. The number of intentional firearm discharges by police, comparatively, is very small, but every time an officer discharges a firearm he or she risks inflicting injury or death on subjects, fellow police officers, or innocent bystanders. And in 2015, two bystanders were injured and one was killed by police gunfire. Because of this, the Department ensures that each incident is thoroughly investigated and analyzed in order to reduce these events, thereby reducing the likelihood of harm to civilians and officers alike.

There were, on average, 35,217 uniformed officers employed by the NYPD in 2015. Of them, 55 (0.16%) intentionally discharged a firearm at a subject.

Other instructive metrics involve comparing the number of ID-AC incidents to the number of high risk radio runs, or to the number of arrests of armed suspects made by officers each year. Over the course of 2015, officers responded to more than 4.5 million calls for service, of which more than 66,000 involved weapons. Of the thousands of weapons arrests that resulted from these encounters, 4,924 were gun-related. Officers also had millions of additional interactions with the public, including reasonable suspicion encounters, car stops, and violation stops, and further, escorted thousands of emotionally disturbed persons to hospitals and care facilities. In the overwhelming majority of incidents in which officers took an armed subject or an emotionally disturbed person into custody, they did not fire their weapons.

# Part III: Intentional Discharge – Animal Attack

# Overview

Department policy requires officers who intentionally discharge their firearms during animal attacks to do so only to defend themselves or others from the threat of physical injury, serious physical injury, or death, and to use their firearm only as a last resort to stop an animal attack. Officers are equipped with non-lethal tools that can be used to cope with animal attacks, including batons and OC spray, but these options are not always feasible or effective.

However, in the latter half of 2015, executive approval was obtained for the Firearms and Tactics Section to purchase 20,200 canisters of OC/Pepper Spray with increased potency. The new formulation contains a significantly higher concentration of Major Capsaicinoids. With this upgrade, NYPD service members are equipped with a more effective, less lethal option. Currently, canisters with the new formula are being issued to members of the service performing patrol duties within the Patrol, Transit, and Housing Bureaus. The remainder of the Department will be issued their new OC sprays at a later date.

Emergency Service Unit personnel carry restraining devices to keep animals at a safe distance, as well as $CO_2$ pistols and rifles capable of firing tranquilizer darts containing Ketaset, a veterinary anesthetic, and Animal Care and Control is also available to assist officers in capturing dangerous dogs or other animals. In rapidly evolving situations, however, when officers may not have prior knowledge that a dog is present, these options are not always prudent or possible.

There were 15 intentional firearms discharges during an animal attack (ID-AA) in 2015, representing an 11.1% decrease from 2014. Thirteen of the 15 were on-duty incidents; the remaining two involved off-duty members. A total of 15 officers discharged their firearms.

Eighteen animals—all of them dogs—were involved in 15 separate incidents; sixteen of the dogs were Pit Bulls, one was a German Shepherd, and one was a Rottweiler; two Pit Bulls were involved in three separate incidents, accounting for any disparity between the total number of incidents and the number of animals. Of the 18 dogs involved, four were killed and an additional eight were injured. Two officers and three civilians were bitten during these exchanges. One officer was shot and four civilians were struck by fragments and debris.

These numbers do not encompass all dog attacks on officers or civilians; only incidents involving intentional firearms discharges by police officers are included. In 2015, police officers responded to thousands of calls for service involving dogs and other animals, and they encountered many more while on patrol, executing search warrants, or investigating complaints—incidents that were not processed through 9-1-1 or 3-1-1.

## ID-AA Incidents by Tour




*Figure 26*

## Dates and Times of Discharges

ID-AA incidents were scattered throughout the year in 2015. April recorded the most incidents (three total), with the months of May, June, and September recording zero (see Appendix G).

Twelve of the 15 ID-AA incidents occurred on Wednesday, Thursday, and Saturday (four incidents each). The remaining three occurred on Monday, Tuesday, and Friday (one incident each); there were no incidents on Sunday. Seven of the 15 or 47% of total incidents occurred during the third platoon, between 1531 in the afternoon and 2330 at night (see Figure 26).


ID / AA Incidents
Legend
Animal Attact Incidents (14) within NYC
Precinct Boundary
N
W
E
S

*Figure 27*

## Locations of Discharges

Of the 15 total ID-AA incidents in 2015, 14 occurred within New York City, and one in Nassau County. Of the 14 within-City incidents, 13 occurred within the jurisdiction of the Patrol Services Bureau, and the remaining was on Housing Development grounds (Eleanor Roosevelt II Houses). No incidents took place within the Metropolitan Transportation Authority (MTA) transit system. Brooklyn and Queens accounted for 80% of ID-AA incidents in 2015, with a total of six incidents each (see Figures 27 and 28). ID-AA incidents occurred in 13 separate precincts; the 113th precinct was the only command to have two separate incidents in 2015. Nine ID-AA incidents occurred in outdoor settings (i.e., on sidewalks and streets), and the remaining six occurred in indoor, residential locations (see Figure 29).




*Figure 28*




*Figure 29*

## Reasons Officer Involved

Officers became involved in ID-AA incidents for a variety of reasons. Thirteen officers were on-duty at the time of the incident. Overall, uniformed patrol assignments were more likely to be involved in ID-AA incidents in 2015. Of the on-duty members involved: 11 were assigned to uniformed patrol and one was assigned to Operation Impact (within the Patrol Services Bureau and the Housing Bureau). One officer was assigned to the Narcotics Division (see Figure 30).




*Figure 30*

The most common reasons precipitating ID-AA incidents were pick-up assignments involving a dog attack, calls for service involving a suspicious/vicious dog, and calls for service involving assaults. Sixty percent of these encounters were precipitated by 9-1-1 requests made by private citizens; the remaining resulted from independent observations and/or investigations conducted by NYPD service members (see Figure 31).




*Figure 31*

## Officer Restraint

A total of 26 rounds were fired by officers during ID-AA incidents in 2015, a decrease of 41% from 2014, when 44 rounds were fired. In fourteen of the 15 ID-AA incidents, officers fired 5 rounds or less; nine

incidents involved the discharge of only one round. Only one officer fired more than five times, and none were required to reload their firearm during an incident (see Figure 32).

Restraint is also apparent when analyzing the number of shots fired per ID-AA incident. In 60% of incidents, only one round in total was fired. The most rounds fired during any incident were six (see Figure 33).




*Figure 32*

## Objective Completion Rate

In 2015, officers struck 12 animals in 15 discrete ID-AA incidents, for an objective completion rate of 80%. This is significantly higher than the objective completion rate for ID-AC incidents. A likely explanation for this higher rate of completion is that, where listed, officers involved in ID-AA incidents were predominantly between one and five feet from the animal when they fired.

## Firearms

All 15 officers who fired their weapons during ID-AA incidents in 2015 utilized 9mm firearms—11 were Glocks (ten 'Model 19' and one 'Model 26') and four were Smith & Wessons (one off-duty 9mm was used by an off-duty member). No officers reported malfunctions during animal attack incidents.




*Figure 33*

## Shooting Techniques

Utilizing a two-handed grip, standing, and lining up a target using the firearm's sights is the preferred method of discharging a firearm, but the fast-paced nature of dog attacks often renders these tactical maneuvers impracticable during the course of duty. Nine of the 15 officers who discharged their firearm during an animal attack incident reported their grip. Eighty-nine percent utilized a two-handed grip, while the remaining 11% reported that they held their firearm with a one-handed, unsupported grip.

Seven officers discharged their firearms when the dogs were seven feet away or closer; an additional five officers discharged their weapons when the dog was between eight to fifteen feet away. The officers that discharged their firearms were unable to take cover during the animal attack.

Eight officers reported on light conditions. Four incidents occurred during daylight hours; in the other four incidents, officers reported adequate, artificial lighting.

## Officer Pedigree

Of the 15 officers who intentionally discharged their firearms during ID-AA incidents in 2015, three were female (20%) and 12 were male (80%). These figures are relatively consistent with the Department's gender demographics; approximately 17% of the Department's uniformed personnel are female and 83% are male.

Although the percentages of White and Hispanic officers involved in ID-AA incidents are, to varying extents, at odds with their representation within the Department, the sample size of officers involved in ID-AA discharges is only 15, just a small fraction of the Department's total uniformed personnel. These figures are therefore not useful in determining the likelihood that an officer of any particular race will become involved in an ID-AA firearms discharge (see Figure 34). There is a greater likelihood that officers in the ranks of police officer or detective and those with fewer years of service will become involved in ID-AA incidents. These officers are more likely to be assigned to respond to 9-1-1 calls involving animal attacks. In addition, these members conduct vertical patrols, effect arrests, and engage in myriad other assignments that significantly increase the likelihood of becoming involved in an ID-AA incident (see Figures 35 and 36).




*Figure 34*




*Figure 35*




*Figure 36*

## Incident Outcomes

Of the six investigations that have been completed at the time of this report, all were determined to have been in compliance with Department firearms guidelines. Although no corrective action was instituted, re-training was recommended for five of the officers involved. Nine cases are pending.

# Part IV: Unintentional Discharge

## Overview

There were 15 incidents of unintentional firearms discharges in 2015, a 16.7% decrease from 2014, when there were 18 recorded. All 15 incidents involved a single officer, and all resulted in a single discharge.

Three incidents resulted in injuries to three separate officers: one to the right thigh and shin, one to the left thigh, and one sustained a laceration above the right eye when the round struck the ground causing concrete to fracture.

Five unintentional discharges occurred while the officer was off-duty, and 10 occurred on-duty. Two incidents occurred outside (one in a hospital parking lot and one in a marked RMP), and 14 occurred inside (eight occurred inside Department facilities, five inside officers' residences, and one inside a church gymnasium).

## Non-Adversarial Unintentional Discharges

Non-adversarial unintentional discharges occur when an officer is loading or unloading, holstering or unholstering, cleaning, or otherwise handling a firearm. In 2015, 14 of the 15 total unintentional discharges were non-adversarial, and therefore fall into this category.

### Loading/Unloading

There was one unintentional discharge in 2015 that involved an officer attempting to unload his service weapon, causing a minor injury to his left thigh.

### Handling

Thirteen non-adversarial unintentional discharges resulted from handling a firearm that was unrelated to loading or unloading a firearm, resulting in injury to two officers. In one incident, an officer accidentally discharged a round from an AR-15 rifle while attempting to voucher the firearm. In the second incident where injury occurred, the officer was seated in his personal vehicle when a round was discharged from his weapon.

Four of the unintentional discharge incidents were related to holstering/unholstering; no injuries resulted from these discharges. One officer was on duty and was attempting to holster her service weapon while sitting in a radio motor patrol (RMP) car. The other three incidents occurred while the officers were on duty in Department facilities and were attempting to holster their authorized weapons.

Three of these incidents transpired during firearm cleaning and one occurred while the officer was handling a newly purchased firearm; none resulted in any injury to MOS.

## Adversarial Unintentional Discharges

Unintentional discharges during adversarial conflict or animal attack occur during the course of lawful police conduct and are brought about either wholly, or in part, by aggravating factors, such as a suspect grabbing an officer's firearm, an officer losing his or her balance, or when an officer's shooting hand is struck by an object. One such discharge occurred while officers were conducting a search for a burglary suspect in a dimly lit church gym. An officer tripped on a commercial floor mat, causing the officer to discharge his firearm.

## Firearms

Of the 15 firearms that were unintentionally discharged in 2015, eight were the officer's service weapons, six were authorized off-duty firearms, and one was a suspect's recovered firearm. Seven of the firearms were Glocks, five were Smith and Wessons, two were Sig Sauers, and one was an AR-15 style rifle.

## Officer Pedigree

Of the 15 officers who unintentionally discharged firearms in 2015, 13 were male (87%) and two were female (13%). These figures are relatively consistent with the Department's gender demographics: approximately 83% of the Department's uniformed personnel are male and 17% are female.

Although the percentages of Black and Hispanic officers involved in unintentional discharges are, to varying extents, at odds with their representation within the Department, the sample size of officers involved in unintentional discharges is only 15, just a small fraction of the Department's total uniformed personnel. These figures are therefore not useful in determining the likelihood that an officer of any particular race will become involved in an unintentional firearms discharge (see Figure 37).




*Figure 37*

Officers with fewer years of service were more likely to be involved in unintentional firearms discharges. Of the officers with five years of service or fewer, three had performed three years of aggregate service and two had accumulated five. Six officers had performed between six to ten years of aggregate service (see Figure 38). Of the officers involved, nine were police officers, four were detectives, and two were sergeants (see Figure 39).

**Years of Service, Unintentional Discharges vs. Department Staffing**




*Figure 38*

**Rank, Unintentional Discharges vs. Department Staffing**




*Figure 39*

## Incident Outcomes

The Department investigates all unintentional firearms discharges thoroughly. One officer was placed on modified assignment and a supervisor was suspended when one unintentional discharge occurred. The investigations that have been completed at the time of this report found that officers were in violation of Department guidelines in eleven cases. The recommended discipline for involved officers ranged from a Schedule 'B' Command Discipline to *Charges and Specifications*. Retraining on relevant tactics was recommended in four cases.

# Part V: Unauthorized Use of a Firearm

## Overview

There were four firearms discharges in 2015 that were classified as unauthorized use of firearm, a 50% decrease from 2014, when eight unauthorized incidents were recorded. Two incidents involved officer suicides, one involved a domestic dispute, and the remaining involved an accidental discharge by a person who mishandled an officer's firearm. During the off-duty domestic incident, the member reportedly fired one round from his off-duty service weapon at a victim known to the Department. The member was summarily arrested by the Yonkers Police Department and placed on suspension.

## Officer Pedigree

Of the three officers who were involved in unauthorized firearms discharges in 2015, all were male; the two officer suicides involved White officers and the domestic incident involved a Hispanic officer. One member had twelve years of service, one had 16, and the remaining had over 20 years. One officer held the rank of police officer, and two were sergeants. An additional police officer with 17 years of service, permitted a civilian to hold his off duty .38 caliber revolver, and the civilian accidentally discharged a round, striking another civilian.

Unauthorized firearms discharges are a relatively infrequent occurrence, and yield no discernible or generalizable trend over time. Moreover, due to the diminutive sample that was captured in 2015—representing a small fraction of the Department's total uniformed staffing—these statistics are insufficient in determining the likelihood that an officer of any particular demographic will become involved in an unauthorized firearm discharge.

## Suicide

Two police officers committed suicide by firearm in 2015; both members were off-duty at the time of the suicide (see Figure 40*).

The Department and a number of external organizations provide mental health resources specifically targeted to uniformed members of the service who may be at risk for suicide. Department resources include the Employee Assistance Unit, the Counseling Services Unit, the Chaplain's Unit, the NYPD Helpline, and the Psychological Evaluation Unit. External resources include Police Officers Providing Peer Assistance (POPPA), the Police Self Support Group, and Columbia Cares (COPE). The Department actively promotes these resources to all uniformed police members of the service.

**Because of the focus of this report Figure 40 depicts officer suicides by firearm only. Suicides or attempted suicides by other methods were not included.*




*Figure 40*

## Discharges by Other than an Officer

There was one incident of a firearms discharge by other than an officer in 2015. One off-duty police officer permitted a friend to handle a loaded revolver and she accidentally fired one round, striking her husband in the leg.

## Incident Outcomes

The Department investigates all incidents of unauthorized use of a firearm thoroughly. In the rare case of an unauthorized discharge other than suicide, the disciplinary process will be initiated against the officer discharging the weapon, and/or the officer charged with the security of the weapon. In cases of serious misconduct, officers are arrested, suspended, and eventually terminated for their actions.

Two officers had been disciplined pending the results of the investigations, one was placed on modified assignment and the second was suspended.

# Part VI: Mistaken Identity

## Overview

The Department defines an incident of mistaken identity as one in which a New York City police officer fires on any law-enforcement agent in the mistaken belief that the subject officer is a criminal and poses an imminent physical threat. Mistaken identity incidents are distinguished from crossfire incidents in that the shooting officer is intentionally firing on the targeted officer. Unintentional crossfire incidents and accidental discharges resulting in injury or death to fellow officers are not included in this category. An unauthorized discharge, in which an officer injures or kills another officer in a criminal manner (e.g., domestic incident), is also excluded. This definition comports with the 2010 New York State Task Force on Police-on-Police Shootings' definition of "Police-on-Police Confrontations."

## 2015 Incidents

In 2015 there were no incidents of mistaken identity.

# Appendices

# Appendix A – Tribute

**DETECTIVE FIRST GRADE BRIAN MOORE**
*105th Precinct*



On May 2, 2015, Police Officer Brian Moore, assigned to the Anti-Crime Unit within the 105th Precinct observed a suspicious male walking in the street. Police Officer Moore and his partner were seated inside their vehicle when they approached the perpetrator from behind based on their belief he was carrying a firearm in his waistband. The perpetrator pulled a firearm from his waist and discharged multiple rounds into the vehicle that Police Officer Moore was seated. Police Officer Moore was struck and removed to Jamaica Hospital due to his injuries. Two days later, on May 4, 2015, Police Officer Moore succumbed to his injuries. The perpetrator was arrested a short time later and charged with first degree Murder.

Police Officer Moore was sworn in as a New York City police officer in January 2010, and served 5 years in the Police Department. Police Officer Moore lived with his parents in Massapequa, New York.

Police Officer Moore is survived by his parents: Raymond, Irene and his sister Christine. Police Officer Moore completed over 90 college credits, working towards a degree in Chemical Engineering. Police Officer Moore was laid to rest at St. Charles Cemetery in Farmingdale, New York. Police Commissioner William J. Bratton posthumously promoted Police Officer Brian Moore to Detective First Grade.

**DETECTIVE FIRST GRADE RANDOLPH HOLDER**
*Police Service Area 5*



On October 20, 2015, Police Officer Randolph Holder and his partner, responded to a 911 call of shots fired. Upon arrival, Police Officer Holder observed the perpetrator fleeing from the scene. As Police Officer Holder heroically approached the armed perpetrator, the perpetrator suddenly turned and discharged his weapon, striking and causing the death of Police Officer Holder. Shortly thereafter, the gunman was apprehended and was charged with first degree murder.

Police Officer Holder was sworn in as a New York City Police Officer in July 2010. Immigrating to the United States in November 2002, to live with his father, Police Officer Holder pursued his lifelong dream of becoming a Police Officer. He followed in his father and grandfather's footsteps, both of whom were Police Officers in his native Guyana.

Police Officer Holder is survived by his father Randolph and stepmother Princess. He held an Associate's Degree in Management. Police Officer Holder was laid to rest in his native country of Guyana. On October 28, 2015, during his funeral, Police Commissioner William J. Bratton posthumously promoted Police Officer Holder to Detective First Grade.

## Appendix B – Historical Data 1971-2015




*Figure 41*




*Figure 42*

## Subjects Shot and Injured by Officers, 1971-2015




*Figure 43*

## Subjects Shot and Killed by Officers, 1971-2015




*Figure 44*




*Figure 45*




*Figure 46*

# Appendix C: Firearms Training

## Overview

NYPD firearms training emphasizes that the ultimate goal of every police officer is to protect life. This means all lives: those of bystanders, victims, subjects, and other officers. One of the realities of police work, however, is the contradiction that can arise when it becomes necessary to protect life by using deadly physical force.

According to the New York State Penal Law, and in keeping with the Patrol Guide restrictions delineated previously in this Report, an officer may use deadly physical force when he or she has probable cause to believe that such force is necessary to protect the officer or other persons present from imminent death or serious physical injury. This includes instances in which a subject is in possession of an object that, because of its appearance and the manner in which the subject holds or uses it, gives the officer a reasonable belief that the object is capable of imminently causing death or serious physical injury.

## Shoot to Stop

Once an officer has determined that deadly physical force is warranted and necessary, the goal of using such force is not to kill, but to stop. Police officers are trained to use deadly physical force to "stop the threat" – i.e., to end the subject's ability to threaten imminent death or serious physical injury to the officer or another person. If, for example, a missed shot nevertheless causes a subject to cease and desist, then that one errant round is all that is necessary. If a subject is injured and surrenders, then shooting to stop has been accomplished. But sometimes the only means of stopping a subject is one that results in the subject's demise. Stated explicitly, however, police officers do not "shoot to kill" – they are trained to shoot to stop.

## Weapons Control

NYPD firearms training also emphasizes weapons control. With regard to shooting technique, the mechanics of pistol shooting in a controlled environment include proper grip, sight alignment, sight picture, trigger control, and breath control. All of these require a degree of concentration and fine motor skills, both of which are unfortunately the first factors impacted in a combat scenario. Training can mitigate this, but officers must be taught to rely on mechanical actions that employ gross motor skills and have as few components as possible.

## NYPD Pistols

There are three semi-automatic 9mm pistol models that are authorized as on-duty service weapons for NYPD officers: the Glock 19, the Sig Sauer P226, and the Smith & Wesson 5946. These weapons are equipped with 15 round magazines, and, with one round in the chamber, each firearm is capable of holding 16 total rounds. Additionally, there are several weapons authorized for off-duty carry, such as the Glock 26, the Smith & Wesson 3914, the Smith & Wesson 3953, the Sig Sauer P239, and the Beretta 8000D Mini Cougar. Some officers carry .38 caliber revolvers. These officers are senior members whose weapons have been grandfathered in; revolvers have not been issued as service weapons since 1992. Current NYPD service pistols are all "double action only," meaning they have a two-stage trigger pull for each round fired (unlike single-action weapons, which can be "cocked," resulting in a one-stage trigger pull). Additionally, all NYPD weapons are modified to have a heavier-than-stock 12 pound trigger pull; this diminishes the likelihood of unintentional discharges. The NYPD uses a 124-grain, hollow-point bullet that is designed to prevent over-penetration and ricochets.

Because combat stress can contribute to the impairment of fine motor skills, and because of the relative imprecision of pistols, police officers are taught to shoot for center mass – usually, the torso. In cases in which a subject uses cover and presents only a portion of his or her body, officers are trained to use the geometric center of the exposed portion as a target.

The human body's center mass is the largest area available as a point of aim. The torso represents approximately one third of a human's surface area, compared to nine percent for an arm or 18 percent for a leg. The torso is also the most stationary portion of the body; extremities are much smaller and less static and therefore are a far less certain target. Additionally, shooting a subject in an extremity is far less likely to stop him or her than a shot to center mass. A leg wound, for example, does little to prevent a subject from continuing to use a knife or gun (see Figure 47).

**Center Mass**



*Figure 47*

# Appendix D: Subjects Killed During ID-AC Incidents

**Incident 1**

On Wednesday, April 22, 2015, at approximately 2120 hours, six officers responded to a radio run at 168-02 Hillside Avenue within the confines of the 103rd precinct. A male perpetrator was involved in an altercation inside of the location which resulted in the discharge of one round into the ceiling of the location. Shortly thereafter the perpetrator verbally ordered seven individuals at gunpoint to extricate themselves from the location. Six 9-1-1 calls were placed in regard to the incident and multiple police units responded. The perpetrator was observed by responding officers to be in possession of a firearm. After the officers issued verbal commands to drop the weapon, the perpetrator proceeded to flee on foot. Two officers exited their vehicles and attempted to approach the subject. During the foot pursuit, the perpetrator fired at the pursuing officers and continued to point his firearm in their direction. Both officers discharged their firearms, striking the armed perpetrator twice. The injured perpetrator was removed to Jamaica Hospital, where he was pronounced deceased. A loaded Glock, 9mm Pistol was recovered on scene. Subject toxicology revealed the presence of alcohol.

**Incident 2**

On Saturday April 25, 2015, at approximately 1337 hours, an individual known to the Department was wanted in regard to an I-Card investigation involving a robbery. Two detectives assigned to the 26th Precinct Detective Squad arrived at 538 East 6th Street, the East Village Halfway House, with the intention of arresting the subject. Detectives arrived at the location, and with the assistance of a civilian security guard, proceeded to the subject's room. The East Village Halfway House offers shelter to ex-prisoners diagnosed with mental disorders. The civilian security guard gained access to the apartment, and as the detectives entered, they observed the subject fleeing out of the window and down the rear fire escape. The detectives pursued, via the inside stairwell and confronted the subject in the rear courtyard of the building. A violent struggled ensued between the detectives and the wanted subject which lasted a minimum of three minutes and thirty seconds. Video surveillance captured a portion of the physical altercation. One round was discharged by one of the involved detectives, striking the individual in his chest and ultimately resulting in his demise. No weapons were recovered on scene. Both detectives were removed to the hospital to treat significant lacerations to their heads as well as other bodily injuries. One detective was admitted for observation. Subject toxicology yielded no presence of narcotics or alcohol.

**Incident 3**

On Tuesday, May 26, 2015, at approximately 0558 hours, a perpetrator wanted for murder in Queens County was confronted by a Sergeant, Detective, and Police Officer from the Warrant Squad in the rear of 875 Pennsylvania Avenue within the confines of the 75th precinct. Hours earlier, the perpetrator fatally

shot a female victim in the confines of the 106th precinct. The officers from the Warrant Squad, working in conjunction with the Technical Assistance Response Unit (TARU) were able to ascertain the perpetrator's physical location through his cellphone. The officers approached the perpetrator's vehicle and, when attempting to exit their vehicle, were fired upon by the perpetrator. The perpetrator had discharged rounds from inside of his vehicle in the direction of the officers and then exited his vehicle continuing to discharge his firearm. All three officers returned fire and struck the perpetrator multiple times, resulting in his demise. A .380 caliber handgun was recovered at the scene next to the perpetrator's body. Subject toxicology yielded the presence of ephedrine and phenylpropanolamine.

**Incident 4**

At approximately 0814 hours on Wednesday, June 10, 2015, four officers responded to a 9-1-1 call about a man with a firearm at 2000 Valentine Avenue within the confines of the 46th precinct. The officers immediately conducted a canvass and were apprised of additional information by the radio dispatcher; they learned that the perpetrator was inside of Apartment 405. The officers were able to look into the apartment and observed the perpetrator sticking his head out of a bedroom. The officers entered the apartment and issued multiple verbal commands to the perpetrator to show his hands. After hearing screams for help from a female, the officers entered the bedroom and observed the perpetrator holding a firearm and pointing it toward the female's midsection. Additional commands were given to the perpetrator to drop the firearm; suddenly, the perpetrator swung his arm to point his firearm in the direction of the Officers. At this time, the female was able to break free. One Police Officer and one Sergeant discharged their firearms at the perpetrator, striking him multiple times. A Taurus .38 caliber revolver was recovered from the perpetrator's right hand. The perpetrator succumbed to his injuries. Subject toxicology yielded no presence of narcotics or alcohol.

**Incident 5**

At approximately 1317 hours on Thursday, June 18, 2015, a police officer assigned to Transit District 34 was assigned to the Q-Line at Ocean Parkway within the confines of the 60th Precinct. The officer was advised of an assault in progress and observed the suspect fleeing from the location. After a short foot pursuit, the officer engaged the perpetrator at Seabreeze Avenue and West 1st Street. The perpetrator violently resisted arrest, produced a large knife and stabbed the police officer in the right shoulder, causing a laceration. The police officer stepped back from the perpetrator and discharged two rounds from his service weapon, striking and stopping the perpetrator's advance. The officer's rounds struck the perpetrator in the chest, resulting in his demise. A large knife was recovered at the scene, directly in front of the deceased. The officer was removed to the hospital and admitted for his injuries. Subject toxicology revealed the presence of alcohol.

**Incident 6**

At approximately 1150 hours, on Saturday, August 14, 2015, members of the Regional Fugitive Task Force, consisting of four NYPD Detectives and four United State Marshals, were seeking to execute a federal probation and weapons possession warrant on a subject at 15 Destiny Court in the confines of the 121st Precinct. Upon arrival, entry into the location was made by the Regional Fugitive Task Force. The team was overcome by smoke that was emanating from a container on the floor inside the apartment. Detectives called out to an individual observed inside to exit location but received no response, leading them to tactically withdraw from inside the location due to the smoke condition. The team placed a call for additional units and FDNY to respond. FDNY responded to the scene and was informed by members of the Regional Fugitive Task Force that a wanted fugitive was believed to be inside the location. A Lieutenant from the FDNY entered the location in an attempt to assist the individual inside. Gunshots were fired a short time later from within the location, striking the FDNY Lieutenant causing a gunshot wound to his leg. The Lieutenant was removed to the hospital and additional officers were called to the scene to assist. The Emergency Service Unit secured the perimeter of the location and the Hostage Negotiation Unit established contact with the perpetrator. Social media revealed that the perpetrator had made statements including, “Today I die.” The Hostage Negotiation Unit engaged in conversation with the perpetrator for over six hours resulting in the perpetrator stating he was going to exit the location. Shortly thereafter, Emergency Service members were fired upon by the perpetrator who was armed with a fully automatic AK-47. The perpetrator had begun to fire through the windows of the location and then opened the rear door in an attempt to exit, all the while continuing to fire his weapon. Seven members of the Emergency Service Unit returned fire, striking the perpetrator multiple times resulting in his demise. No injuries were sustained to members of the Department. Three additional firearms were recovered from inside of the location. Subject toxicology revealed the presence of cocaine.

**Incident 7**

At approximately 2230 hours, on Monday, December 7, 2015, an off-duty police officer agreed to meet an individual regarding a vehicle listed for sale on Craigslist. Communication between the police officer and the individual was conducted through text messaging. The police officer arrived at 177-39 145th Avenue within the confines of the 105th Precinct and was met by two individuals, one of whom placed a firearm to the officer’s back and removed his wallet. The other individual attempted to remove additional items and discovered the officer’s Department issued shield on his waist band. This perpetrator fled the scene in a vehicle, while the other continued to brandish a firearm and point it in the direction of the officer. At this time, the police officer drew his weapon and discharged five rounds, striking the armed perpetrator four times. The officer called 9-1-1 on his cellphone and requested additional units and medical attention for the injured perpetrator. The perpetrator was removed to the hospital, where he succumbed to his injuries. A pellet gun was recovered near the perpetrator. Subject toxicology is still pending.

**Incident 8**

On Tuesday, December 12, 2015, an on-duty police officer observed a motor vehicle in violation of the New York State Vehicle and Traffic Law. Upon activating their emergency lights to conduct a car stop, the vehicle accelerated, striking another vehicle. The driver of the vehicle fled on foot, and was approached by a police officer. The perpetrator attempted to grab the officer's firearm. During the altercation the officer discharged one round striking the perpetrator in the chest, which led to his demise. The passenger in the vehicle was apprehended on scene. The subject had 16 prior arrests including multiple arrests for Burglary and had previous charges of resisting arrest and fleeing from the police. Subject toxicology yielded no presence of narcotics or alcohol.

# Appendix E – Subject Injury & Race







*Figure 48*

| Subjects Wounded by Officers, 2010-2015 | | | | | |
|---|---|---|---|---|---|
| **Year** | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2010** | 3 | 9 | 3 | 1 | 16 |
| **2011** | 2 | 10 | 7 | 0 | 19 |
| **2012** | 1 | 9 | 3 | 0 | 13 |
| **2013** | 1 | 12 | 4 | 0 | 17 |
| **2014** | 0 | 8 | 6 | 0 | 14 |
| **2015** | 2 | 12 | 1 | 0 | 15 |

*Figure 49*

| Subjects Killed by Officers, 2010-2015 | | | | | |
|---|---|---|---|---|---|
| **Year** | **White** | **Black** | **Hispanic** | **Asian** | **Total** |
| **2010** | 2 | 1 | 4 | 1 | 8 |
| **2011** | 4 | 2 | 3 | 0 | 9 |
| **2012** | 2 | 11 | 2 | 1 | 16 |
| **2013** | 0 | 6 | 2 | 0 | 8 |
| **2014** | 2 | 4 | 2 | 0 | 8 |
| **2015** | 2 | 6 | 0 | 0 | 8 |

*Figure 50*

# Appendix F – Incident Breakdown Tables

| Firearms Discharge Incidents by Day, 2015 | | | | | |
|---|---|---|---|---|---|
| **Day** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Monday** | 3 | 1 | 0 | 1 | **5** |
| **Tuesday** | 7 | 1 | 3 | 0 | **11** |
| **Wednesday** | 8 | 4 | 4 | 1 | **17** |
| **Thursday** | 2 | 4 | 1 | 0 | **7** |
| **Friday** | 8 | 1 | 2 | 0 | **11** |
| **Saturday** | 4 | 4 | 3 | 0 | **11** |
| **Sunday** | 1 | 0 | 2 | 2 | **5** |
| **Total** | **33** | **15** | **15** | **4** | **67** |

*Figure 51*

| Firearms Discharge Incidents by Month, 2015 | | | | | |
|---|---|---|---|---|---|
| **Month** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **January** | 4 | 1 | 4 | 0 | **9** |
| **February** | 0 | 2 | 1 | 0 | **3** |
| **March** | 3 | 1 | 1 | 1 | **6** |
| **April** | 2 | 3 | 2 | 2 | **9** |
| **May** | 3 | 0 | 1 | 0 | **4** |
| **June** | 6 | 0 | 0 | 0 | **6** |
| **July** | 1 | 2 | 1 | 0 | **4** |
| **August** | 3 | 1 | 2 | 0 | **6** |
| **September** | 2 | 0 | 1 | 0 | **3** |
| **October** | 2 | 2 | 0 | 0 | **4** |
| **November** | 3 | 1 | 2 | 0 | **6** |
| **December** | 4 | 2 | 0 | 1 | **7** |
| **Total** | **33** | **15** | **15** | **4** | **67** |

*Figure 52*

| Firearms Discharge Incidents by Borough, 2015 | | | | | |
|---|---|---|---|---|---|
| **Borough** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Brooklyn** | 17 | 6 | 3 | 1 | **27** |
| **Bronx** | 3 | 2 | 1 | 0 | **6** |
| **Manhattan** | 5 | 0 | 5 | 0 | **10** |
| **Queens** | 3 | 6 | 4 | 0 | **13** |
| **Staten Island** | 2 | 0 | 2 | 0 | **4** |
| **Outside City** | 3 | 1 | 0 | 3 | **7** |
| **Total** | **33** | **15** | **15** | **4** | **67** |

*Figure 53*

| Firearms Discharge Incidents by Precinct, Manhattan, 2015 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **1st Precinct** | 0 | 0 | 0 | 0 | **0** |
| **5th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **6th Precinct** | 0 | 0 | 1 | 0 | **1** |
| **7th Precinct** | 1 | 0 | 0 | 0 | **1** |
| **9th Precinct** | 1 | 0 | 1 | 0 | **2** |
| **10th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **13th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Midtown South** | 1 | 0 | 0 | 0 | **1** |
| **17th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Midtown North** | 0 | 0 | 0 | 0 | **0** |
| **19th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **20th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Central Park** | 0 | 0 | 0 | 0 | **0** |
| **23rd Precinct** | 1 | 0 | 0 | 0 | **1** |
| **24th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **25th Precinct** | 1 | 0 | 0 | 0 | **1** |
| **26th Precinct** | 0 | 0 | 1 | 0 | **1** |
| **28th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **30th Precinct** | 0 | 0 | 1 | 0 | **1** |
| **32nd Precinct** | 0 | 0 | 1 | 0 | **1** |
| **33rd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **34th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Total** | **5** | **0** | **5** | **0** | **10** |

*Figure 54*

| Firearms Discharge Incidents by Precinct, Bronx, 2015 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **40th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **41st Precinct** | 0 | 0 | 0 | 0 | **0** |
| **42nd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **43rd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **44th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **45th Precinct** | 1 | 0 | 0 | 0 | **1** |
| **46th Precinct** | 2 | 1 | 0 | 0 | **3** |
| **47th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **48th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **49th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **50th Precinct** | 0 | 1 | 1 | 0 | **2** |
| **52nd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Total** | **3** | **2** | **1** | **0** | **6** |

*Figure 55*

| Firearms Discharge Incidents by Precinct, Brooklyn, 2015 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **60th Precinct** | 1 | 0 | 0 | 0 | **1** |
| **61st Precinct** | 0 | 0 | 0 | 0 | **0** |
| **62nd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **63rd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **66th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **67th Precinct** | 2 | 1 | 1 | 0 | **4** |
| **68th Precinct** | 0 | 0 | 0 | 1 | **1** |
| **69th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **70th Precinct** | 1 | 0 | 1 | 0 | **2** |
| **71st Precinct** | 1 | 0 | 0 | 0 | **1** |
| **72nd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **73rd Precinct** | 1 | 1 | 0 | 0 | **2** |
| **75th Precinct** | 3 | 1 | 0 | 0 | **4** |
| **76th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **77th Precinct** | 0 | 0 | 1 | 0 | **1** |
| **78th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **79th Precinct** | 2 | 1 | 0 | 0 | **3** |
| **81st Precinct** | 0 | 1 | 0 | 0 | **1** |
| **83rd Precinct** | 3 | 1 | 0 | 0 | **4** |
| **84th Precinct** | 1 | 0 | 0 | 0 | **1** |
| **88th Precinct** | 2 | 0 | 0 | 0 | **2** |
| **90th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **94th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Total** | **17** | **6** | **3** | **1** | **27** |

*Figure 56*

| Firearms Discharge Incidents by Precinct, Queens, 2015 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **100th Precinct** | 0 | 1 | 0 | 0 | **1** |
| **101st Precinct** | 0 | 1 | 0 | 0 | **1** |
| **102nd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **103rd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **104th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **105th Precinct** | 2 | 1 | 0 | 0 | **3** |
| **106th Precinct** | 0 | 1 | 0 | 0 | **1** |
| **107th Precinct** | 1 | 0 | 1 | 0 | **2** |
| **108th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **109th Precinct** | 0 | 0 | 1 | 0 | **1** |
| **110th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **111th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **112th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **113th Precinct** | 0 | 2 | 0 | 0 | **2** |
| **114th Precinct** | 0 | 0 | 2 | 0 | **2** |
| **115th Precinct** | 0 | 0 | 0 | 0 | **0** |
| **Total** | **3** | **6** | **4** | **0** | **13** |

*Figure 57*

| Firearms Discharge Incidents by Precinct, Staten Island, 2015 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **120th Precinct** | 1 | 0 | 0 | 0 | **1** |
| **121st Precinct** | 1 | 0 | 1 | 0 | **2** |
| **122nd Precinct** | 0 | 0 | 0 | 0 | **0** |
| **123rd Precinct** | 0 | 0 | 1 | 0 | **1** |
| **Total** | **2** | **0** | **2** | **0** | **4** |

*Figure 58*

| Firearms Discharge Incidents by Counties, Outside City, 2015 | | | | | |
|---|---|---|---|---|---|
| **Precinct** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Suffolk** | 0 | 0 | 0 | 1 | **1** |
| **Nassau** | 0 | 1 | 0 | 0 | **1** |
| **Westchester** | 3 | 0 | 0 | 2 | **5** |
| **Rockland** | 0 | 0 | 0 | 0 | **0** |
| **Total** | **3** | **1** | **0** | **3** | **7** |

*Figure 59*

| Firearms Discharge Incidents by Location, 2015 | | | | | |
|---|---|---|---|---|---|
| | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **Within City** | 30 | 14 | 15 | 1 | **60** |
| **Outside City** | 3 | 1 | 0 | 3 | **7** |
| **Total** | **33** | **15** | **15** | **4** | **67** |

*Figure 60*

| Firearms Discharge Incidents by Officer Duty Status, 2015 | | | | | |
|---|---|---|---|---|---|
| **Status** | **ID-AC** | **ID-AA** | **Unintentional** | **Unauthorized** | **Total** |
| **On-Duty** | 30 | 13 | 10 | 0 | **53** |
| **Off-Duty** | 3 | 2 | 5 | 4 | **14** |
| **Total** | **33** | **15** | **15** | **4** | **67** |

*Figure 61*

| ID-AC | TYPE OF THREAT FROM SUBJECT | OFFICERS INVOLVED | SHOTS | HITS | SUBJECTS INVOLVED | SUBJECT GENDER | SUBJECT RACE | SUBJECT AGE | SUBJECT WEAPON |
|---|---|---|---|---|---|---|---|---|---|
| 1 | FIREARM-SUBJECT FIRED AT OFFICER AFTER BOTH SUBJECTS INVOLVED IN ROBBERY | 1 | 3 | 1 | 2 | Male | Hispanic | 28 | Firearm |
| | | | | | | Male | Hispanic | 26 | None |
| 2 | CUTTING INSTRUMENT- SUBJECT LUNGED AT OFFICER | 1 | 1 | 1 | 1 | Male | White | 27 | Cutting Instrument |
| 3 | FIREARM-SUBJECT WITH FIREARM | 1 | 1 | 1 | 1 | Male | Black | 29 | Firearm |
| 4 | CUTTING INSTRUMENT- SUBJECT WAS STABBING CIVILIAN | 1 | 8 | 4 | 1 | Male | White | 37 | Cutting Instrument |
| 5 | FIREARM- SUBJECT POINTED A FIREARM AT THE OFFICER | 2 | 1,3 | 3 | 1 | Male | Black | 34 | Firearm |
| 6 | THREATENED WITH AUTO SUBJECTS INVOLVED IN NARCOTICS SALE | 1 | 1 | 1 | 2 | Male | Black | 36 | Blunt Instrument |
| | | | | | | Male | Black | N/A | |
| 7 | FIREARM- SUBJECT POINTED A FIREARM AT THE OFFICER | 1 | 2 | 0 | 1 | Male | Black | 33 | Firearm |
| 8 | FIREARM- SUBJECT FIRED AT OFFICERS | 2 | 2,3 | 2 | 1 | Male | White | 30 | Firearm |
| 9 | SUBJECT ATTACKED OFFICERS | 1 | 1 | 1 | 1 | Male | Black | 24 | Physical Force |
| 10 | FIREARM-SUBJECT POINTED A FIREARM AT THE OFFICER | 1 | 1 | 0 | 1 | Male | Hispanic | 31 | Firearm |
| 11 | BLUNT INSTRUMENT-ATTACKED POLICE OFFICER WITH HAMMER | 1 | 4 | 4 | 1 | Male | Black | 30 | Blunt Instrument |
| 12 | FIREARM-SUBJECT FIRED AT OFFICER | 3 | 16,9,12 | 14 | 1 | Male | Black | 43 | Firearm |
| 13 | FIREARM-SUBJECT SHOT CIVILIAN | 1 | 2 | 1 | 1 | Male | Hispanic | 28 | Firearm |
| 14 | FIREARM- SUBJECT POINTED A FIREARM AT THE OFFICER | 2 | 13,14 | 24 | 1 | Male | Black | 19 | Firearm |
| 15 | CUTTING INSTRUMENT- SUBJECT WITH KNIFE SUBJECTS WERE COMMITTING A LARCENY | 1 | 1 | 0 | 2 | Male | Black | 24 | Cutting Instrument |
| | | | | | | Male | Black | | |
| 16 | FIREARM-SUBJECT FIRED AT OFFICER | 2 | 3,1 | 0 | 1 | Male | Black | 20 | Firearm |
| 17 | FIREARM-SUBJECT FIRED AT OFFICER | 3 | 2,1,4 | 0 | 1 | Male | Black | 25 | Firearm |
| 18 | CUTTING INSTRUMENT- SUBJECT STABBED OFFICER | 1 | 2 | 2 | 1 | Male | White | 58 | Cutting Instrument |
| 19 | FIREARM- SUBJECTS ROBBED & FIRED SHOTS AT OFF DUTY OFFICER | 1 | 4 | 0 | 2 | Male | Black | 22 | Firearm |
| | | | | | | Male | Black | N/A | Firearm |
| 20 | FIREARM-SUBJECT FIRED AT OFFICERS | 7 | 9,7,4,7, 2,7,3 | 3 | 1 | Male | Black | 38 | Firearm |
| 21 | OFFICER PERCEIVED THREAT SUBJECTS WERE COMMITTING A LARCENY | 1 | 1 | 0 | 2 | Male | Black | 16 | None |
| | | | | | | Male | Black | 16 | None |
| 22 | FIREARM- SUBJECT ROBBED UNDERCOVER OFFICER CONDUCTING AN INVESTIGATION INTO FIREARMS SALES | 1 | 20 | 6 | 3 | Male | Black | 38 | Imitation Firearm |
| | | | | | | Male | Hispanic | 24 | None |
| | | | | | | Male | Hispanic | 37 | None |
| 23 | FIREARM- SUBJECT FIRED AT OFFICERS | 6 | 16,1,25 ,10,16, 16 | 1 | 1 | Male | Black | 27 | Firearm |
| 24 | FIREARM- SUBJECT WITH FIREARM | 1 | 2 | 0 | 1 | Male | Black | N/A | Firearm |
| 25 | FIREARM- SUBJECTS FIRED AT OFFICERS | 3 | 5,8,6 | 1 | 3 | Male | Black | 22 | Firearm |
| | | | | | | Male | Black | 20 | Firearm |
| | | | | | | Male | Black | 19 | N/A |
| 26 | FIREARM-SUBJECT FIRED AT OFFICER | 1 | 10 | 1 | 1 | Male | Black | 30 | Firearm |
| 27 | FIREARM-SUBJECTS ROBBED PLAINCLOTHES OFFICER | 1 | 1 | 1 | 3 | Male | Black | 16 | Imitation Firearm |
| | | | | | | Male | Black | 17 | None |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Male | Black | 21 | None |
| 28 | FIREARM- SUBJECT WITH FIREARM | 1 | 2 | 1 | 1 | Male | Black | 24 | Firearm |
| 29 | OFFICER PERCEIVED THREAT | 1 | 1 | 1 | 1 | Male | Black | 32 | Cutting Instrument |
| 30 | FIREARM-SUBJECT POINTED A FIREARM AT THE OFFICER | 2 | 1,4 | 0 | 2 | Male | Black | 25 | Firearm |
| | | | | | | Male | Black | 24 | None |
| 31 | FIREARM-SUBJECTS ROBBED OFF DUTY MOS | 1 | 5 | 4 | 2 | Male | Black | 30 | Imitation Firearm |
| | | | | | | Male | Black | N/A | None |
| 32 | SUBJECT ATTACKED POLICE OFFICER | 1 | 1 | 1 | 2 | Male | Black | 36 | Physical Force |
| | | | | | | Male | Black | 35 | None |
| 33 | FIREARM-SUBJECT WITH FIREARM | 1 | 1 | 1 | 1 | Male | Black | 20 | Firearm |

*Figure 62*

New York City Police Department

**James P. O'Neill,**

**Police Commissioner**