UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID COLE and KIMBERLY COLE, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00327-LEW |
| | ) | |
| SIG SAUER, INC., | ) | |
| | ) | |
| Defendant | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND ON MOTIONS FOR EXCLUSION OF EXPERT TESTIMONY**

Plaintiff David Cole suffered serious injury when his Sig Sauer P320 service weapon fired while it was holstered. When the incident happened, Mr. Cole was carrying a jacket to his car and the parties believe that the most likely explanation for the incident was due to a zipper slipping into the holster and interacting with the P320's trigger. David Cole and his wife, Kimberly Cole, allege that David's injuries are the result of a defective product (the P320) and, in particular, that the weapon's trigger is far too easily actuated and requires either a tabbed trigger or else a thumb safety combined with a warning to apply the safety when the weapon is holstered.[1]

The matter is before the Court on Defendant Sig Sauer's Motion for Summary Judgment (ECF No. 69), Motion to Exclude Evidence and Opinions of Plaintiff's Expert

[1] Kimberly Cole has a claim for loss of consortium.

Randy Kent (ECF No. 70), and Motion to Exclude Evidence and Opinions of Plaintiff's Expert William Vigilante (ECF No. 71). These motions are denied for reasons that follow.

BACKGROUND

In the District of Maine, the facts for purposes of a summary judgment contest are established by the parties' Local Rule 56 statements of material fact. *See* D. Me. Loc. R. 56. Thus, the "background" narrative for this Decision draws on the parties' respective statements.[2] Where genuine disputes are at issue, that is, where the parties have put forward different factual statements that are supported by evidence but cannot both be true, this narrative portrays the facts in the light most favorable to the non-moving party, David and Kimberly Cole, solely for purposes of ruling on Sig Sauer's Motion for Summary Judgment. To the extent that the Coles rely on expert opinions rather than facts to support their claims, those opinions are related more fully by reference to the experts' reports and deposition testimony, without requiring the Coles to set forth every opinion in a statement of material facts. The opinions are related here at some length because they are challenged, not because the Court assumes the opinions are correct.

*The Incident*

On May 4, 2022, David Cole was working as a detective with the Somerset County Sheriff's Office. On his hip he carried the Sig Sauer P320 pistol in a Blackhawk Serpa paddle holster, both of which items were issued to him by the Sheriff's Office. Per his

[2] *See* Def. Stmt. (ECF No. 72); Pls. Opposing Stmt. and Additional Stmt. (ECF No. 77); Def. Reply to Pl. Additional Stmt. (ECF No. 90).

training, he carried the P320 with a live round in the chamber. The holster did not fully cover the trigger guard of the P320, making the trigger accessible to foreign objects. While walking to his vehicle to offload a coat he was carrying in his hands, the trigger actuated. Although Cole does not know why the P320 discharged, all the expert witnesses conclude that the trigger was actuated and that a zipper on the coat most likely came into contact with the trigger and caused the P320 to fire. Def. Stmt. & Pl. Opposing Stmt. ¶¶ 1-13; Pl. Additional Stmt. ¶¶ 11-15.

*The P320*

The mechanics of the P320's firing system involve a balanced, short-travel, light-pressure trigger connected to a striker pin rather than a hammer. The P320s purchased and issued by the Sheriff's Office lack common external safety systems installed by gun manufacturers, having neither a thumb safety nor a tabbed trigger[3] nor any other external safety mechanism. Pl. Additional Stmt. & Def. Reply Stmt. ¶¶ 28-30, 33-37, 56. When a round is in the chamber, the P320 is effectively "pre-cocked," meaning the striker is already about 97% cocked.[4] *Id.* ¶¶ 36-37. The P320's trigger will actuate the firing pin if it travels as little as 4.2 to 4.4 millimeters. *Id.* ¶ 47. This travel distance is less than half the distance

[3] A tabbed trigger incorporates a lever inside the front face of the trigger. When the lever is at rest in its forward position, the trigger cannot be depressed. In order to depress the trigger, the operator must first depress the lever into the trigger body. A tabbed trigger is designed to prevent actuation of the trigger when the weapon is dropped or if the trigger is subjected to lateral pressure. Vigilante Report at 26.

[4] The Coles repeatedly refer to the P320 trigger as "single-action" as opposed to "double-action" because the pull of the trigger does not both cock and release the hammer. I have credited in my narrative Sig Sauer's observation that, technically, a gun with a firing pin should not be described in the same manner as a gun with a more traditional hammer actuator. However, "Sig Sauer witnesses have explained that the P320 functions more like a single-action than a double-action pistol because the rearward striker movement is too minor to constitute true double action." Def. Reply Stmt. ¶ 134.

necessary to fire competitor guns manufactured by Glock or Smith & Wesson.[5] *Id.* ¶¶ 49-50. The P320 is Sig Sauer's only gun of its kind without an external safety. *Id.* ¶ 41.

The P320 could be manufactured with a tabbed trigger at a minimal per-unit expense. *Id.* ¶ 61. The military versions of the P320, the M17 and M18, come equipped with a manual safety. *Id.* ¶ 64. In a Failure Mode Effects and Criticality Analysis ("FMECA") performed for the U.S. Military in 2017, Sig Sauer identified a manual safety as an appropriate action item to reduce the risk of accidental trigger pull by a foreign object. *Id.* ¶ 69.

*350 Incidents*

David Cole is not isolated in his experience of an unintended discharge. Approximately 350 other incident reports involving unintended discharges of P320s have arisen. *Id.* ¶ 82. In Sig Sauer's own words, "Sig Sauer is aware of approximately 350 reported unintended discharge incidents where the trigger on a P320 was accidentally pulled rearward and the firearm discharged as designed." Def. Reply Stmt. ¶ 82. Due to the number of incidents and/or based on the occurrence of local incidents in their own jurisdictions, several law enforcement agencies have prohibited law enforcement officers from carrying the P320 as their service weapon. Pl. Additional Stmt. & Def. Reply Stmt. ¶¶ 93-108. Of course, incidents vary in their particulars. The occurrence of an unintended discharge is not alone proof of a defect in a firearm. Additionally, given the sheer number of P320 units sold, even the occurrence of 350 incidents in itself is not proof of a defective

[5] Glock and Smith & Wesson are Sig Sauer's two main competitors in the striker-fired, polymer handgun market. Vigilante Report at 25 (ECF No. 77-1).

design. However, in the last few years, Sig Sauer has become aware of a "pattern" of unintended discharges involving the P320 when holstered. Some of these incidents involved holsters for P320s with flashlight attachments, like David Cole's P320 and holster. *Id.* ¶ 122.

*Notice*

Lieutenant Rizzo of the Somerset County Sheriff's Office trained with Sig Sauer to become the local armorer for the Sheriff's Office. During his training, Sig Sauer never advised Lt. Rizzo about the incidents of unintended discharges or the need to consider holster selection carefully when outfitting officers. *Id.* ¶¶ 127-129.

Sig Sauer's sales materials do not indicate that the P320 uses a "pre-tensioned spring" or "cocked trigger." *Id.* ¶¶ 135-136.

**Expert Reports**

*Randy Kent's Opinions*

The opinions of Randy Kent, M.S., P.E. of Kent's Engineering are informed by his expert report (ECF No. 77-5), curriculum vitae (ECF No. 77-6), and deposition transcript (ECF No. 77-7). The contents of the report are summarized here. Because Kent's qualifications are not challenged, the content of his CV is not related.

Concerning the P320 trigger, Kent opines:

> Sig Sauer made several design choices of the trigger function and geometry that make the P320 more susceptible to unintended discharge than competitor striker-fired pistols. When analyzed and compared to competing firearms, clear differences can be seen, that demonstrate the unique characteristics of the P320 that make it unreasonably dangerous and susceptible to unintended trigger actuation.
> ….

> Trigger mechanics have an important effect on how the trigger feels to the user. Sig Sauer marketed the P320 as a short and crisp feeling trigger. To achieve this desired result, Sig Sauer's P320 trigger takes significantly less rearward movement to actuate than competing striker-fired pistols. However, Sig Sauer also chose not to include a trigger safety on the P320 which, coupled with the short trigger pull, results in a trigger that is far more susceptible to unintended trigger actuation than its competitors.
>
> The most readily noticeable difference between the P320 and the competitors is the lack of tabbed-trigger safety. Sig Sauer manufactures the only fully energized striker-fired pistol on the market without any external safeties like a thumb safety or tabbed-trigger safety.
>
> ….
>
> While Sig Sauer claims the tabbed trigger's sole function is to prevent drop fires, the tabbed-trigger which is used by [competitors] provides protection to the trigger by preventing actuation from a sideload or by an object not fully and squarely on the trigger.

Report at 9-10. Additionally, Kent observes that unlike a tabbed trigger, contact with any part of the trigger surface of the P320 can actuate it, whereas a tabbed trigger will actuate only if there is rearward contact with the tabbed portion of the trigger's face. *Id.* at 13-15.

Kent opines that a safety is needed because the P320 has a significantly lighter trigger pull and needs to travel a notably shorter distance than is typical of similar pistols. *Id.* at 17-18. Thus:

> The P320 has a significantly easier trigger to pull than its competitors due to its light take-up and significantly shorter trigger pull, thus making it substantially easier for an unintentional discharge. Simply put, the trigger of P320 requires far less energy to discharge than the triggers of its competitors.

*Id.* at 18. Coupled with these attributes, the P320 firing mechanism is pre-cocked. *Id.* ("Another design choice that adds to the P320's increased risk of unintended discharge is the fact that the striker is always in the cocked position."). Kent observes:

> While Sig Sauer recognized the importance of effectively guarding the trigger to prevent trigger actuation by snags on clothing or gear, its trigger

> guard provided significantly less guarding than competitor striker-fired pistols. Unlike its competitors, it also provided no tabbed trigger for protection against snags or side-pulls. Unlike the military version of the P320, it provided no manual safety, which it stated reduces the occurrence of trigger actuation by a foreign object. Sig Sauer's design choices made the P320 unreasonably susceptible to unintended discharge.

*Id.* at 20.

Kent opines:

> Due to the nature of the P320s trigger, the reduced trigger travel distance, force, and work to actuate the subject P320 as compared to other competitor guns, the reduced protection by the trigger guard, and most significantly the lack of a trigger safety, the design properties of the P320 trigger render it unreasonably exposed to unintended discharges.

*Id.* at 24-25.

In terms of injury causation, Kent demonstrated how a foreign object like a key or zipper could apply leveraged, lateral pressure to the trigger and actuate it with little pressure through a narrow gap created by a holster that does not fully cover the trigger guard. *Id.* at 25-28. Kent opines that the incident likely would not have occurred had the P320 included a tabbed trigger. *Id.* at 29. Kent's conclusions are restated verbatim here:

> [Kent Engineering] has examined the subject pistol with its holster, as well as exemplar P320s and three other competitor pistols for differences in function and geometry to determine whether the P320 is defectively designed, and to determine whether it's designed defect were the cause of David Cole's unintended discharge. The following opinions were developed based upon KE's review of the documents, videos, and information provided, the inspection of the physical evidence including the subject gun and holster, clothing, vest, and other items, as well as the analytical testing and analysis on the subject gun, an exemplar P320, and competitor striker-fired pistols. The opinions below are offered within a reasonable degree of professional certainty:

1. The Sig Sauer P320 is a single-action pistol because the striker is under full tension prior to the trigger pull. The trigger only releases the striker.

2. The P320 triggers require substantially less work to intentionally or unintentionally actuate than the competitor triggers.

3. The P320 is not equipped with a manual safety. If one was provided and engaged, the subject incident would have been prevented.

4. The subject P320 lacks a tabbed trigger safety which allows the trigger to be actuated by side load. Given the fact that Detective Cole's P320 was fully holstered at the time of discharge, a tabbed trigger would have prevented the subject incident to a reasonable degree of certainty.

5. Sig Sauer easily could have incorporated a tabbed trigger into the P320 without sacrificing functionality. A tabbed trigger was a readily available and feasible safer design alternative. It was originally planned and later abandoned.

6. Sig Sauer easily could have incorporated a manual thumb safety into the P320 without sacrificing functionality. Sig Sauer did incorporate the thumb safety into the military versions of the P320, demonstrating that it is an available and feasible safer design alternative.

7. The P320 has significantly reduced trigger guard clearance compared to competitors.

   a. The reduced trigger guard clearance makes the P320 more susceptible to inadvertent sideload pressures causing the trigger to actuate.

   b. Increasing the trigger guard clearance was an easy and feasible design alternative to decrease the likelihood of unintended actuation caused by something grazing the side of the trigger.

8. The P320 is unreasonably dangerous and defectively designed because of the single-action trigger-pull, the minimal work required to actuate the trigger as compared to competitor models, the reduced trigger travel distance, the minimal trigger guard clearance, and the lack of external safeties, all of which combine to make the P320 uniquely susceptible to unintended discharge when the gun is holstered.

> 9. In the event a foreign object contacted Detective Cole's trigger while it was fully seated in its holster, the firearm would not have discharged if it was equipped with a tabbed trigger safety, to a reasonable degree of certainty.
>
> 10. In the event a foreign object contacted Detective Cole's trigger while it was seated in its holster, the firearm would not have discharged if it was equipped with an engaged manual thumb safety, to a reasonable degree of certainty.
>
> 11. The defective design of the P320 was a proximate cause of Detective Coles' accident, as there is no explanation of his P320 discharging in its holster unless a foreign object contacted the trigger, and a tabbed trigger or engaged manual safety would have prevented such actuation by a foreign object from the small gap between the Blackhawk CQC holster and the trigger on the subject P320.

*Id.* at 28-29.

*William Vigilante's Opinions*

The opinions of William Vigilante, Jr., Ph.D., C.P.E., of Vigilante Forensic are informed by his expert report (ECF No. 77-1), curriculum vitae (ECF No. 77-2), deposition transcript (ECF No. 77-3), and testing videos (ECF No. 77-4). The contents of the report are summarized here. Relevant passages of the deposition transcript will be related in the discussion, to the extent that they are relevant to Sig Sauer's challenge to his testimony. Because Dr. Vigilante's qualifications are not challenged, the content of the CV are not related herein. The videos of testing speak for themselves.

Dr. Vigilante describes his investigation as purposed to determine if:

- The Sig P320 has an elevated risk of unintentional discharge.
- The elevated risk of unintentional discharge was foreseeable to Sig Sauer.
- Sig Sauer should have included an external/manual safety on its Sig P320.

- Sig Sauer's failure to include an external manual/safety was a cause of the subject unintentional discharge.

Dr. Vigilante's report begins with a description of the P320, much of which repeats facts related in the preceding background statement, which I do not repeat at length here; the point being, however, that the P320 operates like a single action pistol, is pre-cocked, has a very light and short range trigger pull, is typically carried with a live round, and has no safety. Report and 9-10.

Based on risk assessment principles outlined in the report, Vigilante proposes:

> Sig Sauer was responsible for designing, manufacturing and selling the subject Sig P320 handgun. As the product designer, manufacturer and seller, Sig Sauer, just like its competitors who chose to use external safeties (e.g., tabbed-trigger safety), had a responsibility to assess the performance of its products both during development and while in the field and identify and reasonably mitigate the safety risks associated with the use and foreseeable misuses of its product.

*Id.* at 21. With this in mind, Vigilante observes: "The Sig P320 trigger is significantly more sensitive than competitor striker-fired guns because of the substantially reduced movement required to fire the gun, and as a result it is more prone and susceptible to unintentional discharge than other striker-fired guns." *Id.* at 23. Vigilante further observes: "The lack of a tabbed-trigger safety in conjunction with the short trigger pull and relatively light trigger weight results in the Sig P320 being at an increased risk of unintentional discharge when pressure is applied off-center or to the side(s) of the trigger even when holstered." *Id.* at 27.

Aiming to reinforce his observations, Vigilante conducted tests that demonstrated "that the trigger can be actuated with pressure applied along the top, middle, and bottom

of one or both sides of the trigger as well as at the very tip or top of the front of the trigger." *Id.* "Testing involved using the user's finger to apply pressure as well as foreign objects including a pencil eraser, metal house key, metal socket extension, a wooden probe, and a nylon string/cord." *Id.* "Testing included actuation of the trigger with pressure applied to the sides of the trigger while holstered . . . ." *Id.*[6] Through his testing, Dr. Vigilante demonstrated that the trigger of the P320 can easily be actuated by a variety of foreign objects when fully holstered in a holster identical to Cole's, but that other striker-fired handguns with tabbed triggers could not be. *Id.* at 41-44. He opines:

> My testing demonstrates that the increased risk of an object inadvertently actuating the trigger on a holstered Sig P320 versus a Glock (or similar striker-fired handgun with a tabbed-trigger safety) is due to the fact that the Sig P320 trigger can be actuated with pressure to the side(s), tip, or top of the trigger. Whereas, the Glock and Springfield trigger will not actuate until the tab safety is depressed which requires pressure being applied directly flush with the face of the trigger. The combination of a tabbed-trigger safety in a holstered gun is effective in preventing unintended discharge as demonstrated by the above testing. Conversely, the absence of the tabbed-trigger safety leaves the Sig P320, even when secured in a holster specifically designed for the P320, unreasonably exposed to the risk of unintended trigger actuation.

*Id.* at 42.

[6] The record also reveals that Sig Sauer does not recommend carrying the P320 with a round in the chamber. Evidently, many if not most law enforcement agencies train officers to do so anyway. Vigilante Report at 30-31. The National Rifle Association also advises members to choose holsters that cover a handgun's trigger. *Id.* at 31-32. Because Cole's P320 was carried with a round in the chamber and in a holster that did not fully cover the trigger the jury could find in favor of Sig Sauer on this record, even if the jury finds fault with the P320's design. However, it would not be compelled to do so. According to Dr. Vigilante, Sig Sauer is aware that law enforcement commonly carry the P320 with a round in the chamber and in holsters that do not fully cover the trigger. *Id.* at 33-34. Sig Sauer itself produces holsters that fit the P320 but do not cover the trigger entirely. *Id.* at 38.

On the foreseeability of risk, Dr. Vigilante states: "Given the lack of an external safety, such as a tabbed-trigger safety, in conjunction with its trigger design and its intended use and user population, it was reasonably foreseeable to Sig Sauer that the Sig P320 was at an increased risk of an unintentional discharge even when securely holstered." *Id.* at 48. Given these factors and the sheer number of units sold, including to law enforcement agencies, Dr. Vigilante maintains that "Sig Sauer should have taken pro-active and positive steps to mitigate the risk of unintentional discharge associated with its Sig P320 handgun." *Id.* at 55.

According to Vigilante:

> Had Sig Sauer integrated an external safety (e.g., tabbed-trigger safety) into the design of the Sig P320, it would have significantly reduced the risk of an unintentional discharge without adversely affecting the utility of the handgun and it would have prevented this incident to a reasonable degree of scientific certainty. The time, money and effort to integrate an external safety into the Sig P320 was not cost prohibited.

*Id.* at 61. As he sees it:

> Sig Sauer's failure to integrate an external safety (e.g., tab-trigger) into the design of the Sig P320 was improper and unreasonably dangerous, rendered the firearm defective and unreasonably dangerous, and was most likely a cause of the subject unintentional discharge and Deputy David Cole's injury.
>
> Had Sig Sauer integrated a tabbed-trigger safety into the design of the Sig P320, to a reasonable degree of scientific certainty the subject unintentional discharge would not have occurred and Deputy David Cole would not have been injured.
>
> Sig Sauer made design choices that no other striker fired gun manufacturer has made, combining a single action pistol design without an external safety to reduce and/or eliminate the risk of unintentional discharges.

*Id.* at 62.

Citing a publication of the National Safety Council, Vigilante asserts that in the hierarchy of controls meant to ensure development of safe products, elimination of an identified risk through design is of greater importance than incorporating safety systems, and safety systems are of greater importance than warnings. *Id.* at 56-57. But in Vigilante's opinion, the P320 fails in all three control areas, having an inherently hazardous trigger, lacking any safety system, and lacking an adequate warning. In terms of the warning, Vigilante opines that, although Sig Sauer advises users in its manual that they "must ensure that the holster . . . is made for [the] particular firearm," given what it knew of unintended discharge incidents it should have warned users "that the P320 can and will discharge by contact from a foreign object even when the Sig P320 is fully holstered in a holster specifically designed for the gun." *Id.* at 63, 64.

Dr. Vigilante opines that the product is not only unreasonably dangerous to intended users, but also that a tabbed trigger would have prevented the unintended discharge and that, in the absence of a tabbed trigger, a complete warning concerning the potential for unintended discharges of holstered P320s would have prevented the Somerset County Sheriff's Office from selecting the P320 in the first place. *Id.* at 66.

In a Supplemental Report (ECF No. 77-66), Dr. Vigilante responded to the contention of Sig Sauer's experts that gaps in the holster fit caused the incident rather than the design of the P320's trigger. According to Dr. Vigilante, even Sig Sauer's holsters for the P320 have such gaps. He also cites evidence of other known incidents involving unintended discharges of P320 when holstered that, in his view, should have caused Sig

Sauer to warn of this specific, foreseeable hazard associated with the P320, if it was determined not to modify its trigger design. *Id.* at 8.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary judgment to challenge the existence of evidence capable of raising a genuine dispute on one or more claims. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In effect, summary judgment procedure offers the means "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug*, *Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

The party moving for summary judgment has the "initial responsibility" to show the nonexistence of a genuine issue concerning an essential element of the claim in question, for which the nonmoving party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Assuming the moving party's initial presentation does so, the nonmoving party must then demonstrate that there is admissible evidence of record that contradicts the moving party's showing and generates a genuine issue for trial. *Id.* at 322-23; *see also Carrozza v. CVS Pharmacy*, *Inc.*, 992 F.3d 44, 56-57 (1st Cir. 2021); Fed. R. Civ. P. 56(c); D. Me. Loc. R. 56(a)-(d), (f). A genuine issue exists "if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 187 (1st Cir. 1997).

## DISCUSSION

Sig Sauer's arguments for summary judgment are in five parts, each of which is addressed in turn in this Discussion. First, Sig Sauer argues that the record establishes conclusively that the P320 is not defective; second, that the Coles cannot prove a defect or that a defect was the proximate cause of Cole's injury (this is where the challenge to expert testimony takes hold); third, that the failure to warn claim fails because Cole admits he never read the P320 operator's manual; fourth, that the fraudulent concealment claim is unsupported; and fifth, that the record lacks the kind of evidence that would justify punitive damages. Mem. of Law in Support of Mot. for Summary J. ("Def. Mem.") at 4-17 (ECF No. 69).

### A. Should the P320 Be Deemed Not Defective as a Matter of Law?

Sig Sauer argues that, as a matter of law, the P320 cannot be deemed defective because the lack of any external safety on the weapon "is a design feature, not a defect." Def. Mem. at 4. As Sig Sauer sees things, adding a tabbed trigger would "impair the benefits of the current design" and decrease the P320's utility, which Sig Sauer sees as the P320's ability to provide "improved accuracy and speed in getting off a shot quickly," since a tabbed trigger introduces a "finger placement hazard . . . that a user who intends to fire the weapon inadvertently places his finger on the trigger in a position that fails to disengage the tab." *Id.* at 5-6. Sig Sauer asserts that the tabbed trigger is also unnecessary since the P320 passes industry standard drop tests. *Id.* at 6. Sig Sauer also observes that the "no safety" feature of the P320 is sought out by many in law enforcement. *Id.* at 7.

In opposition, the Coles assert that there is "substantial record evidence that proves the P320 is a first-of-its-kind, single-action gun with a short trigger and no external safeties that is unreasonably dangerous to its users." Pls. Mem. in Opp'n at 13 (ECF No. 78). Because the P320 is a weapon "unique among its competitors and uniquely dangerous," the Coles contend that their product defect claims should go to the jury. *Id.* at 14.

Sig Sauer's opening argument exhibits bravado but little else for summary judgment purposes. It may well serve as an effective closing argument, but as a baseline proposition it does not justify the entry of summary judgment as a matter of law, principally for the reasons that soon will be outlined in the discussion of the expert opinion evidence. But to foreshadow that discussion, Sig Sauer manufactures some handguns with tabbed triggers and presumably does so with the understanding that they are still highly effective weapons. Additionally, it is evident that the tabbed trigger is proposed by the Coles and their experts not to guard against unintended discharges when the P320 is dropped, but to guard against unintended discharges when a foreign object comes into contact with a trigger that has been designed with a very light pull weight and short travel distance that actuate a pre-cocked firing pin.[7] While the jury may ultimately agree with Sig Sauer that the P320's lack of an external safety is a favored feature in the hands of law enforcement, an alternative finding is not ruled out on this record.

[7] Dr. Vigilante's perspective is that "[t]abbed trigger safeties provide an effective method to reduce the risk of trigger actuation with pressure applied to the sides of the trigger without interfering with the utility of the firearm or the user's ability to purposefully fire the gun." Vigilante Report at 65.

Under this argument heading, Sig Sauer also argues that the case should be dismissed because the P320 issued to Cole was in the exact condition contemplated by Cole and the Sheriff's Office. Def. Mem. at 7. To this, the Coles respond that the record does not suggest that the Sheriff's Office was aware of the existence or nature of the alleged defect. Pl. Mem. at 16. I conclude that the Coles have the better position for purposes of summary judgment. Sig Sauer's point is a potentially persuasive closing argument but the Sheriff's Office's attitude about responsible firearms is not the same thing as a purpose to choose an allegedly defective firearm that is susceptible to unintended discharges while holstered. The argument also does not neatly align with Maine's product liability statute, which asks principally whether the product arrived in the condition it was sold in, 14 M.R.S. § 221, although there may be room for a jury instruction that facilitates argumentation on the issue based on comment *g* of the Second Restatement of Torts § 402A.[8] In summary, all of these arguments are for the jury rather than the Court.

[8] The comment reads:

> The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

Restatement (Second) of Torts § 402A cmt. g.

### B. Do Plaintiffs' Experts Provide Enough to Support Plaintiffs' Theories of Liability?

Sig Sauer argues that the Coles do not have sufficient evidence to support a finding that the P320 is defective or that any alleged defect was the proximate cause[9] of David Cole's injury. Mot. at 8. The defective condition of a product, particularly a design defect, is ordinarily demonstrated with expert opinion testimony addressed to the utility of the product's existing design, the risk of the design, and the feasibility of safer alternatives. *See Hinton v. Outboard Marine Corp.*, No. 1:09-cv-00554-JAW, 2012 WL 7638061, at *4 (D. Me. Jan. 20, 2012) (citing *Stanley v. Schiavi Mobile Homes*, *Inc*., 462 A.2d 1144, 1148 (Me.1983)); *Bouchard v. Am. Orthodontics*, 661 A.2d 1143, 1145 (Me. 1995); *Guiggey v. Bombardier*, 615 A.2d 1169, 1172 (Me. 1992)). Expert witness testimony is also commonly relied on to support a finding of proximate causation and can do so when informed by analysis based on reliable factual predicates. *Elwell v. Conair*, *Inc*., 145 F. Supp. 2d 79, 91 (D. Me. 2001); *Reali v. Mazda Motor of Am*., *Inc*., 106 F. Supp. 2d 75, 78 (D. Me. 2000); *Green v. Cessna Aircraft Co*., 673 A.2d 216, 220 (Me. 1996).

When the nonmoving party's trial presentation will depend on the introduction of expert opinion evidence, the moving party may raise a summary judgment challenge to the

[9] "[U]nder Maine law, proximate cause 'is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.'" *Hinton v. Outboard Marine Corp.*, 828 F. Supp. 2d 366, 381 (D. Me. 2011) (quoting *Merriam v. Wanger,* 2000 ME 159, ¶ 8, 757 A.2d 778, 780 (citations omitted)). It can also be said that a product defect proximately causes an injury if it plays a substantial part in bringing about the injury and the injury is either a direct result or a reasonably foreseeable result of the defect. If the connection is only speculative or conjectural, or involves only evenly balanced probabilities, then proximate causation is not established. *Id.*

admissibility of the expert's opinion under Rule 702 of the Federal Rules of Evidence.[10] *See* Fed. R. Civ. P. 56(c)(2). When an expert's testimony is essential to an element of the claim, summary judgment is appropriate if the nonmovant cannot demonstrate that the expert's opinion "is 'based on sufficient facts or data,' is 'the product of reliable principles and methods,' and 'reflects a reliable application of the principles and methods to the facts of the case.'" *Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (quoting Fed. R. Evid. 702). The focus is placed on the soundness of the principles and methods that underpin the opinion, rather than the persuasiveness of the opinion itself. *Id.* Generally speaking, mere concerns over the principles and methods employed must be weighed by the factfinder at trial, rather than the judge at summary judgment. *Id.* Only if the opinion is uninformed by principles and methods, is connected to the relevant facts exclusively by the say-so ("*ipse dixit*") of the expert, or is speculative and/or incapable of validation should a judge exclude the evidence. *Id.* The nonmoving party, as the proponent of the challenged evidence, has the burden of establishing the relevance and reliability of an expert's opinion. *Id.* at 71. The standard means of doing so is by demonstrating that all

[10] Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The provisions of the Rule are modeled after the Supreme Court's discussion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

four elements of Rule 702 are met (see note 10), though establishing the following three factors is often deemed sufficient: (1) that the proposed expert is qualified by "knowledge, skill, experience, training, or education"; (2) that the proposed testimony concerns "scientific, technical, or other specialized knowledge"; and (3) that the testimony will be helpful to the fact finder. Fed. R. Evid. 702; *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997).

Sig Sauer argues that the Coles' experts cannot reliably testify that "there existed a safer, feasible alternative design that would have prevented the complained-of injuries." Mot. at 8 (citing *Reali*, 106 F. Supp. 2d at 80). Specifically, Sig Sauer contends that even if the expert testimony is admitted there would still be no evidence that the lack of a tabbed-trigger safety caused the unintentional discharge. *Id.* at 9. Again, while the jury could be so persuaded at trial, the expert testimony is to the effect that actuation of a tabbed trigger caused by the intrusion of a foreign object like a zipper or zipper pull into the holster gap would be an extraordinarily remote possibility (one that could not be replicated in tests except with extraordinary effort), whereas actuation of the existing trigger was likely (as was readily demonstrated in tests).[11]

Because the expert opinion testimony would generate a genuine issue, if admitted, I address the Rule 702 challenges here. For the reasons that follow, I conclude that the challenges go to weight rather than admissibility.

[11] The advantage of the tabbed-trigger design as a liability theory (as opposed to a thumb safety) is that the finder of fact might determine that a tabbed trigger would have had utility without the risk that the user might carry the P320 with the thumb safety disengaged even if the P320 had such a safety. For instance, Cole testified in his deposition that he carried his former duty weapon with the thumb safety disengaged, consistent with training.

1. Motion to Exclude Expert Randy Kent (ECF No. 70)

Sig Sauer asserts that Randy Kent's opinion that the P320 is "unreasonably exposed to unintended discharges" is unreliable because that view is overly cautious when it comes to state-of-the-art firearms designed with functionality considerations important to law enforcement and other users. Sig Sauer also maintains that Kent's opinion that the P320 is uniquely susceptible to unintended discharges (when holstered) is not informed by any comparative evidence connected with competitor firearms. Lastly, Sig Sauer argues that Kent's causation opinion is unreliable since Cole would not have used a thumb safety and even a tabbed trigger could in theory be actuated by a foreign object, something that Kent did not personally test.

Sig Sauer's opinion that having no safety is a design "feature" goes to weight rather than to the admissibility of Kent's contrary opinion. Kent explains in his report why he considers the subject P320 to be unreasonably dangerous as designed and his view is informed by specialized knowledge of firearms, spelled out in greater detail above, that would be useful for a jury to consider. His opinion is also based on sufficient comparative data associated with trigger characteristics (in particular pull weight and travel that facilitate side actuation), firing pin characteristics (pre-cocked), and common safeties and their characteristics and utility, along with industry data related to the foreseeable risk associated with such a weapon when placed in a holster that allows for foreign object intrusion. Kent's opinion is also the product of reliable principles and methods that illustrate the utility of installing at least one safety on a firearm of this kind, such that the

question of whether the lack of any external safety is a feature or a fault is something for the jury to answer by verdict.

As for causation, Kent has offered a reliable view that a tabbed trigger would in all likelihood have prevented actuation caused by a foreign object. Moreover, should the jury adopt the perspective that a P320 with no external safety is unreasonably dangerous, it could also conclude that Sig Sauer was derelict in its duty to warn of the risk of unintentional discharge and that, had it done so, the Sheriff's Office would have chosen not to purchase the P320 or would have secured models with thumb safeties and instructed officers to use the safeties. Kent has articulated a reliable means of making these assessments based on specialized insight informed by facts and data and a reliable methodology and rationale. In summary, his opinions are qualified by knowledge, skill, experience, and training; concern technical or other specialized knowledge; and will be helpful to the jury, even if the jury ultimately agrees with Sig Sauer that the opinions are not persuasive. Accordingly, the request to exclude his testimony is denied.[12]

2. Motion to Exclude Expert William Vigilante (ECF No. 71)

Sig Sauer's challenge to William Vigilante is thematically consistent with its challenge to Randy Kent. Sig Sauer asserts that David Cole's P320 performed as intended

[12] Sig Sauer's more pointed challenge based on a limited set of comparator pistols goes to weight. Mot. (ECF No. 70) at 9. This argument may have extra force when it comes to the weight to be given to Kent's opinion about the sufficiency of the P320's trigger guard, but the trigger guard aspect of Kent's report is still reinforcing of his overall safety concern and therefore will not be stricken as immaterial or unhelpful. Similarly, Sig Sauer's point that other weapons have unintended discharges and that the incident rate for the P320 may suggest it is not unreasonably dangerous given the sheer number of P320s in circulation is a valid concern that the jury will be able to consider, but such counter arguments go to weight rather than disqualify Kent's opinion. Sig Sauer's best arguments in its defense do not compel summary judgment in its favor.

because it discharged when the trigger was actuated; the P320's actuation characteristics are all desirable design features rather than defects; and the cause of Cole's injury was a gap between the after-market holster and pistol that left the trigger exposed to actuation by a foreign object. Mot. (ECF No. 71) at 1-2. I once more conclude that these potentially persuasive arguments deserve careful consideration by the jury with the aid of helpful opinion testimony and careful examination of the facts. They do not deserve judgment as a matter of law.

Among the challenges emphasized by Sig Sauer is the fact that there is a potential for a variety of differently designed firearms to discharge unintentionally, including firearms with tabbed triggers. Dr. Vigilante has pointed to certain comparator handguns manufactured by other makers to draw distinctions that, in his view, demonstrate the need for Sig Sauer to include some kind of external safety on all of the P320s it sells. But the question of whether there is a design defect in the P320 is not answered decisively in favor of Sig Sauer by evidence that several other handguns manufactured by other companies may be equally or more prone to unintended discharge. Additionally, even if it is possible that a handgun with a tabbed trigger could be actuated by a foreign object, that possibility is not a decisive, winning point where the factual circumstances and the legal standard permit a verdict based on probability and reasonableness considerations. In other words, a jury could find that it matters whether the P320 is dramatically easier to actuate in the holstered scenario, which Dr. Vigilante says he has demonstrated.[13] I cannot say based on

[13] Vigilante ran tests on a P320 that he modified to include an Agency Arms after-market tabbed trigger. He was unable to actuate the trigger with a small zipper when the modified gun was holstered, unlike the

Sig Sauer's various critiques that Dr. Vigilante's demonstrative efforts would not help the jury judge the matter for itself, do not employ a reliable methodology, or are untethered to the facts of the case. Accordingly, the request to exclude his testimony is denied.

In summary, I conclude that Kent's and Vigilante's opinion testimony would prove helpful to the jury and is capable of generating genuine issues at trial in support of the Coles' burden to prove design defect, inadequate warning, and proximate causation. [14]

### C. Is the Failure to Warn Claim Precluded by David Cole's Failure to Read Warnings?

Sig Sauer argues that David Cole's failure to warn claim is not viable because David Cole testified that he never read the warnings that came with the P320. Def. Mem. at 12. This is an accurate statement of the record. David Cole neither read the warnings found in

---

stock P320. He was able to actuate the modified P320 with a large zipper "with a lot of effort and a lot of time getting the [zipper] out in front of the . . . trigger and getting it across the tab." Vigilante Dep. June 20, 2025 (ECF No. 69-15) at 70-71. Evidently, in tests using a large zipper the effort needed to actuate the tabbed trigger was considerably different than the effort needed with the stock trigger. *See also id.* at 51 (describing a similar test involving a Glock with a tabbed trigger). The significance of these tests goes to weight rather than admissibility.

Separately, Sig Sauer argues that the holstered scenario reinforces its request for summary judgment because the Sheriff's Office consulted with someone else about holster selection and because the holster manufacturer should ensure that its holster covers the trigger. Also, it appears to be standard in the industry that "light-bearing holsters" (holsters for pistols that have a mounted light) commonly leave more space for foreign object access to the trigger, and holster manufacturers sometimes warn about this on their own. Mot. at 17-18. However, the jury could find that the state of the art in holster design generated a foreseeable risk for Sig Sauer to design around or warn about. *See* Vigilante Report at 32-38; *see also supra*, n.6.

[14] Concerning a similar scenario involving an unintended discharge, the Sixth Circuit held that the design critiques associated with the lack of an external safety were sufficient, if credited by the jury, to support an inferential finding of causation. *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1231 (6th Cir. 2025) (affirming exclusion of expert testimony only as to proximate causation but not design defect and holding that design defect opinions were sufficient to allow jury to draw its own conclusion as to proximate cause); *see also Slatowski v. Sig Sauer, Inc.*, No. 24-1639, 2025 WL 2178533, at *6 (3d Cir. Aug. 1, 2025) (same assessment on issue of proximate causation). Unlike in *Davis*, here the causation opinions are better tethered to the facts and include a recreation of the most likely scenario. Consequently, I find that they are likely to be of assistance to the jury and should not be excluded.

the P320's operator's manual nor performed any independent research into the subject. Def. Stmt. & Pl. Opposing Stmt. ¶¶ 23-25, 28. The Coles argue in response that, among other things, Sig Sauer should have warned or educated the Sheriff's Office in connection with its acquisition of P320s in bulk, and that one occasion to do so would have been when the Office's armorer, Lt. Rizzo, was training at Sig Sauer's facility.

In Maine, the general rule makes the manufacturers and suppliers of products liable to expected users for harms resulting from foreseeable uses of a product if they have reason to know that the product is dangerous yet fail to exercise reasonable care to inform the user of the danger. *Pottle v. Up-Right, Inc.*, 628 A.2d 672, 675 (Me. 1993). A failure to warn claim involves "a three-part analysis: (1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether the inadequate warning proximately caused the plaintiff's injury." *Id.*

Sig Sauer's challenge goes to the third part of the analysis, whether an inadequate warning was the proximate case of David Cole's injury. Given the record evidence that could support a finding that Sig Sauer was aware of a pattern of unintended discharges involving the P320 when holstered, in advance of the Sheriff's Office's acquisition, the jury could conclude that a warning delivered to Lt. Rizzo most likely would have prevented Cole's injury.

**D. Fraudulent Concealment**

Sig Sauer argues that summary judgment should enter for it against the fraudulent concealment claim because there was no defect to disclose.[15] Def. Mem. at 14. This argument harkens back to Sig Sauer's position that it is entitled to summary judgment in its favor on the entire case because the alleged design defects are really design features, a premise I have already concluded must go to the jury. Sig Sauer otherwise argues that it did not fail to disclose anything it had a duty to disclose since it merely understood that P320s fire when their triggers are pulled. These are closing arguments. They do not call for judgment as a matter of law.

**E. Punitive Damages**

Finally, Sig Sauer argues that the record does not display the kind of conduct that could fairly be regarded by the jury as express or implied malice. Def. Mem. at 14-15. It observes, in part, that from its own perspective the incident rate is extraordinarily low given the sheer number of P320s in circulation. *Id.* at 15. Also, Sig Sauer describes the basic incident as involving the common risk of carrying a pistol in a holster, as well as the common risk associated with a department changing firearms (regardless of the firearm in question), such that every user should be on guard to avoid this kind of unintended discharge. *Id.* at 16-17.

---

[15] "[T]o prevail on a claim for fraudulent concealment, a plaintiff must prove, by clear and convincing evidence, (1) a failure to disclose, (2) a material fact, (3) when a legal or equitable duty to disclose exists, (4) with the intention of inducing another to act or refrain from acting in reliance on the non-disclosure, and (5) the plaintiff in fact relied upon the non-disclosure to the plaintiff's detriment." *Picher v. Roman Catholic Bishop of Portland*, 82 A.3d 101, 102-103 (Me. 2013).

The evidence in this case would not support a finding that Sig Sauer's alleged defective design or failure to warn were motivated by actual malice or an intent to harm its customers. Thus, the question is whether its allegedly tortious conduct could be regarded as sufficiently outrageous that malice is implied. This is a demanding standard requiring proof by clear and convincing evidence. *Staples v. Bangor Hydro-Elec. Co.*, 629 A.2d 601, 604 (Me. 1993).

Based on record evidence involving known incidents and risks (recounted in the Coles' Response at 30-33) and what might be regarded by a lay jury as a uniquely dangerous handgun, I conclude that there is a genuine issue for trial. Ultimately, the question is not whether the Court is or is not outraged by the record or whether gun aficionados consider the P320 a special weapon with outstanding design features rather than defects, but whether a jury comprised of a cross-section of the community could be sufficiently disturbed by the overall circumstances to find Sig Sauer's conduct outrageous in relation to the risk allegedly presented to users of the P320. I decline to rule out that possibility at the summary judgment stage.

CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 69), Motion to Exclude Evidence and Opinions of Plaintiff's Expert Randy Kent (ECF No. 70), and Motion to Exclude Evidence and Opinions of Plaintiff's Expert William Vigilante (ECF No. 71) are DENIED.

SO ORDERED.

Dated this 31st day of March, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge