# EXHIBIT B

# to Sig Sauer, Inc's

# Motion *in Limine* No. 11

Case 1:23-cv-00327-JCN   Document 123-2   Filed 06/05/26   Page 2 of 116   PageID #: 5854

Deposition of David Johnson                                        Mariya Gomelskaya v. Sig Sauer, Inc., et al.

```
------------------------------------x
MARIYA GOMELSKAYA, Individually  : PHILADELPHIA COUNTY
and as Administratrix of the     : COURT OF COMMON PLEAS
Estate of ROMAN NESHIN, DECEASED,: LAW DIVISION
                                 :
              Plaintiff,         :
                                 :
    v.                           : NOVEMBER TERM, 2024
                                 :
SIG SAUER, INC. AND GERSH GROUP, : CIVIL CASE NUMBER:
INC. d/b/a SPOT4GUNS,            : 241200470
                                 :
              Defendants. :
------------------------------------x
```

Zoom Videotaped Deposition of

DAVID JOHNSON taken pursuant to notice,

commencing at 10:04 a.m. EST on Friday, March 6,

2026, before Stephanie L. Hummon, a Registered

Professional Reporter.

Everest Job No.:   50483

Reported by:  Stephanie L. Hummon, RPR

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 3 of 116    PageID
#: 5855
Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

A P P E A R A N C E S


SALTZ MONGELUZZI BENDESKY, P.C.
BY:  ROBERT W. ZIMMERMAN, ESQUIRE
1650 Market Street
52nd Floor
Philadelphia, Pennsylvania 19103
(215)496-8282
rzimmerman@smbb.com
        On behalf of the Plaintiff



LITTLETON JOYCE UGHETTA & KELLY LLP
BY:  KRISTEN DENNISON, ESQUIRE
2460 N Courtenay Parkway
Suite 204
Merritt Island, Florida 32953
(321)574-0280
kristen.dennison@littletonjoyce.com
        On behalf of the Defendants



ALSO PRESENT:  Paul D'Ambra, Videographer

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 4 of 116    PageID
#: 5856
Deposition of David Johnson                                   Mariya Gomelskaya v. Sig Sauer, Inc., et al.

                            I N D E X

WITNESS                                                PAGE

DAVID JOHNSON

        Examination by Mr. Zimmerman                    5

        Examination by Ms. Dennison                    80

        Examination by Mr. Zimmerman                   85

        Examination by Ms. Dennison                    89


                      E X H I B I T S

NUMBER      DESCRIPTION                                PAGE

Exhibit 1  Failure Modes, Effects, and               8
           Criticality Analysis (FMECA),
           SIG-ARMY00000412-SIG-ARMY00000413
           with attachments MHS Pistol Failure
           Modes, Effects, and Criticality
           Analysis(FMECA), 2 pages;
           Probability Levels/FMEA Occurrence,
           1 page; Severity Levels (MIL-STD-882E),
           1 page; Risk Assessment Matrix, 1 page

Exhibit 2  Chart entitled, EPR170 - BENCH, last    53
           revision 4/8/15, 1 page

Exhibit 3  E-mail, June 5, 2014,                   86
           P320Design000040-P320Design000043

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 5 of 116    PageID #: 5857

Deposition of David Johnson                                        Mariya Gomelskaya v. Sig Sauer, Inc., et al.

P R O C E E D I N G S

THE VIDEOGRAPHER:  We're on the record, and today's date is March 6, 2026.  The time is 10:04 a.m. Eastern.

This is the recorded video deposition of David Johnson being taken in the matter of Gomelskaya versus SIG Sauer Incorporated, et al., Court of Common Pleas Philadelphia County, Civil Case Number 241200470.

I'm Paul D'Ambra, the video technician.  Our court reporter today is Stephanie Hummon.  We're both from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

And now, will the court reporter please proceed.

THE STENOGRAPHER:  Due to this deposition taking place remotely, the parties will stipulate that the stenographer may swear in the witness.  Will the attorneys please indicate agreement by stating your name and your agreement on the record, beginning with counsel for the plaintiff.

MR. ZIMMERMAN:  Yes.

MS. DENNISON:  Agreed.

THE STENOGRAPHER:  Thank you, Counsel.

- - -

DAVID JOHNSON,

after having been first duly sworn or affirmed, was examined and testified and testified as follows:

- - -

EXAMINATION

- - -

BY MR. ZIMMERMAN:

Q.   Good morning, sir.  Can you hear me?

A.   I can hear you.

Q.   And can you see me?

A.   I can see you also.

Q.   All right, sir.  My name is Bob Zimmerman.

I understand you've been deposed before related to your time with SIG.  How many times have you given deposition testimony related to your time with SIG?

A.   Twice previously.

Q.    Have you ever testified in court --

A.    No, I haven't.

Q.    -- related to your time with SIG?

A.    No, I haven't.

Q.    Same rules apply.  If you don't understand my question, let me know, I can rephrase it.  Okay?

A.    Okay.

Q.    And if you don't know the answer, please let me know, I don't want you to guess.  Okay?

A.    Right.

Q.    All right.  Sir, in what town do you currently reside?

A.    Hamden, Connecticut.

Q.    And are you with the same employer that you were with, with your other depositions?

A.    Yes, I am.

Q.    And I understand you worked for SIG from 2005 until about 2016?

A.    Yes.

Q.    And specifically, I think you left SIG in December of 2016, does that sound right?

A.    Yes, it does.

Q.    Okay.  You were head of the engineering

department in your later years there?

A.    Yes, I was.

Q.    Are you a licensed engineer?

A.    No.

Q.    Have you ever sat for the licensed engineering test?

A.    No, I haven't.

Q.    Or the PE test?

A.    No, I have not.

Q.    All right.  I want to focus on a period of time where my understanding is you were involved in an FMECA analysis related to the military contract.  You have seen that FMECA before, correct?

A.    Well, in a prior deposition, I was shown it, and I probably saw the final version of it before it was submitted to the government at the time that we prepared it.

Q.    Okay.  And that -- well, I'll fast forward to a question.

Since you were -- since you left the company in December of 2016, do you know for certain whether the FMECA had been delivered to the military before you left the company?

A.   To the best of my knowledge, that was submitted before I left the company as part of a proposal for the modular handgun.

MR. ZIMMERMAN:  I want to show you a document, and we'll mark it as Exhibit 1.

- - -

(Exhibit 1 was marked for identification.)

- - -

BY MR. ZIMMERMAN:

Q.   All right.  Can you see my screen, first?

A.   It's blank, but here it comes.  Yes, sir.

Q.   Okay.  So this is a document that contains the FM -- an FMECA and a two-page written document in front of it.  It's Bates SIG-ARMY 412 to 413, and then it is a PDF copy of the FMECA that I believe has a Bates label of 414.

I want to direct you, sir, to this intro. It says "Ed Murphy" at the top.  You and Ed Murphy created the FMECA together, correct?

A.   I worked with Ed on the tabular portion of this.

Q.   Meaning the chart?

A.   Yes.

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 10 of 116    PageID #: 5862

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Q.   Okay.  His -- his document, the first two pages, has a Date of Revision of February 16, 2017. And it says, "Initial Issue for MHS Program."  And it reads as though this is providing the FMECA to the military.

I don't -- I'm not doing this to second-guess your memory, but having looked at this document, does it refresh your memory, one way or the other, whether the FMECA was delivered before or after you left the company?

A.   You know, I can't -- I would not say that I have a definite recollection of it being submitted before I left, and then based on that date, I would assume that it was submitted after.

Q.   Okay.  Did you personally have any communication or interaction with individuals from the military related to the FMECA?

A.   No.

Q.   Who told you that you were going to be part of the formation of the tabular portion of the FMECA?

MS. DENNISON:  Objection to form.

You can answer.

THE WITNESS:  There was -- and I'm

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 11 of 116    PageID #: 5863

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

not sure of the timing of this, but, you know, there was a considerable amount of information that was required to be submitted to the government in that program, and multiple people worked on that. There were portions of it that sort of made sense as to where it would go. I don't know that I was told you will work on this, as much as maybe just Ed and I conferred and said, all right, let's work on this.

BY MR. ZIMMERMAN:

Q. Okay. So, to the best of your memory, you and Ed, essentially, agreed amongst yourselves that you would take care of the FMECA?

A. I think that's a fair way of putting it.

Q. Okay. Fair to say that that agreement and that project began sometime in 2016?

A. Well --

        MS. DENNISON: Object to form.

        THE WITNESS: I don't -- I don't believe it began before 2016.

BY MR. ZIMMERMAN:

Q. And since you left in 2016, it would have to have been in 2016, right?

A. At least for the portions of it that I

helped with, yes.

Q.   Okay.  Do you know if you started with the FMECA in the summer of that year or the fall or the winter?

A.   No, I can't recall that specifically.

Q.   I expected you wouldn't, but I don't know if you guys were, you know, out in the sunshine or, you know, at a fireplace when you were discussing this.  Just thinking as best you can, you can't really go back and recall what season it was when you were performing this FMECA, fair?

A.   That is fair.

Q.   Okay.  Now, how did you understand that SIG was going to be submitting an FMECA to the military?  Did that understanding come from your review of a document, from conversations with individuals, or from some other source?

A.   So I mean, requirements from the government for information came to us, I think, in different forms, including the request for proposal.  And there were people in the company who had the lead on organizing, preparation, and submittal of those type of documents to the government, but that different functions in the

company would take on different components of that and then contribute to it.

Q.   Who was in charge of gathering the submittals?

A.   I don't know if there was one person, but we had a team that was responsible for government sales.

Q.   Did you consider yourself to be part of that team?

A.   No.

Q.   Who -- do you remember anybody from that team?

A.   Steve Rose was in charge of that.

Q.   Okay.  And do you know whether you first learned that an FMECA was required to be submitted through your review of the bid documents or through conversations with individuals?

A.   No, I don't recall.

Q.   Prior to conducting this FMECA had you ever conducted an FMECA before?

A.   No, I had not.

Q.   Had you ever heard of an FMECA before?

A.   Well, in various forms, something like this -- let me -- let me put that a different way.

So failure modes and effects analysis is a -- probably a more common term in industry, and I had heard about failure modes and effects analysis. I had participated in one which was considered a process failure modes and effects analysis probably close to 20 years prior.

Q.   Okay.  And what is your understanding of the difference between an FMEA and an FMECA?

A.   I'm not sure that I could explain the difference.

Q.   Okay.  Well, are there certain things, having gone through an FMECA, that are contained in an FMECA that are not contained in an FMEA?

A.   Let's just say that, to the limit of my knowledge, which is not extensive, the concept is pretty much the same.

Q.   So it's a failure modes effects and criticality analysis.  The criticality is the "C" and is the letter that is in one and not the other. What does criticality mean to you as one of the individuals who created this FMECA?

MS. DENNISON:  Objection to form.

THE WITNESS:  Well, I would say it speaks to the severity of the consequences of an

event.

BY MR. ZIMMERMAN:

Q.    And tell me a little more about the FMEA that you had been involved in 20 years prior to this FMECA?

A.    It was assessing manufacturing processes and looking at failure modes, their cause, what the impact were or could potentially be, and what actions to take to reduce the likelihood or the severity of the result of one of those occurring.

Q.    Okay.  What was the manufacturing process that you were analyzing?

A.    It was machining parts, I don't recall specifically what items.

Q.    And in terms of the potential risks, were those safety risks or manufacturing risks, production risks?

A.    Those were production risks.

Q.    Prior to the P320 FMECA had you ever performed a failure modes and effects analysis where you were analyzing safety risks of a product or process?

A.    We did something ad hoc that would have some slight resemblance to it at SIG Sauer, it was

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 16 of 116    PageID #: 5868

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

not formalized and didn't follow an established

procedure.

Q.    Tell me about that.

A.    We were doing a safety on the P220 pistol

and we wanted to make a decision as to whether it

would be better for the safety to prevent the

opening of the pistol slide when it was engaged or

if it would be better to not block the slide so

that it could be manually cycled while the safety

was on.

Q.    So that was a design choice that you-all

were considering and you analyzed those two

options?

A.    Yes.

Q.    Was that analysis put in writing?

A.    No.

Q.    Okay.  So that other ad hoc one, as you

called it, was, essentially, more than one person

verbally analyzing two different design choices

that related to the P220?

A.    Yes.

Q.    Did you look at identifying the

probability levels of certain negative outcomes

occurring?

A.    No.

Q.    Did you look at the severity levels of certain outcomes occurring?

A.    No.

Q.    Did you create any type of risk assessment matrix for the P220?

A.    No.

Q.    Prior to starting the FMECA, did you obtain any drafts or examples of other FMECAs for other products, just to understand how they looked and what they contained?

A.    No.

Q.    Did you ask SIG Sauer if they could acquire any examples that you could look at before you started the FMECA?

A.    No, I did not.

Q.    Okay.  Going back to Exhibit 1, you can read the introduction --

A.    Yes.

Q.    -- but it has some references, and it basically says the FMECA fulfills military requirements and is intended to be used in conjunction with these references.

Do any of these references on page 1 look

familiar to you?

A.    Well, let's start with CDRL.  That is something used in government contracting.  It's like Contract Data Requirements List, and then the "A" followed by three numbers would refer back to a list of documents or data that had to be submitted.

Q.    Okay.

A.    And that would be unique to that contract.

MIL Standard 882 kind of, obviously, it's a military standard created by the Department of Defense, and it covers system safety.

Q.    Did you have these references available to you before you started putting pen to paper?

A.    Yes.

Q.    Did you review all five of these references before putting pen to paper?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't recall reviewing those CDRLs, I don't know if they actually had more information than what you see right there associated with them.  We did refer to MIL-STD-882.

BY MR. ZIMMERMAN:

Case 1:23-cv-00327-JCN  Document 123-2  Filed 06/05/26  Page 19 of 116  PageID #: 5871

Deposition of David Johnson                                 Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Q.   So, for example, CDRL A003 appears to be a System Safety Hazard Analysis Report.  004, System Safety Program Plan.  These look to be documents.

Did you read these reports and plans that are outlined A3 through A6?

A.   So, those were not reports and plans provided.  That is the government identifying that you have to prepare and submit those items.

Q.   Did they give -- okay.

So is the FMECA, essentially, to your understanding, one or all of these CDRLs?

MS. DENNISON:  Objection to form.

THE WITNESS:  You know, the relationship of those to the MIL Standard is not something I can speak about knowingly because it's been too long for me to recall if each of those is defined in that MIL Standard.

BY MR. ZIMMERMAN:

Q.   Okay.  But as you understand it, these CDRLs 3 -- A3 through A6, are, essentially, submissions that SIG is going to be creating and giving to the military?

A.   That is my understanding, yes.

Q.   And your understanding is the FMECA --
well, it says up here it fills the requirements of
A007.  Do you know if the FMECA was submitted?
Sorry, strike that.

I want to show you the chart, and I know
you're on a laptop.  I want to give you two
competing benefits, being able to see as much of it
as possible, but also being able to have it be big
enough for you to understand what the heck I'm
saying.

A.   Right.

Q.   So what I'm going to do is I'm going to
try to find the right balance, and you'll tell me
if I have the right balance or if you want me to
zoom in or zoom out.  Okay?

A.   All right.

Q.   So, do you see on my screen, the title,
MHS Pistol FMECA?

A.   Yes, I do.

Q.   Okay.  Now, there are columns on this
chart, and I understand that the top of the chart
has titles of the columns.

Do you see those?

A.   Yes, I do.

Q.    Did you create -- strike that.

Did you decide what would be columns or is that something that the military provided you for this FMECA?

A.    Best of my recollection, that comes out of the MIL Standard.

Q.    Okay.  So -- and this is -- it says up here, "CDRL Item A007," and then it has some letters and numbers underneath.  Did you, essentially, understand that this was a blank document that was given to you that had the title at the top and the column titles already filled out for you?

MS. DENNISON:  Objection to form.

THE WITNESS:  I believe we had to build that.

BY MR. ZIMMERMAN:

Q.    Okay.  So you knew what had to be in there and then you, essentially, put these columns in yourself?

A.    I can't tell you, but those column headings may be taken verbatim from the MIL Standard.

Q.    So they're either taken verbatim or you

Case 1:23-cv-00327-JCN   Document 123-2   Filed 06/05/26   Page 22 of 116   PageID #: 5874

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

just created them yourselves?

MS. DENNISON:  Objection to form.

THE WITNESS:  One of those, yes.

BY MR. ZIMMERMAN:

Q.    Obviously, you were using a computer to complete this.  Do you know whether you were utilizing Microsoft Word or Microsoft Excel or some other platform for entering this information?

A.    No, I don't recall which software we were working in.

Q.    Okay.  So the first column is "Potential Failure Mode (results in a loss of 'Function' or realization of a hazard)."  Tell me what that column was intended to identify in terms of your list.

MS. DENNISON:  Objection.  Form.

THE WITNESS:  I'm not sure what you're asking.  I mean, to me, it's --

BY MR. ZIMMERMAN:

Q.    I'll -- let me ask it differently then.

Were you, essentially, intending to identify potential failure modes associated with pistols?

A.    We're attempting to identify potential

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 23 of 116    PageID #: 5875

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

failure modes associated with pistols, yes.

Q.    Okay.    Now, there are, it looks like a couple dozen different potential failure modes. How were they ordered?  Were they ordered in terms of the most significant?  Were they ordered in terms of what came into your heads first?  Were they ordered alphabetically?  Were they ordered some other way?

A.    I think what came to mind first.  There may have been some realigning of them afterwards just so that they were grouped to be --

Q.    Okay.

A.    -- by similarity.

Q.    Okay.  So, for example, if you're talking about "Pistol accidentally/unintentionally discharging," there are five there before we get to "Multishot failures," then we go back to "Pistol accidentally/unintentionally discharging," there may have been situations where you thought of another and put it in an appropriate type of category or positioning?

A.    You know, I don't recall trying to make sense of the sequence in which they were presented.

Q.    Okay.  But you do recall that, at least

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 24 of 116    PageID #: 5876

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

starting the list, they were the potential failure modes that came to mind first as the people completing this document, fair?

A. As we were drafting it, whether this is -- whether this is the order at which they occurred to us as we were working on this, I can't tell you.

MR. ZIMMERMAN: Off video.

THE VIDEOGRAPHER: Off the video, 10:32.

(Brief recess.)

THE VIDEOGRAPHER: Back on the record, 10:33.

BY MR. ZIMMERMAN:

Q. All right, sir. I want to use the first Potential Failure Mode on here to go through the different columns, and I'm going to zoom in a little bit.

Does zooming in to this degree allow you to read what's in the document?

A. Yes.

Q. Okay. So the first Potential Failure Mode that's identified on this FMECA is a pistol accidentally/unintentionally discharging, correct?

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 25 of 116    PageID #: 5877

Deposition of David Johnson                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

A.    Yes.

Q.    Does the next column discuss the potential causes of that failure?

A.    Yes, it does.

Q.    And was the very first item identified as a potential cause of a pistol accidentally or unintentionally discharging an "Accidental trigger pull (Operator error) Finger on trigger"?

A.    Yes.

Q.    And then the next is, Accidental trigger pull from a foreign object?

A.    Yes.

Q.    Okay.  "O," I understand that to be an occurrence probability, correct?  The "O" column?

A.    I can't say for sure.

Q.    Okay.  So you'll see that there are A, B, C, D, and E --

A.    Yes.

Q.    -- in these columns.

A.    Yep.

Q.    And then there's a little chart here that has A, B, C, D, E, and F.

A.    Right.

Q.    Probability Levels/FMEA Occurrence.

We're looking at page 5 of Exhibit 1.

Is this, essentially, the chart that identifies those letters?

A.    Yes.

Q.    Okay.  So if we look at, for example, Accidental trigger pull of a foreign object, you-all rated that as a C, correct?

A.    Yes.

Q.    And that C, if we go down to the chart, means that there is an occasional probability level or FMEA occurrence rate, correct?

A.    Yes.

Q.    And did you -- when you put C in there, mean that the probability of an accidental trigger pull by a foreign object on a pistol is an occasional probability?

A.    Yes.

Q.    Now, in completing this FMECA, did you analyze any other guns in particular, other than the P320, in coming up with these ratings to the left of the Recommended Action column?

MS. DENNISON:  Objection to form.

THE WITNESS:  This was not generated based on a specific existing firearm.

BY MR. ZIMMERMAN:

Q.   Okay.  Was it based on all firearms from the beginning of time or did you -- did you shrink it by some type of measure?  For example, is this just pistols?  Is this just pistols in the last 30 years or so?  Is this everything from, you know, machine guns, shotguns?

A.   So, I understand your question.  I mean, it was -- it was pretty open.  So if you're trying to put yourself in the place of somebody who might read this later and not really knowing what they might be thinking, you would say, well, there's a possibility of a foreign object pulling a trigger. Okay.  Well, what can you do about that?  Well, you can put a trigger guard on it.

So, no, it was not restricted to a period.  It did not assume a baseline of countermeasures that were common among products in the market at that time.

Q.   Okay.  I want to understand the term you use "trigger guard."  When you are referring to a trigger guard, are you talking about, essentially, an encased perimeter around the trigger?  Or are you talking about some type of guard or safety on

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 28 of 116    PageID #: 5880

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

the trigger itself, or something else?

A.    When I use that term, I am referring to the integral component of the frame that protrudes below or extends below and in front of the trigger.

Q.    Okay.  How did you come up with C in assessing the risk of an accidental trigger pull from a foreign object, on guns generally?

A.    Was very, very subjective.  We basically would think, well, if there were no design measures to protect the trigger from coming into contact with another object, how likely would this be to occur.  And based on intuition, that if there was nothing there to prevent the trigger from coming into contact with other objects, that you could expect it to happen with a fairly high frequency.

Q.    And I guess that's what I'm getting at, fairly high frequency.  Frequent is considered A, on this chart on page 5.  Probably is B. Occasional is C.  Remote is D.

So, are you saying that if a gun lacked any type of guarding around or on the trigger, that you rated that as C, in terms of the probability and level -- probability level and occurrence rate?

A.    Yes.

Q.   And how did you determine that was a C versus a probable or a frequent risk?

MS. DENNISON:  Objection to form.

Go ahead.

THE WITNESS:  That, there was no process to that.

BY MR. ZIMMERMAN:

Q.   Okay.  Do you see it says, "Occurrence" and it identifies certain percentages of occurrence rates?

A.   Yes.

Q.   What was your understanding of that occurrence rate system that is identified on the chart on page 5?

A.   That it's a guideline.

Q.   Okay.  Did you understand that if your assessment was that the occurrence would be at least .1 percent to 10 percent of the time -- strike that.  Let me just read this for a moment.

So is the .1, essentially, equivalent to 10 percent?

A.   Yes.

Q.   Okay.  So if you believe that the probability level was greater than a 10 percent

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 30 of 116    PageID #: 5882

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

chance of occurring for a particular pistol, you would assign an A grade?

A.    Yeah.

Q.    And if there was between a 1 and 10 percent chance of a particular pistol having that happen, you would assign it a B grade?

A.    Yes.

Q.    And if it was between a 0.1 percent chance and a 1 percent chance, you would assign it a C grade?

A.    Yes.

Q.    And then between a 0.0001 percent and a 0.1 percent chance, you would assign it a D grade?

A.    Yes.

Q.    And if it was less than a 0.001 percent chance -- 0.0001 percent chance, but still possible, you would assign it an E grade?

MS. DENNISON:  Objection to form.

MR. ZIMMERMAN:  Let me just do that one again because it was a little rough.

BY MR. ZIMMERMAN:

Q.    If there was a potential for the occurrence that you assigned -- you assessed as 0.0001 percent or less, but still possible, you

would assign it an E grade?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.   And if it was a potential risk that was eliminated through the preventative control, you would assign it an F grade?

A.   Yes.

Q.   Now, how were you -- strike that.

How did you determine that having zero guarding on or around the trigger would result in an unintentional firing of the gun between 0.1 percent of the time and 1 percent of the time?

MS. DENNISON:  Objection to form.

THE WITNESS:  Again, this was very subjective.  I can't tell you what thought process I was using at the time or what I was picturing as the circumstances.

BY MR. ZIMMERMAN:

Q.   Did you consult anyone else on your engineering team to review your subjective grades that you were assigning?

MS. DENNISON:  Objection to form.

THE WITNESS:  Not that I recall.

BY MR. ZIMMERMAN:

Q. Ed Murphy, what was his role at the company?

A. Director of quality.

Q. Did you -- did you come up with the occurrence grades? Did you and Ed come up with the occurrence grades? Did Ed come up with them himself or something else?

MS. DENNISON: Objection to form.

THE WITNESS: Ed and I corroborated on this, but I would say I -- the majority of the content came from me.

BY MR. ZIMMERMAN:

Q. Okay. Do you recall anyone else being involved in the subjective analysis of what letter grade to assign these occurrence levels?

A. No, I do not recall somebody else.

Q. Now, the next one is "Potential Effect of Failure (Severity-Function)." Looking back at the chart, we get to a new page, page 6.

Does this, essentially, give you guidance for that column?

A. Yes, it does.

Q. And you're supposed to rate these -- the

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 33 of 116    PageID #: 5885

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

S column as a 1, if it had the potential for one or more of the following:  Death, permanent total disability, irreversible significant environmental impact, or monetary losses exceeding $10 million, correct?

A.    That's what it says.

Q.    And then you would assign a score of 2, if it was a less severe level than 1, but could result in one or more of the following items that are identified.  Is that how you read this document?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.    Okay.  So, for example, if you assessed that the severity of an occurrence could result in permanent total disability, you would assign it a 1, and if it was permanent partial disability, you would assign it a 2, fair?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.    Were you given any guidance, either through the military documents or through your

employer or through any other sources, as to what would constitute a permanent total disability versus a permanent partial disability?

A.   No.

Q.   What did you understand the difference to be?

A.   Well, I can't say.

Q.   Did you ask anybody to give you further clarity on that?

A.   Not that I recall.

Q.   Did you ask for any vocational assessment, guidance, or literature that gave you more knowledge for determining the severity level between a permanent total disability and a permanent partial disability?

A.   No.

Q.   Now, I want to identify two different severity levels that I've highlighted.  I'm going to zoom in and if I zoom in too much or if you want me to zoom out, just let me know.

A.   That's good.

Q.   The first is an accidental trigger pull by a foreign object with a severity level of 1. And then when you go down about a half a dozen to a

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 35 of 116    PageID #: 5887

Deposition of David Johnson                                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

dozen items, there's one that says, "Accidental trigger pull, Holstering/unholstering," and then in parentheses, "Operator Error)."

Do you see that?

A.    Yes.

Q.    Okay.  So how were you able to assess that an accidental trigger pull by a foreign object had a 1 severity level and an accidental trigger pull holstering or unholstering had a 2 severity level?

A.    Well, that -- in the case of an accidental trigger pull while holstering or unholstering, the pistol would be -- there would be some control about where the pistol was pointed at the time of fire and then it would be in a direction that would be very, very unlikely to strike someone in a way that would cause death or total disability.

Q.    And that's what -- the total disability is what I'm really getting at.  How did you assess that in a holstering or unholstering discharge that, obviously, made contact with the person would have the potential to be a potential -- strike that.

Case 1:23-cv-00327-JCN   Document 123-2   Filed 06/05/26   Page 36 of 116   PageID #: 5888

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

How did you determine that a holstering or unholstering discharge would only have the potential to cause permanent partial disability versus the potential to cause permanent total disability?

MS. DENNISON:  Objection to form.

THE WITNESS:  There was no more to it than what I just described.

BY MR. ZIMMERMAN:

Q.   Okay.  Could a lower leg injury that occurs from an unintentional discharge while holstering or unholstering cause a victim a permanent total disability?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't know.

BY MR. ZIMMERMAN:

Q.   If you don't know that, why -- strike that.

If you don't know that, how were you able to assign these S grades?

MS. DENNISON:  Objection to form.

THE WITNESS:  I just did.  You know, there's not a lot of data and information available, actually, basically none, so you could

see where these potential things happening and you do your best to put some definition on it.

BY MR. ZIMMERMAN:

Q. Okay. In terms of data, did you look at or receive any information about the potential for permanent total disability resulting from lower leg gunshot injuries?

A. No.

Q. Do you know if that data exists?

A. No, I do not know if that exists.

Q. Did anyone from SIG provide you any additional information to assist you in identifying the severity levels of these outcomes?

A. No.

Q. If they did provide you with additional data and information, would you have utilized it in your assessments under this FMECA?

A. Yes.

Q. All right. So it looks as though on the last page of this document, there is a Risk Assessment, and it basically takes the severities at the top and the probabilities going down and identifies different risk assessments from as minimal as being eliminated to as significant as

high.  Do you see those?

A.    Yes.

Q.    And, essentially, if you put a C on the probability and you put a 1 on the severity, it'll tell you where it fits on this chart, correct?

A.    Yes.

Q.    Okay.  So, essentially, when you look back at, for example, "Accidental trigger pull (Foreign Object)," C on the Occurrence Rate and 1 on the Severity Rate gives you an automatic Risk Assessment Matrix Level, in this case, would be high, right?

A.    Yes.

Q.    Compared to "Accidental trigger pull holstering/unholstering," you rated that a D and a 2, and the chart just spits out that being a medium risk, right?

A.    Yes.

Q.    Similar to my questions on the different severity levels between accidental trigger pull (Foreign Object) and accidental trigger pull holstering/unholstering, how did you determine that it would be a more frequent risk of foreign objects pulling a trigger than an accidental trigger pull

while holstering and unholstering?

A.   I don't recall my thought process at that time.

Q.   Do you know if accidental trigger pulls from foreign object have a greater frequency of occurring than accidental trigger pulls holstering and unholstering?

A.   No, I do not.

Q.   Did you ever request from your employer any assistance from any outside sources in order to complete this document?

A.   No, I did not.

Q.   Had SIG offered you any outside resources in order to complete this document, would you have accepted those resources?

A.   Yes.

Q.   Do you know if anybody at the company had ever performed an FMECA or an FMEA that dealt with safety risks of products?

A.   To the best of my knowledge at that time, there was nobody that had.

Q.   And how do you know that?  Is that something that you asked about?  Something that you were told?  Some other source of information

that --

MS. DENNISON:  Objection.  Form.

MR. ZIMMERMAN:  Let me rephrase.

THE WITNESS:  Okay.

BY MR. ZIMMERMAN:

Q.    How did you come to that understanding?

A.    Let me rephrase my answer.  I was unaware of anybody in the company having had any experience with doing this.

Q.    Okay.  Did you ask your employer or any of your employees or coworkers whether they had experience doing these?

A.    I don't recall asking.

Q.    Now, once we get past "Risk Assessment Matrix Level," the, essentially, coloring in the matrix chart level, the next thing is "Recommended Actions."

Do you see that?

A.    Yes.

Q.    Now, is this, essentially, your attempt at identifying the recommended actions that SIG was taking to attempt to minimize or mitigate these risks or potential causes of failure?

MS. DENNISON:  Objection to form.

THE WITNESS:  The design of the P320 was complete before this was prepared.

BY MR. ZIMMERMAN:

Q.    So did it --

A.    So --

Q.    Sorry, go ahead.

A.    So the actions were basically taking attributes of the P320 and identifying how they would impact the occurrence or the severity of that failure mode.

Q.    Okay.  So for an accidental trigger pull of a foreign object, the Recommended Actions are "See P320 Actions" and training.  What do you mean by "See P320 Actions"?  Is that directing you over here?

A.    Yes.

Q.    Okay.  And by "over here," I am referring to the column that says, "Action Taken."

So with respect to accidental trigger pull by a foreign object, the action that was taken in the P320 design says, "P320 trigger is effectively guarded to prevent snags on uniform, gear, or other objects.  Manual safety also further reduces probability of occurrence."

Case 1:23-cv-00327-JCN   Document 123-2   Filed 06/05/26   Page 42 of 116   PageID #: 5894

Deposition of David Johnson                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

You see that?

A.   Yes.

Q.   So, essentially, is that the action that was taken by the design team in trying to mitigate the risk of an accidental trigger pull by a foreign object?

MS. DENNISON:  Objection to form.

THE WITNESS:  You're -- if you're implying that because of this activity of creating the FMECA and identifying that as a hazard that there were -- drove the design, that's incorrect.

BY MR. ZIMMERMAN:

Q.   Okay.  Let me try to rephrase it, so that we're on the same page.

The design of the P320, you believed effectively guarded the trigger to prevent snags on uniform, gear, or other objects and that a manual safety option also further reduced the probability of accidental trigger pulls by a foreign object, fair?

MS. DENNISON:  Objection to form.

THE WITNESS:  So, basically, the P320 had been under evaluation by the government for an extended period of time and was being found

technically acceptable.  We were asked to -- or

required to submit this document where, without

having input from the government on what hazards to

address, did our best to identify what we thought

were hazards and reflect why the P320 had features

or design attributes that would help with

mitigating those.

BY MR. ZIMMERMAN:

Q.   Accidental trigger --

A.   A --

Q.   Oh, I'm sorry.  Go ahead.

A.   I mean, firearms design is evolutionary

and it encompasses a lot of conventional wisdom and

features that are accepted and expected.

Q.   Accidental trigger pulls by contact with

a foreign object was a foreseeable risk of pistols,

correct?

MS. DENNISON:  Objection to form.

THE WITNESS:  When you say,

"foreseeable," I would say you can hypothesize a

situation where that's going to happen, especially

if you're thinking about soldiers under combat

conditions, rather than people going to a training

range where their environment is very consistent

Case 1:23-cv-00327-JCN   Document 123-2   Filed 06/05/26   Page 44 of 116   PageID #: 5896

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

and controlled.

BY MR. ZIMMERMAN:

Q.   So what you're saying is there are different uses for the gun.  One could be going to a range, one could be keeping it in your safe and never touching it.  One could be a police officer has to have it holstered 40 hours a week.  One would be in a military setting.  Right?

MS. DENNISON:  Objection.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.   Okay.  So let's talk about people who are carrying a holstered weapon.  If was foreseeable to SIG that a potential failure cause of a P320 could be an accidental trigger pull by a foreign object, right?

MS. DENNISON:  Objection to form.

THE WITNESS:  I would say that, in that column, it would be foreseeable for a undefined, but hypothetical firearm, under all conditions in which it could be used, that this could occur.

BY MR. ZIMMERMAN:

Q.   Okay.  Now, the right side of the

Case 1:23-cv-00327-JCN  Document 123-2  Filed 06/05/26  Page 45 of 116  PageID #: 5897

Deposition of David Johnson  Mariya Gomelskaya v. Sig Sauer, Inc., et al.

document has an "O" and an "S".  That is an assessment of the P320, right?

A.    Yes.

MS. DENNISON:  Object to form.

BY MR. ZIMMERMAN:

Q.    So meaning, in the foreign object column, there's an occurrence of E and severity of 1.  Do you see that?

A.    Yes.

Q.    It was foreseeable in terms of the design of the P320, that for people who are carrying a holstered weapon -- strike that.

For people carrying a holstered P320, it was foreseeable to SIG Sauer that there was a risk of accidental trigger pulls by a foreign object, fair?

MS. DENNISON:  Objection to form.

THE WITNESS:  On this particular row, it's not referring to holstered pistol.

BY MR. ZIMMERMAN:

Q.    Okay.  Well, we can go to the -- let me rephrase the question then.

It was foreseeable to SIG Sauer that foreign objects contact -- strike that.

It was foreseeable to SIG Sauer that P320s could fire with accidental trigger pulls by a foreign object, correct?

MS. DENNISON:  Objection to form.

THE WITNESS:  So, I would say that it was conceivable that, under some circumstance, that could happen and that it was not -- we could not support making a statement that this could absolutely not happen under any condition.

BY MR. ZIMMERMAN:

Q.   Okay.  So tell me first, it says, "P320 trigger is effectively guarded to prevent snags on uniform, gear, or other objects."  Did you assess the trigger guard of a P320 compared to other trigger guards that were on the market in coming up with the personalized assessment for the P320 on occurrence rates?

A.   No.

MS. DENNISON:  Bob, when you have a -- when you get a natural break, could we take five minutes.

MR. ZIMMERMAN:  Yeah, I'm coming up close to one.

MS. DENNISON:  Okay.

BY MR. ZIMMERMAN:

Q.    Did you analyze the triggers themselves or any features of the triggers of the P320 compared to competitors in assigning the occurrence rate for the potential for accidental trigger pulls by a foreign object?

A.    No.

Q.    Did you assess whether trigger safeties, tab triggers, or trigger safeties, would have the potential to reduce the hazard of accidental trigger pulls by a foreign object?

A.    No.

MR. ZIMMERMAN:  All right.  Let's go off the record.

THE VIDEOGRAPHER:  Off the record, 11:08 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record, 11:14 a.m.

BY MR. ZIMMERMAN:

Q.    Sir, did you feel as though you were competent to assign probability levels related to the potential risks that you identified?

MS. DENNISON:  Objection to form.

THE WITNESS:  I was competent as anybody is going to be.  There is -- there was no quantifiable information available to put those -- to determine those with.

BY MR. ZIMMERMAN:

Q.  I mean, you would agree that if another person at SIG was asked to identify the occurrence and severity levels, their letters and numbers may not match up with yours, right?

A.  That could very well be.

Q.  So looking at, again, at foreign object trigger pulls, the column that says, "Responsibility," it looks to me as though there are some columns -- strike that.

There are some potential failure causes where the responsibility is on SIG engineer and user.  There are some where the responsibility is on SIG engineering.  And there are some where the responsibility is on just the user.

Do you see that?

A.  Yes.

Q.  How -- and just looking at quickly, it looks like those are really the only three options, right, the responsibility is on SIG engineering or

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 49 of 116    PageID #: 5901

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

the user or both, right?

A.    Okay.  Yes.

Q.    How did you determine for each category whether the responsibility was going to be on SIG engineering or the user or both?

A.    Well, it was based on the action.

Q.    Okay.  So looking at the "Recommended Actions" for the foreign objects trigger pull, first action, "See P320 Actions," that's, essentially, what you-all had in the P320's design, right?

A.    Yes.

Q.    And then it says, is it the user's responsibility to have adequate training in accordance with the manual and the military training?

A.    Yes.

Q.    Did you compare the SIG operator's manual to any of your competitors to determine whether there were any differences in the training that was outlined in your manual versus others?

A.    No.

Q.    Now, for foreign objects, trigger pulls, you, essentially, analyzed the risk -- the

occurrence risk in general for guns and the occurrence risk for P320s and assigned a lower occurrence risk for P320s, correct?

MS. DENNISON:  Objection.  Form.

THE WITNESS:  I would say that we started with an occurrence where -- a potential occurrence rate, if there was a design that had no action taken to prevent contact between a foreign object and the trigger, and a lower occurrence rate with a 320 which not uniquely, does have features to protect the trigger from contact with a foreign object.

BY MR. ZIMMERMAN:

Q.   Okay.  I want to understand a little more because you raised a good point here.  Under "Occurrence" for all guns, were you, essentially, giving an occurrence rate assuming there was no mitigation efforts whatsoever?  Or were you giving an occurrence rate based on the normal or average mitigation efforts that are seen in guns?

Basically, were you taking the worst case scenario of any gun that's ever been made?  Or were you assigning, essentially, a letter based on the average of guns?

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 51 of 116    PageID #: 5903

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

MS. DENNISON:  Objection to form, and asked and answered.

Go ahead.

THE WITNESS:  I can't say that I was consistent in all cases on this, but the initial occurrence rate would be based on if there was nothing done to mitigate, not based on what is the typical at that time.  And then the occurrence rate final would be based on the specific 320.

BY MR. ZIMMERMAN:

Q.   Okay.  You indicated here that the P320 had a manual safety -- well, you indicated under "Actions Taken:  Manual safety also further reduces probability of occurrence."

Do you see that?

A.   Yes.

Q.   So for this letter E grade, was that a P320 with a manual safety or a P320 without a manual safety?

MS. DENNISON:  Objection to form.

THE WITNESS:  In this document, it would be the version of the gun submitted to the government.

BY MR. ZIMMERMAN:

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 52 of 116    PageID #: 5904

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Q.    So the one with the manual safety?

A.    Yes.

Q.    And do you know -- strike that.

Would you rate a P320 without a manual safety as a C, a D, or an E, or some other letter?

MS. DENNISON:  Objection to form.

Go ahead.

THE WITNESS:  I don't know if the occurrence -- probability of occurrence would be significantly higher or not.

BY MR. ZIMMERMAN:

Q.    I guess that's the conundrum I'm in.  If you're doing this all subjectively, how do you know any of these letters are appropriate?

MS. DENNISON:  Objection to form.

Go ahead.

THE WITNESS:  I can't -- I would not be able to prove that these are correct.

BY MR. ZIMMERMAN:

Q.    And how would you be able to assign an E for a P320 with a manual safety, but not be able to assign a letter for a P320 without a manual safety?

MS. DENNISON:  Objection to form.

THE WITNESS:  By the same criteria I

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 53 of 116    PageID #: 5905

Deposition of David Johnson                                              Mariya Gomelskaya v. Sig Sauer, Inc., et al.

could set one.

When you start asking how the two versions of the gun might compare, I feel like you're starting to ask me to analyze them to a level that goes beyond what I'm capable of doing or was able to do when preparing this document.

BY MR. ZIMMERMAN:

Q.   Let me ask it differently.

Are you able to assign, as we sit here today, a letter grade on the occurrence level for foreign object contact pulling the trigger on a P320 that does not have a manual safety?

MS. DENNISON:  Objection to form.

THE WITNESS:  If I were to assign one, I would not be able to support it with -- with data.

BY MR. ZIMMERMAN:

Q.   Just like you weren't able to support the E with any data when you gave an E grade with a manual safety, correct?

A.   That is correct.

Q.   Looking at the first column -- strike that.

Looking at the first Potential Cause of

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 54 of 116    PageID #: 5906

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Failure, "Accidental trigger pull (Operator error) finger on trigger," you indicate the action taken with the P320 was "P320 minimum trigger pull is set to maximize trigger control without adversely affecting accuracy."

Did you analyze, in giving grades on the occurrence, changing it from a C to an E?  Did you analyze the trigger pull length or trigger pull weight of a P320 compared to other competitor guns in making this assessment?

MS. DENNISON:  Objection to form.

Go ahead.

THE WITNESS:  No.

BY MR. ZIMMERMAN:

Q.    Were you ever provided any charts or data for this FMECA project that gave you trigger lengths for competitors?

A.    No.

MR. ZIMMERMAN:  I want to show you another document which we'll mark as Exhibit 2.

- - -

(Exhibit 2 was marked for identification.)

- - -

BY MR. ZIMMERMAN:

Q.   This is a document that was previously marked at a Taylor deposition -- I think it was Matt Taylor in April of 2025.  This is a project undertaken in terms of comparing certain guns and certain features.  And the chart identifies 13 different guns and their trigger mechanism, their trigger action, what type of trigger safety or manual safety they have as standard or an option, and then it also gives measurements on trigger travel lengths.

Do you see this document, sir?

A.   Yes.

Q.   Are you familiar with this document or do you recall being involved in the creation of this document?

A.   It is not familiar to me.

Q.   Okay.  And I'll represent to you, my understanding is that this was something that was developed during the P365 initiation.

Were you involved at all in the P365 design?

A.   The design team on the P365 reported to me.  I had oversight over it.

Q.   If --

A.   I did --

Q.   I'm sorry.  Go ahead.

A.   I'm sorry.  I did not get into a lot of the detail of that development.

Q.   Before I showed you this document, were you aware that someone at SIG undertook an effort to compare different guns with different safeties and different trigger lengths?

A.   No.

Q.   Was SIG Sauer capable of providing you comparisons of the P320's design to that of competitors when you were completing this FMECA to look at what types of safeties other competitors offered, how long their trigger pulls were, and other measures?

        MS. DENNISON:  Objection to form.

        THE WITNESS:  Are you asking if I knew that SIG was capable of providing that to me?

BY MR. ZIMMERMAN:

Q.   Yeah.  Was SIG, as a company, capable of obtaining and gathering and providing that information to you in order for you to complete this FMECA?

A.    Yes, I would imagine they were.

Q.    Did anyone disclose to you that a year or more before you were completing an FMECA, SIG had compiled data on other pistols, both hammer and striker fired, to compare the types of safeties these guns utilized and the trigger lengths that these guns utilized?

MS. DENNISON:    Object to form. Foundation.

THE WITNESS:    No.

BY MR. ZIMMERMAN:

Q.    Would having a comparative chart of guns that were available where you could identify the safeties that they used, the trigger lengths that they had, the trigger pull weights, would that information have assisted you in comparing the P320 to other guns --

MS. DENNISON:    Objection to form.

BY MR. ZIMMERMAN:

Q.    -- for purposes of your FMECA analysis?

A.    No.

Q.    Sir, the document has another Potential Cause of Failure:  Impacts to weapon (dropped, bumped, vibration).  It's the fourth one down.

Do you see that?

A.    Um-hum.  I do.

Q.    It says, "In case of a failure of the sear to striker interface, it..."  -- meaning the P320 -- "... has a redundant striker safety that blocks striker travel unless the trigger is pulled."

Do you see that?

A.    Yes.

Q.    Did you -- between you and Ed Murphy, I believe you said that you were the one who, essentially, primarily filled in the information in this chart, correct?

A.    Yes.

Q.    Have you seen any testing done by SIG Sauer at any time that confirmed that the sear to striker interface can be lost or disconnected without a trigger pull?

MS. DENNISON:  Objection to form.

THE WITNESS:  I -- would you state the question again, please.

BY MR. ZIMMERMAN:

Q.    Yeah.  Kristen and I were with each other yesterday on another deposition and we were looking

at the number of drop fire tests, and the drop fire

tests could be categorized as either passing or

having a release of the striker and sear, or having

a release of the striker and sear and a firing

event.

Have you seen testing done by SIG that

can -- that confirmed that the striker-sear

interface or connection can be lost without a

trigger pull event?

MS. DENNISON:  Objection to form.

THE WITNESS:  So, I was aware of

drop test results similar to what you described

where the striker could have ended up against the

striker safety, rather than on the sear or in some

cases, where there was a fire event.

BY MR. ZIMMERMAN:

Q.  And if there was a trigger pull event,

the design of the P320, essentially, removes the

striker safety from blocking the striker from

moving forward, correct?

MS. DENNISON:  Objection.  Form.

THE WITNESS:  During normal

operation, during -- pulling the trigger would move

the striker safety out of its blocking position, so

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 60 of 116    PageID #: 5912

Deposition of David Johnson                                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

that when the sear released the striker, it could

go forward without being impeded by it.

BY MR. ZIMMERMAN:

Q.    Did you-all ever test the types of forces

that were necessary for the striker-sear interface

to become lost without a trigger pull event?

MS. DENNISON:  Objection to form.

BY MR. ZIMMERMAN:

Q.    You can answer, sir.

A.    No.

Q.    Did you-all ever perform any testing or

failure testing of the striker safety to determine

if dust or debris could ever hold the striker

safety in an up position or in a position that does

not allow it to hold back the striker?

MS. DENNISON:  Objection to form.

THE WITNESS:  I do not recall

specifically testing that.

BY MR. ZIMMERMAN:

Q.    Do you know if the following scenario can

occur:  Without a trigger pull event, the striker

safety can lose the interface or connection and a

striker safety can be caught or in the up position

based upon dust or debris being inside the fire

control unit?

MS. DENNISON:  Objection to form. And for purposes of these questions, I assume you're asking him the design of the P320 as of 2016 when he was there?

MR. ZIMMERMAN:  Yes.

THE WITNESS:  All right.  So you asked, do I know if that can happen?

BY MR. ZIMMERMAN:

Q.   Yeah.  And let me just break it down.

I think we've already established that you've seen drop fire testing that showed to you that the striker-sear connection can be lost without a trigger pull, right?

MS. DENNISON:  Objection to form, time.

THE WITNESS:  So there's a implication in that statement, in drop testing, you often see the trigger move, so the trigger's been pulled effectively.

BY MR. ZIMMERMAN:

Q.   Right.

And if the trigger's been pulled effectively, then you're going to get the fire

scenario, not the release scenario, right?

MS. DENNISON:  Objection to form.

BY MR. ZIMMERMAN:

Q.  Let me just define those terms.  I'm talking about release as striker and sear lose their connection, but the striker safety is still holding the striker back.  So that's a release compared to a fire, where striker and safety lose their connection and the striker safety is not there, causing the striker to move forward and fire the round.  Fair?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.  So in a scenario where the trigger is effectively pulled, as you described it, you're going to see two things:  You're going to see striker-sear interface lost and striker lock is getting out of the way, right?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.  And what we know, if there's a release is that there has not been an effective trigger pull

because the striker and sear interface has been lost, but the striker lock hasn't gotten out of the way, fair?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.   So, has SIG analyzed -- strike that.

When you were at the company, did SIG analyze, to your understanding, whether there can be a release, as you've seen in that drop fire testing, and a scenario in which the striker lock is not in the effective position due to dust or debris holding it up?

MS. DENNISON:  Objection to form.

THE WITNESS:  Are -- are you asking if that was witnessed, observed in a test?

BY MR. ZIMMERMAN:

Q.   Are you aware of any testing or analysis that SIG undertook to determine if that was possible?

MS. DENNISON:  Objection to form.

THE WITNESS:  No.

BY MR. ZIMMERMAN:

Q.   Do you know if that's possible?

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 64 of 116    PageID #: 5916

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

A.   No.

MS. DENNISON:  On that last question, was that a do you know -- you don't know it's possible, or it's not possible?

THE WITNESS:  That is a I don't know it's possible.

BY MR. ZIMMERMAN:

Q.   Sir, I just want to go back to the FMECA chart and show you the Potential Cause of Failure being "Accidental trigger pull holstering/unholstering (Operator Error)."

Do you see that?

A.   Yes.

Q.   Okay.  You use the term "Operator Error" both in accidental trigger pull, holstering/unholstering and accidental trigger pull finger on trigger.

Do you see that?

A.   Yes.

Q.   Why did you use the term "Operator Error" there in those sections?

A.   Because what I was envisioning is the operator pulled the trigger.

Q.   So, for holstering/unholstering, you

originally assigned it a D and a 2, in terms of

Occurrence and Severity, in terms of guns

generally.  And then in looking at the P320, it

went to an E-1.

Do you see that?

A.    Yes.

Q.    First question:  How did the design of

the P320 increase the severity level from a 2 to a

1?

MS. DENNISON:  Objection to form.

THE WITNESS:  I have no idea.  That

could be a typo.

BY MR. ZIMMERMAN:

Q.    Okay.  Did you carefully review this

document before submitting it to the military?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't know if I saw

the final version before it went.

BY MR. ZIMMERMAN:

Q.    Okay.  Now, for Actions Taken on the P320

it says, "See recommendations."  And Recommended

Action, is it referring us to that section?

A.    I assume so.

Q.    It says, "Training."  Users should

develop familiarity with the pistol and holster

prior to live fire.  "Proper technique includes

keeping finger out of trigger guard except when

firing."

          Do you see that?

     A.   Yes.

     Q.   Did you analyze -- strike that.

          How did the P320 minimize the occurrence

rate from a D to an E, based poorly on training?

     A.   Because it wouldn't be unique to the 320.

     Q.   Right.

          So how -- how did you change it from a D

to an E, if it wouldn't be unique to the P320?

               MS. DENNISON:  Objection to form.

               THE WITNESS:  I don't understand why

it has to be unique to the 320.

BY MR. ZIMMERMAN:

     Q.   So, my understanding is you gave the

occurrence level of accidental trigger pull

holstering/unholstering a D, in terms of the gun,

right?  The general -- let me start over.

          In terms of the potential cause of

failure of accidental trigger pulls holstering and

unholstering, you assigned an occurrence level of D

to guns generally, correct?

A.    Yes.

Q.    And it looks as though you assigned the P320 as an E, correct?

A.    So, with a -- what I envisioned in this process of creating this document is that if there is a potential hazard identified, that one of the ways of addressing that would be through best practices in the use of that item.  That we were not offering a unique design solution that would change that, but that there needs to be training to minimize that risk.

Q.    Okay.  So when it came to the need for training on guns generally, you're not only assuming the gun lacked all potential design safety options, but that the user also lacked training?

MS. DENNISON:  Objection to form.

THE WITNESS:  Basically, when you think about ways somebody might have an incident, one of the things that came up was, well, you could accidentally pull the trigger while you're holstering or unholstering, and that that should be addressed through training was the reduction step.

BY MR. ZIMMERMAN:

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 68 of 116    PageID #: 5920

Deposition of David Johnson                                   Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Q.    I think we're saying the same thing.  The occurrence before the reduction step assumes that the user does not have adequate training, right?

        MS. DENNISON:  Objection to form.

BY MR. ZIMMERMAN:

Q.    Because reduction step is the training?

A.    Yes.

Q.    So when you're assigning a D to the accidental trigger pull holstering/unholstering, you are taking an untrained gun user and a gun that lacks all potential safety elements, right?

A.    Can't say it's that categorical.  If it was lacking all safety elements might it be a higher probability.

Q.    And, sir, I know this was ten years ago, and I think you did mention at one point that your criteria may not have been uniform throughout this.

A.    Um-hum.

Q.    But I understood your prior testimony to be you were, say, for the accidental trigger pull, for that one, you were assuming a lack of all potential safety design options, right; the trigger guard, trigger safeties, et cetera?

A.    Yes.

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 69 of 116    PageID #: 5921

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Q.    Is it fair to say that the criteria you used for different potential causes of failure was different, depending on if it was, for example, accidental trigger pull by a foreign object versus an accidental trigger pull holstering and unholstering a weapon?

A.    Could very well be.

Q.    Did you understand that the military was going to be relying upon your FMECA analysis and the grading that you were assigning to guns generally versus that of the P320?

MS. DENNISON:  Objection to form. Foundation.

THE WITNESS:  No.

BY MR. ZIMMERMAN:

Q.    Had you understood that they were going to be relying on this FMECA, would you have told your employer, SIG Sauer, that more resources would be necessary in order to provide accurate information therein?

MS. DENNISON:  Objection to form.

THE WITNESS:  So, based on prior discussion we've had, if this was, in fact, submitted in February, it would be not only after

the government had done all of their evaluation of the P320 for that modular handgun program, but also after they had formally announced its selection. So, when we prepared that, I was thinking I had no idea to what extent the government would use this and did not know if they would come back to us and want to review it and discuss it and that they might actually have questions about some of the information in there.

BY MR. ZIMMERMAN:

Q.   Sir, I want to show you the write-up that Ed Murphy did at the top of this exhibit.  This is what we had looked at previously.

A.   Um-hum.

Q.   The "System description," I want to ask you about the sentence I'm highlighting, but you're free to read above and below it and just let me know when you're ready for a question.  And I'll -- once you're done, identify on the record, what I'm referring to.

A.   Okay.  I don't think I need to read the whole paragraph, so...

Q.   Okay.  I've highlighted the second sentence talking about the P320 design submission

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 71 of 116    PageID #: 5923

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

to the military, indicating that they, meaning the handguns, feature a new unique safety system making them the most operator-safe striker duty pistols on the market today.

Do you know what efforts were taken prior to the issuance of this document to the military to certify that the P320 military version was the most operator-safe striker duty pistol on the market?

MS. DENNISON:  Objection to form.

THE WITNESS:  You're going to have to repeat the question.

BY MR. ZIMMERMAN:

Q.    Yeah.  Do you know what, if anything, SIG did to compare and analyze the P320 military version handgun with every striker-fired pistol that was on the market in confirming to the military that the P320 one was the most operator-safe version?

MS. DENNISON:  Objection to form.

MR. ZIMMERMAN:  Let me rephrase it.

BY MR. ZIMMERMAN:

Q.    Do you know if any comparative study was done to make that representation to the military?

A.    So I don't believe that there was a

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 72 of 116    PageID #: 5924

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

comparative study done.

Q.    Okay.   It also says, "The closed design of the firearm helps keeps dirt and other debris from entering, ensuring proper function in harsh environmental conditions."

Do you see that?

A.    Yes.

Q.    Are you aware of any -- are you aware of any testing done in your time at the company that measured the effectiveness of the P320 design in keeping dirt and other debris from entering the FCU?

A.    So, what are you defining as the FCU?

Q.    Sure.  It says here, "The closed design of the firearm helps keep dirt and other debris from entering..."  Do you know what they're referring to when they're saying "from entering"?  Are they talking about the inside of the gun?

MS. DENNISON:  Objection to form.  Speculation.

MR. ZIMMERMAN:  Well, let me rephrase.

BY MR. ZIMMERMAN:

Q.    It says, "The closed design of the

firearm helps keep dirt and other debris from entering..."  Do you agree that the 2016 version of the P320 had a closed design that kept dirt and debris from entering?

A.   I -- I can't qualify that statement.  I can't say what exactly it's trying to convey.

Q.   Okay.  Was there any attempt in the design of the P320 to minimize dirt and debris from entering between the slide and grip portions of the P320, the exterior portions of the P320?

A.   No.

Q.   Do you know how effective the P320 was versus competitors in keeping dirt and debris outside of the internal components of the gun or away from the internal components of the gun?

A.   No.

Q.   The next page says that "MHS presents no new health or safety hazards to the soldier, trainer, or environment when compared to the systems currently fielded and intended to be replaced."

Do you see that under "Conclusion"?

A.   Yes.

Q.   And again, we're looking at Exhibit 1,

this is page 2.

Do you know what the military version of the P320 was going to be replacing?

A.    Well, not completely, but certainly the M9 pistol.

Q.    Was that a Beretta?

A.    Yes.

Q.    Do you know of any comparative studies done between the Beretta and the P320, in terms of trigger lengths, trigger pull weight, or any other features between the guns?

MS. DENNISON:  Objection to form.

THE WITNESS:  No.

BY MR. ZIMMERMAN:

Q.    Were you ever asked, or did you ask anyone else to analyze the differences between the Beretta and the P320, in terms of its features and functions?

MS. DENNISON:  Objection to form.

THE WITNESS:  No.

BY MR. ZIMMERMAN:

Q.    The last sentence of the "Conclusion" section says, All potential failure modes have been addressed to bring residual risk to no greater than

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 75 of 116    PageID #: 5927

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

minimum [sic], and then it says more.

Looking at your FMECA chart, the Risk Assessment Matrix level for the P320 had designations of either eliminating or having low or medium risks, correct?

A.   Yes.

Q.   And that was, essentially, based upon your subjective analysis in modifying the O for occurrence grades or the S for severity grades, correct?

A.   Yes.

MR. ZIMMERMAN:  Let's go off the record.

THE VIDEOGRAPHER:  Off the record, 11:59 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record, 12:06 p.m.

BY MR. ZIMMERMAN:

Q.   All right, sir.  I just want to confirm, you did not consult any testing or data in your completion of the FMECA, correct?

A.   I was aware of testing that had been performed on the P320, and had that in mind when

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 76 of 116    PageID #: 5928

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

preparing this, but I did not have data from

outside of what we had done on the P320 internally.

Q.   Sir, I believe after you left -- well,

strike that.

Had you ever heard of a secondary sear

notch being added to the striker of a P320?

MS. DENNISON:  Objection to form.  I

think you meant sear, not striker.

MR. ZIMMERMAN:  I did, sorry.

BY MR. ZIMMERMAN:

Q.   Sir, have you ever heard of a secondary

sear notch being added to the sear at any point on

a P320?

A.   I did not know whether one had been added

to the P320 at any point.

Q.   Were there ever any discussions before

you left with the inclusion of a secondary sear

notch for --

A.   No.

Q.   -- the P320?

A.   No, there wasn't.

Q.   Was there ever a discussion that you

recall where lighter components were going to be

incorporated into the P320's design to mitigate the

risk of drop fire?

MS. DENNISON:  Objection to form.

THE WITNESS:  I was aware of some discussions about changing the weight or balance of parts to improve drop fire under some very specific conditions.

BY MR. ZIMMERMAN:

Q.   And do you know if those discussions began in 2016 or prior to 2016?  Meaning, did they occur in the last year you were with the company or did they start before that last year?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't recall when that began.

BY MR. ZIMMERMAN:

Q.   Do you know what prompted that discussion?

A.   It was prompted by results from testing for qualification for German police use.

Q.   Do you have a memory that qualification for German police use revealed a failed drop test based upon the testing parameters established by that entity?

A.   Yes.

Q.    Was that the first time that you became aware of an entity performing drop testing, based upon their own parameters and a P320 failing?

A.    I believe so.

Q.    Do you know if the discovery of that German drop test failure became known to you in the last year you were with the company or prior to that last year?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't recall if it was prior to 2016.

BY MR. ZIMMERMAN:

Q.    And do you know who was involved at SIG in discussing that failed drop test and any efforts SIG would undertake to address it?

A.    I know at least some of them.

Q.    Who do you recall being involved?

A.    Well, there was the P320 design team.

Q.    So Matt Taylor, Sean Toner, and others?

MS. DENNISON:  Objection to form.

THE WITNESS:  Primarily, Matt Taylor and Sean Toner.  Adrian Thomele contributed and then engineers -- at least one engineer and maybe more than one in Germany contributed.

Case 1:23-cv-00327-JCN   Document 123-2   Filed 06/05/26   Page 79 of 116   PageID #: 5931

Deposition of David Johnson                                      Mariya Gomelskaya v. Sig Sauer, Inc., et al.

BY MR. ZIMMERMAN:

Q.   On the SIG Germany side?

A.   Yes.

Q.   Do you recall Ron Cohen being involved in those discussions or meetings?

A.   I know that Ron was aware of it.

Q.   Do you know whether Ron was involved in the discussions on what to do as a result of that failed drop test?

A.   No.

Q.   No, you don't know?

A.   No, I don't know.

Q.   Sir, Sean Toner previously testified that his progression at the company was that he was a P320 lead designer, with Matt Taylor being the team lead, and at some point, Sean was promoted to being a team lead within a suppressor project or team. Is that consistent with your memory?

MS. DENNISON:  Objection to form.

THE WITNESS:  The best of my recollection, Sean was still working on the -- with Matt Taylor on that team when I left the company.

BY MR. ZIMMERMAN:

Q.   Prior to you leaving the company, had you

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 80 of 116    PageID #: 5932

Deposition of David Johnson                                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

ever promoted Sean Toner to be a team lead for any

suppressor projects?

                    MS. DENNISON:  Objection to form.

                    THE WITNESS:  We were engaged in

suppressor projects.  I don't recall what level of

involvement or responsibility Sean Toner had on the

suppressor projects while I was still with the

company.

BY MR. ZIMMERMAN:

     Q.   Okay.  Were you the person who was in

charge of selecting team leads?

     A.   Yes.

                    MS. DENNISON:  Objection to form.

BY MR. ZIMMERMAN:

     Q.   And prior to you leaving in December of

2016, do you recall Sean Toner ever being removed

from the P320 team?

                    MS. DENNISON:  Objection to form.

                    THE WITNESS:  I don't recall.

                    MR. ZIMMERMAN:  Sir, I'm going to

continue to take a look at my notes, if

Ms. Dennison has any questions.  I want to thank

you for your time and patience so far.

                    THE WITNESS:  Okay.

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 81 of 116    PageID #: 5933

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

- - -

EXAMINATION

- - -

BY MS. DENNISON:

Q.    All right.  We've hit afternoon, so good afternoon, Mr. Johnson.

If Sean Toner testified that he spent approximately a year in 2016 working as the team lead for the suppressor group, would you have any reason to dispute that?

A.    No, I would not.

Q.    When was the P320 pistol first designed?

A.    Well, I'm not -- I'm not sure of the dates.

Q.    Okay.

A.    Certainly well before 2016.

Q.    And was the P320 pistol tested in the design process?

A.    Yes.

Q.    Do you have any idea how many hours of testing the P320 was subject to between its design and the time that you left the company in December of 2016?

A.    I don't know how I would estimate that,

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 82 of 116    PageID #: 5934

Deposition of David Johnson                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

but there was considerable testing done.

Q.    When the P320 was submitted to the military for consideration as its new sidearm, did SIG Sauer test that pistol before submitting it?

A.    We did.

Q.    Did the U.S. military test the P320 version of the pistol submitted to it prior to accepting it and awarding SIG Sauer the contract to be its next official sidearm?

A.    Yes.

Q.    Do you have an understanding as to what types of tests the military subjected the P320 pistol to that was submitted to it for consideration?

A.    We knew what the technical requirements were and there were -- there was supplemental information about how testing would be conducted. We can only assume -- or I can only assume that they performed all the tests that they said that they were going to.

Q.    Did SIG Sauer subject the P320 pistol to testing, dragging the pistol through mud?

A.    Yes.

                MR. ZIMMERMAN:    Object to form.

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 83 of 116    PageID #: 5935

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Leading.

BY MS. DENNISON:

Q.    Did SIS Sauer ever test the pistol by putting it in sand and then testing its function?

MR. ZIMMERMAN:  Objection.  Leading.

THE WITNESS:  We did all of the environmental and adverse conditions testing that we knew that -- well, or that we expected that the government was going to subject it to.

BY MS. DENNISON:

Q.    Did any of that testing inform SIG Sauer as to how the pistol would withstand exposures to dirt and debris?

MR. ZIMMERMAN:  Object to form. Leading.

THE WITNESS:  We did sand and dust and mud testing and we were able to pass, with the exception in the dust testing, we had a failure in the magazines to reliably present the cartridge for feeding.

BY MS. DENNISON:

Q.    Okay.  And the magazine, that's not something that is -- well, strike that.

Did that result with the magazine have

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 84 of 116    PageID #: 5936

Deposition of David Johnson                                       Mariya Gomelskaya v. Sig Sauer, Inc., et al.

anything to do with the firing components of the firearm?

MR. ZIMMERMAN:  Form.

THE WITNESS:  No.

BY MS. DENNISON:

Q.   Did you answer that?  I'm sorry.

A.   No, it did not.

Q.   Okay.  Thank you.

Had all of this testing that we just talked about been completed before you started drafting the FMECA?

A.   Yes.

Q.   Did you consider that testing when you were drafting the FMECA?

MR. ZIMMERMAN:  Form.

THE WITNESS:  When drafting the FMECA, the working assumption was that this -- that the pistol had met the test requirements of the government and that we were not going to be making design changes.

BY MS. DENNISON:

Q.   So what was the purpose of completing the FMECA?

MR. ZIMMERMAN:  Object to the form.

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 85 of 116    PageID #: 5937

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

Foundation.

THE WITNESS:  It was a requirement that had to be fulfilled.  We wanted to do a -- our best at it.  We didn't want to submit fluff, but we also didn't know to what extent it was going to be critiqued or if we would end up having follow-ups with the government on it.

BY MS. DENNISON:

Q.   When you were completing this FMECA, were you trying to compare the P320 to other specific firearm designs?

MR. ZIMMERMAN:  Form.

THE WITNESS:  No.

BY MS. DENNISON:

Q.   Do you know if there were any changes in the FMECA document from when you left the company in December of 2016 till when it was submitted to the military in February of 2017?

A.   No, I do not.

Q.   Did you do your best to thoroughly and accurately complete the FMECA for the military?

MR. ZIMMERMAN:  Object to the form.

THE WITNESS:  It was done to the best of my ability.

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 86 of 116    PageID #: 5938

Deposition of David Johnson    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

MS. DENNISON:  Thank you.  Those are all the questions I have, Mr. Johnson.

- - -

EXAMINATION

- - -

BY MR. ZIMMERMAN:

Q.  Sir, just a couple of follow-ups.  If I need to show you the document, I will.  But was there anything that you saw in the FMECA today that indicated to you that that was something that was filled in by someone else after you left and not by you?

MS. DENNISON:  Objection to form.

THE WITNESS:  I didn't see anything that would lead me to believe that it is different.

BY MR. ZIMMERMAN:

Q.  Do you know who Amanda Hasevlat, H-a-s-e-v-l-a-t?

A.  Yes.

Q.  Who is Amanda Hasevlat?

A.  Well, she worked in sales, she wasn't doing sales, but she had, I would say an administrative position in sales, I thought primarily related to export.

MR. ZIMMERMAN:  I'm going to show you a document which is an e-mail and I believe an attachment to the e-mail or a document discussed in the e-mail.  We're going to mark it as Exhibit 3.  And for the record, this is -- I'm only going to -- it's part of 56 pages, but I'm going to pull it out.  It's just P320 Design 40 to 43.

- - -

(Exhibit 3 was marked for identification.)

- - -

BY MR. ZIMMERMAN:

Q.  And, sir, I want you to take a look at the e-mails that you were copied on in June of 2014, just let me know when you're finished reading those.

A.  Okay.  I've read it.

Q.  The next page has some items on there, including identifying the P320 as a double action gun.  Do you see that?

A.  Yes.

MS. DENNISON:  Objection to the form.

BY MR. ZIMMERMAN:

Q.    Was the P320 a double action pistol?

MS. DENNISON:  Objection to form.

THE WITNESS:  I would say it was between double action and a single action.

BY MS. DENNISON:

Q.    Do you know why the engineering department allowed sales to identify it as a double action weapon?

MS. DENNISON:  Objection to form.

THE WITNESS:  No, I don't.

BY MR. ZIMMERMAN:

Q.    Did engineering, to your knowledge, ever object to the sales team identifying this as a double action weapon?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't have knowledge of that.

BY MR. ZIMMERMAN:

Q.    Would you object to the marketing of this gun to consumers as a double action weapon?

MS. DENNISON:  Objection to form.

THE WITNESS:  I don't think that it is completely accurate.

BY MR. ZIMMERMAN:

Q.   Do you believe that manufacturers of products should be accurate with their customers, in describing the features of the product?

MS. DENNISON:  Objection to form.

THE WITNESS:  Yes.

BY MR. ZIMMERMAN:

Q.   Did SIG Sauer do a good job of being accurate to its consumers when describing the feature of the P320 as being a double action?

MS. DENNISON:  Objection to form.

THE WITNESS:  I think it could be more accurate.

BY MR. ZIMMERMAN:

Q.   Because it's not a double action gun, right?

MS. DENNISON:  Objection to form.

THE WITNESS:  Well, as I said, I feel it is, at least in that form back then, would be somewhere between a double action and a single action.

BY MR. ZIMMERMAN:

Q.   Okay.  And just to clear up any confusion I'm having.  Is the P320 a double action pistol?

A.   I'd say no.

Q.   But these marketing documents say yes, right?

MS. DENNISON:  Objection to form.

THE WITNESS:  That's what those documents you showed me say.

MR. ZIMMERMAN:  Sir, that's all I have.  Thanks for your patience again.

- - -

EXAMINATION

- - -

BY MS. DENNISON:

Q.   Very quickly, Mr. Johnson.

That document described it as a double action striker fire gun; is that correct?

A.   Yes.

MS. DENNISON:  That's all I have. Thank you.

THE VIDEOGRAPHER:  We are concluding, going off the record at 12:27 p.m.

MS. DENNISON:  You have the opportunity, Dave, to read and sign the transcript. If you read and sign the transcript, you could take a look at it for accuracy, make any corrections that you think were transcribed inaccurately.

Do you want to do that or you can waive that?

THE WITNESS:  I'd love to read it.

MS. DENNISON:  Okay.  So the witness will read and sign.

THE STENOGRAPHER:  Okay.  And do you need a copy, Ms. Dennison?

MS. DENNISON:  Yes, please.  I need an eTran and a TXT, please.

THE STENOGRAPHER:  And do you want the video?

MS. DENNISON:  Yes, please, thank you.

THE STENOGRAPHER:  And, Mr. Zimmerman, your standard?

MR. ZIMMERMAN:  Yes, please.

                    - - -

            (Off the record at 12:28 p.m. EST)

                    - - -

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, STEPHANIE L. HUMMON, Registered Professional Reporter and Notary Public, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for or related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th day of March, 2026.

My commission expires July 6, 2027.

_____

STEPHANIE L. HUMMON

NOTARY PUBLIC

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 93 of 116    PageID #: 5945

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

INSTRUCTIONS TO WITNESS

Please read your deposition carefully and make any necessary corrections.  You should stat the reason in the appropriate space on the Errata Sheet for any corrections that are made.

After doing so, please sign the Errata Sheet and date it.

It is imperative that you return the original Errata Sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Deposition of David Johnson                          Mariya Gomelskaya v. Sig Sauer, Inc., et al.

E R R A T A    S H E E T

PAGE        LINE        CHANGE

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____          _____

Date                     Signature

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**WORD INDEX**

**< $ >**
**$10**  32:*4*

**< 0 >**
**0.0001**  29:*12, 16, 24*
**0.001**  29:*15*
**0.1**  29:*8, 13*  30:*13*
**004**  18:*2*

**< 1 >**
**1**  3:*11, 14, 15, 16*  8:*5,
7*  16:*17, 24*  25:*1*
  28:*18, 20*  29:*4, 9*
  30:*13*  32:*1, 8, 18*
  33:*23*  34:*8*  37:*4, 9*
  44:*7*  64:*9*  72:*24*
**10**  28:*18, 21, 24*  29:*5*
**10:04**  1:*11*  4:*4*
**10:32**  23:*10*
**10:33**  23:*13*
**11:08**  46:*16*
**11:14**  46:*19*
**11:59**  74:*15*
**12:06**  74:*18*
**12:27**  89:*19*
**12:28**  90:*18*
**13**  54:*6*
**16**  9:*2*
**1650**  2:*3*
**18th**  91:*14*
**19103**  2:*4*

**< 2 >**
**2**  3:*13, 16*  32:*7, 19*
  34:*9*  37:*16*  53:*20, 22*
  64:*1, 8*  73:*1*
**20**  13:*6*  14:*4*
**2005**  6:*19*
**2014**  3:*16*  86:*15*
**2016**  6:*19, 22*  7:*22*
  10:*16, 20, 22, 23*  60:*4*
  72:*2*  76:*9*  77:*11*
  79:*16*  80:*8, 16, 23*
  84:*17*
**2017**  9:*2*  84:*18*
**2024**  1:*4*
**2025**  54:*4*

**2026**  1:*12*  4:*3*  91:*15*
**2027**  91:*16*
**204**  2:*9*
**215)496-8282**  2:*5*
**241200470**  1:*6*  4:*9*
**2460**  2:*9*

**< 3 >**
**3**  3:*16*  18:*21*  86:*4, 9*
**30**  26:*6*  92:*10*
**320**  49:*10*  50:*9*
  65:*10, 16*
**321)574-0280**  2:*10*
**32953**  2:*10*

**< 4 >**
**4/8/15**  3:*16*
**40**  43:*7*  86:*7*
**412**  8:*15*
**413**  8:*16*
**414**  8:*17*
**43**  86:*7*

**< 5 >**
**5**  3:*4, 16*  25:*1*  27:*18*
  28:*14*
**50483**  1:*22*
**52nd**  2:*4*
**53**  3:*16*
**56**  86:*6*

**< 6 >**
**6**  1:*11*  4:*3*  31:*20*
  91:*16*

**< 8 >**
**8**  3:*11*
**80**  3:*5*
**85**  3:*6*
**86**  3:*16*
**882**  17:*10*
**89**  3:*7*

**< A >**
**a.m**  1:*11*  4:*4*  46:*16,
19*  74:*15*
**A003**  18:*1*
**A007**  19:*3*  20:*8*
**A3**  18:*6, 21*

**A6**  18:*6, 21*
**ability**  84:*24*
**able**  19:*7, 8*  34:*6*
  35:*19*  51:*18, 20, 21*
  52:*6, 9, 15, 18*  82:*17*
**absolutely**  45:*9*
**acceptable**  42:*1*
**accepted**  38:*15*  42:*14*
**accepting**  81:*8*
**Accidental**  24:*7, 10*
  25:*6, 14*  27:*6*  33:*22*
  34:*1, 7, 8, 12*  37:*8, 14,
20, 21, 24*  38:*4, 6*
  40:*11, 19*  41:*5, 19*
  42:*9, 15*  43:*15*  44:*15*
  45:*2*  46:*5, 10*  53:*1*
  63:*10, 15, 16*  65:*19,
23*  67:*9, 20*  68:*4, 5*
**accidentally**  24:*6*
  66:*21*
**accidentally/unintentio
nally**  22:*15, 18*  23:*24*
**accuracy**  53:*5*  89:*23*
**accurate**  68:*19*
  87:*23*  88:*2, 8, 12*
  92:*12*
**accurately**  84:*21*
**ACKNOWLEDGMEN
T**  94:*1*
**acquire**  16:*14*
**Action**  25:*21*  40:*18,
20*  41:*3*  48:*6, 9*  49:*8*
  53:*2*  54:*8*  64:*22*
  86:*19*  87:*1, 4, 8, 14,
20*  88:*9, 14, 19, 20, 23*
  89:*14*
**actions**  14:*9*  39:*17,
21*  40:*7, 12, 13, 14*
  48:*8, 9*  50:*13*  64:*20*
**activity**  41:*9*
**ad**  14:*23*  15:*17*
**added**  75:*6, 12, 14*
**additional**  36:*12, 15*
**address**  42:*4*  77:*15*
**addressed**  66:*23*
  73:*24*
**addressing**  66:*8*
**adequate**  48:*14*  67:*3*
**administrative**  85:*23*

**Administratrix**  1:*2*
**Adrian**  77:*22*
**adverse**  82:*7*
**adversely**  53:*4*
**affirmed**  5:*8*
**affixed**  91:*14*
**afternoon**  80:*5, 6*
**ago**  67:*15*
**agree**  47:*6*  72:*2*
**Agreed**  5:*2*  10:*12*
**agreement**  4:*22*
  10:*15*
**ahead**  28:*4*  40:*6*
  42:*11*  50:*3*  51:*7, 16*
  53:*12*  55:*3*
**al**  4:*8*
**allow**  23:*19*  59:*15*
**allowed**  87:*7*
**alphabetically**  22:*7*
**Amanda**  85:*17, 20*
**amount**  10:*2*
**Analysis**  3:*11*  7:*12*
  13:*1, 3, 5, 18*  14:*20*
  15:*15*  18:*2*  31:*15*
  56:*20*  62:*18*  68:*9*
  74:*8*
**Analysis(FMECA**
3:*13*
**analyze**  25:*19*  46:*2*
  52:*4*  53:*6, 8*  62:*9*
  65:*7*  70:*14*  73:*16*
**analyzed**  15:*12*
  48:*24*  62:*7*
**analyzing**  14:*12, 21*
  15:*19*
**announced**  69:*3*
**answer**  6:*9*  9:*23*
  39:*7*  59:*9*  83:*6*
**answered**  50:*2*
**answers**  94:*6*
**anybody**  12:*11*  33:*8*
  38:*17*  39:*8*  47:*2*
**appearing**  4:*14*
**appears**  18:*1*
**apply**  6:*5*
**appropriate**  22:*20*
  51:*14*  92:*4*
**approximately**  80:*8*
**April**  54:*4*

**asked** 38:*23* 42:*1* 47:*7* 50:*2* 60:*8* 73:*15*
**asking** 21:*18* 39:*13* 52:*2* 55:*18* 60:*4* 62:*15*
**assess** 34:*6, 20* 45:*13* 46:*8*
**assessed** 29:*23* 32:*15*
**assessing** 14:*6* 27:*6*
**Assessment** 3:*15* 16:*6* 28:*17* 33:*12* 36:*21* 37:*11* 39:*14* 44:*2* 45:*16* 53:*10* 74:*3*
**assessments** 36:*17, 23*
**assign** 29:*2, 6, 9, 13, 17* 30:*1, 7* 31:*16* 32:*7, 17, 19* 35:*20* 46:*22* 51:*20, 22* 52:*9, 14*
**assigned** 29:*23* 49:*2* 64:*1* 65:*24* 66:*3*
**assigning** 30:*22* 46:*4* 49:*23* 67:*8* 68:*10*
**assist** 36:*12*
**assistance** 38:*10*
**assisted** 56:*16*
**associated** 17:*22* 21:*22* 22:*1*
**assume** 9:*14* 26:*17* 60:*3* 64:*23* 81:*18*
**assumes** 67:*2*
**assuming** 49:*17* 66:*15* 67:*21*
**assumption** 83:*17*
**attached** 94:*8*
**attachment** 86:*3*
**attachments** 3:*12*
**attempt** 39:*20, 22* 72:*7*
**attempting** 21:*24*
**attorney** 92:*9*
**attorneys** 4:*21*
**attributes** 40:*8* 42:*6*
**automatic** 37:*10*
**available** 17:*13* 35:*24* 47:*3* 56:*13*
**average** 49:*19, 24*
**awarding** 81:*8*

**aware** 55:*7* 58:*11* 62:*18* 71:*8* 74:*23* 76:*3* 77:*2* 78:*6*

**< B >**
**back** 11:*10* 16:*17* 17:*5* 22:*17* 23:*12* 31:*19* 37:*8* 46:*18* 59:*15* 61:*7* 63:*8* 69:*6* 74:*17* 88:*18*
**balance** 19:*13, 14* 76:*4*
**based** 9:*13* 25:*24* 26:*2* 27:*12* 48:*6* 49:*19, 23* 50:*6, 7, 9* 59:*24* 65:*9* 68:*22* 74:*7* 76:*22* 77:*2*
**baseline** 26:*17*
**basically** 16:*21* 27:*8* 35:*24* 36:*21* 40:*7* 41:*22* 49:*21* 66:*18*
**Bates** 8:*15, 17*
**began** 10:*16, 20* 76:*9, 14*
**beginning** 4:*23* 26:*3*
**behalf** 2:*6, 11*
**believe** 8:*17* 10:*20* 20:*15* 28:*23* 57:*11* 70:*24* 75:*3* 77:*4* 85:*15* 86:*2* 88:*1*
**believed** 41:*15*
**BENCH** 3:*16*
**BENDESKY** 2:*1*
**benefits** 19:*7*
**Beretta** 73:*6, 9, 17*
**best** 8:*1* 10:*11* 11:*9* 20:*5* 36:*2* 38:*20* 42:*4* 66:*8* 78:*20* 84:*4, 20, 24*
**better** 15:*6, 8*
**beyond** 52:*5*
**bid** 12:*16*
**big** 19:*8*
**bit** 23:*18*
**blank** 8:*12* 20:*10*
**block** 15:*8*
**blocking** 58:*19, 24*
**blocks** 57:*6*
**Bob** 5:*19* 45:*19*

**break** 45:*20* 60:*10*
**Brief** 23:*11*
**bring** 73:*24*
**build** 20:*16*
**bumped** 56:*24*

**< C >**
**called** 15:*18*
**capable** 52:*5* 55:*11, 19, 21*
**care** 10:*13*
**carefully** 64:*14* 92:*2*
**carrying** 43:*13* 44:*11, 13*
**cartridge** 82:*19*
**CASE** 1:*5* 4:*9* 34:*11* 37:*11* 49:*21* 57:*3* 91:*11*
**cases** 50:*5* 58:*15*
**categorical** 67:*12*
**categorized** 58:*2*
**category** 22:*21* 48:*3*
**caught** 59:*23*
**cause** 14:*7* 24:*6* 34:*17* 35:*3, 4, 12* 43:*14* 52:*24* 56:*23* 63:*9* 65:*22*
**causes** 24:*3* 39:*23* 47:*15* 68:*2*
**causing** 61:*10*
**CDRL** 17:*2* 18:*1* 20:*8*
**CDRLs** 17:*20* 18:*12, 21*
**certain** 7:*23* 13:*11* 15:*23* 16:*3* 28:*9* 54:*5, 6*
**certainly** 73:*4* 80:*16*
**CERTIFICATE** 91:*1*
**certify** 70:*7* 91:*5* 94:*4*
**cetera** 67:*23*
**chance** 29:*1, 5, 9, 13, 16*
**change** 65:*12* 66:*11* 93:*3*
**changes** 83:*20* 84:*15* 94:*7*
**changing** 53:*7* 76:*4*

**charge** 12:*3, 13* 79:*11*
**Chart** 3:*16* 8:*23* 19:*5, 21* 24:*21* 25:*2, 9* 27:*18* 28:*14* 31:*20* 37:*5, 16* 39:*16* 54:*6* 56:*12* 57:*13* 63:*9* 74:*2*
**charts** 53:*15*
**choice** 15:*11*
**choices** 15:*19*
**circumstance** 45:*6*
**circumstances** 30:*18*
**CIVIL** 1:*5* 4:*9*
**clarity** 33:*9*
**clear** 88:*22*
**close** 13:*6* 45:*23*
**closed** 71:*2, 14, 24* 72:*3*
**Cohen** 78:*4*
**coloring** 39:*15*
**column** 20:*12, 21* 21:*11, 14* 24:*2, 14* 25:*21* 31:*22* 32:*1* 40:*18* 43:*19* 44:*6* 47:*12* 52:*22*
**columns** 19:*20, 22* 20:*2, 19* 23:*17* 24:*19* 47:*14*
**combat** 42:*22*
**come** 11:*15* 27:*5* 31:*5, 6, 7* 39:*6* 69:*6*
**comes** 8:*12* 20:*5*
**coming** 25:*20* 27:*10, 13* 45:*15, 22*
**commencing** 1:*11*
**commission** 91:*16*
**COMMON** 1:*2* 4:*8* 13:*2* 26:*18*
**communication** 9:*16*
**company** 7:*22, 24* 8:*2* 9:*10* 11:*21* 12:*1* 31:*3* 38:*17* 39:*8* 55:*21* 62:*8* 71:*9* 76:*10* 77:*7* 78:*14, 22, 24* 79:*8* 80:*22* 84:*16*
**comparative** 56:*12* 70:*22* 71:*1* 73:*8*

**compare** 48:*18* 52:*3* 55:*8* 56:*5* 70:*14* 84:*10*

**Compared** 37:*14* 45:*14* 46:*4* 53:*9* 61:*8* 72:*19*

**comparing** 54:*5* 56:*16*

**comparisons** 55:*12*

**competent** 46:*22* 47:*1*

**competing** 19:*7*

**competitor** 53:*9*

**competitors** 46:*4* 48:*19* 53:*17* 55:*13, 14* 72:*13*

**compiled** 56:*4*

**complete** 21:*6* 38:*11, 14* 40:*2* 55:*23* 84:*21*

**completed** 83:*10*

**completely** 73:*4* 87:*23*

**completing** 23:*3* 25:*18* 55:*13* 56:*3* 83:*22* 84:*9*

**completion** 74:*22*

**component** 27:*3*

**components** 12:*1* 72:*14, 15* 75:*23* 83:*1*

**computer** 21:*5*

**conceivable** 45:*6*

**concept** 13:*15*

**concluding** 89:*19*

**Conclusion** 72:*22* 73:*22*

**condition** 45:*9*

**conditions** 42:*23* 43:*21* 71:*5* 76:*6* 82:*7*

**conducted** 12:*20* 81:*17*

**conducting** 12:*19*

**conferred** 10:*8*

**confirm** 74:*20*

**confirmed** 57:*16* 58:*7*

**confirming** 70:*16*

**confusion** 88:*22*

**conjunction** 16:*23*

**Connecticut** 6:*14*

**connection** 58:*8* 59:*22* 60:*13* 61:*6, 9*

**consequences** 13:*24*

**consider** 12:*8* 83:*13*

**considerable** 10:*2* 81:*1*

**consideration** 81:*3, 14*

**considered** 13:*4* 27:*17*

**considering** 15:*12*

**consistent** 42:*24* 50:*5* 78:*18*

**constitute** 33:*2*

**consult** 30:*20* 74:*21*

**consumers** 87:*20* 88:*8*

**contact** 27:*10, 14* 34:*22* 42:*15* 44:*24* 49:*8, 11* 52:*11*

**contained** 13:*12, 13* 16:*11*

**contains** 8:*14*

**content** 31:*12*

**continue** 79:*21*

**contract** 7:*13* 17:*4, 9* 81:*8*

**contracting** 17:*3*

**contribute** 12:*2*

**contributed** 77:*22, 24*

**control** 30:*6* 34:*14* 53:*4* 60:*1*

**controlled** 43:*1*

**conundrum** 51:*12*

**conventional** 42:*13*

**conversations** 11:*16* 12:*17*

**convey** 72:*6*

**copied** 86:*14*

**copy** 8:*16* 90:*7*

**correct** 7:*14* 8:*20* 23:*24* 24:*14* 25:*7, 11* 32:*5* 37:*5* 42:*17* 45:*3* 49:*3* 51:*18* 52:*20, 21* 57:*13* 58:*20* 66:*1, 4* 74:*5, 10, 22* 89:*14* 91:*6* 94:*5*

**corrections** 89:*23* 92:*3, 5* 94:*7*

**corroborated** 31:*10*

**counsel** 4:*14, 23* 5:*4* 91:*10*

**countermeasures** 26:*18*

**COUNTY** 1:*1* 4:*8*

**couple** 22:*3* 85:*7*

**COURT** 1:*2* 4:*8, 11, 12, 16* 6:*1* 92:*13*

**Courtenay** 2:*9*

**covers** 17:*12*

**coworkers** 39:*11*

**create** 16:*5* 20:*1*

**created** 8:*20* 13:*21* 17:*11* 21:*1*

**creating** 18:*22* 41:*9* 66:*6*

**creation** 54:*15*

**criteria** 51:*24* 67:*17* 68:*1*

**Criticality** 3:*11, 13* 13:*18, 20*

**critiqued** 84:*6*

**currently** 6:*13* 72:*20*

**customers** 88:*2*

**cycled** 15:*9*

**< D >**

**d/b/a** 1:*6*

**D'Ambra** 2:*14* 4:*10*

**Data** 17:*4, 6* 35:*23* 36:*4, 9, 16* 52:*16, 19* 53:*15* 56:*4* 74:*21* 75:*1*

**date** 4:*3* 9:*2, 14* 92:*7* 94:*18*

**dates** 80:*14*

**Dave** 89:*21*

**DAVID** 1:*10* 3:*3* 4:*6* 5:*6*

**day** 91:*14*

**days** 92:*10*

**dealt** 38:*18*

**Death** 32:*2* 34:*17*

**debris** 59:*13, 24* 62:*13* 71:*3, 11, 15* 72:*1, 4, 8, 13* 82:*13*

**DECEASED** 1:*2*

**December** 6:*22* 7:*22* 79:*15* 80:*22* 84:*17*

**decide** 20:*2*

**decision** 15:*5*

**deemed** 92:*12*

**Defendants** 1:*7* 2:*11*

**Defense** 17:*12*

**define** 61:*4*

**defined** 18:*18*

**defining** 71:*13*

**definite** 9:*12*

**definition** 36:*2*

**degree** 23:*19*

**delivered** 7:*23* 9:*9*

**DENNISON** 2:*8* 3:*5, 7* 5:*2* 9:*22* 10:*18* 13:*22* 17:*18* 18:*13* 20:*14* 21:*2, 16* 25:*22* 28:*3* 29:*18* 30:*2, 14, 23* 31:*9* 32:*12, 20* 35:*6, 14, 21* 39:*2, 24* 41:*7, 21* 42:*18* 43:*9, 17* 44:*4, 17* 45:*4, 19, 24* 46:*24* 49:*4* 50:*1, 20* 51:*6, 15, 23* 52:*13* 53:*11* 55:*17* 56:*8, 18* 57:*19* 58:*10, 21* 59:*7, 16* 60:*2, 15* 61:*2, 12, 20* 62:*4, 14, 21* 63:*2* 64:*10, 16* 65:*14* 66:*17* 67:*4* 68:*12, 21* 70:*9, 19* 71:*19* 73:*12, 19* 75:*7* 76:*2, 12* 77:*9, 20* 78:*19* 79:*3, 13, 18, 22* 80:*4* 82:*2, 10, 21* 83:*5, 21* 84:*8, 14* 85:*1, 13* 86:*22* 87:*2, 5, 9, 15, 21* 88:*4, 10, 16* 89:*3, 11, 16, 20* 90:*4, 7, 8, 12*

**department** 7:*1* 17:*11* 87:*7*

**depending** 68:*3*

**DEPONENT** 94:*1*

**deposed** 5:*20*

**deposing** 92:*9*

**Deposition** 1:*9* 4:*6, 19* 5:*22* 7:*15* 54:*3* 57:*24* 91:*4* 92:*2, 10, 11*

**depositions** 6:*16*

**described** 35:*8* 58:*12* 61:*16* 89:*13*
**describing** 88:*3*, *8*
**DESCRIPTION** 3:*10* 69:*15*
**design** 15:*11*, *19* 27:*9* 40:*1*, *21* 41:*4*, *11*, *15* 42:*6*, *12* 44:*10* 48:*10* 49:*7* 54:*22*, *23* 55:*12* 58:*18* 60:*4* 64:*7* 66:*10*, *15* 67:*22* 69:*24* 71:*2*, *10*, *14*, *24* 72:*3*, *8* 75:*24* 77:*18* 80:*18*, *21* 83:*20* 86:*7*
**designations** 74:*4*
**designed** 80:*12*
**designer** 78:*15*
**designs** 84:*11*
**detail** 55:*5*
**determine** 28:*1* 30:*10* 35:*1* 37:*22* 47:*4* 48:*3*, *19* 59:*12* 62:*19*
**determining** 33:*13*
**develop** 65:*1*
**developed** 54:*20*
**development** 55:*5*
**difference** 13:*8*, *10* 33:*5*
**differences** 48:*20* 73:*16*
**different** 11:*20*, *24* 12:*1*, *24* 15:*19* 22:*3* 23:*17* 33:*17* 36:*23* 37:*19* 43:*4* 54:*7* 55:*8*, *9* 68:*2*, *3* 85:*15*
**differently** 21:*20* 52:*8*
**direct** 8:*18*
**directing** 40:*14*
**direction** 34:*16*
**Director** 31:*4*
**dirt** 71:*3*, *11*, *15* 72:*1*, *3*, *8*, *13* 82:*13*
**disability** 32:*3*, *17*, *18* 33:*2*, *3*, *14*, *15* 34:*18*, *19* 35:*3*, *5*, *13* 36:*6*
**discharge** 34:*21* 35:*2*, *11*

**discharging** 22:*16*, *18* 23:*24* 24:*7*
**disclose** 56:*2*
**disconnected** 57:*17*
**discovery** 77:*5*
**discuss** 24:*2* 69:*7*
**discussed** 86:*3*
**discussing** 11:*8* 77:*14*
**discussion** 68:*23* 75:*22* 76:*17*
**discussions** 75:*16* 76:*4*, *8* 78:*5*, *8*
**dispute** 80:*10*
**DIVISION** 1:*2*
**document** 8:*5*, *13*, *15* 9:*1*, *8* 11:*16* 20:*11* 23:*3*, *20* 32:*11* 36:*20* 38:*11*, *14* 42:*2* 44:*1* 50:*21* 52:*6* 53:*20* 54:*2*, *12*, *14*, *16* 55:*6* 56:*22* 64:*15* 66:*6* 70:*6* 84:*16* 85:*8* 86:*2*, *3* 89:*13*
**documents** 11:*23* 12:*16* 17:*6* 18:*4* 32:*24* 89:*1*, *5*
**doing** 9:*6* 15:*4* 39:*9*, *12* 51:*13* 52:*5* 85:*22* 92:*6*
**double** 86:*19* 87:*1*, *4*, *7*, *14*, *20* 88:*9*, *14*, *19*, *23* 89:*13*
**dozen** 22:*3* 33:*24* 34:*1*
**drafting** 23:*4* 83:*11*, *14*, *16*
**drafts** 16:*9*
**dragging** 81:*22*
**drop** 58:*1*, *12* 60:*12*, *18* 62:*10* 76:*1*, *5*, *21* 77:*2*, *6*, *14* 78:*9*
**dropped** 56:*23*
**drove** 41:*11*
**Due** 4:*18* 62:*12*
**duly** 5:*7*
**dust** 59:*13*, *24* 62:*12* 82:*16*, *18*
**duty** 70:*3*, *8*

**< E >**
**E-1** 64:*4*
**Eastern** 4:*4*
**Ed** 8:*19*, *21* 10:*8*, *12* 31:*2*, *6*, *7*, *10* 57:*10* 69:*12*
**Effect** 31:*18*
**effective** 61:*24* 62:*12* 72:*12*
**effectively** 40:*22* 41:*16* 45:*12* 60:*20*, *24* 61:*16*
**effectiveness** 71:*10*
**Effects** 3:*11*, *13* 13:*1*, *3*, *5*, *17* 14:*20*
**effort** 55:*7*
**efforts** 49:*18*, *20* 70:*5* 77:*14*
**either** 20:*24* 32:*23* 58:*2* 74:*4*
**elements** 67:*11*, *13*
**eliminated** 30:*6* 36:*24*
**eliminating** 74:*4*
**E-mail** 3:*16* 86:*2*, *3*, *4*
**e-mails** 86:*14*
**employed** 91:*10*
**employees** 39:*11*
**employer** 6:*15* 33:*1* 38:*9* 39:*10* 68:*18*
**encased** 26:*23*
**encompasses** 42:*13*
**ended** 58:*13*
**engaged** 15:*7* 79:*4*
**engineer** 7:*3* 47:*16* 77:*23*
**engineering** 6:*24* 7:*6* 30:*21* 47:*18*, *24* 48:*5* 87:*6*, *12*
**engineers** 77:*23*
**ensuring** 71:*4*
**entering** 21:*8* 71:*4*, *11*, *16*, *17* 72:*2*, *4*, *9*
**entitled** 3:*16*
**entity** 76:*23* 77:*2*
**environment** 42:*24* 72:*19*
**environmental** 32:*3*

**71:*5* 82:*7*
**envisioned** 66:*5*
**envisioning** 63:*22*
**EPR170** 3:*16*
**equivalent** 28:*20*
**Errata** 92:*4*, *6*, *9* 94:*9*
**error** 24:*8* 34:*3* 53:*1* 63:*11*, *14*, *20*
**especially** 42:*21*
**ESQUIRE** 2:*3*, *8*
**essentially** 10:*12* 15:*18* 18:*11*, *21* 20:*10*, *19* 21:*21* 25:*2* 26:*22* 28:*20* 31:*21* 37:*3*, *7* 39:*15*, *20* 41:*3* 48:*10*, *24* 49:*16*, *23* 57:*12* 58:*18* 74:*7*
**EST** 1:*11* 90:*18*
**established** 15:*1* 60:*11* 76:*22*
**Estate** 1:*2*
**estimate** 80:*24*
**et** 4:*8* 67:*23*
**eTran** 90:*9*
**evaluation** 41:*23* 69:*1*
**event** 14:*1* 58:*5*, *9*, *15*, *17* 59:*6*, *21*
**Everest** 1:*22* 4:*12*
**evolutionary** 42:*12*
**exactly** 72:*6*
**Examination** 3:*4*, *5*, *6*, *7* 5:*11* 80:*2* 85:*4* 89:*9*
**examined** 5:*8*
**example** 18:*1* 22:*14* 25:*5* 26:*4* 32:*15* 37:*8* 68:*3*
**examples** 16:*9*, *14*
**exceeding** 32:*4*
**Excel** 21:*7*
**exception** 82:*18*
**Exhibit** 3:*11*, *16* 8:*5*, *7* 16:*17* 25:*1* 53:*20*, *22* 69:*12* 72:*24* 86:*4*, *9*
**existing** 25:*24*
**exists** 36:*9*, *10*
**expect** 27:*15*

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 100 of 116
PageID #: 5952
Deposition of David Johnson
Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**expected** 11:*6* 42:*14* 82:*8*
**experience** 39:*8*, *12*
**expires** 91:*16*
**explain** 13:*9*
**export** 85:*24*
**exposures** 82:*12*
**extended** 41:*24*
**extends** 27:*4*
**extensive** 13:*15*
**extent** 69:*5* 84:*5*
**exterior** 72:*10*

**< F >**
**fact** 68:*23*
**fail** 92:*11*
**failed** 76:*21* 77:*14* 78:*9*
**failing** 77:*3*
**Failure** 3:*11*, *12* 13:*1*, *3*, *5*, *17* 14:*7*, *20* 21:*12*, *22* 22:*1*, *3* 23:*1*, *16*, *22* 24:*3* 31:*19* 39:*23* 40:*10* 43:*14* 47:*15* 53:*1* 56:*23* 57:*3* 59:*12* 63:*9* 65:*23* 68:*2* 73:*23* 77:*6* 82:*18*
**failures** 22:*17*
**fair** 10:*14*, *15* 11:*11*, *12* 23:*3* 32:*19* 41:*20* 44:*16* 61:*11* 62:*3* 68:*1*
**fairly** 27:*15*, *17*
**fall** 11:*3*
**familiar** 17:*1* 54:*14*, *17*
**familiarity** 65:*1*
**far** 79:*23*
**fast** 7:*19*
**FCU** 71:*12*, *13*
**feature** 70:*2* 88:*9*
**features** 42:*5*, *14* 46:*3* 49:*10* 54:*6* 73:*11*, *17* 88:*3*
**February** 9:*2* 68:*24* 84:*18*
**feeding** 82:*20*
**feel** 46:*21* 52:*3*

88:*18*
**fielded** 72:*20*
**filled** 20:*12* 57:*12* 85:*11*
**fills** 19:*2*
**final** 7:*16* 50:*9* 64:*18*
**financial** 91:*12*
**find** 19:*13*
**Finger** 24:*8* 53:*2* 63:*17* 65:*3*
**finished** 86:*15*
**fire** 34:*15* 45:*2* 58:*1*, *15* 59:*24* 60:*12*, *24* 61:*8*, *10* 62:*10* 65:*2* 76:*1*, *5* 89:*14*
**firearm** 25:*24* 43:*20* 71:*3*, *15* 72:*1* 83:*2* 84:*11*
**firearms** 26:*2* 42:*12*
**fired** 56:*5*
**fireplace** 11:*8*
**firing** 30:*12* 58:*4* 65:*4* 83:*1*
**first** 5:*7* 8:*11* 9:*1* 12:*14* 21:*11* 22:*6*, *9* 23:*2*, *15*, *22* 24:*5* 33:*22* 45:*11* 48:*9* 52:*22*, *24* 64:*7* 77:*1* 80:*12*
**fits** 37:*5*
**five** 17:*16* 22:*16* 45:*21*
**Floor** 2:*4*
**Florida** 2:*10*
**fluff** 84:*4*
**FM** 8:*14*
**FMEA** 13:*8*, *13* 14:*3* 25:*11* 38:*18*
**FMECA** 3:*11* 7:*12*, *13*, *23* 8:*14*, *16*, *20* 9:*4*, *9*, *17*, *21* 10:*13* 11:*3*, *11*, *14* 12:*15*, *19*, *20*, *22* 13:*8*, *12*, *13*, *21* 14:*5*, *19* 16:*8*, *15*, *21* 18:*11* 19:*1*, *3*, *18* 20:*4* 23:*23* 25:*18* 36:*17* 38:*18* 41:*10* 53:*16* 55:*13*, *24* 56:*3*, *20* 63:*8* 68:*9*, *17*

74:*2*, *22* 83:*11*, *14*, *17*, *23* 84:*9*, *16*, *21* 85:*9*
**FMECAs** 16:*9*
**focus** 7:*10*
**follow** 15:*1*
**followed** 17:*5*
**following** 32:*2*, *9* 59:*20*
**follows** 5:*9*
**follow-ups** 84:*6* 85:*7*
**forces** 59:*4*
**foregoing** 91:*4*, *5* 94:*4*
**foreign** 24:*11* 25:*6*, *15* 26:*13* 27:*7* 33:*23* 34:*7* 37:*9*, *21*, *23* 38:*5* 40:*12*, *20* 41:*5*, *19* 42:*16* 43:*15* 44:*6*, *15*, *24* 45:*3* 46:*6*, *11* 47:*11* 48:*8*, *23* 49:*8*, *11* 52:*11* 68:*4*
**foreseeable** 42:*16*, *20* 43:*13*, *19* 44:*10*, *14*, *23* 45:*1*
**form** 9:*22* 10:*18* 13:*22* 17:*18* 18:*13* 20:*14* 21:*2*, *16* 25:*22* 28:*3* 29:*18* 30:*2*, *14*, *23* 31:*9* 32:*12*, *20* 35:*6*, *14*, *21* 39:*2*, *24* 41:*7*, *21* 42:*18* 43:*17* 44:*4*, *17* 45:*4* 46:*24* 49:*4* 50:*1*, *20* 51:*6*, *15*, *23* 52:*13* 53:*11* 55:*17* 56:*8*, *18* 57:*19* 58:*10*, *21* 59:*7*, *16* 60:*2*, *15* 61:*2*, *12*, *20* 62:*4*, *14*, *21* 64:*10*, *16* 65:*14* 66:*17* 67:*4* 68:*12*, *21* 70:*9*, *19* 71:*19* 73:*12*, *19* 75:*7* 76:*2*, *12* 77:*9*, *20* 78:*19* 79:*3*, *13*, *18* 81:*24* 82:*14* 83:*3*, *15*, *24* 84:*12*, *22* 85:*13* 86:*23* 87:*2*, *9*, *15*, *21* 88:*4*, *10*, *16*, *18* 89:*3* 94:*8*
**formalized** 15:*1*

**formally** 69:*3*
**formation** 9:*20*
**forms** 11:*20* 12:*23*
**forward** 7:*20* 58:*20* 59:*2* 61:*10*
**found** 41:*24*
**Foundation** 56:*9* 68:*13* 84:*1*
**fourth** 56:*24*
**frame** 27:*3*
**free** 69:*17*
**frequency** 27:*15*, *17* 38:*5*
**Frequent** 27:*17* 28:*2* 37:*23*
**Friday** 1:*11*
**front** 8:*15* 27:*4*
**fulfilled** 84:*3*
**fulfills** 16:*21*
**Function** 21:*12* 71:*4* 82:*4*
**functions** 11:*24* 73:*18*
**further** 33:*8* 40:*23* 41:*18* 50:*13*

**< G >**
**gathering** 12:*3* 55:*22*
**gear** 40:*23* 41:*17* 45:*13*
**general** 49:*1* 65:*21*
**generally** 27:*7* 64:*3* 66:*1*, *14* 68:*11*
**generated** 25:*23*
**German** 76:*19*, *21* 77:*6*
**Germany** 77:*24* 78:*2*
**GERSH** 1:*5*
**getting** 27:*16* 34:*20* 61:*19*
**give** 18:*10* 19:*6* 31:*21* 33:*8*
**given** 5:*22* 20:*11* 32:*23* 94:*6*
**gives** 37:*10* 54:*10*
**giving** 18:*23* 49:*17*, *18* 53:*6*
**go** 10:*6* 11:*10* 22:*17* 23:*16* 25:*9* 28:*4* 33:*24* 40:*6* 42:*11*

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 101 of 116
PageID #: 5953
Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

44:*21*  46:*13*  50:*3*
51:*7, 16*  53:*12*  55:*3*
59:*2*  63:*8*  74:*12*
**goes**  52:*5*
**going**  9:*19*  11:*14*
16:*17*  18:*22*  19:*12*
23:*17*  33:*18*  36:*22*
42:*21, 23*  43:*4*  47:*2*
48:*4*  60:*24*  61:*17*
68:*9, 16*  70:*10*  73:*3*
75:*23*  79:*20*  81:*20*
82:*9*  83:*19*  84:*5*
86:*1, 4, 5, 6*  89:*19*
**GOMELSKAYA**  1:*1*
4:*7*
**Good**  5:*14*  33:*21*
49:*15*  80:*5*  88:*7*
**gotten**  62:*2*
**government**  7:*17*
10:*3*  11:*19, 24*  12:*6*
17:*3*  18:*8*  41:*23*
42:*3*  50:*23*  69:*1, 5*
82:*9*  83:*19*  84:*7*
**grade**  29:*2, 6, 10, 13,*
*17*  30:*1, 7*  31:*16*
50:*17*  52:*10, 19*
**grades**  30:*21*  31:*6, 7*
35:*20*  53:*6*  74:*9*
**grading**  68:*10*
**greater**  28:*24*  38:*5*
73:*24*
**grip**  72:*9*
**GROUP**  1:*5*  80:*9*
**grouped**  22:*11*
**guard**  26:*15, 21, 22,*
*24*  45:*14*  65:*3*  67:*23*
**guarded**  40:*22*  41:*16*
45:*12*
**guarding**  27:*21*
30:*11*
**guards**  45:*15*
**guess**  6:*10*  27:*16*
51:*12*
**guidance**  31:*21*
32:*23*  33:*12*
**guideline**  28:*15*
**gun**  27:*20*  30:*12*
43:*4*  49:*22*  50:*22*
52:*3*  65:*20*  66:*15*
67:*10*  71:*18*  72:*14,*

*15*  86:*20*  87:*20*
88:*14*  89:*14*
**guns**  25:*19*  26:*7*
27:*7*  49:*1, 16, 20, 24*
53:*9*  54:*5, 7*  55:*8*
56:*6, 7, 12, 17*  64:*2*
66:*1, 14*  68:*10*  73:*11*
**gunshot**  36:*7*
**guys**  11:*7*

**< H >**
**half**  33:*24*
**Hamden**  6:*14*
**hammer**  56:*4*
**hand**  91:*14*
**handgun**  8:*3*  69:*2*
70:*15*
**handguns**  70:*2*
**happen**  27:*15*  29:*6*
42:*21*  45:*7, 9*  60:*8*
**happening**  36:*1*
**harsh**  71:*4*
**Hasevlat**  85:*17, 20*
**H-a-s-e-v-l-a-t**  85:*18*
**Hazard**  18:*2*  21:*13*
41:*10*  46:*10*  66:*7*
**hazards**  42:*3, 5*
72:*18*
**head**  6:*24*
**headings**  20:*22*
**heads**  22:*6*
**health**  72:*18*
**hear**  5:*14, 15*
**heard**  12:*22*  13:*3*
75:*5, 11*
**heck**  19:*9*
**help**  42:*6*
**helped**  11:*1*
**helps**  71:*3, 15*  72:*1*
**hereunto**  91:*13*
**high**  27:*15, 17*  37:*1,*
*12*
**higher**  51:*10*  67:*14*
**highlighted**  33:*18*
69:*23*
**highlighting**  69:*16*
**hit**  80:*5*
**hoc**  14:*23*  15:*17*
**hold**  59:*13, 15*

**holding**  61:*7*  62:*13*
**holster**  65:*1*
**holstered**  43:*7, 13*
44:*12, 13, 19*
**holstering**  34:*9, 12,*
*21*  35:*1, 12*  38:*1, 6*
65:*23*  66:*22*  68:*5*
**Holstering/unholsterin**
**g**  34:*2*  37:*15, 22*
63:*11, 16, 24*  65:*20*
67:*9*
**hours**  43:*7*  80:*20*
**Hummon**  1:*12, 23*
4:*12*  91:*2, 23*
**hypothesize**  42:*20*
**hypothetical**  43:*20*

**< I >**
**idea**  64:*11*  69:*5*
80:*20*
**identification**  8:*8*
53:*23*  86:*10*
**identified**  23:*23*  24:*5*
28:*13*  32:*10*  46:*23*
66:*7*
**identifies**  25:*3*  28:*9*
36:*23*  54:*6*
**identify**  21:*14, 22, 24*
33:*17*  42:*4*  47:*7*
56:*13*  69:*19*  87:*7*
**identifying**  15:*22*
18:*8*  36:*12*  39:*21*
40:*8*  41:*10*  86:*19*
87:*13*
**imagine**  56:*1*
**impact**  14:*8*  32:*4*
40:*9*
**Impacts**  56:*23*
**impeded**  59:*2*
**imperative**  92:*8*
**implication**  60:*18*
**implying**  41:*9*
**improve**  76:*5*
**inaccurately**  89:*24*
**incident**  66:*19*
**includes**  65:*2*
**including**  11:*20*
86:*19*
**inclusion**  75:*17*

**Incorporated**  4:*7*
75:*24*
**incorrect**  41:*11*
**increase**  64:*8*
**indicate**  4:*21*  53:*2*
**indicated**  50:*11, 12*
85:*10*
**indicating**  70:*1*
**Individually**  1:*1*
**individuals**  9:*16*
11:*17*  12:*17*  13:*21*
**industry**  13:*2*
**inform**  82:*11*
**information**  10:*2*
11:*19*  17:*21*  21:*8*
35:*23*  36:*5, 12, 16*
38:*24*  47:*3*  55:*23*
56:*16*  57:*12*  68:*20*
69:*9*  81:*17*
**Initial**  9:*3*  50:*5*
**initiation**  54:*20*
**injuries**  36:*7*
**injury**  35:*10*
**input**  42:*3*
**inside**  59:*24*  71:*18*
**INSTRUCTIONS**
92:*1*
**integral**  27:*3*
**intended**  16:*22*
21:*14*  72:*20*
**intending**  21:*21*
**interaction**  9:*16*
**interest**  91:*12*
**interface**  57:*4, 17*
58:*8*  59:*5, 22*  61:*18*
62:*1*
**internal**  72:*14, 15*
**internally**  75:*2*
**intro**  8:*18*
**introduction**  16:*18*
**intuition**  27:*12*
**involved**  7:*11*  14:*4*
31:*15*  54:*15, 21*
77:*13, 17*  78:*4, 7*
**involvement**  79:*6*
**irreversible**  32:*3*
**Island**  2:*10*
**issuance**  70:*6*
**Issue**  9:*3*
**Item**  20:*8*  24:*5*  66:*9*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**items**  14:*14*  18:*9*  32:*9*  34:*1*  86:*18*
**it'll**  37:*4*
**its**  58:*24*  69:*3*  73:*17*  80:*21*  81:*3, 9*  82:*4*  88:*8*  91:*12*

**< J >**
**Job**  1:*22*  88:*7*
**JOHNSON**  1:*10*  3:*3*  4:*6*  5:*6*  80:*6*  85:*2*  89:*12*
**JOYCE**  2:*8*
**July**  91:*16*
**June**  3:*16*  86:*14*

**< K >**
**keep**  71:*15*  72:*1*
**keeping**  43:*5*  65:*3*  71:*11*  72:*13*
**keeps**  71:*3*
**KELLY**  2:*8*
**kept**  72:*3*
**kind**  17:*10*
**knew**  20:*18*  55:*19*  81:*15*  82:*8*
**know**  6:*6, 9, 10*  7:*22*  9:*11*  10:*1, 6*  11:*2, 6, 7, 8*  12:*5, 14*  17:*20*  18:*14*  19:*3, 5*  21:*6*  22:*22*  26:*6*  33:*20*  35:*15, 17, 19, 22*  36:*9, 10*  38:*4, 17, 22*  51:*3, 8, 13*  59:*20*  60:*8*  61:*23*  62:*24*  63:*3, 5*  64:*17*  67:*15*  69:*6, 18*  70:*5, 13, 22*  71:*16*  72:*12*  73:*2, 8*  75:*14*  76:*8, 16*  77:*5, 13, 16*  78:*6, 7, 11, 12*  80:*24*  84:*5, 15*  85:*17*  86:*15*  87:*6*
**knowing**  26:*11*
**knowingly**  18:*16*
**knowledge**  8:*1*  13:*15*  33:*13*  38:*20*  87:*12, 16*
**known**  77:*6*
**KRISTEN**  2:*8*  57:*23*

**kristen.dennison@littl etonjoyce.com**  2:*11*

**< L >**
**label**  8:*17*
**lack**  67:*21*
**lacked**  27:*20*  66:*15, 16*
**lacking**  67:*13*
**lacks**  67:*11*
**laptop**  19:*6*
**LAW**  1:*2*
**lead**  11:*22*  78:*15, 16, 17*  79:*1*  80:*9*  85:*15*
**Leading**  82:*1, 5, 15*
**leads**  79:*11*
**learned**  12:*15*
**leaving**  78:*24*  79:*15*
**left**  6:*21*  7:*21, 24*  8:*2*  9:*10, 13*  10:*22*  25:*21*  75:*3, 17*  78:*22*  80:*22*  84:*16*  85:*11*
**leg**  35:*10*  36:*6*
**length**  53:*8*
**lengths**  53:*17*  54:*11*  55:*9*  56:*6, 14*  73:*10*
**letter**  13:*19*  31:*15*  49:*23*  50:*17*  51:*5, 22*  52:*10*
**letters**  20:*9*  25:*3*  47:*8*  51:*14*
**level**  25:*10*  27:*23*  28:*24*  32:*8*  33:*13, 23*  34:*8, 10*  37:*11*  39:*15, 16*  52:*5, 10*  64:*8*  65:*19, 24*  74:*3*  79:*5*
**Levels**  3:*14*  15:*23*  16:*2*  31:*16*  33:*18*  36:*13*  37:*20*  46:*22*  47:*8*
**Levels/FMEA**  3:*14*  24:*24*
**licensed**  7:*3, 5*
**lighter**  75:*23*
**likelihood**  14:*9*
**limit**  13:*14*
**LINE**  93:*3*
**List**  17:*4, 6*  21:*15*  23:*1*
**literature**  33:*12*

**little**  14:*3*  23:*18*  24:*21*  29:*20*  49:*14*
**LITTLETON**  2:*8*
**live**  65:*2*
**LLP**  2:*8*
**lock**  61:*18*  62:*2, 11*
**long**  18:*17*  55:*15*
**look**  15:*22*  16:*2, 14, 24*  18:*3*  25:*5*  36:*4*  37:*7*  55:*14*  79:*21*  86:*13*  89:*23*
**looked**  9:*7*  16:*10*  69:*13*
**looking**  14:*7*  25:*1*  31:*19*  47:*11, 22*  48:*7*  52:*22, 24*  57:*24*  64:*3*  72:*24*  74:*2*
**looks**  22:*2*  36:*19*  47:*13, 23*  66:*3*
**lose**  59:*22*  61:*5, 8*
**loss**  21:*12*
**losses**  32:*4*
**lost**  57:*17*  58:*8*  59:*6*  60:*13*  61:*18*  62:*2*
**lot**  35:*23*  42:*13*  55:*4*
**love**  90:*3*
**low**  74:*4*
**lower**  35:*10*  36:*6*  49:*2, 9*

**< M >**
**M9**  73:*5*
**machine**  26:*7*
**machining**  14:*13*
**magazine**  82:*22, 24*
**magazines**  82:*19*
**majority**  31:*11*
**making**  45:*8*  53:*10*  70:*2*  83:*19*
**Manual**  40:*23*  41:*17*  48:*15, 18, 21*  50:*12, 13, 18, 19*  51:*1, 4, 21, 22*  52:*12, 20*  54:*9*
**manually**  15:*9*
**manufacturers**  88:*1*
**manufacturing**  14:*6, 11, 16*
**March**  1:*11*  4:*3*  91:*15*
**MARIYA**  1:*1*

**mark**  8:*5*  53:*20*  86:*4*
**marked**  8:*7*  53:*22*  54:*3*  86:*9*
**Market**  2:*3*  26:*19*  45:*15*  70:*4, 8, 16*
**marketing**  87:*19*  89:*1*
**match**  47:*9*
**Matrix**  3:*15*  16:*6*  37:*11*  39:*15, 16*  74:*3*
**Matt**  54:*4*  77:*19, 21*  78:*15, 22*
**matter**  4:*7*
**maximize**  53:*4*
**mean**  11:*18*  13:*20*  21:*18*  25:*14*  26:*8*  40:*13*  42:*12*  47:*6*
**Meaning**  8:*23*  44:*6*  57:*4*  70:*1*  76:*9*
**means**  25:*10*
**meant**  75:*8*
**measure**  26:*4*
**measured**  71:*10*
**measurements**  54:*10*
**measures**  27:*9*  55:*16*
**mechanism**  54:*7*
**medium**  37:*16*  74:*5*
**meetings**  78:*5*
**memory**  9:*7, 8*  10:*11*  76:*20*  78:*18*
**mention**  67:*16*
**Merritt**  2:*10*
**met**  83:*18*
**MHS**  3:*12*  9:*3*  19:*18*  72:*17*
**Microsoft**  21:*7*
**MIL**  17:*10*  18:*15, 18*  20:*6, 23*
**military**  7:*12, 24*  9:*5, 17*  11:*15*  16:*21*  17:*11*  18:*23*  20:*3*  32:*24*  43:*8*  48:*15*  64:*15*  68:*8*  70:*1, 6, 7, 14, 17, 23*  73:*2*  81:*3, 6, 12*  84:*18, 21*
**million**  32:*4*
**MIL-STD-882**  17:*23*
**MIL-STD-882E**  3:*14*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**mind** 22:9 23:2 74:24
**minimal** 36:24
**minimize** 39:22 65:8 66:12 72:8
**minimum** 53:3 74:1
**minutes** 45:21
**mitigate** 39:22 41:4 50:7 75:24
**mitigating** 42:7
**mitigation** 49:18, 20
**Mode** 21:12 23:16, 23 40:10
**Modes** 3:11, 13 13:1, 3, 5, 17 14:7, 20 21:22 22:1, 3 23:2 73:23
**modifying** 74:8
**modular** 8:3 69:2
**moment** 28:19
**monetary** 32:4
**MONGELUZZI** 2:1
**morning** 5:14
**move** 58:23 60:19 61:10
**moving** 58:20
**mud** 81:22 82:17
**multiple** 10:4
**Multishot** 22:17
**Murphy** 8:19 31:2 57:10 69:12

**< N >**
**name** 4:22 5:18
**natural** 45:20
**necessary** 59:5 68:19 92:3
**need** 66:13 69:21 85:8 90:7, 8
**needs** 66:11
**negative** 15:23
**neither** 91:10
**NESHIN** 1:2
**never** 43:6
**new** 31:20 70:2 72:18 81:3
**normal** 49:19 58:22
**notarial** 91:14
**NOTARY** 91:1, 3, 24

**notch** 75:6, 12, 18
**noted** 4:15 94:8
**notes** 79:21
**notice** 1:10
**NOVEMBER** 1:4
**NUMBER** 1:5 3:10 4:9 58:1
**numbers** 17:5 20:9 47:8

**< O >**
**Object** 10:18 24:11 25:6, 15 26:13 27:7, 11 33:23 34:7 37:9, 21 38:5 40:12, 20 41:6, 19 42:16 43:15 44:4, 6, 15 45:3 46:6, 11 47:11 49:9, 12 52:11 56:8 68:4 81:24 82:14 83:24 84:22 87:13, 19
**Objection** 9:22 13:22 17:18 18:13 20:14 21:2, 16 25:22 28:3 29:18 30:2, 14, 23 31:9 32:12, 20 35:6, 14, 21 39:2, 24 41:7, 21 42:18 43:9, 17 44:17 45:4 46:24 49:4 50:1, 20 51:6, 15, 23 52:13 53:11 55:17 56:18 57:19 58:10, 21 59:7, 16 60:2, 15 61:2, 12, 20 62:4, 14, 21 64:10, 16 65:14 66:17 67:4 68:12, 21 70:9, 19 71:19 73:12, 19 75:7 76:2, 12 77:9, 20 78:19 79:3, 13, 18 82:5 85:13 86:22 87:2, 9, 15, 21 88:4, 10, 16 89:3
**objects** 27:14 37:23 40:23 41:17 44:24 45:13 48:8, 23
**observed** 62:16
**obtain** 16:9
**obtaining** 55:22

**obviously** 17:10 21:5 34:22
**occasional** 25:10, 16 27:19
**occur** 27:12 43:22 59:21 76:10
**occurred** 23:6
**Occurrence** 3:14 24:14, 24 25:11 27:23 28:8, 9, 13, 17 29:23 31:6, 7, 16 32:16 37:9 40:9, 24 44:7 45:17 46:4 47:7 49:1, 2, 3, 6, 7, 9, 16, 17, 19 50:6, 8, 14 51:9 52:10 53:7 64:2 65:8, 19, 24 67:2 74:9
**occurring** 14:10 15:24 16:3 29:1 38:6
**occurs** 35:11
**offered** 38:13 55:15
**offering** 66:10
**officer** 43:6 91:4
**official** 81:9
**Oh** 42:11
**Okay** 6:7, 8, 10, 24 7:19 8:13 9:1, 15 10:11, 15 11:2, 13 12:14 13:7, 11 14:11 15:17 16:17 17:7 18:10, 20 19:15, 20 20:7, 18 21:11 22:2, 12, 14, 24 23:22 24:13, 16 25:5 26:2, 14, 20 27:5 28:8, 16, 23 31:14 32:15 34:6 35:10 36:4 37:7 39:4, 10 40:11, 17 41:13 43:12, 24 44:21 45:11, 24 48:2, 7 49:14 50:11 54:18 63:14 64:14, 20 66:13 69:21, 23 71:2 72:7 79:10, 24 80:15 82:22 83:8 86:17 88:22 90:4, 6
**once** 39:14 69:19

**open** 26:9
**opening** 15:7
**operation** 58:23
**Operator** 24:8 34:3 53:1 63:11, 14, 20, 23
**operator's** 48:18
**operator-safe** 70:3, 8, 18
**opportunity** 89:21
**option** 41:18 54:9
**options** 15:13 47:23 66:16 67:22
**order** 23:5 38:10, 14 55:23 68:19
**ordered** 22:4, 5, 7
**organizing** 11:22
**original** 92:8
**originally** 64:1
**outcome** 91:12
**outcomes** 15:23 16:3 36:13
**outlined** 18:6 48:21
**outside** 38:10, 13 72:14 75:2
**oversight** 54:24

**< P >**
**P.C** 2:1
**p.m** 74:18 89:19 90:18
**P220** 15:4, 20 16:6
**P320** 14:19 25:20 40:1, 8, 13, 14, 21 41:15, 23 42:5 43:14 44:2, 11, 13 45:11, 14, 16 46:3 48:9 50:11, 18 51:4, 21, 22 52:12 53:3, 9 56:16 57:5 58:18 60:4 64:3, 8, 20 65:8, 13 66:4 68:11 69:2, 24 70:7, 14, 17 71:10 72:3, 8, 10, 12 73:3, 9, 17 74:3, 24 75:2, 6, 13, 15, 20 77:3, 18 78:15 79:17 80:12, 17, 21 81:2, 6, 12, 21 84:10 86:7, 19 87:1 88:9, 23

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 104 of 116
PageID #: 5956
Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**P320Design000040-P320Design000043** 3:*18*

**P320s** 45:*2* 49:*2, 3*

**P320's** 48:*10* 55:*12* 75:*24*

**P365** 54:*20, 21, 23*

**PAGE** 3:*2, 10, 14, 15, 16* 16:*24* 25:*1* 27:*18* 28:*14* 31:*20* 36:*20* 41:*14* 72:*17* 73:*1* 86:*18* 93:*3*

**pages** 3:*13* 9:*2* 86:*6* 94:*4*

**paper** 17:*14, 17*

**paragraph** 69:*22*

**parameters** 76:*22* 77:*3*

**parentheses** 34:*3*

**Parkway** 2:*9*

**part** 8:*2* 9:*20* 12:*8* 86:*6*

**partial** 32:*18* 33:*3, 15* 35:*3*

**participated** 13:*4*

**particular** 25:*19* 29:*1, 5* 44:*18*

**parties** 4:*19* 91:*11*

**parts** 14:*13* 76:*5*

**pass** 82:*17*

**passing** 58:*2*

**patience** 79:*23* 89:*7*

**Paul** 2:*14* 4:*10*

**PDF** 8:*16*

**PE** 7:*8*

**pen** 17:*14, 17*

**Pennsylvania** 2:*4*

**people** 10:*4* 11:*21* 23:*2* 42:*23* 43:*12* 44:*11, 13*

**percent** 28:*18, 21, 24* 29:*5, 8, 9, 12, 13, 15, 16, 24* 30:*13*

**percentages** 28:*9*

**perform** 59:*11*

**performed** 14:*20* 38:*18* 74:*24* 81:*19*

**performing** 11:*11* 77:*2*

**perimeter** 26:*23*

**period** 7:*10* 26:*17* 41:*24*

**permanent** 32:*2, 17, 18* 33:*2, 3, 14, 15* 35:*3, 4, 13* 36:*6*

**person** 12:*5* 15:*18* 34:*22* 47:*7* 79:*10*

**personalized** 45:*16*

**personally** 9:*15*

**PHILADELPHIA** 1:*1* 2:*4* 4:*8*

**picturing** 30:*17*

**Pistol** 3:*12* 15:*4, 7* 19:*18* 22:*15, 17* 23:*23* 24:*6* 25:*15* 29:*1, 5* 34:*13, 14* 44:*19* 65:*1* 70:*8, 15* 73:*5* 80:*12, 17* 81:*4, 7, 13, 21, 22* 82:*3, 12* 83:*18* 87:*1* 88:*23*

**pistols** 21:*23* 22:*1* 26:*5* 42:*16* 56:*4* 70:*3*

**place** 4:*19* 26:*10*

**Plaintiff** 1:*3* 2:*6* 4:*24*

**Plan** 18:*3*

**plans** 18:*5, 7*

**platform** 21:*8*

**PLEAS** 1:*2* 4:*8*

**please** 4:*17, 21* 6:*9* 57:*21* 90:*8, 9, 12, 16* 92:*2, 6*

**point** 49:*15* 67:*16* 75:*12, 15* 78:*16*

**pointed** 34:*14*

**police** 43:*6* 76:*19, 21*

**poorly** 65:*9*

**portion** 8:*21* 9:*20*

**portions** 10:*5, 24* 72:*9, 10*

**position** 58:*24* 59:*14, 23* 62:*12* 85:*23*

**positioning** 22:*21*

**possibility** 26:*13*

**possible** 19:*8* 29:*17, 24* 62:*20, 24* 63:*4, 6*

**potential** 14:*15* 21:*11, 22, 24* 22:*3* 23:*1, 16, 22* 24:*3, 6*

**29:*22* 30:*5* 31:*18* 32:*1* 34:*23* 35:*3, 4* 36:*1, 5* 39:*23* 43:*14* 46:*5, 10, 23* 47:*15* 49:*6* 52:*24* 56:*22* 63:*9* 65:*22* 66:*7, 15* 67:*11, 22* 68:*2* 73:*23***

**potentially** 14:*8*

**practices** 66:*9*

**preparation** 11:*22*

**prepare** 18:*9*

**prepared** 7:*18* 40:*2* 69:*4*

**preparing** 52:*6* 75:*1*

**PRESENT** 2:*14* 82:*19*

**presented** 22:*23*

**presents** 72:*17*

**pretty** 13:*16* 26:*9*

**prevent** 15:*6* 27:*13* 40:*22* 41:*16* 45:*12* 49:*8*

**preventative** 30:*6*

**previously** 5:*24* 54:*2* 69:*13* 78:*13*

**primarily** 57:*12* 77:*21* 85:*24*

**prior** 7:*15* 12:*19* 13:*6* 14:*4, 19* 16:*8* 65:*2* 67:*19* 68:*22* 70:*5* 76:*9* 77:*7, 11* 78:*24* 79:*15* 81:*7*

**probabilities** 36:*22*

**Probability** 3:*14* 15:*23* 24:*14, 24* 25:*10, 14, 16* 27:*22, 23* 28:*24* 37:*4* 40:*24* 41:*18* 46:*22* 50:*14* 51:*9* 67:*14*

**probable** 28:*2*

**probably** 7:*16* 13:*2, 5* 27:*18*

**procedure** 15:*2*

**proceed** 4:*17*

**proceedings** 91:*7*

**process** 13:*5* 14:*11, 22* 28:*6* 30:*16* 38:*2* 66:*6* 80:*18*

**processes** 14:*6*

**product** 14:*21* 88:*3*

**production** 14:*17, 18*

**products** 16:*10* 26:*18* 38:*19* 88:*2*

**Professional** 1:*13* 91:*3*

**Program** 9:*3* 10:*4* 18:*3* 69:*2*

**progression** 78:*14*

**project** 10:*16* 53:*16* 54:*4* 78:*17*

**projects** 79:*2, 5, 7*

**promoted** 78:*16* 79:*1*

**prompted** 76:*16, 18*

**Proper** 65:*2* 71:*4*

**proposal** 8:*3* 11:*21*

**propounded** 94:*7*

**protect** 27:*10* 49:*11*

**protrudes** 27:*3*

**prove** 51:*18*

**provide** 36:*11, 15* 68:*19*

**provided** 18:*8* 20:*3* 53:*15*

**providing** 9:*4* 55:*11, 19, 22*

**PUBLIC** 91:*1, 3, 24*

**pull** 24:*8, 11* 25:*6, 15* 27:*6* 33:*22* 34:*2, 7, 9, 12* 37:*8, 14, 20, 21, 24* 40:*11, 20* 41:*5* 43:*15* 48:*8* 53:*1, 3, 8* 56:*15* 57:*18* 58:*9, 17* 59:*6, 21* 60:*14* 61:*24* 63:*10, 15, 16* 65:*19* 66:*21* 67:*9, 20* 68:*4, 5* 73:*10* 86:*6*

**pulled** 57:*7* 60:*20, 23* 61:*16* 63:*23*

**pulling** 26:*13* 37:*24* 52:*11* 58:*23*

**pulls** 38:*4, 6* 41:*19* 42:*15* 44:*15* 45:*2* 46:*5, 11* 47:*12* 48:*23* 55:*15* 65:*23*

**purpose** 83:*22*

**purposes** 56:*20* 60:*3*

**pursuant** 1:*10*

**put** 12:*24* 15:*15* 20:*19* 22:*20* 25:*13*

Deposition of David Johnson                           Mariya Gomelskaya v. Sig Sauer, Inc., et al.

26:*10*, *15*  36:*2*  37:*3*, *4*  47:*3*
**putting**  10:*14*  17:*14*, *17*  82:*4*

**< Q >**
**qualification**  76:*19*, *20*
**qualify**  72:*5*
**quality**  31:*4*
**quantifiable**  47:*3*
**question**  6:*6*  7:*20*  26:*8*  44:*22*  57:*21*  63:*3*  64:*7*  69:*18*  70:*11*
**questions**  37:*19*  60:*3*  69:*8*  79:*22*  85:*2*  94:*6*
**quickly**  47:*22*  89:*12*

**< R >**
**raised**  49:*15*
**range**  42:*24*  43:*5*
**rate**  25:*11*  27:*23*  28:*13*  31:*24*  37:*9*, *10*  46:*5*  49:*7*, *9*, *17*, *19*  50:*6*, *8*  51:*4*  65:*9*
**rated**  25:*7*  27:*22*  37:*15*
**rates**  28:*10*  45:*17*
**ratings**  25:*20*
**read**  16:*18*  18:*5*  23:*20*  26:*11*  28:*19*  32:*10*  69:*17*, *21*  86:*17*  89:*21*, *22*  90:*3*, *5*  92:*2*  94:*4*
**reading**  86:*15*
**reads**  9:*4*
**ready**  69:*18*
**realigning**  22:*10*
**realization**  21:*13*
**really**  11:*10*  26:*11*  34:*20*  47:*23*
**reason**  80:*10*  92:*4*
**recall**  11:*5*, *10*  12:*18*  14:*13*  17:*19*  18:*17*  21:*9*  22:*22*, *24*  30:*24*  31:*14*, *17*  33:*10*  38:*2*  39:*13*  54:*15*  59:*17*

75:*23*  76:*13*  77:*10*, *17*  78:*4*  79:*5*, *16*, *19*
**receipt**  92:*10*
**receive**  36:*5*
**recess**  23:*11*  46:*17*  74:*16*
**recollection**  9:*12*  20:*5*  78:*21*
**recommendations**  64:*21*
**Recommended**  25:*21*  39:*16*, *21*  40:*12*  48:*7*  64:*21*
**record**  4:*3*, *15*, *23*  23:*13*  46:*14*, *15*, *19*  69:*19*  74:*13*, *14*, *18*  86:*5*  89:*19*  90:*18*  91:*6*
**recorded**  4:*5*
**reduce**  14:*9*  46:*10*
**reduced**  41:*18*  91:*8*
**reduces**  40:*24*  50:*13*
**reduction**  66:*23*  67:*2*, *6*
**redundant**  57:*5*
**refer**  17:*5*, *22*
**references**  16:*20*, *23*, *24*  17:*13*, *17*
**referring**  26:*21*  27:*2*  40:*17*  44:*19*  64:*22*  69:*20*  71:*17*
**reflect**  42:*5*
**refresh**  9:*8*
**Registered**  1:*12*  91:*2*
**related**  5:*21*, *22*  6:*3*  7:*12*  9:*17*  15:*20*  46:*22*  85:*24*  91:*10*
**relationship**  18:*15*
**release**  58:*3*, *4*  61:*1*, *5*, *7*, *23*  62:*10*
**released**  59:*1*
**reliably**  82:*19*
**relying**  68:*9*, *17*
**remember**  12:*11*
**Remote**  27:*19*
**remotely**  4:*19*
**removed**  79:*16*
**removes**  58:*18*
**repeat**  70:*11*

**rephrase**  6:*6*  39:*3*, *7*  41:*13*  44:*22*  70:*20*  71:*22*
**replaced**  72:*21*
**replacing**  73:*3*
**Report**  18:*2*
**Reported**  1:*23*  54:*23*
**Reporter**  1:*13*  4:*11*, *16*  91:*1*, *3*
**Reporting**  4:*13*
**reports**  18:*5*, *7*
**represent**  54:*18*
**representation**  70:*23*
**request**  11:*20*  38:*9*
**required**  10:*3*  12:*15*  42:*2*
**requirement**  84:*2*
**requirements**  11:*18*  16:*22*  17:*4*  19:*2*  81:*15*  83:*18*
**resemblance**  14:*24*
**reside**  6:*13*
**residual**  73:*24*
**resources**  38:*13*, *15*  68:*18*
**respect**  40:*19*
**Responsibility**  47:*13*, *16*, *17*, *19*, *24*  48:*4*, *14*  79:*6*
**responsible**  12:*6*
**restricted**  26:*16*
**result**  14:*10*  30:*11*  32:*9*, *16*  78:*8*  82:*24*
**resulting**  36:*6*
**results**  21:*12*  58:*12*  76:*18*
**return**  92:*8*
**revealed**  76:*21*
**review**  11:*16*  12:*16*  17:*16*  30:*21*  64:*14*  69:*7*
**reviewing**  17:*20*
**revision**  3:*16*  9:*2*
**right**  5:*18*  6:*11*, *12*, *22*  7:*10*  8:*11*  10:*8*, *23*  17:*22*  19:*11*, *13*, *14*, *16*  23:*15*  24:*23*  36:*19*  37:*12*, *17*  43:*8*, *16*, *24*  44:*2*  46:*13*  47:*9*, *24*  48:*1*, *11*

60:*7*, *14*, *22*  61:*1*, *19*  65:*11*, *21*  67:*3*, *11*, *22*  74:*20*  80:*5*  88:*15*  89:*2*
**Risk**  3:*15*  16:*5*  27:*6*  28:*2*  30:*5*  36:*21*, *23*  37:*10*, *17*, *23*  39:*14*  41:*5*  42:*16*  44:*14*  48:*24*  49:*1*, *2*, *3*  66:*12*  73:*24*  74:*2*  76:*1*
**risks**  14:*15*, *16*, *17*, *18*, *21*  38:*19*  39:*23*  46:*23*  74:*5*
**ROBERT**  2:*3*
**role**  31:*2*
**ROMAN**  1:*2*
**Ron**  78:*4*, *6*, *7*
**Rose**  12:*13*
**rough**  29:*20*
**round**  61:*11*
**row**  44:*19*
**RPR**  1:*23*
**rules**  6:*5*
**rzimmerman@smbb.com**  2:*5*

**< S >**
**safe**  43:*5*
**safeties**  46:*8*, *9*  55:*8*, *14*  56:*5*, *14*  67:*23*
**safety**  14:*16*, *21*  15:*4*, *6*, *9*  17:*12*  18:*2*, *3*  26:*24*  38:*19*  40:*23*  41:*18*  50:*12*, *13*, *18*, *19*  51:*1*, *5*, *21*, *22*  52:*12*, *20*  54:*8*, *9*  57:*5*  58:*14*, *19*, *24*  59:*12*, *14*, *22*, *23*  61:*6*, *8*, *9*  66:*15*  67:*11*, *13*, *22*  70:*2*  72:*18*
**sales**  12:*7*  85:*21*, *22*, *23*  87:*7*, *13*
**SALTZ**  2:*1*
**sand**  82:*4*, *16*
**sat**  7:*5*
**SAUER**  1:*5*  4:*7*  14:*24*  16:*13*  44:*14*, *23*  45:*1*  55:*11*  57:*16*

Deposition of David Johnson                              Mariya Gomelskaya v. Sig Sauer, Inc., et al.

68:*18*  81:*4, 8, 21*
82:*3, 11*  88:7
saw  7:*16*  64:*17*  85:*9*
saying  19:*10*  27:*20*
43:*3*  67:*1*  71:*17*
says  8:*19*  9:*3*  16:*21*
19:*2*  20:*7*  28:*8*  32:*6*
34:*1*  40:*18, 21*  45:*11*
47:*12*  48:*13*  57:*3*
64:*21, 24*  71:*2, 14, 24*
72:*17*  73:*23*  74:*1*
scenario  49:*22*  59:*20*
61:*1, 15*  62:*11*
score  32:*7*
screen  8:*11*  19:*17*
seal  91:*14*
Sean  77:*19, 22*  78:*13,*
*16, 21*  79:*1, 6, 16*
80:*7*
sear  57:*4, 16*  58:*3, 4,*
*14*  59:*1*  61:*5*  62:*1*
75:*5, 8, 12, 17*
season  11:*10*
second  69:*23*
secondary  75:*5, 11, 17*
second-guess  9:*7*
section  64:*22*  73:*23*
sections  63:*21*
see  5:*16, 17*  8:*11*
17:*21*  19:*7, 17, 23*
24:*16*  28:*8*  34:*4*
36:*1*  37:*1*  39:*18*
40:*13, 14*  41:*1*  44:*8*
47:*20*  48:*9*  50:*15*
54:*12*  57:*1, 8*  60:*19*
61:*17*  63:*12, 18*  64:*5,*
*21*  65:*5*  71:*6*  72:*22*
85:*14*  86:*20*
seen  7:*13*  49:*20*
57:*15*  58:*6*  60:*12*
62:*10*
selecting  79:*11*
selection  69:*3*
sense  10:*5*  22:*23*
sentence  69:*16, 24*
73:*22*
sequence  22:*23*
set  52:*1*  53:*3*  91:*13*
setting  43:*8*

severe  32:*8*
severities  36:*22*
Severity  3:*14*  13:*24*
14:*10*  16:*2*  32:*16*
33:*13, 18, 23*  34:*8, 9*
36:*13*  37:*4, 10, 20*
40:*9*  44:*7*  47:*8*  64:*2,*
*8*  74:*9*
Severity-Function
31:*19*
Sheet  92:*4, 6, 9*  94:*9*
SHORTHAND  91:*1*
shotguns  26:*7*
show  8:*4*  19:*5*
53:*19*  63:*9*  69:*11*
85:*8*  86:*1*
showed  55:*6*  60:*12*
89:*5*
shown  7:*15*
shrink  26:*3*
sic  74:*1*
side  43:*24*  78:*2*
sidearm  81:*3, 9*
SIG  1:*5*  4:*7*  5:*21,*
*23*  6:*3, 18, 21*  11:*14*
14:*24*  16:*13*  18:*22*
36:*11*  38:*13*  39:*21*
43:*14*  44:*14, 23*  45:*1*
47:*7, 16, 18, 24*  48:*4,*
*18*  55:*7, 11, 19, 21*
56:*3*  57:*16*  58:*6*
62:*7, 8, 19*  68:*18*
70:*13*  77:*13, 15*  78:*2*
81:*4, 8, 21*  82:*11*
88:*7*
SIG-ARMY  8:*15*
SIG-ARMY00000412-
SIG-ARMY00000413
3:*12*
sign  89:*21, 22*  90:*5*
92:*6*
Signature  94:*18*
significant  22:*5*  32:*3*
36:*24*
significantly  51:*10*
Similar  37:*19*  58:*12*
similarity  22:*13*
single  87:*4*  88:*19*
sir  5:*14, 18*  6:*12*
8:*12, 18*  23:*15*  46:*21*

54:*12*  56:*22*  59:*9*
63:*8*  67:*15*  69:*11*
74:*20*  75:*3, 11*  78:*13*
79:*20*  85:*7*  86:*13*
89:*6*
SIS  82:*3*
sit  52:*9*
situation  42:*21*
situations  22:*19*
slide  15:*7, 8*  72:*9*
slight  14:*24*
snags  40:*22*  41:*16*
45:*12*
software  21:*9*
soldier  72:*18*
soldiers  42:*22*
solution  66:*10*
somebody  26:*10*
31:*17*  66:*19*
Sorry  19:*4*  40:*6*
42:*11*  55:*3, 4*  75:*9*
83:*6*
sort  10:*5*
sound  6:*22*
source  11:*17*  38:*24*
sources  33:*1*  38:*10*
space  92:*4*
speak  18:*16*
speaks  13:*24*
specific  25:*24*  50:*9*
76:*5*  84:*10*
specifically  6:*21*
11:*5*  14:*14*  59:*18*
Speculation  71:*20*
spent  80:*7*
spits  37:*16*
SPOT4GUNS  1:*6*
Standard  17:*10, 11*
18:*15, 18*  20:*6, 23*
54:*9*  90:*15*
start  17:*2*  52:*2*
65:*21*  76:*11*
started  11:*2*  16:*15*
17:*14*  49:*6*  83:*10*
starting  16:*8*  23:*1*
52:*4*
stat  92:*3*
state  57:*20*
statement  45:*8*

60:*18*  72:*5*
stating  4:*22*
STENOGRAPHER
4:*18, 20*  5:*3*  90:*6, 10,*
*14*
stenographic  4:*15*
stenographically  91:*8*
step  66:*23*  67:*2, 6*
Stephanie  1:*12, 23*
4:*12*  91:*2, 23*
Steve  12:*13*
stipulate  4:*20*
Street  2:*3*
strike  19:*4*  20:*1*
28:*19*  30:*9*  34:*17, 23*
35:*17*  44:*12, 24*
47:*14*  51:*3*  52:*22*
62:*7*  65:*7*  75:*4*
82:*23*
striker  56:*5*  57:*4, 5,*
*6, 17*  58:*3, 4, 13, 14,*
*19, 24*  59:*1, 12, 13, 15,*
*21, 23*  61:*5, 6, 7, 8, 9,*
*10, 18*  62:*1, 2, 11*
70:*3, 8*  75:*6, 8*  89:*14*
striker-fired  70:*15*
striker-sear  58:*7*
59:*5*  60:*13*  61:*18*
studies  73:*8*
study  70:*22*  71:*1*
subject  80:*21*  81:*21*
82:*9*
subjected  81:*12*
subjective  27:*8*
30:*16, 21*  31:*15*  74:*8*
subjectively  51:*13*
submission  69:*24*
submissions  18:*22*
submit  18:*9*  42:*2*
84:*4*
submittal  11:*23*
submittals  12:*4*
submitted  7:*17*  8:*2*
9:*13, 14*  10:*3*  12:*15*
17:*6*  19:*3*  50:*22*
68:*24*  81:*2, 7, 13*
84:*17*
submitting  11:*14*
64:*15*  81:*4*

substance 94:*8*
Suite 2:*9*
summer 11:*3*
sunshine 11:*7*
supervision 91:*9*
supplemental 81:*16*
support 45:*8* 52:*15, 18*
supposed 31:*24*
suppressor 78:*17* 79:*2, 5, 7* 80:*9*
sure 10:*1* 13:*9* 21:*17* 24:*15* 71:*14* 80:*13*
swear 4:*20*
sworn 5:*7*
system 17:*12* 18:*2, 3* 28:*13* 69:*15* 70:*2*
systems 72:*20*

< T >
tab 46:*9*
tabular 8:*21* 9:*20*
take 10:*13* 12:*1* 14:*9* 45:*20* 79:*21* 86:*13* 89:*22*
taken 1:*10* 4:*6* 20:*22, 24* 40:*18, 20* 41:*4* 46:*17* 49:*8* 50:*13* 53:*2* 64:*20* 70:*5* 74:*16* 91:*5, 7*
takes 36:*21*
talk 43:*12*
talked 83:*10*
talking 22:*14* 26:*22, 24* 61:*5* 69:*24* 71:*18*
Taylor 54:*3, 4* 77:*19, 21* 78:*15, 22*
team 12:*6, 9, 12* 30:*21* 41:*4* 54:*23* 77:*18* 78:*15, 17, 22* 79:*1, 11, 17* 80:*8* 87:*13*
technical 81:*15*
technically 42:*1*
technician 4:*11*
technique 65:*2*
tell 14:*3* 15:*3* 19:*13* 20:*21* 21:*13* 23:*7*

30:*16* 37:*5* 45:*11*
ten 67:*15*
TERM 1:*4* 13:*2* 26:*20* 27:*2* 63:*14, 20*
terms 14:*15* 21:*14* 22:*4, 6* 27:*22* 36:*4* 44:*10* 54:*5* 61:*4* 64:*1, 2* 65:*20, 22* 73:*9, 17*
test 7:*6, 8* 58:*12* 59:*4* 62:*16* 76:*21* 77:*6, 14* 78:*9* 81:*4, 6* 82:*3* 83:*18*
tested 80:*17*
testified 5:*8, 9* 6:*1* 78:*13* 80:*7*
testimony 5:*22* 67:*19* 91:*7*
testing 57:*15* 58:*6* 59:*11, 12, 18* 60:*12, 18* 62:*11, 18* 71:*9* 74:*21, 23* 76:*18, 22* 77:*2* 80:*21* 81:*1, 17, 22* 82:*4, 7, 11, 17, 18* 83:*9, 13*
tests 58:*1, 2* 81:*12, 19*
Thank 5:*3* 79:*22* 83:*8* 85:*1* 89:*17* 90:*12*
Thanks 89:*7*
thing 39:*16* 67:*1*
things 13:*11* 36:*1* 61:*17* 66:*20*
think 6:*21* 10:*14* 11:*19* 22:*9* 27:*9* 54:*3* 60:*11* 66:*19* 67:*1, 16* 69:*21* 75:*8* 87:*22* 88:*11* 89:*24*
thinking 11:*9* 26:*12* 42:*22* 69:*4*
thirty 92:*9*
Thomele 77:*22*
thoroughly 84:*20*
thought 22:*19* 30:*16* 38:*2* 42:*4* 85:*23*
three 17:*5* 47:*23*
till 84:*17*
time 4:*4* 5:*21, 22* 6:*3* 7:*11, 18* 26:*3, 19*

28:*18* 30:*13, 17* 34:*15* 38:*3, 20* 41:*24* 50:*8* 57:*16* 60:*16* 71:*9* 77:*1* 79:*23* 80:*22*
times 5:*21*
timing 10:*1*
title 19:*17* 20:*11*
titles 19:*22* 20:*12*
today 4:*11, 14* 52:*10* 70:*4* 85:*9*
today's 4:*3*
told 9:*19* 10:*7* 38:*24* 68:*17*
Toner 77:*19, 22* 78:*13* 79:*1, 6, 16* 80:*7*
top 8:*19* 19:*21* 20:*12* 36:*22* 69:*12*
total 32:*2, 17* 33:*2, 14* 34:*18, 19* 35:*4, 13* 36:*6*
touching 43:*6*
town 6:*12*
trainer 72:*19*
training 40:*13* 42:*23* 48:*14, 16, 20* 64:*24* 65:*9* 66:*11, 14, 16, 23* 67:*3, 6*
transcribed 89:*24*
transcript 89:*21, 22* 91:*6* 92:*10, 12*
transcription 94:*5*
travel 54:*11* 57:*6*
trigger 24:*7, 8, 10* 25:*6, 14* 26:*13, 15, 21, 22, 23* 27:*1, 4, 6, 10, 13, 21* 30:*11* 33:*22* 34:*2, 7, 8, 12* 37:*8, 14, 20, 21, 24* 38:*4, 6* 40:*11, 19, 21* 41:*5, 16, 19* 42:*9, 15* 43:*15* 44:*15* 45:*2, 12, 14, 15* 46:*5, 8, 9, 11* 47:*12* 48:*8, 23* 49:*9, 11* 52:*11* 53:*1, 2, 3, 4, 8, 16* 54:*7, 8, 10* 55:*9, 15* 56:*6, 14, 15* 57:*6, 18* 58:*9, 17, 23* 59:*6, 21* 60:*14, 19* 61:*15,*

24 63:*10, 15, 16, 17, 23* 65:*3, 19, 23* 66:*21* 67:*9, 20, 22, 23* 68:*4, 5* 73:*10*
triggers 46:*2, 3, 9*
trigger's 60:*19, 23*
true 91:*6*
try 19:*13* 41:*13*
trying 22:*22* 26:*9* 41:*4* 72:*6* 84:*10*
Twice 5:*24*
two 9:*1* 15:*12, 19* 19:*6* 33:*17* 52:*2* 61:*17*
two-page 8:*14*
TXT 90:*9*
type 11:*23* 16:*5* 22:*20* 26:*4, 24* 27:*21* 54:*8*
types 55:*14* 56:*5* 59:*4* 81:*12*
typewriting 91:*9*
typical 50:*8*
typo 64:*12*

< U >
U.S 81:*6*
UGHETTA 2:*8*
Um-hum 57:*2* 67:*18* 69:*14*
unaware 39:*7*
undefined 43:*20*
underneath 20:*9*
understand 5:*20* 6:*6, 18* 11:*13* 16:*10* 18:*20* 19:*9, 21* 20:*10* 24:*13* 26:*8, 20* 28:*16* 33:*5* 49:*14* 65:*15* 68:*8*
understanding 7:*11* 11:*15* 13:*7* 18:*12, 24* 19:*1* 28:*12* 39:*6* 54:*19* 62:*9* 65:*18* 81:*11*
understood 67:*19* 68:*16*
undertake 77:*15*
undertaken 54:*5*
undertook 55:*7* 62:*19*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**unholstering**  34:*9, 13, 21*  35:*2, 12*  38:*1, 7*  65:*24*  66:*22*  68:*6*
**uniform**  40:*22*  41:*17*  45:*13*  67:*17*
**unintentional**  30:*12*  35:*11*
**unintentionally**  24:*7*
**unique**  17:*8*  65:*10, 13, 16*  66:*10*  70:*2*
**uniquely**  49:*10*
**unit**  60:*1*
**untrained**  67:*10*
**use**  23:*15*  26:*21*  27:*2*  63:*14, 20*  66:*9*  69:*5*  76:*19, 21*
**user**  47:*17, 19*  48:*1, 5*  66:*16*  67:*3, 10*
**Users**  64:*24*
**user's**  48:*13*
**uses**  43:*4*
**utilized**  36:*16*  56:*6, 7*
**utilizing**  21:*7*

**< V >**
**various**  12:*23*
**verbally**  15:*19*
**verbatim**  20:*22, 24*
**version**  7:*16*  50:*22*  64:*18*  70:*7, 15, 18*  72:*2*  73:*2*  81:*7*
**versions**  52:*3*
**versus**  4:*7*  28:*2*  33:*3*  35:*4*  48:*21*  68:*4, 11*  72:*13*
**vibration**  56:*24*
**victim**  35:*12*
**video**  4:*5, 10*  23:*8, 9*  90:*11*
**Videographer**  2:*14*  4:*2*  23:*9, 12*  46:*15, 18*  74:*14, 17*  89:*18*
**Videotaped**  1:*9*
**vocational**  33:*11*

**< W >**
**waive**  90:*2*
**want**  6:*10*  7:*10*  8:*4, 18*  19:*5, 6, 14*  23:*15*  26:*20*  33:*17, 19*

49:*14*  53:*19*  63:*8*  69:*7, 11, 15*  74:*20*  79:*22*  84:*4*  86:*13*  90:*1, 10*
**wanted**  15:*5*  84:*3*
**way**  9:*8*  10:*14*  12:*24*  22:*8*  34:*17*  61:*19*  62:*3*
**ways**  66:*8, 19*
**weapon**  43:*13*  44:*12*  56:*23*  68:*6*  87:*8, 14, 20*
**week**  43:*7*
**weight**  53:*9*  73:*10*  76:*4*
**weights**  56:*15*
**Well**  7:*15, 19*  10:*17*  12:*23*  13:*11, 23*  17:*2*  19:*2*  26:*12, 14*  27:*9*  33:*7*  34:*11*  44:*21*  47:*10*  48:*6*  50:*12*  66:*20*  68:*7*  71:*21*  73:*4*  75:*3*  77:*18*  80:*13, 16*  82:*8, 23*  85:*21*  88:*17*
**went**  64:*4, 18*
**We're**  4:*2, 12*  21:*24*  25:*1*  41:*14*  67:*1*  72:*24*  86:*4*
**we've**  60:*11*  68:*23*  80:*5*
**whatsoever**  49:*18*
**WHEREOF**  91:*13*
**winter**  11:*4*
**wisdom**  42:*13*
**withstand**  82:*12*
**WITNESS**  3:*2*  4:*21*  9:*24*  10:*19*  13:*23*  17:*19*  18:*14*  20:*15*  21:*3, 17*  25:*23*  28:*5*  30:*3, 15, 24*  31:*10*  32:*13, 21*  35:*7, 15, 22*  39:*4*  40:*1*  41:*8, 22*  42:*19*  43:*10, 18*  44:*18*  45:*5*  47:*1*  49:*5*  50:*4, 21*  51:*8, 17, 24*  52:*14*  53:*13*  55:*18*  56:*10*  57:*20*  58:*11, 22*  59:*17*  60:*7, 17*  61:*13, 21*  62:*5, 15,*

*22*  63:*5*  64:*11, 17*  65:*15*  66:*18*  68:*14, 22*  70:*10*  73:*13, 20*  76:*3, 13*  77:*10, 21*  78:*20*  79:*4, 19, 24*  82:*6, 16*  83:*4, 16*  84:*2, 13, 23*  85:*14*  87:*3, 10, 16, 22*  88:*5, 11, 17*  89:*4*  90:*3, 4*  91:*13*  92:*1*
**witnessed**  62:*16*
**Word**  21:*7*
**work**  10:*7, 8*
**worked**  6:*18*  8:*21*  10:*4*  85:*21*
**working**  21:*10*  23:*6*  78:*21*  80:*8*  83:*17*
**worst**  49:*21*
**write-up**  69:*11*
**writing**  15:*15*
**written**  8:*14*

**< Y >**
**Yeah**  29:*3*  45:*22*  55:*21*  57:*23*  60:*10*  70:*13*
**year**  11:*3*  56:*2*  76:*10, 11*  77:*7, 8*  80:*8*
**years**  7:*1*  13:*6*  14:*4*  26:*6*  67:*15*
**Yep**  24:*20*
**yesterday**  57:*24*
**you-all**  15:*11*  25:*7*  48:*10*  59:*4, 11*

**< Z >**
**zero**  30:*10*
**ZIMMERMAN**  2:*3*  3:*4, 6*  5:*1, 13, 19*  8:*4, 10*  10:*10, 21*  14:*2*  17:*24*  18:*19*  20:*17*  21:*4, 19*  23:*8, 14*  26:*1*  28:*7*  29:*19, 21*  30:*4, 19*  31:*1, 13*  32:*14, 22*  35:*9, 16*  36:*3*  39:*3, 5*  40:*3*  41:*12*  42:*8*  43:*2, 11, 23*  44:*5, 20*  45:*10, 22*  46:*1, 13, 20*  47:*5*

49:*13*  50:*10, 24*  51:*11, 19*  52:*7, 17*  53:*14, 19*  54:*1*  55:*20*  56:*11, 19*  57:*22*  58:*16*  59:*3, 8, 19*  60:*6, 9, 21*  61:*3, 14, 22*  62:*6, 17, 23*  63:*7*  64:*13, 19*  65:*17*  66:*24*  67:*5*  68:*15*  69:*10*  70:*12, 20, 21*  71:*21, 23*  73:*14, 21*  74:*12, 19*  75:*9, 10*  76:*7, 15*  77:*12*  78:*1, 23*  79:*9, 14, 20*  81:*24*  82:*5, 14*  83:*3, 15, 24*  84:*12, 22*  85:*6, 16*  86:*1, 12, 24*  87:*11, 18, 24*  88:*6, 13, 21*  89:*6*  90:*15, 16*
**Zoom**  1:*9*  19:*15*  23:*17*  33:*19, 20*
**zooming**  23:*19*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

## WORD LIST

**< $ >**
**$10** *(1)*

**< 0 >**
**0.0001** *(3)*
**0.001** *(1)*
**0.1** *(3)*
**004** *(1)*

**< 1 >**
**1** *(25)*
**10** *(4)*
**10:04** *(2)*
**10:32** *(1)*
**10:33** *(1)*
**11:08** *(1)*
**11:14** *(1)*
**11:59** *(1)*
**12:06** *(1)*
**12:27** *(1)*
**12:28** *(1)*
**13** *(1)*
**16** *(1)*
**1650** *(1)*
**18th** *(1)*
**19103** *(1)*

**< 2 >**
**2** *(11)*
**20** *(2)*
**2005** *(1)*
**2014** *(2)*
**2016** *(17)*
**2017** *(2)*
**2024** *(1)*
**2025** *(1)*
**2026** *(3)*
**2027** *(1)*
**204** *(1)*
**215)496-8282** *(1)*
**241200470** *(2)*
**2460** *(1)*

**< 3 >**
**3** *(4)*
**30** *(2)*
**320** *(4)*

**321)574-0280** *(1)*
**32953** *(1)*

**< 4 >**
**4/8/15** *(1)*
**40** *(2)*
**412** *(1)*
**413** *(1)*
**414** *(1)*
**43** *(1)*

**< 5 >**
**5** *(5)*
**50483** *(1)*
**52nd** *(1)*
**53** *(1)*
**56** *(1)*

**< 6 >**
**6** *(4)*

**< 8 >**
**8** *(1)*
**80** *(1)*
**85** *(1)*
**86** *(1)*
**882** *(1)*
**89** *(1)*

**< A >**
**a.m** *(5)*
**A003** *(1)*
**A007** *(2)*
**A3** *(2)*
**A6** *(2)*
**ability** *(1)*
**able** *(12)*
**absolutely** *(1)*
**acceptable** *(1)*
**accepted** *(2)*
**accepting** *(1)*
**Accidental** *(38)*
**accidentally** *(2)*
**accidentally/unintentio nally** *(3)*
**accuracy** *(2)*
**accurate** *(6)*
**accurately** *(1)*
**ACKNOWLEDGMEN**

**T** *(1)*
**acquire** *(1)*
**Action** *(23)*
**actions** *(11)*
**activity** *(1)*
**ad** *(2)*
**added** *(3)*
**additional** *(2)*
**address** *(2)*
**addressed** *(2)*
**addressing** *(1)*
**adequate** *(2)*
**administrative** *(1)*
**Administratrix** *(1)*
**Adrian** *(1)*
**adverse** *(1)*
**adversely** *(1)*
**affirmed** *(1)*
**affixed** *(1)*
**afternoon** *(2)*
**ago** *(1)*
**agree** *(2)*
**Agreed** *(2)*
**agreement** *(3)*
**ahead** *(8)*
**al** *(1)*
**allow** *(2)*
**allowed** *(1)*
**alphabetically** *(1)*
**Amanda** *(2)*
**amount** *(1)*
**Analysis** *(14)*
**Analysis(FMECA** *(1)*
**analyze** *(9)*
**analyzed** *(3)*
**analyzing** *(3)*
**announced** *(1)*
**answer** *(5)*
**answered** *(1)*
**answers** *(1)*
**anybody** *(5)*
**appearing** *(1)*
**appears** *(1)*
**apply** *(1)*
**appropriate** *(3)*
**approximately** *(1)*
**April** *(1)*
**asked** *(6)*
**asking** *(6)*

**assess** *(4)*
**assessed** *(2)*
**assessing** *(2)*
**Assessment** *(11)*
**assessments** *(2)*
**assign** *(17)*
**assigned** *(5)*
**assigning** *(5)*
**assist** *(1)*
**assistance** *(1)*
**assisted** *(1)*
**associated** *(3)*
**assume** *(6)*
**assumes** *(1)*
**assuming** *(3)*
**assumption** *(1)*
**attached** *(1)*
**attachment** *(1)*
**attachments** *(1)*
**attempt** *(3)*
**attempting** *(1)*
**attorney** *(1)*
**attorneys** *(1)*
**attributes** *(2)*
**automatic** *(1)*
**available** *(4)*
**average** *(2)*
**awarding** *(1)*
**aware** *(9)*

**< B >**
**back** *(14)*
**balance** *(3)*
**based** *(16)*
**baseline** *(1)*
**basically** *(8)*
**Bates** *(2)*
**began** *(4)*
**beginning** *(2)*
**behalf** *(2)*
**believe** *(11)*
**believed** *(1)*
**BENCH** *(1)*
**BENDESKY** *(1)*
**benefits** *(1)*
**Beretta** *(3)*
**best** *(12)*
**better** *(2)*
**beyond** *(1)*

bid  *(1)*
big  *(1)*
bit  *(1)*
blank  *(2)*
block  *(1)*
blocking  *(2)*
blocks  *(1)*
Bob  *(2)*
break  *(2)*
Brief  *(1)*
bring  *(1)*
build  *(1)*
bumped  *(1)*

< C >
called  *(1)*
capable  *(4)*
care  *(1)*
carefully  *(2)*
carrying  *(3)*
cartridge  *(1)*
CASE  *(7)*
cases  *(2)*
categorical  *(1)*
categorized  *(1)*
category  *(2)*
caught  *(1)*
cause  *(11)*
causes  *(4)*
causing  *(1)*
CDRL  *(3)*
CDRLs  *(3)*
certain  *(7)*
certainly  *(2)*
CERTIFICATE  *(1)*
certify  *(3)*
cetera  *(1)*
chance  *(7)*
change  *(3)*
changes  *(3)*
changing  *(2)*
charge  *(3)*
Chart  *(19)*
charts  *(1)*
choice  *(1)*
choices  *(1)*
circumstance  *(1)*
circumstances  *(1)*
CIVIL  *(2)*

clarity  *(1)*
clear  *(1)*
close  *(2)*
closed  *(4)*
Cohen  *(1)*
coloring  *(1)*
column  *(14)*
columns  *(7)*
combat  *(1)*
come  *(7)*
comes  *(2)*
coming  *(5)*
commencing  *(1)*
commission  *(1)*
COMMON  *(4)*
communication  *(1)*
company  *(20)*
comparative  *(4)*
compare  *(6)*
Compared  *(6)*
comparing  *(2)*
comparisons  *(1)*
competent  *(2)*
competing  *(1)*
competitor  *(1)*
competitors  *(6)*
compiled  *(1)*
complete  *(6)*
completed  *(1)*
completely  *(2)*
completing  *(6)*
completion  *(1)*
component  *(1)*
components  *(5)*
computer  *(1)*
conceivable  *(1)*
concept  *(1)*
concluding  *(1)*
Conclusion  *(2)*
condition  *(1)*
conditions  *(5)*
conducted  *(2)*
conducting  *(1)*
conferred  *(1)*
confirm  *(1)*
confirmed  *(2)*
confirming  *(1)*
confusion  *(1)*
conjunction  *(1)*

Connecticut  *(1)*
connection  *(5)*
consequences  *(1)*
consider  *(2)*
considerable  *(2)*
consideration  *(2)*
considered  *(2)*
considering  *(1)*
consistent  *(3)*
constitute  *(1)*
consult  *(2)*
consumers  *(2)*
contact  *(8)*
contained  *(3)*
contains  *(1)*
content  *(1)*
continue  *(1)*
contract  *(4)*
contracting  *(1)*
contribute  *(1)*
contributed  *(2)*
control  *(4)*
controlled  *(1)*
conundrum  *(1)*
conventional  *(1)*
conversations  *(2)*
convey  *(1)*
copied  *(1)*
copy  *(2)*
correct  *(24)*
corrections  *(4)*
corroborated  *(1)*
counsel  *(4)*
countermeasures  *(1)*
COUNTY  *(2)*
couple  *(2)*
COURT  *(7)*
Courtenay  *(1)*
covers  *(1)*
coworkers  *(1)*
create  *(2)*
created  *(4)*
creating  *(3)*
creation  *(1)*
criteria  *(3)*
Criticality  *(5)*
critiqued  *(1)*
currently  *(2)*
customers  *(1)*

cycled  *(1)*

< D >
d/b/a  *(1)*
D'Ambra  *(2)*
Data  *(12)*
date  *(5)*
dates  *(1)*
Dave  *(1)*
DAVID  *(4)*
day  *(1)*
days  *(1)*
dealt  *(1)*
Death  *(2)*
debris  *(11)*
DECEASED  *(1)*
December  *(5)*
decide  *(1)*
decision  *(1)*
deemed  *(1)*
Defendants  *(2)*
Defense  *(1)*
define  *(1)*
defined  *(1)*
defining  *(1)*
definite  *(1)*
definition  *(1)*
degree  *(1)*
delivered  *(2)*
DENNISON  *(111)*
department  *(3)*
depending  *(1)*
DEPONENT  *(1)*
deposed  *(1)*
deposing  *(1)*
Deposition  *(11)*
depositions  *(1)*
described  *(4)*
describing  *(2)*
DESCRIPTION  *(2)*
design  *(35)*
designations  *(1)*
designed  *(1)*
designer  *(1)*
designs  *(1)*
detail  *(1)*
determine  *(9)*
determining  *(1)*
develop  *(1)*

developed *(1)*
development *(1)*
difference *(3)*
differences *(2)*
different *(18)*
differently *(2)*
direct *(1)*
directing *(1)*
direction *(1)*
Director *(1)*
dirt *(8)*
disability *(13)*
discharge *(3)*
discharging *(4)*
disclose *(1)*
disconnected *(1)*
discovery *(1)*
discuss *(2)*
discussed *(1)*
discussing *(2)*
discussion *(3)*
discussions *(5)*
dispute *(1)*
DIVISION *(1)*
document *(32)*
documents *(7)*
doing *(8)*
double *(11)*
dozen *(3)*
drafting *(4)*
drafts *(1)*
dragging *(1)*
drop *(13)*
dropped *(1)*
drove *(1)*
Due *(2)*
duly *(1)*
dust *(5)*
duty *(2)*

< E >
E-1 *(1)*
Eastern *(1)*
Ed *(11)*
Effect *(1)*
effective *(3)*
effectively *(6)*
effectiveness *(1)*
Effects *(7)*

effort *(1)*
efforts *(4)*
either *(4)*
elements *(2)*
eliminated *(2)*
eliminating *(1)*
E-mail *(4)*
e-mails *(1)*
employed *(1)*
employees *(1)*
employer *(5)*
encased *(1)*
encompasses *(1)*
ended *(1)*
engaged *(2)*
engineer *(3)*
engineering *(8)*
engineers *(1)*
ensuring *(1)*
entering *(8)*
entitled *(1)*
entity *(2)*
environment *(2)*
environmental *(3)*
envisioned *(1)*
envisioning *(1)*
EPR170 *(1)*
equivalent *(1)*
Errata *(4)*
error *(6)*
especially *(1)*
ESQUIRE *(2)*
essentially *(23)*
EST *(2)*
established *(3)*
Estate *(1)*
estimate *(1)*
et *(2)*
eTran *(1)*
evaluation *(2)*
event *(7)*
Everest *(2)*
evolutionary *(1)*
exactly *(1)*
Examination *(8)*
examined *(1)*
example *(7)*
examples *(2)*
exceeding *(1)*

Excel *(1)*
exception *(1)*
Exhibit *(13)*
existing *(1)*
exists *(2)*
expect *(1)*
expected *(3)*
experience *(2)*
expires *(1)*
explain *(1)*
export *(1)*
exposures *(1)*
extended *(1)*
extends *(1)*
extensive *(1)*
extent *(2)*
exterior *(1)*

< F >
fact *(1)*
fail *(1)*
failed *(3)*
failing *(1)*
Failure *(31)*
failures *(1)*
fair *(11)*
fairly *(2)*
fall *(1)*
familiar *(3)*
familiarity *(1)*
far *(1)*
fast *(1)*
FCU *(2)*
feature *(2)*
features *(8)*
February *(3)*
feeding *(1)*
feel *(3)*
fielded *(1)*
filled *(3)*
fills *(1)*
final *(3)*
financial *(1)*
find *(1)*
Finger *(4)*
finished *(1)*
fire *(15)*
firearm *(7)*
firearms *(2)*

fired *(1)*
fireplace *(1)*
firing *(4)*
first *(19)*
fits *(1)*
five *(3)*
Floor *(1)*
Florida *(1)*
fluff *(1)*
FM *(1)*
FMEA *(5)*
FMECA *(56)*
FMECAs *(1)*
focus *(1)*
follow *(1)*
followed *(1)*
following *(3)*
follows *(1)*
follow-ups *(2)*
forces *(1)*
foregoing *(3)*
foreign *(30)*
foreseeable *(8)*
form *(94)*
formalized *(1)*
formally *(1)*
formation *(1)*
forms *(2)*
forward *(4)*
found *(1)*
Foundation *(3)*
fourth *(1)*
frame *(1)*
free *(1)*
frequency *(3)*
Frequent *(3)*
Friday *(1)*
front *(2)*
fulfilled *(1)*
fulfills *(1)*
Function *(3)*
functions *(2)*
further *(4)*

< G >
gathering *(2)*
gear *(3)*
general *(2)*
generally *(5)*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

generated  (1)
German  (3)
Germany  (2)
GERSH  (1)
getting  (3)
give  (4)
given  (4)
gives  (2)
giving  (4)
go  (19)
goes  (1)
going  (32)
GOMELSKAYA  (2)
Good  (5)
gotten  (1)
government  (15)
grade  (11)
grades  (7)
grading  (1)
greater  (3)
grip  (1)
GROUP  (2)
grouped  (1)
guard  (7)
guarded  (3)
guarding  (2)
guards  (1)
guess  (3)
guidance  (3)
guideline  (1)
gun  (17)
guns  (20)
gunshot  (1)
guys  (1)

< H >
half  (1)
Hamden  (1)
hammer  (1)
hand  (1)
handgun  (3)
handguns  (1)
happen  (6)
happening  (1)
harsh  (1)
Hasevlat  (2)
H-a-s-e-v-l-a-t  (1)
Hazard  (5)
hazards  (3)

head  (1)
headings  (1)
heads  (1)
health  (1)
hear  (2)
heard  (4)
heck  (1)
help  (1)
helped  (1)
helps  (3)
hereunto  (1)
high  (4)
higher  (2)
highlighted  (2)
highlighting  (1)
hit  (1)
hoc  (2)
hold  (2)
holding  (2)
holster  (1)
holstered  (5)
holstering  (10)
Holstering/unholsterin
g  (8)
hours  (2)
Hummon  (5)
hypothesize  (1)
hypothetical  (1)

< I >
idea  (3)
identification  (3)
identified  (6)
identifies  (4)
identify  (9)
identifying  (8)
imagine  (1)
impact  (3)
Impacts  (1)
impeded  (1)
imperative  (1)
implication  (1)
implying  (1)
improve  (1)
inaccurately  (1)
incident  (1)
includes  (1)
including  (2)
inclusion  (1)

Incorporated  (2)
incorrect  (1)
increase  (1)
indicate  (2)
indicated  (3)
indicating  (1)
Individually  (1)
individuals  (4)
industry  (1)
inform  (1)
information  (16)
Initial  (2)
initiation  (1)
injuries  (1)
injury  (1)
input  (1)
inside  (2)
INSTRUCTIONS  (1)
integral  (1)
intended  (3)
intending  (1)
interaction  (1)
interest  (1)
interface  (7)
internal  (2)
internally  (1)
intro  (1)
introduction  (1)
intuition  (1)
involved  (9)
involvement  (1)
irreversible  (1)
Island  (1)
issuance  (1)
Issue  (1)
Item  (3)
items  (5)
it'll  (1)
its  (9)

< J >
Job  (2)
JOHNSON  (7)
JOYCE  (1)
July  (1)
June  (2)

< K >
keep  (2)

keeping  (4)
keeps  (1)
KELLY  (1)
kept  (1)
kind  (1)
knew  (4)
know  (67)
knowing  (1)
knowingly  (1)
knowledge  (6)
known  (1)
KRISTEN  (2)
kristen.dennison@littl
etonjoyce.com  (1)

< L >
label  (1)
lack  (1)
lacked  (3)
lacking  (1)
lacks  (1)
laptop  (1)
LAW  (1)
lead  (7)
Leading  (3)
leads  (1)
learned  (1)
leaving  (2)
left  (14)
leg  (2)
length  (1)
lengths  (6)
letter  (7)
letters  (4)
level  (19)
Levels  (9)
Levels/FMEA  (2)
licensed  (2)
lighter  (1)
likelihood  (1)
limit  (1)
LINE  (1)
List  (4)
literature  (1)
little  (5)
LITTLETON  (1)
live  (1)
LLP  (1)
lock  (3)

Case 1:23-cv-00327-JCN    Document 123-2    Filed 06/05/26    Page 113 of 116
PageID #: 5965
Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

**long**  *(2)*
**look**  *(12)*
**looked**  *(3)*
**looking**  *(12)*
**looks**  *(5)*
**lose**  *(3)*
**loss**  *(1)*
**losses**  *(1)*
**lost**  *(6)*
**lot**  *(3)*
**love**  *(1)*
**low**  *(1)*
**lower**  *(4)*

**< M >**
**M9**  *(1)*
**machine**  *(1)*
**machining**  *(1)*
**magazine**  *(2)*
**magazines**  *(1)*
**majority**  *(1)*
**making**  *(4)*
**Manual**  *(16)*
**manually**  *(1)*
**manufacturers**  *(1)*
**manufacturing**  *(3)*
**March**  *(3)*
**MARIYA**  *(1)*
**mark**  *(3)*
**marked**  *(4)*
**Market**  *(6)*
**marketing**  *(2)*
**match**  *(1)*
**Matrix**  *(6)*
**Matt**  *(5)*
**matter**  *(1)*
**maximize**  *(1)*
**mean**  *(8)*
**Meaning**  *(5)*
**means**  *(1)*
**meant**  *(1)*
**measure**  *(1)*
**measured**  *(1)*
**measurements**  *(1)*
**measures**  *(2)*
**mechanism**  *(1)*
**medium**  *(2)*
**meetings**  *(1)*
**memory**  *(5)*

**mention**  *(1)*
**Merritt**  *(1)*
**met**  *(1)*
**MHS**  *(4)*
**Microsoft**  *(2)*
**MIL**  *(5)*
**military**  *(26)*
**million**  *(1)*
**MIL-STD-882**  *(1)*
**MIL-STD-882E**  *(1)*
**mind**  *(3)*
**minimal**  *(1)*
**minimize**  *(4)*
**minimum**  *(2)*
**minutes**  *(1)*
**mitigate**  *(4)*
**mitigating**  *(1)*
**mitigation**  *(2)*
**Mode**  *(4)*
**Modes**  *(13)*
**modifying**  *(1)*
**modular**  *(2)*
**moment**  *(1)*
**monetary**  *(1)*
**MONGELUZZI**  *(1)*
**morning**  *(1)*
**move**  *(3)*
**moving**  *(1)*
**mud**  *(2)*
**multiple**  *(1)*
**Multishot**  *(1)*
**Murphy**  *(5)*

**< N >**
**name**  *(2)*
**natural**  *(1)*
**necessary**  *(3)*
**need**  *(5)*
**needs**  *(1)*
**negative**  *(1)*
**neither**  *(1)*
**NESHIN**  *(1)*
**never**  *(1)*
**new**  *(4)*
**normal**  *(2)*
**notarial**  *(1)*
**NOTARY**  *(3)*
**notch**  *(3)*
**noted**  *(2)*

**notes**  *(1)*
**notice**  *(1)*
**NOVEMBER**  *(1)*
**NUMBER**  *(4)*
**numbers**  *(3)*

**< O >**
**Object**  *(36)*
**Objection**  *(84)*
**objects**  *(8)*
**observed**  *(1)*
**obtain**  *(1)*
**obtaining**  *(1)*
**obviously**  *(3)*
**occasional**  *(3)*
**occur**  *(4)*
**occurred**  *(1)*
**Occurrence**  *(43)*
**occurring**  *(5)*
**occurs**  *(1)*
**offered**  *(2)*
**offering**  *(1)*
**officer**  *(2)*
**official**  *(1)*
**Oh**  *(1)*
**Okay**  *(79)*
**once**  *(2)*
**open**  *(1)*
**opening**  *(1)*
**operation**  *(1)*
**Operator**  *(7)*
**operator's**  *(1)*
**operator-safe**  *(3)*
**opportunity**  *(1)*
**option**  *(2)*
**options**  *(4)*
**order**  *(5)*
**ordered**  *(5)*
**organizing**  *(1)*
**original**  *(1)*
**originally**  *(1)*
**outcome**  *(1)*
**outcomes**  *(3)*
**outlined**  *(2)*
**outside**  *(4)*
**oversight**  *(1)*

**< P >**
**P.C**  *(1)*

**p.m**  *(3)*
**P220**  *(3)*
**P320**  *(79)*
**P320Design000040-**
**P320Design000043**  *(1)*
**P320s**  *(3)*
**P320's**  *(3)*
**P365**  *(3)*
**PAGE**  *(18)*
**pages**  *(4)*
**paper**  *(2)*
**paragraph**  *(1)*
**parameters**  *(2)*
**parentheses**  *(1)*
**Parkway**  *(1)*
**part**  *(4)*
**partial**  *(4)*
**participated**  *(1)*
**particular**  *(4)*
**parties**  *(2)*
**parts**  *(2)*
**pass**  *(1)*
**passing**  *(1)*
**patience**  *(2)*
**Paul**  *(2)*
**PDF**  *(1)*
**PE**  *(1)*
**pen**  *(2)*
**Pennsylvania**  *(1)*
**people**  *(7)*
**percent**  *(14)*
**percentages**  *(1)*
**perform**  *(1)*
**performed**  *(4)*
**performing**  *(2)*
**perimeter**  *(1)*
**period**  *(3)*
**permanent**  *(11)*
**person**  *(5)*
**personalized**  *(1)*
**personally**  *(1)*
**PHILADELPHIA**  *(3)*
**picturing**  *(1)*
**Pistol**  *(30)*
**pistols**  *(7)*
**place**  *(2)*
**Plaintiff**  *(3)*
**Plan**  *(1)*
**plans**  *(2)*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

platform *(1)*
PLEAS *(2)*
please *(10)*
point *(5)*
pointed *(1)*
police *(3)*
poorly *(1)*
portion *(2)*
portions *(4)*
position *(6)*
positioning *(1)*
possibility *(1)*
possible *(8)*
potential *(37)*
potentially *(1)*
practices *(1)*
preparation *(1)*
prepare *(1)*
prepared *(3)*
preparing *(2)*
PRESENT *(2)*
presented *(1)*
presents *(1)*
pretty *(2)*
prevent *(6)*
preventative *(1)*
previously *(4)*
primarily *(3)*
prior *(16)*
probabilities *(1)*
Probability *(17)*
probable *(1)*
probably *(4)*
procedure *(1)*
proceed *(1)*
proceedings *(1)*
process *(8)*
processes *(1)*
product *(2)*
production *(2)*
products *(4)*
Professional *(2)*
Program *(4)*
progression *(1)*
project *(4)*
projects *(3)*
promoted *(2)*
prompted *(2)*
Proper *(2)*

proposal *(2)*
propounded *(1)*
protect *(2)*
protrudes *(1)*
prove *(1)*
provide *(3)*
provided *(3)*
providing *(4)*
PUBLIC *(3)*
pull *(43)*
pulled *(5)*
pulling *(4)*
pulls *(12)*
purpose *(1)*
purposes *(2)*
pursuant *(1)*
put *(11)*
putting *(4)*

< Q >
qualification *(2)*
qualify *(1)*
quality *(1)*
quantifiable *(1)*
question *(9)*
questions *(6)*
quickly *(2)*

< R >
raised *(1)*
range *(2)*
rate *(15)*
rated *(3)*
rates *(2)*
ratings *(1)*
read *(15)*
reading *(1)*
reads *(1)*
ready *(1)*
realigning *(1)*
realization *(1)*
really *(4)*
reason *(2)*
recall *(25)*
receipt *(1)*
receive *(1)*
recess *(3)*
recollection *(3)*
recommendations *(1)*

Recommended *(6)*
record *(15)*
recorded *(1)*
reduce *(2)*
reduced *(2)*
reduces *(2)*
reduction *(3)*
redundant *(1)*
refer *(2)*
references *(5)*
referring *(7)*
reflect *(1)*
refresh *(1)*
Registered *(2)*
related *(9)*
relationship *(1)*
release *(7)*
released *(1)*
reliably *(1)*
relying *(2)*
remember *(1)*
Remote *(1)*
remotely *(1)*
removed *(1)*
removes *(1)*
repeat *(1)*
rephrase *(7)*
replaced *(1)*
replacing *(1)*
Report *(1)*
Reported *(2)*
Reporter *(5)*
Reporting *(1)*
reports *(2)*
represent *(1)*
representation *(1)*
request *(2)*
required *(3)*
requirement *(1)*
requirements *(6)*
resemblance *(1)*
reside *(1)*
residual *(1)*
resources *(3)*
respect *(1)*
Responsibility *(8)*
responsible *(1)*
restricted *(1)*
result *(6)*

resulting *(1)*
results *(3)*
return *(1)*
revealed *(1)*
review *(6)*
reviewing *(1)*
revision *(2)*
right *(41)*
Risk *(22)*
risks *(10)*
ROBERT *(1)*
role *(1)*
ROMAN *(1)*
Ron *(3)*
Rose *(1)*
rough *(1)*
round *(1)*
row *(1)*
RPR *(1)*
rules *(1)*
rzimmerman@smbb.com *(1)*

< S >
safe *(1)*
safeties *(7)*
safety *(41)*
sales *(6)*
SALTZ *(1)*
sand *(2)*
sat *(1)*
SAUER *(16)*
saw *(3)*
saying *(5)*
says *(22)*
scenario *(6)*
score *(1)*
screen *(2)*
seal *(1)*
Sean *(9)*
sear *(13)*
season *(1)*
second *(1)*
secondary *(3)*
second-guess *(1)*
section *(2)*
sections *(1)*
see *(35)*
seen *(6)*

Deposition of David Johnson                                    Mariya Gomelskaya v. Sig Sauer, Inc., et al.

selecting  (1)
selection  (1)
sense  (2)
sentence  (3)
sequence  (1)
set  (3)
setting  (1)
severe  (1)
severities  (1)
Severity  (20)
Severity-Function  (1)
Sheet  (4)
SHORTHAND  (1)
shotguns  (1)
show  (7)
showed  (3)
shown  (1)
shrink  (1)
sic  (1)
side  (2)
sidearm  (2)
SIG  (44)
SIG-ARMY  (1)
SIG-ARMY00000412-
SIG-ARMY00000413
 (1)
sign  (4)
Signature  (1)
significant  (3)
significantly  (1)
Similar  (2)
similarity  (1)
single  (2)
sir  (21)
SIS  (1)
sit  (1)
situation  (1)
situations  (1)
slide  (3)
slight  (1)
snags  (3)
software  (1)
soldier  (1)
soldiers  (1)
solution  (1)
somebody  (3)
Sorry  (7)
sort  (1)
sound  (1)

source  (2)
sources  (2)
space  (1)
speak  (1)
speaks  (1)
specific  (4)
specifically  (4)
Speculation  (1)
spent  (1)
spits  (1)
SPOT4GUNS  (1)
Standard  (8)
start  (4)
started  (5)
starting  (3)
stat  (1)
state  (1)
statement  (3)
stating  (1)
STENOGRAPHER
 (6)
stenographic  (1)
stenographically  (1)
step  (3)
Stephanie  (5)
Steve  (1)
stipulate  (1)
Street  (1)
strike  (16)
striker  (33)
striker-fired  (1)
striker-sear  (4)
studies  (1)
study  (2)
subject  (3)
subjected  (1)
subjective  (5)
subjectively  (1)
submission  (1)
submissions  (1)
submit  (3)
submittal  (1)
submittals  (1)
submitted  (14)
submitting  (3)
substance  (1)
Suite  (1)
summer  (1)
sunshine  (1)

supervision  (1)
supplemental  (1)
support  (3)
supposed  (1)
suppressor  (5)
sure  (6)
swear  (1)
sworn  (1)
system  (6)
systems  (1)

< T >
tab  (1)
tabular  (2)
take  (7)
taken  (16)
takes  (1)
talk  (1)
talked  (1)
talking  (6)
Taylor  (6)
team  (16)
technical  (1)
technically  (1)
technician  (1)
technique  (1)
tell  (9)
ten  (1)
TERM  (6)
terms  (15)
test  (13)
tested  (1)
testified  (5)
testimony  (3)
testing  (26)
tests  (4)
Thank  (6)
Thanks  (1)
thing  (2)
things  (4)
think  (15)
thinking  (4)
thirty  (1)
Thomele  (1)
thoroughly  (1)
thought  (5)
three  (2)
till  (1)
time  (23)

times  (1)
timing  (1)
title  (2)
titles  (2)
today  (5)
today's  (1)
told  (4)
Toner  (7)
top  (5)
total  (9)
touching  (1)
town  (1)
trainer  (1)
training  (13)
transcribed  (1)
transcript  (5)
transcription  (1)
travel  (2)
trigger  (98)
triggers  (3)
trigger's  (2)
true  (1)
try  (2)
trying  (5)
Twice  (1)
two  (7)
two-page  (1)
TXT  (1)
type  (7)
types  (4)
typewriting  (1)
typical  (1)
typo  (1)

< U >
U.S  (1)
UGHETTA  (1)
Um-hum  (3)
unaware  (1)
undefined  (1)
underneath  (1)
understand  (17)
understanding  (12)
understood  (2)
undertake  (1)
undertaken  (1)
undertook  (2)
unholstering  (10)
uniform  (4)

unintentional  (*2*)
unintentionally  (*1*)
unique  (*6*)
uniquely  (*1*)
unit  (*1*)
untrained  (*1*)
use  (*9*)
user  (*7*)
Users  (*1*)
user's  (*1*)
uses  (*1*)
utilized  (*3*)
utilizing  (*1*)

< V >
various  (*1*)
verbally  (*1*)
verbatim  (*2*)
version  (*9*)
versions  (*1*)
versus  (*8*)
vibration  (*1*)
victim  (*1*)
video  (*5*)
Videographer  (*9*)
Videotaped  (*1*)
vocational  (*1*)

< W >
waive  (*1*)
want  (*23*)
wanted  (*2*)
way  (*7*)
ways  (*2*)
weapon  (*7*)
week  (*1*)
weight  (*3*)
weights  (*1*)
Well  (*30*)
went  (*2*)
We're  (*8*)
we've  (*3*)
whatsoever  (*1*)
WHEREOF  (*1*)
winter  (*1*)
wisdom  (*1*)
withstand  (*1*)
WITNESS  (*90*)
witnessed  (*1*)

Word  (*1*)
work  (*2*)
worked  (*4*)
working  (*5*)
worst  (*1*)
write-up  (*1*)
writing  (*1*)
written  (*1*)

< Y >
Yeah  (*6*)
year  (*7*)
years  (*5*)
Yep  (*1*)
yesterday  (*1*)
you-all  (*5*)

< Z >
zero  (*1*)
ZIMMERMAN  (*123*)
Zoom  (*7*)
zooming  (*1*)